HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
LAUREN COLLINS (Bar No. 240173)
E Mail: lauren_collins@fd.org
Deputy Federal Public Defender
CELESTE BACCHI (Bar No. 307119)
E Mail: celeste_bacchi@fd.org
Legal Research and Writing Specialist
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

ROSE D. ANGULO (Bar No. 261992)
E Mail: rose_angulo@fd.org
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone: (714) 338-4500
Facsimile: (714) 338-4520

Attorneys for Petitioner
David Allen Lucas

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ALLEN LUCAS, | NO. 15cv1224 GPC (WVG) |
| Petitioner, | **DEATH PENALTY CASE (HABEAS CORPUS)** |
| v. | **PETITION FOR WRIT OF HABEAS CORPUS** |
| RON DAVIS, Warden, California State Prison at San Quentin, | |
| Respondent. | |

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION .................................................................... 1

II.  PROCEDURAL HISTORY ...................................................... 3

    A.   Charges ......................................................................... 3

    B.   Presiding Judges and Consolidation ............................. 5

    C.   Proceedings Regarding Johnny Massingale ................. 5

    D.   In Limine Motions: All Cases ....................................... 6

        1.   Severance of Counts/Consolidation ..................... 6

        2.   Vindictive Prosecution ....................................... 6

        3.   Recusal Motion ................................................... 6

        4.   Jury Composition ................................................ 7

    E.   In Limine Motions: Jacobs ............................................ 7

        1.   *Hitch*/*Trombetta* Suppression Motion Concerning Loss or Destruction of Fingerprint on Love Insurance Note ................. 7

        2.   Defense Challenges to Opinion Testimony Comparing the Handprinting on the Love Insurance Note With the Handprinting of Lucas .............................................. 8

        3.   Denial of In-Court Testing of the Handprinting Expert ........... 8

        4.   Exclusion of Rochelle Coleman's Statement That Another Person Was the Author of the Love Insurance Note ................. 9

    F.   In Limine Motions: Santiago ....................................... 9

        1.   *Pitchess* Motion ............................................... 9

        2.   *Ballard* Motion ................................................ 10

        3.   Eyewitness Identification Issues ........................ 12

        4.   Expert Testimony Regarding Eyewitness Identification ......... 12

    G.   In Limine Motions: Swanke ......................................... 12

        1.   Challenge to Electrophoresis Evidence ................. 12

i

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

2.    Hearsay Statement by Shannon Lucas ..................................... 13

H.    In Limine Motions: Penalty ........................................................ 14

    1.    Motion to Exclude 1973 Prior Rape Conviction ..................... 14

I.    Guilt Phase ................................................................................ 14

J.    Penalty Phase ............................................................................ 16

    1.    Trial Proceedings ..................................................................... 16

    2.    Deliberations ............................................................................ 17

        a.    Juror Questions ........................................................................ 17

        b.    Inspection of Jury Room and Supplemental Instruction ....... 20

        c.    Juror Issues .............................................................................. 22

        d.    Jurors' Requests for Testimony ............................................... 23

K.    Verdict, New Trial, and Modification Motions ........................ 23

L.    Direct Appeal Proceedings ........................................................ 24

M.    State Habeas Proceedings .......................................................... 24

N.    Federal Habeas Proceedings ...................................................... 25

III.    JURISDICTIONAL ALLEGATIONS ...................................... 25

IV.    THE JACOBS CASE:  STATEMENT OF FACTS ...................... 26

A.    The Prosecution's Case ............................................................. 26

    1.    Chronology of Events on May 4, 1979 ................................... 26

    2.    The Crime Scene Investigation ............................................... 27

    3.    Injuries to the Victims ............................................................. 30

        a.    Suzanne Jacobs ........................................................................ 30

        b.    Colin Jacobs ............................................................................ 31

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

4.    The Arrest of John Massingale ................................................ 32

5.    Forensic Evidence ................................................................... 34

     a.    The Love Insurance Note ...................................................... 34

     b.    Boot Print Evidence............................................................. 36

     c.    Hair Comparison Evidence .................................................. 37

     d.    Blood and Fingerprint Evidence........................................... 38

6.    Lucas's Mother's MG Midget................................................. 39

7.    Lucas's Whereabouts on the Day of the Homicides ................ 39

B.    Defense Evidence ........................................................................... 40

    1.    John Massingale ..................................................................... 40

     a.    Pre-Confession Events........................................................... 40

     b.    Massingale's Confessions ...................................................... 43

     c.    Massingale's Violence Toward Women ............................... 46

     d.    The San Diego Salvation Army Rescue Mission.................. 46

    2.    Boot Print Evidence .............................................................. 47

    3.    The Love Insurance Note ...................................................... 48

    4.    Hair Evidence........................................................................ 49

    5.    The MG .................................................................................. 49

V.    THE SANTIAGO CASE:  STATEMENT OF FACTS ......................... 50

    A.    The Abduction and Assault of Jodie Santiago .......................... 50

     1.    Santiago's Injuries and Medical Treatment........................... 52

     2.    Investigation by the San Diego Sheriff's Office .................... 54

     3.    Santiago Returns to Seattle.................................................... 58

(15cv1224)

# TABLE OF CONTENTS

PAGE

4. December 1984 Meetings Between Santiago and San Diego Detectives ................................. 59

5. Additional Key Prosecution Evidence Against Lucas At Trial ................................................. 63

6. Defense Evidence ....................................................... 64

VI.  THE GARCIA CASE:  STATEMENT OF FACTS ........................................... 67

    A.  Prosecution Evidence ................................................................. 67

        1. Lucas's Activities Prior to the Homicide ................................. 67

        2. Events Leading to the Homicide ................................ 68

        3. The Crime Scene Investigation ................................ 69

        4. Injuries to the Victim ................................ 70

    B.  Defense Evidence ................................................................. 71

        1. Alibi Evidence ................................ 71

        2. Investigation of William and Richard Greene ....................... 72

        3. Knife Comparison Evidence ................................ 73

VII. THE STRANG/FISHER CASE:  STATEMENT OF FACTS ............................. 73

    A.  Prosecution Evidence ................................................................. 74

        1. Lucas's Relationship with Rhonda Strang and Her Family ................................ 74

        2. The Events Leading to the Homicides ................................ 74

        3. Autopsies Of the Victims ................................ 76

    B.  Defense Evidence ................................................................. 77

        1. Domestic Violence in the Strang Household ...................... 77

        2. Robert Strang's Drug Use ................................ 79

# TABLE OF CONTENTS

**PAGE**

VIII. THE SWANKE CASE:  STATEMENT OF FACTS ........................................... 80

    A.    Prosecution Evidence ............................................................................... 80

        1.    Lucas's Activities Before the Homicide ................................ 80

        2.    The Abduction of Anne Swanke ........................................... 81

        3.    Scratches on Lucas's Face .................................................... 83

        4.    Leyva's Contact With the Police........................................... 84

        5.    Discovery Of Anne Swanke's Body....................................... 84

        6.    Injuries to the Victim and Autopsy Report............................ 86

        7.    Lucas's Arrest and Police Searches ...................................... 88

        8.    Serological Evidence............................................................. 89

                a.    ABO Testing by San Diego Sheriff's Department............... 89

                b.    Testing By Serological Research Institute (SERI)............... 90

                        (1)    Brian Wraxall's Qualifications and SERI's Standards and Procedures ............................................ 90

                        (2)    SERI's Results .......................................................... 91

                              (a)    Swanke's Fingernail Clippings ........................... 92

                            (b)    SERI'S Genetic Marker Testing of the Sheepskin............................................................ 93

        9.    Electrophoretic Testing by the San Diego County Sheriff's Department............................................................................ 95

    B.    Defense Evidence................................................................................... 95

        1.    Drug and Alcohol Use by Frank and Cecelia Clark ............ 95

        2.    Scratches on Lucas's Face .................................................... 95

        3.    Defense Testimony Regarding the Physical Evidence............ 96

                a.    Vehicle Description at the Kidnap Site ................................. 96

v

# TABLE OF CONTENTS

**PAGE**

b.    Fingerprint Evidence ............................................................. 96

c.    The Dog Chain ....................................................................... 96

d.    Hair Evidence ........................................................................ 97

e.    Serological Evidence ............................................................. 98

(1)    Wraxall's Civil Suit                                         98

(2)    San Diego County's ABO Testing of Sheepskin
Stain on Passenger Seat                                     98

(3)    ABO Testing by SERI                                         98

(4)    Electrophoretic Testing by SERI                            99

(5)    SERI's Testing Procedures                                  99

(6)    Wraxall's Character                                         100

IX.    PENALTY PHASE STATEMENT OF FACTS ................................ 100

A.    Prosecution Case in Aggravation ................................................ 100

B.    Defense Evidence ........................................................................ 101

1.    Family and Friends .............................................................. 101

2.    Attorney Anthony Gilham ................................................... 105

3.    Loyal Tallchief .................................................................... 106

4.    Dr. Alvin Marks ................................................................... 107

5.    Prison Conditions ................................................................ 112

C.    Prosecution Rebuttal Evidence ................................................... 113

1.    Laura Stewart ....................................................................... 113

2.    "Pruno" Incidents ................................................................ 114

3.    Possession of a Broomstick ................................................. 114

D.    Defense Surrebuttal ..................................................................... 115

vi

# TABLE OF CONTENTS

**PAGE**

E.    Closing Arguments...................................................................115

X.    INCORPORATION OF EXHIBITS AND REQUEST FOR JUDICIAL NOTICE...................................................................117

XI.    GENERAL ALLEGATIONS ...........................................................118

XII.    STANDARDS OF REVIEW ...........................................................121

    A.    AEDPA Limitations on Relief ..............................................121

    B.    Suspension of the Writ .......................................................123

XIII.  CLAIMS FOR RELIEF ...............................................................125

CLAIM 1:  LUCAS'S FEDERAL CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY TRIAL COURT ERRORS REGARDING THE ADMISSION OF THE LOVE INSURANCE NOTE...............................................125

    A.    Introduction ....................................................................125

    B.    The Trial Court Erred in Admitting Photographic Copies of the Love Insurance Note in Violation of the Best Evidence Rule ..............................................................................127

        1.    The Failure of the Trial Court to Apply the Best Evidence Rule Was Unreasonable in Light of the Circumstances and Rendered Lucas's Trial Fundamentally Unfair.............................................. 127

        2.    To the Extent That Trial Counsel Failed to Adequately Object Under the Best Evidence Rule to the Admission of Photographs of the Love Insurance Note, Counsel Was Ineffective................................................... 130

    C.    The Trial Court Erred in Admitting Photographic Copies of the Love Insurance Note in Violation of California Evidence Codes §§ 1531 and 1551 .........................................................131

        1.    Lucas's Due Process Rights Were Violated by the Erroneous Admission of an Uncertified Copy of the Love Insurance Note ........................................... 131

        2.    To the Extent That Trial Counsel Failed to Adequately Object Under Sections 1531 and 1551 to the Admission of the Love Insurance Note, Counsel Was Ineffective .......... 133

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

D.    Lucas's Due Process Rights Were Violated When the Trial Court Erroneously Admitted the Photographs of the Love Insurance Note Without Making the Required Preliminary Finding of Accuracy Under Evidence Code Sections 1400 and 1401 and Erroneously Failed to Instruct the Jury on Contested Authentication ............................................................ 134

CLAIM 2:  LUCAS'S RIGHT TO DUE PROCESS, RIGHT TO PRESENT A DEFENSE, AND RIGHT TO CONFRONTATION WERE VIOLATED BY THE STATE COURT'S ERRORS REGARDING THE ADMISSIBILITY OF THE PROSECUTION'S COMPARATIVE HANDWRITING ANALYSIS ....... 137

A.    Relevant Law ................................................................... 137

B.    Relevant Procedural Background and Supporting Facts ........................ 138

    1.    In Limine Proceedings—Prosecution Witnesses .................. 138

    2.    In Limine Proceedings—Defense Witnesses ........................ 142

    3.    Trial Proceedings ................................................. 143

C.    Lucas's Right to Present a Defense Was Violated by the Trial Court's Refusal to Admit Defense Evidence Which Countered the Prosecution's Lay and Expert Opinion Testimony Regarding Who Wrote the Love Insurance Note ....................................................... 146

    1.    The Trial Court Violated Lucas's Rights by Refusing to Consider Proffered Expert Witnesses and Evidence Supporting Lucas's In Limine Motions to Exclude Harris's Testimony ..................................................... 147

    2.    Even If Harris's Handprinting Opinion Was Properly Admitted, the Trial Court Violated Lucas's Right to Present a Defense by Erroneously Excluding Defense Experts, Proficiency Studies, and In-Court Testing at Trial ............................................................... 149

    3.    The Trial Court Violated Lucas's Right to Present a Defense by Erroneously Excluding Coleman's Statement That David Woods Authored the Love Insurance Note ................................................. 151

# TABLE OF CONTENTS

**PAGE**

4.   The Exclusion of Defense Experts, In-Court Testimony, and Coleman's Statement at Trial Unconstitutionally Impaired the Jury's Ability to Assess Harris's Credibility .... 153

D.   The State Violated Lucas's Right to Due Process, Confrontation, and Equal Protection When It Failed to Follow Its Procedures for the Admission of Evidence at Trial ................................................ 154

1.   The Trial Court Violated Lucas's Rights to Due Process, Confrontation, and Equal Protection by Allowing the Prosecution's Expert to Testify Without the In-Court Testing Requested by the Defense ........................................ 155

2.   The Trial Court Arbitrarily Violated Lucas's Due Process Rights by Improperly Shifting the Section 352 Burden to the Defense and By Finding That the Probative Value of Harris's Opinion Outweighed Any Prejudicial Impact ...... 156

3.   Harris's Opinion That He Was "Reasonably Certain" That Lucas Authored the Note Should Have Been Excluded Under California Evidence Law and State and Federal Due Process Principles ..................................... 157

4.   The Trial Court Arbitrarily Denied Lucas's Request to Require the Jury to Make a Preliminary Finding of Uniqueness Before Using Handwriting Comparison for Purposes of Identification ..................................... 159

E.   Unreliable Comparative Handwriting Evidence Was Erroneously Introduced at Lucas's Trial ............................... 160

1.   Handwriting Comparison is Unreliable and Has Not Been Validated by the Scientific Community ...................... 160

2.   Because Handwriting and Handprinting Comparison is an Unproven Scientific Technique, *Kelly/Frye* Should Have Been Applied ..................................... 162

3.   Even If A *Kelly* Hearing Was Not Necessary For Handwriting Comparison, A Hearing Was Required As To Handprinting Comparison ............................ 165

4.   *Kelly* Should Not Be Limited To Expert Opinions Regarding Matters That Are Both "New" and "Scientific" ... 165

ix

# TABLE OF CONTENTS

**PAGE**

5.    Even If Prong One of *Kelly* Is Not Applicable to Handprinting Comparison, Prong Three Should Be Applicable ........................................................................ 166

6.    The Failure to Hold a *Kelly* Hearing Violated the Federal Constitution.......................................................................... 167

7.    The Fingerprint Evidence Should Have Been Excluded Under the *Daubert/Kumho* Standard.................................... 168

F.    Handprinting Comparison From a Photograph is Unreliable and Should Have Been Excluded................................................... 170

1.    Using Photographs Rather Than the Original Note Rendered Lucas's Trial Fundamentally Unfair ..................................... 170

2.    To the Extent That Trial Counsel Failed to Adequately Object to the Admission of Expert Testimony Based on the Use of Photographs of the Love Insurance Note Rather Than the Original, Counsel Was Ineffective ................................. 171

G.    Clark's Opinion That Lucas Authored the Love Insurance Note Should Have Been Excluded .................................................................. 172

H.    The Errors Were Not Harmless............................................................. 174

CLAIM 3: THE DISTRICT ATTORNEY'S OFFICE DEPRIVED LUCAS OF A FAIR TRIAL BY PURSUING INCONSISTENT THEORIES OF THE CASE IN VIOLATION OF THE DUE PROCESS CLAUSE ....................................................... 177

CLAIM 4: LUCAS'S RIGHT TO DUE PROCESS, RIGHT TO PRESENT A DEFENSE, RIGHT TO COMPULSORY PROCESS, AND RIGHT TO CONFRONTATION WERE VIOLATED BY THE STATE COURT'S ERRORS REGARDING THE EYEWITNESS IDENTIFICATIONS AND TESTIMONY OF JODIE SANTIAGO........................................................................................................ 180

A.    Introduction ........................................................................................... 180

B.    Relevant Law.......................................................................................... 181

1.    Suppression of Eyewitness Identification Evidence.............. 181

2.    Denial of the Right to Present a Defense ............................... 182

# TABLE OF CONTENTS

**PAGE**

C.   Santiago's Identification of Lucas Was the Product of Unnecessarily Suggestive Pretrial Procedures Conducive to Irreparable Mistaken Identification and Should Have Been Suppressed ................................... 183

    1.   The Events Prior To the Photo Lineup Were Suggestive and Conducive To an Irreparable Mistaken Identification .............................................................................. 184

    2.   The Photo Lineup Was Unnecessarily Suggestive and Conducive To an Irreparable Mistaken Identification .............................................................................. 185

    3.   Santiago's Identifications of Lucas's House Should Also Have Been Suppressed as the Unreliable Product of Suggestive Pretrial Identification Procedures ................... 186

    4.   The Problems Inherent in Santiago's Identification and Testimony Were Compounded by the State Court's Exclusion of Santiago's Subjective Impression of the Lineup .................................................................................. 188

    5.   The Reliability Requirements of the Federal Constitution Require That the Witness Be Given Full and Fair Instructions and Double-Blind Sequential Photo Lineups ..... 189

        a.   Full and Fair Instructions ................................... 189

        b.   Double-Blind Lineups ........................................ 191

D.   Exclusion of the Testimony of the Defense Eyewitness Identification Experts Rendered Lucas's Trial Fundamentally Unfair ......................... 192

E.   Lucas Was Denied His Right to Present a Defense When the State Court Precluded the Defense Theory That the Detectives Intentionally Assembled a Suggestive Photo Lineup ..................................... 194

F.   Failure to Permit Discovery and Evidence Relating to Santiago's Ability to Remember the Matters to Which She Testified Was Error ..... 195

    1.   The State Court Erroneously Denied the Defense Request for Neuropsychological and Psychological Testing Agreed to by Santiago ................................................................... 195

    2.   The State Court Erred in Excluding Evidence That Santiago Left a Bar With a Stranger the Night Before the Attack ........ 196

# TABLE OF CONTENTS

**PAGE**

3. The State Court Denied Lucas's Right to Present a Defense By Excluding Expert Testimony as to Santiago's Ability to Remember the Events to Which She Testified ...................... 197

4. The State Court's Denied Lucas's Right to Present a Defense by Excluding Evidence as to the Importance of Testing in Evaluating Santiago's Ability to Remember......... 198

G. These Errors, Taken Individually or Cumulatively, Were Not Harmless ........................................................................ 198

CLAIM 5: LUCAS'S RIGHTS TO DUE PROCESS AND CONFRONTATION WERE DENIED BY THE STATE COURT'S EXCLUSION OF IMPEACHMENT EVIDENCE AGAINST THE HOMICIDE DETECTIVES IN THE SANTIAGO CASE ..................................................................................... 200

A. Relevant Law.................................................................. 200

B. Relevant Facts ............................................................... 200

CLAIM 6: THE JUDGE UNDERMINED THE DEFENSE THEORY OF THIRD PARTY GUILT BY EXCLUDING EVIDENCE ABOUT THE SUSPICIOUS ACTIVITIES OF ANNE SWANKE'S FORMER BOYFRIEND.............................. 205

A. Relevant Law.................................................................. 205

B. Facts in Support of the Claim ................................................. 206

CLAIM 7: THE ADMISSIBILITY OF THE EXPERT SEROLOGICAL EVIDENCE IN SWANKE VIOLATED LUCAS'S RIGHT TO DUE PROCESS, RIGHT TO COUNSEL, AND RIGHT TO CONFRONTATION .......... 210

A. Introduction .................................................................. 210

B. Relevant Law.................................................................. 211

C. The ABO Testing Evidence Failed To Satisfy Prong 3 of *Kelly*............. 213

1. SDSO's ABO Testing .......................................... 213

2. SERI's ABO Testing............................................ 214

D. The Electrophoretic Testing Evidence Failed To Satisfy Prong 3 of *Kelly* .......................................................................... 214

# TABLE OF CONTENTS

**PAGE**

1. The SERI Electrophoresis Testing Failed Prong 3 of *Kelly* Because It Reported Matches When the Readers Disagreed ........................................................................ 214

2. SERI's Failure To Comply With the Double-Reader Agreement Requirement Was Not Excused By Photographing the Results ...................................................... 215

3. Failure of SERI to Follow Its Own Electrophoresis Protocol Violated Prong 3 ...................................... 217

4. The Legal and Scientific Community Has Rejected Expert Conclusions Which are Based on the Subjective Experience of the Expert Rather Than Objective Standards and Criteria ........................................................ 218

5. Subjective Expert Opinions Should Be Excluded Under *Kelly* ........................................................................ 219

E. The Wraxall Gm and Km Electrophoresis Results Should Have Been Excluded Under *Kelly/Frye* ...................................... 219

1. The Electrophoresis Evidence Should Have Been Excluded Under the *Daubert/Kumho* Standard .................................... 221

F. The Constitutional Rights to Counsel and Confrontation Require the Prosecution To Notify Defense Counsel Before Conducting Blood Testing Which Cannot Be Preserved .............................. 222

G. The Trial Court's Erroneous Rulings on the Swanke Serological Evidence, Taken Individually or Cumulatively, Were Prejudicial and Not Harmless .................................................................... 223

CLAIM 8: THE DEFENSE DID NOT HAVE A FAIR OPPORTUNITY TO LITIGATE ITS CHALLENGE TO THE COMPOSITION OF LUCAS' JURY ........ 224

A. Relevant Law ........................................................................ 224

B. The State Court Improperly Denied Discovery .......................... 225

1. Necessity For Additional Discovery ............................ 225

2. The Failure To Allow Access To The Necessary Jury Commission Information Was Error .............................. 227

xiii

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

C.   The Trial Court Erroneously Refused an Evidentiary Hearing on the Jury Composition Challenge ........................................................229

    3.   An Evidentiary Hearing Should Have Been Granted as to the Underrepresentation of Hispanics ................................... 229

    4.   The Judge Erroneously Denied an Evidentiary Hearing on Whether 18 to 24 Year Olds Are a Cognizable Class ............ 231

D.   The Judgment Should Be Vacated ........................................................231

E.   Ineffective Assistance of Counsel ........................................................231

CLAIM 9:  LUCAS WAS DENIED HIS RIGHT TO CONFRONT MASSINGALE ........................................................................................232

A.   Relevant Law ........................................................................................232

B.   Relevant Facts ......................................................................................233

C.   The Error Was Not Harmless ...............................................................236

CLAIM 10:  COUNSEL WERE INEFFECTIVE AT GUILT PHASE ......................237

A.   Introduction ..........................................................................................237

B.   Relevant Law ........................................................................................238

C.   Trial Counsel Failed to Present Defense Handprinting Experts, Proficiency Studies, and In-Court Testing of the Prosecution Expert Supporting Lucas's Defense That the He Did Not Write the Love Insurance Note ......................................................................................239

D.   Trial Counsel Failed to Renew the Motion to Sever After the Presentation of the Defense Case .........................................................240

E.   Trial Counsel Failed to Offer Readily Available Evidence to Satisfy the Court's Concerns About the Admissibility of Evidence Presented by the Defense Handwriting Experts ......................................................242

F.   Trial Counsel Failed to Retain an Expert to Empirically Test the Fairness of the Photo Lineup ................................................................246

G.   Trial Counsel Failed to Request Sanctions Based Upon the State's Destruction of Biological Material on the Jacobs Hair Evidence............251

# TABLE OF CONTENTS

**PAGE**

H.    Trial Counsel Failed to Make Necessary Objections to Defend and Preserve Lucas's Rights ........................................................................252

I.    Cumulative Prejudice ................................................................254

CLAIM 11: THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE MEDIA TO PUBLISH THE JURORS' NAMES AND ADDRESSES ............256

CLAIM 12:  LUCAS WAS CONVICTED ON FAULTY SCIENTIFIC EVIDENCE....................................................................................................258

CLAIM 13:  LUCAS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE STATE'S FAILURE TO PRESERVE KEY PHYSICAL EVIDENCE ............261

A.    Relevant Law...........................................................................261

B.    Lost, Destroyed, and/or Missing Material Evidence in the Lucas Case...........................................................................262

    1.    The Latent Fingerprint and Photograph of the Fingerprint on the Love Insurance Note...................................................262

    2.    Evidence Collected From the Santiago Rape Kit ..................265

    3.    Hair Found in Suzanne Jacobs's Hands ................................268

    4.    Records of the Pretrial Identification Procedures Used by the San Diego Sheriff's Office in the Santiago Case ............269

    5.    Massingale's Shirt ...............................................................273

    6.    Forensic Evidence That Was Not Collected or Was Lost From the Jacobs Crime Scene.................................................274

C.    The Loss, Destruction, and/or Failure to Preserve Evidence Violated Lucas's Due Process Rights ......................................................275

CLAIM 14:  THE PROSECUTOR'S FAILURE TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE VIOLATED LUCAS'S RIGHT TO A FAIR TRIAL ........................................................................................................276

A.    Relevant Law...........................................................................276

xv

(15cv1224)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

B.    The State's Failure to Disclose Hartman's Criminal Conduct Violated Lucas's Due Process Right to Impeach the State's Witnesses and Present His Defense ............................................................................... 277

C.    The State's Failure to Timely Disclose Impeachment Evidence Regarding John Massingale Violated Lucas's Due Process Right to Impeach the State's Witnesses and Present His Defense ........................ 280

D.    The State's Failure to Timely Disclose the Four Photos Shown to Massingale During His Interrogation and Confession Violated Lucas's Due Process Right to Impeach the State's Witnesses and Present His Defense .................................................................................................. 282

E.    Taken Individually or Cumulatively, the State's Violations of Its Duty to Disclose Prejudiced Lucas and Were Not Harmless ........................ 283

CLAIM 15:  COUNSEL WERE INEFFECTIVE AT PENALTY  ............. 284

A.    Introduction ................................................................................. 284

B.    Relevant Law .............................................................................. 284

    1.    Deficient Performance ........................................................... 284

    2.    Prejudice ............................................................................... 285

    3.    Prevailing Professional Norms for Capital Defense Counsel in 1986-89 .................................................................. 287

C.    Trial Counsel were Ineffective for Opening the Door to Prejudicial Evidence .................................................................... 288

    1.    Relevant Facts ....................................................................... 289

        a.    Dr. Alvin Marks ............................................................... 289

        b.    The Chronology ............................................................... 294

    2.    Trial Counsel Mistakenly Opened the Door to Unfavorable Evidence ........................................................... 295

        a.    Deficient Performance ...................................................... 295

        b.    Prejudice ......................................................................... 297

xvi

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

3.   Trial Counsel Failed to Rebut, Challenge or Contextualize the Inflammatory Diagnosis ................................ 298

    a.   Deficient Performance ......................................... 298

        (1)   Inaccurate Social History ........................... 299

        (2)   The ASH Diagnosis Was Made Using an Outdated DSM ......................................... 301

        (3)   Biological Components of Mental Illness ................. 301

    b.   Prejudice ......................................................... 302

D.   Trial Counsel Were Ineffective for Failing Adequately to Investigate Lucas's Life History ............................................ 303

    1.   Introduction ...................................................... 303

    2.   Duty to Investigate, Present, and Explain the Significance of Available Mitigating Evidence ............................ 304

    3.   Lucas's Counsel Unreasonably Failed to Retain a Qualified Mitigation Specialist and Qualified Experts ......... 305

    4.   Reasonable Counsel Would Have Presented Mitigating Evidence ........................................................ 307

    5.   Mitigation Not Presented to Lucas's Jurors ........................ 307

        a.   Physical Trauma Inflicted On Lucas By His Father ........... 308

        b.   Psychological Battering and Emotional Neglect ................. 311

        c.   Vicarious Trauma ..................................... 313

        d.   Disordered Attachment ................................ 314

        e.   Lucas's Family History and Genetic Vulnerability ........... 315

        f.   Lack of Protective Buffers ............................ 318

        g.   Post-Traumatic Stress Disorder ........................ 319

# TABLE OF CONTENTS

**PAGE**

h.    Substance Abuse and Related Disorders ............................ 325

i.    Trauma in Marriage ............................................................ 332

j.    Exposure to Neurotoxins ................................................... 332

k.    Impact on Lucas's Demeanor at Trial ............................... 333

l.    Institutional Failure ........................................................... 333

6.    Lucas was Prejudiced Under *Strickland* Prong Two
Due to Counsel's Deficient Performance ............................ 340

E.    Counsel Were Ineffective for Failing to Clarify Dr. Marks's
Misleading Testimony That Lucas's Brain Damage Was
"Minimal" ................................................................................... 343

F.    Counsel Were Ineffective for Failing to Rebut the Prosecution's
Suggestion That Lucas Did Not Express Remorse ................... 347

G.    Miscellaneous Penalty Phase Failures ..................................... 348

1.    Failure to Object to the Prosecutor's Closing Argument ....... 348

2.    Failure to Seek Review of the Denial of the
Disqualification Motion ........................................................ 349

3.    Failure to Preserve Trial Court Error Claims ....................... 349

4.    Failure to Object to Improper Argument ............................... 349

H.    Lucas's Death Sentence Was Based on Incomplete, Inaccurate
and Unreliable Evidence ........................................................... 350

I.    Cumulative Penalty Phase Prejudice ......................................... 350

CLAIM 16:  THE TRIAL COURT IMPROPERLY ADMONISHED THE JURY
TO ACCEPT THE ATASCADERO DIAGNOSIS AS A PROVEN FACT ............. 351

xviii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**PAGE**

CLAIM 17:  LUCAS WAS IMPROPERLY INDUCED TO LEAVE THE IN CAMERA HEARING ON DEFENSE COUNSEL'S INEFFECTIVENESS  ............354

    A.    Relevant Law.......................................................................354

    B.    Relevant Facts ...................................................................355

    C.    Lucas's Absence at a Secret Chambers Conference Violated His Constitutional Rights...............................................................356

    D.    The Error Was Structural and, Therefore, Reversible Per Se .................360

CLAIM 18:  THE TRIAL COURT IMPROPERLY PRECLUDED VOIR DIRE AS TO WHETHER LUCAS'S PRIOR RAPE CONVICTION WOULD PREVENT THE JURORS FROM PERFORMING THE REQUIRED WEIGHING OF AGGRAVATION AND MITIGATION ........................................................360

CLAIM 19:  THE TRIAL COURT ERRONEOUSLY DENIED LUCAS'S MOTION TO STRIKE THE ONLY AGGRAVATING EVIDENCE .......................364

    A.    Introduction .....................................................................364

    B.    Relevant Law.....................................................................365

    C.    Relevant Facts ...................................................................365

    D.    Trial Counsel in the 1973 Case was Ineffective ...........................366

        1.    Relevant Facts ........................................................ 366

            a.    Prosecution Evidence at the 1973 Trial..............................366

            b.    Defense Evidence at the 1973 Trial ...................................368

            c.    The Prosecution's Changing Timeframes ...........................368

            d.    Petition for Writ of Coram Nobis....................................369

        2.    Counsel in the 1973 Case Rendered Deficient Performance . 369

        3.    Lucas Was Prejudiced by his Counsel's Ineffectiveness at his 1973 Trial ....................................................... 373

    E.    Appellate Counsel in the 1973 Case was Ineffective..............................375

        1.    Relevant Facts ........................................................ 375

# TABLE OF CONTENTS

**PAGE**

2.     Arm's Representation Created a Conflict of Interest ............ 376

3.     Arm's Representation Was Ineffective.................................. 377

F.     The Trial Court Erred in Refusing to Strike the Prior ............................378

G.     The Error Was Not Harmless..................................................................378

CLAIM 20:  THE TRIAL COURT IMPROPERLY PRECLUDED MITIGATING
EVIDENCE...................................................................................................380

A.     Relevant Facts ........................................................................................381

B.     The Trial Court Improperly Excluded Critical Mitigation
Evidence ................................................................................................383

C.     The Error Was Not Harmless.................................................................384

CLAIM 21:  LUCAS'S RIGHTS WERE VIOLATED BY THE TRIAL COURT'S
DISPOSITION OF JUROR NOTES REGARDING THE DEATH OF JUROR
P.W.'S FATHER, WITHOUT NOTIFYING LUCAS OR HIS COUNSEL ..............385

A.     Introduction ............................................................................................385

B.     Relevant Law..........................................................................................386

C.     Lucas's Denial Of Counsel Was Constitutional Error Because It
Happened At a Crucial Stage Of The Proceedings Which May
Have Affected Lucas's Substantial Rights ..............................................386

D.     Prejudice.................................................................................................387

CLAIM 22:  FAILURE TO RE-VOIR DIRE THE JURORS PRIOR TO THE
PENALTY TRIAL AND TO GIVE AN ADEQUATE CAUTIONARY
INSTRUCTION WAS PREJUDICIAL ERROR .........................................................388

A.     Introduction and Relevant Law..............................................................388

B.     Re-Voir Dire Was Necessary In the Present Case ...................................389

C.     The Instructions Did Not Cure the Jurors' Biases .................................390

D.     The Penalty Judgment Should Be Reversed ...........................................393

E.     Ineffective Assistance of Counsel...........................................................393

# TABLE OF CONTENTS

**PAGE**

CLAIM 23:  THE TRIAL COURT WAS BIASED REGARDING THE 1973 PRIOR OFFENSE ....................................................................394

    A.    Relevant Law....................................................................395

    B.    Relevant Facts ................................................................396

    C.    The Trial Court had the Appearance of Bias ..........................398

CLAIM 24:  THE JUDGE ENGAGED IN JURY-TAMPERING BY ORDERING THE BAILIFF TO INSPECT THE DELIBERATION ROOM DURING RECESSES, AND BY GIVING A SPECIAL SUPPLEMENTAL INSTRUCTION IN LIGHT OF WHAT THE BAILIFF LEARNED .....................................................399

    A.    Introduction ...................................................................399

    B.    Relevant Law....................................................................399

    C.    The Trial Court Improperly Invaded the Jurors' Privacy .......................400

    D.    The Judge Improperly Used the Knowledge Gleaned From the Jury Room Intrusion To Influence The Course of the Deliberations ................................................................401

    E.    Assuming Arguendo that Relying on the Bailiff's and Trial Court's Observation of the Jury Room Was Not Improper, the Resultant Finding was Unfair, Unreliable, and Unconstitutional ...........403

        1.    The Trial Court's Process Violated Fundamental Rights....... 403

        2.    The Trial Court's Process was Unreliable.............................. 403

    F.    The Error Was Structural and Reversible Per Se.....................................404

    G.    If Not Reversible Per Se, the Secret Monitoring Of The Deliberations And the Unwarranted Supplemental Instruction Were Prejudicial To Lucas .................................................404

    H.    Counsel's Failure to Object Violated Lucas's Right to Effective Assistance of Counsel ...............................................406

CLAIM 25:  THE PROSECUTOR'S CLOSING ARGUMENTS WERE IMPROPER....................................................................406

    A.    The Prosecution Improperly Relied on Biblical Law and a "Good v. Evil" Paradigm for the Sentencing Decision .........................407

xxi

# TABLE OF CONTENTS

**PAGE**

B.   The Prosecutor's Argument Improperly Minimized the Jurors' Role .....412

C.   The Prosecutor Improperly Encouraged the Jury to Disregard Mitigating Factors ................................................................413

D.   Indiviually and Cumulatively, the Prosecution's Misconduct Prejudiced Lucas ................................................................415

CLAIM 26:  THE PENALTY JURY WAS NOT IMPARTIAL BECAUSE A JUROR WAS SUBSTANTIALLY LEANING IN FAVOR OF DEATH ..................416

A.   Relevant Law................................................................416

B.   Relevant Facts ................................................................418

C.   Arbitrary Denial of a State Created Right Violates the Due Process Clause Of the Federal Constitution................................419

D.   The Error Was Structural and the Judgment Must Be Reversed ............419

CLAIM 27:  DURING VOIR DIRE, ONE JUROR MADE FALSE STATEMENTS AND TWO JURORS MISREPRESENTED THEIR ABILITY TO BE OPEN MINDED................................................................420

A.   Introduction ................................................................420

B.   Relevant Law ................................................................420

C.   Juror Misconduct During Voir Dire Violated Lucas's Rights ................421

1.   Lying on Voir Dire................................................ 421

2.   Misrepresentation of Ability to Remain Open Minded ......... 423

CLAIM 28:  LUCAS IS ENTITLED TO A NEW TRIAL BECAUSE THE JURORS CONSIDERED EVIDENCE NOT PRODUCED AT TRIAL ....................425

CLAIM 29:  JUROR D.O., WHO VOTED FOR THE GUILT VERDICTS, DID NOT "CONSCIENTIOUSLY CONSIDER THE EVIDENCE" AND OPERATED "FALSELY IN THE JURY ROOM" AS FOUND BY THE TRIAL COURT AT PENALTY ................................................................428

A.   Introduction ................................................................428

B.   Relevant Law................................................................428

C.   Relevant Facts ................................................................429

# TABLE OF CONTENTS

**PAGE**

D.    Juror D.O.'s Guilt-Phase Participation Rendered the Trial Unfair..........430

CLAIM 30:  THE TRIAL COURT VIOLATED LUCAS'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY IMPROPERLY INSTRUCTING THE JURY ON THE CROSS-ADMISSIBILITY OF EVIDENCE .................................................432

A.    The Other Crimes Evidence Was Emphasized To the Exclusion Of Other Evidence, In Violation of Lucas's Sixth and Fourteenth Amendment Rights...................................................................................433

B.    The Other Crimes Instruction Erroneously Failed To Require the Jurors To Determine That Lucas Committed the Other Offense Before Cross-Considering It ....................................................................433

C.    The Instructions Impermissibly Allowed The Jury To Cross-Consider The Charges On The Issue Of Identity Without Making The Prerequisite Finding That The Other Offenses Shared Signature-Like Similarities............................................436

D.    The Other Crimes Instruction Unconstitutionally Failed To Present the Defense Side Of The Issue..................................................................437

E.    The Other Crimes Instruction Erroneously Failed To Require Juror Unanimity As To The Existence Of The Requisite Cross-Offense Similarity Needed As a Prerequisite To Consideration Of Other Crimes Evidence ........................................................................................438

F.    The Standard For Determining Whether the Defendant Committed the Other Offenses Should Have Been Proof Beyond A Reasonable Doubt......................................................................................................439

G.    The Court's Errors Were Prejudicial ......................................................440

CLAIM 31:  JURY INSTRUCTIONS:  EVIDENTIARY AND DELIBERATION...440

A.    The Preliminary Guilt Phase Instructions Tilted the Field in Favor of the Prosecution ........................................................................................441

B.    The Trial Court Unconstitutionally Refused to Give a Cautionary Accomplice Instruction as to Third-Party Suspect Massingale...............442

# TABLE OF CONTENTS

**PAGE**

C.    The Trial Court Improperly Denied the Defense's Request For an "Immunity Agreement" Instruction ........................................................... 442

D.    The Judge's Consistent and Arbitrary Denial Of Requested Preliminary Finding Instructions, Which Were Mandatory Under Evidence Code § 403(C), Violated Lucas's Due Process Rights ........... 443

E.    The Trial Judge Improperly Rejected the Defense's Request To Define the Term "Inference" In the Jury Instructions ............................ 444

F.    The Instructions Improperly Allowed the Jury Not To Consider All the Evidence ..................................................................................... 445

G.    The Judge Erroneously Denied The Defense Request To Specify Which Opinion Testimony Was Circumstantial Evidence ..................... 446

H.    The Judge Improperly Coerced The Jurors By Admonishing Them That They Were Expected To Reach A Just Verdict ............................... 448

I.    The Final Instructions Were Cumulatively Deficient ............................. 449

    1.    The Trial Court's Instructions Improperly Framed the Issues In Terms Of Finding Guilt or Innocence .................... 449

    2.    The Instruction Regarding "Willfully False" Testimony Improperly Failed To Define "Material ................................. 449

    3.    The Trial Court's Instructions Improperly Lessened the Prosecution's Burden Through CALJIC 2.21.2's "Probability Of Truth" Language and CALJIC 2.22.'s "Convincing Force" Language ............................................. 450

    4.    The Trial Court Improperly Limited Instructions Regarding Witness Credibility to Witnesses who Testified Under Oath ............................................................ 450

    5.    Numerous Instructions Were Improperly Limited To the Testimony Of "Witnesses" ................................................ 451

    6.    The Instructions Improperly Failed To Instruct the Jurors How to Consider Transcripts Read Into the Record ..................................................................................... 451

J.    The Instructions Were Not Sufficiently Understandable to Satisfy the Eighth and Fourteenth Amendment Reliability Requirements of the Federal Constitution ........................................................................ 452

xxiv

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

K.   The Errors Were Prejudicial..................................................................454

CLAIM 32:  THE TRIAL COURT VIOLATED LUCAS'S RIGHT TO A FAIR
TRIAL BY COMMITTING NUMEROUS ERRORS IN INSTRUCTING THE
JURY ON THE BURDEN OF PROOF AS TO EACH OF THE CHARGED
MURDERS ...........................................................................................454

A.   The Jury Instructions Unconstitutionally Lightened the
     Prosecution's Burden Of Proof And Deprived Lucas Of
     A Fair Trial..................................................................................455

B.   The Trial Court's Instructions Failed Adequately to Define
     or Explain the Burden of Proof ...................................................455

C.   The Trial Court's Instructions Failed To Affirmatively Instruct
     That The Defense Had No Obligation To Present Or Refute .................455

D.   The Trial Court's Instructions Improperly Described the
     Prosecution's Burden as Continuing "Until" the Contrary
     is Proved.....................................................................................456

E.   The Trial Court Failed to Instruct That The Prosecution's
     Burden Applies To Every Essential Element Of The Charge .................456

F.   The Trial Court's Instructions Improperly Suggested that the
     Defendant Must Produce Evidence In Order To Raise A
     Reasonable Doubt .......................................................................457

G.   The Burden of Proof Instructions Failed to Adequately Define
     the Standard of Proof ..................................................................458

H.   The Trial Court Improperly Refused the Defense's Request for
     Comparison of Proof Beyond a Reasonable Doubt with Other
     Burdens.......................................................................................459

I.   The Trial Court's Instructions Unconstitutionally Implied That
     Reasonable Doubt Requires Jurors to Articulate Reason and Logic
     for Their Doubt ...........................................................................459

J.   The Trial Court's Instructions Unconstitutionally Distinguished
     Possible from Reasonable Doubt .................................................459

K.   The Trial Court Improperly Instructed Jurors to Take Moral
     Considerations into Account in Deciding Guilt............................460

(15cv1224)

# TABLE OF CONTENTS

PAGE

L.    The Trial Court's Instructions Improperly Lightened The Prosecution's Burden Of Proof, and Created a Conclusive Presumption Of Guilt, Through Circumstantial Evidence Instructions (CALJIC 2.01 And 2.02) ..................... 461

M.    The Trial Court's Instructions Improperly Limited CALJIC 2.01's Burden of Proof Principles to Circumstantial Evidence .......................... 461

N.    The Trial Court's Errors Were Structural Error ....................................... 462

CLAIM 33:  THE COURT UNCONSTITUTIONALLY REFUSED TO GIVE A CALJIC 2.03 CONSCIOUSNESS OF GUILT INSTRUCTION AS TO MASSINGALE ........................... 462

CLAIM 34:  THE TRIAL COURT'S INSTRUCTIONS IMPROPERLY SHIFTED THE BURDEN TO LUCAS ON THIRD PARTY GUILT ........................ 463

CLAIM 35:  LUCAS'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BY NUMEROUS INSTRUCTIONAL ERRORS ..................... 465

A.    The Jury Was Unconstitutionally Permitted To Rely On Lucas's Guilt Phase Conviction In Determining Whether Lucas's Guilt Of The 1973 Rape Had Been Proven Beyond a Reasonable Doubt ........ 465

B.    The Factor (B) Instruction Failed To Require the Jurors To Find Beyond A Reasonable Doubt That Lucas Committed The 1973 Rape ................ 467

C.    The Lingering Doubt Instruction Undermined A Crucial Penalty Phase Defense Theory ........................ 467

D.    The Instructions Unconstitutionally Restricted Jurors' Consideration to Mitigating Evidence Offered by the Defendant ....................... 469

E.    The Instructions Unconstitutionally Precluded the Jury From Considering Lucas' Good Behavior At Trial As Mitigation .................. 471

F.    Instructional Use Of the Term "Expert" To Describe Certain Penalty Phase Witnesses Was Error ........................ 471

G.    The Jury Instructions Unconstitutionally Implied That the Penalty Decision Was a Choice Between Good And Bad ..................... 472

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

H.   By Failing To Instruct the Jury That Neither Party Had the Burden Of Proof At Penalty the Trial Court Failed To Assure Juror Impartiality.........................................................473

I.   The Trial Court Erroneously Refused the Defense Request For An Instruction Permitting Juror Consideration Of Sympathy For Lucas's Family ...........................................................474

J.   The Trial Court's Supplementary Instruction Unconstitutionally Limited The Jurors' Consideration Of Mitigating Evidence To the Specific Matters Enumerated In The Instructions ....................475

K.   The Trial Court Erroneously Denied The Requested Instruction Precluding Juror Consideration Of Future Dangerousness......................476

L.   The Special Supplemental Penalty Instructions Improperly Limited the Jurors' Consideration Of the Guilt Phase Evidence To "Evidence Of The Circumstances Of The Crimes".......................................477

M.   The Trial Court Unconstitutionally Failed to Instruct on the Presumption of a Life Sentence ................................................478

N.   The Errors Were Prejudicial....................................................479

CLAIM 36:  THE TRIAL COURT VIOLATED LUCAS'S RIGHT TO A FAIR TRIAL BY COMMITTING NUMEROUS ERRORS IN PERMITTING THE JURY TO READ PORTIONS OF THE TRIAL TESTIMONY IN THE JURY ROOM WITHOUT ANY INSTRUCTIONS ................................................479

A.   Introduction ...........................................................................479

B.   Relevant Facts .......................................................................480

C.   Lucas's Right to Be Personally Present Was Violated When the Jurors Were Permitted to Read Transcripts in the Jury Room ..........................481

D.   Lucas's Right to Have Counsel Present at All Critical Stages of His Trial Was Violated When the Jurors Were Permitted to Read Transcripts in the Jury Room ................................................484

E.   Lucas's Right to a Public Trial Was Violated When the Jurors Were Permitted to Read Transcripts in the Jury Room ....................................485

    1.   Relevant Law ................................................................485

xxvii

# TABLE OF CONTENTS

**PAGE**

2.    There Was No Waiver Or Satisfactory Showing Of Necessity ................................................................. 486

3.    The Denial Of the Right To Public Trial Requires Relief ..... 487

F.    Lucas's Right to a Trial By A Jury That Is Supervised And Properly Instructed Was Violated When the Jurors Were Allowed To Read the Transcripts Without Supervision or Instruction and in the Absence of a Judge ............................... 487

CLAIM 37:  THE JUDGE ERRED IN ALLOWING THE JURY TO READ PORTIONS OF THE TESTIMONY DURING DELIBERATIONS WITHOUT ANY INSTRUCTIONS AS TO THE PROPER USE OF THE TRANSCRIPTS ....... 490

A.    Introduction ....................................................................... 490

B.    Relevant Law ..................................................................... 490

C.    The Error Was Prejudicial ................................................. 491

CLAIM 38:  THE TRIAL COURT IMPROPERLY COERCED THE JURY AFTER IT REPORTED BEING DEADLOCKED AT PENALTY ........................... 492

A.    Introduction ....................................................................... 492

B.    Relevant Law ..................................................................... 492

C.    The Trial Court's Responses and Charges to the Jurors' Announced Deadlock Was Coercive ................................. 493

1.    Instructing Jury to Continue Without Inquiry ....................... 493

2.    Improper Reference to Length of Trial ................................. 494

3.    Improper Instructions That Deadlock Would Result in a New Penalty Trial ............................................................. 494

4.    Failure to Instruct Each Juror Follow His or Her Own Conscience ................................................................... 495

5.    Inspection of the Deliberation Room and Supplemental Instructions to Consider Guilt Evidence ............................... 496

D.    The Death Sentence Should Be Vacated ............................. 496

1

# TABLE OF CONTENTS

2

**PAGE**

3

CLAIM 39:  THE JUDGE IMPROPERLY FAILED TO GIVE CRUCIAL
4 SUPPLEMENTAL INSTRUCTIONS ORALLY ........................................................ 497

5 CLAIM 40:  THE JURORS' CONSIDERATION OF THE CONSEQUENCES
OF DEADLOCK WAS MISCONDUCT AND THE TRIAL COURT'S
6 INSTRUCTIONS REGARDING THE CONSEQUENCES OF A DEADLOCK
WERE ERRONEOUS ........................................................................................ 498

7

CLAIM 41: AFTER RECEIVING NOTICE THAT A JUROR'S FATHER HAD
8 DIED, THE JUDGE ERRONEOUSLY FAILED TO DETERMINE WHETHER
THE JUROR COULD CONTINUE TO FULFILL HER DUTIES ............................. 500

9
A.   Introduction ............................................................................... 500
10

B.   Relevant Law ............................................................................. 501
11

C.   The Judge's Failure To Determine Juror P.W.'s Ability To
12       Deliberate Violated Lucas' Federal Constitutional Rights ....................... 502

13 D.   Prejudice .................................................................................. 502

14 CLAIM 42:  INADMISSIBLE PREJUDICIAL EVIDENCE IN THE JURY
ROOM THROUGHOUT THE PENALTY DELIBERATIONS CREATED A
15 PRESUMPTION OF PREJUDICE WHICH WAS NOT REBUTTED  .................... 503

16 A.   Introduction and Relevant Facts ................................................. 503

17 B.   Relevant Law ............................................................................. 504

18 C.   Juror Exposure to Extrinsic Evidence Creates a Presumption
of Prejudice ............................................................................... 505
19

D.   The Presumption of Prejudice Was Not Rebutted in the
20       Present Case .............................................................................. 505

21 E.   Even Without the Presumption of Prejudice the Judgment
Should Be Reversed ................................................................... 506
22

CLAIM 43:  THE CRIMES RELATED TO EACH CASE WERE NOT
23 ADMISSIBLE TO PROVE IDENTITY IN THE CRIMES RELATED
TO ANY OTHER CASE. ................................................................................. 507
24

A.   Introduction ............................................................................... 507
25

B.   Relevant Procedural Background and Consolidation Facts .................... 507
26

27

28

1

## TABLE OF CONTENTS

2

**PAGE**

3

4      1.    The Trial Court's Ruling on Cross-Admissibility ................. 507

5      2.    Relevant Facts of Each Case .................................................. 508

6      3.    Wound Comparison Testimony ............................................. 509

7            a.    Dr. Katsuyama ..................................................................509

8            b.    Dr. Robin ...........................................................................510

9            c.    Dr. Geiberger ....................................................................512

10           d.    Dr. Bucklin .......................................................................513

11           e.    Other Throat Slashing Cases .............................................516

12     4.    Testimony of Dr. Penrod ...................................................... 517

13  C.   Relevant Law......................................................................................518

14  D.   Joinder Violated Lucas's Right to Due Process....................................519

15     1.    Comparison of Similarities and Differences ......................... 520

16     2.    The Similarities Found by the Trial Court Were Not
           Substantial............................................................................. 526

17  E.   Prejudice..............................................................................................527

18     1.    Jacobs.................................................................................... 528

19     2.    Santiago ................................................................................ 531

20     3.    Swanke ................................................................................. 531

21  F.   Even If Guilt Is Not Vacated, the Penalty Judgment Should Be .............532

22  CLAIM 44:  THE TRIAL COURT ERRONEOUSLY FAILED TO CONSIDER
    EXPERT TESTIMONY REGARDING THE INABILITY OF JURORS TO HEED
23  LIMITING INSTRUCTIONS IN CROSS-ADMISSIBILITY CASES ...................532

24  CLAIM 45:  THE TRIAL COURT ERRONEOUSLY FAILED TO RULE ON
    THE CROSS-ADMISSIBILITY OF EACH OFFENSE INDEPENDENTLY ..........534

25

26

27

28

(15cv1224)

# TABLE OF CONTENTS

**PAGE**

CLAIM 46:  THE TRIAL COURT ERRONEOUSLY DENIED AN
EVIDENTIARY HEARING ON WHETHER THE PROSECUTION'S
MOTION TO CONSOLIDATE WAS A VINDICTIVE RESPONSE TO
LUCAS'S ATTEMPT TO EXERCISE HIS RIGHT TO A SPEEDY TRIAL............535

CLAIM 47:  BY BOOTSTRAPPING ITS FINDINGS, THE TRIAL COURT
DENIED LUCAS A FAIR AND RELIABLE IN LIMINE DETERMINATION
AS TO CROSS-ADMISSIBILITY AND OTHER CRUCIAL EVIDENTIARY
ISSUES ................................................................................................539

CLAIM 48:  THE CUMULATIVE EFFECT OF THE ERRORS AND
VIOLATIONS REQUIRES THAT HABEAS CORPUS RELIEF BE
GRANTED ..........................................................................................541

CLAIM 49:  LUCAS IS INELIGIBLE FOR A DEATH SENTENCE DUE
TO HIS MENTAL IMPAIRMENTS ..........................................................544

    A.    Relevant Law.................................................................544

    B.    Relevant Facts ..............................................................547

CLAIM 50:  CALIFORNIA'S DEATH PENALTY STATUTE, AS
INTERPRETED BY THE CALIFORNIA SUPREME COURT AND APPLIED
AT LUCAS'S TRIAL, VIOLATES THE UNITED STATES CONSTITUTION ......549

    A.    California's Death Penalty Statute Unconstitutionally Fails
to Narrow the Class of Murders Eligible for the Death Penalty.............549

    B.    Lucas's Death Penalty Is Invalid Because Penal Code § 190.3(a), As
Applied, Allows Arbitrary and Capricious Imposition of Death In
Violation of the Fifth, Sixth, Eighth, And Fourteenth Amendments To
the United States Constitution.................................................552

    C.    California's Death Penalty Statute, As Interpreted By the California
Supreme Court, Forbids Inter-case Proportionality Review, Thereby
Guaranteeing Arbitrary, Discriminatory, Or Disproportionate
Impositions of the Death Penalty .............................................553

    D.    The Constitution Forbids Consideration of Unadjudicated Criminal
Activity at the Penalty Phase ..................................................556

    E.    The Statutory Mitigating Factors, as Written, and as Applied Through
the Jury Instructions, Precluded a Fair, Reliable, and Evenhanded
Administration of the Capital Sanction.......................................556

xxxi

1

## TABLE OF CONTENTS

2

**PAGE**

3

4

    1.    Irrelevant Factors Should Have Been Deleted ...................... 557

5

    2.    Restrictive Adjectives Acted As Barriers to Consideration of Mitigation ...................................................................... 557

6

    3.    The Jury Should Have Been Instructed That Factors (d) Through (h), (j) and (k) Could Only Be Considered As Mitigation.................................................................... 558

7

F.    The California Statute Violates The Equal Protection Clause Of The Federal Constitution By Denying Procedural Safeguards To Capital Defendants Which Are Afforded To Noncapital Defendants.................560

8

9

G.    The Penalty Of Death In California Is Arbitrarily and Capriciously Imposed Depending On the County In Which the Defendant Is Charged, In Violation Of the Right To Equal Protection Of The Law.................................................................................................563

10

11

12

H.    California's Scheme Violates Due Process By Allowing the Jury to Repeatedly Consider the Same Evidence in Aggravation ...................564

13

I.    Execution Following Lengthy Confinement Under Sentence Of Death Would Constitute Cruel and Unusual Punishment In Violation of Petitioner's State and Federal Constitutional Rights and International Law.............................................................565

14

15

16

J.    California's Use of the Death Penalty Violates International Law and  Norms of Humanity and Decency And Violates The Fifth, Sixth, Eighth and Fourteenth Amendments............................567

17

18

K.    The State May Not Execute An Accused Whom It Has Not Afforded Fair And Reliable Procedural Protection .................................573

19

L.    The California System of Unified Appellate and Postconviction Review Is Unconstitutional.........................................................574

20

21

M.    In Combination, the Foregoing Constitutional Deficiencies Cumulatively Result in a Denial of Lucas's Constitutional Rights .........................................................................................575

22

23

CLAIM 51:  CALIFORNIA'S DEATH PENALTY STATUTE VIOLATES DEFENDANTS' RIGHT TO A JURY TRIAL ON EACH ELEMENT OF A CAPITAL CRIME, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION .........................................................................................577

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

A.    The Sixth and Fourteenth Amendments Require That Any Fact Necessary to Impose the Death Penalty Be Found by a Jury Beyond a Reasonable Doubt ..................................................577

B.    California Unconstitutionally Fails to Require Unanimity, or a Reasonable Doubt Standard, at the Penalty Phase ..................................580

C.    *Ring/Apprendi* Error Is Structural ........................................585

D.    Even If Harmless Error Analysis Applies, the Error Was Not Harmless 587

CLAIM 52:  CALIFORNIA'S DEATH PENALTY SYSTEM VIOLATES THE EIGHTH AMENDMENT'S BAN ON CRUEL AND UNUSUAL PUNISHMENT ..................................................588

A.    California's Death Row System is Plagued by Extreme Delay ..............588

B.    The Extraordinary Delays that Permeate California's Death Penalty System Render it Unconstitutional Under the Eighth Amendment .........590

    1.    California's Death Penalty is Unconstitutionally Arbitrary ... 590

    2.    California's Death Penalty Lacks Any Valid Penological Purpose ..................................................591

    3.    Lucas's Case Exemplifies These Problems ............................592

CLAIM 53:  EXECUTION BY LETHAL INJECTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT ..................................................592

CLAIM 54:  CONSTITUTIONAL FLAWS IN THE DEATH QUALIFICATION JURY SELECTION PROCESS PRODUCED BIASED JURORS WHO VOTED FOR THE DEATH VERDICT WITHOUT FAIRLY CONSIDERING THE MITIGATING EVIDENCE ..................................................595

CLAIM 55:  THE PENALTY PHASE INSTRUCTIONS ARE UNCONSTITUTIONALLY VAGUE AND INCAPABLE OF BEING UNDERSTOOD BY JURORS ..................................................599

XIV. PRAYER FOR RELIEF ..................................................602

xxxiii

(15cv1224)

1.       DAVID ALLEN LUCAS petitions this Court, pursuant to 28 U.S.C. § 2241 et seq., and the Local Rules for the United States District Court for the Southern District of California, to issue a writ of habeas corpus ordering that his conviction for capital murder and his sentence of death be vacated.

# I.  INTRODUCTION

2.       From May 1979 to November 1984, there was a series of unsolved throat-slashing assaults and killings in the San Diego area.  Five years after the first assault, a confidential phone call to police raised the possibility that the perpetrator might be David Allen Lucas.  Desperate to solve the crimes, law enforcement began building a case against Lucas—a case which was based on biased investigation, faulty memories, and flawed forensics.  Once Lucas was identified as a suspect, the San Diego District Attorney's Office inappropriately consolidated seven disparate cases into one behemoth prosecution.  The office even charged him with the double murder of Suzanne and Colin Jacobs despite the fact that another man, Johnny Massingale, had confessed to the crimes to acquaintances and law enforcement.  Today, Lucas stands convicted of the murders of Suzanne and Colin Jacobs and Anne Swanke, as well as the attempted murder of Jodie Santiago.  The jury acquitted Lucas of homicide charges in the Gayle Garcia case, and hung on the murders of Rhonda Strang and Amber Fisher.

3.       The case against Lucas was based largely on circumstantial evidence, and hinged primarily on the testimony of Jodie Santiago, who identified Lucas as her attacker.  However, Santiago's identification of Lucas was deeply flawed, the product of a highly suggestive investigation and photo lineup which was improperly ingrained in Santiago's damaged memory.  Homicide detectives visited Santiago on at least four separate occasions without taking notes or otherwise contemporaneously memorializing their interviews with her, including interviews done while she was in intensive care and under the influence of narcotic pain killers and other mind-altering medications.  Santiago's description of her attacker evolved considerably from her first meeting with law enforcement to the time homicide detectives told her that they had a suspect and

showed her a highly suggestive photo lineup where only Lucas's photograph matched her description of her attacker.  Santiago's subsequent identifications of Lucas's house and car were the result of similarly suggestive and problematic actions by the police.

4.    Santiago's identification served as the shaky foundation upon which all other aspects of the Lucas case were built, including the highly prejudicial consolidation of cases.  The prosecution's misconduct in consolidating the cases was compounded by a series of erroneous trial court rulings which hamstrung the defense and rendered Lucas's trial fundamentally unfair.  Time after time, the trial court denied Lucas's right to present a defense by excluding defense expert witnesses, restricting cross-examination and impeachment evidence against key prosecution witnesses, and failing to suppress prosecution evidence that was unconstitutional under state and federal law.  For example, one of the most important pieces of evidence against Lucas was a note found at the Jacobs crime scene which said simply, "Love Insurance 280-1700."  The prosecution presented extensive expert testimony which purported to prove that Lucas was the author of this note.  Yet defense counsel was prohibited from presenting their own experts to counter this testimony.  Similarly, the trial court excluded Lucas's eyewitness expert witnesses, who could have explained for the jury the numerous, serious problems inherent in Santiago's identification and with the procedures used by the police.  The trial court also routinely denied defense counsel's request to impeach key witnesses, including Massingale, homicide detectives, and prosecution expert witnesses, about their misconduct, bias, and untruthfulness.

5.    Defense counsel soldiered on through two years of trial, but unfortunately made critical errors during both the guilt and penalty phases.  Counsel's errors during the penalty phase were especially damaging.  Despite the acquittal and hung juries for three of the charges, defense counsel chose to focus the penalty phase presentation on lingering doubt of the convicted crimes and on Lucas's likely innocence of the sole aggravator in the case: a 15-year old prior rape conviction.  All of this was undermined when counsel made an egregious mistake of law and inadvertently opened the door to a

1974 diagnosis of antisocial personality disorder. Even though this diagnosis was inaccurate in light of Lucas's history of trauma, post-traumatic stress disorder, substance abuse, and physical abuse, counsel was completely unprepared to address the diagnosis. As a result, counsel's mistake devastated the lingering doubt strategy by making the jury believe, incorrectly, that Lucas would go on to commit violent, sexually-based crimes. The penalty phase deliberations were fraught with problems, including inappropriate jury instructions, juror misconduct, and judicial coercion after the jury reported that they were deadlocked as to penalty. Finally, after eight days of deliberation, the jury returned a verdict of death on the Jacobs count.

6. These and other violations of Lucas's constitutional rights compounded one another and resulted in a proceeding that could not and did not produce a just result. For all these reasons, and others described herein, Lucas's convictions and sentence must be vacated.

## II. PROCEDURAL HISTORY

### A. Charges

1. On March 18, 1985, a six-count information was filed in case number 73093 ("CR 73093") in San Diego Superior Court alleging in Counts One and Two that Lucas kidnapped Jodie Santiago[1] on June 8 and 9, 1984 in violation of Penal Code § 207(a)[2] and attempted to murder Santiago in violation of Penal Code Sections 187/664. Counts Three and Four alleged that on or about October 23, 1984, Lucas murdered Rhonda Strang and Amber Fisher in violation of Penal Code § 187. Counts Five and Six alleged that on or about November 20, 1984, Lucas kidnapped Anne Swanke in violation of Penal Code § 207(a) and murdered Swanke in violation of Penal Code § 187. It was alleged in all counts that Lucas personally used a knife in the commission

---

[1] During trial Jodie Santiago changed her last name to Robertson due to marriage. (38 RT 7314.) However, she will be referred to as Santiago throughout this brief.

[2] All references are to the California Penal Code unless otherwise noted.

3

(15cv1224)

of the crimes within the meaning of Penal Code § 12022(b) and in Counts One and Five that Lucas had inflicted great bodily injury on the victims within the meaning of Penal Code § 12022.7.  (1 CT 70-72.)

2.    The information further alleged the following special circumstances: that the murder alleged in Count Six was committed in the commission of a kidnapping, in violation of Penal Code § 207(a) and § 190.2(a)(17)(ii) and that Lucas had been convicted of more than one offense of murder within the meaning of Penal Code § 190.2(a)(3).  The kidnapping special circumstance was subsequently dismissed by the Court of Appeal on a Pretrial writ. (C004114).  Additionally, as a first prior, it was alleged that on or about August 16, 1973, Lucas had been convicted of a serious felony, a rape, in violation of Penal Code § 261, within the meaning of Penal Code § 667(a) and § 1192.7(c)(3).  (1 CT 70-72.)

3.    On August 1, 1985, an information was filed in case number 75195 ("CR 75195") in San Diego Superior Court alleging in Counts One and Two, that on or about May 4, 1979, David Allen Lucas murdered Suzanne and Colin Jacobs in violation of Penal Code § 187.  Count Three alleged that on or about December 8, 1981, Lucas murdered Gayle Garcia in violation of Penal Code § 187.  It was further alleged in Counts One through Three that Lucas personally used a knife in the commission of the crimes within the meaning of Penal Code § 12022(b).  (27 CT 5744-45.)

4.    The information further alleged a multiple-murder special circumstance within the meaning of Penal Code § 190.2(a)(3).  The information also alleged, *inter alia*, a 1973 prior conviction for rape in violation of Penal Code § 261.

5.    On March 22, 1985, Lucas was arraigned and entered a plea of not guilty as charged in the information in CR 73093.  (22 CT 4598.)  On August 1, 1985, Lucas was arraigned and entered a plea of not guilty as charged in the information in CR 75195.  (68 CT 15029.)

4

(15cv1224)

**B.      Presiding Judges and Consolidation**

6.      Judge Orfield originally presided over the in limine proceedings in both CR 73093 (Santiago, Strang/Fisher, Swanke) and CR 75195 (Jacobs, Garcia).  On November 13, 1986, CR 75195 was sent out to trial before Judge Kennedy.  (68 CT 15211.)  CR 73093 was to be tried after completion of the trial in CR 75195.  (23 CT 4802.)

7.      In December 1986, the prosecution moved to consolidate the trial of both cases.  (43 CT 9350-9406.)  Because Judge Orfield was no longer available (23 CT 4804) and Judge Kennedy was disqualified on both cases (47 CT 10300-04), the cases were assigned to Judge Hammes for all purposes.  (23 CT 4810-11.)[3]

8.      Judge Hammes heard all the in limine matters de novo except for certain rulings of Judge Orfield which she decided not to reconsider.  (26 Pretrial 4242-45.)  Judge Hammes eventually granted the prosecution's motion to consolidate.  (79 Pretrial 22512-13; 24 CT 5211-12.)

**C.      Proceedings Regarding Johnny Massingale**

9.      Based primarily on Johnny Massingale's admissions to two witnesses and his taped confessions to law enforcement officers, Massingale was charged with the Jacobs murders by a San Diego county complaint filed on March 19, 1984.  (42 CT 9254.)  After a preliminary hearing, the magistrate found probable cause to hold Massingale to answer and an information was filed in Superior Court on May 13, 1984 which charged Massingale with the Jacobs' murders.  (22 CT 4726; 42 CT 9255.)

10.      After Lucas's arrest for the Swanke and Santiago offenses, the charges against Massingale were dismissed and Lucas was charged with the Jacobs offenses.  (27 CT 5680-81; 42 CT 9255-56.)  Massingale filed a Penal Code § 851.8 motion for

---

[3]  Judge Hammes disclosed her prior employment as a Deputy District Attorney and her husband's current employment in the District Attorney's Office.  (68 CT 15269.)

5

(15cv1224)

finding of factual innocence.  (39 CT 8560-74; 43 CT 9256.)  The San Diego County District Attorney did not oppose the motion and on May 24, 1985 Judge Gill made the finding.  (39 CT 8578-79, 8587, 8603-06.)

11.    After the finding of factual innocence, Lucas's attorneys requested that the charges against Massingale be reinstated.  (39 CT 8544-8636.)  Judge Kennedy denied Lucas's motion to reinstate the charges against Johnny Massingale.  (68 CT 15201-03.)

**D.    In Limine Motions: All Cases**

**1.    Severance of Counts/Consolidation**

12.    The defense motion for severance of the Garcia and Jacobs charges was denied by Judge Kennedy.  (68 CT 15197.)  Subsequently, Judge Hammes ruled, over defense objection, that all the charges were cross-admissible and could properly be consolidated for trial by a single jury.  (248 Pretrial 25472-513; 24 CT 5211-12.)  At the consolidation hearing, the judge precluded the defense from presenting any evidence, including the testimony of Dr. Penrod, an expert who had been allowed to testify by Judge Orfield.  (234 Pretrial 24037-38; 24 CT 5176-77.)

**2.    Vindictive Prosecution**

13.    The prosecution moved to consolidate all the charges at the eleventh hour after Lucas asserted his right to a speedy trial.  Accordingly, the defense filed a supplemental motion alleging prosecutorial vindictiveness as another ground for denying consolidation and as a ground for recusal of the San Diego County District Attorney's Office.  (18 CT 3702-3824; 247 Pretrial 25366; 248 Pretrial 25474-94.)  Judge Hammes denied the defense request for an evidentiary hearing on vindictiveness and denied the defense motions without hearing any testimony.  (248 Pretrial 25460; 25465.)

**3.    Recusal Motion**

14.    Because third party suspect Johnny Massingale had filed a wrongful prosecution action against the County of San Diego, the defense moved to recuse the

6

(15cv1224)

1   District Attorney's office, District Attorney Miller, and Deputy District Attorneys

2   Williams and Clarke.  (18 CT 3702-03.)  The motion was denied.  (24 CT 5211.)

3       **4.**    **Jury Composition**

4       15.    The defense filed a motion challenging the jury selection process in San

5   Diego County.  (31 CT 6846-56.)  They were provided an opportunity to conduct juror

6   surveys and were given access to jury selection data for September 1985, December

7   1985 and January 1986.  However, the defense request for data from a majority of the

8   months in 1986 was denied by Judge Orfield and Judge Hammes.  (46 Pretrial 8582; 79

9   Pretrial 4242-45.)  Judge Hammes also denied the defense request for an evidentiary

10   hearing to show that Hispanics and persons between 18 and 24 years of age were

11   unconstitutionally under represented.  (250 Pretrial 25663-66, 25709-10.)

12   **E.**    **In Limine Motions: Jacobs**

13       **1.**    *Hitch/Trombetta* **Suppression Motion Concerning Loss or**

14             **Destruction of Fingerprint on Love Insurance Note**

15       16.    At the Jacobs scene, a small note, with the words "Love Insurance" and a

16   telephone number for the agency, was found in the bathroom.  The detectives directed

17   the evidence technician to use ninhydrin on the note to try to raise fingerprints on it.

18   This was done and some latent print images were raised.  (4 RT 550-51; 8 RT 1364,

19   1366; 9 RT 1489, 1518.)  There were five or six points of identification on the note

20   which gave it value as an elimination print.  (10 RT 1809.)  However, the evidence

21   technician was unaware that ninhydrin fades with time and he did not photograph the

22   note after it was treated with ninhydrin.  (10 RT 1811.)  When the case was later

23   investigated in December 1980, no photograph of the fingerprint could be found.

24   Moreover, the print on the original note had disappeared.  (4 RT 581; 8 RT 1366; 9 RT

25   1518; 42 RT 7995-96.)  Efforts were made to raise the print again but nothing worked.

26   As a result, the fingerprint was lost and the original printing on the note was

27   obliterated.

28

17.     Due to the loss of the fingerprint and destruction of the original note, the defense moved for sanctions under *People v. Hitch*, 12 Cal. 3d 641 (1974).  (38 CT 8334-60.)  The trial court found that *Hitch* had been supplanted by *California v. Trombetta*, 467 U.S. 479 (1984).  Applying *Trombetta*, the court found that the Love Insurance note would not have been exculpatory because, in its view, Lucas was the person who authored the note.  The motion was denied.  (24 CT 5210; 70 RT 15510; 247 Pretrial 25438-43.)

**2.     Defense Challenges to Opinion Testimony Comparing the Handprinting on the Love Insurance Note With the Handprinting of Lucas**

18.     The defense objected to the admission of handwriting comparison testimony based on *People v. Kelly*, 17 Cal. 3d 24 (1976), Evidence Code § 352, and due process, when the case was before Judge Kennedy.  (53 Pretrial 602.)  Judge Kennedy sustained the *Kelly* objection on the basis that the prosecution had not met their burden of producing disinterested expert witnesses on the validity of the techniques.  (53 Pretrial 613.)

19.     However, when the case was reassigned to Judge Hammes, the handwriting issue was reopened.  The defense again sought handwriting comparison testimony.  (79 Pretrial 4106-12; 43 CT 9263-80; 47 CT 10276-84.)  Judge Hammes excluded proficiency studies of handwriting and handprinting, denied the defense request for a *Kelly* hearing, and rejected the other grounds for exclusion raised by the defense.  (79 Pretrial 4109; 111 Pretrial 8160-61.)

20.     The judge also rejected the defense motion to exclude the lay opinion of Lucas's business partner, Frank Clark, that Lucas wrote the Love Insurance note.  (21 RT 3835.)

**3.     Denial of In-Court Testing of the Handprinting Expert**

21.     John Harris, handwriting comparison expert for the prosecution, concluded with "reasonable certainty" that Lucas was the author of the Love Insurance note.  (111

8

Pretrial 8142; 8154.)  The defense challenged the reliability of this conclusion in limine and sought to support this challenge by testing, in open court, Harris' ability to identify Lucas's printing.  (148 Pretrial 13899-13902.)  The trial court denied the defense request, ruling that it was "not within the scope of direct. . . ."  (148 Pretrial 13902.)

### 4. Exclusion of Rochelle Coleman's Statement That Another Person Was the Author of the Love Insurance Note

22.    To counter the prosecution's expert and lay opinion testimony that David Lucas authored the Love Insurance note, the defense sought to introduce the taped statement of Rochelle Coleman.  Coleman was familiar with the writing of David Ray Woods, and who stated during a taped interview that the Love Insurance note was David Woods's writing.[4]  (38 RT 7168.)  The defense offered Coleman's statement as a spontaneous lay opinion that Lucas did not author the note (Cal. Evid. § 1416) and for the nonhearsay purpose of establishing that the handprinting on the Love Insurance note was not unique.  (63 CT 13948-49.)

23.    The trial court denied the defense request, ruling that the statement was not spontaneous and that Wood's actual handprinting would be the "best evidence."  (42 RT 7950-51.)

## F. In Limine Motions: Santiago

### 1. *Pitchess* Motion

24.    In CR 75195, the defense filed a motion for an order to produce documents for inspection, specifically requesting documents in the San Diego Sheriff's Department personnel records of Detectives Fullmer, Henderson, Fisher and Hartman. (29 CT 6387-6405.)  The defense also filed a motion to produce documents requesting personnel records of two officers in the National City Police Department.  (30 CT

---

[4] At the time of Lucas's trial Rochelle Coleman was dead and unavailable as a witness.  (63 CT 13948.)

9

(15cv1224)

6406-24.)  This was in regard to whether Lucas was a suspect prior to December 11, 1984.  (30 CT 6407-08.)

25.     Judge Orfield ruled that, with regard to the *Pitchess* motion served on the Sheriff's Department, the defense was entitled to have the court review the subpoenaed documents *in camera* to determine their relevance to the case.  Judge Orfield found no relevant records and ordered them sealed. (68 CT 15089.)

26.     On January 15, 1987, in response to a local case in which case Detectives Henderson, Fullmer and Fisher were accused of acts of professional misconduct, failing to follow required duties and procedures, including lying on the witness stand, in order to obtain conviction of the suspect (*People v. Cavanaugh)*, the defense made an informal *Pitchess* motion.  (69 Pretrial 2490-97.)  Subsequently, a formal *Pitchess* motion was filed.  (46 CT 10050-64.)

27.     Judge Hammes ruled that the defense should be given discovery of the Internal Affairs investigation but not the conclusions and findings of that investigation. (80 Pretrial 4466.)

28.     In CR 75195, the defense filed a petition for a writ of mandate regarding the *Pitchess* motion concerning Detectives Henderson and Fullmer.  (D008106.)

29.     After reviewing the Internal Affairs records and the transcripts in *People v. Cavanaugh*, Judge Hammes ruled that the specific evidence of misconduct in *Cavanaugh* should be excluded under Evidence Code § 352 because the homicide detectives were merely "tangential witnesses."  (238 Pretrial 24496.)  The judge also concluded that Santiago's testimony was otherwise corroborated and the *Cavanaugh* evidence would "take weeks" and thus require undue consumption of time.  (238 Pretrial 24494-98.)

## 2.     *Ballard* Motion

30.     In *Ballard v. Superior Court*, 64 Cal. 2d 159 (1966), the California Supreme Court found that trial courts have discretion "to order a psychiatric examination of the complaining witness in a case involving a sex violation if the

10

defendant presents a compelling reason for such an examination." *Id.* at 176. The court recognized that while a victim of a sexual crime should not and cannot be forced to submit to a psychiatric examination, "a comment on that refusal should be permitted." *Id.* at 177.

31.     Pursuant to *Ballard*, the defense filed motions in CR 73093, for psychiatric and neurological examination and testing of witness Jodie Santiago.

32.     The court received testimony from Dr. Heywood Zeidman, the psychiatrist who treated Santiago at Grossmont Hospital in June 1984 shortly after the attack. Santiago–who initially opposed release of her medical and mental treatments by four Seattle doctors–waived her privilege as to her medical records from Grossmont Hospital in San Diego.  Santiago also executed written waivers as to the four Seattle doctors: Snow, Davis, McLean, and Kamm.

33.     Counsel argued the *Ballard* motion, which Judge Orfield denied.  (22 CT 4749.)

34.     The defense filed a petition for a writ of mandate and stay regarding the denial of the *Ballard* motion which was summarily denied.  (10 CT 2046.)

35.     Later, in both cases, the defense made a motion to reopen the *Ballard* motion.  The motion was granted.  (22 CT 4760; 68 CT 15172.)

36.     Judge Orfield heard argument on the renewed *Ballard* motion for psychiatric and neurological examinations of Jodie Santiago.  (22 CT 4781.)  Judge Orfield determined that it would be inappropriate to order the testing the witness and denied the motion.  (22 CT 4781.)

37.     Subsequently, Judge Hammes ruled that Santiago had not willingly volunteered to undergo psychological/neurological testing.  The request that she submit to such testing was denied.  (24 CT 5187-91.)

38.     During trial, the defense renewed its motion for a neuropsychological examination of witness Jodie Santiago.  The motion was denied.  (26 CT 5508.)

(15cv1224)

### 3. Eyewitness Identification Issues

39.     The defense filed a motion before Judge Hammes to suppress Jodie Santiago's identification of David Lucas based on suggestive and unreliable identification procedures.  (38 CT 8315-29.)

40.     The court denied the motion as to Santiago's identification of Lucas finding that the procedures were not suggestive and that, in any event, Santiago's in-court identification of Lucas was independent of any such procedures.

### 4. Expert Testimony Regarding Eyewitness Identification

41.     The prosecution raised an in limine objection to expert testimony regarding eyewitness identification testimony.  (16 CT 3365-71.)  At the in limine hearing the defense presented the testimony of Dr. Robert Buckhout.  (188 Pretrial 17880-18014.)

42.     The court originally ruled that expert testimony on eyewitness identification was not admissible because Santiago's identification was corroborated. Eventually, however, the court found that the defense experts, Dr. Robert Buckhout and Elizabeth Loftus, were "not experts" because their research was not based on actual crimes and victims.

43.     At trial, the court precluded both the prosecution and the defense experts from specifically testifying as to Jodie Santiago's ability to remember the events to which she testified.  This ruling was based primarily on Evidence Code § 352 and the court's strong desire not to allow the trial to become a battle of the experts.

### G.     In Limine Motions: Swanke

### 1. Challenge to Electrophoresis Evidence

44.     The defense made a (then) *Kelly/Frye* motion to exclude expert testimony regarding the blood analysis of the material found under Anne Swanke's fingernails and the stain found on the sheepskin seat cover in Lucas's truck.  (48 CT 10446-61.)

45.     After a lengthy hearing, the court ruled that ABO typing by absorption-elution on aged blood evidence was not subject to *Kelly/Frye* and the correctness of the

12

scientific procedures employed is therefore a jury question.  It found that electrophoresis and the BAS Multisystem were accepted by a consensus of the scientific community.  (62 CT 13825.)  Additionally, it ruled that any deficiencies in the electrophoretic methodology used in the Lucas case were cured by only allowing into evidence results which were photographed and that the absorption-inhibition testing for the genetic markers Gm and Km in the Lucas case satisfied prongs 1 and 3 of *Kelly*.

### 2.   Hearsay Statement by Shannon Lucas

46.   Following David Lucas's arrest, Lucas's wife, Shannon Lucas, underwent a lengthy, taped interrogation by San Diego County detectives.  The detectives showed her a dog choke chain, which they did not reveal had been allegedly found around Swanke's neck.  Shannon stated the chain belonged to one of hers and Lucas's dogs.

47.   The prosecution moved to admit Shannon's hearsay testimony regarding the dog chain under the "spontaneous declaration" exception to the hearsay rule per Evidence Code § 1240.  The defense opposed admission of the statements because they reflected Shannon's deliberate opinion.  The defense also argued the statements should be barred under the marital privilege (Evidence Code § 970), and because their probative value was outweighed by the prejudicial impact.  (Evidence Code § 352.)

48.   The court initially ruled that Shannon Lucas's statements concerning the dog chain were inadmissible hearsay.  The court found her statements were not spontaneous declarations since they were a mere description of an opinion.  The court further found that the probative value of the opinion testimony outweighed its prejudicial effect and the testimony was of misleading quality

49.   However, before trial, the court reversed its original decision and ruled that Shannon's statements fell under the "spontaneous declaration" exception to the hearsay rule asserting that the statements were spontaneous reaction to an "exciting event."

(15cv1224)

**H.    In Limine Motions: Penalty**

    **1.    Motion to Exclude 1973 Prior Rape Conviction**

    50.    The defense made a Motion to Strike the prior conviction based on claims that both trial counsel and appellate counsel had been ineffective.  (36 CT 7745-81.) The trial court originally refused to hear the motion, ruling that it was procedurally barred and substantively suspect.  However, the Court of Appeal, in a published decision, ordered the trial court to entertain the Motion to Strike which it did, after first denying a defense request that it recuse itself for purposes of the motion.

    51.    On November 22, 1988, the judge denied the Motion to Strike, ruling that there was no ineffective assistance of counsel and that the 1973 prior conviction would remain in full force and effect for purposes of aggravation at the penalty trial.

**I.    Guilt Phase**

    52.    Trial began on January 3, 1989.  (25 CT 5378-81.)  Lucas did not testify.

    53.    The prosecution rested on April 12, 1989.  (26 CT 5485.)

    54.    The defense renewed its motion for severance, incorporating all previous pleadings.  The defense also moved for a judgment of acquittal for insufficient evidence pursuant to Penal Code § 1118.1.  The court denied both motions.  (26 CT 5486.)

    55.    On May 23, 1989, after presenting the defense case, and after renewing its motion for acquittal, again denied, the defense rested its case and the prosecution commenced rebuttal testimony.  (26 CT 5531-35.)  The defense did not renew the motion to sever at the conclusion of the defense case.

    56.    After another defense motion for acquittal pursuant to Penal Code §1118.1 was denied, both the prosecution and defense rested their cases on May 30, 1989.  (26 CT 5540-41.)

    57.    On June 7, 1989, the defense reopened briefly, then both the prosecution and defense rested again.

58.     The prosecution made its closing argument to the jury and the defense moved for a mistrial based on improper prosecution argument.  The judge denied the motion.  (26 CT 5550-51.)  The defense made its closing argument.  (26 CT 5551.)

59.     The prosecution presented rebuttal argument on June 9, 1989.  The defense objected to the prosecution's closing argument, citing prosecution error and improper argument, and again moved for a mistrial.  The judge denied the motion.  (26 CT 5553-54.)

60.     On June 12, 1989, the court instructed the jurors and they began deliberation.  (26 CT 5555.)  On June 21, 1989, the jurors informed the court that they had reached verdicts on some counts but were deadlocked on others.  (26 CT 5563.)  The jurors were polled and the verdicts recorded.  (26 CT 5563.)

61.     The jury found David Allen Lucas guilty of the murders of Suzanne and Colin Jacobs, as charged in Counts One and Two, and further found that Lucas, in the commission of the offenses, personally used a deadly and dangerous weapon within the meaning of § 12022(b).  (26 CT 5565-66; 64 CT 14232-33.)

62.     The jury found Lucas not guilty of the murder of Gayle Garcia as charged in Count Three.  (26 CT 5567; 64 CT 14234.)

63.     The jury found Lucas guilty of kidnapping Jodie Santiago, in violation of § 207(a), as charged in Count Four, and further found that he had used a deadly weapon within the meaning of § 12022(b), and further that he inflicted great bodily injury within the meaning of § 12022.7.  (26 CT 5569; 64 CT 14236.)  Lucas was also found guilty of attempted murder as charged in Count Five, as well as the weapon use and great bodily injury allegations.  (26 CT 5570; 64 CT 14237.)

64.     The jury returned verdicts of guilty in Count Eight, the kidnapping of Anne Swanke, along with the weapon use and great bodily injury allegations.  (26 CT 5571; 64 CT 14238.)  The jury also returned a verdict of guilty on Count Nine, the murder of Anne Swanke, as well as the weapon use allegation.  (26 CT 5572; 64 CT

15

14239.)  The jury also found true the multiple murder special circumstance allegations. (Penal Code § 190.2(a)(3).)  (26 CT 5573; 64 CT 14240.)

65.   The court inquired of the jury as to Counts 6 and 7, the Strang/Fisher murders, and found the jury hopelessly deadlocked as to those counts.  The court declared a mistrial as to Counts 6 and 7.  (26 CT 5563.)

66.   The judge instructed the jurors regarding the penalty trial and then excused them until commencement of that trial.  The jurors were not precluded from considering penalty during the 15 day recess prior to commencement of the penalty trial.

## J.    Penalty Phase

### 1.    Trial Proceedings

67.   The defense requested that the jury be voir dired again prior to the commencement of the penalty trial.  This request was denied.  (26 CT 5574.)

68.   As to the issue of Lucas's prior conviction, the defense raised all previous objections.  (26 CT 5574.)  Lucas waived his right to a jury trial on the issue of his prior felony conviction and agreed to a court trial on the issue.  The judge found beyond a reasonable doubt that Lucas had suffered the prior conviction and found the prior true.  (26 CT 5575.)

69.   Counsel stipulated that in 1973 Lucas was convicted of rape in violation of Penal Code § 261.  (26 CT 5576.)  This stipulation was the only affirmative aggravating evidence presented by the prosecution.

70.   The defense presented a number of mitigation witnesses, including psychological expert Alvin Marks.  An issue was raised concerning whether Dr. Marks had received and considered a social history assembled by the defense and whether Dr. Marks's consideration of the social history should allow the prosecution to present Lucas's Atascadero records in rebuttal.  The judge and attorneys met on the issue in camera, in the absence of Lucas, who was invited to leave by the judge.  During the in camera hearing, the parties agreed to stipulate to the Atascadero diagnosis of Lucas by

16

Dr. Schumann.  Dr. Schumann diagnosed Lucas as: "an antisocial personality, severe; [sic] alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, and the prognosis was very guarded."  (69 RT 13025-26.)

71.    On July 13, 1989, an alternate juror was excused because she overheard a deputy attorney general make a comment about the case.[5]  However, the excused juror was allowed to remain seated with the other jurors for the duration of the trial.  The juror was admonished not to tell the other jurors about the comment or that she had been excused.  (69 RT 13052-58.)

72.    On July 17, 1989, the prosecution presented closing argument.  A defense motion for mistrial based on prosecutorial misconduct during argument was denied. (26 CT 5586.)  The defense then presented its closing argument.  (26 CT 5586.)

73.    The judge then instructed the jury and the jury commenced deliberations. (26 CT 5587.)

## 2.    Deliberations

### a.    Juror Questions

74.    On Monday, July 17, 1989, the jurors began their penalty phase deliberations.  (26 CT 5586-87.)  On July 18, at 11:15 a.m., the jury sent a note to the judge which indicated that "it is the feeling of the jury that a unanimous decision is not possible."  (70 RT 13341; 108 CT 24250.)

75.    The trial court advised the parties that it was going to ask the jury to deliberate further.  (70 RT 13341.)  The defense objected, arguing that the jury's use of the words "not possible" indicated that they were hopelessly deadlocked.  (70 RT 13342.)  The defense noted that the penalty phase was not lengthy (six days) and the jury had already deliberated for a full four hours.  (70 RT 13342.)  The defense further contended that sending the jury back to deliberate further would pressure the holdouts,

---

[5]  The overheard comment was to the effect of "I hope they gas him."  (69 RT 13022.)

17

whichever side they favored and would be an improper *Allen*[6] charge. (70 RT 13342-43.)

76.     The court ruled that in view of the length and complexity of the case, the complexity of the instructions and the short amount of time that the jury had deliberated, she would send them back for further deliberations.  (70 RT 13343-44.)

77.     The judge responded to the jurors' first note by asking the jurors to attempt to deliberate further in light of the length and complexity of the case.  She urged the jurors to attempt to understand each other's opinions fully and completely.  She indicated that no juror should feel pressured and that any further notes indicating they could not reach a decision would be respected.  (70 RT 13346-47.)

78.     The jurors continued to deliberate throughout the afternoon of July 18.

79.     On the morning of July 19th, the court received another note from the jurors, asking about the consequences of deadlock and indicating that the jurors were in disagreement as to whether any further progress was possible from continued deliberations.  (26 CT 5589).  The note stated:

> At this time, some help from the court would be beneficial, for the following reasons:
>
> 1.  Some jurors have assumed that if no decision is reached, the life imprisonment penalty is automatic. What happens in case of a deadlock?
>
> 2.  Some jurors have made their decisions and feel that we should go home because no further progress is possible. Some jurors feel that further progress is possible with direction from the court.

(108 CT 24251.)

---

[6] *Allen v. United States*, 164 U.S. 492 (1896).

80.     The defense renewed its motion for mistrial, which was denied.  (26 CT 5589.)  The defense then requested a polling of the jurors, which was also denied.  (71 RT 13418.)

81.     The trial court ruled, over defense objection, that it would read the "appropriate code section out of the Penal Code" (Penal Code § 190.4(b), paragraph 2) to answer the question of whether life imprisonment is automatically imposed if the jury deadlocks.  (71 RT 13414-16.)[7]  Before the response was given, and over the defense objection, the judge asked the bailiff to see if the jurors had any further questions.  (71 RT 13423-24.)  The bailiff advised that another note was forthcoming.  (71 RT 13426-27.)

82.     The third juror note again asked about the consequences of deadlock and also about what evidence and factors could be considered:

      1.  What happens in case of deadlock?

      2.  Does aggravating and mitigating circumstances pertain to whole trial or just to penalty phase?

      3.  Are we as jurors limited to the factors of consideration as given by court?

(108 CT 24252; 71 RT 13427.)

---

[7] Penal Code § 190.4(b) provides:

If defendant was convicted by the court sitting without a jury the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court.  If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.

If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be.  If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole.

19

(15cv1224)

83.     The judge ordered the bailiff to ask the jury foreman to clarify the second question (71 RT 13437) and the jurors responded:

> Clerification [sic] for question 2: Does evidence from whole trial pertain to juror decisions during penalty phase or just evidence from penalty phase may be used?

(108 CT 24252; 71 RT 13438.)

84.     The court drafted a proposed response.  (108 CT 24253-54.)  The defense contended that the response should remind the jurors of their "individual opinion and duty to deliberate" and to render their own individual opinion.  (71 RT 13448-49.)  The defense also argued that the judge should admonish the jurors not to take any cue from the judge.  (71 RT 13451.)  The court denied these requests.  (71 RT 13452-53.)

85.     The trial court gave the jurors a written response to their questions. Regarding deadlock, the judge conveyed the California Penal Code's provision that in the event of deadlock, the court shall dismiss the jury and order a new jury impaneled to determine the penalty.  She indicated that what happens in the event of deadlock should not influence the jurors' deliberations.  Regarding whether evidence from the whole trial pertains to penalty, the judge answered that evidence of the circumstances of the crimes for which the defendant was convicted, and the finding of special circumstances, may be considered at penalty if relevant.  The judge referred the jurors to the list of aggravating and mitigating factors.  Finally, regarding whether the jurors are limited to the factors of consideration given by the court, the judge answered in the affirmative and directed the jurors to the written instructions.  (108 CT 24253-54.)

86.     After sending the written response the judge excused counsel and the jurors resumed deliberations.  (71 RT 13453-54; 26 CT 5589-90.)

### b.     Inspection of Jury Room and Supplemental Instruction

87.     On the same day, the trial court revealed to counsel that the jurors' notes had prompted it to inquire about the condition of the jury room.  The court asked Deputy Ching, the bailiff, to inform the court "what condition the room was left in."

20

(71 RT 13455.)  Deputy Ching informed the court that the guilt phase exhibits had not been moved.  (71 RT 13456.)

88.    Based on the bailiff's observations, the trial court concluded that the jurors had not been considering the guilt phase evidence.  (71 RT 13456-57.)

89.    The prosecution agreed and argued that the judge should inform the jury that the exhibits were available for them to view.  (71 RT 13459.)

90.    The defense objected, contending that this was a critical stage, and the judge would be suggesting to the jury that it should focus on the facts of the crime; to do this a second time within 24 hours would communicate an adversarial posture.  (71 RT 13462-63.)

91.    The defense requested the opportunity to inspect the jury room themselves to corroborate the assertions that were made, but this was denied.  (71 RT 13473.)

92.    The next day, the court informed counsel that the bailiff had looked more deeply at the jury room and noticed that one exhibit had been moved.  (71 RT 13476.)

93.    The defense objected to any instructions as to what evidence should be considered.  (71 RT 13477-79.)  The defense contended that, since an exhibit had been moved, the concerns were no longer present and the jurors should be free from outside influences.  (71 RT 13478.)  The defense also noted that the jurors had heard all the guilt phase evidence and deliberated over it for eight days.  (71 RT 13481.)  According to the defense, the proposed note from the judge would effectively communicate her belief to the jurors.  (71 RT 13482.)

94.    The trial court overruled the defense objection.  (71 RT 13483.)

95.    The defense also objected on the basis that the note would raise a problem with the Strang/Fisher and Garcia evidence still in the jury room.  (71 RT 13483.)  The court responded that the note would instruct the jurors not to consider that evidence.

96.    The defense argued that the note would impact the jurors' subjective reasoning power and emphasize those exhibits which they were not to consider.  The judge said that this would be a matter of defense appeal, as it would be impossible to go

21

through and separate all of the individual pieces of evidence relating to Strang/Fisher and Garcia.  (71 RT 13484-85.)

97.    Although the defense continued to object, contending that the jurors have an absolute right not to look at exhibits they had already seen and considered (71 RT 13485), the judge ruled that the supplemental instruction would be given.  (71 RT 13487.)

98.    Accordingly, the jurors were given the following written instruction: Ladies and Gentlemen:

A matter of clarification.  In case there is any question, the jury should understand it has access to the following during deliberations at the Penalty Phase:

Jury Instructions, Jurors' Notes, Exhibits, and Verdict Forms from the Penalty Phase.

Jury Instructions, Jurors' Notes, and Exhibits from the Guilt Phase.  (Except: The Jury must exclude from consideration those Guilt Phase Instructions, Notes and Exhibits relating to the Garcia and Strang/Fisher cases.)

The jury may also request from the court: 1) answers to legal questions, and 2) transcripts of testimony as needed.

(108 CT 24265.)

### c.    Juror Issues

99.    On July 24, 1989, Juror D.O. was dismissed after the court found that he had failed to discharge his duty to deliberate under Penal Code § 1089 and perpetuated a fraud on the court regarding the reasons for his absence on July 21, 1989.  He was replaced by an alternate juror.  (71 RT 13625-27; 26 CT 5594.)

100.   The same day,[8] another juror note alleged that, during the break in deliberations, Juror L.G. had visited someone in San Quentin Prison.  The foreperson, Juror B.P., stated that Juror L.G. had visited someone in San Quentin and told the other jurors about the visitation procedures and his feelings about prisons in general.  (71 RT 13525-26.)  The defense declined to examine B.P. further on the subject and no further inquiry was conducted as to Juror L.G.'s visit to San Quentin.  (71 RT 13526-27.)

101.   Also on July 24, Juror C.D. (71 RT 13561-62) and Juror L.G. (71 RT 13566-69) were questioned by the judge concerning the 1973 rape victim.  This inquiry was prompted by a note from Juror C.D. stating that Juror L.G. had allegedly given the other jurors information about the rape victim.  (71 RT 13506; 108 CT 24257.)  The inquiry revealed that it was actually Juror D.O. who revealed the information about the rape victim.  (71 RT 13524-26, 13527-30.)  The court then questioned the remaining jurors as to any information they may have received about the 1973 rape victim.  After the inquiry, the judge ruled that deliberations should go forward.  (71 RT 13617.)

### d.   Jurors' Requests for Testimony

102.   On July 31, 1989, the jury requested and received (at 1:34 p.m.) the transcript of the stipulation of Dr. Schumann's diagnosis of Lucas at Atascadero.  (69 RT 13025-26; 108 CT 24263.)  The jurors also requested and received additional transcripts for two witnesses, Dr. Marks and Patricia Katzenmaier.  (108 CT 24263.)

### K.   Verdict, New Trial, and Modification Motions

103.   The jury returned a verdict of death on August 2, 1989.  (26 CT 5600; 67 CT 14861.)

104.   On August 25, 1989, the defense filed a motion for a new trial.  (67 CT 14870-14914.)

---

[8]  The note was erroneously dated July 23, 1989.  (108 CT 24257.)

23

105.   On September 19, 1989, the defense motions for a new trial and for modification of the verdict were denied.  (26 CT 5604.)  Judge Hammes concluded that the aggravating factors substantially outweighed the mitigating factors and that the verdict of death was warranted.  She entered a judgment of death.  (26 CT 5604.)

**L.   Direct Appeal Proceedings**

106.   Lucas appealed his conviction and death sentence to the California Supreme Court.  Attorney Thomas Lundy was appointed on July 29, 1993, to represent Lucas on appeal.  On August 15, 2003, Lucas's opening brief on direct appeal was filed.

107.   Lucas raised approximately 217 claims on direct appeal.  The Appellant's Opening Brief ("AOB"), containing all claims raised on direct appeal, was lodged with this Court by Respondent as Lodgment 6, reflected at Docket ("Dkt.") numbers 30-36. Lucas incorporates the AOB by reference here.

108.   On August 21, 2014, the California Supreme Court ("CSC") issued its opinion on direct appeal, affirming the judgment in full.  *People v. David Allen Lucas*, 60 Cal. 4th 153 (2014) (Case number S012279.)  Lucas filed a petition for rehearing on September 3, 2014, which was denied on November 12, 2014.

109.   Lucas filed a petition for writ of certiorari in the United States Supreme Court challenging the CSC's affirmation of his conviction and death sentence on March 28, 2015.  The Supreme Court denied the petition on June 1, 2015.  *David Allen Lucas v. California* (Case number 14-9137).

**M.   State Habeas Proceedings**

110.   State habeas proceedings began while the direct appeal was still pending. Lundy was also appointed to represent Lucas in state habeas corpus proceedings on July 29, 1993.  On November 6, 2008, Lucas filed a petition for writ of habeas corpus.

111.   Lucas raised approximately 53 claims in his state habeas petition. Petitioner's state Petition for Writ of Habeas Corpus, containing all claims raised in state habeas proceedings, was lodged with this Court by Respondent as Lodgment 12,

24

(15cv1224)

reflected at Dkt. numbers 30-36.  Lucas incorporates the state petition by reference here.

112.   No evidentiary hearings were held on Lucas's state habeas petition.  On November 24, 2015, the California Supreme Court summarily denied the petition on the merits.  (Case number S168103).  The court also denied Claim V(D) on procedural grounds as not properly preserved in the trial court, except to the extent it alleges ineffective assistance of trial counsel.

**N.    Federal Habeas Proceedings**

113.   On June 2, 2015, Lucas filed a request for the appointment of counsel (Dkt. 3), and the Office of the Federal Public Defender was appointed on June 16, 2015 (Dkt. 7).  Lucas timely filed the instant petition on or before the expiration of the one-year statute of limitations contained in 28 U.S.C. § 2244(d)(1).

### III.  JURISDICTIONAL ALLEGATIONS

1.     Lucas is a prisoner of the State of California.  He is illegally and unconstitutionally confined and restrained of his liberty at the California State Prison at San Quentin, California, by Warden Ronald Davis and Scott Kernan, secretary of the California Department of Corrections and Rehabilitation, pursuant to convictions and a death sentence imposed upon him by the San Diego County Superior case number 73093/75195.  No execution date is currently set.

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2241 et seq.  Venue is proper in the Southern District of California because Lucas was convicted in San Diego County, California, which is located in this district.  28 U.S.C. § 2241(d).

3.     The claims raised in this Petition allege violations of Lucas's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as international law.

# IV.  THE JACOBS CASE:  STATEMENT OF FACTS

**A.    The Prosecution's Case**

### 1.    Chronology of Events on May 4, 1979

1.    On May 4, 1979, at approximately 5:00 p.m., Michael Jacobs returned home from work and discovered the bodies of his wife, Suzanne, and their three-year-old son, Colin, in their white wood frame house in San Diego.  (1 RT 112, 118-19.)  At trial, the State's case focused heavily on the day's "chronology of events," which prosecutors deemed "important" to demonstrating that only one person (rather than two or more people) committed the murders.  (62 RT 11762-64 (closing argument).)

2.    The Jacobs had been expecting the delivery of a new dinette set on May 4, and had placed an ad to sell their old dinette set in the local newspaper.  According to Michael, Suzanne received phone calls about the old dinette set on the evening of May 3rd, and someone was supposed to come to the house to view the set on May 4th.  (1 RT 134-35.)  The prosecution's theory was that the perpetrator responded to the ad in the paper.  (62 RT 11763.)

3.    Michael Jacobs left for work on May 4 at about 6:00 a.m. (1 RT 112.) Margaret Harris, who lived across the street from the Jacobs, testified that she looked out of her kitchen window between 8:00 and 9:00 a.m. and saw an older, "beat up" sports car with a maroon body and black top parked in the Jacobs' driveway.[9]  (1 RT 175; 2 RT 191-92, 216, 235-36.)  Harris did not recognize the car, but assumed it was either a friend of Suzanne's or someone responding to the ad about the dinette set.  (2 RT 216, 244-45.)

4.    Sometime between 11:00 and 11:30 a.m., both Michael Jacobs and Margaret Harris phoned Suzanne, but no one answered.  (1 RT 112-13; 2 RT 198, 206-

---

[9]  Harris originally told police that she saw the car between 8 and 9:00 a.m.  (2 RT 234-35.)  However, at trial she testified that she saw the car between 8:30 and 9:30 a.m.

(15cv1224)

07.)  Although Margaret did not see Suzanne or Colin in the front yard as she usually did in the mornings, nothing seemed unusual to her about the day except the sports car in the driveway.  (2 RT 205, 217.)

5.      Between 12:00 and 12:30 p.m., Harris saw a Montgomery Ward's truck delivering a dinette set at the Jacobs's residence.  (2 RT 198-99, 210-15.)  The delivery truck driver, Louis Hoeniger, and his helper knocked on the front door and went around the house in an effort to see if anyone was home, but no one responded.  They did not see or hear anyone inside the house, although the helper did see dogs in the backyard who barked at them when he approached.  Hoeniger and his helper left the dinette set on the front porch at approximately 12:30 p.m.; they were at the house for no more than ten minutes.  (1 RT 141-53.)

6.      When Michael Jacobs returned home at approximately 5:00 p.m. that evening, Margaret and Ed Harris were in their driveway.  (1 RT 157-58; 2 RT 199.)  The dinette set was still on the front porch.  Michael called for Suzanne as he entered the house, but got no reply.  He opened the door of the bathroom and saw blood everywhere; he then discovered Colin's body lying in the hallway outside of the master bedroom.  (1 RT 118-19.)  Michael fled the house and lay on the grass; he appeared to Ed Harris to be in shock.  (1 RT 158.)  Margaret and Ed Harris went in the house, and Ed eventually discovered Suzanne's body in the master bedroom.  (1 RT 159-62.)  He noticed that the bed frame was broken, and he had to step over Colin's body in order to enter the master bedroom.  (1 RT 162-63.)  Margaret checked Colin's body to see if he was still breathing, but he was not.  (2 RT 199-200.)  Margaret called the operator and asked that paramedics be sent immediately.  (2 RT 199-200.)

**2.      The Crime Scene Investigation**

7.      Captain Edward Fairhurst was with the first emergency unit to arrive.  He walked through the middle of the living room, into the hallway, and observed Colin on the floor of the bedroom.  (2 RT 246-47.)  He leaned into the doorway of the master bedroom (without touching the door jamb), but did not see Suzanne's body.  He walked

27

back out the way he came in, traversing both hardwood floors and rugs, called the San Diego Police Department, and sealed the premises.  (2 RT 249, 252, 257.)

8.    When San Diego Police Officer Frederick Edwards arrived at the scene, no other investigator besides Fairhurst had been in the home.  Edwards observed a large amount of blood in the bathroom and a trail of blood from the bathroom to the master bedroom, as well as a trail of bloody footprints that went into the kitchen and toward the back door.  According to Edwards, the prints resembled SWAT combat boots.  (2 RT 261-74.)  He entered the master bedroom to check for vital signs on Suzanne and Colin; none were present.  He did not enter the kitchen or dining room.  (2 RT 263-64.)

9.    San Diego Police Evidence Technician Pat Stewart collected evidence and photographed the scene.  (2 RT 279.)  There were bloody footprints in the dining room and directly in front of the television set at the edge of the hardwood floor and rug.  (2 RT 311-12.)  The television set was on, and on top of the television were two glasses, one of which was a wine glass that still contained a wine-like substance. (4 RT 488-90, 562-63, 591-92.)  There was also an ashtray with a light brown cigarette butt inside.  (4 RT 562, 569; *see also* Def. Trial Ex. 508.)  Stewart photographed the items on top of the television; he then seized the wine glass and collected a sample of the liquid inside, with the purpose of determining whether fingerprints or other evidence could be adduced.  (9 RT 1441.)  However, he did not seize the cigarette or the other glass on top of the television, despite knowing that each of those items could contain fingerprints and/or saliva.[10]  (9 RT 1442-44; 1446.)

10.    There was a large concentration of blood on the bathroom floor, on the front and inside of the bathtub, and in the hallway outside the bathroom.  (2 RT 282-83.)  Inside the bathroom, detectives discovered a folded piece of pink paper lying on top of a pink throw rug.  (2 RT 283-84.)  Detective Gleason, using evidence gloves,

---

[10]   The technology for determining a person's ABO grouping from a saliva sample was in existence in 1979.  (48 RT 8958-59; 45 RT 8418-23.)

(15cv1224)

examined the paper, on which were found the words "Love Insurance" and "280-1700" handprinted in ink.  (2 RT 347-48; 8 RT 1360-61.)  Stewart collected the paper (hereinafter "the Love Insurance note") and took scrapings from a red stain found on the paper.  (2 RT 347-48; 8 RT 1355-57.)

11.    Colin and Suzanne were both lying in the master bedroom, where the evidence indicated that there had been a struggle on the bed and elsewhere in the room. Colin's body lay just inside the doorway, and Suzanne was lying between the chest of drawers and the foot of the waterbed.  (2 RT 323.)  The padded railing of the waterbed was dislodged and was upside down off the bed on the floor just above Colin's head. (2 RT 320; 4 RT 450-51; 9 RT 1452.)[11]  The bed clothing was in a state of disarray and two chests of drawers and the items on top of them were also in a state of disarray.  (2 RT 323.)  A clump of hairs was located on the floor near the bedpost.  (4 RT 605-06.) There were bloody hand smears near the light switch on the wall and on the door frame, and the base of the door had blood smears going down it.  (2 RT 327, 334.)

12.    The master bedroom floor was covered with blood such that no one could have walked around the bodies without leaving footprints.  (4 RT 447.)  A bloody footprint led away from Suzanne's body, with the toe of the footprint pointed toward the door.  (2 RT 334, 341.)  There was a footprint near Colin's body with the toe also pointing toward the door leading out of the bedroom.  (2 RT 342.)  There were footprints that looked like they had been made by a work boot or combat boot, all of which appeared to lead out of the bedroom and hallway toward the kitchen.  (4 RT 447.)  The prints appeared to be the same size and consistently went right foot, left foot. (4 RT 446.)  The adult footprints in the living room also led toward the dining room and then into the kitchen.  (2 RT 344-45.)

---

[11]  A white 4-hole button was located on the bed frame near the headboard; it was out of place because it did not match those on Suzanne Jacobs' shirt. (4 RT 595-96.)

(15cv1224)

13.     There was evidence that the perpetrator may have entered the kitchen, perhaps in an attempt to wash up after committing the murders.  This evidence included at least two partial bloody footprints in front of and facing the kitchen sink, with what appeared to be several other bloody imprints on top of those two prints; a washcloth in the sink; hair and other debris in the kitchen sink drain; and what appeared to be blood on the left faucet handle.  (2 RT 315-16, 344-45; 4 RT 447-48.)  To the left of the sink was a green paper towel.  (4 RT 531-32.)  None of the bloody footprints in the kitchen led out the back door.  (4 RT 481-82.)

14.     Investigators dusted throughout the house for latent prints, including on the master bedroom door, door jamb, and light switch.  (2 RT 327-28.)  Altogether there were twenty-eight latent print lifts.  (8 RT 1315.)  Investigators also seized the bedding from the master bedroom and the rug underneath Suzanne's body.  (8 RT 1335-36.)

15.     Clenched in Suzanne's left hand were a number of hairs.  (2 RT 325; 8 RT 1345.)  There were also several strands of hair clutched in her right hand (2 RT 330) and on her left elbow.  (8 RT 1346-47.)  Investigators collected some of this hair at the scene and then covered her hands with bags; the rest of the hair was removed at the morgue.  (8 RT 1330-31, 1342.)

### 3.     Injuries to the Victims

16.     Forensic pathologist Dr. David Katsuyama conducted the Jacobs' autopsies at the San Diego coroner's office.  (6 RT 943-44.)

### a.     Suzanne Jacobs

17.     Although Suzanne Jacobs had a rip in the back of her shirt and a broken bra strap, she was otherwise fully clothed and there was no evidence of sexual attack.  (2 RT 324-25, 355; 38 RT 7199.)  Oral, vaginal, and rectal swabs were taken and examined, but there was no evidence of sperm present.  (7 RT 1092-93.)

18.     In the upper portion of Suzanne's neck, there was a gaping cutting/slashing injury in which the upper portion of the neck and the underlying

30

structures were cut into and exposed, resulting in injuries to the jugular vein and carotid artery on the right side of the neck.  (6 RT 944-45.)  There appeared to be at least six distinct cuts through her neck which were likely caused by a relatively thick, stiff blade, anywhere from two to six inches long.  (6 RT 979-80.)  Suzanne also had three serious stab wounds—a small wound above her left collarbone that penetrated her subclavian vein, a larger wound in her chest which severed the pulmonary artery, and a wound to her abdomen that deeply penetrated her liver.  (6 RT 953-78.)  Without immediate treatment, any of the three stab wounds could have been fatal.  (6 RT 954, 961.)  There were no noticeable ligature marks, although Dr. Katsuyama did observe some petechial hemorrhaging[12] in the inner aspect of the lower eyelids.  (6 RT 970-73; 7 RT 1093-94.)  Because Suzanne's tongue was clenched between her teeth, Dr. Katsuyama thought there was a possibility that she had been restrained underneath the jaw.  (6 RT 974-75.)

19.     Blood testing revealed a blood/alcohol level of .04%.  (7 RT 1071-72.)  Based on her weight of 126 pounds, this would have been consistent with consumption of at least two standard drinks an hour before death, or more than two drinks earlier in the morning.  (7 RT 1071-73, 1088; 44 RT 8319-21 (defense).)

### b.     Colin Jacobs

20.     Colin's neck appeared to have been cut with at least two distinct slashes, transecting the right jugular vein and right carotid artery.  (6 RT 976-77, 984-85.)  There were no noticeable ligature marks and no evidence of choking or petechiae.  (6 RT 989; 7 RT 1093-94.)  There were cuts on the tips of two of his fingers, his right thumb, and the palm of his left hand that appeared to be consistent with the time frame of the cutting injuries to his neck.  (6 RT 984-86.)  Like Suzanne, the wounds appeared to have been caused by an instrument with a sharp edge and relatively stiff blade.  (6 RT 987.)

---

[12]  A petechial hemorrhage is a tiny pinpoint red mark that is often an indication of a death by manual strangulation, hanging, or smothering.

(15cv1224)

21.   Dr. Katsuyama did not conduct time of death tests on either victim, as he believed that too much time had elapsed from the time the bodies were found until the time he conducted the autopsies.  (6 RT 989-90; 7 RT 1080.)

### 4.   The Arrest of John Massingale[13]

22.   John Massingale, a drifter from Harlan County, Kentucky, became a suspect in the Jacobs murders after his former traveling companion, Jimmy Joe Nelson, told police officers in Alabama that a person named "Johnny" had confessed to the killing of a woman and child in San Diego.  (41 RT 7869, 7910 (defense).)  According to Nelson, "Johnny" stated that he had been drinking with the woman in her home (a white wood frame house) and that he cut the victims' throats with a knife in the bedroom.  (41 RT 7923; 47 RT 8897-99 (defense).)  Authorities eventually determined that "Johnny" was John Massingale, and in March 1984, San Diego Police Department Detectives David Ayers and William Green[14] located Massingale in Kentucky and interrogated him.  (5 RT 667, 688, 701.)  Kentucky State Police Detective Denny Pace, who knew Massingale and his family, was also present.  (5 RT 745; 45 RT 8468 (defense).)  Massingale trusted Pace and wanted him present during the interview with Ayers and Green.  (5 RT 808-09.)

23.   In their initial interview, Massingale admitted that he had been a drifter in Southern California in 1979 through 1980, but he initially denied any knowledge about the Jacobs murders or about bragging about their deaths to his fellow hitchhikers. However, the next day, in tape-recorded interviews, Massingale admitted that he used to carry a fixed-blade knife, and he ultimately confessed to the murders.  His confession included details which matched the crime scene, including the fact that the Jacobs home

---

[13]   Massingale's confession and arrest were the primary focus of Lucas's defense to the Jacobs prosecution.  More details about Massingale's role in the Jacobs case are discussed in Part IV(B) (The Defense Case).

[14]   William Green had been a detective in the San Diego Police Department Team Four homicide unit.  He later went to work for the San Diego District Attorney's office and, at the time of trial, was Supervising Criminal Investigator.  (42 RT 7968.)

32

(15cv1224)

was white with a blue dune buggy parked outside, the approximate ages of Suzanne and Colin, that Colin had been killed in the bathroom, and that Massingale exited the back door while hearing the sounds of barking dogs.

24.    At trial, Massingale retracted his confession.  He denied telling anybody that he had murdered anyone, denied carrying anything except a small pocket knife, and denied ever mistreating or hitting a woman.  (5 RT 702-03, 717-18, 722, 806-07.) He testified that he confessed because the San Diego police officers intimidated and threatened him during the interrogation, saying things in a "real hateful" manner and yelling and screaming at him.  (5 RT 786-87, 811-12.)  At one point, according to Massingale, Pace and Ayers got into an argument over the way the San Diego officers were talking to Massingale.  (5 RT 811; 6 RT 886, 897-98.)  Massingale testified that Pace told him that the San Diego detectives had proof that Massingale committed the crime, so Massingale should give the detectives the information they wanted.  (5 RT 753-54; 6 RT 869-70.)  Massingale stated that during the first interrogation detectives showed him photographs of the crime scene, and he was able to use details from those photographs in his later recorded confessions.  (5 RT 667, 691; 6 RT 872-75.) Massingale testified that he had no money for a lawyer, was frightened of the detectives, and feared receiving the death penalty.  (5 RT 819-21; 6 RT 876-78.) According to Massingale, Pace told him that the cops had fingerprints, handwriting, and hair evidence, and that Massingale should throw himself on the mercy of the court. (6 RT 900.)  At that point Massingale confessed because he was afraid of dying in the gas chamber and because he wanted to get the detectives off his back.  (5 RT 691.)

25.    Massingale was arrested and charged with the Jacobs murders in March 1984.  (4 RT 461-62.)  However, with the December 1984 arrest of David Lucas, Massingale was released.[15]  (42 CT 9255-56.)

_____

[15]  Based on "insufficiency of evidence and pursuant to Penal Code § 1385," the prosecution moved for dismissal of the charges against Massingale, which was granted

(15cv1224)

26.     Massingale testified that had very little education, and only went as far as the 5th grade in special education classes.  (5 RT 659-61.)  He could read and spell small words and write his name, but he could not do a lot of writing and was not capable of reading a book.  (5 RT 659, 662; 6 RT 858.)  When he traveled, he hitchhiked and often stayed in Salvation Army missions.  (5 RT 664; 50 RT 9471-72 (defense).)  He had experienced a series of head injuries and had also undergone drug detoxification.  (5 RT 665-66, 688.)

### 5.     Forensic Evidence

#### a.     The Love Insurance Note

27.     Shortly after the investigation began, Detective Gleason completed a lab work request (4 RT 460) to have the note found in the Jacobs' bathroom sprayed with ninhydrin, a chemical turns purple that when applied to paper.  If fingerprints are present, the chemical makes them visible.  (4 RT 460-61; 8 RT 1362.)  Once an item is treated with ninhydrin, any fingerprints raised will eventually oxidize and evaporate.  Therefore, Gleason requested that the note be photographed to preserve any evidence of fingerprints and the handprinting on the paper.  (4 RT 460-61, 582.)

28.     On May 11, 1979, Pat Stewart took a series of photographs of the note and then applied the ninhydrin, which raised a partial fingerprint.  (9 RT 1489-90, 1510-11; People's Trial Exs. 20, 21, and 22A and B.)  Stewart did not attempt to photograph or record specifically what the fingerprint looked like.  (8 RT 1364; 9 RT 1487, 1491, 1519-20.)

29.     Pursuant to department policy, Stewart transferred the note to San Diego Police Department latent print examiner Leigh Emmerson.  (8 RT 1365; 9 RT 1498; 10 RT 1809.)  At that time it was a matter of policy to have all fingerprints examined by

---

on January 4, 1985.  (42 CT 9255-56.)  Thereafter, on May 24, 1985, Massingale sought and obtained a judgment of factual innocence and order sealing and destroying his arrest record.  (42 CT 9256.)  In the present case, the defense moved to have the charges against Massingale reinstated.  (39 CT 8546-8636.)  The motion was denied. (68 CT 15201-03.)

latent print examiners.  (8 RT 1365; 9 RT 1498-1500.)  The prints would then be photographed after the latent print examiner had made an analysis and/or if the latent print examiner determined the print had some value and requested that a print be photographed. (8 RT 1365-66; 9 RT 1498-1500.)[16]

30.    Emmerson examined the Love Insurance note and found a partial latent print with five points visible for comparison. (10 RT 1809.)  When Emmerson observed the five point latent he immediately went to Gleason and asked him if the piece of paper had much meaning in the case.  (10 RT 1810-11; 11 RT 1850-51.)  When Gleason told him that it did, Emmerson said that the print had five or six points and should be preserved.  (10 RT 1810; 11 RT 1850-51.)  According to Emmerson, although the print was not detailed enough for identification purposes, it could successfully be used to eliminate possible suspects.  (10 RT 1810; 11 RT 1857.)  Emmerson described it as a very important piece of evidence.  (10 RT 1810.)  After Emmerson told the detectives about the print, it was retained in the Latent Print Section in a locked file.  (10 RT 1811; 11 RT 1850-52.)  He did not photograph it because it was the responsibility of the investigating officer, not the latent print examiner, to photograph ninhydrin results.  (10 RT 1811; 11 RT 1849.)  Typically, the latent print examiner would notify the investigating officer that a print had been raised; the investigating officer would inform a lab technician; and a lab technician would photograph the results.  (11 RT 1852; *see also* 8 RT 1216.)

31.    After Johnny Massingale became a suspect in the Jacobs murders, Gleason and Stewart discovered the print on the Love Insurance note was no longer visible, and no photographs of the ninhydrined print could be found.  (4 RT 581; 8 RT 1366, 9 RT

---

[16]  Stewart thought he had seen a black and white Polaroid photo of the latent print on the Love Insurance note taken by Emmerson after the ninhydrin was applied. (8 RT 1365; 9 RT 1500-01, 1533-36.)  In the ordinary course of business, a Polaroid taken of a raised print would have gone with the latent to the Latent Print Section. (9 RT 1484-85.)  No photo of the latent print on the note was ever found.

35

(15cv1224)

1518-19.)  Stewart tried without success to get the print to reappear through the use of more ninhydrin.  (8 RT 1367; 9 RT 1518.)  SDPD sent the note to the FBI to see if the print could be raised again, but the FBI was also unsuccessful.  (8 RT 1367-68.)  When the FBI returned the note it was a blackish, unreadable piece of paper, and the writing on the note was barely visible.  (8 RT 1370; 9 RT 1518, 1581.)

32.    After Lucas was arrested in December 1984, police obtained handprinting exemplars from him, which were examined by John J. Harris, a comparative handwriting analyst.  Harris compared those exemplars, as well as other writings made by Lucas in the past, to photographs of the Love Insurance note taken before the ninhydrin was applied.  Harris testified that it was his expert opinion, with "reasonable certainty," that Lucas wrote the Love Insurance note.[17]

### b.    Boot Print Evidence

33.    Roy Nilson, a former deputy sheriff who specialized in shoe print examinations, examined a photograph of a single bloody footprint found in the Jacobs' living room.  He concluded that the sole pattern matched that of a size 12 Vibram style No. 100 sole, which is a type of sole typically fitted to work or hiking boots.  (11 RT 1906, 2018-19.)

34.    In the spring of 1979, Lucas worked at Precision Metal, a metal forging company, where he wore Lehigh work boots in a size 10½ D.  Nilson researched this brand and size and learned that the manufacturer often used a size 12 Vibram sole trimmed to fit a size 10 shoe.  (12 RT 2066-67.)  Nilson compared an inked print from an exemplar pair of Lehigh size 10½ boots with the photograph of the bloody footprint from the Jacobs crime scene and concluded that it was possible the bloody prints could have been left by the same brand and size of boot as the exemplar.  (11 RT 2020-21.)

---

[17]   Defense counsel challenged the use of Harris as a handwriting expert, the use of copies of the note instead of the original and Harris's ultimate identification of Lucas as the author of the Love Insurance note.  (*See* Claims 1 and 2.)

However, the boot print size itself was consistent with the shoe sizes of at least four different people, including Massingale, Lucas, and Fire Captain Fairhurst, who was the first official to arrive at the crime scene.  (6 RT 890-91; 11 RT 1914-16; 12 RT 2066-67; 43 RT 8176-77 (defense).)

### c.   Hair Comparison Evidence

35.    John Simms, a criminalist at the SDPD forensic science laboratory, prepared slides of hairs collected at the crime scene, including the hairs found in Suzanne's clenched hands, and compared them to hair samples from Lucas[18] and Massingale.  (12 RT 2101-05, 2125-27, 2185-86.)  Simms determined that there was "no match, no exclusion" with regard to Lucas's hair, although three of the hairs collected from Suzanne's right hand (People's Trial Ex. 61) were "close" to Lucas's hair standards.  (12 RT 2185-86, 2191-92.)  Ultimately, Simms was not able to include or exclude Lucas as the source of any of the hair found at the crime scene or collected from the morgue.  (12 RT 2152-60.)

36.    James Bailey, a criminalist with the Los Angeles Sheriff's Department, also examined the questioned hairs.  In contrast to Simms, Bailey concluded that most of the hairs from Suzanne's right hand were similar in physical and microscopic characteristics to the known head hair from Lucas.  (12 RT 2203-05.)  Two other hairs collected from Suzanne's right hand at the crime scene (People's Trial Ex. 61E) were close to the hair samples of both Colin Jacobs and David Lucas.  (12 RT 2210.)  Bailey also examined hairs which were collected from Suzanne's right hand at the morgue.  (12  RT 2217; 13 RT 2222; People's Trial Ex. 65C.)  Of those hairs, three were similar

---

[18]  The Lucas hair standards were taken on January 2, 1985 while he was at the sheriff's jail facility.  (12 RT 2148, 2151.)  Simms testified the police collected combings of loose head hair as well as samples from the top, front scalp region, the right and left side scalp regions, and the rear portion of Lucas's scalp.  (12 RT 2130-32.)  According to Simms, loose hairs may have different types of characteristics in them, so it was important to collect them and include them in the standard.  (12 RT 2132-33.)

(15cv1224)

to Colin; four were similar to the head hair sample from Lucas, and two could have come from either Colin or Lucas. (13 RT 2222.) Other hairs collected from the scene which could have come from Lucas included a hair collected from Suzanne's left elbow (13 RT 2223-24; People's Trial Ex. 67) and a hair collected from the bedroom rug. (12 RT 2215-16.)

37.    Bailey testified that he first received hair evidence from the Jacobs homicide case in October 1983, when District Attorney Investigator William Green delivered them to him in Los Angeles. (13 RT 2248.) Included in that evidence were bindles which were identified as coming from the left and right hands of Suzanne Jacobs. He marked the bindle with hairs from the left hand of Suzanne Jacobs (People's Trial Ex. 66) as JB-1 (to identify that he had examined the contents). However, when he opened the bindle he did not find any hair inside. Similarly, the bindle labeled "hairs from right hand of female adult," which he marked as JB-3, also did not contain any hairs. (13 RT 2248-49.)

38.    In 1985, after Lucas's arrest, SDPD sent the hair evidence from the Jacobs case back to Bailey, along with Lucas's hair standards. This time, bindle JB-3 contained a number of glass slides with mounted hairs. (13 RT 2251.)

### d.    Blood and Fingerprint Evidence

39.    Testing revealed that Suzanne and Colin Jacobs both had Type O blood, while Michael Jacobs's blood was Type A. (8 RT 1164, 1168.) Criminalist James Stam collected bloodstain evidence samples from various sources in the Jacobs home, including, *inter alia*, shoe prints, portions of the kitchen sink, the green towel near the sink, the bathtub, the bedroom door jamb, fingernail clippings from Suzanne Jacobs, and scrapings from the Love Insurance note. (7 RT 1107-52; 8 RT 1162-67.) Serological analysis of these items revealed that the source blood was type O and therefore could have come from Suzanne or Colin (or any other type O donor).

40.    John Torres, a latent print examiner with SDPD, found only five prints at the scene which were useful for identification purposes. Of these, two matched

38

(15cv1224)

1   Michael Jacobs; the remaining three prints did not match Lucas, Suzanne, Colin, or

2   Michael.  (10 RT 1684-87.)  Torres never examined the three prints to determine

3   whether Massingale could be excluded as the donor.  (10 RT 1792-93.)

### 6.   Lucas's Mother's MG Midget

4

5        41.   Margaret Harris, the next door neighbor to the Jacobs, told Detective

6   Green that the car she saw in the driveway the morning of the homicides was a maroon

7   sports car, but she did not identify what kind of sports car it was.  (2 RT 208.)  At trial,

8   she testified that the car she saw was a maroon MGB.  Harris testified that she did not

9   originally mention that the car was an MGB because she did not know the make until

10  she and her husband drove around two days later looking for a vehicle that was similar

11  to the one she had seen in the Jacobs' driveway, and she saw an MGB which reminded

12  her of the car she saw that day.  (2 RT 190-91, 217-18, 221-23.)  According to DMV

13  records, Lucas's mother, Patricia, bought a MG Midget Roadster on December 20,

14  1974.  (14 RT 2500; People's Trial Ex. 118.)  On November 11, 1976, Lucas was

15  stopped for speeding while driving his mother's MG, and then involved in an accident

16  while driving the MG on November 19, 1976.  (14 RT 2540-44, 2560.)

### 7.   Lucas's Whereabouts on the Day of the Homicides

17

18       42.   In May 1979, Lucas worked for Precision Metals as a furnace operator and

19  was a resident of the New Horizons program, which was associated with the Salvation

20  Army in downtown San Diego.  (11 RT 1955-56.)  While living there, Lucas's presence

21  was monitored, and he was required to be in the facility between the hours of 9:00 a.m.

22  and 1:00 a.m.  (11 RT 1957-61, 1963.)  There were no reports of Lucas violating the

23  time restrictions during the time he lived at the residence. (11 RT 1958-59.)

24       43.   Employee attendance records indicated that Lucas was not at work on May

25  3 or May 4, 1979.  (11 RT 1939, 1945-46.)

26

27

28

**B.     Defense Evidence**

  **1.     John Massingale**

  44. Massingale's role as a third-party suspect was the crux of Lucas's defense to the Jacobs homicides.  In support of that defense, trial counsel called a number of witnesses to impeach Massingale's testimony that he was not involved in the Jacobs killings.  These witnesses also provided evidence which impeached Massingale's claims that he never carried a fixed-blade knife, that he never told other people about the killings, and that the police had coerced his confession.

  **a.     Pre-Confession Events**

  45. In August 1980, John "Shorty" Smith was driving from Arizona to Benton Station, California to look for work in a gold mine.  (41 RT 7814.)  On his way to California, he picked up a hitchhiker who introduced himself as Johnny Massingale.  (41 RT 7815-17.)  Smith and Massingale traveled together to Benton Station, but when they arrived, the mine was closed, so Smith and Massingale continued on to Los Angeles.  (41 RT 7814-15.)  Somewhere along the way, Smith picked up another hitchhiker, Jimmy Joe Nelson.  (41 RT 7818-19.)

  46. During his direct testimony, Massingale claimed that in 1980 the only knife he carried was a small pocket knife.  (5 RT 722.)  However, both Smith and Nelson recalled that during their trip to Los Angeles, Massingale kept a long knife on his belt.  Smith recalled Massingale wearing a Buck knife with an approximately 4½" long blade.  (41 RT 7820-21.)  Nelson remembered Massingale had a Bowie knife with an 11" or 12" blade which he wore in a holster which was so sharp that "you could just stick the end of your finger with it and it would draw blood."  (41 RT 7864-65, 7896-97.)  He still had a scar on the end of his finger from pricking himself with the knife.  (41 RT 7865.)  Additionally, California Highway Patrol Officer Robert McLean testified that he pulled Massingale over in August 1980 for hitchhiking, and noted that Massingale (who McLean described as being "a very scary individual") was wearing a sheathed knife with a six to eight inch fixed blade.  (42 RT 7958.)

40

(15cv1224)

47.     At some point during their drive to Los Angeles, Massingale told Smith and Nelson that he was wanted for murder in California because he had cut someone's head off. (41 RT 7816-18.)  According to Smith, Massingale said something about a kid who was pestering him and the woman he was with, and he got so frustrated that he shut the kid up because "[h]e was bothering about going to the bathroom so much." (41 RT 7821.)  It seemed to Smith that Massingale was bragging about killing these people. (41 RT 7831.)

48.     Nelson confirmed Smith's recollection of events.  Massingale told Nelson that in the spring of 1979, he had met a woman named "Sue Ann" or "Suzanne Jacobs" in San Diego and had gone to her house or apartment. (41 RT 7864, 7866-67, 7896, 7904, 7921.)[19]  Massingale told Nelson he and the woman had been drinking and were sitting on the couch in the living room making out when her little boy came in and wanted to be taken to the bathroom. (41 RT 7864-65, 7879-80, 7905.)  The woman got up to take the boy to the bathroom and Massingale got up as well.  Massingale told Nelson that he then "took care of it" by grabbing the woman by the hair and slitting her throat and the little boy's throat with a knife. (41 RT 7864-66.)  He just reached up, caught the woman by the hair and slit her throat.  Massingale added that after he was done, "the little boy would never have to go to the bathroom again." (41 RT 7866.)  Massingale told him that when he was finished there was blood all over the place. (41 RT 7900.)

49.     Eventually, Smith and Nelson parted ways with Massingale in Los Angeles and returned to Kentucky. (41 RT 7828-29, 7898, 7902-03.)  When they parted, Massingale gave Nelson clothing and other items which he said he no longer

---

[19]  In 1981, Nelson gave a written statement which said: "He (Massingale) told me that he had met this Suzanne S-u-z-a-n-n-e Jacobs.  I believe he said her last name was Jacobs, if I am not badly mistaken, in a bar." (41 RT 7921.)  On re-cross, Nelson explained that he spoke fast with a southern accent and that there wasn't much difference between "Sue Ann" and "Suzanne." (41 RT 7921.)

41

(15cv1224)

needed.  (41 RT 7869, 7890, 7902.)  One of the shirts was a striped silk-like shirt, and Nelson noticed that the left sleeve looked as if a woman had taken her fingernails and raked them down the sleeve.  (41 RT 7869-70.)  There were runs in the shirt and a substance on it that looked like blood.  (41 RT 7870.)

50.    In December 1980, Jimmie Joe Nelson was arrested on another matter in Alabama.  Nelson told Alabama Detective Sergeant Harold Phillips that a person named Johnny had confessed to the killing of a woman and child in San Diego by cutting their throats with a knife in the bedroom.  (41 RT 7869, 7910, 7918, 7922-23; 47 RT 8896-99.)  According to Nelson, "Johnny" said that he and the woman had been drinking at her house and he cut their throats with a knife in the bedroom.  (47 RT 8897-99.)  Nelson told Phillips that the victims lived in a white wood frame house and he mentioned a blue vehicle as well.  (41 RT 7923-24.)

51.    Phillips contacted the San Diego Police Department and provided Detective David Ayers with the information Nelson had given him.  (41 RT 7765.)  Ayers did not provide Phillips with any details about the crimes or the names of the victims.  (45 RT 8589.)  At Ayers's request, Phillips recovered the clothing and other items that Massingale had given to Phillips, which included a pair of work boots as well as the stained and ripped shirt that Nelson had described.  (41 RT 7779-80, 7785-86.)  Phillips mailed all of Massingale's items to Detective Ayers.[20]  (41 RT 7780-85.)

52.    Detective Ayers spoke with Nelson on January 26, 1981, and Nelson relayed the same information to Ayers that he told Sergeant Phillips, except he claimed that the perpetrator of the murders was a man named David Woods.  (41 RT 7882; 45 RT 8544-45.)  However, the next day Nelson told Ayers that he had lied about Woods, and that a person named "Johnny" had actually bragged about committing the murders.

_____

[20]  As detailed in Claim 14, the box Phillips sent was received by Ayers. However, when Phillips reviewed the box and its contents at trial, the shirt was not in the box.  (41 RT 7780-81, 7784-85; Def. Trial Ex. 505A-1.)  There has been no explanation from SDPD about where the shirt could have gone.

42

(41 RT 7882-83, 7906; 45 RT 8543-44.)  Nelson stated that he fingered Woods for the crime because Woods had previously accused Nelson of committing a murder that Woods had actually committed.  (41 RT 7882-83, 7906.)

53.     Eventually, Ayers was able to locate Massingale, who was in custody in Harlan County, Kentucky on an outstanding warrant.  (45 RT 8474-75, 8504, 8561.)

### b.     Massingale's Confessions

54.     Detective Ayers and San Diego County District Attorney William Green travelled to Harlan County and first interviewed Massingale on March 18, 1984.  (42 RT 8036; 45 RT 8561-63.)  Detective Pace was also present.  (45 RT 8474.)  Green and Ayers identified themselves, explained that they were there to discuss the 1979 case, and informed Massingale of his *Miranda* rights.  (42 RT 8039-40; 45 RT 8475.)  Massingale stated he understood his rights and agreed to speak with the detectives.  (42 RT 8106; 45 RT 8475-76.)

55.     After the interview began, Pace wanted to leave the room, but Massingale asked him to stay.  (42 RT 8113; 45 RT 8474, 8479.)  Massingale was allowed to use the bathroom, he was given coffee and cigarettes, and they took breaks as needed.  (42 RT 8070-71.)  The detectives denied that they screamed at Massingale or threatened him in any way.  (45 RT 8587.)

56.     Massingale admitted that he had met Smith while hitchhiking in 1979, and that they rode together in a van to California; they ended up in Hollywood, where they eventually parted company.  (42 RT 8058-59.)  However, he denied confessing to or committing the Jacobs homicides.  (42 RT 8106; 45 RT 8584-87.)  Ayers showed Massingale a photo of Nelson, but Massingale said he had never seen Nelson before.  (42 RT 8059, 8092.)  Massingale also denied carrying any knives, but when told that there were witnesses who saw him with a large knife he finally admitted to carrying a pocket knife on occasion.  (42 RT 8065-66.)

57.     At one point, Massingale asked Pace if Pace thought he needed an attorney.  (45 RT 8483.)  Pace told him, "Johnny, if you didn't do anything wrong, I

43

don't feel like you need an attorney." (45 RT 8483.)  Massingale then voluntarily continued with the interview.  (45 RT 8483.)  Later, Ayers told Massingale it was a serious case that could call for the death penalty.  (45 RT 8597.)  Eventually, Massingale indicated he wanted to talk to a lawyer and would not talk to the detectives any longer.  (42 RT 8071, 8114; 45 RT 8478.)  The interview, which lasted about five hours and was not recorded, concluded at that point.  (42 RT 8071-73, 8104; 45 RT 8591.)

58.    During the interview, Massingale was shown four out of the more than 100 crime scene photos taken at the Jacobs home.  (42 RT 8080-83, 8113; 45 RT 8578-79, 8583-87.)  Two of the photos showed full body shots of the victims lying on the bedroom floor; their wounds were not visible.  (42 RT 8086-87.)  The other photos were of the front and side yards outside of the house.  (42 RT 8086; 45 RT 8580-83.)  The detectives deliberately withheld various details about the murders, including the fact that the victims had nearly been decapitated.  In fact, Detective Pace knew very few details about the murders, except that Colin had been killed in the bathroom.  (45 RT 8484.)

59.    After the interview, Massingale told Pace that he wanted to speak with him alone.  (45 RT 8480-83.)  The two men sat in a patrol car, and Massingale asked Pace what he should do.  Pace advised Massingale that Ayers and Green knew more than they were telling Massingale, and said that Massingale should just tell the truth.  (45 RT 8484, 8506.)  Pace never told Massingale that he should confess—in fact, he told Massingale not to confess to anything he did not do.  (45 RT 8497-98, 8506.)  Massingale asked Pace what other information the detectives had about the crime, but Pace said that he could not give Massingale any information about the crime unless Ayers and Green gave him permission.  (45 RT 8484.)  Although Pace denied telling Massingale that he was going to be sent to the gas chamber, he did explain to Massingale that the case was murder in the first degree and the maximum sentence was the death penalty.  (45 RT 8485, 8507, 8522.)  Pace assured Massingale that he would

44

not be convicted of a crime he did not commit, but that if he did commit the crimes he should ask for mercy from the court.  (45 RT 8507-08.)  At that point, Massingale indicated that he wanted Pace to speak to Green and Ayers, so they returned to the State Police post.  (45 RT 8486.)

60.     According to Pace, he took Massingale back into his office and told him that Ayers and Green knew he was lying about not carrying a knife and about not knowing Nelson.  (45 RT 8487-88.)  Pace told Massingale that the only way he could have known the boy was killed in the bathroom was if he was present at the scene, at which point Massingale said, "I'm guilty."  (45 RT 8488.)

61.     Massingale had been nervous, but after he said he was guilty it appeared to be a relief to him and he became more talkative.  (45 RT 8500-01.)  He described meeting a lady named Sue Ann at a bar and going back to her house.  "Sue Ann" was approximately 27 years old and the boy was approximately five.  (45 RT 8490.)  Massingale and "Sue Ann" sat on the couch in her living room and he pinched her on the leg.  (45 RT 8489-91.)  Massingale was "spaced out" on blotter acid, and when she told him to "get the hell out" he went crazy.  (45 RT 8489, 8491.)  He remembered the little boy saying, "Don't hit my mommy," and he remembered cutting both of them.  He remembered cutting the boy in the bathroom, but doesn't remember where he went after he left the bathroom.  (45 RT 8489.)  Massingale said he cut them with a dagger that he carried in the sheepskin holster on his belt, and that he washed up in the bathroom or kitchen sink and then left the residence through the back door.  (45 RT 8489.)  He said he remembered hearing a dog barking,[21] and he also remembered seeing a blue dune buggy parked in the driveway beside the house, which was white.  (45 RT 8490.)  Massingale said he went to the Salvation Army to get new clothes and he later buried the knife in the desert in Mexico.  (45 RT 8490-91, 8513.)  Massingale

_____

[21]  Several defense witnesses testified that the Jacobs had dogs which barked. (42 RT 7992; 44 RT 8287-89.)

(15cv1224)

also admitted that he did know Nelson, that he had given him a black flowered shirt, and that he told Nelson that he almost cut a woman named Sue Ann's head off, along with her son's head.  (45 RT 8488, 8501.)

62.    Pace acknowledged that during his conversation with Massingale he had shown Massingale a photograph of the Jacobs bathroom.  (45 RT 8494.)  However, none of the photos Massingale saw showed the victims' deep neck wounds.

63.    During the prior interview conducted by Detectives Green and Ayers, Green never told Massingale anything about Colin Jacobs being slashed in the bathroom, about the possibility that the killer washed his hands in the kitchen sink, or about the Jacobs' dogs.  (42 RT 8087; 45 RT 8584.)  Ayers never told Massingale that Suzanne and Colin were nearly decapitated.  (45 RT 8582-83.)

64.    The following day, Massingale gave a tape-recorded confession which recounted substantially what he had confessed to Pace the day before.  (42 RT 8089-90, 8110; 45 RT 8492, 8501.)  During this interview, Massingale again confessed to killing Suzanne and Colin Jacobs.  (5 RT 802-03 (prosecution).)  Massingale later agreed to a second taped interview, where he again confessed to the crimes and repeatedly apologized for what he had done.  (42 RT 8112, 8117.)  According to Green, Massingale's confession appeared to be genuine and believable.  (42 RT 8094-96.)

### c.    Massingale's Violence Toward Women

65.    On direct examination, Massingale denied that he would ever hit a woman.  (5 RT 806 (prosecution).)  However, in December 1988, William Turner witnessed Massingale strike his wife, throw her around the room and against a wall.  (48 RT 8694; 45 RT 8536-37.)

### d.    The San Diego Salvation Army Rescue Mission

66.    In 1979, Kenneth Clarence worked at the San Diego Rescue Mission.  (50 RT 9471-73.)  The mission was located in downtown San Diego and provided free clothing, food, and shelter to needy individuals.  (50 RT 9473.)  Clarence identified

46

1    Massingale and testified that Massingale came to the Rescue Mission and stayed a few

2    times in 1979.[22]  (50 RT 9473.)

3        **2.    Boot Print Evidence**

4        67.    The defense presented several pieces of evidence challenging the

5    prosecution's theory that Lucas had left the bloody boot prints found at the crime scene.

6        68.    First, Lucas presented evidence that a furnace operator at Precision Metals

7    (the job held by Lucas at the time of the crimes) would not have worn their safety boots

8    outside of work.  The furnace operators worked in an area where the grit and lubes

9    were on the floor, as well as metal residue, which would get picked up in the crevices

10   of the sole pattern of the operators' boots.  (45 RT 8456-57, 8463.)  Workers were

11   required to wear leather boots in the work area.  (45 RT 8458.)  Because the boots were

12   heavily soiled with the lubricants used in the forge shop, workers would take off their

13   boots and coveralls in the dressing room and leave the boots in their lockers.  (45 RT

14   8435-38.)  If someone were to wear the boots in the house, the metal residue, grit, and

15   lubricants would ruin their carpet and leave tracks throughout the house.  (45 RT 8438,

16   8457, 8461.)  No evidence of metal residue, grit, or lubricants was found on the floor in

17   the Jacobs residence.

18       69.    SDPD Criminalist John Simms testified that he compared a pair of boots

19   seized from Lucas's house to a photographic enlargement of a print found at the Jacobs

20   home.  (46 RT 8677.)  While he noted some generally similar tread design, he

21   concluded that there was sufficient dissimilarity in the tread detail to find that overall

22   the boots did not match the shoe print at the Jacobs crime scene.  (46 RT 8677.)

---

23
24
25
26       [22]  Clarence's testimony was relevant to demonstrate (1) that Massingale was
     being truthful when he stated that he got fresh clothes at the Salvation Army after
27   killing the Jacobs; and (2) in support of Lucas's claim that if the writing on the Love
     Insurance note was his, it came from an article of clothing that Lucas left at the
28   Salvation Army after staying there himself in 1979. (*See* Claims 1 and 2.)

70.     In contrast to the boots seized from Lucas's home, the boots worn by Captain Edward Fairhurst, the first official to arrive at the Jacobs house, did look similar to the bloody boot print.  (43 RT 8171.)  Fairhurst originally denied wearing boots with a Vibram sole on May 4, 1979, and indeed denied ever owning a pair of shoes with Vibram soles.  (2 RT 254.)  However, shoemaker David Daywood testified that Fairhurst was one of his longtime customers, and in April 1979, Daywood re-soled a pair of Fairhurst's shoes with Vibram soles and heels.  (43 RT 8171-75.)  Fairhurst's boots were size 10½, and Daywood believed that the soles he put on Fairhurst's boots were size 12 and had to be cut down to fit the shoe, as that was what they usually had to do with that size shoe.  (43 RT 8176-77.)  Moreover, defense investigator Thomas Caldwell testified that he contacted Fairhurst in 1986, and Fairhurst admitted that he was wearing Vibram-soled boots when he entered the Jacobs home.  (57 RT 10779.)

71.     Fairhurst testified that no one at the crime scene ever checked his boots to see if perhaps they had left the prints at the scene.  Fairhurst had thrown away the boots in question by the time defense investigators contacted him about the boot prints.  (43 RT 8170.)

### 3.     The Love Insurance Note

72.     David Oleksow, a handwriting expert for the San Diego County Sheriff's Department, examined the handwriting on the Love Insurance note on several occasions, both before and after the note had been rendered unreadable.  After Lucas was arrested, Oleksow compared Lucas's handwriting samples with photographs of the note.  According to Oleksow, the handwriting on the note had a limited amount of characters from which to make useful comparisons.  (48 RT 8987-88.)  Moreover, because he was dealing with a photograph of the note, he was unable to conduct the microscopic examinations he normally would do to look for embossing and other details caused by writing pressure.  (48 RT 8988-89.)  After conducting three comparisons of Lucas's writing with the note, Oleksow determined that he could not positively identify Lucas as the writer of the note.  (48 RT 8982-85, 8993.)  Oleksow

observed "numerous unexplained variations" between the printings, but also no "significant differences." (48 RT 8982, 8986.)

73.     On cross by the prosecution, Oleksow acknowledged that a March 1985 report (prepared after his third and final comparative analysis) stated that Lucas was "probably responsible" for the handwriting on the Love Insurance note. (48 RT 8994.)

### 4.     Hair Evidence

74.     The defense re-called prosecution expert John Simms, who had been unable to determine whether Lucas was the source of the hairs found at the crime scene and on Suzanne's body. Simms explained that because "blond hairs have a limited range of characteristics," all light blond hair can be expected to show at least some similarity. Hence, blond hair with similar characteristics can come from different individuals. (46 RT 8676.) Additionally, Lucas's hair could have changed in the five plus year hiatus between 1979 and 1984 when the samples were obtained from Lucas. (46 RT 8676.)

### 5.     The MG

75.     The defense presented evidence to rebut the state's theory that Lucas used his mother Pat's MG to drive to the Jacobs house on the day of the killings.

76.     Jeannette Robertson, a neighbor of the Jacobs family, testified that she drove by the Jacobs residence around 9:00 a.m. on May 4, 1979, as well as two other times that same morning, and she did not see any car parked in the driveway on any of those occasions.

77.     Several witnesses, including Pat Lucas, testified that Pat's MG was bright purple in 1979, not maroon. (47 RT 8902-07 (Pat Lucas); 43 RT 8209 (Dennis Smith); 55 RT 10406 (Curt Andrewson).) Pat Lucas testified that the MG did not run from March 1979 until 1981, when she sold the car (46 RT 8633-35); her testimony was confirmed by Curt Andrewson, who stated that he saw the car in late 1979 or early 1980 and its engine was in pieces. (55 RT 10406-07, 10431.) Dennis Smith, who bought the MG in 1981, testified that it was in bad mechanical condition, with flat tires,

1   a seized engine, and a dry-rotted rag top.  (43 RT 8212, 8214.)  Bugs and mice had

2   infested the car. (43 RT 8214.)

3        78.     At the conclusion of the guilt phase, the jury deliberated for seven days

4   before reaching a verdict.  (26 CT 5563.)  Notes from the jury indicate that the

5   prosecution's handwriting expert testimony, the hair evidence, the boot evidence, and

6   the fingerprint evidence were important to their deliberations.  (Court Ex. 32 at 3-5 and

7   7.)  Lucas was ultimately convicted of the first degree murder with special

8   circumstances on the Jacobs counts.

9                **V.     THE SANTIAGO CASE:  STATEMENT OF FACTS**

10  **A.     The Abduction and Assault of Jodie Santiago**

11       1.     In 1984, Jodie Santiago lived in Seattle, Washington.  (38 RT 7315.)  In

12  June of that year, Santiago visited her brother, Terry Hopperstad, in San Diego.  (38 RT

13  7315-16.)  Hopperstad lived in an apartment complex across the street from a cocktail

14  lounge and restaurant called Baxter's.  (38 RT 7317.)  On the evening of Friday, June 8,

15  1984, Santiago went to Baxter's by herself for some dinner and drinks.  (38 RT 7316-

16  17.)  She walked from her brother's apartment and arrived at Baxter's at about 7:30

17  p.m. (38 RT 7321; 39 RT 7399.)  Santiago had some nachos and two or three

18  Margaritas, spoke with some other patrons, and danced a bit.  (38 RT 7323; 39 RT

19  7399-40, 7402-03.)  She left Baxter's to return to her brother's apartment between

20  10:30 and 11:00 p.m.  (38 RT 7324; 39 RT 7399.)

21       2.     Santiago walked the same route home that she had walked to get to

22  Baxter's, and while waiting to cross the street in front of the restaurant, she saw a "nice

23  looking sports car" slow down and turn the corner.  (38 RT 7324-25; 39 RT 7360,

24  7412-15.)  After the car turned, the light changed and Santiago crossed the street.  As

25  she was walking along the sidewalk, a man came out of the apartment complex parking

26  lot and walked toward her.  Santiago glanced at the man, whom she did not recognize,

27  and he appeared to be looking at her as he walked by.  (38 RT 7326-28.)  About 30 or

28  40 seconds later, the man turned around, came up behind Santiago, and put a knife to

                                    50

her throat.  (38 RT 7326-27, 7329.)  Because the knife was on the right side of her neck, Santiago assumed that the man had the knife in his right hand.  (39 RT 7417.)  He told her if she screamed or tried to run, he was going to cut her throat.  (38 RT 7329.)  The man led Santiago into the complex parking lot to a dark brown sports car, possibly a 280-Z type, with louvers on the back.  (38 RT 7331; 39 RT 7359-60.)  The car was already running.  (29 RT 7417, 7420.)  Santiago tried to memorize the license plate, which she believed was a California plate with three numbers and three letters.  (39 RT 7359-60, 7363, 7418-20.)

3.     The man put Santiago into the car through the open driver's side door and pushed her over the center console.  (38 RT 7332-33; 39 RT 7422-23.)  The car had sheepskin seat covers, with a small space between the seats and a shift knob on the floor.  (39 RT 7361-62, 7443.)  During the ride, Santiago was seated partially in the center of the car and partially in the passenger seat.  (38 RT 7333; 39 RT 7423.)  The knife was on the dashboard in front of the steering wheel, and Santiago described it as having an approximately 3" long blade with a light brown wooden handle.  (39 RT 7423-24.)  The man drove with his left hand on the steering wheel and his right hand on her right shoulder and neck.  (38 RT 7333-34; 39 RT 7433.)

4.     Santiago occasionally wore glasses but was not wearing them that night.  (40 RT 7534.)  However, Santiago could see the man's face in the rear view mirror from the bridge of his nose to his forehead.  (38 RT 7337.)  The man's light-colored eyes stood out to Santiago[23] and she watched his eyes for most of the car ride.  (40 RT 7541-42, 7551.)

5.     After about 15 minutes, they arrived at a house with a semi-circular driveway and a bush or tree near the street.  (38 RT 7337-38, 7349.)  Although

---

[23]  Santiago's description of her attacker's eyes evolved during the course of the investigation, and was a key element of the defense's objection to her identification of Lucas.  *See* Claim 4.

Santiago had briefly visited San Diego years before, she did not know where she was. (40 RT 7536.)  The man pulled her back over the center console and out of the car and they walked up to the house.  Santiago did not remember seeing anything on the porch. (39 RT 7446.)  They entered the house and the man took her down a hallway to a room with boxes in it, where he pulled out some cord or rope and tied her hands behind her back.  (38 RT 7340-41, 7351.)  He then took her to another room, where he put her face down on a bed and told her to stay there.  (38 RT 7340-42, 7352; 39 RT 7447.)  There were lights on and she could see the man's face.  (38 RT 7341-42.)  The man left the room for a minute, returned to ask for some cigarettes, then left the room again.  (38 RT 7342.)  At some point, Santiago began coughing, and she turned her head to try and get leverage to clear her throat.  The man came back into the room, where she again saw his face.  (38 RT 7343; 39 RT 7448; 40 RT 7589.)  The last thing she remembered was his hands on her throat, choking her, before she lost consciousness.  (38 RT 7343-44; 39 RT 7448.)  Santiago had no recollection of anything that happened after she lost consciousness; her next memory was days later in the intensive care unit of Grossmont Hospital.  (38 RT 7343-44.)

### 1. Santiago's Injuries and Medical Treatment

6.   At approximately 6:30 a.m. on June 9, Santiago was discovered lying in brush and weeds just off the road at the intersection of Lyons and Calavo, which was about 1.1 miles from Lucas's house.  (17 RT 2996-99, 3001-03; 26 RT 4833-34.)  She was transported by ambulance to the hospital, where Deputy Sheriff Sheila Anderson was waiting for her arrival.  Deputy Anderson observed a large amount of blood around her head and shoulder area and a severe cut across the front of her neck, as well as deep cuts on her fingers and a mark on her neck that looked like a rope burn.  (17 RT 3034, 3043, 3050.)  Santiago was clothed only in a sleeveless light blue and yellow shirt and was nude from the waist down.  (17 RT 3016-17, 3047-48.)  Deputy Anderson ordered that a rape kit be taken and that Santiago's fingernails be scraped for trace evidence. (17 RT 3050-51, 3053, 3061-62.)  There were several hairs on the bottom of Santiago's

1   feet which Anderson removed, placed in an envelope, and gave to lab personnel.[24]   (17

2   RT 3053-54, 3062; 18 RT 3273.)

3       7.     Dr. Charles Geiberger, the on-call trauma surgeon, performed emergency

4   surgery on Santiago.  (20 RT 3680-81, 3684-85.)  When Dr. Geiberger first saw

5   Santiago, her blood pressure was 70 over 0, which suggested a serious reduction in the

6   ability of the heart to pump blood and oxygen to the brain.  (20 RT 3719.)  Santiago

7   was given muscle relaxants, as she was "quite restless" and "thrashing."  (20 RT 3684,

8   3724-25.)  She may or may not have been unconscious at that time.  (20 RT 3724-25.)

9       8.     The cut in Santiago's neck passed right above her Adam's apple, divided

10  the tissues of the larynx, and went straight through almost to the neck bone.  (20 RT

11  3685, 3691.)  Only the small arteries within the neck structure had been cut; the carotid

12  artery and internal jugular vein were not injured.  (20 RT 3685-86.)  On the edges of

13  the laceration there were at least two little skin tags, indicating some movement of the

14  instrument in the wound rather than the cut occurring in one continuous motion.  (20

15  RT 3692.)[25]  In Dr. Geiberger's opinion, the wound would not necessarily have been

16  caused by a firm blade, as those structures were not hard to cut through.  (20 RT 3687.)

17  Dr. Geiberger also noted a fairly uniform black and blue mark which could have been

18  created by a smooth ligature.  (20 RT 3694; 37 RT 7073, 7075.)

19      9.     In addition to her neck injury, Santiago sustained serious injuries to her

20  head, including a skull fracture that extended around the back of her skull and two four-

21  inch long lacerations above and behind each ear.  (20 RT 3695, 3713, 3715.)  The

22  fracture caused a build-up of blood behind the ear, air in the occipital area of her skull,

23  and swelling of the brain.  (20 RT 3695-96, 3715-18.)  Based on the severity of her

24

25  _____

26  [24]  The rape kit was eventually analyzed for evidence; the hairs were apparently
    never tested.  (18 RT 3273-75.)

27  [25]  Dr. Geiberger's trial testimony differed from his Pretrial testimony on March
    26, 1986, where he stated that the injury may have been caused by one stroke rather
28  than several without reference to a sawing motion.  (37 RT 7063-64.)

53

injuries, Dr. Geiberger concluded that Santiago had sustained a concussion.  (20 RT 3714.)  Dr. Geiberger also observed defensive wounds on the back of the fingers of Santiago's right hand, with cuts on her middle and ring finger going through to the bone.  (37 RT 7054-55.)

10.     After the surgery, Santiago was taken to the ICU and given Demerol, a synthetic narcotic which can slow the brain's processing speed and negatively affect a person's cognitive abilities.  (20 RT 3726-27.)  She was given Demerol approximately 15 times over five days in the ICU, as well as another synthetic narcotic on occasion.  (20 RT 3726-27, 3729.)  During his follow-up care of Santiago, Dr. Geiberger asked her for the details of what happened to her, but she was not able to remember.  (20 RT 3709-12.)  Dr. Geiberger concluded that Santiago was suffering from amnesia as a result of her injuries.  (20 RT 3711, 3714.)

### 2.     Investigation by the San Diego Sheriff's Office

11.     Detective Fullmer from the San Deigo Sheriff's Office ("SDSO") was one of the first officers to arrive at the Santiago recovery site.  (18 RT 3171-72.)  He observed blood on the road and weeds, and determined that the injuries had occurred at that location.  (18 RT 3173-74, 3285, 3302.)  A broken watch which was found near some of the bloodstains was later identified as belonging to Santiago.  (18 RT 3184-85.)

12.     Detectives Fullmer and Henderson conducted numerous interviews with Santiago while she was in the hospital.  Their first contact was on June 10, 1984 in the ICU.  (87 Pretrial 5312.)  Santiago was highly sedated and in great pain, and was unable to communicate with the detectives.  (87 Pretrial 5310; 18 RT 3179-80, 3296.)  Henderson and Fullmer were given two pieces of paper written by Santiago prior to their arrival which included her name and address, her father's name, and a phone number.  (87 Pretrial 5313-15; 94 Pretrial 6010-11; People's Trial Exs. 61 and 62.)  The papers did not contain any information about her assailant.  (*See id.*)  By the time of

(15cv1224)

Lucas's trial there were no contemporaneous notes from the meeting; Fullmer did not prepare his report on the event until December 18, 1984.  (90 Pretrial 5574, 5586.)

13.   On either June 9 or June 10, Detective Henderson spoke with John Bludworth, a police agent for the City of El Cajon.  (23 Pretrial 3392.)  In response to this conversation, Bludworth dictated a memo for distribution to the patrol units with the following descriptions of the suspect: "White male, 25 to 30, six foot, slender, short blond hair, very blond."  Bludworth's memo contained the following description of the vehicle:  "Brown two-door compact, fairly new, bucket seats, center gear shift."  The memo contained the following description of the offense: "From Baxter's to Timbers about 11:30 p.m.  Contacts in parking lot.  Drives 10 minutes.  Taken into house.  Rapes.  Beaten on head.  Multiple skull fracture.  Throat cut ear to ear." (23 Pretrial 3394-95; Pretrial Ex. RR.)  Bludworth's notes taken after his conversation with Henderson included, "Brother did it.  Refused prosecution.  May have been the head injury.  Fits description of suspect."  Bludworth explained this entry as follows: "If I remember correctly, Detective Henderson advised me that in his initial contact with Jodie Santiago she was delirious, possibly from the head injuries, and he believed that some of the statements that she made indicated that her brother may be a suspect, but he was just guessing at that, and that it possibly would wind up that the end result would be a no prosecution, if it did turn out to be a family situation." (23 Pretrial 3395-96.)

14.   As noted above, according to Henderson and Fullmer, they were not able to communicate with Santiago on June 10.  Thus, based on Bludworth's recollection that his conversation with Henderson occurred on June 9 or 10, it is unclear where Henderson got his information about the subject and the crime.

(15cv1224)

15.     Henderson and Fullmer's next contact with Santiago was on June 11, 1984.[26]  Santiago was still unable to talk, so she answered the detectives' questions in writing, albeit with some difficulty due to the injuries and bandages on her right hand. (87 Pretrial 5319-21; 18 RT 3180; People's Trial Exs. 63, 64, 66.)  Santiago responded to questions about her name, her relatives in San Diego, where her relatives lived, and her age and her brother's age.  (87 Pretrial 5320-21.)  According to Detective Fullmer, he asked Santiago what kind of vehicle her brother drove, and Santiago wrote "Brown Colt."  (87 Pretrial 5320.)  However, Dena Warr, the ICU nurse who treated Santiago and was present for the interview on June 11, recalled that "Brown Colt" was written in response to a question about the car in which Santiago was abducted.[27]  (61 Pretrial 1795-96.)  Warr also remembered the detectives visiting Santiago twice on June 11, whereas Fullmer and Henderson testified they only visited her once.  (61 Pretrial 1785; 90 Pretrial 5582-85.)  The interview was not recorded, and any notes taken by the detectives were shredded.  (90 Pretrial 5573-74; 94 Pretrial 6014-15.)  Neither Fullmer nor Henderson documented the questions they asked, and neither had any recollection of the precise questions which generated Santiago's responses.  (90 Pretrial 5581-82; 94 Pretrial 6017.)

16.     The next interview was on June 15, 1984.  (18 RT 3181.)  Santiago was out of the ICU, but was still not able to speak and once again communicated by writing. (18 RT 3181.)  Santiago described her attacker as "Tall, about six foot two.  Blond hair. Blue eyes, I think."  (People's Trial Ex. 171; 40 RT 7625, 7635-36.)  She described the vehicle her attacker had been driving as a "[b]rown two door. Possibly a 280-Z."  (40 RT 7636.)  With reference to the house where she was taken, Santiago wrote, "Four to

---

[26]  The information Santiago relayed during this interview was excluded at trial because Santiago had no independent recollection of the event.  (238 Pretrial 24449-53.)  Detective Fullmer testified to his recollection of what occurred on this date during Pretrial litigation to suppress Santiago's identification of Lucas.

[27]  A DMV check revealed that Santiago's brother, Terry Hopperstad, owned a brown Colt.  (91 Pretrial 5753-54.)

(15cv1224)

five hours, rear bedroom, bed/dresser." (90 Pretrial 5604-05.)  Once again, by the time of Lucas's arrest, the detectives had no notes or other contemporaneous record of the interview or what specific questions were asked.  (94 Pretrial 6028-30, 6040.)  Henderson's report of the June 15 interview was not written until January 3, 1985.  (90 Pretrial 5603.)

17.     By the time of the next interview on June 21, 1984, Santiago was able to speak, but it was difficult for her.  (18 RT 3182.)  She described her attacker as 6'2" tall, blond, approximately 25-30 years old, and neat in appearance.  (91 Pretrial 5625; 94 Pretrial 6039.)  She described the vehicle as a small brown sports car type, possibly a 280-Z, with two doors, bucket seats, and a standard four-speed transmission.  (90 Pretrial 5600; 91 Pretrial 5625; 94 Pretrial 6039-40.)  She also mentioned, for the first time, that her attacker said he had been hired by her boyfriend to scare her.  (94 Pretrial 6041.)

18.     Fullmer and Henderson next saw Santiago on June 26 and 27, 1984.  (18 RT 3183.)  This time, Santiago described the car as having a "tan interior, maybe sheepskin," and that the attacker was only six feet tall, with collar length hair and a mustache.  (91 Pretrial 5639; 94 Pretrial 6042, 6044-46.)  Also for the first time, Santiago mentioned meeting and spending the night with a man named Neil Reynolds the night before the attack.[28]  (91 Pretrial 5636-37.)  Santiago did not mention anything about the assailant that was unusual or distinctive.  (94 Pretrial 6041-43.)

19.     Henderson took notes of the June 26 interview (People's Trial Ex. 70), but he had no record or recollection of the precise questions that were asked.  (94 Pretrial 6043.)  It was Henderson's custom and practice to ask eyewitnesses whether they remembered anything highly distinctive about the assailant.  (94 Pretrial 6043.)  However, Henderson could not remember whether he did so on June 26, 1984.  (94

[28]  Evidence regarding Neil Reynolds was excluded at trial.  (38 RT 7171.)

Pretrial 6043.)  According to Fullmer, his colleague Detective Fisher returned some of Santiago's personal property at that time, including her watch and a ruby and diamond ring she was wearing the night of the attack.[29]  (18 RT 3183-84, 3294-95.)  Neither the ring nor the watch were tested for trace evidence.  (18 RT 3294-95.)

### 3.     Santiago Returns to Seattle

20.     After Santiago was released from the hospital on June 26, 1984, she returned to Seattle, where she continued to recover and receive medical treatment from a neurosurgeon and an orthopedist for her injuries.  (39 RT 7369-70, 7449-51.)  For months after her release, Santiago experienced dizzy spells, routine nightmares, and severe headaches, for which she took Tylenol Three with Codeine.  (39 RT 7450, 7452, 7454.)  She also took antidepressant medication on and off for five months.  Santiago was eventually awarded disability benefits for her injuries.  (39 RT 7481.)

21.     Santiago began therapy with a rape counselor, Lucy Berliner, with weekly sessions that began in July or August 1984.  (39 RT 7451.)  Berliner diagnosed Santiago with post-traumatic stress disorder (PTSD), and recommended that Santiago seek treatment from a psychiatrist.  (39 RT 7456-57.)  Santiago was a patient of psychiatrist Dr. Wendy Freed from November 1984 until April 1985.  (39 RT 7370, 7457.)

22.     Santiago continued seeing Berliner as well, and she expressed to Berliner that it was very important for her to find the person who had attacked her.[30]  At

---

[29]  Fullmer's trial testimony about the ring is contradicted by a report prepared by Fullmer on December 18, 1984.  In that report, Fullmer  describes going to see Santiago with Henderson on July 8, 1984 and returning her ring at that time.  (Ex. 95, 12-18-84 Fullmer Rpt.)  According to Santiago, she returned to Seattle on June 28, 1984 and did not return to San Diego until December 1984.  (39 RT 7369-70.)  Therefore, if Fullmer and Henderson did return Santiago's ring in July 1984, they had to travel to Seattle to do it.

[30]  In 1973, while living in Philadelphia, Santiago was the victim of a violent assault.  (40 RT 7542.)  She reported the assault to the police and was shown mug books, but she was not able to identify her attacker.  (40 RT 7542, 7551.)  The person who assaulted her was never apprehended.  (40 RT 7542.)

58

Santiago's behest, Berliner contacted the Seattle police, and in October 1984, Detective Gillis of the Seattle Police Department helped Santiago use an Identi-Kit[31] to create a composite drawing.  (39 RT 7364-65, 7458-60.)  The session took three and a half hours, and although the result was as close as Santiago could get to the likeness of her abductor, she was not satisfied with the result.  (39 RT 7365, 7461.)

23.     According to Santiago, she had no contact with any San Diego authorities between the date she left San Diego in June 1984 and December 4, 1984.  (39 RT 7459, 7461-62.)  However, Fullmer recalled that he spoke with Santiago during that time.  (18 RT 3297.)

### 4.     December 1984 Meetings Between Santiago and San Diego Detectives

24.     By early December 1984, Henderson had been assigned to the Swanke and Strang homicides, and he theorized the possibility of a connection between the Santiago, Swanke, and Strang cases.  (94 Pretrial 6058.)

25.     On December 4, 1984, Detectives Henderson, Fullmer, and Bove went to Seattle to conduct an in-depth interview with Santiago.  (39 RT 7366.)  Detective Bove, an artist, was there to create a drawing of the assailant at Santiago's direction.  (18 RT 3186-87, 3297; 39 RT 7366.)  According to Santiago, the drawings were better than Gillis's Identi-Kit rendering, but she still wasn't completely satisfied.  (39 RT 7367.)

26.     The detectives then conducted a recorded interview with Santiago, which lasted several hours.  She described her attacker as a blond man with a mustache that did not go below the lips.  (39 RT 7466.)  For the first time, she described him as "about 5'10" tall" with "bulging eyes."  (39 RT 7466-67, 7480-81.)  Santiago expressed that she "doubted very seriously" that the car was a "Z car" because she did not believe

---

[31]  Identi-Kit is a system used to assist witnesses with facial reconstruction.  In the 1980s, the system utilized individual strips showing a variety of facial features; the witness would work with a sketch artist to help create a facial reconstruction based on the witness's description and selection of Identi-Kit features.

59

(15cv1224)

those cars were automatics, and she had not noticed her assailant shifting while they drove.  (94 Pretrial 6066-67.)  She also told the detectives that the car in which she was abducted had a California license plate with three numbers and three letters.  (39 RT 7419-20.)  Santiago attempted to draw a diagram of the house to which she was taken and stated that if she ever saw the house again she would know it on sight.  (38 RT 7346-47; 39 RT 7498.)

  27. According to Henderson, he first heard the name David Lucas on December 11, 1984.[32]  (94 Pretrial 6060.)  A routine warrant check revealed that Lucas had an outstanding warrant on a drunk driving charge.  (81 Pretrial 5328.)  Lucas was arrested on this warrant on December 13, 1984 and taken to the Lemon Grove substation, where the arresting officer, Frank Winter, took several Polaroid photos of him at the request of Henderson and Fullmer.  (81 Pretrial 5328; 94 Pretrial 6080.)  When Fullmer saw the original shots, he asked for additional photos with a closer view of Lucas's face, and Fullmer ultimately chose a photo with a tight focus on Lucas's face to include in a photo array for Santiago.  (91 Pretrial 5672-73; In Limine Ex. GG6-GG13; People's Trial Ex. 179A.)

  28. Henderson contacted Santiago in Seattle and asked her to fly down to San Diego to view the photo lineup, explaining, "We have a possible suspect [and] we would like you to go through a lineup to determine whether or not he is in fact the man who accosted you and, if so, to please tell us."  (82 Pretrial 4647; 39 RT 7370, 7386.)  Santiago flew to San Diego that same day, arriving at approximately 10:30 p.m.  She was met by Henderson and Fullmer, who drove her to a Holiday Inn where the detectives had arranged for her to stay.  (18 RT 3190; 39 RT 7371, 7465-66, 7482-83.)  There, they were met by detectives Fisher, Hartman, and Deputy Zuniga, who accompanied the detectives to act as Santiago's "bodyguard" (95 Pretrial 6288, 6295)

---

[32]  However, witness statements indicated that SDSO had Lucas as a suspect as early as October 1984.  (11 CT 2309.)

60

(15cv1224)

and stay with her at the hotel. (18 RT 3196-97.) Around midnight or 1:00 a.m., the detectives went to Santiago's room to show her the lineup, where Fullmer instructed Santiago, "We wish to have you look at a group of photographs. . . .[Y]ou are not to assume anything—that we have anyone in custody, but merely to look at the photograph and see if you can identify anyone contained within that photographic lineup." (18 RT 3198-99.) Although Fullmer recalled that he told Santiago not to assume anyone was in custody, according to Henderson and Santiago, Santiago had already been told by SDSD that they had a possible suspect. (81 Pretrial 4646-47; 39 RT 7370-71.) After a couple of minutes,[33] Santiago selected Lucas's photo, the top photo in the middle. (39 RT 7372, 7485.)

29. After the identification, Santiago and the detectives all went down to the lounge, where drinks were ordered and Santiago had a glass of wine. (39 RT 7495; 40 RT 7533-34, 7548.) Subsequently, in the early morning hours of December 15, 1984, Santiago went with Zuniga, Henderson, Fisher, and Fullmer on a car ride to see if they could locate the house where Santiago was taken. (18 RT 3188; 39 RT 7372-73, 7495-96.) They went to the apartment complex where she had been abducted and drove several different routes, but Santiago could not successfully direct them to the house. (39 RT 7373, 7496-98.) They drove by Lucas's house twice, but Santiago did not recognize it. (18 RT 3191-92; 39 RT 7373, 7498.) They returned to the hotel, where Zuniga stayed with Santiago in her hotel room. (39 RT 7374-75.)

30. Later in the morning of December 15, Santiago met at the sheriff's station with the detectives and Deputy District Attorney Dan Williams. (39 RT 7374, 7498.) While there, the detectives and the prosecutor prepared a search warrant for Lucas's

---

[33] On the identification form (People's Trial Ex. 179B), Fullmer wrote that the identification was made "immediately." However, that form was not admitted into evidence at trial, and no other testimony contradicted Santiago's opinion that it took her a couple of minutes. (*But see* the prosecutor's opening statement at 1 RT 42-43 (Santiago "immediately identified the photograph of David Lucas as being her attacker").)

(15cv1224)

house in full view of Santiago.  Lucas's address was on the search warrant.  After several hours at the station, Santiago, Fullmer, and Fisher left to take Deputy Zuniga home, they took a route that went down Lucas's street.  (39 RT 7374-75, 7498; 57 RT 10899-900, 10932-33.)  Fullmer was driving; Santiago was in the right front seat; Zuniga was in the left rear seat and Fisher was sitting behind Santiago.  (40 RT 7549; 57 RT 10900-01, 10916-17, 10933.)  On the ride to Zuniga's home, the car slowed down as it passed by Lucas's house.  (39 RT 7375; 40 RT 7549.)  Santiago turned her head, looked at the house, and asked Fullmer to drive past it again.  (39 RT 7375, 7499.)  Fullmer complied, slowing the car as they drove past Lucas's house.  Fisher asked Santiago, "Do you see something that you recognize?"  (57 RT 10935.)

31.     Although the detectives provided different versions of the events leading up to and including Santiago's identification, all agreed that Santiago eventually identified Lucas's house as the house to which she had been taken the night she was attacked.  (Compare, 91 Pretrial 5689-90 (Fullmer testimony); 94 Pretrial 6136-37, 6139  (Fisher testimony); 95 Pretrial 6293-94 (Zuniga testimony).)[34]

32.     Later that day (December 15), Santiago was shown a small truck, either a Toyota or a Datsun, which had sheepskin covers on the seats.  (39 RT 7375; 40 RT 7533.)

33.     On December 15, 1984, the detectives obtained a search warrant for Lucas's home and an arrest warrant for Lucas.  (36 RT 6874-75.)  The search warrant also authorized the detectives to seize and search Lucas's truck.  (29 RT 5399; 36 RT 6876-77.)  On Sunday morning, December 16, 1984, Lucas was arrested and his home searched.  (16 RT 2793.)  The next day, December 17, Lucas's truck was searched and evidence taken from it.  (28 RT 5097-98, 5101; 29 RT 5350, 5363-68.)

---

[34]  Although Fisher testified that he wrote down what Santiago said about the house (e.g., the color and the circular driveway), by the time of trial there were no contemporaneous recordings or reports made available which detailed the circumstances of Santiago's identification of the house.

62

(15cv1224)

### 5.   Additional Key Prosecution Evidence Against Lucas At Trial

34.   In 1984, Lucas owned a carpet cleaning business called Carpet Maintenance Company ("CMC") with his friend and business partner Frank Clark.  (20 RT 3734-76.)  Lucas also owned a home on Casa de Oro Boulevard in Spring Valley.  (21 RT 3770.)  In June 1984, Lucas shared his home with Greg Esry, Rick Adler, and (periodically) his estranged wife, Shannon Lucas.  (19 RT 3441, 3468-69.)  Adler, who also worked with Lucas at CMC, lived in the Casa de Oro house for a month to six weeks during June and July 1984.  (19 RT 3424, 3426.)  Adler's room was sparsely furnished, and while he was "living out of boxes" at that time, he did not recall if the boxes were in his room.  (19 RT 3472-73.)  Lucas occupied the easternmost bedroom in the house.  (19 RT 3441.)  Although Adler owned a Buck knife and a folding Hunter knife while he lived at Lucas's house, Adler never saw Lucas carry a knife.  (19 RT 3495-96, 3530.)

35.   At the time of Santiago's attack, Lucas owned a green Datsun pickup affiliated with CMC, as well as a black Datsun 280-Z with the license plate "CMC INC 2."  (21 RT 3773-74; 23 RT 4181-82.)  In June, 1984, Lucas told Rick Adler and Frank Clark that because he was having financial problems, he intended to trade in the 280-Z for something less expensive.  (19 RT 3481, 3493; 21 RT 3773-74.)  On June 13, 1984, Lucas traded the 280-Z for a new Toyota pick-up truck and received substantially lower monthly payments.  (17 RT 3080-81, 3093.)  Adler helped him transfer the license plate and the sheepskin covers from the 280-Z to the new truck.  (19 RT 3433-34.)

36.   Michael George purchased Lucas's car after he traded it in.  (17 RT 3121-22.)  George testified that the car was a stick shift and "talked" in a computerized voice as the vehicle was operated.  (17 RT 3132, 3138; *see also* 19 RT 3478-81 (Adler testimony).)  There were no louvers on the car, although he noticed some gummy material on the four corners of the back windshield that seemed like adhesive.  (17 RT 3128-32.)  A car parts manager testified that nonfactory louvers could be installed on 280-Z's with a clip and adhesive.  (40 RT 7640-41.)

(15cv1224)

37.     Santiago identified Lucas in court as the man who attacked her.  (38 RT 7344.)  She testified that the car in which she was abducted looked similar to a 280-Z, had louvers on the back window, and had sheepskin covers on the seats.  (40 RT 7544-46, 7550.)  The car had a California plate with three numbers and three letters.  (39 RT 7359-60, 7363.)  She did not hear any computerized voices come from the vehicle.  (39 RT 7434.)  When shown photographs of Lucas's car, Santiago testified that it looked like the car except that the rear louvers were missing.  (39 RT 7361, 7479; 40 RT 7543-44.)  She identified a sheepskin seat cover from Lucas's truck as being similar to the ones that were in the car she was abducted in.  (39 RT 7361-62.)  However, she was unable to positively identify Lucas's car as the car driven by her attacker.  (39 RT 7479-80.)  Santiago had been told that Lucas owned a Z-car before her first attempt to identify the car.  (40 RT 7540.)

38.     Two of Lucas's neighbors testified that they had seen a black sports car with louvers parked at Lucas's house.  (40 RT 7620 (Stewart testimony), 7684, 7688-89 (Jacobus testimony).)

39.     Because Santiago did not recall her abductor shifting gears as he drove, Investigator William Green conducted a test drive of Lucas's car along the route from Santiago's abduction site to Lucas's house.  (40 RT 7647, 7657, 7672.)  Green was able to drive the entire way in second gear, with his right hand in his pocket and observing all speed limits and traffic signals.  (40 RT 7652-54, 7669.)

**6.     Defense Evidence**

40.     Four different witnesses testified that they were very familiar with Lucas's 280-Z and never saw louvers on the back of the car.  (49 RT 9242-43 (Johnson testimony); 53 RT 9896-98 (Hoehn testimony), 9912-15 (Adair testimony), 9977 (Linker testimony).)  Defense investigator John Rose took photographs of the 280-Z and saw no indication that anything had ever been attached to the back window.  (47 RT 8782-84.)

64

41.     In response to Santiago's testimony that she did not recall seeing anything on the porch of the house where she was taken (39 RT 7446), the defense presented three witnesses who had been to Lucas's home many times and recalled a number of large items, including a weight bench and a Weber BBQ grill, on the front porch.  (53 RT 9899-903 (Hoehn testimony), 9913-15 (Adair testimony), 9978 (Linker testimony).)

42.     The defense presented testimony on the lack of forensic evidence tying Lucas to the attack of Santiago.  For example, sperm cells and acid phosphatase[35] were found on the vaginal swabs from Santiago's rape kit.  (47 RT 8765-67, 8771.)  While the ABO blood group type results neither included nor excluded Lucas as the donor of the sperm cells (47 RT 8777-78), electrophoretic testing excluded Lucas as a possible source. (36 RT 6764-69; People's Trial Ex. 69.)  Additionally, although the fingernail scrapings from Santiago were presumptively positive for blood (47 RT 8773-74), the quantity was too small to determine if it was human blood.  (47 RT 8774.)

43.     The defense also challenged the procedures used by the police for Santiago's identification of Lucas and his home.  (*See* Claim 4.)  With regard to the post photo lineup drivebys, the defense elicited, *inter alia*, testimony from Detective Fullmer that someone in the car said "this house" or "what about this house" as they drove by Lucas's home on Casa de Oro Boulevard.  (48 RT 9009-11.)

44.     In an attempt to demonstrate that Santiago's identification of Lucas was not reliable, the defense presented testimony about how Santiago's mental health, memory loss, and strong desire to find her attacker might have improperly influenced her memory and identification.  In addition to Dr. Geiberger's testimony about Santiago's severe physical injuries, several witnesses, including Grossmont psychiatrist

---

[35]  Acid phosphatase is an enzyme that is found in extremely high concentrations in seminal fluid and is a presumptive indication that seminal fluid is present. Independent of the timing, the existence of acid phosphatase can be consistent with sexual intercourse, provided that the presumptive acid phosphatase test is confirmed, usually by the presence of sperm.  (47 RT 8767-68.)

(15cv1224)

Heywood Zeidman, rape crisis counselor Lucy Berliner, and psychiatrist Dr. Wendy Freed, all testified about Santiago's serious depression and emotional trauma. (48 RT 8966-69, 9028, 9041-63; 53 RT 10108-10, 10114-15.) Berliner and Freed both officially diagnosed Santiago with PTSD and depression. (48 RT 9041-63; 53 RT 10110, 10114-15.) For many months after she was attacked, Santiago experienced headaches, dizziness, and suicidal ideations. (48 RT 9028, 9081-83.)

45. Defense expert Dr. Sheldon Zigelbaum, a psychiatrist specializing in PTSD, testified about the correlation between PTSD and closed head injuries and the varied effects that closed head injuries, like Santiago's, can have on the brain. (54 RT 10137-38, 10143-45.) Closed head injuries can impair people's ability to perceive events and the world around them, to think about what they have seen, to remember, and later, to be able to utilize the information in an effective way. (54 RT 10147, 10156-57.) Memory, perception, and thought are all affected by closed head injuries, and depression and amnesia are not uncommon. (54 RT 10157, 10179-80, 10211.) The more serious the head injury, the more opportunity there is for memory impairment. (54 RT 10211.) Based on Santiago's PTSD, closed head injury, lack of oxygen to the brain, and likelihood of brain damage, memory loss and impairment was likely. (54 RT 10176-77, 10181-83.) Memory lags behind all other recovery, so that if someone had memory impairment, it would be the last thing to recover. (54 RT 10212.) On average, it takes a full year for memory to be recovered. (54 RT 10211.)

46. Finally, the defense presented alibi evidence from Francine and Loren Linker, who were friends with Lucas and his family. They testified that on the night of June 8, 1984, Lucas was at their home. (53 RT 9960, 9965-66 (Francine Linker); 10002, 10004-05 (Loren Linker).) According to Loren, he and Lucas arrived at the Linker house at approximately 9:00 p.m. and Lucas stayed there for two to three hours, eventually leaving sometime between 11:00 and 12:00. (53 RT 9979-80, 10002, 10004-05.) Santiago was abducted between 10:30 and 11:00 p.m. (38 RT 7324, 7399.)

(15cv1224)

47.     As in the Jacobs case, the jury requested transcripts of witnesses who testified to the key components of the Santiago case, including eyewitness testimony and the perpetrator's method of attack.  (Court Ex. 32 at 9-10.)  After seven days of deliberation, Lucas was convicted of the attempted first degree murder and kidnapping of Santiago.  (26 CT 5569-70.)

## VI.  THE GARCIA CASE:  STATEMENT OF FACTS

1.     Gayle Garcia was a real estate agent who was killed on December 8, 1981 inside the home she had advertised for sale or lease.  Although Lucas was acquitted of Garcia's murder, the facts of her case are relevant to Lucas's claims regarding cross-admissibility (Claims 43, 44, 45, and 47.) and consolidation of the crimes for trial (Claims 47).

**A.     Prosecution Evidence**

**1.     Lucas's Activities Prior to the Homicide**

2.     In 1981, Lucas worked as a manager at M & A Carpet Care along with Frank Clark.  (20 RT 3734.)  Clark testified he could not recall whether Lucas was present at the business any time on December 8, 1981, the day of Garcia's homicide.  (20 RT 3751.)  However, according to payroll records, Clark filled in for Lucas on the afternoon of December 8.  (23 RT 4302-03, 4341-43.)  Lucas was back in the office on the morning of December 9, 1981.  (23 RT 4342-43.)

3.     Because Garcia was murdered in her role as a real estate agent, the prosecution presented evidence attempting to demonstrate that Lucas was looking for an apartment around the time of the homicide.  In November 1981, Lucas moved to a home on Bancroft Street, which was within walking distance of M & A.  (21 RT 3861, 3875, 3877.)  According to Clark, in late 1981, Lucas was looking for an apartment in the want ads because he wanted to live in the Spring Valley/Casa de Oro area.  (20 RT 3736-37; 21 RT 3857, 3862.)  However, on cross-examination, Clark admitted that Lucas was not looking for an apartment because he had just moved in November, and

(15cv1224)

the two were actually looking through the newspaper want ads because they wanted to open their own carpet business.  (21 RT 3861-63, 3878.)

4.      Emmett and Maria Stapleton managed an apartment building in the Spring Valley/Casa de Oro area in December 1981.  (38 RT 7201, 7209.)  They testified about a man who came to the building on December 7, 1981 to see an apartment they had for rent.  (38 RT 7202-04, 7224-26.)  According to Emmett Stapleton, the man looked like a "geek" and had "slight" features.  (38 RT 7225, 7227.)  The man acted oddly, stuttered, said very little, and left quickly.  (38 RT 7216-17, 7225.)  On December 9, after hearing about Garcia's murder, Stapleton contacted the sheriff's department and did an Identi-Kit composite of the man who came to his home.  (38 7217-19, 7223, 7227.)  From December 1981 until March 1985, Stapleton had no contact with SDSO.  Then, on March 13, 1985, Stapleton saw a newscast in which Lucas's photo appeared.  (56 RT 10648.)  The next day, Stapleton called SDSO to say that he had recently seen Lucas on TV, and he subsequently met with sheriff's deputies to look at a photo lineup.  (38 RT 7226-27.)  Stapleton identified Lucas as the man who came to his door.  (38 RT 7226-27, 7232-33.)

**2.      Events Leading to the Homicide**

5.      In 1981, Annette Goff and William Green were in a dispute over a house they owned together in Spring Valley.  (15 RT 2610-11, 2655-56.)  Goff filed a civil suit against Greene in the property dispute and obtained a restraining order against him to keep him out of the house.  (15 RT 2656-57, 2665.)  Eventually, Goff and Greene decided to sell the house, and Goff hired her friend, Gayle Garcia, as the real estate agent.  (15 RT 2610-13, 2659-60.)

6.      Garcia was scheduled to show the house to prospective clients between 4:00 and 6:00 p.m. on December 8.  (15 RT 2615-16.)  On the morning of December 8, Goff and her brother, Chris, went to the house.  (15 RT 2640, 2644.)  Goff left an envelope with $585.00 in cash in a kitchen drawer for Garcia to cover title costs and

68

(15cv1224)

other expenses.  (15 RT 2650-51.)  All the doors and windows were locked when Goff left the house that morning.  (15 RT 2644.)

7.      Around 4:55 or 5:00 p.m. on December 8, Goff called Greene to let him know that Garcia was at the house and would be showing it to people, and they had an argument about whether or not Greene could come by the house during that time.  (15 RT 2647-48, 2671.)  At 5:30 p.m., Greene called Goff and told her he had just spoken with Garcia and he was going over to the house to "get some answers."  (15 RT 2648.)  According to Goff, Greene was argumentative and quarrelsome, and she eventually hung up on him.  (15 RT 2671-72.)  Five minutes later, at approximately 5:35 p.m., Goff called Garcia at the house to let her know that she would be coming to the house in about 20 minutes, and that Greene might be coming by as well.  (15 RT 2616-17, 2648, 2668, 2673.)  Garcia told Goff that she was getting ready to leave and probably would not be there by the time Goff arrived.  (15 RT 2617.)

8.      Goff, her colleague, and her brother Chris arrived at the house at approximately 6:05 p.m.  (15 RT 2622-23.)  The front door was open and the phone was ringing as they entered the house.  (15 RT 2622-23.)  When Chris answered the phone, Greene was on the line, and he asked if Garcia was still there.  (15 RT 2623.)  Goff took the phone while Chris went through the house calling for Garcia.  (15 RT 2623.)  Chris discovered Garcia's body lying on the floor of the dark, unlit bedroom.  (15 RT 2623.)  Goff hung up from her phone call with Greene and called for an ambulance.  (15 RT 2624, 2648-49.)

### 3.      The Crime Scene Investigation

9.      Homicide detectives Thomas Streed and Sam Bove arrived at the Garcia scene at 7:30 p.m.  (15 RT 2742; 16 RT 2803.)  By the time they arrived, approximately 13 people, including Goff's neighbors, paramedics, a fire unit crew, and other police had been inside the house.  (15 RT 2649-50, 2698, 2742; 16 RT 2800.)  Because of the number of people who had been in the house, Streed was worried about crime scene contamination.  (15 RT 2742-43.)

69

10.     Garcia was lying on the floor atop vacuum cleaner tubing.  (16 RT 2818.) Paramedics had moved Garcia's head in an attempt to revive her, but otherwise had not tampered with her body.  (15 RT 2743-45; 16 RT 2805.)  All of the blood at the scene was underneath Garcia's body or in the immediate vicinity, suggesting that the attack was quick and without an extended range of violence.  (17 RT 2982-83.)  A single broken fingernail of Garcia's was found just outside the bedroom where her body was discovered.  (16 RT 2823.)  Garcia's pants had two parallel smears running down them which appeared consistent with wipe marks from a bloody knife blade.  (16 RT 2755.) The evidence indicated that Garcia was killed within a 30 minute period between 5:35 and 6:05 p.m.  (17 RT 2991.)  This was corroborated by the pathologist, who found fixed postmortem lividity which would have been consistent with a time of death between 5:40 and 6:10 p.m.  (24 RT 4541-42.)

11.     Criminalist Ron Barry dusted the crime scene for prints and collected hair and other trace evidence, including Garcia's broken fingernail.  None of the 12 usable latent prints he examined matched Lucas.  (17 RT 2974-75, 2989.)  Even though the fingernail found at the scene could have come off in a struggle (and possibly contain evidence if she had scratched her assailant), Barry did not examine the fingernail for skin, blood, or other trace evidence.  (16 RT 2924-26.)

12.     The $585 Goff had left in the kitchen drawer for Garcia was missing, but stereo equipment and a television were still in the house.  (15 RT 2650-51, 2748-49.)

## 4.    Injuries to the Victim

13.     Dr. Howard Robin, a contract pathologist with the San Diego Coroner's Office, performed Garcia's autopsy on December 9, 1981.  (24 RT 4487, 4490-91, 4541.)  The body had a large, gaping wound in the throat area, extending from the angle of the jaw on the left side and across the neck to the angle of the jaw on the right side.  (24 RT 4492-94.)  The wound pierced the membrane between the hyoid bone and the top of the thyroid cartilage and cut through the carotid arteries and jugular veins on both sides of her neck.  (24 RT 4493, 4496-97, 4499.)  The incision was so deep that it

70

went through the membrane and nicked the second cervical vertebrae.  (24 RT 4493, 4499-4500.)  The incision on the left side of the neck had a jagged edge forming an unusual and irregular pattern.  (24 RT 4496.)  It was Robin's opinion that the wound was caused by a very sharp rigid blade or knife and used only one cutting stroke.  (24 RT 4501-03.)  Robin could not render an opinion about the length of the blade, although he assumed it was a long one.  (24 RT 4539-40.)

14.    Robin noted some petechial hemorrhaging in the conjunctiva of the eyes which could have been caused by choking, but he found no evidence of ligature or compression marks on her neck.  (24 RT 4496.)[36]  In addition to the neck wound, there were superficial abrasions on her forehead, nose, and near her left ear, as well as scratches under her chin.  (24 RT 4492-95, 4538-39.)  A routine toxicology screen revealed no evidence of drugs or alcohol in Garcia's blood.  (24 RT 4535-36.)  The cause of Garcia's death was exsanguination due to laceration of carotid arteries.  (24 RT 4504.)

## B.    Defense Evidence

### 1.    Alibi Evidence

15.    Lucas presented the testimony of several relatives and friends, including his mother, former stepfather, and siblings, who said that Lucas was at a family birthday party on the evening of December 8, 1981 along with his girlfriend and their two children.  (46 RT 8637-43 (Steven Katzenmeier), 8651-55 (Donald Lucas); 47 RT 8869-70, 8922-27 (Cathy McEvoy), 8927-28 (Mark McEvoy).)  Lucas arrived shortly before dusk (which occurred at 4:43pm[37]) and stayed at the party for two to three hours, leaving after it was dark.  (46 RT 8638-39, 8651-55; 47 RT 8916.)  Lucas's departure

---

[36]  This could have been caused by hypoxia or lack of oxygen, a sudden cut off of the blood supply to the eyes, as would occur when the blood vessels in the neck are cut, or with strangulation. (24 RT 4497-98.)  Petechial hemorrhaging might be observed in the absence of strangulation or throat cuts.  (24 RT 4536.)

[37]  The trial court took judicial notice that December 8, 1981 was a Tuesday and the sun had set at 4:43 p.m.  (47 RT 8916-17.)

1   from the party was notable to several family members because it was marked by a

2   derogatory comment made by Lucas's brother Donald about David's daughter.  (47 RT

3   8871-72, 8889-90, 8892-93.)

4         16.    Officer Thomas Caldwell drove from the location of the Lucas family

5   party to the house where Garcia was killed, a distance of 11 miles.  (56 RT 10709-10.)

6   Caldwell made the trip between 4:30 and 4:45 p.m. and the trip took him approximately

7   42 minutes while going the speed limit in heavy traffic.  (56 RT 10710-11.)

8   **2.**    **Investigation of William and Richard Greene**

9         17.    On the night of the homicide, as she waited outside her house for the

10   police to complete their investigation, Goff saw a motorcyclist go down her street who

11   looked like William Greene's brother, Richard.  (15 RT 2684-2685.)  Goff mentioned

12   seeing Richard to a uniformed officer at the scene, and also told him about her phone

13   calls with William Greene earlier that day.  (15 RT 2685.)  Sergeant Steven Blackwood

14   of the San Diego Sheriff's Department noticed the motorcyclist and thought that he

15   seemed interested in what was going on at the scene.  (48 RT 9113-15.)  As Blackwood

16   wrote down the license plate number on the motorcycle, it sped off.  (48 RT 9115,

17   9118-19.)  Blackwood pursued and pulled over the motorcyclist, who identified himself

18   as Richard Greene.  (48 RT 9115-19.)  Richard Greene gave Blackwood his address,

19   where Detective Streed eventually picked up William Greene and took him in for

20   questioning at the police station.  (16 RT 2842-45.)

21         18.    On December 9, 1981, between 2 and 3:00 p.m., William Greene called

22   Annette Goff at a friend's house and they discussed what had happened the night

23   before.  (15 RT 2681-83.)  Greene denied ever having said he was going to their

24   residence while Garcia was there.  (15 RT 2679-81.)

25         19.    William Greene died approximately one year prior to trial.  (15 RT 2710.)

26

27

28

72

### 3.   Knife Comparison Evidence

20.   When police searched Lucas's house in 1984, the sheath for a Model 112 folding knife was found and seized.  (16 RT 2795.)[38]  Because no corresponding knife was found, Detective Streed obtained a Model 112 from the Buck knife factory to evaluate whether that kind of knife could have left the bloody streaks found on Garcia's pants.  (16 RT 2790-94, 2843.)  Streed concluded that there was a considerable degree of consistency between the stain and the general length, shape, and characteristics of the Buck Model 112.  (16 RT 2793-96.)  However, Streed did not compare the wipe marks on the pants with any other kind of knife, and he could not say how many other kinds of knives might also have been consistent with the marks.  (16 RT 2844.)

21.   During the defense's case, trial counsel presented evidence that the Model 112 was extremely common in the United States, and in fact was Buck's third highest selling knife.  (16 RT 2843-44; 37 RT 6965-66, 6975.)  Parker Bell, a forensic expert, tested eight different kinds of knives to see whether they might be consistent with the bloodstains on Garcia's pants.  (44 RT 8297.)  Bell concluded that none of the eight knives he tested could be excluded as possible sources of the stains, and that any similar type of knife could have left those marks.  (44 RT 8297-8302.)

22.   Lucas was found not guilty of Garcia's murder.  (26 CT 5567.)

### VII.  THE STRANG/FISHER CASE:  STATEMENT OF FACTS

1.   Rhonda Strang and Amber Fisher were murdered in Strang's home on October 23, 1984.  (19 RT 3402-04.)  The jury was unable to reach a verdict on these counts, the trial court declared a mistrial, and the court later granted the prosecutor's motion to dismiss these charges.  (26 CT 5563.)  Although Lucas was not convicted of these murders, the facts of the Strang/Fisher case are relevant to Lucas's claims

---

[38]  The court gave a limiting instruction regarding this testimony in that it was offered to show why Streed did what he did but not for the truth of the matter asserted. (16 RT 2794-95.)

73

regarding cross-admissibility and consolidation of the crimes for trial (*See* Claims 43-47.)

**A.   Prosecution Evidence**

    **1.   Lucas's Relationship with Rhonda Strang and Her Family**

    2.   At the time of her death, 24-year-old Rhonda Strang was married to Robert Strang, with whom she had an infant daughter.  (19 RT 3425-26.)  Her brother, Rick Adler, was Lucas's friend and employee at CMC, and he introduced Lucas to the Strang family.  (19 RT 3425.)  Robert Strang was a user of cocaine, methamphetamine, and marijuana, and he began selling drugs out of the house he shared with Rhonda.  (19 RT 3499, 3508-11.)  In order to avoid being the middle man, Adler[39] introduced Robert to Paula St. Germaine, who became Robert's supplier.  (19 RT 3499; 20 RT 3558-59.)  Lucas had been to the Strang house once or twice to hang out with the family.  (19 RT 3428-29; 20 RT 3566-67, 3569.)

    3.   Rhonda was very afraid of Robert's drug activity and his contact with St. Germaine.  (19 RT 3502, 3508.)  She expressed her fear that she was being watched, and she started keeping a diary monitoring Robert's drug activity.  (54 RT 10094; 56 RT 10637.)  She became very security conscious, always checked to see who was at the door before she opened it, and kept the doors and windows of the house locked at all times.  (19 RT 3429-30, 3497.)

    **2.   The Events Leading to the Homicides**

    4.   Because of a drunk driving conviction, Lucas had to report for two days of work credit at the Descanso Detention Facility in San Diego.  (20 RT 3635-36.)  On October 22, 1984, Lucas reported to the facility for work.  (20 RT 3635-36.)  Lucas worked the entire day on October 22, and then requested that his second day be rescheduled from the 23rd to the 25th to accommodate a large carpet cleaning job with

---

[39]   Rick Adler was granted immunity from prosecution for narcotics possession and sales in order to compel his testimony at trial.  (19 RT 3458-59.)

(15cv1224)

CMC.  (20 RT 3636-38.)  However, according to CMC's dispatch logs, that job had been completed three days prior.  (21 RT 3784.)  Moreover, Frank Clark testified that Lucas called early on the morning on October 23 and told Clark that he had reported to Descanso but they would not admit him because he was sick, so he rescheduled for another day.  (21 RT 3794.)  Lucas did not appear for work at CMC on October 23.  (21 RT 3793-94.)

5. On October 23, 1984, Rhonda Strang agreed to babysit Gregory Fisher's daughter, Amber.  (19 RT 3393-95.)  Fisher dropped Amber off around 9:30 a.m.  (19 RT 3395-99.)  Robert Strang was already at work, arriving around 8:00 or 8:30 a.m. and staying there until 3:30 p.m.  (57 RT 10892, 10897.)

6. At approximately 1:30 p.m., Lynn Haines of the Lakeside Fire Department received a call regarding a throat slashing.  (19 RT 3402-03, 3415.)  It took the fire department crew about two minutes to arrive at the Strang house.  (19 RT 3403.)  A neighbor met the fire engine outside and told Haines that Strang's daughter came home from school and found her mother with her throat slashed.  (19 RT 3403, 3417.)  Firefighters entered the home through the unlocked kitchen door and found the bodies of Rhonda and Amber lying on the living room floor.  (19 RT 3403-04.)

7. SDSO Detective Robert Fullmer investigated the crime scene and found no evidence of forced entry.  (18 RT 3202; 19 RT 3388-89.)  All of the windows were shut and their screens in place, and all of the doors to the residence were locked except the one between the kitchen and garage.  (18 RT 3202-03.)  Loose hairs were found and collected from each of the bodies, and a partially burned Marlboro cigarette found on the floor near Strang's foot was also seized.  (18 RT 3207, 3333-34, 3337.)  It did not appear to Fullmer that a struggle had taken place because most of the blood was close to the bodies.  (18 RT 3212-13.)  A blue steel revolver was found in the master bedroom, along with a mirror containing a white powder residue consistent with cocaine or crystal methamphetamine.  (19 RT 3378-81, 3391.)  Fullmer directed the lab

tech, Deputy Masters, to dust the house for prints.  (19 RT 3360.)  One print was found and collected.  (19 RT 3360.)

8.     Fullmer interviewed Robert Strang on October 23, 1984.  (19 RT 3366-67.)  A couple of days later, Fullmer returned to the house to conduct a search, as he had received information that there may be a diary or audio tapes in the house documenting Robert's drug use and sales.  (19 RT 3363-66.)  Fullmer searched the house but did not locate the diary, cassette tapes, or any other documentation on Robert's drug activities.

### 3.     Autopsies Of The Victims

9.     On October 24, 1984, Dr. Robert Bucklin, a forensic pathologist, performed the autopsies on Strang and Fisher.  (37 RT 6979, 6983-84.)  Rhonda Strang's death was caused by a cutting wound to her neck which transected the airway and blood vessels.  (37 RT 6993.)  Her neck wound extended across the front part of the neck, cutting through the carotid arteries, all the jugular veins, and the larynx.  (37 RT 6988-90.)  It measured six and one-half inches long on its upper border and eight inches on its lower border, and was two inches wide at its widest point.  At the right border was a one-quarter inch superficial cut, indicating the probable starting point of the wound.  (37 RT 6986.)  Based on the borders of the wound, the cuts appeared to have been made from her right to her left.  (37 RT 7010.)  Bucklin found five cutting injuries involving anterior surfaces of the third and fourth cervical vertebrae, which led him to believe that there were at least five distinct cutting strokes.  (37 RT 6989, 6993.)  The skin tag on the right side of the wound also indicated to him that the knife had changed directions and was reapplied. (37 RT 6994.)  There were a number of irregular, prewound abrasions around the neck which were consistent with the perpetrator using the gold necklace Strang was wearing to strangle her.  (37 RT 6991-92.)  Her gold necklace was imbedded in the left side of the neck wound.  (37 RT 6992.)  Strang's head showed suffusion, a dusky color consistent with choking, and petechiae in the skin of her face and the whites of her eyes.  (37 RT 6983-84.)  Bucklin

(15cv1224)

concluded that Strang's cause of death was due to the cutting wound to the neck which transected the airway and blood vessels.  (37 RT 6993.)

10.     The wounds to Amber Fisher were very similar to those found on Strang. (37 RT 6990-91.)  Like Strang, Amber had a bruise on her right shoulder.  Her neck injury was also a deep cutting wound, about six inches long, on the anterior front surface of the neck.  The point of origin of the cutting instrument was on the right side of the neck, and the wound went from the right side of the body to the left.  (37 RT 6995, 7010.)  The wound severed the larynx, the carotid arteries, and the jugular veins. (37 RT 6995.)  The skin on her neck indicated that the wound was made using more than one cutting stroke.  (37 RT 6996-97.)

11.     During the defense case, Dr. Cyril Wecht, a specialist in anatomic, clinical and forensic pathology, testified that the direction of the wounds in the Strang/Fisher case suggested that the assailant was left-handed.  (50 RT 9369, 9399-400.)

**B.     Defense Evidence**

**1.     Domestic Violence in the Strang Household**

12.     Several witnesses testified concerning violent incidents against Strang by her husband Robert.  On one occasion, their friend Ronnie Christensen saw Robert grab Rhonda by the throat and say, "I am going to kill you, bitch."  (49 RT 9191-93.) Robert then slapped Rhonda in the face.  (49 RT 9191-93.)  Strang was wearing a folding 110 Buck knife at the time.  (49 RT 9193-94.)  About a week after that incident, Christensen saw Rhonda with scratches on the side of her neck and bruises on her left shoulder, which Rhonda stated were caused by Robert beating her.  (49 RT 9194-95.)

13.     At approximately 2:00 a.m. on July 8, 1984, the Strang's neighbor, Thomas Bradshaw, heard loud arguing coming from the Strang house.  (48 RT 9108.) About an hour later, he heard a woman screaming, "Help me.  Help me.  He's trying to kill me," followed by the sounds of pounding and breaking glass.  (48 RT 9108-09.) Bradshaw called the sheriff's office and reported what he heard.  (48 RT 9109-10.)  He looked out the window and tried to direct the deputies to the area from where he heard

77

(15cv1224)

the sounds. (48 RT 9108.) After he called the sheriff, Bradshaw heard what sounded like pounding on a door and then the sound of glass breaking. (48 RT 9108.) The next morning, Bradshaw saw a two foot by four foot hole through the large glass window in the front of the Strang's house. (48 RT 9109.) A paramedic who responded to the Strang house that night stated that Rhonda did not appear injured and refused any aid. (50 RT 9464-65.) The window of the house was broken when the firefighters arrived and a four by four piece of wood was in the dirt at the base of the broken window. (54 RT 10076-77.)

14. Friends of the Strangs reported seeing Rhonda on occasions with a black eye and bruises on her face and arms between July and October 1984. (54 RT 10091-93; 56 RT 10635-36.) Robert threatened Rhonda with guns on more than one occasion and told her that if she left him he would kill her. (54 RT 10095.) Another friend described Robert as a walking time bomb with a violent temper. (56 RT 10639-40.)

15. Robert Strang was known to have a fetish for knives and was routinely seen sharpening them. (50 RT 9494.) Two witnesses described seeing Robert carry a Buck knife on his belt. (53 RT 10028; 54 RT 10095-96; 56 RT 10639.)

16. Margaret (a/k/a Peggy) Shelton was Rick Adler's girlfriend and met Rhonda Strang through Adler. (54 RT 10219-20.) Shelton and Rhonda became very close, and Rhonda would confide in Shelton about the problems she was having with Robert and his drug use. (54 RT 10221-22.) In August 1984, Shelton and her son moved in with the Strangs, and Shelton soon noticed that Robert was heavily involved with drugs. (54 RT 10221.) Shelton observed several arguments between the Strangs, including incidents where Robert slapped Rhonda, pushed her into a wall, and pulled a gun on her and pointed it at her head. (54 RT 10223-25; 55 RT 10454.) According to Adler and Clark, during the latter half of 1984, Rhonda would contact Lucas once or twice a week. (19 RT 3449-50; 21 RT 3777.) Rhonda never expressed a dislike for Lucas, and Adler described them as good friends. (19 RT 3504; 55 RT 10463 (defense).)

78

### 2.  Robert Strang's Drug Use

17.  Rhonda told Shelton that she was recording conversations between Robert and Paula St. Germaine and that she was trying to make arrangements to have Robert's dealer arrested. (54 RT 10221-22, 10449-50.) According to Shelton, Rhonda wanted to get St. Germaine arrested to cut off Robert's drug supply, in the hopes that Robert would stop using drugs and they could get their lives back together. (55 RT 10450-51.)

18.  In the summer of 1984, Rhonda began cooperating with San Diego Police Detective Dale Kitts concerning her husband's drug activities, and identified Robert's dealer as Paula St. Germaine. (47 RT 8802, 8809-10.) Rhonda told several of her friends that she was covertly tracking Robert's drug activities by keeping a diary, taping phone conversations, and keeping lists of drug dealers and drug deals. (50 RT 9483-86, 9509-11; 55 RT 10449-50; 56 RT 10637.) For months, Rhonda expressed her fear of Robert and his drug associates to a number of different people, including her father, her ex-husband, and Peggy Shelton. (53 RT 10026-27; 55 RT 10458; 56 RT 10633, 10637, 10641.)

19.  Approximately two weeks before she was killed, Rhonda called her step-father, Paul Fortin. (54 RT 10089-90; 10093.) Rhonda was crying and very upset, and told Fortin that she was afraid because she knew she was going to be killed. (54 RT 10090-91.) She said she knew too much and was trying to expose certain people who were involved in Robert's drug transactions. (54 RT 10091.) Fortin told her that he would come and get her, but Rhonda did not want Fortin to get involved because she was afraid something could happen to him and her mother. (54 RT 10094.) Rhonda told Fortin she was keeping two diaries relating to the drugs Robert was dealing—one that she had hidden in the bedroom, and one that was hidden under a drawer in the kitchen. The diaries included names, dates, places, what was sold, who bought the narcotics and the names of the people who were involved. (54 RT 10094.) Rhonda wanted to expose the drug ring and put a stop to it. (54 RT 10094-95.)

(15cv1224)

20.     On November 26, 1984, the San Diego Sheriff's Department executed a search warrant at St. Germaine's residence, where they discovered 5.85 grams of cocaine and a triple beam scale.  (56 RT 10646-47.)

21.     The jury was hopelessly deadlocked as to the Strang/Fisher charges, and a mistrial was declared as to those murder counts.  (26 CT 5563.)

### VIII.  THE SWANKE CASE:  STATEMENT OF FACTS

**A.     Prosecution Evidence**

**1.     Lucas's Activities Before the Homicide**

1.     On the morning of November 24, 1984, the body of 22-year-old Anne Swanke was discovered lying at the bottom of a steep hill in a remote area of Spring Valley.  (25 RT 4653-59.)

2.     During the latter half of 1984, Lucas and his business partner Frank Clark were using crystal methamphetamine and marijuana a couple of times a week.[40]  (21 RT 3799.)  Clark and Lucas also drank alcohol on a fairly regular basis.  (21 RT 3800.)  On the night of November 19, 1984, Lucas and Clark[41] left CMC together in Lucas's truck and went to a bar, where they drank between three and five beers each and consumed crystal methamphetamine.  (21 RT 3797-98; 23 RT 4280, 4283-84.)

3.     Between 10:00 p.m. and 10:30 p.m., Lucas and Clark went to Clark's house in Mission Valley and drank more beer.  (21 RT 3797-98, 3802; 23 RT 4286-90, 4320; 24 RT 4377-78, 4381.)  Clark's wife, Cecilia, was watching the concluding episode of the television miniseries "Fatal Vision" that night.  (21 RT 3797, 3803-04.)  Clark and Lucas may have watched parts of the movie, but they were more or less

---

[40]  Clark was granted immunity from prosecution for his illegal drug use.  (21 RT 3800, 3916-18.)

[41]  Clark originally told law enforcement that all of these activities took place on Tuesday, November 20, 1984.  (23 RT 4203-04.)  However, Clark later changed his statement and testified that he realized the events actually occurred on November 19 because "Fatal Vision, Part Two" was on television that night.  (21 RT 3797, 3803-04.)  "Fatal Vision, Part Two" aired on November 19, 1984.  (24 RT 4422-26.)

80

(15cv1224)

talking between themselves.  (21 RT 3804.)  After the program ended, they watched the 11:00 p.m. news and the beginning of Johnny Carson.  (24 RT 4381.)  Lucas left Clark's house at approximately midnight or shortly thereafter.  (21 RT 3797, 3806; 23 RT 4296, 4321.)  According to Clark, Lucas did not appear intoxicated or impaired.  (21 RT 3802-03; 23 RT 4321.)

### 2.   The Abduction of Anne Swanke

4.     On the evening of November 19, 1984, Anne Swanke was visiting her boyfriend of three years, Gregory Oberle, at his apartment near the San Diego State University campus.  (24 RT 4439.)  Swanke arrived at approximately 7:00 p.m. and stayed until between 12:30 a.m. and 1:00 a.m.  (24 RT 4443.)  Swanke drove a Dodge Colt, and before leaving Oberle's apartment she mentioned to him that it was low on gas.  (24 RT 4440-44.)  Oberle testified that he and Swanke may have engaged in some sexual activity without genital contact, but they did not have sexual intercourse that evening.  (24 RT 4451-54.)

5.     During the early morning hours of November 20, 1984, Gale Graham was working as an attendant at the Shell gas station on Jackson Drive in La Mesa.  (24 RT 4455.)  Sometime after midnight, a woman (whom he later learned was Anne Swanke), walked into the gas station from the direction of Fletcher Parkway and got gas in a small gas can.  (24 RT 4457-60.)

6.     That same night, Richard Leyva was driving home and stopped at a traffic light at the intersection of Fletcher Parkway and Jackson Drive at approximately 1:15 or 1:30 a.m.  (24 RT 4549-53; 25 RT 4599-4600.)  While waiting at the light, he noticed a car parked on Jackson Drive near the gas station with someone bent over near the rear of the car as if the person was putting gas in the car.  (24 RT 4554-56; 25 RT 4600-01.)  Leyva looked away briefly, and when he looked back, he saw that there was now a second vehicle parked behind the first vehicle.  (24 RT 4556-58, 25 RT 4602.)

81

1   Leyva could see that the first vehicle was a car, but he was not sure if the second

2   vehicle was a car or a truck.  (25 RT 4597-98; 4604.)[42]

3        7.    The light turned green, and as Leyva made a left turn onto Jackson Drive

4   he passed by the vehicles.  As he was approaching the rear of the second vehicle, he

5   glanced at the license plate and noticed that it contained an unusual combination of

6   letters, possibly "TNC CNC or CNC TNC," or possibly "CNC INC."  (24 RT 4558,

7   4562-63.)  The plate reminded him of "TIN CAN" for some reason.  (24 RT 4562; 25

8   RT 4610, 4616-18.)  It was a light colored plate, and may have had an orange or yellow

9   background that reminded Leyva of either Oregon, Illinois, or Iowa plates.  (24 RT

10   4562-63; 25 RT 4609-10, 4613.)  Levya also saw what looked like the silhouette of two

11   people, one slightly taller than the other, who looked like they were in an embrace.  (24

12   RT 4558, 4560; 25 RT 4607-09.)  Leyva first thought it looked like a lover's embrace,

13   but as he passed the front of the first vehicle he briefly thought that perhaps it was a

14   kidnapping.  However, he saw no weapon or force being used.  (24 RT 4558; 25 RT

15   4607, 4618.)

16        8.    During the early morning hours of November 20, 1984, Officer Charles

17   Drake of the La Mesa Police Department learned of an abandoned brown Dodge Colt at

18   the intersection of Jackson Drive and Fletcher Parkway.  (25 RT 4620-21.)  Anne

19   Swanke's wallet was inside the car on the passenger seat.  (25 RT 4621-22, 4624, 4628-

20   29.)  There was a flashlight on the left rear corner of the trunk, and the gas tank top and

21   keys were also on top of the trunk lid.  (25 RT 4621, 4623, 4629.)  The gas tank flap

22   was open and there was a gas can on the ground.  (25 RT 4623.)

23

24

25

26   ─────────────────

27      [42]  Leyva told SDSO Detective Henderson that the second vehicle may have been
similar in size to the first vehicle and that it was a sedan as opposed to a van or a truck.

28   (25 RT 4606.)

(15cv1224)

### 3. Scratches on Lucas's Face

9. On the morning of November 20, 1984, Frank Clark received a call from Lucas, who said that after leaving Clark's home the night before he had gone to a bar, where he got into a fight. Lucas said someone hit him with a beer mug and he could not remember anything that happened after that. He told Clark that he needed to take the remainder of the week off of work. (21 RT 3807, 3818-19, 3823-24; 23 RT 4254-55, 4257.)

10. Rick Adler, who was living with Lucas at the time, saw Lucas that same morning.[43] (19 RT 3434-35.) Lucas had scratches on his face, forehead, and cheeks that had not been there when Adler last saw him on November 18.[44] (19 RT 3435, 3446.) The scratches were fresh and partially bleeding, and Adler commented to Lucas that Lucas looked like he had been run over by a truck. (19 RT 3447.) Lucas told him that he went to a bar, a fight broke out, and he was hit in the face with a beer mug or pitcher. (19 RT 3453.) According to Adler, their roommate, Vicky Johnson, saw scratches on Lucas's face that morning and commented about them. (19 RT 3442, 3447, 3452.)[45]

11. When Frank Clark next saw Lucas, on Friday, November 23, Lucas had four long scratches on the left side of his face that started around the eyelid, went down his cheek, and off his chin. The scratches seemed fairly fresh and were just beginning

---

[43] Rick Adler was living at Lucas's house at the time. (19 RT 3434.) He was granted immunity in order to compel his testimony at trial. (19 RT 3458-65; Def Trial. Ex. 554.)

[44] Adler testified that he did not believe Lucas was at the house at all the night of November 19, 1984. (19 RT 3520-21.) However, in February 1986, Adler talked to defense investigator Tom Caldwell and told him that he had spent the night of November 19, 1984, at Lucas's house and that Lucas was there when he went to sleep. (20 RT 3611-12.) Adler also testified to those facts at a Pretrial hearing in January 1987. (20 RT 3612.)

[45] However, Johnson testified that she saw Lucas the morning of November 20 and did not see the scratches on his face. (49 RT 9208.)

(15cv1224)

to heal.  (21 RT 3809-11.)  Lucas did not have bandages on his face or otherwise make any effort to conceal his injuries.  (23 RT 4260.)

12.   That same day, Lucas met with two advertising sales representatives, William McCarthy and John Storms, at CMC.  Both noticed scratches on Lucas's face, and Lucas explained that he received them in a bar fight.  (37 RT 7087-89, 7106 (McCarthy testimony); 7109, 7117 (Storms testimony).)

### 4.   Leyva's Contact With The Police

13.   On the evening of November 20, Leyva heard about Swanke's case on the news and contacted the La Mesa Police Department regarding what he had seen at the intersection of Fletcher Parkway and Jackson Drive, including the personalized license plate which read something like TNC CNC, followed by an unknown number.  (24 RT 4562; 25 RT 4624-25.)  Initially, Leyva told the police that he left his girlfriend's house shortly after 12:00 a.m. and it took him 20 minutes to get home.[46]  (25 RT 4650-52.)  Later in the same conversation, he told police that he arrived at the intersection at 1:30 a.m.  (25 RT 4634-35, 4639.)  There was no explanation for the conflicting times given by Leyva.  (25 RT 4650-52.)

### 5.   Discovery Of Anne Swanke's Body

14.   In the early morning hours of November 24, 1984, James McNelly was walking in the hills near his Spring Valley home when he spotted an unusual object on the side of a hill.  (25 RT 4653-59, 4665-67.)  He walked toward the object, went down a steep rocky hill, and discovered Anne Swanke's body.  (25 RT 4658-4667.)  McNelly went back up the hill to his house and called 911.  (25 RT 4660.)

15.   SDSO Detectives Craig Henderson and Robert Fullmer arrived at the scene.  (18 RT 3235; 25 RT 4701.)  Swanke was lying facedown in the mud, and her body was nude from the waist down except for her socks.  (25 RT 4705, 4753, 4755.)

---

[46]   According to Oberle, Swanke did not leave his apartment until sometime between 12:30 and 1:00 a.m.  (24 RT 4441.)

(15cv1224)

There was a silver dog chain around her neck.  (18 RT 3235; 28 RT 5075.)  When the body was rolled over, Henderson observed a severe cut to the throat area of her neck.  (25 RT 4707, 4731.)  Swanke's shirt and bra had been cut along the midline area of the front, and a pair of blue slacks found a few feet away were zipped and buttoned, but sliced through along the zipper to the crotch area.  (25 RT 4706, 4753-54; 28 RT 5079-80.)  Her shoes and underpants were found scattered further up the hill.  (25 RT 4706-07; 28 RT 5158.)  Based on his training and experience, the weather conditions, and the condition of the body, Henderson believed that the body had been there several days.  (25 RT 4713.)

16.     There were tire tread marks at the scene, but a comparison of those marks to the tires on Lucas's truck revealed that they were not a match.  (25 RT 4761-64.)

17.     Swanke's body was bagged and moved to the coroner's office, where Detective Fullmer examined Swanke's body prior to the autopsy and completed a report detailing the position of the abrasions and wounds on Swanke's body.  (18 RT 3235-36; People's Trial Ex. 188.)  In addition to the wound across Swanke's throat, Fullmer noted a puncture wound on the left side of the neck, abrasions on the face, and bruises on the back of the head.  (18 RT 3237, 3239-41.)  Fullmer also noted that there was hair and blood matted on the dog chain.[47]  (19 RT 3383-84.)  Deputy Frederick Freiberg removed the silver dog chain from around Swanke's neck, assisted by criminalist Charles Merritt.  (27 RT 4998, 5026-27.)  They noticed staining that appeared to be blood, hair, and other foreign material in the grooves in the links of the chain.  (27 RT 5000, 5027.)

18.     A rape kit including genital swabbing and public hair combing was performed to determine whether Swanke had been sexually molested.  (25 RT 4756-58;

---

[47]  Fullmer had the chain in his office from about December 17, 1984 until approximately January 9, 1985.  (19 RT 3385-86.)  He made no effort to freeze or refrigerate the chain.  (19 RT 3386.)

(15cv1224)

28 RT 5157.)  Later analysis of the genital swabs yielded a weak presumptive positive for the presence of acid phosphatase—an insufficient result to confirm that semen was present.  (56 RT 10730.)

19. Foreign debris, including blood and possibly skin, was observed on Swanke's fingernails.  (28 RT 5085.)  In order to preserve the material for testing, Freiberg clipped each nail as close to the finger as possible, and Merritt collected the clippings in a box as they fell from the nail.  (27 RT 5001-02, 5030; 28 RT 5084.)  They clipped and collected five nails from each hand.  (27 RT 5003-04.)  Two pieces of nail clippings from one hand were also included in the clippings which resulted when Freiberg did not cut all the way from one edge of a nail to the other and he clipped off the remaining pieces.  (27 RT 5004-05.)  The nails were placed between two pieces of foam and impounded by Merritt.  (27 RT 5004.)

20. Additional evidence collected at the coroner's office included Swanke's clothing (28 RT 5083), head hair and pubic hair samples (28 RT 5144-45), a single loose hair collected from Swanke's upper leg (28 RT 5145), hairs in Swanke's right hand and on her right breast (25 RT 4758; 28 RT 5154), and debris from Swanke's left hand and pubic hair (28 RT 5154.)

### 6. Injuries to the Victim and Autopsy Report

21. Dr. David Katsuyama performed the Swanke autopsy on November 25, 1984.  (26 RT 4852-53.)  Dr. Katsuyama observed a large gaping neck wound which extended from behind the right ear downward to the upper portion of the neck and to the left side.  (26 RT 4866; 27 RT 4976.)  There was a separate disruption about one inch in length behind the lower portion of the left ear, which appeared to be consistent with two knife strokes.  (27 RT 4976.)  There was another injury that could either have been caused by a stab in the neck or by the tip of the cutting instrument poking through the neck from within, but Dr. Katsuyama did not believe it was a separate stab wound.  (29 RT 4976-77.)  The throat cut went through her wind pipe, the neck muscles, the

(15cv1224)

larynx, the esophagus, and the carotid vessels and jugular veins on both sides of her neck.  (26 RT 4867-71.)

22.     There were cutting marks which struck the front portion of the vertebra and the connective tissue that holds the backbone together.  (26 RT 4872-73.)  In Dr. Katsuyama's opinion, there appeared to be more than one stroke by a cutting instrument with a medium to heavy blade of at least three to four inches in length.  (26 RT 4867.)  There appeared to be seven separate strokes utilized on the left side, and at least four distinct strokes on the right side.  (26 RT 4867-68.)  The strokes left small tags on the margin of the wound.  (26 RT 4868.)  The tags and margin of the skin edge indicated that some change in direction of the blade had occurred.  (26 RT 4868-69.)

23.     Discolorations and marks on Swanke's neck were consistent with the dog chain discovered at the scene having been pulled tightly in an upward direction around her neck.  (26 RT 4854, 4864-66.)

24.     Scratches on the body, primarily located on the buttocks and thighs, showed some brush marks or line-like scrapes as if the body had either brushed against something by falling, or had been dragged across a surface from a previous location to the location where the body was found.  (26 RT 4854, 4857-58.)  Dr. Katsuyama believed that the scratches were made close to the time of death, either shortly prior to or very shortly after.  (25 RT 4859.)  There was also an injury to Swanke's tongue, suggesting that it had been bitten during choking or strangulation.  (27 RT 4910-11.)  However, Dr. Katsuyama did not note any obvious petechial hemorrhaging in the head area, which is typically found with strangulation.  (27 RT 4910, 4974.)

25.     Based on the partial dehydration of Swanke's eyes, the presence of larvae on the trachea, and some partial decomposition of the body, Dr. Katsuyama estimated that Swanke had been dead for at least 48 hours, and probably longer.  However, he could not pinpoint the exact date and hour of Swanke's death.  (27 RT 4890, 4962, 4987-88.)  The cause of death was hemorrhage due to extension neck lacerations.  (27

87

RT 4915.)  Swanke would have died within a very few minutes after her throat was cut. (26 RT 4905.)

### 7.   Lucas's Arrest and Police Searches

26.    After Jodie Santiago chose Lucas's photo from a photo spread, SDSO Detective Gary Fisher obtained an arrest warrant for Lucas and a search warrant for Lucas's home and pickup truck.  (29 RT 5350; 36 RT 6874-75, 6877.)  On Sunday morning, December 16, 1984, Lucas was arrested and his home searched.  (36 RT 6875-80.)  Lucas's truck was searched the next day.

27.    Detective Henderson had a photograph taken of Lucas at the time of his arrest because he saw scratches on Lucas's face.  The scratches had been there for some time and had healed.  (25 RT 4739.)  Blood, head hair, mustache hair, and pubic hair samples were collected and sent to the crime lab.  (18 RT 3243-44.)

28.    During the search of Lucas's home, police seized several items related to hunting knives, including a sheath for a model 112 Buck folding knife.  (28 RT 5089-90; 29 RT 5387; 37 RT 6968.)  The Model 112 was a very common folding knife and Buck's third highest selling model.  (37 RT 6965, 6975.)  Another knife case was seized and examined for blood, but none was found.  (28 RT 5089-90.)  In a tackle box located in a closet, Merritt found a very sharp fixed-blade Buck knife in a sheath, as well as other knives in a drawer in the kitchen.  Tests for the presence of blood on these items were negative.  (28 RT 5094-97; 29 RT 5397-98.)

29.    From Lucas's truck, Merritt seized a Buck fillet knife which was found in a tool box in the bed of the truck, two pieces of cord, and two sheepskin seat covers. (28 RT 5098-5101; 29 RT 5363-66, 5391-92, 5399-5400.)

30.    After the arrest and search, Detective Henderson conducted a tape recorded interview at SDSO's Homicide Office with Lucas's wife, Shannon.  (25 RT 4732-33; 26 RT 4830.)  During the interview, Henderson showed Shannon Lucas the dog choke chain that had been found around Swanke's neck.  (25 RT 4733-34, 4738.) Shannon let out a gasp, appeared to be visibly shaken, and stared at the chain for ten or

twelve seconds.  (25 RT 4733-34, 4738-39.)  Shannon described the chain as "one of Duke's," their recently deceased dog.  (25 RT 4737.)  Because Shannon Lucas died before Lucas's trial, the trial court allowed the prosecution to play the tape recording of her statement for the jury.  (25 RT 4734-35.)

### 8. Serological Evidence

#### a. ABO Testing by San Diego Sheriff's Department

31.    Criminalist Charles Merritt conducted ABO testing of Swanke's blood. (28 RT 5104.)  Merritt concluded that Swanke was Type O and that both David and Shannon Lucas had type A blood.  (28 RT 5108, 5112-14.)

32.    On December 17, 1984, Merritt took the seat covers seized from Lucas's truck to the crime lab, where he performed bloodstain analysis on a stain on the driver's seat cover.  (28 RT 5103-04, 5114.)  At the time he removed the seat cover, Merritt was aware that Lucas was a suspect in the case.  (30 RT 5459.)  Merritt conducted a presumptive test for blood on the stain, which yielded a positive result.  (28 RT 5114.)  He then tried to do a species determination on the stain but got no result, and there was an insufficient amount to conduct further testing.  (28 RT 5114.)[48]

33.    Merritt also located a stained area on the vertical portion of the passenger seat cover.  (28 RT 5116-17.)  He did a presumptive test for blood, which yielded positive results.  (28 RT 5118-19.)  He then cut off wool fibers from the stained area and placed them in a container in a freezer, as well as an unstained portion of the fibers for a control sample.  (28 RT 5119-20; 29 RT 5343.)  On December 27, 1984, Merritt performed ABO testing on the stain and concluded that the blood on the fibers was Type O blood.  (28 RT 5104-05, 5108, 5122-23.)  However, his report merely stated the conclusions of the testing without providing the testing protocol.  (51 RT 9654-55.)

---

[48]  Substances other than blood can give a positive result in a presumptive test such as apples, cabbage, and horseradish.  (28 RT 5114-15.)

(15cv1224)

**b.    Testing By Serological Research Institute (SERI)**

**(1)    Brian Wraxall's Qualifications and SERI's**

**Standards and Procedures**

34.    Swanke's fingernail clippings, the passenger seat sheepskin cover, the bloody fibers collected by Merritt, and the dried bloodstains and samples from Lucas, Shannon Lucas, and Swanke were sent to the Serological Research Institute (SERI) for electrophoresis[49] testing by Brian Wraxall, a forensic serologist and founder of SERI. (28 RT 5121-22, 5134; 30 RT 5527, 5530-32.)  Wraxall, a member of California Association of Criminalists ("CAC") (31 RT 5756),  received a higher National Certificate in Applied Biology from Borough Polytechnic school in England, without "distinction."  (31 RT 5754.)  At the time he applied to CAC, Wraxall falsely stated that he had attended college, and based on that misrepresentation, he became the subject of an ethics investigation.  (31 RT 5756-59, 5767-69.)  Wraxall admitted that he had also applied to the American Association of Forensic Scientists and was rejected because he did not have a college degree.  (31 RT 5775.)  While at the Polytechnic school, the classes Wraxall attended were pursuant to a part-time program geared toward people working in the food industry.  (31 RT 5754.)

35.    At trial, Wraxall testified that there were no governmental standards or licensing requirements for serological labs and, by and large, the labs defined their own policies.  (31 RT 5775-76, 5779.)  The interpretations of serological results were often subjective, as there was no "match criteria" for deciding which conclusion to draw from the electrophoretic results.  (31 RT 5799.)

---

[49] Electrophoresis is a method for separation and analysis of macromolecules (including DNA, RNA, and proteins) based on their size and charge.  Although PCR testing is now the most commonly used form of DNA analysis, electrophoretic testing was and is used in forensic science to isolate and compare DNA, blood proteins, and inorganic substances from crime scenes with suspects, victims, or standard reference material.

90

(15cv1224)

36.     At the time of his trial testimony in 1989, Wraxall's laboratory had a policy of double-reading electrophoretic test results and contemporaneously recording the results.  (31 RT 5781-82, 5900.)  Under this procedure, the original analyst will: (1) look at the plate at the time he is ready to make the reading, (2) record the result in the notebook, (3) ask another analyst to read the plate without any reference to what the samples are, and (4) check the second reader's results against the first results.  (31 RT 5779-80.)  Both readers have to agree with the results before making a conclusion about the results.  (32 RT 5994.)  However, in December 1984, when SERI conducted its testing on the Swanke case, SERI did not have a double-read policy in place.  (34 RT 6508.)

37.     Wraxall saved the data from the tests he performed, but he did not save the gels.  (31 RT 5795.)  All of the gels were thrown away except for those where the GC and transferrin were recorded.  (31 RT 5796.)  Wraxall did not photograph ABO and Gm results because it was impractical to do so. (31 RT 5797, 5900.)

### (2)     SERI's Results

38.     In an effort to determine if the blood found on Lucas's sheepskin seat covers belonged to any of the victims in the case, SERI performed ABO testing on the blood samples from Santiago, Swanke, Shannon Lucas, and David Lucas.  When Wraxall received Swanke's blood, it was in poor condition, with no available blood cells for ABO typing.  (32 RT 6101.)  In a degraded sample, like Swanke's, the cells rupture and it is not possible to separate cells from the serum, which presents special problems when testing.  (32 RT 6101-02.)  SERI analysts ultimately concluded that Santiago's and Swanke's blood was Type O, and that David and Shannon Lucas's blood was Type A.  (30 RT 5582-86.)

39.     The blood samples were additionally tested for Group I and Group II enzymes, Group III serum proteins, the Gm and Km allotypes, and PGM subtyping.  (30 RT 5586, 5590-93, 5595-98, 5600, 5609-10.)  Wraxall tested Swanke's blood approximately ten times before he arrived at results in the Haptoglobin system.  (31 RT

91

5855.)[50]  He determined that Swanke's blood contained either the enzyme protein PGM subtype 2-1 or 2-1M, as the bands were very similar.  (31 RT 5855-56, 5874-75.)

### (a)    Swanke's Fingernail Clippings

40.    SERI received Swanke's fingernail clippings into evidence on February 7, 1985, but they were not inventoried until sometime later.  (28 RT 5126-27.)  When Wraxall first took inventory, there were five nails plus a few little chips in the left-hand box, and five intact nails in the right-hand box.  (30 RT 5538; 32 RT 6040-41.)  He numbered each of the nails one through five, designated by an L for left hand and R for right hand.  (30 RT 5538, 5542.)  When he came back to do some further work he discovered a sixth nail in the left hand box, stuck between the side of the box and the foam padding on which the other clippings rested.  (30 RT 5537-39; 32 RT 6009, 6039.)  Wraxall saw what appeared to be blood or tissue present on most of the nails clipped from Swanke's left hand.  (30 RT 5539-40.)  The sixth nail looked different from the other nails in the left hand box because there was no staining and it looked clean.  (29 RT 5540.)  Even though its presence could have contaminated his testing results, Wraxall did not tell anyone about the sixth nail after he discovered it, nor did he perform any testing on the sixth nail.  (32 RT 6037, 6065, 6074-75.)  Wraxall testified that there was no evidence at all that the material tested from fingernail L2 was contaminated, and if the blood in L2 had been contaminated it would have appeared in the PGM subtyping run.  (38 RT 7242.)  Contaminants would not change one marker to appear to be another marker.  (35 RT 6703.)

41.    On fingernail L2, Wraxall observed an accordion-shaped piece of tissue-like material which, when stretched out, was about a half an inch to three-quarters of an inch long.  (30 RT 5542-43, 5549-50.)  Blood from that fingernail clipping, and from

---

[50]  Wraxall made six separate runs on Swanke in the haptoglobin system but the typing was not successful.  (33 RT 6185.)  Wraxall did not note any unsuccessful runs in his reports unless they were relevant to the interpretation.  (33 RT 6188.)

(15cv1224)

another labeled L4, tested as Type A blood.  (30 RT 5607.)  Nail R1 was stained with Type O blood.  (30 RT 5607.)

42.     PGM subtyping revealed that Swanke could have donated the blood under nail R1, but not nail L2 or L4.  (30 RT 5609; 31 RT 5737.)  David Lucas could have donated the blood under nails L2 and L4, because the blood under both was type A with 2+1+ PGM subtyping markers, which was inconsistent with Swanke but consistent with Lucas.  (30 RT 5609; 31 RT 5738.)

43.     Wraxall's Gm analysis determined that the blood on nails R4 and L1 tested positive for Gm allotype genetic markers which were consistent with a mixture of Swanke's and Lucas's blood.  Anything in the stain that was Gm 1, 3, 11, 23 could have originated from Swanke, but the Gm 2 was foreign to Swanke and would have come from someone who was either a Gm 1, 2 or 1, 2, 3, 11, or 1, 2, 3, 11, 23.  (30 RT 5622; 31 RT 5738-39, 5742.)

44.     In summary, based on the ABO and PGM subtyping results on nails L2 and L4, Wraxall was unable to exclude Lucas as the donor.  (31 RT 5745.)  The Gm results led Wraxall to the same conclusion for fingernails R4 and L1.  (People's Trial Ex. 245.)  Putting the results of the fingernails together, Wraxall could eliminate everyone else he compared except David Lucas.  (31 RT 5742.)  Wraxall concluded that the markers found on the fingernails which were consistent with Lucas were found in one person in 69 Caucasian people, 1 in 547 Blacks, and 1 in 197 Hispanics/Native Americans.  (31 RT 5743; 35 RT 6582.)

**(b)     SERI'S Genetic Marker Testing of the Sheepskin**

45.     In Wraxall's view, the stained sample from the sheepskin was limited, but he chose to run approximately nine different tests on the sheepskin fibers.  (31 RT 5786-87.)  He also ran Swanke's blood approximately 15 times.  (31 RT 5788-90.)

46.     Based on the results of PGM subtyping, the Group II and Group III enzymes, and Gm analysis, Wraxall excluded David Lucas, Shannon Lucas, and Santiago as donors of the blood on the sheepskin fibers.  (30 RT 5603-06, 5617-19.)

However, Wraxall concluded that the bloodstain on the sheepskin fibers could have originated from Swanke.  (30 RT 5606, 5619; 31 RT 5727-28, 5730.)[51]

47.     At the time they did the ABO testing on the sheepskin, Wraxall already knew Merritt had concluded that Swanke was type O blood.  (32 RT 5989.)  He also knew that Merritt concluded that David Lucas was type A.  (32 RT 5990.)  Wraxall testified that he never did any other confirmatory testing of his ABO results on the sheepskin fibers.  (32 RT 5990-91.)

48.     Wraxall testified that a person's genetic markers never change.  (33 RT 6215.)  However, his lab concluded in separate tests conducted about 18 days apart, each with triple concurrences, that Amber Fisher was both a 2-1 and a 2 in the GC system, a result that was impossible.  (33 RT 6215-16.)  In his final report Wraxall reported Fisher as a 2-1 GC.  (33 RT 6216, 6264.)  But he failed to mention in his final report the results of the earlier tests indicating that Fisher was a 2.  (33 RT 6216, 6264.)

49.     Wraxall's final report also failed to report that his lab had originally gotten a possible 1 call in the haptoglobin system for the sheepskin.  (33 RT 6231, 6233-34.)  A 1 in the haptoglobin system would have excluded Swanke as a donor of the sheepskin stain.  (33 RT 6234.)

50.     Nevertheless, despite these errors in testing and reporting, Wraxall testified that he had no doubt that his conclusions, as set forth in People's Trial Ex. 245, were accurate.  (38 RT 7246.)  There was also no doubt in his mind that the sheepskin stain could have come from Swanke, or that the blood on fingernails L2, L4, L1 and R4 could have come from Lucas.  (38 RT 7247.)  Wraxall calculated the relative population frequencies of the markers found on the sheepskin and opined that the blood characteristics derived from the bloodstained sheepskin occur in only approximately 1 in 4,794 Caucasians, 1 in 5,875 Blacks, and 1 in 444 Hispanic/Native Americans.  (31

----

[51]  If there had been even one difference in markers between Swanke's blood and the sheepskin, she would have been excluded.  (31 RT 5729.)

(15cv1224)

RT 5735-36; 34 RT 6502; 35 RT 6580.)  (For a chart summarizing the Swanke blood evidence testing results, see People's Trial Ex. 251.)

### 9. Electrophoretic Testing by the San Diego County Sheriff's Department

51.  On December 28, 1984, Marilyn Fink of the San Diego County Sheriff's Department performed electrophoretic testing using the Group I and II systems on the blood samples from Santiago, Swanke, Lucas, and Shannon Lucas, as well as the stained sheepskin fibers from the Swanke case.  (36 RT 6816; 36 RT 6764-65, 6769.)  The blood proteins and genetic markers in Swanke's blood were consistent with the tests of the sheepskin bloodstain and inconsistent with the blood of Lucas, Shannon, or Santiago.  (36 RT 6757-69, 6817.)

## B. Defense Evidence

### 1. Drug and Alcohol Use by Frank and Cecelia Clark

52.  Sometime between 11:00p.m. and 1:00 a.m., Frank and Cecelia knocked very loudly on the Linker's front door and woke them up.  (53 RT 9925-28.)  The Clarks both smelled of alcohol and their speech was slurred, and Loren Linker concluded that they were intoxicated.  (53 RT 9993.)  Ken Nolte, who was present at the Linkers that night, also concluded that the Clarks were intoxicated.  (53 RT 9933-36.)  The Clarks stayed at the Linker's for 2 or 3 hours.  (53 RT 9933.)

### 2. Scratches on Lucas's Face

53.  Vicky Johnson saw Lucas on a regular basis while living at Lucas's house.  (49 RT 9206.)  On Tuesday, November 20, 1984, Johnson saw Lucas and did not see any scratches on his face.  (49 RT 9208.)  On the morning of the Wednesday before Thanksgiving (November 21, 1984), Vicky Johnson noticed fresh scratches on Lucas's face.  (49 RT 9206-07, 9210.)  When Vicky asked Lucas what had happened to him, Lucas said that he went to a bar to have a few drinks and was sitting there minding his own business when someone hit him.  (49 RT 9226.)

95

### 3.   Defense Testimony Regarding the Physical Evidence

#### a.   Vehicle Description at the Kidnap Site

54.   Richard Leyva testified that the vehicles he saw were approximately the same size.  (24 RT 4561; 25 RT 4598, 4614-15.)  Lucas's truck, however, was over a foot taller and 16" longer than Swanke's vehicle.  (56 RT 10653-59.)

#### b.   Fingerprint Evidence

55.   Frederick Freiberg was provided with the latent print cards of fingerprints recovered from Swanke's vehicle.  (57 RT 10784.)  Prints were found on the driver's side window, passenger side window, gas tank flap, and gas can.  (57 RT 10787-88.) He compared the prints against the known prints of Swanke and Lucas, and Lucas was not identified as the source of any of the usable prints.  (57 RT 10785.)

#### c.   The Dog Chain

56.   Peggy Fisher, D.V.M., testified that on April 20, 1984, Shannon Lucas brought a dog named Duke to her office for hospitalization.  Fisher put the dog to sleep on April 21, 1984.  (55 RT 10401-03.)  If the owner requested the collar or leash back, they always give them back.  (55 RT 10403.)  Fisher testified that they sometimes make an effort to return the items, but sometimes they do not.  (55 RT 10403.)

57.   James Boyd, general manager for Hartz Mountain pet supplies, examined the dog chain found around Swanke's neck and recognized it as a chain Hartz commonly distributed to pet stores and supermarkets.  (56 RT 10570, 10588.) According to Hartz's business records, from 1982 through 1984 the company sold over 34,000 of the same or similar chains in California per year.  (56 RT 10585-87.)  Boyd also testified that several other companies also sold chains similar to the chain used in Swanke's homicide.  (56 RT 10588-89, 10593.)

58.   Patricia Rutan, a former neighbor of Lucas's, used to take care of his dog Duke when Lucas was away during the summer.  (37 RT 6955-57.)  Rutan would routinely walk the dog and occasionally untangle his chain from around a tree in the yard.  (37 RT 6956, 6960.)  According to Rutan, the chain found with Swanke's body

96

(15cv1224)

appeared longer than Duke's chain and did not have the "scrolling" lines in each chain link like the ones found in Duke's chain.  (37 RT 6959.)

59.     Kevin Chess, a private investigator, went to various stores and supermarkets in San Diego County and found several chains similar to the one found around Swanke's neck.  (57 RT 10796-99.)

### d.     Hair Evidence

60.     Criminalist Charles Merritt had expertise in hair comparison in sexual assault cases.  (56 RT 10718.)  He obtained pubic hair standards from Swanke at the morgue.  (56 RT 10719.)  Merritt found one dark brown hair among the hairs in the pubic combing which did not appear to have come from Swanke.  (56 RT 10724-25.) Merritt compared Lucas's pubic hair standards with the pubic combings from Swanke. (56 RT 10725-26.)  The one brown hair was visually and microscopically different from the hairs of Swanke and Lucas.  (56 RT 10726, 10731-32.)  Merritt did not examine Oberle's hair.  (56 RT 10729.)

61.     Merritt also analyzed a pubic hair found on Swanke's left hip.  (56 RT 10720; Def. Trial Ex. 727.)  This hair was visually and microscopically different from the pubic hair standards of Swanke.[52]  (56 RT 10725-26.)  Merritt also collected pubic hair standards from Lucas and from Gregory Oberle, Swanke's boyfriend.  (56 RT 10720, 10722.)  According to Merritt's analysis, the hair removed from Swanke's left hip did not come from either Lucas or Swanke.  (56 RT 10727, 10730, 10732.)  Merritt did not render an opinion as to whether or not this hair was consistent with Oberle's. (56 RT 10729.)  However, John Simms, a forensic criminalist and hair comparison expert, concluded that the hair found on Swanke's left hip was inconsistent with the hair of Swanke, Lucas and Oberle.  (56 RT 10738-44.)  Simms also concluded that the

---

[52]  Swanke's hair was a reddish color.  (56 RT 10725.)

97

(15cv1224)

foreign hair found in Swanke's pubic combings was "markedly different" from the hair of Swanke, Lucas and Oberle.[53]  (56 RT 10738, 10745.)

### e.  Serological Evidence

#### (1)  Wraxall's Civil Suit

62.  Wraxall admitted that he had been involved in a civil lawsuit which alleged that he failed to reveal results obtained by his lab in a capital case.  (38 RT 7302.)  The defense read into the record relevant portions of the findings of the superior court order in the civil action, *Williams vs. Wraxall*, where Wraxall was found to have breached his duty to his defendant client.  (Def. Trial Ex. 652.)

#### (2)  San Diego County's ABO Testing of Sheepskin Stain on Passenger Seat

63.  Hermann Schmitter, an expert in serology,[54] concluded that the ABO testing conducted by Charles Merritt was not scientifically reliable because he failed to include what protocols (technical procedures), if any, he used.  (51 RT 9654-55; 63 RT 11979-80; *see also* Def. Trial Ex. 705.)  In Schmitter's opinion, absorption-elution tests for ABO on evidence stains must be done with two sets of antisera and the results must be consistent.  (51 RT 9629, 9632, 9644-45.)

#### (3)  ABO Testing by SERI

64.  Schmitter expressed similar criticism of the ABO testing procedure utilized by SERI.  In Schmitter's opinion, SERI should have tested the sample twice and only reported consistent results.  (51 RT 9646.)  Schmitter faulted SERI for relying on Merritt's undocumented ABO results because there was no protocol, only a

---

[53]  Simms thought these results were "even more significant" than the comparison of the hair  found on Swanke's hip because the hair from the combings was an intact, standard pubic hair, whereas the hair found on her hip was a shorter, finer "transitional type" hair.  (56 RT 10743-44, 10746.)

[54]  Schmitter was employed in the Bundeskriminalamt, the federal police organization of Bundes Republic, which was the German equivalent of the FBI.  (51 RT 9630.)

(15cv1224)

conclusion.  (51 RT 9654-55; 63 RT 11979-80; *see also* Def. Trial Ex. 705.)  Schmitter would not have accepted any of the results obtained on the fingernails because there was no simultaneous duplicate testing.  (52 RT 9713.)

### (4)    Electrophoretic Testing by SERI

65.    Schmitter reviewed the protocols and photographs of SERI's electrophoretic work.  He read the photos blindly without knowing what was analyzed.  (51 RT 9672.)  Afterwards, he compared the protocols to his results, which strongly challenged the results obtained by SERI.  (51 RT 9672.)  Schmitter disagreed with SERI's PGM subtyping results for Lucas's blood and expressed doubts that it was a 2+1+ as Wraxall claimed.  (52 RT 9720, 9849-50.)  He was unable to read the Swanke PGM subtyping result of 2-1- as the sample was overdeveloped and unreadable.  (51 RT 9674, 9676; 52 RT 9716, 9794-95, 9798.)  Overall, Schmitter did not feel that the three Swanke samples looked like a 2-1, which was Wraxall's determination.  (51 RT 9688; 52 RT 9826.)  Schmitter came to that conclusion based on the presence of an extra band that appeared in all three samples, which was a result he had never seen before.  (52 RT 9827-29.)  Schmitter also believed there were no reportable results in the Gm and Km genetic marker tests because none of the tests were performed correctly.  (51 RT 9665; 52 RT 9807, 9825-26.)  Additionally, Schmitter would not have reported any of Gm results obtained in the Lucas, Santiago, and Swanke blood, as the testing was not duplicated.  (52 RT 9711-12.)

### (5)    SERI's Testing Procedures

66.    As part of the defense's challenge to Wraxall's qualifications, the parties stipulated that FBI Special Agent William Eubanks would testify that all FBI serology examiners must have, at a minimum, a bachelor's degree from a four-year college with a major in chemistry or biochemistry.  (57 RT 10789.)  Eubanks would also testify that the FBI requires the use of controls and duplicate testing for the kind of serology tests employed in Lucas's case, and that all results must be interpreted by a second

99

1    examiner.  (57 RT 10789-90.)  If there is disagreement on the result, the result is

2    deemed inconclusive.  (57 RT 10789-90.)

3         67.    SERI, on the other hand, did not require a double-reader agreement.

4    Wraxall was allowed to make a specific call even if it didn't coincide with the other

5    reader's call.  (34 RT 6508.)

6                        **(6)    Wraxall's Character**

7         68.    Douglas Greer, a criminal defense attorney from Sacramento, testified that

8    between 1981 and 1986 he had had occasion to consult with Brian Wraxall on two

9    cases, and had spent approximately 15 hours with Wraxall.  (55 RT 10408-09, 10411,

10   10423.)[55]  In his opinion, Wraxall was not honest.  (55 RT 10410.)

11        69.    Similarly, attorney Loretta Hellen, Greer's co-counsel, testified that she

12   had utilized Wraxall's services on a case and had spent between 15 and 20 hours

13   consulting with him.  (55 RT 10427-29.)  She also found that Wraxall was not always

14   honest.  (55 RT 10428.)

15        70.    After seven days of deliberation, which included requests by the jury to

16   review key forensic evidence in the case (including the testimony of testifying

17   pathologists (Court Ex. 32 at 10), Lucas was found guilty of the kidnapping and murder

18   of Swanke.  (26 CT 5572-73.)

19              **IX.  PENALTY PHASE STATEMENT OF FACTS**

20   **A.    Prosecution Case in Aggravation**

21        1.    The only evidence presented in aggravation was a set of court documents

22   and a stipulation that on August 16, 1973, Lucas was convicted of forcible rape in

23   violation of Penal Code § 261, and that Lucas was armed with a knife in the

24   commission of the offense.  (67 RT 12597.)  The trial court admonished the jurors that

25

26   _____

27        [55]  The cases were *People v. Kenneth Darrel Williams*, a death penalty case, and
     *Williams v. Wraxall*, the civil suit Williams filed against his former expert.  (55 RT
28   10411.)

                                        100

                                                              (15cv1224)

the stipulated matters were given to them as proven facts.  (67 RT 12597)  This prior conviction was offered under aggravating factor § 190.3(c) (prior felony conviction) and factor (b) (prior violent criminal conduct).  (70 RT 13268.)

**B.    Defense Evidence**

  **1.    Family and Friends**

2.    The majority of penalty-phase defense witnesses were Lucas's family and friends.

3.    Patricia Lucas-Katzenmaier ("Pat"), Lucas's mother testified about Lucas's life, beginning with childhood.  When he was young, Lucas had problems with bed-wetting, for which his father, Clarence Lucas ("Clarence") spanked and scolded him.  Lucas suffered from asthma that sometimes sent him to the hospital.  Although Lucas was allergic to grass pollen and got sick from mowing the lawn, his father forced him mow it.  (69 RT 13044-47.)

4.    Clarence had a fiery temper, which he readily exhibited around Lucas and the other children.  He pulled the plugs out of the television and sometimes pulled the phone out of the wall.  He used profanity, and sometimes he punched holes in the walls with his fists.  Clarence never attended Lucas's Little League games.  (69 RT 13045-49.)

5.    When Lucas was five years old, his mother worked nights while Clarence stayed home with the children.  (67 RT 12653; 69 RT 13048.)

6.    When Lucas was around fifteen years old, Pat and Clarence separated, but Clarence would not let her go to court for the divorce.  Eventually, though, she left for good.  (69 RT 13049.)

7.    When Lucas was sent to Atascadero State Hospital in 1973, as the result of his rape conviction, Pat visited him as much as she could.  (67 RT 12756, 12764; 69 RT 13049.)  Pat also called and visited him at the jail as much as possible after his arrest in the present case.  (69 RT 13049-50.)

(15cv1224)

8.     Pat asked the jury to spare her son's life.  She testified that she loved him, that he was a good person, and that she believed he was innocent.  (69 RT 13050.)

9.     Cathy Lucas McEvoy, Lucas's older sister, testified about their sibling relationship and other observations of Lucas.  The defense introduced photographs of Lucas's childhood.  (67 RT 12659-60, 12669.)  In addition to repeating some of Pat's testimony, she testified to Clarence's treatment of Lucas and the other children. Clarence did not let the children speak at the dinner table, and hit them, closed-fisted, if they did.  The children had to finish everything on their dinner plates.  One time at dinner, Cathy became sick to her stomach and vomited salad onto her plate.  Clarence forced her to eat the vomit, in front of the other children.  (67 RT 12661.)

10.     Clarence was a very cold man, who hit his children with fists, belts, and telephone cords.  When Lucas was sixteen or seventeen years old, Clarence chased him with a two-by-four board.  The abuse continued until Pat and Clarence separated.  (67 RT 12662.)

11.     Lucas stood up for Cathy when neighborhood bullies picked on her.  One time some boys tried forcing her to undress and Lucas came to her defense while she ran away.  (67 RT 12663-64.)

12.     Cathy married Jim Graves in 1972.  Lucas was very close to Cathy, Jim, and their children, Trisha and Timmy.  Lucas brought groceries when they were low on food and helped provide for the family financially.  He talked to Trisha if she got out of hand and loved Trisha and Timmy as well as other children in the family.  (67 RT 12664-66.)

13.     Cathy visited, called, and wrote letters to Lucas when he was in custody in 1973.  (67 RT 12666.)

14.     Cathy saw Lucas build his company from a few dollars into a successful business.  They remained close and if she had a problem, he would be there to help.  He was caring towards everybody.  (67 RT 12668.)

(15cv1224)

15.     Lucas had a daughter, Christina, whom he took care of and played with. He also married a woman, Shannon, who had a son named Wesley.  He treated Wesley well, as if Wesley was his own child, and on one occasion, told Shannon not to hit Wesley.  (67 RT 12666-68.)

16.     Cathy visited Lucas in jail and wrote to him after his arrest in the capital case.  She was aware of his convictions.  Cathy asked the jury to save her brother; execution would hurt her children and family.  She did not believe that Lucas was guilty, loved him very much, and would do almost anything to help him.  (67 RT 12670, 1273-74.)

17.     Cathy's first husband, Jim Graves, testified about Lucas's friendship and helpfulness.  He expressed that his family was fond of Lucas and asked the jury to spare his life.  (67 RT 12721.)  Cathy's second husband, Mark McEvoy, similarly testified about Lucas's helpfulness and positive influence on his children.  He also asked the jury to spare Lucas's life, noting that Lucas could do constructive things within the prison system.  (67 RT 12641-48.)

18.     Candy Graves, who married Jim Graves in 1980, likewise testified about Lucas's politeness and positive interactions with children.  She asked the jury to give Lucas a sentence of life in prison.  (67 RT 12722-26.)

19.     Twelve year-old Timmy Graves and sixteen year-old Trisha Graves both testified that Lucas was a good uncle who was there for them and did many nice things for them.  Trisha expressed how much she loved her uncle.  They both thought the appropriate sentence for Lucas was life in prison.  (67 RT 12727-29 (Timmy Graves); 67 RT 12771-74 (Trisha Graves).)

20.     Donald Lucas ("Donald"), Lucas's younger brother, testified that Clarence treated Lucas very poorly and hit and abused Lucas on numerous occasions.  If something was spilled at the dinner table, Clarence reacted with violence. Spilled milk was "sudden death" their father would punch them very, very hard, with closed-fists. Clarence warned them that if they told their mother about being hit they would get

103

(15cv1224)

worse treatment the next day.  The abuse never occurred in front of their mother; she had no idea what was going on at home when she was not there.  (67 RT 12740-44.)

21.     Lucas was more of a father to Donald than Clarence, as well as a friend. Lucas helped him with Little League practice and took him fishing.  Once there was a fire at their house when Clarence was cleaning the garage with gasoline and the hot water heater ignited the gasoline.  The whole garage was engulfed in flames.  Donald was caught in the middle, so Lucas jumped in and pulled Donald out.  (67 RT 12741-42.)

22.     Donald trusted Lucas with his children and Lucas always made sure to attend the children's birthday parties even if he had work that day.  When Donald was unemployed, Lucas helped with groceries and even took Donald's family into his own home.  He gave Donald a job as well.  Lucas helped people both inside and outside of the family.  Donald asked the jury to sentence Lucas to life in prison, expressing that if Lucas was killed, he would not have a brother and his children would not have an uncle.  (67 RT 12743-45.)

23.     Lucas's childhood friends testified that Clarence never expressed any affection toward Lucas and treated him aggressively and violently.  (67 RT 12598-602 (Kurt Andrewson); 67 RT 12608-10 (Martin Lantry).).  There was no supervision in the house when Pat was working and Lucas did not seem to have a sense of direction in life.  (67 RT 12653 (Corrine Douthit).)  Lucas spoke of problems with Clarence to his friends. (67 RT 12651-52 (Corrine Douthit).)

24.     Friends also testified that Lucas was a good friend who helped them out through emotional or financial support.  (67 RT 12602-03 (Kurt Andrewson); 67 RT 12731-33 (Sue Herrin); 67 RT 12618-19 (Mitchell Hoehn); 67 RT 12625-26 (Vicky Johnson).)  Lucas let people move in with him when they fell on hard times.  (67 RT 12617-18 (Mitchell Hoehn); 67 RT 12625 (Vicky Johnson).)  Lucas was very easy to talk to and seldom angry.  (67 RT 12651-52 (Corrine Douthit);

(15cv1224)

25.     People who had worked with Lucas testified that he was a hard, reliable, and very good worker.  (67 RT 12613-14 (Lloyd Gerber); 67 RT 12729-30 (Leo Fadden).)

26.     Further, Lucas's friends, like his family, observed that Lucas interacted well with children and was a loving uncle.  (67 RT 12605 (Kurt Andrewson); 67 RT 12733 (Sue Herrin); 67 RT 12619 (Mitchell Hoehn); 67 RT 12624-25 (Vicky Johnson).)

27.     Lucas's friends thought the appropriate sentence for Lucas was life without parole, despite their knowledge of Lucas's convictions.  His execution would be a loss to them.  (67 RT 12606 (Kurt Andrewson); 67 RT 12611-12 (Martin Lantry); 67 RT 12654-55 (Corrine Douthit); 67 RT 12734 (Sue Herrin); 67 RT 1237-38 (Christina Jones); 67 RT 12620-21 (Mitchell Hoehn); 67 RT 12628-30 (Vicky Johnson).)

28.     Regarding the prior rape conviction, Kurt Andrewson explained that at Lucas's rape trial he had testified that he was with Lucas at the time of the alleged rape, but the jury nevertheless had convicted Lucas.  (67 RT 12603-06.)  Linda Neumayer-McKay, best friend of Cathy Lucas, testified that Lucas was like a brother to her and that he was not the kind of boy who would commit a rape.  (67 RT 12639-40.)

### 2.     Attorney Anthony Gilham

29.     Attorney George Anthony Gilham represented David Lucas in the 1973 rape case and believed that Lucas was not guilty of the rape charge.  Gilham also believed that Lucas should be sentenced to life in prison in the capital case and that Lucas was a hard working individual who could be a benefit to society if he received a life sentence.  Taking into account Lucas as an individual, the positive side of Lucas's life, his character, and family, and weighing it against the crimes, Gilham believed his life should be spared.  (67 RT 12704-08; 12716-17.)

### 3.     Loyal Tallchief

30.     In 1974, Loyal Tallchief was a psychiatric technician and unit supervisor at Atascadero State Hospital.  (67 RT 12753-54; 68 RT 12812.)  Tallchief believed Lucas was committed to Atascadero in early 1974 as a result of a rape conviction.  (67 RT 12756.)  Lucas was incarcerated at Atascadero for 18 to 20 months.  (67 RT 12764.)  Tallchief was Lucas's advisor for the first six months of Lucas's stay and remembered Lucas.  (67 RT 12754, 12766.)  Lucas did not present any behavioral problems, and while there, gained self-esteem and insight into his relationship with his father.  (67 RT 12754-55, 12765.)  Lucas got along well with staff and the inmates and was elected to the Inmate Council, which operated as a liaison between inmates and staff.  Eventually, Lucas became Ward Chairman, an individual who acts as the mayor of the ward government.  (67 RT 12754-55.)

31.     In April of 1974, there was a family interview at Atascadero.  Lucas's mother, brother and sister were interviewed, but his father failed to attend.  Lucas indicated there had been problems with his father in the past.  (68 RT 12825.)

32.     In 1974, Atascadero had a lot of inmates who were Mentally Disordered Sex Offenders; rapists, child molesters, and murderers.  (67 RT 12756-57, 12759.)  Other inmates were found not guilty by reason of insanity or incompetent to stand trial.  (67 RT 12759.)  The age of the inmates at Atascadero ranged from 18 to 70 years.  (67 RT 12761.)  Lucas was committed under a Youth Authority commitment.  (67 RT 12759.)  At the time, Atascadero had about 1300 or 1400 patients, approximately 40 of whom were Youth Authority commitments.  (67 RT 12761, 12767.)  Lucas was one of the youngest inmates.  (67 RT 12767.)

33.     At the time of Lucas's incarceration, Atascadero suffered from a shortage of clinical staff; most of the treatment was done by psychiatric technicians.  (67 RT 12767-68.)

34.     When Lucas was first committed to Atascadero he had been considered a danger; but that danger was later considered to have been reduced.  After serving his

(15cv1224)

term, Lucas was released by the Youth Authority to his mother in San Diego.  (67 RT 12764-65.)

### 4.   Dr. Alvin Marks

35.    On direct examination, Dr. Alvin Marks, a clinical and forensic psychologist, met with Lucas for clinical interviews and psychological tests on three occasions, in 1985 and 1987.  (67 RT 12775-78; 68 RT 12828.)  Dr. Marks had contact with Lucas's family and interviewed Lucas's brother and sister to obtain data, including historical data from Lucas's birth until 1985.  (67 RT 12778, 12785.)  On cross-examination, Dr. Marks clarified that the historical information came from a combination of sources, including a chronological report by an investigator and conversations with Lucas and his family.  (68 RT 12831; 69 RT 13029.)  He did not have any historical information for the 20 month period when Lucas was in Atascadero.  (69 RT 13026.)

36.    On direct examination, Dr. Marks opined that Lucas had a "personality disorder," which is a maladaptive pattern of behavior where personality traits are so inflexible that they constantly work against the afflicted person.  Dr. Marks classified the disorder as "personality not otherwise specified" using the DSM-III.  Earlier versions of the DSM would have classified Lucas's disorder as "inadequate personality" and "mixed personality disorder."  According to Dr. Marks, personality disorders produce maladaptive behavior, that is, behavior as behavior that is "destructive to oneself, others, or to society."  (67 RT 12779-81.)  However, Dr. Marks testified that a personality disorder does not mean that all the personality traits are negative or pathological.  (67 RT 12793-94.)

37.    In evaluating Lucas, Dr. Marks considered that before Lucas was one year-old he fell out of his stroller, hitting his head on the concrete, and that Lucas also sustained head injuries in a car accident when he was 15 or 16 years old.  Dr. Marks was also aware that as a child Lucas had asthma, a severe thumb-sucking problem, and was a bed-wetter.  (67 RT 12782, 12791.)

(15cv1224)

38.     Dr. Marks found that Lucas was born to a mother and father who represented a typical dysfunctional family of great severity.  People in such a situation develop a kind of mental disability because of so much dysfunction.  (67 RT 12782-83.)  Significantly, Lucas was exposed to a very brutal, iron-handed "workaholic" father who ruled the house.  Lucas's mother was absent a good amount of the time.  The children were not allowed to talk or express emotion.  If the children did something wrong there were severe consequences.  The dysfunction was intensified as to Lucas because he was singled-out for the worst abuse.  (67 RT 12784.)

39.     Lucas's father had "total contempt . . . for women."  Lucas's father denigrated women, and committed spousal rape on at least one occasion.  Lucas modeled his father and became a "workaholic" like Clarence.  (67 RT 12785-86.)

40.     Because Lucas had such a tyrannical father, he began to fear men and understand the abuse of power.  Dr. Marks thought it was significant that Lucas and his sister felt they were each other's best friend.  However, Dr. Marks felt Lucas had ambivalent feelings about women: he both loved them and hated them.  Lucas was in pursuit of the perfect woman.  (67 RT 12785.)

41.     When he was around sixteen years old, Lucas got his girlfriend pregnant; she had an abortion.  This devastated Lucas.  He felt that she had taken the life of his child.  Lucas told Dr. Marks that from that instant on, he hated women.  (67 RT 12787; 69 RT 13032-33.)  After the abortion, Lucas felt a great rage, part of which was directed toward women.  (67 RT 12787.)

42.     Lucas also had a great deal of sensitivity.  He became an altar boy at the Catholic Church.  He loved animals and children.  (67 RT 12786.)  Lucas baptized animals and tried to prevent other children from hurting them.  (67 RT 12787).  However, Lucas could not express his feelings.  The expression of emotion was absolutely forbidden by his father and Lucas would be physically punished for doing so.  (67 RT 12786.)

108

(15cv1224)

43.     Lucas was raised in the Cowles Mountain neighborhood, where drug use was prevalent.  In the 9th grade, Lucas began experimenting with marijuana, cocaine and speed.  Lucas also suffered from alcohol abuse.  Lucas's drug use continued through 1984 or 1985.  (67 RT 12788.)

44.     Dr. Marks was aware of Lucas's prior rape conviction, and his commitment to Atascadero.  Lucas was one of the youngest people in Atascadero, and he was surrounded by a number of men who were a great deal older than himself.  Dr. Marks felt that this fact had an impact on his clinical analysis of Lucas, as it was part of the same pattern.  Lucas was able to get along with men, even though he was highly fearful of them, particularly in an institutional setting.  (67 RT 12790.)

45.     Dr. Marks discussed the fact that after Atascadero, Lucas had a child, and the woman left with the child, again depriving Lucas.  (67 RT 12787.)  Lucas then married Shannon, whose son Wesley, had been subjected to some physical abuse from the mother, which Lucas objected to.  (67 RT 12788.)  Lucas wanted to take Wesley and raise him as his own son, but the marriage went bad and Shannon and Wesley disappeared.  Lucas had a conflict about women–searching for the perfect one, wanting children and a family, yet not being able to achieve that.  Lucas was filled with rage and anger. He did a good job of containing it because he was able to function well in his business.  There was a pattern of a great fear of men, a love/hate relationship with women and a very distrusting attitude toward authority, man or woman.  This was Lucas's personality disorder.  (67 RT 12787-88.)  Lucas's history caused his personality disorder, locking him into it.  (67 RT 12794.)

46.     Dr. Marks also considered Lucas's kindness to others:  Lucas sent his niece through modeling school; he had helped his brother Donald when he was jobless and downtrodden; Lucas got Donald a job.  Lucas helped everyone in the family when he could.  Most significantly, at age 15, it was Lucas who went to his mother and asked her to give his father another chance.  (67 RT 12789-90.)

(15cv1224)

47.     Dr. Marks referenced two head injuries suffered by Lucas.  In addition to the personality disorder, Dr. Marks was of the opinion that Lucas had "minimal" brain damage.  Dr. Marks performed neurological testing on Lucas and found some evidence of brain damage.  Dr. Marks also reviewed a report prepared by neuropsychologist Dr. Gale Winston Bach that showed some evidence of brain damage.  (67 RT 12791-93; 68 RT 12832.)

48.     Dr. Marks also testified on direct that although it was difficult for Lucas to show feelings, this did not make him devoid of emotion.  Dr. Marks believed that Lucas felt deep remorse, but he found it extremely difficult to express such feelings.  (67 RT 12793-94; 68 RT 12836.)

49.     After Dr. Marks's direct testimony, the prosecution asked for discovery of material Dr. Marks relied upon and for Lucas's ASH records.  (67 RT 12796-12800.)  Defense objected to the discovery of the ASH records on the grounds that Dr. Marks had not "relied upon" them.  (67 RT 12800-04.)  Defense counsel's objection to the ASH records revealed their mistake.  (Dkt. 36-8 at 85, 2008 State Pet., Ex. 10 ¶ 8-10.)  Because the defense had placed Lucas's mental state at issue by calling Dr. Marks, the trial court granted the prosecution's motion to unseal the ASH records even though Dr. Marks did not rely on them.  (67 RT 12804; 69 RT 13009.)

50.     Although Dr. Marks had not seen Lucas's Atascadero records (67 RT 12830), he had reviewed a "chronological report by an investigator," which included references to Lucas's experiences at Atascadero.  (67 RT 12831.)  However, the defense had not intended for him to see this chronology nor had they intended to open the door to admission of the Atascadero records.

51.     Once it was clear that counsel could not keep the records from the jury, defense counsel and the prosecution entered into the following stipulation:

> Mr. Williams: The stipulation being that on February 7th, 1974, a licensed physician with the state of California, a doctor – medical doctor, psychiatrist, by the name of R.M.

110

Schumann, S-C-H-U-M-A-N-N, examined in the month of February or diagnosed in the month of February 1974 Mr. David Allen Lucas, the defendant in this action, while at the Atascadero state hospital that has heretofore been referred to in these proceedings, and diagnosed him as in the DSM III or in the DSM manual as an antisocial personality, severe; alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, and the prognosis was very guarded."

(69 RT 13025-26.)

52.     After the parties stipulated, the trial court admonished the jury as follows: "Again, ladies and gentlemen, that's a stipulated matter, now. It's not a matter that you have to decide. It's given to you as a fact." (69 RT 13026.)  The judge's post-stipulation admonition was reinforced by a subsequent jury instruction providing: ". . . [I]f the attorneys have stipulated or agreed to a fact, you must regard that fact as conclusively proved." (65 CT 14359.)

53.     On cross-examination, Dr. Marks testified that he was aware of the factors that support a diagnosis of antisocial personality in the DSM, but it was his opinion that those factors were not present in Lucas.  (69 RT 13031.)

54.     Also on cross-examination, Dr. Marks testified that Lucas had a continuing distrust of authority, which stemmed from his father.  While a jail environment would be an authority situation, Dr. Marks expected that Lucas would conform and work with the situation; he could accept authority while incarcerated.  (68 RT 12834-35; 69 RT 13036-37.)

55.     Dr. Marks further testified on cross that over the past five years Lucas had shown more emotion than he had in his previous 29 years.  When Dr. Marks saw Lucas in 1987, Lucas felt very badly that he had difficulty in seeing enough of his family. Lucas's predicament was worsened by the death of Shannon, whom Lucas said he still

111

1    loved.  (68 RT 12836; 69 RT 13032.)  There was turmoil in their relationship, but

2    Lucas was remorseful over Shannon's death.  (69 RT 13037-38.)

3        56.    Dr. Marks felt Lucas showed considerable remorse for his situation.  This

4    remorse had always been with Lucas but it was not until after he had been incarcerated

5    that he was able to express it to others.  (68 RT 12836-37.)  During the 1985 interview,

6    Lucas expressed remorse for the family of the victims in the case, but he did not tell

7    Marks that he committed any of the crimes.  (69 RT 13038-39.)

8        57.    The prosecution was able to elicit damaging statements from Dr. Marks.

9    For example, although Dr. Marks felt that Lucas was normally able to control his rage,

10   Dr. Marks also believed, with medical certainty, that Lucas was incapable on certain

11   occasions of controlling his rage toward women.  (69 RT 13033, 13035.)  Further, on

12   cross-examination, Dr. Marks testified as follows:

13        "[Prosecutor] Q.   . . . Let me ask you then, would he

14        [defendant] hurt a child?

15        [Dr. Marks] A.  I don't think he would 99 percent of the time.

16   (69 RT 13034-35.)

17   **5.    Prison Conditions**

18       58.    Louis Nelson, a retired San Quentin prison warden, testified about his

19   experiences at San Quentin through 1974.  (67 RT 12677-12704.)  He said that inmates

20   serving life terms without possibility of parole ("lifers") provided a positive benefit to

21   the prison.  The longer the inmate stays, the more he settles down.  He testified as to

22   work opportunities and the possibility that an inmate could benefit himself and society

23   when under a life sentence.  (67 RT 12688-90.) Nelson testified that if a person

24   performed well in an institution and he returned for another sentence, he would

25   generally be expected to perform well again.  (67 RT 12699; 12703.)

26       59.    Nelson also testified about the security measures of San Quentin, including

27   the concrete wall with armed posts that surrounded the prison.  It is classified as a

28   maximum security prison.  (67 RT 12695-98.)

112

(15cv1224)

60.    Dr. Craig Haney, a professor of psychology at University of California. Santa Cruz, testified as to issues concerning the sentence of life without possibility of parole (LWOP).  (68 RT 12928; 12942.)  A prisoner with LWOP would be sent only to the highest security level prisons, classified by the Department of Corrections as "Level Four" prisons.  (68 RT 12942-44.)

61.    Dr. Haney described the living conditions, procedures, structure, and drastic security measures of Level Four prisons.  (68 RT 12943-47.)  He also described the typical daily routine, activities, and security designations of an inmate at a Level Four prison.  (68 RT 12947-48; 12978-81.)  Additionally, he described visiting and lockdown procedures.  (68 RT 12982-84.)

62.    Dr. Haney testified that a good work record is a very strong predictor of positive adjustment to prison life.  (68 RT 12958-59.)

63.    The nature of the offense for which the person was convicted may have a bearing on their adjustment. If the criminal activity is the kind not likely to occur inside the institution, a positive adjustment would be predicted. Further, prior institutional adjustment is usually the best predictor of a person's future adjustment.  (68 RT 12959-61.)

64.    Social relationships outside the prison also have a bearing on how a person adjusts inside; prisoners who maintain relationships away from the prison tend to function better inside.  (68 RT 12962.)

65.    From a correctional perspective those sentenced to life are often regarded as the most desirable inmates to deal with as they have the largest investment of time in the prison, and thus the greatest interest in having things run well.  (68 RT 12977.)

C.    **Prosecution Rebuttal Evidence**

1.    **Laura Stewart**

66.    Laura Stewart, Lucas's neighbor, never spoke with him but during the course of living next-door heard Lucas speak to other people.  Stewart knew Lucas was married to Shannon Lucas and was familiar with Shannon's voice.  David and Shannon

113

Lucas lived next door to Stewart for over a year.  (69 RT 13076-77.)  Shannon did not always stay at the house.  (69 RT 13080.)

67.     In Stewart's opinion, the Lucases had a violent, tumultuous relationship. They constantly fought outside in the yard.  Stewart was awakened in the morning by fighting, screeching cars, sheriffs and paramedics.  (69 RT 13078, 13082.)

68.     Stewart recalled one instance when Shannon had Lucas's truck.  Stewart was awakened by yelling and screeching tires up and down the street.  Stewart heard Lucas say, "Get the chain."  There was arguing and profanity between Lucas and Shannon, and Lucas was saying, "I'm going to get her.  I'm going to get her."  Shannon came partly into the driveway and ran the truck into a pole.  Lucas opened the truck door and pulled Shannon out by her hair.  Shannon was saying, "Don't hit me.  Don't hit me."  Shannon was taken away, into custody.  (69 RT 13079-82.)

69.     Stewart testified that this was not an isolated incident; there was often fighting.  Stewart saw Lucas hit Shannon a couple of times.  One time Shannon came to Stewart's house to use the phone.  Stewart thought that Shannon had been hit her face was very red and her hair was a "mess."  (69 RT 13078, 13080.)

### 2.     "Pruno" Incidents

70.     Two officers testified that, on two separate occasions, they found "pruno," a homemade alcoholic beverage, in Lucas's jail cell.  (69 RT 13112 (Deputy Sheriff Scott Kleinhesselink); 69 RT 13124 (Deputy Sheriff Michael Barletta).)

71.     Additionally, a stipulation was read to the jury that on September 5, 1985, a search was conducted of Lucas's jail cell by Deputy Robinson and "pruno" was discovered.  On April 4, 1988, Lucas's cell was searched by Deputy Seitz and "pruno" was found in Lucas's possession and he was again punished.  (69 RT 13142-43.)

### 3.     Possession of a Broomstick

72.     On February 23, 1989, Deputy Sheriff Mark Profeta searched Lucas's jail cell while Lucas was at court.  Profeta found a five-foot long broomstick with one burnt end, which was tapered to a point that was not sharp.  Inmates were not allowed to have

114

(15cv1224)

sharpened broomsticks, as it was a security risk for other inmates and the staff. It was a "major" violation, and Lucas's privileges were restricted as a result.  (69 RT 13146-48, 13156.)

73.     On cross-examination Profeta testified that there was a television set in the tank that was located directly outside of the cells.  The inmates were allowed to watch television while they were in their cells.  (69 RT 13150-53.)  The defense offered a photograph, which depicted a person holding a stick and using it to do something to the television set.  (69 RT 13161.)  On redirect, Profeta testified that the stick he seized did not look like the stick depicted in Exhibits 738D or E.  (69 RT 13171.)

**D.      Defense Surrebuttal**

74.     In January 1989, Sonny Lee was housed with Lucas in Tank 5F in the central jail.  Lee testified that cell 3, Lucas's cell, was where the broomstick was standing.  There was a television in tank 5F.  (70 RT 13242-43.)  The television could only be adjusted from cell 3.  (70 RT 13244-45.)  When Lee and Lucas came to Tank 5F there already was a stick with a burned end in the tank, which inmates had been using to adjust the television.  Lucas used it for that purpose.  Lee testified that Exhibit 738E demonstrated how the stick could be used.  (70 RT 13245-46.)  After the stick was taken away from Lucas, Lee requested and received a new stick to use with the television.  (70 RT 13246-47.)

75.     Peter Bunn, a licensed private investigator, testified that he went to Tank 5F in the San Diego jail and took the photographs contained in Exs. 738A-E.  When he entered the stick was already in the tank.  In cell 3, Bunn's assistant, James McCarthy, was able to successfully use the stick against the television.  McCarthy attempted to use the stick from cell 4 and cell 2 but he was unable to reach the television set.  (70 RT 13260-65.)

**E.      Closing Arguments**

76.     In closing, the prosecution described Lucas as "wicked," urging the jury that "the candle of the wicked should be put out."  (70 RT 13266.)  In arguing for

death, the prosecutor reviewed potential aggravating factors and contended that Lucas's prior rape conviction satisfied § 190.3 factors (b), the presence of criminal activity other than the crimes of which he was currently convicted, and (c), the presence of a prior felony conviction. (70 RT 13269-70.) He also relied upon Stewart's testimony about Lucas being an abusive husband to preemptively combat any evidence of mitigation the defense might present. (70 RT 13272) He similarly argued that Lucas did not deserve any sympathy because he is a "butcher of human beings." (70 RT 13272.) In support of these, the prosecutor detailed circumstances of each crime, arguing they satisfy § 190.3 factor (a), the circumstances of the crime. (70 RT 13274.)

77. The prosecutor also implied that life without the possibility of parole was not a harsh enough sentence because Lucas would still be able to enjoy television, sports, visits from family, possibly marriage, and special holiday dinners, which the victims would never get to enjoy. (70 RT 13275-76.)

78. Referencing the Bible, the prosecutor urged the jury to consider that Moses established capital punishment as a just punishment for premeditated murder. (70 RT 13277.) He described as "nonsense" the notion that the death penalty was inhuman or immoral.

79. The prosecutor ended his argument by reminding the jury of Dr. Marks's testimony that Lucas "was incapable on certain occasions of controlling the rage he had for women." (70 RT 13278.)

80. At closing, the defense suggested that choosing execution would result in the jurors engaging in the same conduct for which they had found Lucas guilty. (70 RT 13284.) Counsel urged them to put their emotions aside, stay open, and follow the law. (70 RT 13285.)

81. Overall, the defense relied on a theory of lingering doubt. The defense explained lingering doubt as "more than an abiding conviction to a moral certainty." (70 RT 13286.) It noted the particular importance of lingering doubt to the only special circumstance in the case, the Jacobs multiple murder. (70 RT 13286.) The defense

116

reviewed weaknesses in evidence in the Jacobs case. (70 RT 13301-03.) They also reviewed frailties in the Santiago eyewitness identification and Swanke case. (70 RT 13311.) The defense also asked the jury to consider lingering doubt as to the prior rape conviction, given the testimony of Andrewson, Gilham, and McKay calling into question Lucas's involvement. (70 RT 13292.)

82. The defense reminded the jury that they could not consider sympathy to the victims or their families, but they had a duty to consider mercy for Lucas. (70 RT 13288, 13291.) The defense argued that life without the possibility of parole was an adequate punishment and that Lucas would do well in an institutional setting. (70 RT 13294-97.) The defense also noted that Lucas's childhood background was a factor in mitigation. (70 RT 13297-98). Counsel reminded the jury that Lucas was a hard worker and had many other good characteristics, to which friends and family had testified. (70 RT 13298-301.) Lucas is not irredeemable. (70 RT 13304.)

# X.  INCORPORATION OF EXHIBITS
## AND REQUEST FOR JUDICIAL NOTICE

1. While Lucas has endeavored to specifically state all facts and law supporting each claim herein, additional supporting facts and law may have been stated in separate claims. For this reasons, Lucas incorporates by reference each and every paragraph of this Petition into each and every claim presented, as if fully set forth therein. Lucas incorporates all exhibits appended to this Petition and all exhibits that may be subsequently filed in this action.

2. Lucas requests that this Court take judicial notice of the certified record on appeal and all pleadings, briefs, orders, and exhibits filed with the California Supreme Court in connection with Lucas's automatic appeal of his conviction and death sentence, *People v. Lucas*, case number S012279, and his state habeas corpus action, *In re Lucas*, case number S168103. Lucas also requests this Court take judicial notice of all pleadings, briefs, orders, and exhibits filed with the United States Supreme court in *Lucas v. California*, case number 14-9137.

117

3.     Lucas requests that the Court consider all the exhibits filed with this Petition, including all exhibits lodged by Respondent as reflected in Docket entries 30-36.  As to those exhibits that have not been authenticated, which contain hearsay information or which might otherwise be inadmissible at an evidentiary hearing, Lucas presents them as an offer of proof about what evidence he could introduce after full investigation, discovery, and access to this Court's subpoena power.  Lucas does not concede that these exhibits are the only evidence that could be presented at an evidentiary hearing.

4.     The exhibits in support of the Motions in Limine are part of the trial record.  (*See* Ex. 99, In Limine Index.)  Current counsel has made efforts to obtain copies of these exhibits from the trial court, but has not obtained a complete set as of the date of this filing.  (*See* Ex. 101, R. Angulo Decl.)

5.     All articles, records, photographs, and other documents submitted as evidence are what they purport to be.  Lucas originally copied or printed some documents on paper larger or smaller than 8½ x 11 inches; except where noted, Lucas has reduced or enlarged those copies in size for convenience of filing.

6.     Some original exhibits were filed with the California Supreme Court by state habeas counsel, pursuant to its rules directing petitioners to do so.  Other original exhibits are available at the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012, and will be furnished to the Court or shown to opposing counsel on request.

## XI.  GENERAL ALLEGATIONS

1.     To avoid unnecessary repetition, Lucas makes the following allegations for each of the enumerated claims below and incorporates these allegations into each claim:

2.     Lucas's confinement, conviction, and death sentence are illegal and in contravention of his rights, as guaranteed under the federal Constitution and international law.  These rights include but are not limited to the right to the effective

118

(15cv1224)

assistance of counsel under the Sixth and Fourteenth Amendments; the right to due process of law and equal protection of law under the Fifth and Fourteenth Amendments; the right to a fair and reliable trial under the Sixth and Fourteenth Amendments, the right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments; and other rights afforded under international law.

3.     If Respondent disputes any of the facts alleged below, Lucas requests that this Court issue an order directing that an evidentiary hearing be held so that factual disputes may be resolved.

4.     After Lucas has been afforded discovery and the use of this Court's subpoena power, and the opportunity to fully investigate his claim, he requests an opportunity to supplement or amend this Petition.

5.     Lucas does not waive any applicable rights or privileges, including the attorney-client privilege or the work-product privilege, by the filing of this Petition and the supporting exhibits.  Lucas requests that any waiver of privilege occur only after a hearing with sufficient notice and the right to be heard.  Lucas requests "use immunity" for each and every disclosure he has made and may make in support of this Petition.

6.     The violations of Lucas's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the error was harmless.  Even assuming that the harmless error doctrine applies, relief is required because the error had a substantial and injurious effect or influence on the determination of Lucas's convictions and sentence.  *See Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638, (1993); *Fry v. Pliler*, 551 U.S. 112, 121-122 (2007).  Relief is also required because the errors so infected the integrity of the proceeding as to warrant habeas relief even if they did not substantially influence the jury's verdict.  *See Brecht*, 507 U.S. at 638 n. 9.

7.     The constitutional violations set forth in each individual claim alone mandate relief from the convictions and sentences.  Even if these violations do not mandate relief standing on their own, relief is required when each claim is considered

119

together with the additional errors alleged in the other claims in this Petition. Cumulatively, these errors mandate relief from Lucas's convictions and sentences. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (recognizing *Chambers* as clearly established federal law on cumulative error).

8.    If Respondent contends that any claims should not be considered on the merits because the final state court decision found the claim to be procedurally barred under state law, Lucas contends that the bar does not preclude federal merits review because it was not an adequate and independent state ground. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Bennett v. Mueller*, 322 F. 3d 573, 580 (9th Cir. 2003). If this Court finds any claim to be procedurally defaulted, federal review of the merits is nevertheless required because Lucas can establish (1) cause and prejudice for the default; and (2) failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750, 753-54; *House v. Bell*, 547 U.S. 518, 536 (2006).

9.    To the extent that any claim, or part thereof, is deemed to be unexhausted, untimely, or procedurally or otherwise barred, it is a result of the ineffective assistance of prior counsel (state trial, appellate, and/or habeas counsel) and/or inadequate state court funding for post-conviction proceedings, and accordingly this Court should adjudicate the claim on the merits. Prior counsel (state trial, appellate and/or habeas counsel) were ineffective in not raising the claim earlier. *Trevino v. Thaler*, 133 S. Ct. 1911, 1915, 1921 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Nguyen v. Curry*, 736 F.3d 1287, 1289-90 (9th Cir. 2013) (applying *Martinez* to a claim of ineffective assistance of appellate counsel); *see Visciotti v. Martel*, 839 F.3d 845, n.10 (9th Cir. 2016) ("the question of whether a petitioner's procedural default is excused by cause and prejudice for purposes of federal habeas review is a federal, not state, question." (citations omitted.)).

120

(15cv1224)

# XII.  STANDARDS OF REVIEW

## A.    AEDPA Limitations on Relief

1.    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to this petition because it is being filed after April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320 (1996).

2.    Under the AEPDA, as codified in 28 U.S.C. § 2254(d), this Court may grant relief if it determines that a state court's adjudication of a claim was (1) contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Section 2254(d) only applies to state court decisions addressing the substantive grounds of a claim.  *Lambert v. Blodgett*, 393 F.3d 943, 966 (9th Cir. 2004)

3.    Clearly established federal law refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  Although the source of clearly established federal law must be the Supreme Court, circuit court decisions remain persuasive authority in determining what law is clearly established.  *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000).

4.    A state court acts contrary to clearly established federal law if it applies a legal rule that contradicts a prior Supreme Court holding or if it reaches a different result from a Supreme Court case presenting indistinguishable facts.  *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000).  A state court decision involves an unreasonable application of clearly established federal law if it identifies the correct legal principle but applies it in an unreasonable manner to the particular facts before it. *Terry Williams*, 529 U.S. 362, 407 (2000).

5.    Section 2254(d)(2) allows petitioners to challenge the state court's factual findings based upon the evidence before the state court.  *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).  A § 2254(d)(2) challenge can be premised on any one of numerous

theories, including that: (1) the state's factual finding is unsupported by sufficient evidence or is based on a misstatement of the evidence; (2) the state court fact-finding process is defective; (3) no factual finding was made by the state court at all; and (4) the state court makes factual findings under the wrong legal standard. *Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004).

6.      Federal court review of a state court decision under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *See* 28 U.S.C. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). The state-court record "includes both the allegations of [the] habeas corpus petition . . . and . . . any matter of record pertaining to the case." *Id.* at 188 n.12 (internal quotation marks omitted). The relevant state court decision is the last reasoned decision regarding a claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).

7.      The Supreme Court has stated that "in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). To that end, while the standard as articulated in § 2254 is demanding, it is not insatiable; "[d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks omitted).

8.      Section 2254(d) does not preclude relief for the claims stated herein because: (1) the state court's denial of the claims was contrary to or an unreasonable application of clearly established federal law; (2) the state court's denial of the claims was based on an unreasonable factual determination; and/or (3) § 2254(d) does not apply to the claims because they were not adjudicated on the merits in state court. When § 2254(d) does not apply or is satisfied, the federal habeas court reviews a claim de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

(15cv1224)

**B.** **Suspension of the Writ**

9.      The denial of federal habeas relief without adequate federal and/or state court process and fact-development procedures is an unconstitutional suspension of the writ of habeas corpus.

10.      In *Harrington v. Richter*, 562 U.S. 86, 98 (2011), the Supreme Court held that a state court summary denial is presumed to be an adjudication on the merits and "the habeas petitioner's burden [under § 2254(d)] still must be met by showing there was no reasonable basis for the state court to deny relief." In *Pinholster*, 536 U.S. 182, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." These two cases working together impede Lucas's ability to receive federal factual development where he was denied state factual development.

11.      In California, a state court summary denial means the state court determined the petition did not state a prima facie case for relief. *People v. Romero*, 8 Cal. 4th 728, 737 (1994); *see Pinholster*, 563 U.S. at 188 n.12. Most of Lucas's claims were summarily denied, so he was never given the opportunity for factual development of those claims. *See Romero*, 8 Cal. 4th at 739-40. Because many habeas claims require factual development to be colorable, *McFarland v. Scott*, 512 U.S. 849, 855 (1994), full and fair factual development at the state court level necessarily is a predicate to the application of § 2254(d) in federal court. *See Boumediene v. Bush*, 553 U.S. 723, 790 (2008) (holding that federal habeas proceedings may be constitutionally circumscribed only to the extent that some court is available to consider the relevant evidence supporting a claim); *Harris v. Nelson*, 394 U.S. 286, 300 (1969) (holding that "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry" into colorable claims); *Townsend v. Sain*, 372 U.S. 293, 313 (1963) (describing the content of a full and fair state court adjudication with emphasis on factual development), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

123

(15cv1224)

12. The federal court requirement that Lucas satisfy § 2254(d) based on the record before the state court – which is necessarily limited because he was not entitled to fact-development procedures – violates Lucas's constitutional rights. In the absence of a full and fair opportunity to litigate habeas claims in state court, the application of AEDPA to those claims violates Lucas' s right to due process and results in a suspension of the writ by leaving Lucas with no effective remedy for federal constitutional violations occurring at his criminal trial. *See Boumediene*, 553 U.S. at 790; *Ford v. Wainwright*, 477 U.S. 399, 424 (1986) ("[F]undamental fairness is the hallmark of the procedural protections afforded by the Due Process Clause."); *Case v. Nebraska*, 381 U.S. 336, 338 (1965) (Clark, J., concurring) (explaining that the exhaustion doctrine "presupposes that some adequate state remedy exists"); *Young v. Ragen*, 337 U.S. 235, 238-39 (1949). Equally, it violates the equal protection guarantee as it applies to indigent petitioners, *Smith v. Bennett*, 365 U.S. 708 (1961), and undermines the reliability of capital sentencing under the Eighth Amendment, *Woodson v. North Carolina*, 428 U.S. 280 (1976).

13. Accordingly, AEDPA deference should not apply to those claims for which Lucas was denied factual development in state court and he should be afforded the opportunity to factually develop those claims in this Court.

124

(15cv1224)

# XIII. CLAIMS FOR RELIEF

**CLAIM 1: LUCAS'S FEDERAL CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY TRIAL COURT ERRORS REGARDING THE ADMISSION OF THE LOVE INSURANCE NOTE (AOB[56] 2.4.3, 2.4.4, 2.4.5; SHP VI.N, VI.O)**

**A. Introduction**

1. The Love Insurance note was the key piece of evidence against Lucas for the Jacobs homicides. As noted in Part IV(A)(5)(a), San Diego police (SDPD) recognized the note was a very valuable piece of evidence, and they prioritized analyzing it for prints. (4 RT 460-61; 10 RT 1810; 11 RT 1850-51.) The original application of ninhydrin raised a partial fingerprint suitable for exclusion purposes. (4 RT 550-51; 8 RT 1364; 10 RT 1810.) However, because SDPD evidence technicians negligently failed to photograph the ninhydrin results, the latent print was lost, as ninhydrin results fade over time. (4 RT 581.) Evidence technician Pat Stewart tried to raise the print again through the use of more ninhydrin without success. (8 RT 1367; 9 RT 1518.) Stewart then sent the note to the FBI for assistance, but they were also unable to raise the lost latent print. When SDPD received the Love Insurance note back from the FBI, the once-pink piece of paper with readily visible handprinting was blackish, unreadable, and unsuitable for evidentiary purposes. (8 RT 1369-70; 9 RT 1517-18, 1581.) Therefore, at trial, the prosecution sought to admit photographic copies of the Love Insurance note (taken before the ninhydrin was applied) in lieu of the original.

---

[56] For purposes of demonstrating exhaustion, each claim title indicates where the claim was previously presented to the California Supreme Court. "AOB" refers to the "Appellant's Opening Brief" presented on direct appeal and previously lodged with this Court as Lodgement 6 at Dkt. 35-84 through Dkt. 35-95. "SHP" refers to the State Habeas Petition presented in state habeas corpus proceedings and lodged with this Court as Lodgment 12 at Dkt. 36-5 through Dkt. 36-7.

2.     The State's case utilized two elements of the Love Insurance note as circumstantial evidence of Lucas's guilt in the Jacobs homicides.  First, the prosecution relied upon the handprinting on the note by presenting expert testimony that it matched Lucas's handwriting; and second, the prosecution relied upon the content of the note (i.e., the name of the company and the telephone number) as evidence that Lucas was the perpetrator because he became a customer of Love Insurance two months after the Jacobs homicides.  (*See e.g.*, 62 RT 11770-73.)  Linking Lucas to the note through handwriting comparison was crucial because "Lucas bought car insurance through Love Insurance *after* the homicides," not before.  (51 CT 11224.)  Therefore, in order for the prosecution to narrow the pool of suspects from "every person whoever [sic] dealt with Love Insurance," it had to connect Lucas to the note through handwriting to ensure that the note was not more prejudicial than probative.  (51 CT 11224; *see also* Cal. Evid. Code § 352.)

3.     In Pretrial briefs and hearings, trial counsel argued that there were serious problems with using photographic copies of the note, particularly with regard to handwriting comparison.  (*See, e.g.*, 51 CT 11219-24.)  For example, the photograph of the Love Insurance note was a two-dimensional representation of a three-dimensional object, and as such it necessarily lost or improperly manipulated crucial elements of the handprinting contained on the paper.  (51 CT 11220-21.)  Additionally, there were relevant differences between the original and the photograph, including missing content within the folds of the note and the absence of impression marks.  (111 Pretrial 8219-23; 148 Pretrial 13891-92; 240 Pretrial 24625.)  As trial counsel argued to the trial court, this was why most authorities advised not using photographic copies for purposes of handwriting comparison.  (51 CT 11220-21.)

4.     Based on these and other factors, the defense maintained that the prosecution could not sufficiently establish that the photographs were "an exact and accurate copy of the original," as required under California's evidence code.  Trial counsel asserted that because an accurate and fair assessment of the handwriting by the

126

jury was impossible without viewing the original—i.e., Lucas could not be linked to the note through handwriting analysis without suffering unwarranted prejudice—the photographic copy of the note should be excluded.  (51 CT 11224-26.)  Counsel also argued for the exclusion of the photographs based upon lack of authentication and lack of certification.  The trial court allowed the photographs to be entered into evidence, and also refused defense requests for limiting or clarifying instructions regarding the Best Evidence Rule, authentication, and certification.  (59 RT 11338-39.)

5. As explained below, the trial court's rulings resulted in three critical errors which prejudiced Lucas and rendered the prosecution of the Jacobs case fundamentally unfair.

**B.     The Trial Court Erred in Admitting Photographic Copies of the Love Insurance Note in Violation of the Best Evidence Rule**

**1.     The Failure of the Trial Court to Apply the Best Evidence Rule Was Unreasonable in Light of the Circumstances and Rendered Lucas's Trial Fundamentally Unfair**

6. At the time of Lucas's trial,[57] the Best Evidence Rule required the trial court to weigh and consider any deficiencies in the photograph before allowing it into evidence.  California evidence law defined the Best Evidence Rule as follows:

> Except as otherwise provided by statute, no evidence other than the original of a writing is admissible to prove the

---

[57]  In 1999 the Best Evidence Rule (Cal. Evid. Code §§ 1500-1511) was replaced by the Secondary Evidence Rule (Cal. Evid. Code §§ 1521- 1523).  However, "this reform [was] not a major departure from former law, but primarily a matter of clarification and simplification." (1998 Law Revision Commission Comments to Evidence Code § 1521.) The Secondary Evidence Rule retained the former requirement that a judge must exclude secondary evidence if he or she determines either "(1) A genuine dispute exists concerning material terms of the writing and justice requires the exclusion, [or] (2) Admission of the secondary evidence would be unfair." Cal. Evid. Code §1521. Section 1511, as enacted in 1985, brought California into line with the Federal Rule of Evidence 1003 on the admissibility of duplicates. *People v. Garcia*, 201 Cal. App. 3d 324, 328 94 (1988) ("Federal Rule of Evidence 1003 . . . is identical to [California] Evidence Code section 1511.").

127

content of a writing. . . . A duplicate is admissible to the same

extent as an original unless (a) a genuine question is raised as

to the authenticity of the original or (b) in the circumstances it

would be unfair to admit the duplicate in lieu of the original.

Cal. Evid. Code §§ 1500, 1511.  Then, as now, "[The Best Evidence Rule] relies on the wise discretion of trial courts to determine those particular circumstances in which it is unfair to use a duplicate in lieu of the original."  *People v. Garcia*, 201 Cal. App. 3d 324, 330 (1988).  Among the broad range of factors which the judge should consider in exercising this discretion is whether there is a challenge to admission "based on substance, not mere speculation that the original might contain some relevant difference."  *Id.*

7.    During Pretrial proceedings, trial counsel's primary argument was that the note was inadmissible "under Evidence Code sections governing 'authentication' of writings [§§ 1440 and 1441] and Evidence Code section 352," with only a brief reference to the Best Evidence Rule.[58]  (*See, e.g.*, 51 CT 11217.)  However, these arguments clearly presented factors germane to the Best Evidence Rule, as the circumstances showed that "it would be unfair to admit the duplicate in lieu of the original." Cal. Evid. Code § 1511.  (59 RT 11338 ("The Best Evidence Rule goes hand in hand with the issue of authentication" (defense argument)).)  In light of the information before the trial court, the judge should have exercised her discretion and evaluated the photographic copies of the note under the Best Evidence Rule prior to finding them admissible.

---

[58]  The California Supreme Court found that this claim was not preserved for appeal because trial counsel failed to make a "timely and specific" objection under the Best Evidence Rule, but that in any event, the claim lacked merit. *People v. Lucas*, 60 Cal. 4th 153, 264-65, (2014) (citing *People v. Abel*, 53 Cal. 4th 891, 924, (2012)). As Lucas asserts in Claim 10,  trial counsel's failure to object to the admission of the photographs of the note under the Best Evidence Rule violated his right to effective assistance of counsel.

128

(15cv1224)

8.       Later, during the hearing on jury instructions, trial counsel requested that the court instruct the jury on the Best Evidence Rule with regard to the copies of the Love Insurance note.  (59 RT 11338; 60 RT 11437.)  The trial court concluded that the Best Evidence Rule did not apply because the prosecution was not attempting to prove the content of the writing: "Best Evidence is denied as inappropriate statement of the law.  We're not talking about the content of the writing.  Content of writing is not attempted to be proved. It's just the writing itself."  (60 RT 11437.)  As the record demonstrates, the trial court erred in its analysis.  The note was clearly offered to prove the content (i.e., the name and telephone number of Love Insurance) because this information was substantially utilized by the prosecution as circumstantial evidence that Lucas left the note at the scene since he later purchased Love Insurance for himself.  (*See, e.g.*, 62 RT 11770-73.)  Moreover, the prosecution's handwriting comparison and expert testimony also depended on the "content" of the printing (i.e., the shape, formation, and style of the letters and numerals) on the note.  These details were critical to the State's case.  (*See* Prosecution's Closing Argument at 62 RT 11769-70 ("The writing is more probative of who the killer was than [the destroyed fingerprint] . . . not just to identify the author of that writing, but to look at and discuss **the content of that writing**" (emphasis added)).)  Hence, the accuracy of the photograph was fundamental to the purpose for which it was admitted, and the Best Evidence Rule applied.  *See, e.g.*, *Garcia* at 201 Cal. App. 3d. at 329-30 (Best Evidence Rule applicable to photograph of composite sketch in eyewitness identification case).

9.       Accordingly, the evidence and defense counsel's objection required the trial court to exercise her discretion under Evidence Code § 1511, and her failure to do so was not harmless.  Rather, the trial court's error rendered Lucas's trial fundamentally unfair, because the Love Insurance note was crucial evidence against Lucas in the closely balanced Jacobs prosecution.  Given the limited evidence against Lucas in the Jacobs case and the substantial impact of the error, the trial court's failure to exercise discretion and exclude the note under the Best Evidence Rule undoubtedly

129

had a "substantial and injurious effect or influence" upon the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993); *Ayala v. Wong*, 756 F.3d 656, 674 (9th Cir. 2014); *see also United States v. Caruto*, 532 F.3d 822, 832 (9th Cir. 2008) ("Longer jury deliberations 'weigh against a finding of harmless error because length of deliberations suggest a difficult case.'"). Moreover, even if the error was not prejudicial as to guilt, it was prejudicial, individually and cumulatively, as to penalty because it undermined the mitigating theory of lingering doubt. Like the guilt determination, the penalty trial was closely balanced and the error was substantial. Erroneously allowing the jury to utilize the Love Insurance note to find Lucas guilty of the Jacobs murders, thereby undermining lingering doubt as to Lucas's guilt, was a "substantial error" under *Brecht.*

> **2. To the Extent That Trial Counsel Failed to Adequately Object Under the Best Evidence Rule to the Admission of Photographs of the Love Insurance Note, Counsel Was Ineffective**

10. On direct appeal, the California Supreme Court found that trial counsel did not object in a "timely and specific" manner to the admission of the photograph under the Best Evidence Rule and therefore forfeited this claim on appeal. *Lucas*, 60 Cal. 4th 153, 264-65 (2014). Lucas disputes this finding, which is an unreasonable determination of the facts in light of the state court record. (*See, e.g.*, 59 RT 11338 ("The Best Evidence Rule goes hand in hand with the issue of authentication" (defense argument).)

11. However, should this Court determine that the California Supreme Court's interpretation of the facts is correct, Lucas asserts that trial counsel's failure to properly preserve the claim violated his state and federal constitutional right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052; 80 L. Ed. 2d 674 (1984). There are several exceptions to the Best Evidence Rule, and the proponent of the evidence bears the burden of showing that one of the exceptions applies. *People v. Hovarter*, 44 Cal. 4th 983, 1013, 189 P.3d 300, 81 Cal. Rptr. 3d 299

130

(2008).  Thus, in this case the burden was on trial counsel to either raise a genuine issue as to authenticity of the original or to show that under the circumstances it would be unfair to use the duplicate in lieu of the original.

12.    There was no strategic reason for failing to timely and specifically object to the admission of the photographs when the Best Evidence Rule clearly applied to that evidence.  Counsel's failure to properly object under §§ 1500 and 1511 prejudiced Lucas in this closely balanced case, as it is more likely than not that Lucas would not have been convicted of the Jacobs murders had the Love Insurance note been excluded.

**C.    The Trial Court Erred in Admitting Photographic Copies of the Love Insurance Note in Violation of California Evidence Codes §§ 1531 and 1551**

**1.    Lucas's Due Process Rights Were Violated by the Erroneous Admission of an Uncertified Copy of the Love Insurance Note**

13.    Lucas's rights under the Eighth and Fourteenth Amendments were violated by the trial court's erroneous and arbitrary admission of an uncertified photographic copy of the Love Insurance note.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *White v. Illinois*, 502 U.S. 346, 363-64 (1992); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991).

14.    Under California law in effect at the time of Lucas's trial, a photograph of a lost or destroyed writing was admissible only when the person who directed or caused the copy to be made attached or otherwise included a certification stating that "the copy is a correct copy of the original or a specified part thereof, as the case may be."  Cal. Evid. Code § 1531; *see also* Cal. Evid. Code § 1551 (a copy is admissible as the original writing itself only "if, *at the time of the taking* of [the copy], the person under whose direction and control it was taken attached thereto . . . a certification complying with the provisions of § 1531 and stating the date on which, and the fact that, it was so taken under his direction and control.") (emphasis added).  Hence, under the express terms of § 1551, a photograph of a destroyed or lost writing was inadmissible if the

131

certification requirements of § 1531 were not met. *See People v. Kirk*, 74 Cal.App.4th 1066 (Cal. 1999) (uncertified public records are inadmissible per Evidence Code § 1530 and § 1531.)

15.   In this case, the prosecution sought to present photographs of the note in order to support its theory that Lucas was the person who handprinted the note and therefore was the person who killed Suzanne and Colin Jacobs.  (61 RT 11769-73.)  As such, the copy was a writing,[59] and the relevance of its content, including the handprinting, depended entirely on the preliminary fact that the photograph was certified as an authentic and correct copy of the original. However, evidence technician Pat Stewart, who took photographs of the note before the application of ninhydrin, failed to certify "at the time of the taking" that the photographs represented a correct copy of the note found in the bathroom of the Jacobs home. Cal. Evid. Code § 1551. Therefore, the failure to certify the photograph of the note as required by California Evidence Code § 1551 and § 1531 rendered the note inadmissible, and the trial court erred in admitting it.

16.   Because the note was the key piece of evidence in the Jacobs charges and was arbitrarily admitted in violation of express state statutory prerequisites, Lucas was denied his rights under the Due Process Clause of the Fourteenth Amendment.  *See Hicks*, 447 U.S. at 346; *Estelle*, 502 U.S. at 70 (1991); *see also Hernandez v. Ylst*, 930 F.2d 714, 716 (9th Cir. 1991).  Lucas's right to verdict reliability under the Due Process Clause was also prejudicially impaired by the erroneous admission of the Love Insurance note.  *See White*, 502 U.S. at 363-64; *Donnelly v. DeChristoforo*, 416 U.S. 637, 646, (1974).  Finally, the error also violated the Eighth Amendment's requirement

---

[59] "'Writing' means handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." Cal. Evid. Code § 250.

(15cv1224)

of heightened reliability in the determination of guilt and death eligibility before a sentence of death may be imposed. *See Beck*, 447 U.S. at 627-46; *see also Burger v. Kemp*, 483 U.S. 776, 785 (1987); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).

17.   The trial court's error was prejudicial because the Love Insurance note was crucial evidence against Lucas in the closely balanced Jacobs prosecution. Without the note, the only evidence which placed Lucas in the Jacobs home was hair evidence, which had serious contamination issues and was not definitively determined to be from Lucas. (*See* Claim 12 and 13.)  There were no fingerprints or blood evidence which placed Lucas at the scene. Given the closeness of the evidence against Lucas in the Jacobs case and the substantial impact of the error, the admission of the note undoubtedly had a "substantial and injurious effect or influence" upon the jury's verdict. *Brecht*, 507 U.S. at 627.  Moreover, even if the error was not prejudicial as to guilt, it was prejudicial, individually and cumulatively, as to penalty because it undermined the mitigating theory of lingering doubt.  Like the guilt determination, the penalty trial was closely balanced and the error was substantial.  Erroneously allowing the jury to utilize the Love Insurance note to find Lucas guilty of the Jacobs murders, thereby undermining lingering doubt as to Lucas's guilt, was a "substantial error" under *Brecht.*

**2.    To the Extent That Trial Counsel Failed to Adequately Object Under Sections 1531 and 1551 to the Admission of the Love Insurance Note, Counsel Was Ineffective**

18.   On direct appeal, the California Supreme Court found that trial counsel did not properly object to the admission of the photograph under §§ 1531 and 1551 and therefore forfeited this claim on appeal.  *Lucas*, 60 Cal. 4th at 263 n. 41.  Lucas disputes this finding, which is an unreasonable determination of the facts in light of the state court record.  28 U.S.C. § 2254(d)(2). (*See* 59 RT 11339 ("We are requesting that this court strike and exclude the Love Insurance note at this time on the basis of [§§ 1531 and 1551]"); 60 RT 11438.)

133

19.     However, should this Court determine that the California Supreme Court's interpretation of the facts is correct, Lucas asserts that trial counsel's failure to properly preserve the claim violated his state and federal constitutional right to effective assistance of counsel.  *See Strickland*, 466 U.S. 668.  There was no strategic reason for failing to object to the admission of the photograph of the note when its admission into evidence clearly violated state law.  Counsel's failure to properly object under §§ 1531 and 1551 prejudiced Lucas in this closely balanced case, as it is more likely than not that Lucas would not have been convicted of the Jacobs murders had the Love Insurance note been excluded.

**D.     Lucas's Due Process Rights Were Violated When the Trial Court Erroneously Admitted the Photographs of the Love Insurance Note Without Making the Required Preliminary Finding of Accuracy Under Evidence Code Sections 1400 and 1401 and Erroneously Failed to Instruct the Jury on Contested Authentication**

20.     Under California evidence law, a writing,[60] whether an original or a copy, may not be admitted into evidence without a preliminary finding of the writing's authenticity.  *See* Cal. Evid. Code §§ 1400 and 1401.  "The foundation for admission of a writing or copy is satisfied by the introduction of evidence sufficient to sustain a finding that the writing and copy are what the proponent of the evidence claims them to be."  *People v. Garcia*, 201 Cal. App. 3d 324, 328-29, (1988).  The accuracy of a copy, particularly a photographic copy, is relevant to the issue of authentication, and conflicting inferences concerning the accuracy of the photograph are for the judge and jury to resolve.  *Id.* at 329.  Ultimately, the adequacy of the authentication is measured by the purpose for which the copy is admitted.  *People v. Mayfield*, 14 Cal. 4th 668, 747, (1997).

---

[60]  A writing includes a photograph.  Cal. Evid. Code § 250.

134

21.     In this case, the defense presented evidence showing actual, crucial differences between the original and the photograph.  (*See* Part A, ¶ 3; *see also* 51 CT 11224-25; People's Trial Ex. 22.)  Therefore, authentication of the photographs of the Love Insurance note was a preliminary fact within the meaning of Evidence Code § 403, and the judge was required to make the necessary factual finding under §§ 1400 and 1401.  Additionally, on request of counsel, the trial court was required to appropriately instruct the jury regarding contested authentication.  *See People v. Epps*, 25 Cal. 4th 19 (2001); *see also* Cal. Evid. Code § 403(c)(1) ("If the court admits the proffered evidence under this section, the court: (1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.").  Unfortunately, the trial court permitted the prosecution to show the photos to the jury without any explicit finding as to their authenticity.[61]  (60 RT 11389-92; 59 RT 11338-39.)  The trial court then compounded this mistake by failing to instruct the jury on Lucas's challenge to the accuracy of the photographs after trial counsel requested an instruction under §§ 1400 and 1401.  (65 CT 14554; 66 CT 14639.)

22.     Because the Love Insurance note was the most damaging piece of evidence against Lucas in the Jacobs prosecution, Lucas's Sixth and Fourteenth Amendment rights to due process and trial by jury were violated by the trial court's erroneous admission of the photographs and her refusal to instruct the jury on contested authentication.[62]  Improper admission of evidence may violate due process if the

---

[61]   The California Supreme Court held that because the trial court "was briefed on the authentication issue" and subsequently admitted them into evidence over defense objection, the court "impliedly found the photographs to be authentic." *Lucas*, 60 Cal. 4th at 262. However, this finding is belied by the record, which shows that the trial court never found the photographs to be authentic, but in fact ruled "that authentication and those authentication codes in the Evidence Code [did not] apply to the Love note." (60 RT 11437; *see also* 59 RT 11338-39.)

[62]   On appeal, the State did not dispute that the trial court erred in failing to instruct on contested authentication. *Lucas*, 60 Cal. 4th at 263. The California Supreme

135

(15cv1224)

admission of such evidence rendered the prosecution "fundamentally unfair." *Estelle*, 502 U.S. at 70-72; *Williams v. Taylor*, 529 U.S. 362, 375 (2000) (State court "errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify [habeas relief]." Moreover, implicit in the right to trial by jury afforded criminal defendants is the right to have that jury decide all relevant issues of fact and to weigh the credibility of witnesses and evidence. *Davis v. Alaska*, 415 U.S. 308, 318 (1979) ("[C]ounsel [must be] permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, [could] appropriately draw inferences relating to the reliability" of evidence); *Bollenbach v. United States* (1946) 326 U.S. 607, 614 (1946) ("[T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials...".) Because it is "the jury's constitutional responsibility . . . not merely to determine the facts, but to apply the law to the facts." *United States v. Gaudin*, 515 U.S. 506, 514 (1995), federal constitutional rights to due process and to a fair trial may be violated if jurors do not fully understand, and fairly and accurately apply, the law as stated in jury instructions. *See Estelle*, 502 U.S. at 70-72 (due process implicated if jurors misunderstood instructions).

23.     Removing authentication from the jurors' consideration violated Lucas's Sixth and Fourteenth Amendment rights to due process and trial by jury. Moreover, by arbitrarily denying Lucas his state created rights under California Evidence Code sections 403, 1400 and 1401, the error violated Lucas's rights to due process and heightened reliability in guilt and sentencing under the federal constitution. *Hicks*, 447 U.S. 343; *Beck*, 447 U.S. at 627-46.

24.     Because it deprived Lucas of a judge and jury finding as to the accuracy and reliability of the key prosecution evidence in a closely balanced case, the judgment

---

Court agreed that "the trial court erred by failing to give the instruction," but ultimately determined that such error was harmless. *Id.*

136

should be vacated, as the error cannot be considered harmless.  The Love Insurance note was crucial evidence against Lucas in the closely balanced Jacobs prosecution. Given the limited evidence against Lucas in the Jacobs case and the substantial impact of the error, the trial court's rulings undoubtedly had a "substantial and injurious effect or influence" upon the jury's verdict.  *Brecht*, 507 U.S. at 627.

25.     Finally, even if the error was not prejudicial as to guilt, it was prejudicial, individually and cumulatively, as to penalty, under both the state and federal standards of prejudice because it undermined the mitigating theory of lingering doubt.  Like the guilt determination, the penalty trial was closely balanced and the error was substantial. Erroneously allowing the jury to utilize the Love Insurance note to find Lucas guilty of the Jacobs murders, thereby undermining lingering doubt as to Lucas's guilt, was a "substantial error" under *Brecht.*

**CLAIM 2:  LUCAS'S RIGHT TO DUE PROCESS, RIGHT TO PRESENT A DEFENSE, AND RIGHT TO CONFRONTATION WERE VIOLATED BY THE STATE COURT'S ERRORS REGARDING THE ADMISSIBILITY OF THE PROSECUTION'S COMPARATIVE HANDWRITING ANALYSIS (AOB CLAIMS 2.5.1, 2.5.2, 2.5.3, 2.5.4, 2.5.5, 2.5.6, 2.5.7, 2.6.1, 2.6.2, 2.6.3, 2.6.4, 2.6.5)**

**A.     Relevant Law**

1.     The Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation clauses of the Sixth Amendment guarantee criminal defendants a meaningful opportunity to present a complete defense. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987).  This right manifests itself in a variety of ways.  For example, under the Compulsory Process Clause, a defendant has a right to call witnesses and present evidence that is material and favorable to his defense.  *Washington v. Texas*, 388 U.S. 14, 18-19 (1967).  In addition, admitting evidence without allowing the parties to dispute the reliability of that evidence before the factfinder cannot be reconciled with due process or the protections of the Sixth

137

Amendment.  *Davis v. Alaska*, 415 U.S. 308, 315 (1974).  Similarly, a defendant's Sixth Amendment right to confront the witnesses against him is violated where it is found that a trial judge has limited cross-examination or presentation of evidence in a manner that precludes an entire line of relevant inquiry (for example, impeachment of a witness).  *See United States v. Nixon*, 418 U.S. 683, 709 (1974).  Nor may state evidence rules be arbitrarily and unjustifiably invoked to preclude a criminal defendant's right to present a defense.  *See, e.g.*, *Rock*, 483 U.S. 44.

**B.**   **Relevant Procedural Background and Supporting Facts**

     **1.**   **In Limine Proceedings—Prosecution Witnesses**

     2.   As noted above in Claim 1, the prosecution relied upon the handprinting visible in the photographic copies of the Love Insurance note as evidence that Lucas was in the Jacobs home and committed the homicides.  The prosecution sought to introduce expert testimony through John Harris, a questioned documents expert, who compared the printing on the note with the known printing of Lucas and determined that he was "reasonably certain" that Lucas wrote the note.  (13 RT 2309.)

     3.   During Pretrial litigation, the defense challenged the admission of Harris's testimony on two main grounds.  First, the defense argued that Harris's testimony should be subjected to a hearing under *People v. Kelly*, 17 Cal. 3d 24 (1976) and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), because comparative handwriting analysis is an unproven scientific technique to which the *Kelly/Frye* test[63] should be applicable.  Additionally, the defense argued that such evidence violated Lucas's due process rights, and sought to offer its own expert testimony and proficiency studies

---

[63] *Kelly* holds that expert testimony based upon scientific or technical analysis is not admissible at trial unless the proponent of the expert testimony can establish: (1) the reliability of the analysis or method used; (2) that the expert witness is properly qualified as an expert in the use of that method; and (3) that the correct method was used in the particular case. *Kelly*, 17 Cal. 3d at 30.  *Frye* holds that scientific evidence must be based upon scientific principles that are "sufficiently established to have gained general acceptance in the particular field to which it belongs." *Frye*, 293 F.3d at 1014.

138

regarding the reliability of handwriting comparison pursuant to California Evidence Code sections 352 and 1418.[64]

4.      The original judge on the Jacobs and Garcia cases, Judge Kennedy, sustained the *Kelly/Frye* objection on the basis that the prosecution had not met its burden of producing disinterested expert witnesses on the validity of the techniques employed by Harris.  (53 Pretrial 613.)  However, when the case was reassigned to Judge Hammes, the handwriting issue was reopened.  The defense requested a *Kelly/Frye* hearing on the reliability and admissibility of handwriting comparison testimony by prosecution experts.  (79 Pretrial 4106-12; 43 CT 9263-80; 47 CT 10276-84.)  The defense argued that because handwriting is not a science, the burden was on the prosecution both to justify calling an expert and to establish that his testimony met the requirements of *Kelly/Frye*.  (79 Pretrial 4111-12.)  The court ruled that *Kelly/Frye* did not apply to handwriting evidence because handwriting is not scientific, and is "so well known" and "so generally accepted that I think the defense is going to ultimately bear the burden of showing the court otherwise."  (79 Pretrial 4109.)  Additionally, the standard for calling a witness as an expert did not require the vetting under *Kelly/Frye* that the defense requested.  (111 Pretrial 8160-61.)  However, the judge stated that she might "rethink" her ruling if, "in the normal cross-examination [of Harris] for other purposes . . . it came to my attention . . . that a *Kelly* issue was beginning to develop." (147 Pretrial 13843.)

_____

[64]  California Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

California Evidence Code section 1418 states: "The genuineness of writing, or the lack thereof, may be proved by a comparison made by an expert witness with writing (a) which the court finds was admitted or treated as genuine by the party against whom the evidence is offered or (b) otherwise proved to be genuine to the satisfaction of the court."

5. The trial court did permit an in limine hearing on the question of whether the prosecution's expert testimony would prove to be more prejudicial than probative and therefore violate Lucas's due process rights. (111 Pretrial 8114-8283, 114 Pretrial 8554-8690, 148 Pretrial 13855-13950, 183 Pretrial 17486-17603, 181 Pretrial 17414-473.) At the hearing, the court heard testimony from Manuel Gonzales, the documents examiner and handwriting analyst for the Sheriff's Department. Gonzales met with Lucas at the County Jail on January 2, 1985 and obtained handwriting exemplars which included "Love Insurance" and a telephone number. (114 Pretrial 8558.) Gonzales knew the original Love Insurance note was a small piece of paper, and so he had Lucas write on little pieces of paper because sometimes handwriting changes with the size of the paper involved. (114 Pretrial 8559.) According to Gonzales, it is important that the writer not be restrained when giving exemplars, as any restraints might affect the handwriting. (114 Pretrial 8568.) However, Gonzales conceded that Lucas may have been shackled when he provided the exemplars, since Gonzales had no recollection either way. (114 Pretrial 8577.) In Gonzales's opinion, Lucas was cooperative while preparing the samples, and there was no indication that he was trying to disguise his handwriting. (114 Pretrial 8569.)

6. The trial court also heard testimony from the prosecution's expert witness John J. Harris during in limine hearings. According to Harris, it is best to have the original of the questioned handwriting, rather than a copy or a photograph. (111 Pretrial 8156; *see also* 114 Pretrial 8615-16 (Gonzales testimony).) However, due to its highly damaged condition after repeated ninhydrin applications, he was unable to rely on the original for any of his comparisons. (111 Pretrial 8123.) Instead, he used various photographs taken of the note before it was damaged to compare with the exemplars from Lucas, as well as writing samples of Lucas's found on his probation and parole reports. (111 Pretrial 8123-25.)

7. Harris explained that because there is a lot of handwriting similarity in the general population, comparative handwriting analysis depends upon the existence of

(15cv1224)

"individualistic," unique variations. (111 Pretrial 8157; 148 Pretrial 13861.) However, unlike fingerprint comparison, there is no standard number of similarities required before an opinion of a match or nonmatch may be rendered. (148 Pretrial 13899.) Even so, a finding of handwriting identification requires that all classifying details of the disputed writing must occur in the same way in the known specimens unless there is a logical explanation for an obvious deviation. (111 Pretrial 8232-33.) Harris testified that more than anything, the art of handwriting comparison involves common sense. (148 Pretrial 13873.)

8.    Harris insisted that even though he only had a limited sample to work with in Lucas's case (since the note contained only eleven out of a possible 52 letters, and only five out of ten numbers), he was satisfied with the amount of printing available to him. (111 Pretrial 8162.) He conceded that his comparison of the printing was hindered by the small sample. (111 Pretrial 8164.) He also conceded that he had five to six times as much professional experience comparing handwriting (i.e., cursive) than handprinting (which was the form of writing present on the Love Insurance note). (111 Pretrial 8210.)

9.    Despite these limitations on his analysis, Harris concluded that Lucas's handwriting contained sufficient individualistic forms, which tended to appear in the letters and in the combination of letters and spacing. (111 Pretrial 8206.) Specifically, Harris noted that the "2," "8," "L," "N," and "S" had individualistic elements that were found on both the note and the samples of Lucas's handwriting. (111 Pretrial 8218-20.) There were also unexplained dissimilarities between the note and the samples, including variations in the number "7" across Lucas's writings, and the fact that the "C" and the "E" differed between the note and the exemplars. (111 Pretrial 8221, 8232.) In particular, the "E's" on the note were made with three strokes (the most common way of forming an "E"), while the "E's" on Lucas's exemplars were made with four strokes. (148 Pretrial 13856, 13859, 13860, 13866.) However, in Harris's opinion, the differences between the note and the exemplars were within an acceptable

141

range of variations which did not impact his ultimate finding that Lucas, with "reasonable certainty," authored the Love Insurance note.  (111 Pretrial 8143, 8154; 148 Pretrial 13920.)

       10.    During Harris's testimony, the defense requested the opportunity to test his comparative techniques and abilities in open court.[65]  (148 Pretrial 13899-13902.)  This requested was denied as "not within the scope of direct. . . ."  (148 Pretrial 13902.)

## 2.      In Limine Proceedings—Defense Witnesses

       11.    In an effort to demonstrate that the prosecution's handwriting expert testimony violated due process and section 352 as more prejudicial than probative, the defense presented two expert witnesses:  Dr. Michael Saks and Dr. Mark P. Denbeaux.

       12.    Dr. Saks was presented as an expert on proficiency studies and statistics. Dr. Saks is a social scientist, statistician, and research methodologist who has done research into the theory and background of handwriting comparison—specifically, handwriting comparison proficiency studies and the general reliability of document examiners.  (183 Pretrial 17487, 17500.)  The defense sought to introduce proficiency studies through Dr. Saks which showed error rates of 36% for handwriting comparison experts and 45% for handprinting comparison experts.  (183 Pretrial 17502-03; Def. In Limine Exh. 586, 587, 588.)  However, the trial court refused to consider this evidence, holding that the studies were irrelevant to counter Harris's in limine testimony since "virtually unassailable" caselaw permitted testimony on comparative handwriting analysis.  (184 Pretrial 17625, 17634.)

       13.    The defense also presented the testimony of Dr. Mark P. Denbeaux, a law professor who had extensively studied issues relating to expert testimony on handwriting comparisons.  Like Dr. Saks, Dr. Denbeaux was not a handwriting analyst himself; however, he conducted extensive research on the field and had testified as an

---

[65]  Defense counsel renewed this request during Harris's trial testimony and it was likewise denied.  (43 RT 8155-57.)

142

(15cv1224)

expert on handwriting issues in other cases.  (181 Pretrial 17418.)  Dr. Denbeaux testified that the one-on-one comparison used in handwriting analysis makes the procedure susceptible to bias and mistakes.  (181 Pretrial 17431.)  Dr. Denbeaux also discussed the wholly subjective nature of the discipline, which had no categories or markers for identification, no taxonomy of terms, no licensing procedures, no objective credentialing system—and indeed, little to no critical analysis of the field from its practitioners.[66]  (181 Pretrial 17437, 17447-52.)  In fact, handwriting "experts" had never been shown to be better at distinguishing or "matching" handwriting than lay persons.  (181 Pretrial 17447-48.)

14.     The trial court ruled that Harris's testimony was admissible.  Additionally, the court determined that Dr. Saks and Dr. Denbeaux were not handwriting experts, and that nothing in their testimony or in other defense evidence demonstrated that Harris's testimony should be excluded.

### 3.     Trial Proceedings

15.     At trial, John J. Harris testified for the prosecution and opined, as he did during in limine testimony, that he was "reasonably certain" that Lucas was the author of the Love Insurance note.  (13 RT 2309.)  The defense renewed its request to perform in-court testing on Harris, which was denied.  (43 RT 8155-57.)  Later, the defense presented an offer of proof that the writing they had wanted to use for the in-court testing of Harris was a piece of paper which read "280-1704"[67] and was purportedly written by Woods.  (43 RT 8156.)  The court ruled that the defense needed to make an offer of proof that Woods committed the murders before Harris could see the hsndwriting.  (43 RT 8157.)  Trial counsel did not recall Harris for any purpose.

---

[66]  Ironically, one of the few critical papers on comparative handwriting analysis available at the time of Lucas's trial was written by prosecution expert John J. Harris, who wrote the bedrock study on handwriting individuality (and the lack thereof) in 1958.  John J. Harris, *How Much Do People Write Alike?*, 48 J. Crim. Law & Criminology 637, 647 (1958).

[67]  This was the phone number found on the Love Insurance note.

143

(15cv1224)

16.     The prosecution also presented the testimony of Frank Clark, Lucas's former business partner, who testified that the Love Insurance note was Lucas's handwriting.  (21 RT 3838.)  The defense objected to Clark rendering an opinion on who wrote the note, arguing, *inter alia*, that his opinion was unduly prejudicial, a discovery violation, and (since Clark did not know Lucas at the time the note was written) irrelevant.  (21 RT 3827-3837.)  The judge ruled that the note was highly probative, that any prejudice that accrued to Lucas was not a due process or section 352 violation, and that the defense's other concerns went to the weight of Clark's evidence rather than its admissibility.  (21 RT 3835.)  The judge also denied the defense request for a cautionary instruction concerning opinion testimony of a lay witness, ruling that the preliminary instruction was sufficient.[68]

17.     To counter the lay and expert opinion testimony presented by the prosecution, trial counsel sought to introduce the taped statement of Rochelle Coleman, the former girlfriend of David Ray Woods.  Woods was a potential suspect in the Jacobs murders.[69]  Coleman lived with Woods, had received at least one printed letter from him, and was familiar with Woods's writing, both printing and cursive.  (Def. Trial Ex. 660 at 12.)  In January 1980, Coleman was interviewed by three police officers, including San Diego Police Detective David Ayers, regarding the Jacobs homicides.  When presented with the Love Insurance note, Coleman immediately identified Woods as the writer of the printing.  In support of her identification, Coleman stated that she had letters which had been printed by Woods if they wanted to match the

---

[68]   In actuality, the lay witness opinion instruction (CALJIC 2.81), was not given until the end of the guilt phase.  (65 RT 12197.)

[69]   Defense witness Jimmie Joe Nelson originally told San Diego Police Detective David Ayers that David Woods, rather than Johnny Massingale, was the man who had confessed to the throat slashing murders of a woman and child in the east part of San Diego.  (41 RT 7882; 45 RT 8544-45, 8547-48.)  Nelson later told Ayers that Massingale had actually confessed to the homicides, and that Nelson fingered Woods for the crimes because Nelson was angry at Woods for framing him for a murder that Woods had in fact committed.  (41 RT 7882-84, 7906.)

printing on the note.  (*Id.* at 12-13; 42 RT 7927-29.)  According to Coleman, the printing on the note was "identical" to Woods's printing.  (Def. Trial Ex. 660 at 13.)  Woods also told the police that Woods had confessed to her that he had killed two unnamed people and would not hesitate to do it again.  (*Id.* at 7-8.)

18.     Because Coleman was dead by the time of Lucas's trial, the defense offered Coleman's statement as a spontaneous lay opinion that Lucas did not author the note (pursuant to California Evidence Code section 1416) and for the nonhearsay purpose of establishing that the handprinting on the Love Insurance note was not unique.  (63 CT 13948-62.)  The judge denied the defense request, ruling that the statement was not spontaneous and that Woods's actual handwriting would be the "best evidence."  (42 RT 7950-51.)

19.     The defense then presented the testimony of David Oleksow, a forensic document examiner for the San Diego County Sheriff's Department crime laboratory.  (48 RT 8974.)  Oleksow first examined the Love Insurance note in 1979, when he compared it with handwriting samples given to him by SDPD and determined that none of the samples matched the writing on the note.  (48 RT 8979-80.)  After Lucas's arrest in December 1984, he twice compared the note with known samples from Lucas, and each time he concluded that he could neither identify nor exclude him as the author of the note.  (48 RT 8982-83.)  Oleksow testified that one of the key problems he faced, in addition to the limited amount of questioned writing on the note, was that he had to work with copies of the note rather than the original.  (48 RT 8988.)  This factor hampered his ability to examine the note for reverse side embossing and other fine details of the questioned writing which would aid in identification.  (48 RT 8988-89.)

20.     Then, in February 1985, Oleksow obtained additional samples of Lucas's writing from different time periods.  He concluded at that point that while he could not find "total agreement between the characteristics," he believed that Lucas was "probably responsible" for the writing on the Love Insurance note.  (48 RT 8984-86,

145

(15cv1224)

8994.)  However, his report specifically indicated that he "was not making a positive identification" or finding that it was Lucas's writing on the note.  (48 RT 8996.)

21.    Because the trial court had determined that Dr. Saks and Dr. Denbeaux were not experts, Lucas did not present their testimony at trial.[70]

## C.    Lucas's Right to Present a Defense Was Violated by the Trial Court's Refusal to Admit Defense Evidence Which Countered the Prosecution's Lay and Expert Opinion Testimony Regarding Who Wrote the Love Insurance Note

22.    Criminal defendants are constitutionally assured "a meaningful opportunity to present a complete defense," a fundamental right which is a key component of the Due Process, Compulsory Process, and Trial by Jury Clauses of the Sixth and Fourteenth Amendments.  *Chambers*, 410 U.S. at 291; *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Cudjo v. Ayers*, 698 F.3d 752, 766 (9th Cir. 2012) (discussing and relying upon *Chambers*, 410 U.S. at 291, 297).  This right may be violated when a defendant is prevented from presenting evidence important to his defense.  *Trombetta*, at 488-89; *see also Webb v. Texas*, 409 U.S. 95, 98; *Washington*, 388 U.S. at 19; *United States v. Lopez-Alvarez*, 970 F.2d 583, 588 (9th Cir. 1992). Where a defendant is arbitrarily denied the right to present witnesses on his behalf, including during in limine proceedings, his rights to due process, confrontation, and compulsory process have been violated.  *Chambers*, 410 U.S. at 294; *Washington*, 388 U.S. at 17-19; *Holt v. Virginia*, 381 U.S. 131, 136, (1965) ("The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and

---

[70]  On appeal, the California Supreme Court held that trial counsel forfeited any claim that the trial court erred by excluding defense witnesses, defense evidence of proficiency studies, and in-court testing at trial because defense counsel "did not offer the contemplated witnesses or evidence for purposes of challenging the credibility of the state's handwriting expert at trial."  *Lucas*, 60 Cal. 4th at 232.  To the extent that defense counsel failed in this regard, defense counsel's performance was ineffective. *See* Claim 10 (ineffective assistance of guilt phase counsel).

(15cv1224)

raise relevant issues."). Additionally, domestic rules of evidence may not be arbitrarily and unjustifiably invoked to preclude a criminal defendant's right to present a defense. *See, e.g.*, *Rock*, 483 U.S. 44 (1987); *Washington*, 388 U.S. 14. In this case, the trial court violated these core principles and rendered Lucas's trial fundamentally unfair by prohibiting him from presenting crucial evidence to the jury which countered the prosecution's assertion that Lucas was the author of the Love Insurance note.

> **1.** **The Trial Court Violated Lucas's Rights by Refusing to Consider Proffered Expert Witnesses and Evidence Supporting Lucas's In Limine Motions to Exclude Harris's Testimony**

23. During in limine proceedings, the defense sought to offer expert testimony and proficiency studies regarding the reliability of handwriting comparison testimony in support of its Evidence Code section 352 and due process challenges to prosecution witness John Harris's testimony. The defense also argued that the judge should consider reliability in exercising her discretion under Evidence Code section 1418,[71] which uses the discretionary term "may" as to the admissibility of handwriting testimony. (183 Pretrial 17488-89.)

24. The trial court conditionally allowed the defense to present expert testimony as to the section 352 and due process challenges, finding that the defense was "entitled to attack the constitutionality of the statute." (183 Pretrial 17489, 17512.) As noted above, the defense proffered the testimony of Dr. Denbeaux to testify about the lack of any formal training or certification process required for handwriting "experts" and the lack of scientific categories or a taxonomy of terms. (181 Pretrial 17450-52.) Dr. Denbeaux further testified that there has never been any demonstration that an

---

[71] California Evidence Code section 1418, "Comparison of Writing by Expert Witness," states, "The genuineness of writing, or the lack thereof, may be proved by a comparison made by an expert witness with writing (a) which the court finds was admitted or treated as genuine by the party against whom the evidence is offered or (b) otherwise proved to be genuine to the satisfaction of the court."

147

expert is in any greater position to distinguish between two sets of similar handwriting than a lay person.  (181 Pretrial 17447-48.)  The defense also presented the testimony of Dr. Saks, who was prepared to discuss high error rates revealed in proficiency studies, which would impeach Harris's testimony by showing that handwriting comparison is a subjective analysis that has a false aura of expertise.  (183 Pretrial 17576.)  The trial court ultimately ruled that the defense experts were not qualified to testify on the reliability of handwriting comparison because they did not have any direct experience in the field and could only offer "abstract criticism."  (183 Pretrial 17518-20; 17584; 247 Pretrial 25439-40.)  Additionally, the trial court ruled that Dr. Saks could not testify about the proficiency studies, those studies would not be admitted into evidence, and the defense request to take judicial notice of the studies was denied.  (183 Pretrial 17523, 17567-68.)  In response to this ruling, the defense offered to present a witness from the organization which developed the proficiency tests, but that request was also denied.  The court found that the presentation of expert handwriting comparison evidence is "unassailable" and that Harris's testimony was admissible.  (184 Pretrial 17624-25.)

25.    By excluding the testimony of the defense experts, the trial court failed to conduct a proper assessment of the reliability of handprinting testimony, thereby denying Lucas's right to due process, equal protection, and to present a complete defense.  By refusing to consider the proficiency studies and the testimony of Dr. Saks, the trial court ignored critical evidence which exposed the unreliability, and therefore the relevance, of Harris's opinion testimony.  The fact that handwriting experts would err as often as 36% of the time (and up to 45% of the time when comparing handprinting) would have provided a dramatically different view of Harris's testimony and undermined the essential assumption of uniqueness upon which the trial court relied.  The trial court abused its discretion by deeming such evidence irrelevant and excluding it from her consideration when ruling on the prosecution's handprinting comparison testimony.

(15cv1224)

26.     Moreover, the trial court's ruling that Dr. Saks and Dr. Denbeaux were not an expert who could testify as to handwriting comparison was patently erroneous. Surely an academic who has devoted his efforts to the study of a field or technique should be able to offer the results of that study without being a practicing purveyor of the technique. *See, e.g.*, *United States v. Cordoba*, 991 F. Supp. 1199, 1201 n.6 (C.D. Cal. 1998) (acknowledging Dr. David C. Raskin as "the nation's foremost polygraph expert" even though he was not a practicing polygrapher himself).

**2.     Even If Harris's Handprinting Opinion Was Properly Admitted, the Trial Court Violated Lucas's Right to Present a Defense by Erroneously Excluding Defense Experts, Proficiency Studies, and In-Court Testing at Trial**

27.     As noted above, the defense understood the trial court's in limine rulings on the proposed defense experts, proficiency studies evidence, and in-court testing to also apply to trial proceedings.  In Claim 10, Lucas alleges ineffective assistance against his trial counsel for failing to present defense experts and evidence to impeach Harris.  However, to the extent that the trial court indeed intended the in limine rulings to extend to trial proceedings, the trial court violated Lucas's rights under the Sixth, Eighth, and Fourteenth Amendments.

28.     "A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Olden v. Kentucky*, 488 U.S. at 231 (internal citations and quotations omitted).  "[T]he fact that the exclusion of evidence is grounded in familiar evidentiary rules alone does not determine that such exclusion is constitutionally permissible.  It is one thing to limit the scope of testimony, via evidentiary rulings, but it is another thing, and of drastic consequence for [the

(15cv1224)

defendant], for the state court to have entirely excluded his important defense expert." *Moses v. Payne*, 543 F.3d 1090, 1111 (9th Cir. 2008) (Gould, J., dissenting).

29.   In a habeas proceeding, determining whether the exclusion of evidence in the trial court violated petitioner's due process rights involves a balancing test.   In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider (1) the probative value of the evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003).

30.   Here, the probative value of the excluded defense expert testimony and proficiency studies showing the unreliability of Harris's expert analysis was evident. Providing the jury with expert testimony to impeach the prosecution's expert was a crucial element of the defense strategy to counter one of only two pieces of evidence which placed Lucas at the scene of the Jacobs homicides.   The trial court was perfectly capable of evaluating the impact of the proficiency studies (as the jury would have been had the evidence been allowed to be presented to them), and the excluded evidence and testimony was not cumulative to anything else that was presented.   Additionally, the trial court's demand that defense counsel make an offer of proof that Woods committed the homicides before allowing Harris to see his handwriting (43 RT 8157) was patently erroneous and prejudicial.   Whether Woods committed the murders had nothing to do with the stated purpose of the evidence, which was to challenge Harris's claimed expertise in open court.   Under this rubric, and indeed under Supreme Court precedent controlling the exclusion of evidence, "no government interest outweighed the value of admitting relevant evidence highly necessary to [Lucas's] presentation of his defense." *Cudjo*, 698 F.3d at 766; *Moses*, 543 F.3d at 111.

31.   In denying the jury the opportunity to hear legitimate critiques of competent defense experts, the trial court ignored the fact that the same considerations

150

(15cv1224)

that inform a court's legal decision to admit evidence also influence the factfinder's determination as to what weight such evidence, once admitted, should receive. *See, e.g., United States v. Velasquez*, 64 F.3d 844, 848 (3rd Cir. 1995) (holding that the district court's determination that the prosecution's handwriting expert testimony was admissible should not have precluded the testimony of defense witness Dr. Mark Denbeaux, as Denbeaux's testimony called into doubt the reliability and credibility of the prosecution's evidence). The opposing expert testimony and evidence was important for the jury to hear "precisely because it is opposing" and would "help the jury to evaluate the reliability of the opinion offered by the proponent expert. *Id.* at 852. The trial court's exclusion of this vital evidence on hearsay and relevancy grounds was simply not supported by the facts or the law. *Chambers*, 410 U.S. at 297; *Cudjo*, 698 F.3d at 766-67.

### 3. The Trial Court Violated Lucas's Right to Present a Defense by Erroneously Excluding Coleman's Statement That David Woods Authored the Love Insurance Note

32.   The defense offered the Coleman statement into evidence for two purposes—as hearsay evidence that the writing on the Love Insurance note was not Lucas's writing, and for the nonhearsay purpose of impeaching the prosecution's opinion witnesses by showing that the writing was not sufficiently unique and individualistic to make a reliable comparative handwriting identification. (63 CT 13949-50.)

33.   The defense presented a recording of Coleman's statement to the police as well as a printed transcription. (Def. Trial Exs. 660 (transcript) and 661 (tape).) Counsel argued that that because Coleman "basically interrupted [the police officer] . . . in a spontaneous way" immediately upon seeing the note, her hearsay statement that Woods wrote the note was admissible as a spontaneous lay opinion. (42 RT 7947-48.) The trial court ruled that the statement was not a spontaneous utterance, because she

(15cv1224)

1  was "allowing herself to be interviewed" by the police and there was no "nervous

2  excitement" in Coleman's voice.  (42 RT 7950.)  This ruling was in error.

3        34.    Coleman's hearsay opinion statement is comparable to that made by

4  Shannon Lucas, who identified the dog chain used in the Swanke murder as looking

5  like one which belonged to Lucas during an interview with the police.  (*See* Section

6  VIII(A)(7).)  As noted by the prosecutors in their "Memorandum of Law Regarding

7  Admissibility of Spontaneous Declaration of Shannon Lucas," the fact that the

8  declaration was elicited by a question from the police did not deprive the statement of

9  spontaneity if made under the stress of excitement.  (47 CT 10272-75.)  The trial court

10  accepted this argument and permitted Shannon Lucas's hearsay statement to be

11  presented to the jury.  (25 RT 4734-35.)  The reasoning applied by the trial court

12  regarding Shannon Lucas's statement is equally applicable to Coleman's statement.  In

13  each situation, the women were being interviewed by police regarding a homicide in

14  which her romantic partner was the prime suspect.  They were presented with physical

15  evidence which the police believed linked the men to the crimes, and each woman

16  spontaneously made statements about the physical evidence which allegedly linked the

17  evidence to the suspects.  (*Compare*, Def. Trial Ex. 660 (Coleman statement) with Def.

18  Trial Ex. 212 (Shannon Lucas statement).)  Indeed, Coleman's identification was more

19  reliable than Shannon Lucas's identification, because Coleman made the identification

20  without hesitation and additionally offered to support her identification with further

21  evidence of Woods's printing.  (Def. Trial Ex. 660, at 13; 42 RT 7936.)  Hence,

22  Coleman's identification had unique reliability, and should have been admitted so the

23  trier of fact would have a complete and objective view of the Love Insurance note

24  evidence.  Yet the trial court inexplicably denied Coleman's statement as defense

25  evidence, while allowing Shannon Lucas's statement as prosecution evidence.  This

26  arbitrary error was not supported by either evidence law or the facts and denied Lucas

27  an important opportunity to challenge the prosecution's case against him.

28

35.   Coleman's statement was also admissible for the nonhearsay purpose of showing that the Love Insurance note was not unique.  Both the lay opinion testimony of Frank Clark and opinion testimony of two handwriting experts were founded on the essential assumption that Lucas's printing had sufficient unique and individualistic components to be distinguishable from other printing.  Thus, the fact that Woods's printing was sufficiently similar to the Love Insurance printing to cause Coleman to believe that Woods authored the note was relevant to counter the allegation of uniqueness advanced by the prosecution.

**4.    The Exclusion of Defense Experts, In-Court Testimony, and Coleman's Statement at Trial Unconstitutionally Impaired the Jury's Ability to Assess Harris's Credibility**

36.   Exclusion of evidence has been found to be arbitrary or disproportionate "where it has infringed upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1997) (citing *Rock*, 483 U.S. at 58); *see also Franklin v. Duncan*, 70 F.3d 75, 83 (9th Cir. 1995).  Where the excluded testimony bears "persuasive assurances of trustworthiness" and "was critical to [the defendant's] defense," the state violates due process.  *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (*citing Chambers*, 410 U.S. at 295) (California's application of its evidentiary rules to exclude hearsay testimony denied defendant her constitutional right to present a defense).

37.   Lucas's proffered defense experts, the proposed in-court examination, and Coleman's statement[72] all undermined the reliability of Harris's identification of Lucas as the author of the Love Insurance note.  The evidence challenged Harris's presumption of uniqueness and provided evidence that someone other than Lucas may

---

[72]  Exclusion of Coleman's statement was particularly arbitrary because even after ruling that Woods's own writing (rather than Coleman's statement) would be the best evidence on the issue, she denied the defense the opportunity to test the prosecution expert with a sample of Woods's own printing.

(15cv1224)

have written the note found at the crime scene. Thus, the trial court's erroneous determination that state evidence law outweighed Lucas's right to impeach Harris and defend against the prosecution's case "significantly undermined fundamental elements of [his] defense." *Scheffer*, 523 U.S. at 315. The state court's error is especially egregious considering that it allowed the prosecution to present similar evidence to the jury at different points in the trial, yet denied it in the Jacobs case. (*See* Section VIII (permitting use of proficiency studies during *Kelly* hearings and cross-examination on electrophoresis testing, as well as granting the prosecution's request to present the hearsay statement of Shannon Lucas regarding the provenance of the dog collar found in the Swanke case).) *See Green v. Georgia*, 442 U.S. 95, 97 (1979) (due process violation where defense precluded from presenting hearsay testimony which the prosecutor used against the co-defendant). Lucas maintained at trial, and continues to maintain, that the trial court prejudicially erred by admitting Shannon Lucas's hearsay statement about the dog collar against him. However, if the trial court was going to admit that kind of evidence for the prosecution, it should have equally done so for the defense, especially where the indicia of reliability were stronger with the defense's proffered evidence.

38.     The trial court's unbalanced approach and erroneous exclusion of key defense evidence was arbitrary, disproportionate, and a violation of due process in light of Lucas's weighty interest in presenting a defense to the most damaging evidence against him in the Jacobs prosecution. *Chambers*, 410 U.S. at 297.

## D.     The State Violated Lucas's Right to Due Process, Confrontation, and Equal Protection When It Failed to Follow Its Procedures for the Admission of Evidence at Trial

39.     The Due Process and Equal Protection Clauses of the Fourteenth Amendment prohibit the unjustified and uneven application of criminal procedures in a way that favors the prosecution over the defense. *See, e.g.*, *Wardius v. Oregon*, 412 U.S. 470, 475 (1973) ("[I]n the absence of a strong showing of state interests to the

contrary. . . there must be a two-way street" between the prosecution and the defense); *Green*, 442 U.S. at 97.  Additionally, if a state provides for the imposition of criminal punishment under a certain procedural scheme, the defendant in such a case has a "substantial and legitimate expectation that he will be deprived of his liberty" only to the extent provided for in that scheme.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *see also Rock*, 483 U.S. at 51.  That liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.  *See Hicks*, 447 U.S. at 346 (citing *Vitek v. Jones*, 445 U.S. 480, 488-89 (1980)).

> **1.    The Trial Court Violated Lucas's Rights to Due Process, Confrontation, and Equal Protection by Allowing the Prosecution's Expert to Testify Without the In-Court Testing Requested by the Defense**

40.    During in limine hearings on the admissibility of the prosecution's handprinting comparison testimony, the trial court denied the defense request to evaluate Harris's ability to identify Lucas's handprinting in open court, ruling that the request was beyond the scope of direct.  (148 Pretrial 13899-902.)  After the trial court denied this defense evidence, Lucas filed a trial brief on the issue (51 CT 11209-216), and the prosecution filed a responsive brief.  (16 CT 3359-61.)  The defense argued that its expert, Dr. Denbeaux, would provide support for the in-court testing of witness Harris.  (181 Pretrial 17424.)  However, the judge did not change her ruling disallowing the defense evidence and she again denied the request at trial.  (43 RT 8155-57.)

41.    These rulings denied the defense an opportunity to fully confront and cross-examine a key prosecution witness in violation of Lucas's state and federal constitutional rights to confrontation, due process and fair trial by jury.  *See Crawford v. Washington*, 541 U.S. 36 (2004); *Neal v. Neal*, 58 Cal. 287, 288 (1881) ("A witness may be asked on his cross-examination any question which tends to test his accuracy, veracity, or credibility"); *see also Maryland v. Craig*, 497 U.S. 836, 845-46 (1990) (explaining that "[t]he central concern of the Confrontation Clause is to ensure the

reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversar[ial] proceeding before the trier of fact"); *Olden*, 488 U.S. at 231; Cal. Const. Art. I, sections 1, 7, 15, 16, 17 and 28(d); U.S. Const. 6 and 14.

42.    The type of cross-examination requested by the defense was permissible under California and multi-jurisdictional authority.  "Like expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 320 (2009). Hence, the judge's ruling deprived the defense of "the right to test, in an effective and practical manner, the accuracy and worth of the opinions [of Harris]" a request which was designed to "cause doubt upon the credibility of the witness and his skill as an expert." *Hoag v. Wright*, 174 N.Y. 36, 43 (Ct. App. NY 1903.)  This ruling denied Lucas's constitutional right to "show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Olden*, 488 U.S. at 231.

**2.    The Trial Court Arbitrarily Violated Lucas's Due Process Rights by Improperly Shifting the Section 352 Burden to the Defense and By Finding That the Probative Value of Harris's Opinion Outweighed Any Prejudicial Impact**

43.    Notwithstanding the judge's ruling that *Kelly* did not apply to the handprinting experts, under California law the prosecution still had the burden of proving that the evidence was relevant and otherwise admissible in the face of the other defense objections pursuant to Cal Evid. Code §§ 352 and 1418, and due process.  "As is true with all evidence . . . if an objection is made the proponent of this evidence has the burden of establishing its particular relevance." *People v. Humphrey*, 13 Cal. 4th 1073, 1091 (2006) (Baxter, J., concurring); *see also People v. Kaurish*, 52 Cal. 3d 648, 693 (1991) (proponent of evidence has burden of establishing all preliminary facts

pertinent to relevancy); Cal. Evid. Code § 403.)  The trial court violated this fundamental rule by shifting the burden to the defense after commenting that the defense was "attacking the Eiffel Tower" and finding that the defense was "attacking something so often received and so generally accepted that I think the defense is going to ultimately bear the burden of showing the court otherwise . . . [I]t is so well known and so often received that it is one of those areas that passes the burden back to the defense immediately. . . ."  (79 Pretrial 4109; 88 Pretrial 5463; *see also* 183 Pretrial 17575.)

44.    This ruling arbitrarily violated California law.  *See* Cal. Evid. Code § 403 and § 500; *Kaurish*, 52 Cal. 3d at 693.  Accordingly, the judge did not apply the correct legal standard and her resultant admission of the handprinting comparison evidence was an abuse of discretion and an arbitrary denial of Lucas's state-created right.  *Hicks*, 447 U.S. at 346; *see also Rock*, 483 U.S. at 51.

### 3.    Harris's Opinion That He Was "Reasonably Certain" That Lucas Authored the Note Should Have Been Excluded Under California Evidence Law and State and Federal Due Process Principles

45.    As the trial court recognized, the primary reason to present a handwriting expert was so the jury could be alerted to similarities or differences that lay persons might not see themselves.  (247 Pretrial 25439-40.)  Yet the trial court also opined that lay persons could see the similarities between the note and Lucas's printing simply by comparing the two.  (247 Pretrial 25439-40.)  Hence, as the trial court implicitly (if not explicitly) recognized, the probative value of Harris's opinion as to authorship was low. *See United States v. Gonzalez-Maldonado*, 15 F.3d 9, 17 (1st Cir. 1997) ("expert testimony that is within the bounds of a jury's ordinary experience generally has little probative value").  Moreover, apart from the general unreliability of handwriting comparison evidence, several additional facts made Harris's opinion as to authorship especially unreliable, including the small number of characters (21) in the questioned

157

document; the characters were printed rather than cursive writing; and the original document was not available for comparison.  (117 Pretrial 8988-89.)

46.     Accordingly, even if Harris was properly allowed to point out similarities and differences, he should not have been permitted to express his opinion that he was "reasonably certain" Lucas was the author of the note.  (18 Pretrial 17576-78.)  Such a resolution, which has been dubbed the "Hines/McVeigh approach" in one text, has been adopted by numerous courts.  *See* David L. Faigman, et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* (West 2002) § 28-1.4.3 at 422-27; *United States v. Hidalgo*, 229 F. Supp. 2d 961 (D. Ariz. 2002); *United States v. Rutherford*, 104 F.Supp.2d 1190 ( D. Neb. 2000).  Pursuant to Evidence Code sections 352 and 1418 and the state and federal constitutions, the expert opinion as to authorship should have been excluded.  *See Stovall  v. Denno*, 388 U.S. 293, 302 (1967) (observing that the admission of untrustworthy evidence of guilt not precluded by statute or common law doctrine can still violate a defendant's right to due process of law); *Payne*, 501 U.S. at 825; *Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *Hicks*, 447 U.S. at 346; *Hernandez*, 930 F.2d at 716.

47.     Moreover, the State's use of Harris's comparative handprinting analysis and the testimony based on that analysis caused unreliable verdicts.  *See Beck*, 447 U.S. at 637-38; *Woodson v. North Carolina*, 428 U.S. 280 (1976).

48.     The admission of testimony based on those results infected the guilt and penalty phases of the trial.  Those results and testimony provided a critical missing link between Lucas and the deaths of Suzanne and Colin.  Consequently, the State cannot prove this error harmless.

(15cv1224)

**4.     The Trial Court Arbitrarily Denied Lucas's Request to Require the Jury to Make a Preliminary Finding of Uniqueness Before Using Handwriting Comparison for Purposes of Identification**

49.     California Evidence Code section 403[73] requires the judge to instruct, upon request, as to any preliminary factual finding which the jury is required to make.

50.     In this case, the defense requested that the jury be instructed that opinions of identity based upon handprinting comparisons may not be considered by the jurors unless "[t]he specimens or items compared are unique to one individual, and only one individual, and that the comparison method is capable of proving the uniqueness so as to give rise to a reasonable inference of identity without speculation or guesswork." (65 CT 14551-52).

51.     The judge's denial of this instruction (60 RT 11437) was error under Cal. Evid. Code § 403 because the uniqueness of the handprinting on the Love Insurance note was essential to its relevance.  It also violated the state (Cal. Const. Art. I, sections 1, 7, 15, 16 and 17) and federal constitutional rights to due process and a fair trial by jury (6th and 14th Amendments) which require that the jury assess witness credibility. "Implicit in the right to trial by jury afforded criminal defendants under the Sixth Amendment to the Constitution of the United States is the right to have that jury decide all relevant issues of fact and to weigh the credibility of witnesses."  *United States v. Hayward*, 420 F.2d 142, 144 (D.C. Cir. 1969); *see also Davis*, 415 U.S. at 318 (". . . counsel [must be] permitted to expose to the jury the facts from which jurors, as the

---

[73]  Cal. Evid. Code § 403 provides, in pertinent part:

> (c) If the court admits the proffered evidence under this section, the court:
> (1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.

sole triers of fact and credibility, [could] appropriately draw inferences relating to the reliability of the witness.

52. As an arbitrary denial of a right guaranteed by state and federal law, the court's ruling was also a violation of Due Process. *Hicks*, 447 U.S. at 346; *see also Hernandez*, 930 F.2d at 716.

**E. Unreliable Comparative Handwriting Evidence Was Erroneously Introduced at Lucas's Trial**

Under *People v. Kelly*, 17 Cal. 3d 24, a new or novel scientific technique must be excluded unless it has gained general acceptance in the relevant scientific community. In the present case, the trial judge precluded the defense from mounting a *Kelly/Frye* challenge to the prosecution handprinting expert because it determined that handprinting and handwriting comparison is neither scientific nor a new or novel technique. (79 Pretrial 4106-13; 88 Pretrial 5463; 89 Pretrial 5467-70.) Lucas's constitutional rights were violated when the trial court denied his request for a *Kelly/Frye* hearing and erroneously admitted unreliable expert testimony on handwriting analysis at trial. Moreover, the handwriting evidence introduced against Lucas at trial should have been precluded by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), because the methodology underlying the development of the fingerprint evidence was not scientifically valid.

**1. Handwriting Comparison is Unreliable and Has Not Been Validated by the Scientific Community**

53. For decades prior to Lucas's trial, handwriting comparison was accepted by courts throughout the country "despite the absence of a shred of empirical evidence of anyone's ability to do what [handwriting experts claimed they] could do." D.M. Risinger, Mark P. Denbeaux, and Michael J. Saks, *Exorcism of Ignorance as a Proxy For Rational Knowledge; The Lessons of Handwriting Identification "Expertise*," 137 U. of Penn. L. Rev. 731, 769 (1989). However, as Lucas's experts were prepared to testify to at the in limine hearing and at trial, by 1989 numerous studies of handwriting

160

comparative analysis established that the discipline is unreliable and utterly lacking in validation by the scientific community.  *See id.* at 762, 769.

54.     In the first large-scale analysis of scientific studies on the validity of handwriting analysis, Dr. Michael Saks and two scientist colleagues found the following:  "Our literature search for empirical evaluation of handwriting identification turned up one primitive and flawed validity study from nearly 50 years ago, one 1973 paper that raises the issue of consistency among examiners but that presents only uncontrolled impressionistic and anecdotal information not qualifying as data in any rigorous sense, and a summary of one study in a 1978 government report.  Beyond this, nothing. . . .  If handwriting expertise were offered for the first time today with this published record as its foundation, courts would almost certainly reject it."  Risinger, et. al, 137 U. of Penn. L. Rev. at 740.  For example, the Forensic Science Foundation conducted studies[74] in 1975, 1984, 1985, 1986 and 1987 which were never published.  When all five test results were combined, Dr. Saks and his colleagues found that a "rather generous reading of the data would be that in 45% of the reports forensic document examiners reached the correct finding, in 36% they erred partially or completely, and in 19% they were unable to draw a conclusion."  *Id.* at 747.  When the data from the 1975 test was omitted because that test was considered "unrealistically easy," they found that "the examiners were correct 36% of the time, incorrect 42%, and unable to reach a conclusion 22% of the time.  *Id.* at 748.

55.     Since then, an increasing number of courts have recognized that expert handwriting comparison testimony is problematic.  *See, e.g., United States v. Hines*, 55 F. Supp. 2d 62, 68-69 (D. Mass. 1999); *United States v. Rutherford*, 104 F. Supp. 2d 1190, 1193 (D. Neb. 2000); *United States v. Jones*, 107 F.3d 1147, 1157 (6th Cir. 1997)

---

[74]   These were the studies about which Dr. Saks was prepared to present expert testimony and analysis, had he been permitted to do so by the trial court.  *See* Claim 2(C).

("academicians and forensic document examiners alike have recognized the lack of empirical evidence in the field of handwriting analysis"); *United States v. Gonzales*, 90 F.3d 1363 (8th Cir. 1996); 162 F. Supp. 2d 1097, 1104 (D. Ala. 2001) (holding that the field of handwriting comparison suffers from a lack of controlling standards); *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1038 (S.D.N.Y. 1995); *Hines*, 55 F. Supp. 2d at 69; *Rutherford*, 104 F. Supp. 2d at 1193.

56.     In sum, critics and supporters alike agree that there is no consensus in the scientific community concerning the reliability of handwriting analysis.  *See, e.g.,* Michael J. Saks, *On the "general acceptance" of handwriting identification principles,"* J. Forensic Sci. 119-26 (2005) (evaluating expert handwriting analysis under the admissibility requirements of *Frye* and *Daubert* and finding that forensic document examiners and handwriting scientists "appear not to agree" on a uniform set of principles for handwriting identification); Jeff Kukucka and Saul M. Kassin, *Do confessions taint perceptions of handwriting evidence? An empirical test of the forensic confirmation bias*, Law and Human Behavior, 38, 56-70 (2014) (summarizing studies which showed that handwriting analysts who received a confession or other evidence of the defendant's guilt prior to evaluating the questioned samples were more likely to erroneously conclude that the handwriting samples from the defendant and the perpetrator were written by the same person).

**2.     Because Handwriting and Handprinting Comparison is an Unproven Scientific Technique, *Kelly/Frye* Should Have Been Applied**

57.     It has long been the rule in California that expert testimony based upon scientific or technical analysis is not admissible at trial unless the proponent of the expert testimony can establish: (1) the reliability of the analysis or method used; (2) that the expert witness is properly qualified as an expert in the use of that method; and (3) that the correct method was used in the case at hand.  *Kelly*, 17 Cal. 3d at 30; *People v. Dellinger*, 163 Cal. App. 3d 284, 292 (1984).  A method is deemed reliable if it has

(15cv1224)

"gained general acceptance" in the scientific community, and the burden is on the proponent of the method to demonstrate by means of qualified and disinterested experts that the technique meets the *Kelly* standard. *Id.*

58.     *Kelly* made no attempt to explain what qualified as "a new scientific technique." However, in *People v. Leahy*, 8 Cal. 4th 587, 606 (1994), the California Supreme Court clarified that "a technique or procedure may be deemed 'scientific' for purposes of *Kelly/Frye* if 'the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." *Id.* at 606. If the technique was "repeatedly challenged in court" and had "a recent history of legal challenges to [its] admissibility . . . it seems appropriate that we deem the technique 'new' or 'novel' for purposes of *Kelly*." *Id.*

59.     Handprinting analysis is precisely the kind of technique the *Leahy* Court deemed "new" or "novel." At the time of Lucas's trial there was an extensive "recent history of legal challenges" to its admissibility (79 Pretrial 4106-12; 43 CT 9263-80; 47 CT 10276-84), and the subsequent trend in many courts was to bar the admission of exactly the kind of handwriting analysis that is at issue here.[75] The trial court violated California precedent on the application of *Kelly*, and thereby violated Lucas's federal due process rights, by failing to hold a *Kelly* hearing in the face of crucial new evidence on the unreliability and inadmissibility of the technique that the trial court incorrectly

---

[75] *See, e.g.*, *United States v. Saelee*, 162 F. Supp. 2d 1097, 1101-02 (D. Ala. 2001) (relying upon the testimony of defense expert Dr. Michael Saks to find that handwriting comparison was subject to the *Daubert/Kumho* standard and ultimately ruling that such evidence was unreliable and inadmissible); *United States v. Rutherford*, 104 F. Supp.2d 1190, 1193 (D. Neb. 2000); ("[T]he Court finds it prudent to join an ever-growing number of federal district courts that have found it necessary to place limits on the proffered testimony of a handwriting expert"); *United States v. Van Wyk*, 83 F. Supp. 2d 515 (D.N.J. 2000); *United States v. Hines*, 55 F.Supp.2d 62 (D. Mass. 1999) ; *United States v. McVeigh*, 106 F.3d 325 (D. Colo. 1997); *see also United States v. Starzecpyzel*, 880 F. Supp. 1027, 1036 (S.D.N.Y. 1995) ("Were the court to apply *Daubert* to the proffered FDE [forensic document examiner] testimony, it would have to be excluded.")

found "unassailable." *See People v. Smith*, 215 Cal. App. 3d 19, 25 (1989) (in determining whether a particular technique is generally accepted "defendant is not foreclosed from showing new information which may question the continuing reliability of the test in question or to show a change in the consensus within the scientific community concerning the scientific technique").

60.     Moreover, "handwriting analysis," in both name and description, is exactly the kind of technique that purports to provide some "truth" that "the expert need only recognize and relay to the jury." *Leahy*, 8 Cal. 4th. John Harris, the "handwriting expert" in this case, claimed that through his analysis, the true author of the Love Insurance note could be determined with "reasonable certainty." (111 Pretrial 8143.)[76] Such a determination carries the aura of certainty that science provides and certainly would be viewed by the jury as "scientific." Indeed, the position of the Ninth Circuit at the time of Lucas's trial was that "handwriting analysis is a science in which expert testimony assists a jury." *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir. 1982). Similarly, a leading forensic hornbook of the time described handwriting analysis as the "scientific examination of questioned documents" to determine, in part, "whether some specimen of handwriting or typewriting has been made by a suspected individual." Andre A. Moenssens,  Ray Edward Moses, and Fred E. Inbau, *Scientific Evidence in Criminal Cases*, 410-11(1973 ed.). Thus, comparative handprinting expert testimony is just the type of analysis that is subject to the *Kelly* formulation.

---

[76]  "Handwriting identification experts believe they can examine a specimen of adult handwriting and determine whether the author of that specimen is the same person or a different person than the author of any other example of handwriting, if both specimens are of sufficient quantity and not separated by years or the intervention of degenerative disease." Michael Risinger and Michael Saks, *Science and Nonscience in the Courts: Daubert Meets Handwriting Identification Expertise*, 82 Iowa L. Rev. 21, 35 (1996).

3.     **Even If A *Kelly* Hearing Was Not Necessary For Handwriting Comparison, A Hearing Was Required As To Handprinting Comparison**

61.     Even if the trial court correctly ruled that handwriting was sufficiently well accepted to satisfy *Kelly*, the writing on the Love Insurance note was handprinting, not handwriting.

62.     Handprinting has received far less attention and acknowledgment than handwriting.  For example, Harris testified that five out of six analyses involved handwriting, and that the overwhelming majority of the cases in which he had testified involved handwriting, not handprinting.  (111 Pretrial 8209-10.)  Moreover, Harris acknowledged that there is no catalog of printed letters which can be used for comparison and analysis of handprinting.  (111 Pretrial 8211.)  While Harris testified that there are some articles which address handprinting, he failed to specify any.  (111 Pretrial 8210.)  Nor has the proficiency testing of handprinting been prolific.

63.     When he testified for the defense in *United States v. Fujii*, 152 F. Supp. 2d 939 (N.D. Ill. 2000), Michael Saks "was aware of only one" proficiency test involving handprinting, and in that study 45% of the handprinting analysts identified the wrong person.  *Fujii*, 152 F. Supp. 2d at 941.  In the present case, as in *Fujii*, the record left the court with "no idea whether there is a recognized and accepted expertise in identifying handprinted documents. . . ."  *Id.*  Therefore, because handprinting is even less reliable as a scientific technique than handwriting, a *Kelly* hearing should have been granted.

4.     ***Kelly* Should Not Be Limited To Expert Opinions Regarding Matters That Are Both "New" and "Scientific"**

64.     It was demonstrated above that the expert handprinting opinion testimony is novel, scientific evidence as defined under California law.  *Leahy*, 8 Cal. 4th at 606.  However, even if the technique didn't meet the *Leahy* requirements, it still should be reviewed under *Kelly*.  Merely because a scientific procedure is old or well established

does not mean that it is reliable.  *See Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 581 (1993).  To the contrary, the older the procedure the more likely that its scientific underpinnings may have been proven false by modern science.  Indeed, many of the oldest and most established techniques have recently been challenged as unreliable.  *See, e.g.*, National Academy of Sciences Committee Report, *Strengthening Forensic Science in the United States: A Path Forward* (2009)[77] (finding serious deficiencies in a number of forensic science disciplines, including comparative hair analysis, toolmark analysis, print comparison, and fiber analysis).  Accordingly, to the extent that *Kelly* acts as the reliability gatekeeper in California, it violates the federal constitution to allow an "old" scientific technique into evidence without determining that it satisfies *Kelly*.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (trial judges must act as gatekeepers to exclude unreliable scientific and non-scientific expert testimony).

65.    Accordingly, handprinting comparison opinion evidence should not have been admitted into evidence without a *Kelly* reliability determination.

**5.    Even If Prong One of *Kelly* Is Not Applicable to Handprinting Comparison, Prong Three Should Be Applicable**

66.    Under *Kelly*, even in cases where general acceptance of the technique has been proven (Prong 1) the prosecution must still demonstrate that scientifically correct procedures or methods were used in the case at bar (Prong 3).  Prong 3 requires the proponent of expert testimony to demonstrate that correct scientific procedures were used in the particular case.  *Kelly*, 17 Cal. 3d at 30; *see also Leahy*, 8 Cal. 4th at 595.

67.    In the present case, *Kelly* Prong 3 was not satisfied and, therefore, the expert testimony on handprinting comparison should have been excluded.  The trial court found that the investigating authorities negligently failed to follow their own

_____

[77]  Available online at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf.

(15cv1224)

procedures for processing and preserving the Love Insurance note.  (247 Pretrial 25448.)  As a result the handprinting comparison methodology was suspect since the comparison had to be made from a photograph rather than the original note.  (*See* Claim 1(B) and (C).)

68.   Accordingly, prong three of *Kelly* was not satisfied and the handprinting comparison testimony should have been excluded for this reason as well.

## 6.   The Failure to Hold a *Kelly* Hearing Violated the Federal Constitution

69.   Because the trial court should have granted Lucas a *Kelly/Frye* hearing under the California Supreme Court's controlling *Kelly* precedent, the trial court arbitrarily violated Lucas's due process rights.  *Hicks*, 447 U.S. at 346; *Hernandez*, 930 F.2d at 716.  The denial of a *Kelly* hearing precluded the defense from impeaching the prosecution testimony based on its lack of acceptance in the scientific community.  Hence, Lucas's constitutional rights to present a defense, due process, confrontation and compulsory process were also violated.  *Webb*, 409 U.S. at 98; *Washington*, 388 U.S. at 19, *Taylor*, 484 U.S. at 408.

70.   Additionally, the trial court's denial of a *Kelly* hearing violated the federal constitution because it allowed the jury to consider unreliable expert opinion.  The Due Process Clause of the Fourteenth Amendment and the heightened reliability requirements of the Eighth Amendment forbid juror consideration of unreliable evidence in a capital case regardless of whether or not the evidence is based on a new or scientific technique.  *See, e.g.*, *Beck*, 447 U.S. at 627-46; *White v. Illinois*, 502 U.S. 346, 363-64 (1992); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646, (1974).

167

**7.     The Fingerprint Evidence Should Have Been Excluded Under the *Daubert/Kumho* Standard[78]**

71.     In *Daubert*, the Supreme Court held that expert scientific evidence may not be admitted unless "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts." 509 U.S. at 593.  Making this determination necessarily involves an assessment of the reliability of the evidence at issue.  *Id.* at 589.  The Court in *Daubert* set forth a non-exclusive list of factors[79] for courts to consider in determining whether expert evidence is reliable.  These factors are: (1) whether the expert's theory or technique can be or has been tested; (2) whether the expert's theory or technique has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) general acceptance in the scientific community.  *Id.* at 593-94.  As the Supreme Court made clear in a later case, *Kumho Tire Co.*, 526 U.S. 137, *Daubert* assigned a gatekeeping function to trial judges to exclude unreliable scientific and non-scientific expert testimony.  *Kumho*, 526 U.S. at 150.  However, the Court emphasized that this is not an exclusive list, and the factors that a court considers must fit the facts of the particular case.  In this case, the relevant *Daubert* factors to consider are whether the theories and techniques of handwriting comparison have been tested, whether they have been subjected to peer review, the known or potential error rate of forensic document examiners, the existence of standards in making comparisons between known writings

---

[78]     Although *Kelly/Frye* was the applicable test in use in California at the time of Lucas's trial, the *Daubert* decision came out prior to Lucas's direct appeal and thus should have been considered by the California Supreme Court.  *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) (18 U.S.C. § 2254(d)(1) requires federal habeas courts to measure state-court decisions against United States Supreme Court precedents at the time the state-court renders its decision on the merits).

[79]     While it is now one factor among several, it is clear that the federal courts still consider the "general acceptance test" of *Frye* in determining admissibility of expert testimony.  *See United States v. Hines*, 55 F. Supp. 2d at 65 (Frye standard "still important").

(15cv1224)

and questioned documents, and the general acceptance by the forensic evidence community.  (*See, e.g*, Def. In Limine Exh. 586, 587, 588.)

72.   Lucas contends that the expert handprinting evidence introduced against him at trial should have been precluded by *Daubert* and *Kumho* because the methodology underlying the development of the fingerprint evidence was unreliable and scientifically invalid.[80]  Lucas was denied due process when the trial court refused to acknowledge the very serious problems inherent in the methodology Harris used to find "with reasonable certainty" that Lucas authored the Love Insurance note.  Both *Kelly/Frye* and *Daubert* are concerned about the reliability of expert testimony, and the admission of unreliable testimony not only has state law implications, it is a violation of federal due process.  *See Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016). The Supreme Court has long held that "the introduction of faulty evidence violates a petitioner's due process right to a fundamentally fair trial."  *Id.*; *see also Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991) and *Dowling v. United States*, 493 U.S. 342, 352-53 (1990).

73.   In this case, expert testimony regarding handprinting comparison evidence was introduced without first determining whether such evidence was scientifically valid, and hence reliable, under procedures that existed at both the state and federal level.  By concluding that the trial court was not required to subject handprinting evidence to the procedures for determining the reliability of such evidence, the trial court violated Lucas's due process rights when it allowed unreliable evidence to be introduced against Lucas at trial.

---

[80]  Since the *Daubert/Kumho* test is more liberal in favor of admissibility, any evidence that cannot satisfy *Daubert* also cannot satisfy *Kelly*, *a fortiori*.  *Leahy*, 8 Cal. 4th at 595, 603.

**F.    Handprinting Comparison From a Photograph is Unreliable and Should Have Been Excluded**

    **1.    Using Photographs Rather Than the Original Note Rendered Lucas's Trial Fundamentally Unfair**

74.    As Lucas has asserted herein, handprinting comparison expert testimony is not a science and should never be presented as such. However, if it is deemed permissible, it should only be presented if the comparison is made from an original writing, rather than a photograph or a copy. *See Spottiswood v. Weir*, 66 Cal. 525, 529, (1885) (because handwriting analysis "is not regarded as evidence of the most satisfactory character, . . . [i]t would be adding vastly to the danger of such evidence, to permit evidence to be given from a comparison of genuine writings with a press copy of the writing whose genuineness is disputed").

75.    As Lucas argued to the trial court (and as elicited during the cross-examinations of Harris, Gonzales, and Oleksow), using a copy of handprinting rather than the original compromises any comparative analysis. Leading experts in document and handwriting analysis, including the Federal Bureau of Investigation, caution that only original documents should be used for examination purposes. *See, e.g.,* 2 *Scientific Evidence* (3rd ed. 1999), 193 ("Originals rather than Photostats or photographs of original writings are needed. A copy may omit some of the identifying characteristics of the person's handwriting style, such as indications of pen pressure, hesitation points, and other minute pen movements."); *Forensic Handwriting Identification: Fundamental Concepts and Principles* (2000 ed.), 204 ("Copies of documents, as a general rule, do not provide an accurate representation of all the features of a writing, and may even contain trash marks or other defects, the presence of which could be misinterpreted.").

76.    Accordingly, Harris's expert handprinting testimony, which relied upon photographic copies of the Love Insurance note, should not have been admitted. Failure to exclude this testimony violated Lucas's state and federal constitutional rights

to due process, fair trial by jury, confrontation, and effective representation of counsel. *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Taylor*, 484 U.S. at 408-09. Additionally, because Lucas was arbitrarily denied his state created rights under California law, including Evidence Code sections 352, 1400, 1401 and 1418, the error violated his right to due process under the Fourteenth Amendment to the United States Constitution. *Hicks*, 447 U.S. at 346; *Hernandez*, 930 F.2d at 716.

> **2.      To the Extent That Trial Counsel Failed to Adequately Object to the Admission of Expert Testimony Based on the Use of Photographs of the Love Insurance Note Rather Than the Original, Counsel Was Ineffective**

77.      On direct appeal, the State argued that trial counsel did not adequately object to the expert's use of a photograph rather than the original of the Love Insurance note, and Lucas therefore forfeited this claim on appeal. (Dkt. 128-7 (Resp.'s Brief on Appeal.) The California Supreme Court did not address this argument when discussing Lucas's broader claim challenging the admissibility of expert testimony which relied upon a photograph rather than the original, *People v. Lucas*, 60 Cal. 4th 153, 231-32 (2014), and Lucas asserts that his claim is properly preserved for appeal.

78.      However, should this Court determine that the claim is waived, trial counsel's failure to properly preserve the claim violated his state and federal constitutional right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). Attacking the State's evidence regarding the Love Insurance note was a key element of Lucas's defense strategy, and counsel was well aware that "[o]riginals rather than photostats or photographs of original writings are needed" when conducting a handwriting analysis. 2 *Scientific Evidence* (3rd ed. 1999), 193. By failing to move to exclude clearly inadmissible evidence, trial counsel made it easier for the prosecution to carry its burden, thereby prejudicing Lucas. *Kimmelman v. Morrison*, 477 U.S. 365, 379-80 (1986).

**G.     Clark's Opinion That Lucas Authored the Love Insurance Note Should Have Been Excluded**

79.     The state and federal constitutions protect a party from inflammatory and prejudicial matters that affect the fundamental fairness of the proceedings.  *Payne*, 501 U.S. at 825.  The trial court's erroneous admission of Clark's lay opinion testimony rendered Lucas's trial fundamentally unfair because the note was the most crucial piece of evidence against Lucas in the Jacobs case, and (1) the prosecution did not establish the foundational ground of uniqueness prior to Clark's testimony; (2) Clark's opinion was not helpful to the jury; and (3) his testimony was unduly prejudicial.  Additionally, because Lucas was arbitrarily denied his state-created rights under California law, including Evidence Code sections 350, 351, 352, 403, 800, and 1416, the trial court's erroneous rulings violated his due process rights.  *Hicks*, 447 U.S. at 346; *Hernandez*, 930 F.2d at 716.

80.     An essential underlying premise of handwriting identification is that the writing being compared is sufficiently unique to make a reliable identification.  Here, the prosecution, as the proponent of the evidence, had the burden of making the foundational showing of uniqueness before the handwriting comparison evidence was admitted.  However, as discussed above, the prosecution presented no evidence of empirical studies or any other evidence which demonstrated that the printing on the Love Insurance note was so unique that it would only match one person.  In fact, the record was to the contrary, since the printing was also similar to that of David Woods, a former suspect in the Jacobs case.  (*See* Def. Trial Ex. 660 at 12-13 (statement of Rochelle Coleman).)  Nor did the prosecution make any foundational showing as to Clark's ability to reliably identify the limited amount of block printing on the Love Insurance note.  There was no evidence presented that Clark had ever seen Lucas print the exact content of the note and no aid of actual exemplars by which to compare the printing.  Moreover, it had been years since Clark had seen Lucas's handwriting, so his comparison was based on pure memory.  Finally, there was no evidence that Clark had

(15cv1224)

any training in the field of handwriting analysis—no knowledge of the professional criteria for such a task, no knowledge of the science or methodology of handprinting comparison, and no background in examining documents. Yet he was called upon by the prosecution to give an opinion that Lucas, rather than anyone else in the world, was the author of the Love Insurance note, based on common characteristics (never identified) between a photograph of a random document with no context and his memory of seeing Lucas's writing in his business records years ago. Absent any foundational evidence that a lay witness, let alone this lay witness, can reliably "identify" someone's handprinting under these unusual conditions, there was simply no permissible basis for admitting Clark's testimony. The trial court erred in admitting Clark's testimony absent the necessary foundational showing.[81]

81. Additionally, because Clark's opinion was not helpful to the jury, it should have been excluded under Cal. Evid. Code § 800. Lay witness opinions are justified in situations where facts are not directly available to the jury. However, in this case, Clark offered no greater perception of the facts than what was already before the jury (who had the photographic copies of the note as well as a substantial quantity of Lucas's printing from the exemplars). As such, his opinion added nothing and should have been excluded.

82. Finally, even if the issues addressed above did not independently justify exclusion of Clark's testimony, they greatly undermined its probative value, especially in light of the highly prejudicial nature of his opinion. Because the court failed to give the requested cautionary instruction, the jurors were not aware that Clark was in no better position to judge whether the note was written by Lucas than they were. As a

---

[81] The trial court compounded this error by refusing to contemporaneously instruct the jury on its duty to conduct the foundational evaluation under Cal Evid. Code § 403(c)(1), which states: "If the court admits the proffered evidence under this section, the court . . . [m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist."

(15cv1224)

result, they were likely to give Clark's opinion undue weight.  Moreover, because the defense was not permitted to challenge the prosecution's underlying but faulty premise that the handprinting on the note was unique and individualistic, both the jurors and the court were free to rely on this untested assumption to conclude that Lucas must have authored the note.

**H.     The Errors Were Not Harmless**

83.     The impact of these errors, alone or in combination, were prejudicial and cannot be considered harmless.

84.     Generally, the admissibility of evidence is a matter of state law, and is not subject to review in a federal habeas corpus proceeding.  *Estelle*, 502 U.S. at 68.  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process.  *Estelle*, 502 U.S. at 68; *Pulley v. Harris*, 465 U.S. 37, 41, (1984); *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  The admission of the prosecution's handprinting comparison testimony rendered Lucas's trial fundamentally unfair for three reasons.

85.     First, the expert opinion that Lucas authored the note to a "reasonable certainty" was likely to have an undue influence on the jurors.  As the state courts' own precedent recognized, "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials."  *Kelly*, 17 Cal. 3d at 31.  Thus, "[t]he expert opinion testimony created a significant danger that the jurors would conclude erroneously that they were not the best qualified to assess the [evidence], that they should second guess their own judgment, and that they should defer to the Government's experts."  *United States v. Hanna*, 293 F.3d 1080, 1087 (9th Cir. 2002).

86.     Second, admission of the prosecution's expert testimony without allowing the defense to impeach and counter that testimony through its own experts and evidence conveyed, as a given truth, the essential assumption that all handprinting is unique and individualistic.  In other words, Harris's opinion assumed that the 13 block

174

printed letters and seven numbers on the Love Insurance note were so unique that the author could be determined to the "reasonably certain" exclusion of all other persons. Because the defense was not permitted to challenge this essential premise, the jurors were free to fully rely on this premise to conclude that Lucas must have authored the note based on Harris's perceived similarities between the note and Lucas's printing. This improperly denied the jury the opportunity to weigh the credibility of the prosecution's witnesses, thereby giving the prosecution evidence a false aura of reliability. *White*, 502 U.S. at 363-64 (verdict reliability is required by the Due Process clause); *Donnelly*, 416 U.S. at 646 (same); *Franklin v. Henry*, 122 F.3d 1270, 1273 (9th Cir. 1997) (error in excluding a statement relating to the credibility of a child witness was of constitutional magnitude based on *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986)). Given the limited evidence against Lucas in the Jacobs case and the substantial impact of the errors, the trial court's rulings undoubtedly had a "substantial and injurious effect or influence" upon the jury's verdict. Denying Lucas's ability to defend against the Love Insurance note evidence had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993).

87. Finally, the prosecution highlighted the expert and lay opinion testimony about the Love Insurance note as one of the most significant pieces of evidence in the Jacobs case:

> Mr. John Harris came in here one afternoon and told you that the author of that note was Mr. Lucas. . . . And he discussed [the note], and he stood right here on this step by the witness box and he was pointing out various things to you, if you recall that, and then all of a sudden he took this exhibit and he inverted it . . . so that you would see, ladies and gentleman, by shapes, just who it was that authored that note.
>
> In this courtroom you could have heard a pin drop in it after he turned that exhibit over, because it was at that point that

175

(15cv1224)

1    everyone that was in this courtroom knew who wrote that

2    note.  And that person sits right over there at counsel table.

3    His name is David Lucas.

4                              [. . .]

5    And out of 100 witnesses, ladies and gentlemen, did we hear

6    a witness that came in to testify that he is an expert in forensic

7    handwriting comparison to tell you that was not Mr. Lucas's

8    handwriting?

9    You didn't see that, you didn't hear that, because that isn't

10   true.  There isn't anybody out there in the forensic world

11   that's going to come in and say that the author of that note is

12   someone other than Mr. Lucas because it isn't true.

13   (62 RT 11771-73.)

14        88.    The prosecution's emphasis on Harris's testimony and the importance of

15   the Love Insurance note in identifying Lucas as the perpetrator of the Jacobs homicides

16   made it more likely that the jury considered that evidence significant.  *See Gonzalez v.*

17   *Wong*, 667 F.3d 965, 986 (9th Cir. 2011) (stating that a prosecutor's emphasis on a

18   topic during his summations can be viewed as an indication of its significance).  Given

19   that the Love Insurance note was one of only two pieces of physical evidence tying

20   Lucas to the crime scene, the erroneous admission of expert testimony on the note had a

21   substantial and injurious effect on the jury's verdict.  *Brecht*, 507 U.S. at 627.

22        89.    Moreover, even if the errors were not prejudicial as to guilt, they were

23   prejudicial, individually and cumulatively, as to penalty because they undermined the

24   mitigating theory of lingering doubt.  Like the guilt determination, the penalty trial was

25   closely balanced and the error was substantial.  Certainly, erroneously allowing the jury

26   to utilize the Love Insurance note to find Lucas guilty of the Jacobs murders, thereby

27   undermining lingering doubt as to Lucas's guilt, was a "substantial error."  Denying

28

176

Lucas's ability to defend against the Love Insurance note evidence was a "substantial error" under *Brecht*.

**CLAIM 3:  THE DISTRICT ATTORNEY'S OFFICE DEPRIVED LUCAS OF A FAIR TRIAL BY PURSUING INCONSISTENT THEORIES OF THE CASE IN VIOLATION OF THE DUE PROCESS CLAUSE (AOB 2.8.4)**

1.      The Due Process Clause of the federal constitution requires recusal of a prosecutor where the prosecutor prejudicially manipulates or misstates evidence or otherwise operates in a manner that undermines society's confidence in the fairness of the criminal process.  *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986); *Brady v. Maryland,* 373 U.S. 83, 86 (1963); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (the prosecutor may not obtain a conviction through the use of false evidence). Based on this well-established caselaw, recusal may be warranted where the prosecutor presents wholly inconsistent theories in two different legal proceedings involving the same criminal action or defendant.  *Mooney*, 294 U.S. at 112.

2.      In this case, the District Attorney's office engaged in prosecutorial misconduct by presenting one theory of guilt for the Jacobs case in the Lucas criminal prosecution and another theory of guilt for the Jacobs case as defendants in the Massingale civil suit.  *See Haynes v. Cupp*, 827 F.2d 435, 439 (9th Cir. 1987); *Drake v. Francis*, 727 F.2d 990, 994 (11th Cir. 1984), rev'd in part on other grounds, *Drake v. Kemp*, 762 F.2d 1449 (1985).  Additionally, in light of this evident prosecutorial misconduct, the trial court erred in refusing to recuse the District Attorney's office from the Lucas prosecution.  *See id.*

3.      California state law also protects defendants from the kind of prosecutorial misconduct exhibited in this case.  California Penal Code § 1424 provides for the recusal of the District Attorney's office upon a showing "that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial."  Cal. Penal Code § 1424(a)(1).  In order to determine whether recusal is appropriate, a court must first determine whether "'the circumstances of a case evidence a reasonable

possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner.'" *Vetter v. Ayers*, 2009 U.S. Dist. LEXIS 102397, *15 (C.D. Cal. 2009) (quoting *Haraguchi v. Superior Court*, 43 Cal. 4th 706, 713 (2008). If such a conflict exists, the court must then determine whether the conflict is "so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings." *Haraguchi*, 43 Cal. 4th at 713 (citation and some internal quotation marks omitted). "[A]n appearance of a conflict may well signal the existence of a disabling conflict." *People v. McPartland* 198 Cal. App. 3d 569, 574 (1988). When a California court denies a defendant's motion to recuse which is warranted under these state standards, that decision amounts to a federal due process violation as well as a violation under state law. *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

4. In this case, the defense filed a motion to recuse the San Diego District Attorney's Office, citing instances of, *inter alia*, vindictive prosecution, *Brady* and discovery violations, prosecutorial misconduct, and conflict of interest. (57 CT 12474-12587.) One conflict of interest charge was based on Massingale's civil suit against the District Attorney's office and named investigators William Green and Wayne Burgess. (16 CT 3403; 57 CT 12582-86.) As the defense argued in the motion to recuse, there were repeated actions of misconduct by the District Attorney's office due to their role in Massingale's civil suit which amounted to a serious conflict of interest.

5. For example, in response to Massingale's civil suit, representatives from the District Attorney's office (including Deputy District Attorney McArdle and investigators Green and Burgess) provided sworn statements and in-court arguments in 1986 affirming the voluntariness and truthfulness of Massingale's confession. (57 CT 12584-85.) Deputy District Attorney Williams (the lead prosecutor against Lucas) even appeared in federal court during Massingale's litigation, arguing in favor of county counsel and offering that Deputy District Attorney Clarke (the second prosecutor against Lucas) could make a statement to that court regarding the propriety of Massingale's interrogation and confession. (17 CT 3599, 57 CT 12585.) However, in

178

Lucas's case, the District Attorney's office took directly opposing positions regarding the voluntariness (and, indeed, the nature) of Massingale's statements. (57 CT 12584-85.) The District Attorney's presentation of these wholly inconsistent theories (i.e., Massingale's confession was voluntary and truthful in one legal proceeding, but involuntary and untruthful in another legal proceeding) violated Lucas's right to due process in his criminal prosecution. *See Haynes*, 827 F.2d at 439.

6.     Similarly, in an effort to distance the prosecution from the position it had taken in the Massingale criminal case and civil suit, Deputy District Attorney Williams claimed that the prosecution had never characterized Massingale's statements as "confessions." (18 CT 3918). However, Deputy District Attorney McArdle explicitly referred to Massingale's statements as "confessions" when prosecuting Massingale and, in particular, when opposing Massingale's motion to dismiss under Penal Code § 995. (19 CT 3958.) Also, Deputy District Attorney McArdle had entered Massingale's confessions into evidence at Massingale's preliminary hearing as proof of his guilt. (57 CT 12585.) Yet by the time of Lucas's trial, the same District Attorney's office which, while prosecuting Massingale, asserted that Massingale's confession to law enforcement was voluntary (39 CT 8546-8550; 57 CT 12583), had reversed itself by adopting Massingale's claim that he was coerced by law officers into confessing to the Jacobs murders.

7.     To complicate matters further, although William Green was one of two San Diego Police Department detectives who had obtained Massingale's confession in Kentucky, he subsequently became the District Attorney's main investigator in Lucas's prosecution, even though he thought Massingale might have committed the murders. (57 CT 12583-584.) As noted above, Massingale, testifying for the prosecution, accused detectives Green and Ayers of coercing his confession. Clearly, Green was placed in the untenable position of defending himself against charges of misconduct in the Massingale civil suit (by denying that Massingale's confession was coerced or involuntary) while at the same time asserting the legitimacy of Lucas's murder charges

179

(15cv1224)

as a key member of the prosecution team. These conflicting functions rendered his continued involvement in the prosecution of Lucas improper and is further evidence of prosecutorial misconduct (as well as further support for granting Lucas's motion to recuse). (57 CT 12584-585.)

8. Because the wholly inconsistent theories presented by the prosecution violated the essential integrity of the process and rendered Lucas's trial fundamentally unfair, Lucas's due process rights were violated, and the trial court's denial of the recusal motion was an error under both state and federal law. *See Darden*, 477 U.S. at 181-82; *Hicks*, 447 U.S. 343; *Haynes*, 827 F.2d at 439; *People v. Conner*, 34 Cal. 3d 141,148-149; Cal. Penal Code § 1424. Because this error had a "substantial and injurious effect" on the proceedings, it cannot be deemed harmless. *Brecht v. Abrahamson*, 507 U.S. at 637-38.

**CLAIM 4: LUCAS'S RIGHT TO DUE PROCESS, RIGHT TO PRESENT A DEFENSE, RIGHT TO COMPULSORY PROCESS, AND RIGHT TO CONFRONTATION WERE VIOLATED BY THE STATE COURT'S ERRORS REGARDING THE EYEWITNESS IDENTIFICATIONS AND TESTIMONY OF JODIE SANTIAGO (AOB 3.3.1-3.3.5, 3.4.1-3.4.2, 3.5.1-3.5.2, 3.6.1-3.6.4, 3.7.2)**

**A. Introduction**

1. Santiago's eyewitness identification of Lucas was, without question, the most damaging piece of evidence against Lucas in the Santiago prosecution. Her identification was also crucial to the consolidation and cross-admissibility litigation and to the jury's assessment of Lucas's guilt for the other charges. (*See* Claims 43-47.) However, Santiago's identification should never have been used against Lucas due to Santiago's memory impairments, the inherently suggestive identification procedures employed by the police and prosecution, and the state court's erroneous rulings which deprived Lucas of his right to defend against this unreliable and prejudicial evidence.

**B.      Relevant Law**

2.      There are two fundamental constitutional errors that occurred with regard to the identifications and testimony of Jodie Santiago.  First, the state court violated Lucas's due process rights by admitting eyewitness identification evidence which was suggestive, unreliable, and unnecessary.  *Perry v. New Hampshire*, 565 U.S. 228, 229 (2012).  The state court then compounded this error, and violated Lucas's constitutional right to present a defense, by excluding his eyewitness experts and relevant evidence designed to demonstrate the unreliability of Santiago's identification to the jury.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

**1.      Suppression of Eyewitness Identification Evidence**

3.      For decades, researchers and courts have been aware that "[e]rroneous eyewitness testimony—whether offered in good faith or perjured—no doubt is the single greatest cause of wrongful convictions in the U.S. criminal justice system."[82] Wrongful identifications implicate due process concerns; therefore, due process requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 229.  The Supreme Court has long recognized that suggestive identification procedures undermine the reliability of the trial process.  *See Neil v. Biggers*, 409 U.S. 188, 199 (1972).  A Pretrial identification violates due process where: (1) the identification procedure is impermissibly suggestive; and (2) the suggestive procedure gives rise to a very substantial likelihood of misidentification. *Biggers*, 409 U.S. at 197-98; *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977) (noting that due process challenges to identification procedures are reviewed using Biggers'

---

[82] *See* Warden, *How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row* [http://www.law.nwu.edu/wrongful convictions /eyewitnessstudy.htm]

181

(15cv1224)

test); *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (observing that the admission of untrustworthy evidence of guilt not precluded by statute or common law doctrine can still violate a defendant's right to due process of law). The determination of whether to suppress an identification should be done on a case-by-case basis. *Id.* at 116; *see also Biggers*, 409 U.S. at 201. Additionally, due to the risk of unreliable conviction in eyewitness identification cases, a death sentence which is substantially based on a suggestive identification procedure violates the Eighth and Fourteenth Amendments of the federal constitution. *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).

4.     Although state evidentiary rulings are typically not cognizable in a federal habeas proceeding, clearly established federal law holds that the admission of unreliable evidence violates a petitioner's due process right to a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991) and *Dowling v. United States*, 493 U.S. 342, 352-53 (1990); *see also Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016) (the introduction of faulty evidence violates due process).

**2.     Denial of the Right to Present a Defense**

5.     Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (citations omitted); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). Specifically, the right of a criminal defendant to present witnesses, evidence, and argument on his behalf is a fundamental element of due process. *See Webb v. Texas*, 409 U.S. 95, 98 (1972); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Cudjo v. Ayers*, 698 F.3d 752, 766 (9th Cir. 2012). Domestic rules of evidence may not be invoked to preclude a criminal defendant from presenting relevant evidence important to his defense. *See Rock v. Arkansas* 483 U.S. 44 (1987); *Davis v. Alaska*, 415 U.S. 308 (1974).

182

6.     In order to prevail in a habeas action, the petitioner must show that the state court's ruling was so prejudicial that it rendered his trial fundamentally unfair. *Estelle*, 502 U.S. at 68.

## C.     Santiago's Identification of Lucas Was the Product of Unnecessarily Suggestive Pretrial Procedures Conducive to Irreparable Mistaken Identification and Should Have Been Suppressed

7.     The defense filed a motion to suppress Santiago's identification of Lucas, his house, and the seat covers based on suggestive and unreliable identification procedures.  (38 CT 8315-31.)  The court denied the motion as to Santiago's identification of Lucas, finding that the procedures were not suggestive, that "[t]he lineup here was a good one," and that, in any event, Santiago's identification was independent of any such procedures.  (239 Pretrial 24586-87.)  With regard to the identifications of the house and seat covers, the court denied the motion to suppress based on its determination that inanimate objects are not subject to exclusion based on the use of suggestive identification procedures.  (238 Pretrial 24416.)  The defense then requested numerous instructions on eyewitness identification, which were refused.[83] (65 CT 14570-82.)

8.     At trial, Jodie Santiago identified Lucas in the courtroom and testified that she had no "doubt in her mind" that he was her attacker.  (38 RT 7344; 39 RT 7376-77.)  However, notwithstanding her confidence, Santiago's testimony was not reliable, and should have been excluded due to numerous suggestive Pretrial procedures and a highly suggestive photo lineup.

---

[83]  The court ultimately instructed the jury pursuant to CALJIC 2.91 (Burden of Proving Identity Based Solely on Eyewitnesses) and 2.92 (Factors to Consider in Proving Identity by Eyewitness Testimony).

**1.    The Events Prior To the Photo Lineup Were Suggestive and Conducive To an Irreparable Mistaken Identification**

9.    The totality of the circumstances prior to the photo lineup demonstrated that the tactics used by the police were suggestive, resulting in an identification that was fraught with indicia of unreliability and the danger of an irreparable mistaken identification.  (*See* Section V.)

10.    First, Jodie Santiago's ability to accurately remember and identify her attacker's face was compromised by her amnesia, severe closed head trauma, and acute Post Traumatic Stress Disorder (PTSD).  (*See* Part G.)  Second, Santiago's emotional need to have her attacker arrested and convicted made her more prone to suggestion. (81 Pretrial 4542, 4628; 82 Pretrial 4640.)  Third, Santiago's participation in the making of composite drawings on two separate occasions raised the danger that her subsequent identification was tainted.  (188 Pretrial 17931, 17937-38 (Buckhout testimony).)  Fourth, the questioning process was suggestive because the questions may have implanted specific facts in Santiago's mind.  Santiago was interviewed about her of times over the six month period between the attack and Lucas's arrest.  The sheer number of times Santiago had to recount her experience made the possibility of an inaccurate identification more likely, not less.  (*See* 188 Pretrial 17928-29, 17967-69 (research shows that that multiple questioning sessions over a period of time can cause the witness to "fill in" details based on logic rather than actual observation.)  Fifth, by informing Santiago that they had a suspect (81 Pretrial 4490; 82 Pretrial 4647) and by flying Santiago down to see a single photo lineup, the investigating detectives strongly suggested that the suspect would be in the lineup.[84]  Finally, the lack of an adequate

---

[84]    Indeed, the detectives created an air of import and urgency regarding the "suspect" they wanted her to view by already having a ticket for her at the airport when they called her about Lucas.  Upon arrival in San Diego, Santiago was met by two or three detectives who immediately drove her to her hotel and showed her the photo lineup as soon as they got to the hotel.  At least three detectives, all of whom were

184

(15cv1224)

1   record as to what really occurred during the Pretrial identification process further

2   undermines the reliability of the identification, especially where there is evidence that

3   the police were tracking Lucas and considered him a suspect long before they admitted

4   in trial testimony.  (*See* Claim 14.)

5       **2.    The Photo Lineup Was Unnecessarily Suggestive and Conducive**

6           **To an Irreparable Mistaken Identification**

7       11.    Although each case must be based on its own circumstances, certain

8   fundamental principles have been established in applying the due process test for

9   suggestiveness of photo lineups.  A photo lineup is suggestive when the defendant's

10  photograph depicts a subject who alone has the identifying characteristic as described

11  by the witness.  (188 Pretrial 17939-49, 17944-45 (Buckhout testimony).)  As the

12  defense experts testified (during in limine proceedings and during the trial proffer), the

13  photo lineup was deficient and prejudicially unfair because only Lucas had all of the

14  physical characteristics described by Santiago.  (*See* Claim 4(D) and 10.)

15      12.    For example, Santiago testified that the things that stood out "first and

16  foremost" in her mind were her assailant's "bulging" eyes.  (91 Pretrial 5660; *see* also

17  90 Pretrial 5611.)  Yet, according to Santiago, there was only one picture in the photo

18  spread which depicted eyes similar to her description, and that was the photograph of

19  Lucas.  Additionally, Santiago told the detectives that her attacker had a "feathered"

20  hair style which was "laid back," collar-length, and "somewhat wind-blown" (82

21  Pretrial 4660, 4647-48; 94 Pretrial 6044-45); and again, the photo of Lucas is the only

22  one that meets this description.  Other suggestive elements in the lineup included the

23  lack of appropriate facial hair (*compare*, 82 Pretrial 4648-60; 91 Pretrial 5658, and In

24  Limine Ex. 179-A), inappropriate clothing and physical stature (*compare*, 82 Pretrial

25

26

27  aware that Lucas was the suspect, hovered around Santiago while she made the
    identification.

28

185

4647-48; 91 Pretrial 5656, and In Limine Ex. 59), and the size of Lucas's photo relative to the others in the array. (188 Pretrial 17941; In Limine Ex. 179-A.)

13.    In sum, the picture of Lucas in position 2 was obviously the only person Santiago would have considered based on her description of the attacker, and anyone familiar with Santiago's pre-photo lineup descriptions would have picked that photo as the most likely suspect. (*See* Claims 10(F).) This level of suggestibility violates due process. *Perry*, 535 U.S. at 229; *United States ex rel Cannon v. Montage*, 486 F.2d 263, 267 (2nd Cir. 1973) (identification lineup would be impermissibly suggestive if the defendant was the only man in the lineup wearing a green shirt); *United States v. Sanders*, 479 F.2d 1193, 1197-98 (D.C. Cir. 1973) (defendant was "the only one whose facial hair was in any way comparable to the initial uncertain descriptions given by the witnesses").

### 3.    Santiago's Identifications of Lucas's House Should Also Have Been Suppressed as the Unreliable Product of Suggestive Pretrial Identification Procedures

14.    The evidence of suggestiveness as to Santiago's identification of Lucas's residence was strong. Santiago said that she was certain she would recognize the house if she saw it again; yet she was driven by the house twice after the photo lineup and she said nothing. (*See* at Section V.) The next day, Santiago was in the presence of the detectives while they prepared a warrant which specifically referred to the address of the residence. Afterwards, Santiago was again driven by the house, this time in the daylight. There is a contradiction in the evidence[85] as to what happened during these drivebys:

---

[85] Since the driveby was not recorded and neither detective provided detailed notes (*see* Claim 13.). the only record of what really happened on the drive-bys is found in the four different versions of events testified to by law enforcement.

(15cv1224)

1   • Detective Fullmer: On the third of four drive-bys of the Lucas home, there was

2   some conversation between other members in the car that prompted Fullmer to

3   make a U-turn and drive-by again. (91 Pretrial 5689.) As they were near

4   Lucas's home, Fullmer heard someone in the car say, "What about this house?"

5   (91 Pretrial 5689.) Following that statement, Santiago identified the house. (91

6   Pretrial 5690.) At first Fullmer said he did not remember whether or not they

7   stopped in front of the house after the identification. (91 Pretrial 5690-93.)

8   However, he then said he believed they slowed down but he could not recall

9   whether they stopped. (91 Pretrial 5697, 5716.)

10  • Detective Fisher: On the first drive-by of Lucas's house in the daylight, Fisher

11  saw Santiago look in the "general direction" of the house. (94 Pretrial 6136.)

12  They continued driving to see if Santiago would recognize the place where she

13  was found after the assault. (94 Pretrial 6136.) On the way back they went by

14  Lucas's house again, and Santiago was turning in her seat and looking intently

15  out the window. (94 Pretrial 6136-37.) Santiago asked Fullmer to slow the car

16  down which he did near Lucas's residence. (94 Pretrial 6137.) Fisher then

17  asked: "Do you recognize something?" (94 Pretrial 6139; 95 Pretrial 6221-22.)

18  They then circled the block and returned so Santiago could get a better look. (94

19  Pretrial 6139; 95 Pretrial 6226-27.) During that viewing they actually stopped

20  momentarily. (95 Pretrial 6230.) Fisher did not hear anyone in the car say,

21  "What about this house?" (95 Pretrial 6227.)

22  • Deputy Zuniga: Fullmer, Fisher, Santiago and Zuniga were traveling through the

23  Casa De Oro area while driving Zuniga home. (95 Pretrial 6293.) Santiago

24  "suddenly said that the area looked familiar to her." (95 Pretrial 6293.) She

25  asked the detective to turn around and drive down the street a second time. (95

26  Pretrial 6293.) Nothing was said by anyone else in the car. (95 Pretrial 6293;

27  6306.) Santiago then again said the area looked familiar to her and that she

28  thought she had been there before. (95 Pretrial 6294.) Zuniga had no knowledge

187

(15cv1224)

that the area they were in was where Lucas's house was located.  (95 Pretrial 6295.)

- Jodie Santiago:  Santiago was not questioned in detail about the identification of Lucas's house.  She simply testified that she had picked out a house.  (82 Pretrial 4674-74.)  Back at the Sheriff's Office that afternoon, Santiago overheard the detectives say that she had picked out Lucas's house.  (82 Pretrial 4674.)

15.     While it has long been recognized that the eyewitness identification of a person may be excluded based on suggestive identification procedures, the case law on identification of inanimate objects is much less developed.  Nevertheless, the relevance of suggestiveness to inanimate objects is clear.  *See, e.g.,* Arnolds, Carroll, Lewis & Seng, *Eyewitness Testimony: Strategies And Tactics* (West, 1984) § 2.43 (The Sequence Of Events); § 2.44 (Shapes and Dimensions); § 2.45 (Colors).)  In light of the wildly varying testimony of the police officers, the number of times they drove by Lucas's house, Santiago's exposure to Lucas's address, and the strong indication that the detectives' actions were suggestive and improper, state court erred in refusing to even consider the suggestibility and unreliability of Santiago's identification of Lucas's home.

**4.     The Problems Inherent in Santiago's Identification and Testimony Were Compounded by the State Court's Exclusion of Santiago's Subjective Impression of the Lineup**

16.     One of Lucas's primary defense theories in the Santiago case was that the in-court identification was the product of a suggestive photo lineup.  In an effort to demonstrate the subjective nature of the lineup, defense counsel wanted to "explore [Santiago's] state of mind with regard to each photo" by questioning her in front of the jury about her opinion was with regard to the photos in the lineup—i.e., what her opinion about how closely each photo fit the description she gave of her attacker.  (39 RT 7491-92.)  The court excluded that line of questioning, finding that Santiago's opinion about whether the lineup was subjective was "not relevant."  (39 RT 7489-94,

188

7506-14.)  However, the central issue regarding the subjectivity of the lineup was not how the defense, prosecution, or judge viewed the lineup, but how Santiago viewed it. If she subjectively believed that any or all of the other photos did not comport with her description, then this would have been a basis for questioning the reliability of her identification of Lucas's photo at the lineup.  The court's preclusion of an entire line of relevant questioning violated Lucas's right to confrontation and due process.  *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36 (2004); *Neal v. Neal*, 58 Cal. 287, 288 (1881) ("A witness may be asked on his cross-examination any question which tends to test his accuracy, veracity, or credibility.").

**5.  The Reliability Requirements of the Federal Constitution Require That the Witness Be Given Full and Fair Instructions and Double-Blind Sequential Photo Lineups**

**a.  Full and Fair Instructions**

17.  Santiago was aware that the police had a suspect in custody prior to viewing the lineup.  (81 Pretrial 4490; 82 Pretrial 4647.)  According to Santiago, after she arrived in San Diego and was escorted to her hotel by the police, Santiago testified that the detectives said, "We want you to take a look at this lineup and to take your time and, if you see the man that accosted you, to point him out."  (82 Pretrial 4655.)  The detectives then showed Santiago the photo spread and after a couple of minutes, Santiago selected Lucas's photo, which was the top photo in the middle.  (39 RT 7371-72, 7483-85.)

18.  Detective Fullmer testified that he read Santiago the "standard" instruction form for photo lineups, which states:

> I am going to ask you to look at a group of [6] photographs.
> You should not infer anything from the fact that photographs
> are being shown to you, or that we have any suspect in
> custody at this time.  Please look through the photographs and
> see if you can identify any of the individual pictures.

189

(In Limine Ex. 63.)  However, neither of these instructions were sufficient to protect against the high likelihood of a wrongful identification.

19.    Instructions given to the witness prior to viewing a lineup "can facilitate an identification or nonidentification based on his/her own memory." (United States Department of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* (1999), § V(B).  Thus, scientific researchers, numerous jurisdictions, and the Department of Justice all recommend that the following procedure be followed prior to the presentation of a photo lineup to a witness:  (1) Instruct the witness that he/she will be asked to view a set of photographs; (2) Instruct the witness that it is just as important to clear innocent persons from suspicion as to identify guilty parties; (3) Instruct the witness that individuals depicted in lineup photos may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change; (4) Instruct the witness that the person who committed the crime may or may not be in the set of photographs being presented; (5) Assure the witness that regardless of whether an identification is made, the police will continue to investigate the incident; and (6) Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.  *Id.*

20.    In this case, Santiago was not fully and fairly instructed prior to being shown the photo lineup.  She was never informed of the importance of clearing innocent persons from suspicion as much as identifying guilty parties.  Nor was she told that the appearance of the individuals in the photos may be different due to changes in head or facial hair.  Additionally, Santiago was not told that the person who attacked her may or may not be in the photographs presented—to the contrary, she had already been told he was in the photo lineup.  (81 Pretrial 4490; 82 Pretrial 4647.)  Therefore, under the totality of the circumstances the photo lineup and Santiago's subsequent in-court identification were not sufficiently reliable to pass constitutional muster.  *Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 197-98.

(15cv1224)

### b.   Double-Blind Lineups

21.   A double-blind lineup is where the administrator of the lineup knows neither the suspect nor the position or order in which the suspect will be shown to the viewer.  *See* Donald P. Judges, *Two Cheers for the Department of Justice's Eyewitness Evidence: A Guide for Law Enforcement*, 53 Ark. L. Rev. 231, 238 (2000).  Double-blind testing has long been an accepted staple of scientific research generally and for eyewitness identifications specifically.  *See* Robert Rosenthal and Donald B. Rubin, *Interpersonal Expectancy Effects: The First 345 Studies*, 3 Behav. & Brain Sci. 377, 377 (1978).  This method is advised for eyewitness identifications because it prevents the tester from skewing the test result, even in an unintentional fashion.  Researchers have shown that lineup administrators familiar with the suspect may leak the "right" answer "by consciously or unconsciously communicating to witnesses which lineup member is the suspect."  Sarah M. Greathouse and Margaret Bull Kovera, *Instruction Bias and Lineup Presentation Moderate the Effects of Administrator Knowledge on Eyewitness Identification*, 33 Law & Hum. Behav. 70, 71 (2009).

22.   Similarly, the great weight of empirical research has demonstrated that lineups and photo arrays yield more reliable identifications when the individual lineup members or photographs are presented to the witness sequentially rather than simultaneously.  Rosenthal and Rubin, *Interpersonal Expectancy Effects*, 3 Behav. & Brain Sci. at 377.  This disparity is linked to the phenomenon known as "relative judgment," which is the tendency to pick the "best choice" among those available when all options are presented at the same time (i.e., simultaneously).  Since the viewer believes that the alleged perpetrator is in the lineup, the viewer will in all likelihood select a person from the lineup based upon the person who most closely depicts the

(15cv1224)

perpetrator rather than from a recollection that the person is in fact the perpetrator, leading to an unreliable identification.[86]

23.     In this case, Henderson, Fullmer, and Fisher presented Santiago with a non-blind, simultaneous, unduly suggestive lineup—precisely the kind of lineup which decades of research has shown is the kind most likely to produce an unreliable identification.  The detectives who were present for the simultaneous photo lineup knew Lucas was the prime suspect in the case, and they made sure that Santiago knew that they had someone in custody before they flew her down to San Diego to try and identify her attacker.  Moreover, as discussed above, there were numerous other suggestive factors.  Due to the long-known unreliability of traditional simultaneous photo lineups, the Due Process and Cruel and Unusual Punishment Clauses of the federal constitution preclude the imposition of criminal liability and the penalty of death if the eyewitnesses whose testimony contributed to the verdicts were shown a simultaneous lineup by a person who knew which photo depicted the suspect. Accordingly, in the present case the failure to hold a double-blind sequential photo lineup was prejudicial federal constitutional error.  *Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 197-98; *Beck*, 447 U.S. at 627-46.

**D.    Exclusion of the Testimony of the Defense Eyewitness Identification Experts Rendered Lucas's Trial Fundamentally Unfair**

24.     The prosecution raised an in limine objection to expert testimony regarding eyewitness identification testimony.  (16 CT 3365-71.)  In response, the defense presented the testimony of Dr. Robert Buckhout, an expert in eyewitness

---

[86]  Gary L. Wells, Nancy K. Steblay, and Jennifer E. Dysart, *A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field studies*, American Judicature Society 2, available at http://www.ajs.org/wc/pdfs/EWID_PrintFriendly.pdf ("[I]f the actual perpetrator is removed from a lineup and replaced with no one, a large share of eyewitnesses who would have picked the perpetrator tend to shift to another lineup member and identify that person rather than make no identification.").

192

(15cv1224)

identifications, who testified that a number of the elements most conducive to wrongful identifications were present in Lucas's case.  These elements included, *inter alia*, high stress (188 Pretrial 17931-37, 18009-11), weapon focus[87] (188 Pretrial 17996-97, 18005-09), high confidence of the witness (188 Pretrial 17934; 49 RT 9286, 9303-04), and a "biased" and "unfair" lineup.  (188 Pretrial 18002.)  The state court ruled that the defense expert could not be presented at trial because there was independent corroboration of Santiago's identification, including her descriptions of Lucas's house and car.  (238 Pretrial 24897-900.)  The court also found that Dr. Buckhout and Dr. Loftus (another proposed defense witness) were "not experts" because the research they engaged in and relied upon did not utilize actual crime victims and witnesses.  (50 RT 9358-65.)  The exclusion of the defense experts was patently erroneous and rendered Lucas's trial fundamentally unfair.

25.    Expert testimony explaining these common misconceptions is a proper and should have been permitted in Lucas's case—especially where, as here, there is a concern about the suggestibility of the identification procedures used by law enforcement.  *See, e.g.*, *United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006) (reversal for failure to allow expert to testify about effect of show-up identifications, the lack of correlation between confidence and accuracy, confirming feedback, and time delay, even where trial court had allowed testimony on cross-racial impairment and other identification variables); *United States v. Downing*, 753 F.2d 1224 (3rd Cir. 1985) (proffered expert testimony about stress in an identification is sufficiently "helpful" to address evidentiary concerns); *United States v. Smith*, 736 F.2d 1103 (6th Cir. 1984) (weapon focus and stress are a "proper subject[s]" for eyewitness expert testimony); *United States v. Moore*, 786 F.2d 1308 (5th Cir. 1986).

---

[87] *See also* Elizabeth F. Loftus, et al., *Some Facts About "Weapon Focus*," 11 Law & Hum. Behav. 55 (1987).

26.     The expert testimony that was excluded in Lucas's case was necessary to ensure verdict reliability.  *See Beck*, 447 U.S. at 637-38; *Woodson v. North Carolina*, 428 U.S. 280.  Jurors rely heavily—and often mistakenly—on eyewitness identification, and as a result are apt to ignore circumstances that cast serious doubt on the identification of a defendant.  *See*, *e.g.,* Elizabeth F. Loftus, *Incredible Eyewitness*, Psychol. Today, 117 (1974) (finding that an eyewitness identification substantially increased the percentage of mock jurors voting to convict, and that presenting evidence that the lone eyewitness was virtually blind caused only a minimal reduction in the percentage of jurors voting to convict).  Without testimony from a scientific expert to identify and explain the complicating factors that may impact the accuracy of eyewitness testimony, juries tend to believe that eyewitness testimony must be correct.  A lay cross-examiner cannot properly elicit these factors or the context in which identification testimony is given because this information is not obvious to someone who has not studied the scientific research.  In such cases, the assistance and testimony of an expert witness is necessary for effective representation.  *See, e.g.*, *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (where "the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence," failure to present the testimony of experts at trial amounts to ineffective assistance of counsel).

27.     As a result of the court's erroneous rulings, the jury did not hear critical evidence which would have corrected numerous lay misconceptions about eyewitness identification that were present in Lucas's case.  Lucas's trial was rendered fundamentally unfair as a result.

**E.     Lucas Was Denied His Right to Present a Defense When the State Court Precluded the Defense Theory That the Detectives Intentionally Assembled a Suggestive Photo Lineup**

28.     As explained above, the defense contended that the Santiago photo lineup was suggestive on its face—a theory which did not depend on showing that the

194

detectives intentionally created a suggestive lineup.  (*See, e.g.*, 64 RT 12100.)
However, the defense also contended that the detectives intentionally led Santiago to
the identification of Lucas.  (*See, e.g.,* 54 RT 10124-36; 64 RT 12106, 12113.)  This
theory of intentional, rather than inadvertent, suggestion was especially important to the
defense because it provided a basis for the jury to infer that Santiago had been "led" to
Lucas through the entire Pretrial identification process, not just at the lineup.  Whether
or not to draw such an inference was a critical factual issue for the jury because there is
a void in the record as to what was actually said and done during most of the Pretrial
contacts with Santiago, including two lengthy composite sketch sessions and the critical
identification of Lucas's house.  However, the court denied this request because it
deemed the "entire line of questioning irrelevant under [section] 352."  (54 RT 10136.)
The court's ruling violated Lucas's right to present a defense and witnesses on his
behalf, *Chambers*, 410 U.S. at 297; *Cudjo*, 698 F.3d at 766 ("no government interest
outweighed the value of admitting relevant evidence highly necessary to [Lucas's]
presentation of his defense").

**F.      Failure to Permit Discovery and Evidence Relating to Santiago's Ability
to Remember the Matters to Which She Testified Was Error**

**1.      The State Court Erroneously Denied the Defense Request for
Neuropsychological and Psychological Testing Agreed to by
Santiago**

29.      The defense sought neuropsychological and psychological testing of
Santiago to determine whether she was competent to testify in light of her amnesia,
closed head injuries, and PTSD.  (82 Pretrial 4637-38.)  When asked on the record
whether she would be willing to take such tests, Santiago replied, "I don't see why
not."  (82 Pretrial 4638.)  However, notwithstanding Santiago's stated willingness to
undergo the neuropsychological and psychological testing, the trial judge ruled that the
defense could not contact Santiago and conduct the tests because Santiago had not

195

"volunteered willingly" to take the tests and that such an experience would traumatize her further.  (249 Pretrial 24587.)

30.     It is axiomatic that a party may waive rights that exist for his or her own benefit.  Thus, even though Santiago's privilege not to undergo testing protected important privacy rights, it was her prerogative to waive those rights.  Santiago's willingness to undergo psychiatric testing was neither qualified nor conditional, and she never expressed anything suggesting that she felt obligated to consent.  Her reason for consenting to testing was obviously the same reason why she consented to release of her medical and psychiatric records—namely, that she believed she had "nothing to hide."  (82 Pretrial 4637-38.)

31.     In sum, having already found that Santiago voluntarily consented to waiver of her psychiatric privilege, and given Santiago's on-the-record expression of consent, the judge erred in finding, as a matter of law, that Santiago's consent was involuntary.  Even if the record could be interpreted to provide some evidence of involuntariness, such evidence was not sufficient under the circumstances to justify barring the defense from seeking to obtain relevant evidence from a willing witness. *See generally Davis*, 415 U.S. 308; *Chambers*, 410 U.S. 284.

## 2.     The State Court Erred in Excluding Evidence That Santiago Left a Bar With a Stranger the Night Before the Attack

32.     The defense contended that Santiago's recollection of the events leading up to her attack was not reliable due to her admitted amnesia and memory gaps resulting from the trauma she experienced.  In support of this position, the defense sought to offer the theory that Santiago was not abducted by a random stranger, but instead was assaulted after leaving with another Baxter's patron.  This defense theory was predicated on the fact that Santiago had gone home from a bar with a man named Neil Reynolds the night before the incident, but had failed to mention that information to anyone for five months after her attack, despite numerous interviews with law enforcement, medical, and psychiatric personnel.

(15cv1224)

33.     The state court excluded this line of questioning as irrelevant and accused defense counsel of trying to "discredit [Santiago] as being a loose lady." (244 Pretrial 25095.)  That characterization of defense counsel's intention is incorrect.  Rather, the defense was trying to illustrate that Santiago's memory was not reliable, as evidenced by her failure to disclose the incredibly pertinent information about Neil Reynolds to anyone for five months after her attack.  It may have been that Santiago did not remember her time with Reynolds until weeks or months later; it may also have been that Santiago conflated memories of her experience with Reynolds with what occurred to her the night she was attacked.  Regardless, the fact that she left a bar with a stranger the night before the attack was admissible to impeach the credibility of Santiago's recollection of events.  "[D]efense counsel [must be] permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, [could] appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 318 (1974).

**3.     The State Court Denied Lucas's Right to Present a Defense By Excluding Expert Testimony as to Santiago's Ability to Remember the Events to Which She Testified**

34.     The judge precluded both the prosecution and the defense experts from specifically testifying as to Jodie Santiago's ability to remember the events to which she testified.  (48 RT 9067-77; *see also* 239 Pretrial 24587-99 (denial of Motion for Psychiatric & Neurological Testing of Santiago).)  This ruling was based primarily on Evidence Code § 352 and the judge's strong desire not to allow the trial to become a "battle of the experts."  (48 RT 9067; 54 RT 10058.)

35.     However, contesting Santiago's memory of events was the heart of the defense.  Indeed, the primary factual issue for the jury to resolve in Santiago's case was whether she accurately remembered her attacker's face, and no other evidence presented directly addressed the key question of the status of her memory.  Therefore,

197

expert testimony concerning Santiago's ability to remember was material and relevant evidence which should not have been excluded.

### 4. The State Court's Denied Lucas's Right to Present a Defense by Excluding Evidence as to the Importance of Testing in Evaluating Santiago's Ability to Remember

36. The state court's rulings put Lucas's defense in an untenable position regarding Jodie Santiago's ability to identify Lucas and his residence.  On the one hand, the judge precluded the defense from providing its expert, Dr. Zigelbaum, with the foundational facts necessary to evaluate Santiago's ability to remember in light of her psychiatric (PTSD) and neurological impairments.  (54 RT 10064-65; 55 RT 10271-73.)  On the other hand, the judge refused to allow the defense to explain to the jury why its expert did not conduct such testing.  (54 RT 10066-68.)  Moreover, the court specifically instructed the jury to consider the foundation of an expert's opinion in deciding the weight to be given that testimony.  (64 CT 14303-05.)  The failure of Dr. Zigelbaum to test and interview Santiago was likely to be viewed by the jury as a serious deficiency in the defense case.  Thus, the cumulative impact of the judge's whipsaw ruling was to undermine the credibility and probative value of a crucial defense expert.  These rulings violated Lucas's federal constitutional right to present a defense which is predicated upon the rights to a fair trial by jury, due process, confrontation and compulsory process.

### G. These Errors, Taken Individually or Cumulatively, Were Not Harmless

37. Santiago's identification of Lucas and his residence were obviously prejudicial as to the Santiago kidnapping and attempted murder counts.  Santiago's identification of Lucas was the key evidence upon which the prosecution relied to argue that Lucas was the person who kidnapped and assaulted Santiago.  Both sides extensively discussed Santiago's eyewitness identification testimony in their opening statements and final arguments to the jury (1 RT 42-44, 103-108; 62 RT 11792-99; 64 RT 12084, 12113-14, 12124, 12128-29), thereby making it more likely that the jury

considered this information significant.  *See Gonzalez v. Wong*, 667 F.3d 965, 986 (9th Cir. 2011) (stating that a prosecutor's emphasis on a topic during his summations can be viewed as an indication of its significance).  Therefore, the impact of these errors, alone or in combination, were prejudicial and cannot be considered harmless.

38.    The exclusion of Lucas's experts at trial was particularly harmful. Because the defense was not permitted to challenge the jurors' likely misconceptions, they were free to rely on Santiago's unreliable identification to conclude that Lucas was her attacker.  This improperly denied the jury the opportunity to weigh the credibility of the prosecution's witnesses, thereby giving the prosecution evidence a false aura of reliability.  *White*, 502 U.S. at 363-64 (verdict reliability is required by the Due Process clause); *Donnelly*, 416 U.S. at 646 (same); *Franklin v. Henry*, 122 F.3d 1270, 1273 (9th Cir. 1997) (error in excluding a statement relating to the credibility of a child witness was of constitutional magnitude based on *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986)).  Denying Lucas's ability to defend against this evidence had a substantial and injurious effect on the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 627, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

39.    Moreover, even if the errors were not prejudicial as to guilt, they were prejudicial, individually and cumulatively, as to penalty because they undermined the mitigating theory of lingering doubt.  Like the guilt determination, the penalty trial was closely balanced and the error was substantial.  Certainly, erroneously allowing the jury to hear unreliable eyewitness testimony, thereby undermining lingering doubt as to Lucas's guilt, was a "substantial error" under *Brecht*.

(15cv1224)

**CLAIM 5:  LUCAS'S RIGHTS TO DUE PROCESS AND CONFRONTATION WERE DENIED BY THE STATE COURT'S EXCLUSION OF IMPEACHMENT EVIDENCE AGAINST THE HOMICIDE DETECTIVES IN THE SANTIAGO CASE (AOB 3.7.1)**

**A.     Relevant Law**

1.     Criminal defendants are constitutionally assured "a meaningful opportunity to present a complete defense," a fundamental right which is a key component of the Due Process, Compulsory Process, and Trial by Jury Clauses of the Sixth and Fourteenth Amendments.  *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Cudjo v. Ayers*, 698 F.3d 752, 766 (9th Cir. 2012) (discussing and relying upon *Chambers*, 410 U.S. at 291, 297).  "A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness."  *Olden v. Kentucky*, 488 U.S. at 231 (internal citations and quotations omitted).  Similarly, a court violates a defendant's right to confront the witnesses against him when cross-examination or presentation of evidence are limited in a manner that precludes an entire line of relevant inquiry (for example, impeachment of a witness).  *See United States v. Nixon*, 418 U.S. 683, (1974).

**B.     Relevant Facts**

2.     The central defense theory in the Santiago case was that Santiago's memory impairment, coupled with suggestive identification procedures orchestrated by SDSO homicide detectives Fullmer, Henderson, Fisher, and Hartman, produced an inaccurate and unreliable identification of both Lucas and his residence.  (*See* Claim

4.)[88]  There were substantial factual disputes concerning what these detectives did and did not do before, during and after Santiago's identifications.  Therefore, the defense sought to introduce evidence that, in another case, *People v. Cavanaugh*,[89] Fullmer and Henderson gave untruthful and/or misleading testimony.  In *Cavanaugh*,[90] the defendant challenged the legality of her taped confession as well as the seizure of a tape recording of the actual killing that was secretly made by a tape recorder in Cavanaugh's purse.  Cavanaugh contended, *inter alia*, that Henderson erroneously continued to converse with her about the case after she had invoked her right to counsel.  She also contended that Fullmer and Henderson gave untruthful and/or misleading testimony concerning their conduct during the investigation.

3.    Following a suppression hearing, the *Cavanaugh* court suppressed both the confession and the tape recording of the slaying, finding that the confession was illegally obtained in violation of *Miranda*[91], and the tape recording was inadmissible because it was seized without a warrant.  (46 CT 10064.)  The court found that Fullmer and Henderson committed serious misconduct in the performance of their official duties during the investigation of the *Cavanaugh* case, and engaged in misconduct both during the investigation and later when they testified about their actions in the case.  (45 CT 9915-41; *see also* 85 Pretrial 4950-51 (Lucas's trial judge states that "serious

---

[88]  The credibility of these detectives was also an important question with regard to:  (1) The good or bad faith of the detectives regarding destruction of evidence (*see* Claim 13,); (2) the question of whether Lucas was targeted as a suspect before December 11, 1984; and (3) the validity of Lucas's arrest and search-and-seizures of his property.  (11 CT 2277-2426.)

[89]  *People v. Evanna Marie Cavanaugh*, San Diego Superior Court Case No. CRN 10868.  (45 CT 9914.)

[90]  Except where otherwise noted, all factual references in this claim refer to Court's In Limine Exhibit 1, which includes the *Cavanaugh* case materials.

[91]  Detectives Henderson and Fullmer interrogated Lucas after his arrest.  (45 CT 9911-12.)  Even though Lucas invoked his right to remain silent or to have counsel present at least 20 times during the interrogation, Henderson and Fullmer ignored his requests.  (45 CT 9911-12.)  Ultimately, the trial court granted Lucas's motion to suppress on the grounds that his *Miranda* rights were violated.  (21 Pretrial 2897.)

201

(15cv1224)

suspicion" is cast on the detectives' behavior in the *Cavanaugh* case).)  To reach this latter conclusion, the *Cavanaugh* court necessarily found that Detective Fullmer lied about the circumstances under which the tape recorder was seized.  (45 CT 9929.)  The *Cavanaugh* court also faulted the detectives for failing to take accurate and detailed notes of their homicide investigation, declaring that there was "no excuse" for them failing to properly document their activities in such a serious case.  (45 CT 9929-30.)

4.      Because the credibility of Fullmer and Henderson were key issues in Lucas's defense to the Santiago charges, trial counsel requested permission to utilize the *Cavanaugh* evidence and findings both during in limine litigation challenging the Santiago identifications and as impeachment evidence at trial.  Evidence of their misconduct was probative because it demonstrated the detectives' character traits and/or habits of dishonesty, disrespect of a suspect's constitutional rights, and a willingness to lie or mislead under oath in order to help convict criminal defendants. After reviewing Fullmer's and Henderson's Internal Affairs records (Court's In Limine Ex. 1) and the *Cavanaugh* transcripts, the court ruled that the specific evidence of misconduct in *Cavanaugh* should be excluded under Evidence Code § 352 because the homicide detectives were merely "tangential witnesses."  (238 Pretrial 24496.)  The judge also concluded that Santiago's testimony was otherwise corroborated and the *Cavanaugh* evidence would "take probably weeks" and thus require undue consumption of time.  (238 Pretrial 24494-98.)  These rulings were in error.

5.      In *Cavanaugh*, Fullmer and Henderson were accused of committing perjury and other acts of professional misconduct in order to obtain the conviction of the suspect.  They were also faulted for failing to keep necessary and adequate records of their investigation.  The detectives similarly broke the rules in this case in order to convict Lucas.  (*See* Claim 4.)  Accordingly, *Cavanaugh* was relevant to the present case because it provided crucial impeachment evidence against two of the State's key witnesses in the Santiago, Swanke, and Strang/Garcia prosecutions.

202

(15cv1224)

6.      However, the trial judge excluded the Cavanaugh evidence based on its erroneous determinations that the homicide detectives were merely "tangential" witnesses, and that Santiago's identification had "enormous" corroboration from sources other than the detectives' testimony.  (238 Pretrial 24496-98; 111 CT 24496-97.)  Both of these findings are belied by the record.  Fullmer and Henderson were key players in the Santiago investigation, and their trial testimony was crucial to establishing the alleged validity of Santiago's identifications.  Moreover, Lucas's defense centered on the unreliability of those identifications and the many opportunities that Fullmer and Henderson had to influence the "reconstruction" of her recollection of the attack and her attacker.  (*See* Section V and Claim 4.)  Hence, the evidence was highly probative, and the court should have considered the *Cavanaugh* evidence during her in limine rulings and also permitted defense counsel to impeach the detectives with that evidence at trial.

7.      Additionally, the court's assumption that the corroboration all occurred before Lucas became a suspect is itself dependent on the credibility of the detectives.  The detectives consistently maintained that they could not have improperly influenced Santiago prior to December 1984 because they had no suspect prior to that time.  However, other witnesses testified that Lucas was a suspect in Strang/Fisher as early as October 26, 1984.  (11 CT 2308-09.)  Furthermore, according to these witnesses, the detectives said they had a suspect under surveillance in Santiago for several months.  (11 CT 2309.)  Thus, it is only upon the questionable word of Fullmer and Henderson that it can be concluded that Lucas was not a suspect before December 1984.  Additionally, while some of Santiago's memories are generally consistent with Lucas, other parts were specifically inconsistent with him, including, *inter alia*, the license plate, the lack of computerized voice and louvers on the car, the failure to mention the attacker's distinctive bulging eyes for five months, and the failure to identify Lucas's house until the fourth drive by.  (*See* Claim 4.)  In sum, the court engaged in improper

(15cv1224)

bootstrapping by assuming the detectives were credible in order to exclude evidence that they were not credible.

8.     Finally, the court was incorrect when it assumed that it would "probably take weeks" to put on the evidence.  (238 Pretrial 24497.)  This assumption was a gross exaggeration.  First, the entire *Cavanaugh* case did not take weeks, and defense counsel was seeking only to introduce evidence relating to the *Miranda* issue—something that would have taken hours, not weeks, to present.  Accordingly, the judge abused her discretion by excluding the evidence because her "undue consumption of time" finding was based on a grossly erroneous assessment of how much time would be involved.

9.     Lucas's Sixth Amendment right to confront Fullmer and Henderson was violated because the trial judge arbitrarily and unreasonably limited their cross-examinations in a manner that precludes an entire line of relevant inquiry—namely, impeachment of their credibility.  *See Nixon*, 418 U.S. at 709.  The jury was entitled to hear (and Lucas was entitled to present) evidence which "expose[d] to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness."  *Olden*, 488 U.S. at 231.  The evidence showed Fullmer and Henderson's inclination to ignore the law and to testify falsely and misleadingly in order to obtain a conviction.  Such evidence could clearly have led one or more jurors to distrust and discount their testimony which, in turn, would likely have left at least one juror unable to confidently rely upon Santiago's identifications of Lucas and Lucas's home.  Without that identification testimony to rely upon, the jurors would not have been able to convict Lucas as the person who kidnapped and assaulted Santiago, and hence, the exclusion of the Cavanaugh evidence was clearly prejudicial as to the Santiago counts.  Even if the error was not sufficiently prejudicial to require that the guilty verdict be vacated, it had a substantial and injurious effect on his penalty trial.  *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993).

**CLAIM 6:  THE JUDGE UNDERMINED THE DEFENSE THEORY OF THIRD PARTY GUILT BY EXCLUDING EVIDENCE ABOUT THE SUSPICIOUS ACTIVITIES OF ANNE SWANKE'S FORMER BOYFRIEND (AOB 4.6.1)**

**A.     Relevant Law**

1.     Due process includes a criminal defendant's right to "a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal quotations omitted); *Chambers v. Mississippi*, 410 U.S. 284 (1973).  State court evidentiary rulings violate this right if they "infring[e] upon a weighty interest of the accused" or are "arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation and internal quotations omitted); *Cudjo v. Ayers*, 698 F.3d 752, 766 (9th Cir. 2012) (discussing and relying upon *Chambers*, 410 U.S. at 291, 297).  Where the excluded testimony bears "persuasive assurances of trustworthiness" and "was critical to [the defendant's] defense," the state court's exclusion violates due process. *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (California's application of its evidentiary rules to exclude hearsay testimony denied defendant her constitutional right to present a defense).

2.     In this case, the state court denied Lucas's right to present a defense by excluding relevant third party evidence which raised a reasonable doubt as to Lucas's guilt.  It is well established that a defendant may rely on the theory that a third party committed the charged offense, also known as "third party culpability evidence." *People v. Hall*, 41 Cal. 3d 826, 833 (1986).  In order for evidence of another suspect to be admissible, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.  Motive or opportunity is not enough." *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999) (citing *Hall*, 41 Cal. 3d at 833) (internal quotations marked omitted).  However, "the third-party evidence need not show substantial proof of a probability that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." *Hall*, 41 Cal. 3d at 833.

(15cv1224)

Thus, the proper inquiry for a court to make with regard to this kind of evidence is first to consider "whether this evidence could raise a reasonable doubt as to defendant's guilt." *Id.* Then, the court should "simply treat third-party culpability evidence like any other evidence:  if relevant it is admissible unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion." *Id.* Here, the trial court violated these key principles by refusing to admit relevant, probative, and clarifying evidence which supported already admitted evidence that someone else was responsible for Swanke's murder.

**B.     Relevant Facts**

3.     The defense theory in Swanke was third party guilt based on the unexplained presence of pubic hairs on Swanke which did not match Lucas, Swanke, or her boyfriend, Greg Oberle.

4.     During the autopsy, SDSO Criminalist Charles Merritt performed a pubic hair combing on Swanke (Def. Trial Ex. 729) and discovered a dark brown hair that did not appear to come from Swanke, who had reddish hair.  (56 RT 10725-26.) Microscopic analysis revealed that this brown hair was visually and microscopically different from the hairs of Swanke and Lucas.  (56 RT 10726, 10731-32.)  Merritt discovered and collected another pubic hair found on Swanke's left hip (Def. Trial Ex. 727), and comparative hair analysis revealed that this pubic hair was visually and microscopically different from Swanke and Lucas as well.  (56 RT 10720, 10722-26.) Inexplicably, Merritt failed to perform a comparison between these suspect pubic hairs and the pubic hair standard the police had obtained from Oberle.  (56 RT 10729.)

5.     However, hair comparison expert John Simms conducted a comparative hair analysis and determined that the suspect pubic hair found on Swanke's hip was inconsistent with the pubic hair standards of Swanke, Lucas, and Oberle.  (56 RT 10738-45.)  Simms also concluded that the foreign hair found in Swanke's pubic combings was "markedly different" from the hair of Swanke, Lucas, and Oberle.  (56 RT 10738, 10745.)

(15cv1224)

6.     Swanke's body was found nude from the waist down, and tests on the genital swabs yielded a presumptive positive for the presence of acid phosphatase, which is a possible indication of the presence of seminal fluid.[92]  In light of this and other evidence about the crime, the court properly recognized that the presence of a foreign pubic hair on Swanke's body which did not match Lucas, Swanke, or her known sexual partner, Oberle, was highly probative and raised a reasonable doubt as to Lucas's guilt:

> There is a piece of evidence that is very strange on her the night that she's killed that doesn't link up to David Lucas and doesn't link up to the other obvious person, which would be Greg Oberle [24 RT 4449]. . . . I think this is evidence that has to come in.  I don't think there is any question.

(24 RT 4451.)  The court permitted testimony about the pubic hair, as well as testimony from Oberle that Oberle and Swanke did not have sex or any genital contact the night Swanke was killed.  (24 RT 4451-54.)

7.     To further support Lucas's third party guilt defense and raise the specter of reasonable doubt, the defense sought to present evidence (through Anne Swanke's father, Dr. John Swanke) regarding the fraught relationship between Anne and her former boyfriend, Jim Capasso.  The defense made the following offer of proof:

8.     Dr. Swanke told FBI investigators that prior to his daughter's disappearance, Capasso was making constant and unwanted attempts to contact her.  (24 RT 4436.)  The contacts disturbed Swanke and she expressed that she was afraid of Capasso.  (24 RT 4436.)  At 7:00 a.m. on November 21, 1984 (the morning after Swanke's disappearance), Capasso arrived unannounced at the Swanke family's home.  (24 RT 4436.)  Capasso was wearing dark sunglasses and appeared very "nervous" and

---

[92]  There was an insufficient amount of the acid phosphatase to confirm that semen was present.  (56 RT 10730.)

(15cv1224)

"fidgety." (24 RT 4436.)  He then inexplicably appeared at the Swanke house again at 7:00 p.m. that evening.  His demeanor was very unusual and he would not "look anyone in the eye." (24 RT 4436.)  Additionally, Dr. Swanke revealed that Anne Swanke was receiving disturbing crank phone calls at the time of the murder.  (24 RT 4436, 4446.)

9. The court ruled that any evidence about Capasso would be "irrelevant" as well as "misleading and confusing." (24 RT 4436-37.)  The court also found that any relevancy that may attach to the prank phone calls was "substantially outweighed by the potential of confusion to the jury and misleading the jury." (24 RT 4468.)  This ruling infringed upon Lucas's "weighty interest" in presenting evidence which supported reasonable doubt to his guilt and met the "fundamental standards of relevancy . . . [requiring] the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged." *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996).

10. Capasso was repeatedly harassing Swanke, Swanke expressed her fear of him, and he showed up, uninvited and acting furtively, to her parents' home twice the day after her murder.  Additionally, Swanke was being harassed by prank calls in the days leading up to her death.  Such information supported Lucas's reasonable doubt defense and was relevant circumstantial evidence that Capasso may have been the perpetrator of the Swanke homicide. *Spivey*, 194 F.3d at 978.  The evidence which was wrongfully excluded by the court also served to clarify previously admitted evidence of foreign pubic hairs on Swanke's body.  As the Supreme Court has explained, "[o]ur cases establish, at a minimum, that criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).  In this case, the doubt raised by the proposed evidence was not merely speculative—indeed, it was supported by forensic evidence tending to show that someone else other than Lucas may have committed the homicide (and probable sexual assault) of Anne Swanke.  Contrary to the court's ruling, there was no

risk of confusion for the jury because the court had already approved clarifying evidence about the suspect pubic hairs (i.e., Oberle's testimony about his sexual contact with Swanke the night she was killed).

11.     The state court's exclusion of this relevant and probative evidence improperly infringed upon Lucas's constitutionally protected interest in presenting strong evidence supporting reasonable doubt. *Holmes*, 547 U.S. at 324. Such exclusion was not harmless. Even though admissibility is generally a matter of state law, *Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991), habeas relief is warranted where the exclusion of evidence resulted in a denial of due process. *Id.* at 68.

12.     In the Swanke case, the jury was required to balance conflicting evidence. For example, the prosecution sought to connect Lucas to the crime through serological evidence, the scratches on Lucas's face, and Leyva's testimony about the abduction. However, none of this evidence was conclusive. In contrast, the presence of foreign pubic hairs on Swanke's body which did not belong to Lucas, Oberle, or Swanke herself tended to exclude Lucas as the attacker. Hence, the erroneous exclusion of the third party guilt evidence was prejudicial. There was no likelihood that the evidence about Capasso or the prank phone calls would have been misleading or confusing to the jury, especially when other third party culpability evidence had already been presented to them. Denying the jury the opportunity to hear relevant evidence raising reasonable doubt had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993); *see also Crane*, 476 U.S. at 690-91.

13.     Because the Swanke charge was used to convict in the Santiago and Jacobs cases, those convictions, as well as the death judgment, should also be reversed. Moreover, even if the error was not sufficiently prejudicial to require reversal of the guilt judgment, it was prejudicial, individually and cumulatively, at the closely balanced penalty trial. Any substantial error at the guilt trial should be considered prejudicial as to penalty because the primary defense mitigating theory at penalty was lingering doubt.

(15cv1224)

**CLAIM 7:  THE ADMISSIBILITY OF THE EXPERT SEROLOGICAL EVIDENCE IN SWANKE VIOLATED LUCAS'S RIGHT TO DUE PROCESS, RIGHT TO COUNSEL, AND RIGHT TO CONFRONTATION (AOB 4.3, 4.4, 4.5)**

**A.    Introduction**

1.    Lucas's convictions and sentence violate the Sixth, Eighth, and Fourteenth Amendments because the trial court made erroneous rulings pursuant to *People v. Kelly*, 17 Cal. 3d 24(1976) and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) and admitted unreliable serological evidence implicating Lucas.  *Ford v. Wainwright*, 477 U.S. 399 (1986); *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Ballard v. Estelle*, 937 F.2d 453 (9th Cir. 1991).  Additionally, Lucas suffered prejudicial error in his capital trial because the serological evidence introduced against him should have been precluded by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because the methodology used by the prosecution's experts was not scientifically valid.

2.    In this case, the prosecution sought to present expert testimony and blood analysis evidence regarding the material found under Anne Swanke's fingernails and the stain found on the passenger side sheepskin seat cover of Lucas's pickup truck. Two different labs conducted the blood analysis on the Swanke evidence:  The San Diego Sheriff's Office lab (hereinafter, "SDSO") did ABO grouping for blood type (e.g, A, B, O, etc.) and electrophoresis for Group I and II enzymes, and Brian Wraxall's Serological Research Institute (hereinafter, "SERI") did ABO blood typing, electrophoresis for Group I, II, and III enzymes, and agglutination for the genetic markers Gm and Km.[93]  According to the experts' testing results, Lucas's blood was consistent with the blood found under Swanke's fingernails, with 1 in 69 Caucasian persons having blood with those characteristics.  (31 RT 5743.)  The experts also

---

[93]  Gm and Km are types of genetic markers revealed by the electrophoretic testing process that are commonly used to identify and match forensic samples.

(15cv1224)

1    opined that Swanke's blood was consistent with the stain found on the sheepskin seat

2    cover, with 1 in 4,794 Caucasian persons having blood characteristics consistent with

3    that stain.  (31 RT 5735.)

4         3.    The defense made a *Kelly/Frye* motion to exclude the prosecution's

5    serological evidence.  (48 CT 10446-61.)  The defense argued that the prosecution had

6    failed to meet its burden of demonstrating that the scientific evidence met all three

7    prongs required by *Kelly*, namely:  (1) the reliability of the analysis or method used; (2)

8    the expert witness is properly qualified as an expert in the use of that method; and (3)

9    the correct method was used in the particular case.  *Kelly*, 17 Cal. 3d at 30.

10        4.    After a lengthy hearing, the trial court ruled that ABO typing by

11   absorption-elution on aged blood evidence is not subject to *Kelly/Frye* and "the

12   correctness of the scientific procedures employed is therefore a jury question."  (62 CT

13   13842.)  With regard to the electrophoresis testing, the court first determined that

14   electrophoresis analysis of blood is accepted by a consensus of the scientific

15   community and satisfies Prong 1 of *Kelly*.  (62 CT 13823-84.)  The court then ruled that

16   the BAS multisystem (the specific method of electrophoresis testing used by

17   prosecution expert Brian Wraxall) is also accepted by a consensus of the scientific

18   community and satisfies Prong 1 of *Kelly*.  (62 CT 13825.)  Although there were

19   problems with some of the particular electrophoretic procedures used in the Lucas case

20   (*Kelly* Prong 3), they were cured by only allowing into evidence results which were

21   photographed.  (62 CT 13832-41.)  Finally, the court reversed its previous decision

22   excluding the Gm/Km evidence under Prong 1 of *Kelly* (162 Pretrial 15437-38) and

23   instead found that the absorption-inhibition tests for the genetic markers Gm and Km

24   satisfied both Prong 1 and Prong 3 of *Kelly*.  (62 CT 13845-46.)

25   **B.    Relevant Law**

26        5.    As a general matter, it is the duty of the trial judge to ensure that scientific

27   evidence is not only relevant, but reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S.

28   137, 157 (1999); *GE v. Joiner*, 522 U.S. 136, 142 (1997).  Thus, a court is not required

to admit scientific evidence when "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146.  This standard holds particularly true in capital cases, where the Supreme Court "has demanded that factfinding procedures aspire to a heightened standard of reliability." *Ford*, 477 U.S. at 411.  The evidentiary rulings in a capital trial therefore gain added constitutional significance.  Under the Eighth and the Fourteenth Amendments, state evidentiary rules "may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302.  Even "mere" state evidentiary errors can violate federal due process if they render the fact-finding process fundamentally unfair. *Ballard*, 937 F.2d at 456.

6.      In this case, Lucas asserts that the state court violated his right to due process and rendered his trial fundamentally unfair by making erroneous rulings pursuant to *Kelly* Prong 1 and *Kelly* Prong 3.  Under Prong 1, admissibility of expert opinion based on "a new scientific technique" requires proof that its technique is "sufficiently established to have gained general acceptance in the field to which it belongs." *Frye*, 293 F.3d at 1014; *Kelly*, 17 Cal. 3d at 30.  General acceptance under *Kelly* means a consensus drawn from a typical cross-section of the relevant, qualified scientific community." *People v. Soto*, 21 Cal. 4th 512, 519 (1999).

7.      Meanwhile, "[t]he *Kelly* third-prong inquiry involves further scrutiny of a methodology or technique that has already passed muster under the central first prong of the *Kelly* test. . . . [Under Prong 3], [t]he issue of the inquiry is whether the procedures utilized in the case at hand complied with that technique, [which] requires that the testifying expert understand the technique and its underlying theory, and be thoroughly familiar with the procedures that were in fact used in the case at bar to implement the technique." *People v. Venegas*, 18 Cal. 4th 47, 81 (1998).  Because electrophoresis methodology inevitably involves subjective interpretation of the results, Prong 3 analysis of electrophoretic testing must focus on the procedure by which matches are called. *Id.* at 79 ("[M]atch criteria which that laboratory applied" are properly considered under Prong 3).

212

## C.   The ABO Testing Evidence Failed To Satisfy Prong 3 of *Kelly*

### 1.   SDSO's ABO Testing

8.   The ABO testing done at the SDSO lab was performed by Charles Merritt. According to his lab notes, Merritt performed both absorption-elution and a confirming Lattes test,[94] but there was absolutely no information regarding which testing protocol, if any, Merritt used.  (149 Pretrial 13981-88; In Limine Exhibit 690.)

9.   In response to Lucas's *Kelly* challenge to SDSO's ABO results, the judge found that *Kelly* Prong 1 was satisfied because of the reliability and "the correctness of the scientific procedures employed" in absorption-elution testing generally.  (62 CT 13842.)  However, even assuming that the judge was correct as to Prong 1 of *Kelly*, the specific procedures actually utilized in this case were subject to *Kelly* scrutiny.  *See Venegas*, 18 Cal. 4th at 81.  As the trial court stated, "'Correct scientific procedures' include both the completion of each step in the protocol for the performance of the particular test, AND every control measure that must be taken by a qualified analyst in a properly equipped laboratory as a check against each source of error in the production AND reporting of a result."  (62 CT 13834 (capitalization in original).)  Hence, the trial court recognized that to satisfy Prong 3 of *Kelly*, the lab must maintain "proper protocols for testing" (62 CT 13834), follow those protocols during testing (167 Pretrial 15956-57; 180 Pretrial 17293, 17361; 189 Pretrial 18052-61), and accurately record the testing protocol in the bench notes and run data.  (212 Pretrial 20553-58; 62 CT 13834.)  Based on these requirements, SDSO's ABO testing did not meet Prong 3 because their lab notes did not state which protocols, if any, were used for the ABO testing.  (In Limine Ex. 690; Def. Trial Ex. 705.)

---

[94]   Absorption-elution testing removes antibodies from cells and serum present in blood samples and is a method of determining the presence of ABO blood group factors.  A Lattes test also tests for ABO antibodies in bloodstains and was used at the time of Lucas's trial as a backup or confirmatory method rather than the primary test.

### 2.    SERI's ABO Testing

10.    SERI's ABO testing was equally problematic because they were based on absorption-elution testing that was not confirmed by any other tests such as the Lattes test.  (112 Pretrial 8346-47; 138 Pretrial 12324-34.)  Because there was no confirmatory testing done on SERI's results, the prosecution failed to meet its burden of proving that SERI's ABO testing procedures complied with the procedures deemed acceptable by a consensus of the scientific community.  To the contrary, several witnesses testified that the consensus in the scientific community is that confirming testing is required.  (167 Pretrial 15943-46; 190 Pretrial 18195-98; 212 Pretrial 20610; 226 Pretrial 22662, 22711.)  While there was evidence that at least one lab did not require Lattes testing at least at the time—namely, Wraxall's lab SERI—there was no substantial evidence of a consensus in favor of SERI's single test procedure.  (231 Pretrial 23622; *but see* 228 Pretrial 23062 (at one time Scotland Yard did not require a confirmatory Lattes test).)

11.    Furthermore, SERI's methodology was problematic because it used a mixed standard when conducting ABO testing.  (231 Pretrial 23631.)  Again, the prosecution failed to prove that such a procedure was acceptable by a consensus in the scientific community.  In fact, numerous experts testified that mixed standards should not be used because they may produce a "false positive."  (119 Pretrial 9415-16; 120 Pretrial 9425-26; 129 Pretrial 11086-93; 149 Pretrial 14025; 172 Pretrial 16648.)  The evidence was decidedly insufficient to establish a consensus in favor of SERI's mixed standard procedure.

### D.    The Electrophoretic Testing Evidence Failed To Satisfy Prong 3 of *Kelly*

### 1.    The SERI Electrophoresis Testing Failed Prong 3 of *Kelly* Because It Reported Matches When the Readers Disagreed

12.    As noted above, an essential aspect of the Prong 3 analysis is the procedure by which matches are called.  *Venegas*, 18 Cal. 4th at 79.  This question is especially crucial with electrophoresis because the calls are not always clear cut and the

(15cv1224)

methodology is inevitably subjective.  Because of this subjectivity, double-reader agreement was seen as a necessary element of electrophoretic testing because it limits the opportunity for reader bias to affect the call.  (168 Pretrial 16186-91 (double-blind agreement vital to avoid bias).)  As a result, much of the scientific community adopted a requirement of double-blind reading and agreement, wherein the call of one reader is not reported unless a second reader, without knowing the call of the first, reads the plate and independently reaches a conclusion which agrees with the first reader.  (141 Pretrial 12986; 164 Pretrial 15570-71A; 171 Pretrial 16474.)

13.    As noted above, the vast majority of the experts at the hearing testified that without agreement between both readers, the result should not be reported.  But in Lucas's case, the SERI procedure deviated from the community standard because it did not require both readers to agree before reporting a call.  (117 Pretrial 9030-31; 153 Pretrial 14453.)  In fact, if Brian Wraxall disagreed with the other reader's call, Wraxall alone could overrule that reader.  (116 Pretrial 8904.)  This meant that the other SERI reader's call was not really part of the calling process except to the extent that Wraxall concurred with the call.  Hence, there was no check on the possibility of subjective misjudgment or bias by Wraxall.  *Joiner*, 522 U.S. at 146 (trial judge should not be required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *see also Kumho*, 526 U.S. at 157.  Accordingly, the prosecution failed to meet its burden as to Prong 3 of *Kelly* and SERI's electrophoretic results should have been excluded.

### 2.    SERI's Failure To Comply With the Double-Reader Agreement Requirement Was Not Excused By Photographing the Results

14.    Although the trial court seemed to acknowledge that there were some issues with the lack of double-reader concurrence at SERI, the court ultimately concluded that the lack of double-reader concurrence did not violate Prong 3 of *Kelly* where a photograph of the test results was available.  (62 CT 13837.)  In support of this finding, the court relied on the testimony of Dr. Neville Colman, Dr. David Sammons,

215

1   and Cecil Hider.  (62 CT 13837-38.)  However, none of the three witnesses upon which

2   the court relied provided substantial evidence upon which to reasonably conclude that

3   the scientific community considered photography to be an adequate substitute for the

4   double-reader agreement requirement.

5           15.     For example, Neville Colman, director of the V.A. Blood Bank and

6   Hematology Laboratory in New York, testified that there must be double agreement on

7   the call (between the technician and supervisor) and documentation by a photo and/or

8   the original plate.  (167 Pretrial 15943.)  While Colman testified that photographs could

9   accurately record results (167 Pretrial 16015-18), he never suggested that a photograph

10  could substitute for actual reading of the plate.  Similarly, Dr. David Sammons testified

11  that the results should be preserved by saving the gel or taking a photograph, and that

12  the double-reader agreement was required.  (186 Pretrial 17828-29; 189 Pretrial 18093-

13  94.)  He never stated that photographs could completely supplant the double-reading

14  requirement.  Finally, Cecil Hider provided no testimony or evidence that a consensus

15  of the scientific community accepted photographs as a substitute for double-reader

16  agreement.  Moreover, other witnesses not mentioned by the court further suggested

17  that double-reader agreement was still a requirement even if photography was used.

18  (*See, e.g.,* 141 Pretrial 12986; 156 Pretrial 14752 (FBI protocol still required double

19  agreement even though photos were useful); 165 Pretrial 15570-71A (German labs

20  required both photography and double agreement).)

21          16.     Additionally, even if there was scientific acceptance in theory that

22  photographs were an adequate substitute for double-reader agreement, the procedures

23  for the taking of such photographs would also have to comply with Prong 3.  The

24  expert testimony identified several prerequisites for accurate and reliable

25  photographing of electrophoretic testing results.  First, the correct equipment must be

26  used (173 Pretrial 16740); second, the timing of the photos is critical (173 Pretrial

27  16721); and third, special photographic procedures must be utilized to obtain reliable

28  and accurate photos of dark or weak bands.  (173 Pretrial 16735-38.)

(15cv1224)

17.     In this case, the prosecution provided no substantial evidence that SERI's photography procedures were scientifically accepted.  To the contrary, the circumstances strongly suggest that SERI's photographic procedures were not accurate and reliable.  For example, there was no evidence that the required equipment was utilized.  The only specific evidence in this regard indicated that SERI used a Polaroid, even though it had a 35 mm.  (165 Pretrial 15660.)  As to the timing of the photos, one of Wraxall's readers testified that photos were taken when the call was made.  (163 Pretrial 15495.)  However, on at least one occasion the photo was taken much later.  Finally, the record failed to establish that any special procedures were utilized by SERI in photographing dark or weak bands.  In fact, a number of Wraxall's photos were inadequate,[95] which strongly suggested that his procedures were also inadequate.

18.     In sum, there was no substantial evidence that SERI's photographic techniques comported with procedures accepted by a consensus of the scientific community.  For this reason, as well, the SERI electrophoretic testing failed to comply with Prong 3 of *Kelly* and should have been excluded.

### 3.     Failure of SERI to Follow Its Own Electrophoresis Protocol Violated Prong 3

19.     The trial court excused SERI's failure to strictly follow its own protocols because it was not shown that the procedures actually followed were outside permissible parameters of variation.  (147 Pretrial 13826.)  However, the evidence does not demonstrate a scientific consensus that deviating from the protocol is an acceptable scientific procedure.  To the contrary, witnesses such as Dr. Sammons testified that deviation from the protocol is improper.  (189 Pretrial 18052-61; *see also* 180 Pretrial 17281-82, 17293, 17301; 186 Pretrial 17827.)  Hence, because protocol deviation was

---

[95] *See, e.g.*, 255 Pretrial 22621-24; 232 Pretrial 23688-720; 227 Pretrial 23812-22.

217

(15cv1224)

1   not shown to be an acceptable procedure, Prong 3 of *Kelly* was not satisfied, even if the
2   procedures actually used may have been reliable.

3       **4.      The Legal and Scientific Community Has Rejected Expert**
4               **Conclusions Which Are Based On The Subjective Experience Of**
5               **The Expert Rather Than Objective Standards and Criteria**

6       20.     The legal and scientific community has rejected, as unreliable,
7   standardless identification techniques which rely primarily upon the "expertise" of the
8   examiner to decide whether or not to call a match.  *Venegas*, 18 Cal. 4th at 79; *see also*
9   *Joiner*, 522 U.S. at 146.  Recent cases emphasize that quantifiable "match criteria" are
10  an essential prerequisite to reliability and proof of Prong 3 under *Kelly*.  *Id*

11      21.     In the present case, unreliable subjectivity and examiner discretion were
12  indisputably established.  Virtually every witness agreed that the calling process
13  involved subjective discretion by the reader.  (*See e.g.,* 116 Pretrial 8894-8904; 124
14  Pretrial 10123-24.)  This is because each analyst sets up his or her own criteria.  (121
15  Pretrial 9646, 9663; 141 Pretrial 12972; 157 Pretrial 14926-27.)  In particular, when the
16  band was faint or weak, the calls varied from reader to reader and from expert to expert
17  without any quantifiable criteria to determine which call was the correct one.  (157
18  Pretrial 14926-27; *see also* 165 Pretrial 15742-48; 166 Pretrial 15934 (different readers
19  get different results).)[96]  Indeed, this subjectivity found its way into the jury room
20  where the jurors were required to decide between different subjective opinions about
21  the same electrophoretic evidence by two different experts.  Of course, it is the jury's
22  role to decide between conflicting experts when the evidence presents such a conflict;
23  but here, there were no objectively quantifiable criteria by which the jury could

24

25
    _____

26      [96]  For example, in the GC system (a Group III system) Amber Fisher's blood
    was tested in four different runs with six different tests.  On the first run on December
27  31, 1984, the result was a 2-1.  However, a run conducted on January 21, 1985
    indicated a result of 2.  In theory, a person cannot be a type 2-1 and type 2 in the
28  genetic marker system involving GC.  (124 Pretrial 10173-78.)

                                    218

evaluate which expert to believe. Both experts analyzed the same results, yet each expert gave a different opinion which, in the final analysis, was based primarily on that expert's experience. Hence, the jury resolution of this conflict was necessarily speculative and unreliable since the jury could do little more than guess which expert was correct.

### 5. Subjective Expert Opinions Should Be Excluded Under *Kelly*

22. *People v. Kelly*, should not be read so as to allow the admission of subjective, unreliable scientific evidence. Any scientific method that is so subjective as to leave the jury guessing is inadmissible as a matter of state and federal law. *See Joiner*, 522 U.S. at 146.

## E. The Wraxall Gm and Km Electrophoresis Results Should Have Been Excluded Under *Kelly/Frye*

23. The trial court originally found that the prosecution failed to meet its *Kelly* Prong 1 burden as to the admissibility of Wraxall's testing method for the markers Gm and Km. (162 Pretrial 15437-38.) However, the judge allowed the prosecution to reopen over defense objection and present the testimony of Moses Schanfield. Schanfield testified that he used an agglutination process to test for Gm and Km. (249 Pretrial 25544-60.) He required double-reading and photography of the result. (249 Pretrial 25558-59, 25570-71.) According to Schanfield, other labs were using Schanfield's methodology. (249 Pretrial 25585-86; 144 Pretrial 13418; 151 Pretrial 14245.) However, only one other lab—not Schanfield's—was using SERI's Gm/Km methodology. (249 Pretrial 25586-88.)[97]

24. In sum, Schanfield's testimony was clearly insufficient to meet the prosecution's Prong 1 burden. To the contrary, according to Schanfield, SERI's methodology was *not* used by the vast majority of labs. Furthermore, SERI's method

---

[97] The one lab which was using Wraxall's method was switching to Schanfield's. (249 Pretrial 25586-87.)

219

(15cv1224)

was deficient because the control could not be read and because the agglutination came apart and could not be reconstructed.  (249 Pretrial 25595, 25602.)  Nevertheless, Judge Hammes expressly declined to apply the required *Kelly* Prong 3 test to this evidence, finding that Schanfield "was aware of Mr. Wraxall's variation on the technique and knew of no reason why it should not be reliable, unless one judged the reliability by the number of other laboratories that used exactly the same variation."  (62 CT 13845.) Yet the number of labs which use the technique—i.e., the general acceptance of the technique in the community—is the very thing that *Kelly/Frye* required the judge to consider.

25.   Another problem with SERI's Gm and Km results was Wraxall's refusal to use unstained controls in his testing of the fingernails, even though that was the widely accepted approach.  (151 Pretrial 14227-29.)  The prosecution failed to establish that such uncontrolled testing is accepted by a consensus of the scientific community. Therefore, Prong 3 of Kelly was not established and the Gm results as to the fingernails should have been excluded.

26.   Finally, Schanfield testified that photographing the Gm/Km results was a part of his standard procedure.  (249 Pretrial 25571-72.)  Yet the trial court concluded that Gm/Km testing without photography was accepted by a consensus of the scientific community because photography was not necessary for ABO agglutination typing.  (62 CT 13845-46.)  This conclusion was not supported by the record because Schanfield was the only expert on Gm/Km who testified on the issue.  Moreover, the court's decision was internally inconsistent because it relied on Schanfield to satisfy Prong 1 of *Kelly*, yet rejected Schanfield to satisfy Prong 3.  There was no evidentiary basis for accepting one part of Schanfield's testimony and not the other, and such an illogical, result-oriented skewing of the evidence was an abuse of discretion.

(15cv1224)

### 1.    The Electrophoresis Evidence Should Have Been Excluded Under the *Daubert/Kumho* Standard[98]

27.    In *Daubert*, the Supreme Court held that expert scientific evidence may not be admitted unless "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts." *Id.* at 593.  Making this determination necessarily involves an assessment of the reliability of the evidence at issue.  *Id.* at 589.  The Court in *Daubert* set forth a non-exclusive list of factors[99] for courts to consider in determining whether expert evidence is reliable.  These factors are: (1) whether the expert's theory or technique can be or has been tested; (2) whether the expert's theory or technique has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) general acceptance in the scientific community.  *Id.* at 593-94.  As the Supreme Court made clear in a later case, *Kumho Tire Co.*, 526 U.S. 137, *Daubert* assigned a gatekeeping function to trial judges to exclude unreliable scientific and non-scientific expert testimony.  *Kumho*, 526 U.S. at 150.  However, the Court emphasized that this is not an exclusive list, and the factors that a court considers must fit the facts of the particular case.

28.    Lucas contends that the electrophoresis evidence introduced against him at trial should have been precluded by *Daubert* and *Kumho* because the methodology used

---

[98]    Although *Kelly/Frye* was the applicable test in use in California at the time of Lucas's trial, the *Daubert* decision came out prior to Lucas's direct appeal and thus should have been considered by the California Supreme Court.  *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) (18 U.S.C. § 2254(d)(1) requires federal habeas courts to measure state-court decisions against United States Supreme Court precedents at the time the state-court renders its decision on the merits).

[99]    While it is now one factor among several, it is clear that the federal courts still consider the "general acceptance test" of *Frye* in determining admissibility of expert testimony.  *See United States v. Hines*, 55 F. Supp. 2d at 65 (Frye standard "still important").

by Wraxall was unreliable and scientifically invalid.[100]  Both *Kelly/Frye* and *Daubert* are concerned about the reliability of expert testimony, and the admission of unreliable testimony not only has state law implications, it is a violation of federal due process. *See Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016).  The Supreme Court has long held that "the introduction of faulty evidence violates a petitioner's due process right to a fundamentally fair trial."  *Id.*; *see also Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991) and *Dowling v. United States*, 493 U.S. 342, 352-53 (1990).

**F.     The Constitutional Rights to Counsel and Confrontation Require the Prosecution To Notify Defense Counsel Before Conducting Blood Testing Which Cannot Be Preserved**

29.     The right to counsel under the Sixth Amendment to the United States Constitution encompasses counsel's assistance whenever necessary to assure a meaningful defense.  *United States v. Wade*, 388 U.S. 218 (1967).  The Sixth Amendment mandates that "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial."  *Id.* at 226; *see also Coleman v. Alabama*, 399 U.S. 1 (1970).  A defendant requires the guiding hand of counsel at every step in the proceedings against him and this constitutional principle is not limited to the presence of counsel at trial.  *Id.* at 7.

30.     The question of whether electrophoretic testing is a "critical stage" to which the right to counsel applies depends on an analysis of "whether potential substantial prejudice to defendant's rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice."  *Coleman*, 399 U.S. at 9; *Escobedo v. Illinois*, 378 U.S. 478, 486, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964).  For example, the

---

[100]  Since the *Daubert/Kumho* test is more liberal in favor of admissibility, any evidence that cannot satisfy *Daubert* also cannot satisfy *Kelly*, *a fortiori*.  *Leahy*, 8 Cal. 4th at 595, 603.

(15cv1224)

Sixth Amendment requires that defense counsel receive notice of any intended live lineup identification process contemplated by the prosecution. *See Gilbert v. California*, 388 U.S. 263 (1967).

The same considerations which require the presence of counsel at a Pretrial lineup also required counsel to be present during the electrophoretic testing in the present case. Due to the nature of the techniques used, the defense could not adequately confront electrophoretic results after the testing has been completed because the initial reading and interpretation of the results was subjective, the gels which showed the testing results were not preserved, and photography was insufficient to fully preserve the testing results. Accordingly, because a defense expert was not present during the testing, the defense could not adequately confront the evidence at the *Kelly* hearing and at trial.

**G.     The Trial Court's Erroneous Rulings on the Swanke Serological Evidence, Taken Individually or Cumulatively, Were Prejudicial and Not Harmless**

31.     The serology evidence, even though of questionable reliability, likely had a substantial impact on the jurors. Although the prosecution presented other circumstantial evidence such as Leyva's observations of a license plate similar to Lucas's at the scene of the kidnapping and the scratches on Lucas's face, this evidence was subject to dispute. For example, Leyva described the vehicles he saw as approximately the same size when, in fact, Lucas's was substantially bigger. And, Lucas gave an explanation for the scratches. (19 RT 3453; 21 RT 3810-19.) Most importantly, the forensic evidence raised a reasonable doubt as to Lucas' guilt because the pubic hairs found on Swanke, and presumably left by the attacker, did not belong to Lucas.

32.     In this context, the serology evidence would likely have been viewed as determinative by the jurors since it provided apparently reliable scientific evidence to counter the expert forensic testimony regarding the pubic hair. "Lay jurors tend to give

223

(15cv1224)

considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials." *Kelly*, 17 Cal. 3d at 31.  Given that the serological evidence tying Lucas to Swanke was the most important component of the prosecution's case against him, the erroneous admission of this evidence had a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 627.  Even if the errors were not prejudicial as to guilt, they were prejudicial, individually and cumulatively, as to penalty because they undermined the mitigating theory of lingering doubt.

**CLAIM 8:  THE DEFENSE DID NOT HAVE A FAIR OPPORTUNITY TO LITIGATE ITS CHALLENGE TO THE COMPOSITION OF LUCAS'S JURY (AOB 1.4.1; SHP VI.K)**

1.     The defense made a preliminary showing of systematic under-representation of Hispanics and young persons (age 18-24) on the panels from which Lucas's jury was drawn.  However, the defense didn't have a fair opportunity to challenge the composition of the jury panels because: (1) the judge refused to order necessary discovery, and (2) the motion was erroneously rejected based on the defense offers of proof, thus improperly foreclosing an evidentiary hearing.  Accordingly, Lucas was denied a jury selected from a fair cross-section of the community, a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Castaneda v. Partida*, 430 U.S. 482 (1977).

**A.     Relevant Law**

2.     The Sixth and Fourteenth Amendments give defendants the right to a petit jury selected from a fair cross section of the community. *Duren v. Missouri*, 439 U.S. 357 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).  Hence, the underrepresentation of Hispanics and young persons from Lucas's jury violated his Sixth Amendment rights.  Moreover, because Lucas was only 18 when he allegedly committed the rape prior conviction, and 24 years old when he allegedly committed the Jacobs murder, the underrepresentation of young persons violated the Equal Protection

(15cv1224)

Clause of the federal constitution.  U.S. Const. amend. XIV; *see also Castaneda*, 430 U.S. at 494.

3.      Further, under *Campbell v. Louisiana*, 523 U.S. 392, 397-98 (1998), Lucas should have third party standing to assert underrepresentation of both Hispanics and young persons as a violation of the Equal Protection Clause.

4.      To establish a prima facie violation of the fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.  *Duren*, 439 U.S. at 364.

5.      The denial of a fair opportunity to litigate the underrepresentation claims through denial of discovery and an evidentiary hearing independently violated the Due Process Clause of the Fourteenth Amendment.  The federal constitution guarantees the defendant a right to "his day in court," *In re Oliver*, 333 U.S. 257, 273 (1948), free from arbitrary adjudicative procedures.  *Truax v. Corrigan*, 257 U.S. 312, 332 (1921).

6.      Moreover, the Sixth and Fourteenth Amendments guarantee the defense the rights to confrontation, compulsory process and due process.  *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  These fundamental constitutional rights apply to motion hearings as well as to the jury trial itself.  *See Holt v. Virginia*, 381 U.S. 131, 136 (1965).  The right to present evidence is a linchpin of the due process right to a fair hearing.  *See Reece v. Georgia*, 350 U.S. 85, 89 (1955).

**B.      The State Court Improperly Denied Discovery**

**1.      Necessity For Additional Discovery**

7.      In 1985, the defense received discovery of master juror lists, juror summonses, written excuses with identifying information for those persons and identifying information for persons who did not appear.  However, this information was limited to a period of three months: July 1985 and December 1985 - January 1986.

225

(15cv1224)

Because a new master jury list was compiled and utilized for most of 1986, and because it was necessary to have the information for a continuous period of at least a full year to conduct an accurate study (44 Pretrial 8323), the defense filed a new discovery motion requesting access to information from December 16, 1984 through November 1, 1986. (10 CT 2063-2104.)

8.     The surveys conducted by Dr. Kaplan in August 1985 and December 1985-January 1986 revealed that of the potential jurors who reported for service in response to the original summons, 8% were Hispanic.  (44 Pretrial 8281-82.)  In 1980, Hispanics were 14.7% of the population in San Diego County according to U.S. Census figures.  (44 Pretrial 8313-14; In Limine Exhibit 6-C/7-W.)  The Hispanic population in the San Diego County was projected to be 17.25% of the total population in 1985.  (44 Pretrial 8314-17; In Limine Exhibit 6-C/7-W.)

9.     Dr. Edgar Butler, a recognized expert in the field (44 Pretrial 8296-99), testified that the data showed "a possible underrepresentation of Hispanic population" and that a review of the San Diego County jury selection system was warranted.  (44 Pretrial 8320-21.)  Such a review would be directed toward determining (1) if there was underrepresentation and (2) where the underrepresentation might be occurring within the system.  (44 Pretrial 8300; 8315; 8336.)

10.     To conduct this two-pronged review it would be necessary to "go through the various systems in the jury selection procedures [in] the Jury Commissioner's Office and the data collected there to evaluate that in a systematic way."  (44 Pretrial 8318.)  However, there appeared to be limited information about "what happens to people once they are within the system."  (44 Pretrial 8306; 8321.)[101]  Therefore, Dr. Butler testified that it would be necessary to systematically go through the qualification

_____

[101]   This lack of knowledge was in part due to the inability of the Commissioner's office to conduct its own independent study.  (44 Pretrial 8231.)

226

(15cv1224)

and impanelment process.  (44 Pretrial 8306-07.)  Accordingly, there would need to be two types of discovery.

11.     First, it would be necessary to have "specific information regarding the computer program which is used to help compose jury lists and help, in effect, select the jurors. . . ."  (44 Pretrial 8416.)  "[I]t would be of great assistance to have as much knowledge as possible about the operation and characteristics of the computerized jury processing system in operation in San Diego County."  (44 Pretrial 8417.)

12.     Second, it would be necessary to obtain the jury selection data, such as the qualified juror list, written excuses, no-shows, etc., for a continuous one year period over the past year to avoid statistical aberrations.  (44 Pretrial 8323, 8417-18).

## 2.     The Failure To Allow Access To The Necessary Jury Commission Information Was Error

13.     The trial judge denied the requested discovery because of the burden it would impose and because no justification had been shown.  (46 Pretrial 8582-83.)  This ruling was error.  In California, a defendant seeking access to this information is "obviously not required to justify that request by making a prima facie case of underrepresentation."  *People v. Jackson*, 13 Cal. 4th 1164, 1194-95 (1996).  Instead, upon a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion, "the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent."  *Id*. (citation omitted).  Further, "some of the information sought, such as master lists of jury pools, as well as general jury selection policies and practices, are judicial records that are or should be available to the public."  *Id*. (citation omitted).

14.     The defense more than satisfied the *Jackson* standard.  The offers of proof suggested over an 8% absolute disparity and close to a 50% absolute disparity as to Hispanics based on projected census figures.  Such a disparity was clearly sufficient,

(15cv1224)

especially considering that the Supreme Court has declined to specify "the method or test courts must use to measure the representation of distinctive groups in jury pools." *Berghuis v. Smith*, 559 U.S. 314, 329 (2010).  The Ninth Circuit even encourages "courts and defendants to use a more robust set of analytical tools [that] will ensure more accurate, and narrowly tailored, responses to individual *Duren* challenges, which [the Court] can then assess on a fully developed record specific to the circumstances presented." *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1165 (9th Cir. 2014).

15.     Accordingly, Judge Orfield's denial of discovery, and Judge Hammes' subsequent adoption of that denial despite changed circumstances and a renewed discovery motion, erroneously precluded the defense from obtaining the information and data necessary to fully develop its prima facie burden.  *See United States v. Rodriguez-Lara*, 421 F.3d 932, 947 (9th Cir. 2005) *over'd on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014) (holding that it was an abuse of discretion not to grant [defendant] the expert help he requested to try to make out his fair cross-section claim);[102] *see generally Duren v. Missouri*, 439 U.S. 357 (1979).

16.     Denial of a fair opportunity to litigate a material Pretrial issue violates the state and federal constitutions.  The Constitution guarantees the defendant a right to "his day in court" (*In re Oliver*, 333 U.S. 257, 273 (1948)), free from arbitrary adjudicative procedures.  *Truax v. Corrigan*, 257 U.S. 312, 332 (1921).

17.     Lucas was denied his constitutional right to an impartial judge.  Additionally, by unjustifiably giving the prosecution more favorable treatment than the defense, Judge Hammes violated Lucas's rights under the Due Process Clause of the federal constitution.  *Wardius v. Oregon*, 412 U.S. 470 (1973).

---

[102]  Lucas relies on the direct appeal cases *Rodriguez-Lara* and *Hernandez-Estrada* for those portions of the holdings relying on the Sixth Amendment rather than the Jury Selection and Service Act of 1968 (JSSA) which did not govern the CSC.

## C.     The Trial Court Erroneously Refused an Evidentiary Hearing on the Jury Composition Challenge

18.     Based on surveys conducted in January and February 1988, 10.7% of the potential jurors who reported for duty were Hispanic.  In comparison, it was estimated that Hispanics comprised at least 14% of the total eligible jurors.  (250 Pretrial 25638-40.)  The surveys showed that 9% of the persons reporting for duty were between the ages of 18 and 24.  (250 Pretrial 25694.)  In comparison, it was estimated that the 18-24 age group was approximately 22% of the total eligible jurors.  (250 Pretrial 25694-95.)

19.     The defense also offered to prove through expert testimony that the age group of 18 to 24 year olds was a cognizable class because they had beliefs and attitudes which were generally unique to that group.  (250 Pretrial 25643-50.)

20.     The judge erroneously denied the evidentiary hearing because the showing was "insufficient" to show underrepresentation of Hispanics.  (250 Pretrial 25666.)

21.     As to the 18-24 age group, the judge noted that the disparity of nearly two-thirds is the "kind of statistic that you can't ignore . . . [A] two-thirds differential is something that would have to be explored."  (250 Pretrial 25696.)  Still, the judge denied an evidentiary hearing because: (1) "you can't absolutely draw the lines and identify what youth is" and (2) "I don't think there is anything to suggest that young people are less apt to convict than older people. . . ."  (250 Pretrial 25710-11.)

### 3.     An Evidentiary Hearing Should Have Been Granted as to the Underrepresentation of Hispanics

22.     The trial court judge denied an evidentiary hearing as to Hispanics on the theory there was an insufficient showing of underrepresentation. To make a prima facie showing of a violation of the fair cross-section requirement, the defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) that this

229

(15cv1224)

1  under-representation is due to the systematic exclusion of the group in the jury

2  selection process." *Duren*, 439 U.S. at 364 (1979).

3      23.    Although the disparities shown in the offer of proof would have been

4  within the California Supreme Court's "tolerance" level (*see People v. Burgener,* 29

5  Cal. 4th 833, 860 (2003)), the low representation of Hispanics was not fair and

6  reasonable in relation to the number of persons in the community in violation of *Duren*.

7  Moreover, the 3.3% absolute disparity proffered in the present case was greater than the

8  1.8 % figure for blacks found unrepresentative in *People v. Alexander*, 163 Cal. App.

9  3d 1189, 1199 (1985); and is on a par with the 3.6 % absolute disparity held to

10  demonstrate under-representation in *People v. Buford*, 132 Cal. App. 3d 288, 296

11  (1982); and the 3.9 % absolute discrepancy deemed prima facie proof of a violation in

12  *People v. Jones*, 151 Cal. App. 3d 1027, 1031 (1989); *but* see *People v. Bell*, 49 Cal. 3d

13  502, 527 (1989) (5 percent figure questioned).)[103]

14      24.    More importantly, the 3.3% figure in the present case was, of necessity,

15  "speculative" and only an estimate because the defense was denied the current and

16  complete jury selection information it needed.  (250 Pretrial 25655-57.)

17      25.    In particular, the 14% figure for total Hispanic juror eligibles was based on

18  a total population estimate of 16.4%.  (250 Pretrial 25660.)  However, because a census

19  had not been taken for over seven years the actual percentage of Hispanics in San

20  Diego was not known and could have been as high as 20%.  (250 Pretrial 25661.)

21  Hence, the juror eligibility figure and the absolute disparity could actually have been

22  several percentage points higher which would have put it above the 5.3% absolute

23  disparity which this California Supreme Court held sufficient to meet the

24  underrepresentation prong of *Duren* in *People v. Harris*, 36 Cal. 3d 36, 47 (1984).

25

26      [103]  The defense expert who testified before Judge Kennedy, Dr. John Weeks,

27  stated that 2.8% disparity between 12.3% and 9.5% (calculated from 1985 surveys) was
   statistically significant.  (58 Pretrial 1382-84)  Dr. Weeks was 95% certain that this

28  difference could not have happened by chance alone.  (58 Pretrial 1381.)

(15cv1224)

26.     However, the defense was not permitted to conduct its proposed sampling of the community to update the census figures.  (250 Pretrial 25661-62.)  Accordingly, the judge erroneously denied an evidentiary hearing on this issue.

### 4.     The Judge Erroneously Denied an Evidentiary Hearing on Whether 18 to 24 Year Olds Are a Cognizable Class

27.     The underrepresentation of 18 to 24 year olds was constitutionally significant.  Both the absolute disparity of over 13% and the comparative disparity of almost two-thirds dwarves the disparities which have been deemed insufficient in other California cases.  *See Burgener*, 29 Cal. 4th at 860.

28.     The defense should have been given an evidentiary hearing on the issue of whether the excluded group was a cognizable class.  The offer of proof provided sufficient cause for a hearing and indicated the group had distinct and unique views.  Here, the defense was not given a fair opportunity to meet its prima facie burden as to systematic exclusion because it was denied access to current and complete information about the system.

### D.     The Judgment Should Be Vacated

29.     Because the rulings erroneously denied Lucas a fair opportunity to challenge the composition of the jury panels from which his jury was chosen, structural error was committed and the judgement should be vacated.  *See generally Duren*, 439 U.S. 357, *Arizona v. Fulminante* (1991) 499 U.S. 279, 309.  If this Court finds that relief cannot be granted on the current record, Lucas is entitled to an evidentiary hearing after discovery and a chance to supplement the record.

### E.     Ineffective Assistance of Counsel

30.     To the extent that trial counsel failed to make a particularized showing supporting a reasonable belief that under-representation existed in the jury pool or venire, trial counsel violated Lucas's right to effective assistance of counsel because there was no reasonable tactical justification for counsel's omission.

231

31.     Lucas was prejudiced at the guilt and penalty phases of the trial and on appeal by trial counsel's omission because the lack of discovery erroneously denied Lucas a fair opportunity to challenge the composition of the jury panels from which his jury was chosen. Because the prejudice from counsel's omission was substantial and the trial was closely balanced as to both guilt[104] and penalty,[105] there is a reasonable probability that, absent counsel's omissions, the outcome of the trial would have been more favorable to petitioner.

**CLAIM 9:  LUCAS WAS DENIED HIS RIGHT TO CONFRONT MASSINGALE (AOB 2.8.1(C))**

1.     John Massingale was the original suspect in the Jacobs homicides, and his testimony recanting his confessions to the Jacobs murders was crucial to the prosecution's case against Lucas.  At the time of Massingale's testimony, he was prosecuting a civil suit against San Diego authorities for approximately $3 million in damages, alleging police and prosecutorial misconduct, coercion, and wrongful arrest. Because Massingale had an obvious financial interest in the outcome of the Lucas case, he had a strong incentive to testify against Lucas, as Lucas's conviction would likely carry a great deal of weight with Massingale's civil jury.  The trial court's denial of Lucas's request to question Massingale about his financial incentives and likely bias violated Lucas's rights to confrontation and to present a defense.

**A.     Relevant Law**

2.     The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence." *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  "[A] criminal defendant states a violation of the confrontation clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical

---

[104] *See* Dkt. 36-31, 2008 State Pet. Ex. 35, pp. 34-38; Dkt. 36-31, 2008 State Pet. Ex. 36, pp. 42-50; Dkt. 36-31, 2008 State Pet. Ex. 37, pp. 54-58.

[105] *See* Dkt. 36-9, 2008 State Pet. Ex. 15, pp. 84-87.

232

(15cv1224)

form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974).)  The United States Supreme Court has "recognized that the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316.  Subject to the "broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation . . . the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Id.*; *see also Curry v. Superior Court of San Francisco*, 2 Cal. 3d 707, 715 (1970) ("Cross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude."); *Staley v. State Bar*, 17 Cal. 2d 119, 143 (1941) (opining that there may be no stronger witness bias than "a financial interest in the outcome of the litigation contingent upon its terminating favorably for the party for whom [the witness] testified").

**B.    Relevant Facts**

3.    Based on his detailed confessions to the Jacobs homicides, the San Diego District Attorney's office filed death penalty charges against Johnny Massingale, with trial set for January 14, 1985.  (42 CT 9254-55.)  However, in December of 1984, on the eve of Massingale's capital trial, Lucas became a suspect in the Jacobs case (27 CT 5775), and on January 4, 1985, the charges against Massingale were dismissed (although Lucas was not charged with the Jacobs murders until March 13, 1985).  (39 CT 8554, 8557; 27 CT 5680-81.)  In May of that year, Massingale obtained a finding of "factual innocence" and an order sealing all records relating to his arrest, pursuant to California Penal Code § 851.8.  (2 RT 291-92.)  Massingale subsequently filed a federal civil lawsuit against the San Diego authorities responsible for arresting and

233

(15cv1224)

prosecuting him.[106]  (2 RT 369-70; 5 RT 710-712.)  As part of that litigation, Massingale filed a petition in Lucas's case to inspect and copy exhibits because he needed to prove in his civil suit that Lucas was guilty of the murders.  (16 CT 3402-05.)

4.     At Lucas's trial, the San Diego District Attorney's office called Massingale as a witness to provide affirmative evidence that he had not committed the Jacobs murders.  Massingale testified that he never had confessed to Jimmie Joe Nelson (6 RT 856-57) or John "Shorty" Smith (5 RT 722-24) and that he had been coerced into confessing to law enforcement while in Harlan County, Kentucky.  (5 RT 691, 764, 786-789, 807-812, 820; 7 RT 864, 866, 900, 902.)

5.     In response, defense counsel sought to demonstrate Massingale's bias by questioning him about his civil suit and his financial stake in the outcome of the Lucas trial.  As defense counsel argued to the court, by denying his role in the crime and implicitly shifting the blame to Lucas, Massingale was motivated, at least in part, by his hope to gain a large award in his civil suit.  Massingale stood to benefit in his suit for damages if he could demonstrate through his testimony at Lucas's trial that the police and district attorney improperly prosecuted him instead of Lucas.  As a result, he had a financial incentive to portray himself as a person who had a poor memory and who could be "mixed up" during questioning, either by the police or defense counsel.[107]  (5 RT 700, 707, 709, 717, 749, 791; 6 RT 876-77, 899.)  Thus, while it was clearly in Massingale's financial best interest to do whatever he could to help get Lucas convicted, it was in Lucas's legal best interest to expose Massingale's financial incentives and likely bias.  *See, e.g.*, *Wheeler v. United States*, 351 F.2d 946, 947-48 (1st Cir. 1965) ("[I]nquiry into the possible financial stake of a witness in a particular outcome of a case in which the witness is testifying is a proper subject for cross-

---

[106]  Named defendants included, *inter alia*, David R. Ayers, William F. Green, Denny Pace, and the City and County of San Diego.

[107]  At one point, Massingale even equivocated on identifying his own voice on a tape confessing to Ayers and Green.  (5 RT 809-10.)

(15cv1224)

examination.").  However, Lucas was prevented from fully confronting Massingale's self-serving testimony because the court ruled that since Massingale had already obtained a finding of factual innocence, the outcome of Lucas's case would not affect Massingale's civil action, and therefore Lucas's proposed cross-examination was not relevant.  This ruling was contrary to both the facts and the law.

6.    As the California Supreme Court recognized on appeal,[108] the trial court's ruling "rest[ed] on the false assumption that Massingale's finding of factual innocence could be admitted into evidence at his civil trial."  *People v. Lucas*, 60 Cal. 4th 153, 272 (2014).  However, the express terms of the law on findings of factual innocence prohibits that finding from being admissible as evidence in any action.  *See* Cal. Penal Code § 851.8.  Therefore, because Massingale's factual innocence finding could have no bearing on the outcome of his civil suit, it was very important to Massingale's case that Lucas be convicted of the Jacobs homicides.  Exposure of such a motive might well have caused the jury to discredit Massingale's testimony denying knowledge of the Jacobs murders.  Because the prohibited cross-examination might reasonably have produced "a significantly different impression of [the witness'] credibility," the trial court erred in denying Lucas the opportunity to expose the likely bias of a key prosecution witness.  *Van Arsdall*, 475 U.S. at 678-679; *see also People v. Easley*, 46 Cal. 3d 712, 727-28 (1988) (overruled on other grounds, *People v. Doolin*, 45 Cal. 4th 390, 421 (2009) (defense counsel improperly failed to question a prosecution witness about possible bias based on a federal civil damages suit).

7.    Additionally, Lucas was denied his federal constitutional rights to due process, trial by jury, representation of counsel, and compulsory process which permit a criminal defendant to present through counsel evidence and valid defense theories in

---

[108]   The California Supreme Court found that the trial court erred in finding Massingale's civil suit irrelevant to Lucas's cross-examination; however, that ruling did not rise to the level of constitutional error.  *Lucas*, 60 Cal. 4th at 272.

235

(15cv1224)

defending against a criminal prosecution.  *See Gilmore v. Taylor* 508 U.S. 333 (1993); *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988); *Chambers v. Mississippi*, 410 U.S. 284 (1973).

## C.  The Error Was Not Harmless

8.  Clearly, Massingale was a key prosecution witness whose testimony was essential to convict Lucas for the Jacobs murders.  Moreover, the death penalty could not have been imposed against Lucas if he had not been convicted of the Jacobs murders.[109]  Accordingly, the denial of Lucas's right to confrontation on the questions of whether Massingale's testimony was truthful and whether there was a reasonable doubt that Lucas committed the Jacobs murders was uniquely and fundamentally prejudicial.

9.  The factors to be considered when assessing the harmless of a Confrontation Clause violation include the importance of the witness's testimony to the prosecution's case, whether the testimony was cumulative, whether there was evidence corroborating or contradicting the witness, the extent of the cross-examination actually permitted, and the overall strength of the prosecution's case.  *Van Arsdall*, 475 U.S. at 684.  These factors apply even in the habeas context, where the ultimate question is whether the error had a "substantial and injurious" effect on the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993); *Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000) (holding that the *Van Arsdall* factors are properly applied on habeas review).

10.  The application of these factors to Lucas's trial demonstrates that the error likely had a substantial and injurious effect on the jury's verdict.  First, the prosecution's case as to the Jacobs murders was closely balanced, and Massingale's

---

[109]  Lucas was convicted of one other murder, the murder of Anne Swanke, but the only special circumstance alleged or found was multiple murder, a finding which, in light of the jury's verdicts, required conviction on the Jacobs counts.  (26 CT 5573; 64 CT 14240.)

testimony was crucial to convicting Lucas because Lucas's primary attack on the prosecution's case was a defense that Massingale had committed the crimes. Attacking Massingale's recantation of his confessions was therefore critical to Lucas's defense. Additionally, any testimony about Massingale's financial incentive would not have been cumulative to or corroborated by any other testimony, because (1) the jury had no other information about Massingale's civil suit, and (2) even if the jury recognized that Massingale had a personal interest in convicting Lucas (and thereby proving his own innocence of capital murder), "there may be no stronger witness bias than a financial interest in the outcome of the litigation." *Staley*, 17 Cal. 2d at 143. Finally, the cross-examination of Massingale that was permitted by the trial court merely presented him as having a poor memory and being easily "mixed up." Full cross-examination on Massingale's strong financial incentive to get Lucas convicted would have provided "a significantly different impression of [his] credibility," *Van Arsdall*, 475 U.S at 680—namely, as a mercenary litigant, calculatingly portraying himself as memory-impaired and easily misled in order to bolster his chances for a monetary recovery in his federal lawsuit against the San Diego authorities. The trial court erroneously denied Lucas's right to confront Massingale and to provide his jury with all relevant evidence bearing upon Massingale's credibility. *See Id.*; *Davis*, 415 U.S. at 318.

## CLAIM 10:  COUNSEL WERE INEFFECTIVE AT GUILT PHASE (SHP VI.H, VI.I, VI.L, VI.N, VI.O, VI.P, VI.Q, VI.R, VI.S, VI.T, VI.U, VI.V, VI.W, VI.X, VI.Y, VI.AA, VI.KK)

### A.    Introduction

1.    During Lucas's guilt phase, trial counsel failed to perform some very fundamental duties, including failure to present expert testimony, failure to present evidence which supports the theory of defense, and failure to properly litigate the case through objections, impeachment, and necessary motions practice. As a result, some of the most damaging pieces of evidence against Lucas (including the Santiago identification and the Love Insurance note) were allowed to be presented to the jury in

237

a manner that not only failed to protect Lucas's right to effective counsel, but also made it easier for the prosecution to carry its burden of proving Lucas guilty beyond a reasonable doubt. *Kimmelman v. Morrison*, 477 U.S. 365, 377, 379-80 (1986).

**B.     Relevant Law**

2.     The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Without the effective assistance of counsel, "the right to a fair trial itself would be of little consequence . . . for it is through counsel that the accused secures his other rights." (internal citations omitted). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). The deficient performance component requires a showing that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 693-94; *Wiggins*, 539 U.S. at 534-38. The prejudice component requires the petitioner to demonstrate that there is a reasonable probability that but for counsel's failings the result would have been more favorable—i.e., that at least one juror would have had a reasonable doubt as to his guilt had counsel not performed deficiently. *See Kimmelman*, 477 U.S. at 387; *Strickland*, 466 U.S. at 687-96; *Wiggins*, 539 U.S. at 534-38. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

3.     While the inquiry into ineffective assistance involves a presumption that counsel's conduct is within the "wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, that presumption does not excuse counsel's failure to investigate and prepare a defense. *Kimmelman*, 477 U.S. at 385. Any presumption that counsel reasonably exercised professional judgment is rebutted when, as in this case, the challenged acts and omissions were not informed tactical decisions, but resulted from a lack of diligence in preparation and investigation. *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998).

(15cv1224)

**C.     Trial Counsel Failed to Present Defense Handprinting Experts, Proficiency Studies, and In-Court Testing of the Prosecution Expert Supporting Lucas's Defense That the He Did Not Write the Love Insurance Note**

4.      One of the most critical issues in the Jacobs prosecution was whether Lucas's handprinting was on the Love Insurance note.  The prosecution presented the expert testimony of comparative handwriting analyst John J. Harris, who opined that he was "reasonably certain" that Lucas was the author of the note.  (13 RT 2309.)  During in limine proceedings, trial counsel attacked the reliability (and, therefore, the probity and relevance) of Harris's findings, and sought to exclude his testimony as a challenged scientific finding under *People v. Kelly*, 17 Cal. 3d 24 (1976), as well as on due process grounds.  (*See* Claim 1 and 2.)  In support of that effort, trial counsel retained two experts, Dr. Mark Denbeaux and Dr. Michael Saks, who were prepared to testify to the serious problems inherent in handwriting and handprinting comparisons.  Dr. Saks, a social scientist with extensive experience in evaluating handwriting analysis, was prepared to testify to proficiency studies revealing the high rate of error by so-called "experts."  (183 Pretrial 17502-03; Def. In Limine Exh. 586, 587, 588.)  Dr. Denbeaux, a law professor who had testified as an expert on handwriting comparisons in a number of other cases, presented testimony on the wholly subjective nature of the discipline and how the lack of licensing and other standards made handwriting comparison uniquely susceptible to bias and mistakes.  (181 Pretrial 17431, 17437, 17447-52.)  The trial court refused to accept the proffered defense expert testimony, refused to take judicial notice of the handwriting comparison proficiency studies, and refused to exclude Harris's testimony on *Kelly* or any other grounds.

5.      Defense counsel believed that the state court's exclusion of the defense experts and the proficiency studies during in limine admissibility proceedings also meant that the defense would not be able to present the defense experts and proficiency studies at trial as part of their attack on Harris's credibility.  (*See* Claim 2.)  However,

239

the California Supreme Court found that defense counsel's interpretation of the court's ruling was mistaken, and in fact counsel could have offered the contemplated witnesses and evidence for purposes of challenging Harris's credibility at trial. *People v. Lucas*, 60 Cal. 4th 153, 232 (2014). Indeed, the state court stated that it might be "open" to an offer of the proficiency studies themselves at trial (184 Pretrial 17632-33), but trial counsel inexplicably failed to make that offer. Under the facts of this claim, there can be no reasonable tactical basis for trial counsel's failure to present their experts' testimony and the proficiency studies at trial, as such evidence was crucial to supporting Lucas's defense that he was not the author of the writing on the Love Insurance note (and therefore, not the perpetrator of the Jacobs homicides). Moreover, this error by counsel was a significant and prejudicial blunder, as it allowed the State's unreliable expert testimony to go virtually unchallenged before the jury. *See* Risinger, M., Denbeaux, M., and Saks, M.J., *Exorcism of Ignorance as a Proxy For Rational Knowledge; The Lessons of Handwriting Identification "Expertise*," U. of Penn. L. Rev. Vol 137, 731, 769 (1989) (discussing the need to challenge the judicial system's widespread acceptance of handwriting comparison evidence "despite the absence of a shred of empirical evidence of anyone's ability to do what [handwriting experts claimed they] could do"). In a case such as this, where "'the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence,'" failure to present the testimony of Dr. Saks and Dr. Denbeaux at trial amounts to ineffective assistance of counsel. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014).

**D.    Trial Counsel Failed to Renew the Motion to Sever After the Presentation of the Defense Case**

6.    Elsewhere in this Petition, Lucas asserts that the state court rendered his trial fundamentally unfair by consolidating all of the cases for trial and for not giving him a full and fair opportunity during Pretrial litigation to establish that consolidation and cross-admissibility violated his due process rights. (*See* Claims 30, 43, 45, and 47.)

240

7.     One of the key arguments defense counsel made with regard to the consolidation and cross-admissibility issue is that the ruling impermissibly allowed the prosecution to heavily rely on the other crimes to bolster weaker cases. For example, the prosecution was allowed to use Santiago's eyewitness identification of Lucas as the foundation for its opening argument (62 RT 11750) and as a way of filling in the evidentiary gaps in the Jacobs count. As Lucas argued, this bolstering exemplified the impropriety of joining a stronger case with a weaker case. In an effort to avoid such prejudice, trial counsel moved to sever after the conclusion of the prosecution's case-in-chief, which was denied. However, trial counsel inexplicably failed to renew the motion to sever after the conclusion of the defense case, which he was permitted to do under California law. *See People v. Ervin*, 22 Cal. 4th 48, 68 (2000) ("If further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever.").

8.     Trial counsel rendered deficient performance by not renewing the motion to sever, and that deficiency prejudiced Lucas. At the conclusion of the defense case, there had been a number of developments which supported Lucas's argument that the cases should never have been consolidated in the first place. These factors included, *inter alia*:  (1) Lucas had an alibi for the Garcia homicide (47 RT 8870, 8922-28); (2) the perpetrator of the Strang/Fisher homicides was most likely left-handed (51 RT 9369; 9399-400); (3) Lucas had an alibi for the Santiago homicide (53 RT 9960, 9965-66, 10002, 10004-05); (4) there was some evidence of an alibi for the Swanke homicide (20 RT 3611-12); (5) there were two pubic hairs found on Swanke which did not match Lucas, Swanke, or Swanke's boyfriend (i.e., there was strong evidence supporting a claim of third party culpability) (55 RT 10738-44); and (6) Santiago's identification of Lucas was flawed and not reliable (*see generally* Claim 4). These additional facts would have strongly supported a renewed motion to sever, as they were relevant to show that the prosecution had improperly bootstrapped weak cases to stronger ones. Indeed, the jury's acquittal in Garcia and mistrial in Strang/Fisher showed that it

241

(15cv1224)

understood that the prosecution had charged Lucas on some cases with little to no evidence pointing to him as the perpetrator. By failing to renew the motion to sever, which most likely would have been granted, trial counsel prejudiced Lucas by virtually ensuring that he received an unreliable verdict due to improperly consolidated cases. *See White v. Illinois*, 502 U.S. 346, 363-64 (1992) (verdict reliability is required by the Due Process Clause of the federal constitution); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974) (same).

9.    There is "a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." *Bean v. Calderon*, 163 F.3d 1073, 1084 (*citing United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986)). To assess prejudice, the reviewing court looks at each count separately to decide if the trial of one count was rendered unfair because of the joinder of that count with one or more of the other counts. *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000). In this case, it is highly likely that the improper joinder of Jacobs, Swanke, and Santiago rendered those trials fundamentally unfair. Trial counsel knew of the "high risk of prejudice" in allowing those cases to remain consolidated, and yet they failed to renew the motion to sever, which after the trial court's erroneous rulings is the one thing that would have avoided the prejudice that Lucas suffered.

**E.    Trial Counsel Failed to Offer Readily Available Evidence to Satisfy the Court's Concerns About the Admissibility of Evidence Presented by the Defense Handwriting Experts**

10.    Lucas's trial counsel provided ineffective assistance by failing to present readily available testimony which would have supported the defense motion to admit the testimony and evidence of handwriting experts Dr. Saks and Dr. Denbeaux. Specifically, trial counsel should have presented available testimony that the empirical research and proficiency testing relied upon by Drs. Saks and Denbeaux were "of a type that reasonably may be relied upon by an expert in forming an opinion upon the

242

subject to which his testimony relates," which would have rendered their testimony admissible within the meaning of California Evidence Code § 801(b). Additionally, trial counsel should have presented the testimony of Maureen Casey Owens, a practicing handwriting examiner, who could testify to the adequacy and thoroughness of the data upon which Dr. Saks relied in coming to his conclusions about handwriting comparison analysis. But for these errors, which were not the result of an informed tactical choice, it is reasonably probable at least one juror would have found Lucas not guilty of the Jacobs homicides.

11. The only evidence which purportedly provided a direct link between Lucas and the Jacobs murders was the Love Insurance note. The defense sought to exclude the prosecution's expert testimony based on the testimony of two expert witnesses, Dr. Michael Saks and Dr. Denbeaux. However, the state court ruled that they were not qualified witnesses and refused to consider their testimony. The court concluded that the scientific literature and studies relied upon by the defense experts did not constitute material "that may reasonably be . . . relied on" because "there is nothing the testimony so far from someone who is an expert in the field. . . ." (183 Pretrial 17530-31.) In the court's view, only a practitioner or a researcher who directly conducted testing in the area of handwriting comparison would have the expertise to say that the data upon which the defense experts had relied was the appropriate data to analyze for purposes of drawing inferences about the expertise (or lack thereof) of handwriting examiners. (183 Pretrial 17519-20.)

12. Lucas contends that the state court's ruling was in error, and that Dr. Saks and Dr. Denbeaux were more than qualified to testify about handwriting analysis. (*See* Claim 2) However, to the extent trial counsel could have provided the state court with the evidence it believed it needed to find the defense experts qualified but failed to do so, counsel rendered ineffective assistance.

13. The declaration of Dr. Saks, which provides facts and data available to defense counsel at the time of trial, demonstrates that trial counsel could have

243

1   addressed the state court's objections to the proffered testimony of Dr. Saks and Dr.

2   Denbeaux.  (*See* Dkt. 36-30, 2008 State Pet. Ex. 30, M. Saks Decl.)

3       14.   With regard to whether the materials relied upon by Dr. Saks and Dr.

4   Denbeaux were of the type "that may reasonably be . . . relied on" by handwriting

5   experts, Dr. Saks would have testified as follows:

6           The manner in which I [conducted research on] . . . the

7           claimed expertise of forensic document examiners followed

8           then common and accepted practice. I worked first to obtain

9           all published studies on the question at hand, and also tried to

10          find any unpublished  studies–largely by using bibliographic

11          databases and slogging through relevant journals on library

12          shelves, but also by seeking direction from persons who

13          might know of such studies. . . . Such reviews of research are

14          sufficient as well as necessary to obtain a competent

15          foundation upon which to evaluate the state of knowledge

16          about a supposed phenomenon or about the empirical claims

17          of a field of asserted expertise.  Indeed, no one has thought of

18          a better way – that is why such reviews of existing empirical

19          studies are what scientists of all kinds do all the time (in

20          addition, of course, to conducting their own original empirical

21          research, which then becomes part of that body of  literature).

22  (Dkt. 36-30 at 91, ¶ 5.)  According to Dr. Saks, it is not sufficient (or scientific, for that

23  matter) for the validity of any field to be based solely on the views of those who

24  practice in those field and hold themselves out as "experts."  (Dkt. 36-30 at 92, ¶ 8.)

25  Rather, "[t]he most dependable path (and most if not all scientists would say the only

26  path) to assessing whether people can do what they claim to be able to do is to look at

27  the empirical research evidence."  (*Id*.)  Therefore, as long as someone is familiar with

28  the foundations of the discipline and the empirical research on that discipline, he should

be permitted to testify to that kind of data, whether or not he is a day to day practitioner within the field.  (*Id.*)

15.     The testimony in Dr. Saks's declaration would have clarified the basis for admitting the defense expert testimony under Evidence Code § 801(b), and made clear to the state court that Dr. Saks, as an expert in empirical research and proficiency studies, did indeed have the expertise to put together an appropriate database for evaluating the claimed expertise of handwriting examiners, and that he had followed generally accepted scientific procedures in doing so.

16.     The state court's concerns about the defense experts' qualifications could have been further assuaged by the testimony of Maureen Casey Owens, a handwriting analyst with whom Dr. Saks had consulted in constructing his database.  (Dkt. 36-30 at 91, ¶ 6.)  Ms. Owens, who was the chief document examiner for the Chicago Police Department at the time of Lucas's trial, was obviously a practitioner and an expert in the field (insofar as the field has genuine expertise).  Hence, she could have testified as to the relevant publications in the field to which she had referred Dr. Saks, as well as the thoroughness and adequacy of the database upon which he had relied.

17.     Trial counsel's failure to present this readily available evidence was deficient performance, and that deficiency prejudiced Lucas in two ways.  First, Harris's expert opinion that Lucas authored the note to a "reasonable certainty" was likely to have had an undue influence on the jurors. "Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials."  *Kelly*, 17 Cal. 3d  at 24.  Thus, allowing the prosecution's expert to testify without a counterpoint from the defense experts "created a significant danger that the jurors would conclude erroneously that they were not the best qualified to assess the [evidence], that they should second guess their own judgment, and that they should defer to the Government's experts."  *United States v. Hanna*, 293 F.3d 1080, 1087 (9th Cir. 2002).  Second, the expert testimony conveyed, as a given truth, the essential assumption that all handprinting is unique and individualistic.  In other

245

(15cv1224)

words, Harris's opinion that Lucas authored the note necessarily assumed that the 13 block printed letters and seven numbers on the Love Insurance note were so unique that the author could be determined to the "reasonably certain" exclusion of all other persons.  Because the defense failed to challenge this essential premise, the jurors (and the state court) were free to conclude that Lucas must have authored the note based on perceived similarities between the note and Lucas's printing without hearing necessary and important evidence which would have exposed comparative handwriting analysis as the subjective, flawed discipline defense counsel knew it to be.  (247 Pretrial 25439-40.)  Where, as here, trial counsel knew that "'the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence,'" failure to consult with and present the testimony of Dr. Saks and Owens as a means of countering the state court's flawed analysis amounts to ineffective assistance of counsel.  *Hinton*, 134 S. Ct. at 1088.

## F.     Trial Counsel Failed to Retain an Expert to Empirically Test the Fairness of the Photo Lineup

18.     At trial, Jodie Santiago identified David Lucas stating that she had no "doubt in her mind" that he was her attacker.  (38 RT 7344; 39 RT 7376-77.)  However, notwithstanding her confidence, Santiago's testimony was not reliable, and should have been excluded due to numerous suggestive Pretrial procedures, including a highly suggestive photo lineup.

19.     During Pretrial proceedings, the defense sought to exclude her identification of Lucas because, *inter alia*, the photo lineup from which she originally identified Lucas was unfairly suggestive.  (*See* Claim 4.)  Trial counsel consulted with and presented the testimony of defense expert Dr. Buckhout, who concluded that the photo lineup was deficient and prejudicially unfair because only Lucas had all of the physical characteristics described by Santiago.  (188 Pretrial 17939-49; 17944-45.)  For example:

246

- Santiago testified that the thing about her assailant that stood out "first and foremost" in her memory was his "bulging" eyes. (91 Pretrial 5660.) However, a review of the photos used (and Santiago's own testimony) reveal that only Lucas's picture depicted eyes similar to her description. (*See* People's Trial Ex. 179A.)

- Santiago told detectives that her attacker had a "feathered," "laid back" hairstyle that was "collar-length" and "somewhat windblown." (82 Pretrial 4647-48, 4660; 94 Pretrial 6044-45.) The photo of Lucas was the only one that met this description. According to Dr. Buckhout, "If the feature has also been mentioned by the witness such as the eyes, which are easier to see . . . in a photograph where the face is closer, then [use of such a photograph] is a mistake that violates the general principle of matching up the photographs to each other and to the description provided by the witness." (188 Pretrial 17973-74.)

- The photo lineup also failed to include individuals with mustaches which matched Santiago's description. Santiago described the suspect's mustache as neat in appearance but not meticulously groomed, and it did not extend past the lip. (82 Pretrial 4647; 91 Pretrial 5658.) However, four out of the six photographs in the lineup could immediately be excluded from consideration because they lacked facial hair that even came close to meeting Santiago's description. For example, the photographs in positions 4 and 5 were automatically excluded because each had a mustache which extended well beyond the lips, in a "fu-man-chu" style. (82 Pretrial 4659-60.) Similarly (and perhaps more egregiously), the photos in positions 3 and 6 would have been excluded because they did not show any mustache at all. (*See* People's Trial Ex.179A.)

(15cv1224)

- • Finally, only Lucas's photo matched the clothing and body type described by Santiago. According to Santiago, her assailant wore a blue, polo-type shirt with "buttons halfway down" and was "neat" in his appearance and dress. (82 Pretrial 4648; 91 Pretrial 5656.) Lucas (in position 2) was depicted wearing a light colored shirt with a collar and buttons. (*See* People's Trial Ex. 179A.) Meanwhile, four out of the remaining five suspects in the photo lineup wore clothing completely out of line with what Santiago described. (*See id.* (the person in position 3 wore a flowery shirt; the persons in positions 4 and 6 wore t-shirts; and the person in position 5 wore an unbuttoned, checkered, long-sleeve shirt over a t-shirt).)

20. Despite these evident flaws with the lineup, the state court found that "[t]he lineup was a good one" and that "small factors of difference [between the photos] did not constitute impermissibly suggestive factors within the photo lineup." (237 Pretrial 24586.)

21. Lucas disagrees with this finding and has challenged the state court's ruling on the admissibility and suggestive nature of the lineup. (*See* Claim 4.) However, Lucas also asserts that trial counsel erred by not providing the court with empirical data which could have readily addressed the court's misconception that Lucas was quibbling about "small factors of difference" between the photos that did not actually add up to error.

22. According to Dr. Buckhout (as well as post-conviction eyewitness expert Dr. John Brigham), a commonly used form of empirical testing was available which would have demonstrated both the general fallibility of eyewitness identification as well as the specific problems inherent in the photo lineup relied upon by Santiago. (188 Pretrial 17922; *see also* Dkt. 36-30 at 55, 2008 State Pet. Ex. 28 (J. Brigham Decl. (hereinafter Dkt. 36-30 at 55), ¶ 10-11).) The test is based on the premise that people who have not themselves viewed a culprit, and instead are given only a verbal

248

(15cv1224)

description of the culprit, should not be able to select a suspected culprit out of a lineup at a greater rate than would be expected by chance.  (*See id.*)  As Dr. Buckhout explained, "If an outsider without memory of the crime can pick out the individual, then you essentially have a very unreliable test."  (188 Pretrial 17922; *see also* Dkt. 36-30 at 55, ¶ 18.)

23.   In this case, Dr. Buckhout alleged that Santiago's lineup was biased, and he discussed empirical testing which could have helped to establish that bias for the jury.  However,  trial counsel unreasonably failed to retain Dr. Buckhout or some other eyewitness expert to conduct this empirical testing.  Had counsel obtained empirical testing of the lineup they could have obtained an empirical determination that "the lineup used in the Lucas case was highly unfair."  (*Id.* at ¶ 19.)

24.   Post-conviction counsel retained Dr. Brigham, an expert in the field of eyewitness identification, to conduct the empirical testing suggested by Dr. Buckhout. Dr. Brigham recruited 52 college students (or "mock witnesses"), each of whom were given one of three versions (short, medium, or long) of the eyewitness's description of the perpetrator.  (*Id.* at ¶ 13.)  They were then instructed to guess which photo lineup member was the suspect, based only upon the description that had been given by the eyewitness.  (*Id.*)  The results were compelling and remarkably consistent:  "Of the 20 mock witnesses who saw the short description, 70.0% chose the suspect . . . [o]f the 13 people who were given the medium-length description, 69.2% chose the defendant.  Of 19 people given the long description, 68.4% chose the defendant."  (*Id.* at ¶ 18.) According to Dr. Brigham, the empirical results of this test demonstrated that the lineup used in the Lucas case "was highly unfair, according to the match-to-description analyses. . . [and] provides strong evidence that the suspect fit the description of the perpetrator more closely than did any of the other lineup members."  (*Id.* at ¶ 19.)  In Dr. Brigham's opinion, Lucas's lineup was so suggestive as to be "essentially a one-photo showup" rather than "a fair 6-person lineup."  (*Id.*)  As courts have routinely found, the display of a single photograph is one of the most suggestive, and

(15cv1224)

objectionable, methods of identification.  *Manson v. Brathwaite*, 432 U.S. 98, 111 (1977); *Foster v. California*, 394 U.S. 440, 443 (1969); *Stovall v. Denno*, 388 U.S. 293, 302 (1967).

25.   A criminal defendant's fundamental right to a fair trial is violated under the Due Process Clause of the Fourteenth Amendment when the jury is allowed to consider evidence of an identification by an eyewitness whose testimony has been tainted by unnecessarily suggestive police procedures.  *Manson*, 432 U.S. at 111. Convictions based on tainted eyewitness identification must be set aside even if a course of cross-examination exposes to the jury the method's potential for error. *United States v. Wade*, 388 U.S. 218, 228 (1967).  In determining the reliability of an identification, the trial judge must weigh the corruptive influence of the procedure against independent evidence of reliability.  *Manson*, 432 U.S. at 114; *People v. Johnson*, 3 Cal. 4th 1183, 1216 n. 5 (1977).  Therefore, the state court's weighing process would have been fundamentally different if it had not erroneously believed the lineup to be a "good one."  Had trial counsel retained an expert such as Dr. Brigham to test the suggestibility and legitimacy of the lineup before trial, it is reasonably probable that they would have been able to change the state court's conclusion that the lineup was a "good one."  It is also reasonably probable that the court would have concluded that Santiago's identification was in fact influenced by the lineup, and therefore would have excluded Santiago's identification of Lucas as her attacker.  Because Santiago's identification of Lucas was by far the most important piece of evidence linking him to her attack, if that identification had been excluded it is reasonably probable that Lucas would not have been convicted in any of the charges he faced.  (*See* Claims 45 and 47.)

26.   Even if the empirical testing results had not persuaded the state court to exclude the Santiago identification, trial counsel were ineffective for failing to obtain empirical testing of the lineup and present the results to the jurors at the guilt and/or penalty trial.  Had the jurors received such evidence, it is reasonably probable that at least one of them would have voted not to convict him in the guilt phase or sentence

(15cv1224)

him to death in the penalty phase.  The probability of a more favorable verdict at penalty was especially high in light of the lingering doubt theory upon which the defense relied.

## G.   Trial Counsel Failed to Request Sanctions Based Upon the State's Destruction of Biological Material on the Jacobs Hair Evidence

27.   At least one, and possibly as many as seven, of the hairs collected from the hands of Suzanne Jacobs had root or other tissue material attached which could have been tested serologically.  (143 Pretrial 13232; 208 Pretrial 20218-19.)  The hairs needed to be refrigerated in order to properly preserve that biological material, but the police unreasonably and inexplicably failed to do so.  (143 Pretrial 13227; 208 Pretrial 20218-21.)  The defense filed a *Hitch/Trombetta* motion to exclude testimony about the suspect hairs based on the State's failure to preserve exculpatory evidence (38 CT 8334-60), but the state court denied the motion on the grounds that electrophoretic analysis of hair root sheaths was just in its infancy, and therefore the detectives could not be faulted for not having preserved that biological material.  (247 Pretrial 25444-45.)

28.   As Lucas argues in Claim 13 (*Trombetta/Youngblood*), the State violated *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988) by failing to refrigerate hairs collected from Suzanne Jacobs's hands, which the police believed came from the head of the person who killed Suzanne and Colin.  Lucas also asserts that the state court's analysis of the defense motion to impose sanctions on the State under *Trombetta* (i.e., to exclude the hair evidence or at the least offer a limiting instruction) was wrong in light of the facts and caselaw at the time. Additionally, Lucas showed that he was entitled to a sanction even if he failed to meet the *Trombetta* standards because the inability to test the hair made his trial fundamentally unfair and impaired the reliability of the guilt and penalty verdicts.  On appeal, the State argued that Lucas had forfeited this claim because he failed to raise "this novel argument" at trial.  (Dkt. 128-7 (Resp.'s Brief on Appeal) at 206.)

251

(15cv1224)

29.     Lucas argues that the claim was adequately preserved at trial.  However, to the extent that the claim was not adequately preserved, trial counsel's failure to do so violated Lucas's constitutional right to effective assistance of counsel because there was no reasonable strategic reason for not adequately preserving it.  Under California law, once the defendant has proved a loss of material evidence, the trial court has discretion to impose appropriate sanctions, including fashioning a suitable cautionary instruction.  *People v. Medina*, 51 Cal. 3d 870, 894 (1990) (citing *People v. Zamora* 28 Cal. 3d 88, 99-103 (1980)).  However, because courts are not required to impose such sanctions *sua sponte*, it is crucial for defense counsel to adequately raise and litigate the issue.  *See id.* A motion to impose sanctions for failure to preserve a material, apparently exculpatory piece of evidence was part and parcel of defense counsel's theory that (1) the questioned hairs did not belong to Lucas, and (2) the prosecution's evidence identifying Lucas as the source of those hairs was unreliable and should not be presented to the jury.  There was no tactical reason for counsel to fail to seek sanctions under *Trombetta/Youngblood*, and counsel's failure to do so was unreasonable under *Strickland*.

## H.     Trial Counsel Failed to Make Necessary Objections to Defend and Preserve Lucas's Rights

30.     Trial counsel repeatedly and unreasonably failed to make necessary objections to adequately defend Lucas's rights.  The Supreme Court has acknowledged that counsel's failure to preserve a constitutional claim of error for appellate or habeas review may form the basis for a claim of ineffective assistance of counsel.  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Indeed, the Court noted that "[t]he ability to raise ineffective assistance claims based in whole or in part on counsel's procedural defaults" is a critical safeguard to prevent the procedural default doctrine from producing "unremedied manifest injustices."  *Id.*  Counsel's ineffectiveness in failing to preserve a constitutional claim is not only cause to excuse procedural default, however; it also may be presented as an independent claim for relief.  *Id.* at 489; *see also Burns v.*

252

*Gammon*, 260 F.3d 892, 896-98 (8th Cir. 2001) (granting habeas relief on the basis of ineffective assistance of counsel where trial counsel objected to the prosecutor's improper closing argument, but failed to do so on constitutional grounds); *Jordan v. Hepp*, 831 F.3d 837, 849 (7th Cir. 2016) (finding trial counsel ineffective for failing to object when the prosecutor improperly vouched for the credibility of a key witness).

31.   In this case, the following acts and omissions of trial counsel were unreasonable and fell below prevailing professional norms:

32.   Trial counsel failed to properly object to the trial court's cross-admissibility ruling, specifically the assumptions upon which the trial court based its findings.  (SHP VI.L; *see* Claims 30 and 45-47.)

33.   Trial counsel failed to properly object to the admission of the photographs of the Love Insurance note on the grounds that it was not certified and was not admissible under the Best Evidence Rule.  (SHP VI.N and VI.O; *see* Claim 1(B)(2).)

34.   Trial counsel failed to properly object to the admissibility of the handwriting expert comparison based on lack of the original.  (SHP VI.Q; *see* Claim 1.)

35.   Trial counsel failed to object to the prosecution's untimely disclosure of photographs shown to Massingale during a police interview.  (SHP VI.S; *see* Claim 14.)

36.   Trial counsel failed to object to Santiago's testimony on the grounds that the defense was denied a fair opportunity to litigate the reliability of her identifications. (SHP VI.T; *see* Claim 4.)

37.   Trial counsel failed to object to the pre-lineup admonishment in the Santiago case.  (SHP VI.U; *see* Claim 2.)

38.   Trial counsel failed to object to the manner in which the lineup photographs were presented to Santiago.  (SHP VI.V; *see* Claim 4(C)(5).)

39.   Trial counsel failed to object to the lineup and to present the theory that the detectives purposely chose a suggestive photograph for the Santiago lineup.  (SHP VI.W; *see* Claim 4(E).)

(15cv1224)

40.     Trial counsel failed to challenge and properly object to the admission of expert testimony based on subjective interpretation of test results.  (SHP VI.X; *see* Claim 7.)

41.     Trial counsel failed to object to the *Kelly* prong one standard on the basis that the judge has no discretion to consider important factors relevant to reliability. (SHP VI.Y; *see* Claim 7.)

42.     Trial counsel failed to object to the court's decision to provide the jury with transcripts of a witness's testimony rather than having the testimony read back. The trial court's decision rendered Lucas's trial fundamentally unfair as it was in violation of Penal Code § 1138 and his rights to due process, personal presence, presence of the trial judge and effective assistance of counsel.  (SHP VI.AA; *see* Claim 36.)

43.     Trial counsel failed to timely object and/or request that the trial judge remove or redact the Strang/Fisher and Garcia guilt phase exhibits from the jury room during deliberations.  (SHP VI.KK; *see* Claim 42.)

## I.     Cumulative Prejudice

44.     To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."); *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998).

45.     A single, serious error by counsel may be a sufficient basis on which to grant relief on a claim of ineffective assistance of counsel.  *Kimmelman*, 477 U.S. at 384.  Nonetheless, it is not necessary that any one error alone rise to the level of prejudice; multiple errors considered together may also warrant relief under *Strickland*.

(15cv1224)

When assessing the reasonable probability of a different result, errors must be "considered collectively, not item-by-item." *See Kyles v. Whitley*, 514 U.S. 419 (1995).

46.   Further, the Court must consider the cumulative prejudice resulting from trial counsel's deficiencies in all phases of Lucas's trial, because counsel's ineffectiveness during the guilt phase caused Lucas continuing prejudice at the penalty phase.  Where multiple instances of ineffective assistance of counsel are alleged, the court must:

> Examine all aspects of the counsel's performance at different stages, from Pretrial proceedings, through trial and sentencing.  Separate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance.  They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of counsel.

*Sanders v. Ryder*, 342 F.3d 991, 1000-01 (9th Cir. 2003); *see also Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005) (reversing both the guilt and death sentence verdicts where the cumulative effect of the errors demonstrated prejudice); *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted."); *Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir. 1992) ("We need not decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death.").

47.   "[C]ounsel's conduct so undermined the proper functioning of the adversarial process that [Lucas's] trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  For the foregoing reasons, Lucas's convictions

(15cv1224)

and death sentences were obtained in violation of his Fifth, Sixth, Eight, and Fourteenth Amendment rights, and must be vacated.

**CLAIM 11: THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE MEDIA TO PUBLISH THE JURORS' NAMES AND ADDRESSES (AOB 1.4.2)**

1.     Lucas's case was the object of intense media publicity.  In Pretrial surveys 86% of the population recognized the case and 50% believed Lucas was guilty.  (253 Pretrial 26048-49; 26062.)  Because the change of venue motion was denied, the defense was concerned that the jurors selected to try Lucas's case would feel pressure from others in the community, thus jeopardizing Lucas's federal constitutional right to a fair and impartial jury.  (253 Pretrial 26048-49; 26052-53; 26063; 19 CT 3987-88.)  The defense argued that, on balance, the need to protect Lucas's federal constitutional rights outweighed the media's interest in publishing the jurors' personal identification information and, therefore, they should be precluded from doing so.  (253 Pretrial 26063-66; 19 CT 3986-88.)  The media opposed the defense motion, arguing that their right to publish was guaranteed by the First Amendment.  (253 Pretrial 26054-57.)

2.     The trial court found that there was no "compelling . . . need" for the public to have the juror contact information and that the "interests of justice" would not be "best served by publication of the jurors [sic] names."  (253 Pretrial 26074.)  Nevertheless, the court denied the defense motion under the mistaken assumption that she had no other alternative.  (253 Pretrial 26073.)

3.     By allowing publication of the jurors' names and addresses the trial court failed to assure that the deliberations were full, fair, and free of undue influence.  The jurors were subject to intense community and media pressure to convict.  This violated Lucas's rights under the Sixth, Eighth, and Fourteenth amendments to due process, a fair trial by jury, and verdict reliability.

4.     The Sixth Amendment right to trial by an "impartial jury" is "fundamental to the American scheme of justice." *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

(15cv1224)

This right, and/or the right to due process, is abridged if any juror has been subjected to undue influence during deliberations.  *See, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 314 (1998) (per se rule of exclusion is permissible for evidence that "is likely to influence the jury unduly").

5.     The Cruel and Unusual Punishment Clause requires heightened reliability in the determination of guilt and death eligibility before a sentence of death may be imposed.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).  Hence, notwithstanding the First Amendment rights of the media, "an accused's interest in a fair trial constitutes an 'overriding interest' supporting closure" of the trial to the public.  *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 14 (1986).  It is beyond dispute that the trial judge has the discretion to order the far less comprehensive limitation of foreclosing publication of the jurors' names and addresses upon a showing of good cause.

6.     Juror anonymity has a limited impact on the overall openness of the trial and, thus, can and should be ordered when justified.  *See, e.g.*, *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 513 (1984) (partial closure of voir dire may be appropriate to protect privacy interests of individual jurors).  Moreover, "no right ranks higher than the right of the accused to a fair trial."  *Id*. at 508.

7.     Instead of weighing the risk of an unfair trial against the First Amendment interests of the media, the trial court incorrectly concluded that it had no other choice but to allow publication.  By giving the press "the highest priority" above "the Sixth Amendment rights of criminal defendants" the court misconstrued the nature of its discretion which required a weighing of Lucas's right to a fair trial against the First Amendment rights at issue.

8.     Had the trial court properly exercised its discretion, it would have concluded that juror anonymity was more than justified and issued an order to that effect.  Given the highly publicized and inflammatory nature of the charges, there was a very real danger that the jurors would feel public pressure that would undermine

257

(15cv1224)

Lucas's right to a fair trial.  Not only did the trial receive extensive publicity as it progressed, but at least one juror received "death threats" during the trial.[110]  While this death threat occurred after the judge had already ruled, it illustrates that the danger was real.

9.      Because the error undermined the entire structure of the trial, it was structural error and the judgment should be reversed.  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (structural defects in the trial mechanism, which defy analysis by "harmless-error" standards are reversible per se).

10.      Even under a harmless error standard, the judgment should be reversed because the error had a substantial and injurious effect on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Without the public pressure the jurors felt from having their names published in the community, there is a reasonable probability that at least one juror would have voted differently.

## CLAIM 12:  LUCAS WAS CONVICTED ON FAULTY SCIENTIFIC EVIDENCE

1.      Lucas was convicted on the basis of junk science when law enforcement criminalists testified about hair comparison analysis and concluded that the hairs found on the body of Suzanne Jacobs were "very close" (12 RT 2105) and "similar to the hair of David Lucas and could have come from him."  (13 RT 2222.)  In the absence of confirmatory testing, microscopic comparative hair analysis which purports to show that a hair "matches" or "could have come from" a source (like the testimony put forth

---

[110]      Juror A.R. sent a note to the court on July 12, 1989 regarding anonymous, threatening telephone calls she received.  (68 RT 12864.)  Originally the juror was not going to mention the call to the court, but after she told the other jurors about it they convinced her to inform the court.  (68 RT 12865-66; 12874-75.)  The judge voir dired the other jurors about this.  (68 RT 12880-903; 26 CT 5580.)

Additionally, the court clerk received an anonymous phone call referring to one of the jurors by name. ("Mrs. C.D.") and accusing her of talking with Mrs. Lucas.  (108 CT 24221.)  In another incident, a "courtwatcher" came up to Juror A.B. and asked him some questions about his testimony.  (24 RT 4523-24.)

(15cv1224)

by Bailey and Simms in this case) is now without support in the scientific community. *See* National Academy of Sciences Report, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (hereinafter "NAS Report") at 161 ("[There is] no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA").[111]  Because the scientific community, as well as an increasing number of courts, now recognize that "testimony linking microscopic hair analysis with particular defendants is highly unreliable" (*id.*), the State's use of this faulty evidence to secure Lucas's convictions in the Jacobs case rendered his trial fundamentally unfair.

2.     As the Ninth Circuit has recently made clear, habeas petitioners can assert claims that they were convicted on the basis of faulty or flawed evidence.  *Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016).  Such a claim is grounded in the due process clause, and is based on new scientific or technological developments undermining evidence that was presented at trial.

3.     In *Gimenez*, the Ninth Circuit reviewed the denial of a second or successive petition in which the petitioner challenged his conviction on a number of grounds, some of which stemmed from evolving science in the area of shaken baby syndrome ("SBS").  At Gimenez's trial, the prosecution presented evidence that Gimenez's daughter Priscilla died of SBS and argued that Gimenez was responsible for her death; the jury convicted Gimenez of second-degree murder.  *Id.* at 1138.  Several years after his conviction, Gimenez filed a second or successive habeas petition based in part on new developments in the area of SBS.  Although the Ninth Circuit ultimately found that Gimenez had not met the high standard for filing a second or successive petition, the Court did make clear that a habeas petitioner can seek relief on the basis that the evolution of scientific knowledge rendered the evidence or testimony put forth in his case faulty or false.  As the Court explained, "[R]ecognizing such a claim is

---

[111] Available online at http://www.nap.edu/catalog/12589.html (last visited November 21, 2016).

259

(15cv1224)

essential in an age where forensics that were once considered unassailable are subject to serious doubt." *Id.* at 1144.

4.      In this case, criminalist James Bailey relied on his FBI training and years of comparative hair analysis experience to opine that hairs collected from the right hand of Suzanne Jacobs "were most similar in physical and microscopic characteristics to the known head hair from David Lucas." (12 RT 2205.) Such scientific testimony has been discredited. Although scientists engage in microscopic hair comparison for exclusionary purposes (i.e., to determine whether a suspect hair is of a particular color or animal type), forensics experts today would never testify to any kind of a match or similarity between hairs based solely on microscopic hair comparison alone. (NAS Report at 61.) As the vast majority of scientists (and the FBI) have concluded, science no longer supports the kind of conclusions or inferences that were made by Bailey in this case. (*Id.*) Microscopic hair analysis has been undermined by evolutions in scientific understanding, and there is no debate that microscopic "matching" among hairs, in the absence of confirmatory DNA testimony, is no longer accepted forensic testimony. (*Id.*)

5.      As the Ninth Circuit explained in *Gimenez*, a petitioner asserting a faulty evidence due process claim is only entitled to relief if he demonstrates that admission of the faulty evidence resulted in a fundamentally unfair trial. *Gimenez*, 821 F.3d at 1143-44. This is simply a different way of stating the reasonable probability of prejudice test. *Hein v. Sullivan*, 601 F.3d 897, 914-15 (9th Cir. 2010) (noting courts equate the fundamental fairness and reasonable probability standards). In this case, the only pieces of evidence that allegedly placed Lucas at the scene of the Jacobs homicides were the Love Insurance note and the hair evidence. As described above, the evidence against Lucas in the Jacobs homicides was minimal, so any evidence which tended to show that Lucas was in the Jacobs home was crucial. Indeed, the prosecutor recognized the probative and material value of Bailey's and Simms's expert testimony when he emphasized the "match" during closing argument. The

260

(15cv1224)

prosecution's emphasis on the importance of a witness's testimony during closing argument bolsters the conclusion that impeachment of that witness may have significantly damaged the prosecution's case. *Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005); *see Reynoso*, 462 F.3d at 1117. The inclusion of this flawed expert testimony, based on since-discredited science, rendered Lucas's trial fundamentally unfair. *Estelle v McGuire*, 502 U.S. 62, 68-70 (1991).

## CLAIM 13: LUCAS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE STATE'S FAILURE TO PRESERVE KEY PHYSICAL EVIDENCE (AOB 2.4.2, 2.7.1, 3.3.2)

### A. Relevant Law

1. The prosecution's duty to gather, preserve, and disclose evidence to a defendant in a criminal prosecution is set forth in a trio of decisions by the United States Supreme Court: *Brady v. Maryland*, 373 U.S. 83 (1963); *California v. Trombetta*, 467 U.S. 479 (1984); and *Arizona v. Youngblood*, 488 U.S. 51 (1988).

2. In *Brady*, the Supreme Court held that a prosecutor must disclose all exculpatory evidence to the accused. "[S]uppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Under *Brady*, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In *Trombetta* and *Youngblood*, the Supreme Court established the standard courts must follow to determine when the government's failure to preserve evidence rises to the level of a due process violation. In *Trombetta*, the Court held that the government violates a defendant's right to due process if the unavailable evidence is "material," in that it possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by reasonably available means." *Trombetta*, 467 U.S. at

489; see also 3 Witkin and Epstein, *California Criminal Law* (4th ed.), *Presentation at Trial*, sec. 1263. at 180 (applying the *Trombetta* standard).  Materiality can be demonstrated by showing that law enforcement was aware of the exculpatory nature of the evidence before its destruction; likewise, the exculpatory nature of the evidence can be inferred from law enforcement's testing of (or intent to test) the missing item.  *See id.*  Four years later, in *Youngblood*, the Court added the additional requirement that if evidence is "potentially" useful as opposed to "apparently" useful, a due process violation arises only if a defendant can demonstrate that the state acted in bad faith in failing to preserve the potentially useful evidence. *Youngblood*, 488 U.S. at 58.

3.      In practice, "*Youngblood's* bad faith requirement dovetails with the first part of the *Trombetta* test:  that the exculpatory value of the evidence be apparent before its destruction."  *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).  Thus, when applying the *Trombetta/Youngblood* standards, "[t]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed."  *Id.* (citations omitted)

**B.      Lost, Destroyed, and/or Missing Material Evidence in the Lucas Case**

**1.      The Latent Fingerprint and Photograph of the Fingerprint on the Love Insurance Note**

4.      San Diego Police Evidence Technician Pat Stewart discovered the Love Insurance note in the Jacobs bathroom as he was processing the crime scene.  (74 Pretrial 3143.)  Several days after the note was seized, homicide Detective Gary Gleason requested that ninhydrin be applied to the note to see if any fingerprints could be identified.  (74 Pretrial 3155-56.)  Stewart applied the ninhydrin on May 11, 1979, and some latent print images were raised.  (74 Pretrial 3157.)

5.      The procedure in effect at the San Diego Police Department (SDPD) in 1979 was to photograph the note after spraying it with ninhydrin.  (74 Pretrial 3158.)  This was done in an effort to preserve evidence, because ninhydrin results faded over time.  (75 Pretrial 3346.)  However, Stewart failed to photograph the ninhydrin results

which showed the latent print.  (74 Pretrial 3160; 23 CT 4818-20; 69 CT 15239-41.)
Instead, the note was passed to latent print examiner Leigh Emmerson, who found five
or six points of identification on the note.  (75 Pretrial 3335.)  According to Emmerson,
the resulting print was valuable as an elimination print to exclude potential suspects,
and was a "good piece of evidence."  (75 Pretrial 3340.)  Emmerson instructed the
detectives to preserve this "very important piece of evidence" with the intent that the
latent would be preserved by photographing it, as photographing print results was the
typical procedure in the San Diego Police Department.  (75 Pretrial 3346; *see also* 97
Pretrial 6424-25.)  The evidence technicians at SDPD (in this case, Pat Stewart) had
responsibility for photographing the note.  (75 Pretrial 3375-76.)  Again, however, this
protocol was not followed.

6.     By the time the case was reopened in December 1980, no photograph of
the fingerprint could be found, and the print on the original note had disappeared.  (74
Pretrial 3152-53, 3166; 103 Pretrial 7019.)  Efforts were made to raise the print again,
but nothing worked.  As a result, the fingerprint was lost; and as a consequence of the
repeated efforts to raise a fingerprint, the original printing on the note was obliterated.
(74 Pretrial 3152-53, 3168.)

7.     At Lucas's trial, the defense moved to exclude the Love Insurance note on
the grounds that the destruction of the fingerprint evidence was highly prejudicial and
prevented the jury from having all material facts before it regarding who actually
possessed the note and left it at the scene.  Applying *Trombetta*,[112] the trial judge found
that the Love Insurance note would not have been exculpatory because "in light of the
evidence in all of the Lucas cases and particularly including the clear and unmistakable

---

[112]   The defense originally moved for relief under *People v. Hitch*, 12 Cal. 3d 641
(1974), which held that a defendant's due process rights could be violated if suppressed
or destroyed evidence was found to be material.  *Hitch*, 12 Cal. 3d at 647.  The trial
court determined that *Hitch* had been supplanted by *Trombetta* and based its decision
on *Trombetta*'s holding.  (247 Pretrial 25409-12.)

(15cv1224)

evidence of Mr. Lucas's printing on the note, leads this court to conclude that the chances are virtually nonexistent that the partial print, if preserved, would have been exculpatory to Mr. Lucas." (247 Pretrial 25438-39.)  The trial judge dismissed the defense handwriting experts as providing only "abstract criticism" of handwriting comparison. (247 Pretrial 25439.)  In denying relief under *Trombetta*, the state court failed to address the defense theory that even if the note was authored by Lucas, it may nonetheless have been left by Massingale, who could have been wearing Lucas's clothing obtained at the San Diego Salvation Army.

8.     Contrary to the state court's ruling, the requirements of *Trombetta* were met in this case.  First and perhaps most importantly, the exculpatory value of the fingerprint on the Love Insurance note was clearly apparent from the moment the note was collected.  Within days after seizing the note, it was tested for fingerprint evidence, and the detectives were informed that the latent print was "a good piece of evidence" to exclude potential suspects. (75 Pretrial 3335, 3340.)  *Trombetta*, 467 U.S. at 489.  Without the handwriting comparison which identified Lucas as the author of the note, the evidence against Lucas for the Jacobs homicides would have been extremely thin, especially in light of the fact that Johnny Massingale confessed to the murders.  Hence, the Love Insurance note and the fingerprint found on the note were material pieces of evidence.

9.     The trial court's determination that the print could never have been exculpatory is not supported by the facts or the law.  If the print had such inculpatory value for the police and prosecution, it therefore follows that it had exculpatory value for Lucas or any other suspect who could have been excluded as the source of the print.  The presence of another person's fingerprint on the note would have provided additional support for the defense argument that the prosecution's handprinting comparison did not establish that Lucas wrote the note.  More crucially, if the print had belonged to Massingale, such evidence would have provided support for the defense theory that Massingale was the perpetrator—even if the jury believed that Lucas's

264

handprinting was on the note.  As the defense argued, Lucas's authorship of the note would not have proved that he "possessed the note for all purposes, for all times, and, therefore . . . it was dropped by Lucas." (247 Pretrial 25408.)  Lucas stayed at the San Diego Salvation Army mission (11 RT 1955-57), and in 1979, Massingale stayed at the same mission several times.  (5 RT 664; 50 RT 9471-74.)  Thus, Massingale could have obtained Lucas's clothing from the mission, left his fingerprint on the note, and dropped the note on the day of the Jacobs homicides.

10. The prejudice to Lucas was magnified by the fact that no comparable fingerprint evidence existed which trial counsel could test.  *Trombetta*, 467 U.S. at 489. As a result, Lucas was denied the ability to defend himself against the prosecution's argument that he wrote the note (and therefore, according to the prosecution, murdered Suzanne and Colin Jacobs).  Thus, this Court should independently find a violation of Lucas's due process rights pursuant to *Trombetta*.

11. However, should this Court disagree with Lucas that the value of the destroyed fingerprint and missing photograph was not "apparently exculpatory" under *Trombetta*, it should determine that the evidence was "potentially useful" and that the police acted in bad faith.  *See Youngblood*, 488 U.S. at 58.  A bad faith failure to collect and preserve even potentially exculpatory evidence can violate the Due Process Clause. *See Miller v. Vasquez*, 868 F.2d 1116, 1120-21 (9th Cir. 1989) (citing *Youngblood*, 488 U.S. at 58).  Here, the police knew that ninhydrin fades over time, and they knew that SDPD policy was to photograph latent print results.  Their utter failure to abide by their own department's policies, resulting in the loss of fingerprint evidence the police knew to be valuable, amounts to bad faith under *Youngblood*.  *Miller*, 868 F.2d at 1120-21.

## 2. Evidence Collected From the Santiago Rape Kit

12. While Jodie Santiago was in the emergency room being treated for her injuries, San Diego Sheriff's Deputy Sheila Anderson ordered that a rape kit be taken, which included pubic combings, head hair samples, saliva swabbings, and vaginal and rectal swabbings.  (17 RT 3050-51, 3061-62.)  Criminalist Randall Robinson conducted

(15cv1224)

an examination of the Santiago rape kit, including the vaginal swabs.  (57 RT 10862.)
There was an indication that Santiago had either been assaulted or willingly engaged in
sexual activity shortly before she was found, as both sperm cells and acid phosphatase
were identified in the vaginal slides and swabs.  (47 RT 8771.)  The swabs were tested
for ABO blood group type, but those results neither included nor excluded Lucas as the
donor of the sperm cells.  (47 RT 8777-78.)  However, electrophoretic testing by the
San Diego County Sheriff's Department excluded Lucas.  (36 RT 6757-58, 6764-65,
6768; 52 RT 9721-23.)  After processing, the rape kit was stored at the San Diego
Sheriff's Department.  (Ex. 97, SDSD Evidence List, Case No. 84-3981.)

13.     On April 21, 2016, four representatives from the Office of the Federal
Public Defender (FPD), including investigator Alejandro Villaseñor, went to view
evidence in the Sheriff Department's possession.  (Ex. 100, A. Villaseñor Decl., ¶ 2.)
Detective Richie Hann of SDSD's cold case unit assisted the FPD employees with
viewing, scanning, and/or photographing the evidence on the Santiago, Swanke, and
Strang/Fisher cases.  (*Id.* at ¶ 3.)  Detective Hann was responsible for removing the
evidence from its packaging and placing the evidence on a white paper-covered table.
(*Id.* at ¶¶ 6-8.)  Villaseñor's role was to photograph the physical evidence after
Detective Hann removed it from its packaging.  (*Id.* at ¶ 5.)

14.     Among the evidence Villaseñor observed and photographed was the
Santiago rape kit.  (*Id.* at ¶¶ 10-16.)  The vial containing the deep vaginal swabs was
marked "Needs Refrigeration" and appeared to be filled with a "murky brown, semi
thick" liquid.  (*Id.* at ¶ 11.)  When Detective Hann removed this vial from its
packaging, he read "Needs Refrigeration" out loud and commented, "I guess that didn't
happen."  (*Id.* at ¶ 12.)

15.     Liquid samples with blood or other biological material require
refrigeration and can be kept at room temperature for no longer than 24 hours before
degradation of the samples occur.  *See* U.S. Dept. of Justice Report, *A National*

266

*Protocol for Sexual Assault Medical Forensic Examinations*, 2nd ed., at 75 n. 158 (2013).[113]

16.      Detective Hann subsequently removed an envelope labeled "Pubic Hair Combing" and "Trauma, JANE, BD 01-01-48, 06-09-84." (Ex. 100, A. Villaseñor Decl., ¶ 13(d).)  Detective Hann opened the envelope and pulled out a glass slide with a dark-colored hair on top and a piece of paper.  (*Id.* at ¶ 14.)  As Detective Hann pulled the slide out of the envelope, Villaseñor observed the dark hair become stuck on the top flap of the envelope.  (*Id.*)  At that point, Detective Hann stated, "There is nothing in the envelope," and flicked the dangling dark colored hair off of the envelope top flap. (*Id.*)  Villaseñor saw the hair land on the white paper covered table top and said "Stop!" in an effort to alert Detective Hann that the hair was on the paper.  (*Id.*)  However, as Villaseñor was saying "Stop!", Detective Hann brushed the hair from the paper and onto the floor.  (*Id.*)  When Detective Hann asked what was wrong, Villaseñor informed him that there was a hair in the pubic combings envelope and that Hann had just brushed the hair onto the floor.  (*Id* at ¶ 15.)  Stunned, Villaseñor told everyone in the room not to move.  (*Id.* at ¶ 16.)  Detective Hann said nothing in response to what happened, but instead turned on his cell phone flashlight and shone the light on the carpet in an apparent effort to locate the dropped hair.  (*Id.* at ¶ 16.)  Villaseñor told Detective Hann that "if he did find a hair there was no way we could know whether that hair actually was the one that came from the evidence envelope."  (*Id.*)  Detective Hann never commented in any way on the lost evidence, nor (to Villaseñor's knowledge) made any notation or prepared a report about the loss of evidence.  (*Id.*)

17.      As a result of the negligent actions of SDSD, crucial evidence from the Santiago rape kit was lost.  This loss was completely preventable and is a violation of Lucas's rights under *Trombetta*.  Lucas maintained at trial that Santiago misidentified

---

[113]   Available online at www.ncjrs.gov/pdfiles1/ovw/241903.pdf.

(15cv1224)

him as her assailant.  The rape kit provided some evidence that Santiago was sexually assaulted by someone other than Lucas, but that evidence was not definitive.  (People's Trial Ex. 69 (electrophoretic testing excluded Lucas as the donor of the semen found on the rape kit swabbings); 47 RT 8777-79 (ABO blood typing neither included nor excluded Lucas).)  DNA testing, which was not available at the time of Lucas's trial, exists today which could have definitively excluded Lucas as the source of the semen on Santiago's vaginal swabs.  Similarly, the lost hair, collected from pubic combings, could well have contained DNA evidence of who assaulted Santiago.  The exculpatory nature of these pieces of evidence was clear to the police, who ordered collection of the rape kit evidence and testing of the items.  *See Trombetta*, 467 U.S. at 489.  Moreover, there is no comparable evidence for the unrefrigerated and (presumably) destroyed vaginal swab material, and certainly no comparable evidence for the lost hair from the pubic combing.  *See Cooper*, 983 F.2d at 931.  While Lucas asserts that the loss and destruction of this apparently exculpatory evidence meets the *Trombetta* standard, bad faith under *Youngblood* can also be presumed by the careless manner in which SDSD stored and handled the evidence.  *See Youngblood*, 488 U.S. at 58; *Miller*, 868 F.2d at 1120-21.

### 3.   Hair Found in Suzanne Jacobs's Hands

18.   The prosecution argued that various hairs found in Suzanne Jacobs's hands were consistent with the hair of David Lucas.  (12 RT 2152-58.)  At least one, and possibly as many as seven, of those hairs had a root attached to it which could have been tested serologically.  (143 Pretrial 13232; 208 Pretrial 20218-19.)  In order to properly preserve the root material for serological testing, it was necessary for the hairs to be refrigerated.  (143 Pretrial 13227, 208 Pretrial 20218-21.)  However, SDPD did not refrigerate the hairs collected from Suzanne Jacobs's hands, and therefore no serological testing was conducted.  (208 Pretrial 20218-21.)

19.   The defense filed a *Hitch/Trombetta* motion based on SDPD's failure to preserve exculpatory hair evidence.  (38 CT 8334-60.)  The motion was denied

268

because, according to the trial judge, "the technology at the time on electrophoretic analysis of those hair root sheaths was just in its infancy. . . [therefore] we cannot fault the detectives for not having preserved the hair root sheaths." (247 Pretrial 25444-45.)

20.     Lucas's due process rights were violated by the state court's erroneous denial of the *Hitch/Trombetta* motion. As both prosecution and defense witnesses testified, these serological tests were known in the scientific community and had been published in scientific journals as early as 1979. (143 Pretrial 13217.) The apparently exculpatory nature of the hairs was evidenced by SDPD's efforts to collect and examine the hairs to determine if they possibly came from the perpetrator. At least one of the hairs was described as having "tissue" on the end, which could have been root bulb material or possibly even skin tissue. (143 Pretrial 13225.) This material could have supported Lucas's defense that someone else committed the murders. Instead, the prosecution was permitted to argue that the hairs found in Suzanne Jacobs's hand were from Lucas when they had failed to preserve evidence which could have exonerated Lucas. Thus, in light of the state of the science at the time, and the clearly valuable evidence contained on at least one of the hairs collected from Suzanne Jacobs's hands, the failure to preserve the root and/or tissue material meets the *Trombetta* standard. Yet even assuming the hair material was only potentially exculpatory, the failure to preserve such obviously valuable evidence rises to the level of bad faith. *Miller*, 868 F.2d at 1120-21.

## 4.     Records of the Pretrial Identification Procedures Used by the San Diego Sheriff's Office in the Santiago Case

21.     In addition to the state's broad duty to preserve evidence "that might be expected to play a significant role in the suspect's defense," *Trombetta*, 467 U.S. at 488, the importance of preserving records and information about material circumstances surrounding an eyewitness identification of the alleged culprit is beyond dispute. *See, e.g.*, *Hernandez v. Nevada*, 469 F.2d 1393 (9th Cir. 1972) ("[I]t is the duty of the state to preserve a record of the photographs used for identification purposes

269

(15cv1224)

to enable counsel to reconstruct the identification process").  In light of the high rate of wrongful felony convictions based on eyewitness error, the "[c]omplete and accurate documentation of the witness' statement is essential to the integrity and success of the investigation."  *United States Department of Justice*, *"Eyewitness Evidence: A Guide for Law Enforcement"* (1999) § III(D) at 24; *see also* Wise, R.A., Fishman, C.S., & Safer, M.A., *How to Analyze the Accuracy of Eyewitness Testimony in a Criminal Case*, 42 Conn. L. Rev. 435, 455-64 (finding that eyewitness error contributes to at least half of all wrongful felony convictions, and discussing common causes of such error).

22.   As explained in Claim 4, the trial court violated Lucas's rights to due process, confrontation, fair trial by jury, compulsory process, present a defense, and equal protection by denying the defense request to exclude Santiago's identifications due to improperly suggestive Pretrial identification procedures.  However, apart from the substantive inadmissibility of the identification testimony, relief should also be granted because the state's failure to preserve records from Santiago's interrogation and Pretrial identification denied Lucas a fair opportunity to demonstrate for the court and the jury that her identification testimony was unconstitutionally tainted.

23.   Santiago's extensive injuries and medical treatments caused her to have no memory whatsoever of her first ten days in the hospital and caused emotional, physical, and mental impairments for months after she was assaulted.  (81 Pretrial 4588, 4592-93.)  Because Santiago's own memory was so impaired, any records or reports relating to Santiago's contacts with the police and her identification of Lucas was crucial to Lucas's defense that Santiago misidentified him as her attacker.  However, this record was limited because it was based entirely on the after-the-fact testimony and reports of investigating detectives whose credibility was contested by the defense.  For the majority of Santiago's encounters with the authorities, there was no clear record of what the investigators said to Santiago.  For example:

270

(15cv1224)

- There were no contemporaneous reports or recordings from police contacts with Santiago on June 10, 1984 (the first day police interviewed her in the ICU) or June 11, 1984 (the day Santiago identified her abductor's car as a "brown Colt")[114]. (61 Pretrial 1770, 1772-76, 1795-96; 87 Pretrial 5320; 90 Pretrial 5573-74, 5586, 5603.)  The reports from these police interviews were ultimately not written until six or seven months later, after the police had decided Lucas was a suspect and Santiago had identified Lucas in the photo lineup.  (90 Pretrial 5586, 5603.)

- There were also no records or reports at all on Henderson and Fullmer's contacts with Santiago on June 15, 1984 or June 21, 1984.  (90 Pretrial 5586, 5603; 94 Pretrial 6014-15.)  Again, these contacts were made while Santiago was still recovering in the hospital, still traumatized from her experience, and still under the heavy influence of pain medication and other mind-altering drugs.  (*See* Ex. 96 (Jodie Robertson-Santiago Hospital Records).)

- On June 26, 1984, the detectives interviewed Santiago again, and while Detective Henderson made notes of that meeting, there was no recording and no documentation of what questions were asked.  (82 Pretrial 4691-92; 94 Pretrial 6043; People's Pretrial Ex. 70.)

- There was no record whatsoever of the 2 1/2 to 3 hour interaction between Detective Gillis (of the Seattle Police Department) and Santiago, during which an Identi-Kit composite was constructed (81 Pretrial 4623-24; In

---

[114]  There were some written answers from Santiago on those dates.  (82 Pretrial 4685-91; People's Pretrial Exs. 63 and 64.)  Detective Henderson claimed that Santiago was referring to her brother's car when she wrote "brown Colt," but Nurse Warr, who was present for the interview, testified that Santiago was referring to the car in which she was placed after she was abducted.  (16 Pretrial 1771-72; 61 Pretrial 1795-96.)  Lucas did not drive a brown Colt.

271

Limine Exhibit V); nor was there any record of the 2 1/2 hour composite session taken by San Diego detectives on December 4, 1984.

- The police failed to preserve the original pool of photos from the photo array, and failed to document what occurred before, during, and after the photo lineup.[115]

- There were no contemporaneous notes, recordings, or reports made of Santiago's identification of Lucas's residence—an identification which came into serious dispute when the four people who were in the vehicle prior to and during the identification gave four substantially different stories as to what was said and done.  (*Compare*, 91 Pretrial 5689-90 (Fullmer testimony); 94 Pretrial 6136-37, 6139 (Fisher testimony); 95 Pretrial 6293-94 (Zuniga testimony).)

- There was no recording, notes, or report made of Santiago's meeting with the district attorney and police officers on December 15, 1984.  This meeting occurred after Santiago had identified Lucas in the photo array, and after detectives had done their first drive-by of the Lucas residence (where Santiago failed to identify the house).  There was evidence that Santiago was present while police officers prepared and openly discussed the search warrant for Lucas's house in the district attorney's office.  (91 Pretrial 5685-87; 94 Pretrial 6099, 6101.)  After this meeting, police officers drove Santiago by Lucas's house again; this time, Santiago identified Lucas's house, although (as noted above) there were significant discrepancies in each participant's version of how the identification occurred.

---

[115]  As noted in Claim 4, the lack of contemporary recording and documentation of Santiago's identification was particularly troubling because of crucial discrepancies between the later recollections of Santiago and the detectives.

272

(15cv1224)

- The only interaction between Santiago and the police which was ever recorded was the interview which took place on December 4, 1984 in Seattle—before Lucas's arrest in this case, but after the date he alleges that police were considering him as a suspect. (81 Pretrial 4631-32; 90 Pretrial 5601; 94 Pretrial 6061-63.)

24.     The potentially exculpatory nature of this evidence was apparent, as any information which would have impeached the police identification procedures and/or Santiago's identification was crucial to Lucas's defense of misidentification. While the simple fact that evidence was "potentially exculpatory" may not provide a sufficient showing of prejudice, *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997), a bad faith failure to collect and preserve even potentially exculpatory evidence can violate the Due Process Clause. *See Miller*, 868 F.2d at 1120-21. Here, the detectives' inexplicable failure to document or record key aspects of their homicide investigation and the surviving witness's identification of a possible suspect, in direct contravention of police procedures and best practices, is evidence of bad faith under *Youngblood*. *See id.; see also Youngblood*, 488 U.S. at 58.

### 5.     Massingale's Shirt

25.     Jimmy Joe Nelson was a witness who alerted the Texas and San Diego police about Massingale's confession to the Jacobs homicides. After Nelson wasarrested in Texas, he informed Chickasaw Police Detective Harold Phillips that Massingale had given him some personal items, including boots, pants, and shirts, that Massingale said he did not need. (41 RT 7869, 7890, 7902.) One night, Nelson started to put on one of the shirts Massingale had given him and discovered that the left sleeve looked as if a woman had taken her fingernails and raked them down the sleeve. (41 RT 7869-70, 7888.) There was also a substance on the shirt which looked like blood. (41 RT 7870.) When Detective Phillips seized the items from Nelson's mother's home, he recalled that one of the shirts "had runs in it . . . like a hosiery gets," as well as "dark colored stains" which looked like blood. (41 RT 7779-80, 7786.) Detective Phillips

1   mailed all of the items he seized to San Diego Police Detective Ayers.  (41 RT 7769,

2   7784.)  However, the torn and apparently blood-stained shirt was not included in the

3   box when it was introduced as an exhibit through Detective Phillips at trial.  (Def. Trial

4   Ex. 505-A.)  Detective Phillips testified he included that shirt in the box when he

5   mailed it and to his knowledge it was received by Detective Ayers.  (41 RT 7784.)  At

6   Lucas's trial, Detective Phillips reviewed the contents of the box that he mailed and it

7   appeared that everything else that he mailed (primarily clothing) was still in the box.

8   (41 RT 7784.)

9          26.     The loss of such a crucial piece of evidence remains unexplained.  What is

10  clear is the extent to which the loss of this evidence prejudiced Lucas.  The fact that the

11  original suspect in the crime was in possession of a torn and apparently blood-stained

12  shirt was obviously material and probative evidence in the Jacobs homicide case.  If the

13  shirt had been tested and the stain determined to be the blood of Suzanne and/or Colin

14  Jacobs, such evidence would have been highly exculpatory to Lucas, and highly

15  inculpatory to Massingale.  The last known location of the shirt was a box mailed by

16  Detective Phillips to the San Diego Police Department, and that box was received with

17  apparently only that one item missing.  (Def. Trial Exs. 505 at 2; 505A-1 through A-10;

18  *see also* Ex. 102 (SDPD Supplemental Evidence List for Jacobs Case.)  To the extent

19  that either Chickasaw or San Diego police officers were responsible for losing or

20  destroying this apparently exculpatory piece of evidence, that action violated

21  *Trombetta*.

22      **6.    Forensic Evidence That Was Not Collected or Was Lost From the**

23          **Jacobs Crime Scene**

24          27.     A cigarette which did not appear to be a brand used by the Suzanne or

25  Michael Jacobs was photographed but not seized for examination.  (4 RT 562-63, 565,

26  569.)  In 1979, it was possible to determine the ABO blood grouping of a person from

27  saliva.  (4 RT 566; 45 RT 8418; 48 RT 8958-59.)

28

274

(15cv1224)

28. A wine glass found on top of the Jacobs television set contained a wine-like substance which was never analyzed; the police also did not check the wine glass or another glass found in the living room for fingerprints. (8 RT 1222-23.)

29. A partially eaten apple, which could have contained saliva or teeth marks from the perpetrator, was not collected or preserved; neither was a cigarette found on top of the television which appeared to be from a brand not used by Suzanne or Michael Jacobs. (4 RT 599; 9 RT 1444, 1446.)

30. Blood samples which had been collected at the morgue from Suzanne and Colin Jacobs were lost. (9 RT 113-44.)

31. Hair and debris found in the kitchen sink drain screen (8 RT 1235-36), a file box (8 RT 1244), and a button found on the headboard bed frame near Suzanne's body but which did not match Suzanne's shirt (8 RT 1246-1247), were not tested or checked for prints.

## C. The Loss, Destruction, and/or Failure to Preserve Evidence Violated Lucas's Due Process Rights

32. Because both the guilt and penalty phases of a trial require heightened reliability, *Beck v. Alabama*, 447 U.S. 625, 627-46, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), Lucas submits that the *Trombetta* and *Youngblood* requirements should be relaxed where, as here, the lost evidence impairs the reliability of the guilt and/or penalty adjudication in a capital case. Nevertheless, Lucas's claims meet the *Trombetta* and *Youngblood* standards. Over and over again, police officers in this case destroyed or lost evidence, failed to collect and/or photograph evidence, and neglected to document facts in reports or notes, even when it was protocol to do so—and then would get on the stand and testify to the existence of facts and evidence for which they, through their own misconduct, had no corroborating evidentiary support. This pattern and practice is indicative of bad faith warranting relief under *Youngblood.*

275

**CLAIM 14:  THE PROSECUTOR'S FAILURE TO DISCLOSE MATERIAL IMPEACHMENT EVIDENCE VIOLATED LUCAS'S RIGHT TO A FAIR TRIAL (SHP VII.A; AOB 2.8.1(D))**

**A.    Relevant Law**

1.    Due process requires the prosecution to divulge all evidence to the defense which is both favorable to the defendant and material either to guilt or to punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  A prosecutor's suppression of evidence violates Brady if three elements are met: (1) the evidence is favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence was suppressed; and (3) the suppressed evidence was material.  *United States v. Bagley*, 473 U.S. 667, 674-76 (1985); *Brady*, 373 U.S. at 87.  "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." *Bagley*, 473 U.S. at 674-76.  Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  A prosecutor's duty to disclose favorable, material evidence continues beyond the trial itself into appellate and collateral litigation.  *See Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under *Brady*"); *see also Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992) (duty to disclose exculpatory evidence extends to post-conviction habeas proceedings).

2.    In this case, police and prosecutors failed to disclose material exculpatory evidence about the criminal conduct of San Diego Sheriff's Department lead detective Dennis Hartman, who earned money from and managed an illegal brothel both before, during, and after Lucas's trial.  Additionally, the prosecution failed to timely disclose impeachment evidence relating to Johnny Massingale, in violation of the due process clause of both the state and federal constitutions.  As a result, Lucas's convictions and sentence of death violated *Brady, Kyles,* and their progeny and therefore were

unlawfully and unconstitutionally imposed in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**B.     The State's Failure to Disclose Hartman's Criminal Conduct Violated Lucas's Due Process Right to Impeach the State's Witnesses and Present His Defense**

3.     San Diego Sheriff's Department Sgt. Dennis Hartman was the lead homicide detective assigned to the Santiago, Swanke, and Strang/Fisher investigations. (32 Pretrial 5512.)  In November 1991, San Diego Sheriff's Sgt. Sacco received a telephone call from a "concerned citizen" who reported that Sgt. Hartman had been operating a massage parlor, Yong Acupressure, which acted as a front for a prostitution ring. (Dkt. 36-39 at 54 (2008 State Pet. Ex. 88, RT of Grand Jury in *People v. Dennis Hartman*, CR-134016 (hereinafter Dkt. 36-39 at 54 ) at 56)  The citizen caller alleged that Sgt. Hartman had been "running the business and controlling it and collecting the day's receipts" for at least one and a half years—i.e., since at least approximately June of 1990.  (Dkt. 36-42, AG's Informal Response, 07/07/2009 (hereinafter Dkt. 36-42), Ex. 3 at 174, 179-80.)

4.     The San Diego Sheriff's Department launched an investigation, which revealed that Hartman had a very active role in Yong Acupressure's operations.  (Dkt. 36-39, p 54 at 58, 38-55.)  Sandy Hall, the owner of Yong Acupressure, obtained a license for the business on October 20, 1988.  (*Id.* at 73.)  A La Mesa Police Department Vice Squad undercover investigation determined that the business was a front for a prostitution ring.  (*Id.* at 40, 50.)  Hartman was observed on multiple occasions going into Yong Acupressure, and on at least one occasion he was seen entering the business with an empty bank bag and leaving with a full bank bag.  (*Id.* at 40-42.)  According to his former wife Barbara, Hartman purchased an expensive Gold Wing motorcycle in 1989. (*Id.* at 66.)  Hartman told Barbara that he put down $5000 in cash on the motorcycle and financed the rest through the credit union where they

banked. (*Id.* at 68.)  However, although she typically managed the couple's finances, Barbara never saw any paperwork for that transaction. (*Id.* at 61-72.)

5.   In December 1990, Hartman left Barbara, his wife of ten years, for Hall.[116] (*Id.* at 60, 64.)  Subsequently, during the years 1991 and 1992, Hartman deposited more than $50,000 in cash into his credit union account.  Large sums of money were regularly transferred between Hall's account, Yong Acupressure's business account, and Hartman's account.  The district attorney's forensic accountant, Ray Tatum, determined that Hartman was engaged in money laundering, and there was no evidence of taxes being paid on these large sums of cash.  Tatum estimated that the net profit of Yong Acupressure was $100,000 in a one-year period. (*Id.* at 74-78.)

6.   After a lengthy investigation, including grand jury proceedings, Hartman was charged with one count of keeping a house of prostitution (Cal. Penal Code § 315), one count of pimping (Cal. Penal Code § 266(h)) and two counts of pandering (Cal. Penal Code § 266(i)).  Hartman ultimately pleaded guilty to one count of attempted pimping and was sentenced to three years' probation in January 1993. (Dkt. 36-42 at 154.)

7.   The evidence shows that Sgt. Hartman engaged in serious acts of moral turpitude prior to, during, and after Lucas's trial in 1989.  Moreover, the currently available evidence shows that the San Diego District Attorney's Office was aware of an investigation into Hartman's criminal activities as early as 1991[117], which was during the pendency of Lucas's appeal.  By failing to disclose Sgt. Hartman's criminal behavior to Lucas and his counsel, the prosecution violated its continuing duty to disclose material evidence to the defense.  *See Broam*, 320 F.3d at 1030; *see also*

---

[116]   According to Sgt. Sacco, Barbara Hartman was not the "concerned citizen" who first reported the prostitution ring.  (SHP Ex. 88 at 3080.)

[117]   Should Lucas receive the subpoena and discovery power he requests in this petition, he anticipates that he will be able to show that the relevant date is even earlier than 1991.

(15cv1224)

*Tennison v. San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009) (holding that police inspectors could not avoid liability under 42 U.S.C. § 1983 for failure to produce exculpatory evidence on the basis that they received the evidence after the guilty verdict "because the record disclose[d] that they received the [information] while they were still involved in the new trial and post-conviction proceedings for [the former defendants and § 1983 plaintiffs].").

8.      The police and prosecution had a duty to inform the defense of Sgt. Hartman's criminal conduct because that conduct adversely reflected on his honesty and undermined confidence in the honesty and reliability of the investigation which he headed. Sgt. Hartman was the chief supervising homicide officer in the Swanke and Santiago cases; all of the other detectives reported to him.  Police misconduct was the central theme of Lucas's guilt phase defense, including the allegation that Santiago's identification of Lucas was strongly tainted by suggestive procedures employed by Sgt. Hartman and his other officers. Sgt. Hartman was deeply involved in Santiago's identification of Lucas, and the identity of Lucas as the perpetrator in the Jacobs and Swanke cases was largely influenced by the identification Sgt. Hartman and his detectives obtained from Santiago.  Additionally, two of the detectives supervised by Sgt. Hartman (Henderson and Fullmer) were caught lying on tape in another case, and trial counsel vigorously litigated that issue in an effort to show that the investigation in Lucas's case had also been tainted by police misconduct.  (*See, e.g.*, 11 CT 2277-2426; *see also* Claim 5.)

9.      Thus, information that Sgt. Hartman operated a massage parlor as a front for prostitution and pimped the women who worked there reasonably could have affected the outcome of Lucas's case.  The defense relied on an integrated strategy of reasonable doubt at the guilt phase and lingering doubt at the penalty phase—a strategy which relied in substantial part on allegations of investigatory misconduct.  Evidence of Sgt. Hartman's criminal activity was favorable and material within the meaning of *Brady* because it would have helped Lucas demonstrate that police misconduct tainted

279

his case, and it would have hurt the prosecution by providing serious impeachment evidence against the lead detective in the Santiago, Swanke, and Strang/Fisher cases. *Bagley*, 473 U.S. at 674-76.

10.    Sgt. Hartman committed the type of misconduct that, as lead investigator, he was ethically and constitutionally obligated to divulge to the defense during trial. The fact that Sgt. Hartman found himself untenably positioned between his own self-preservation and his duties as a law enforcement officer does not strip Lucas of his right to impeachment material under *Brady*.  Moreover, even if one accepts that law enforcement (and subsequently the district attorney's office) had no knowledge of Sgt. Hartman's activities until 1991, that information should nevertheless have been disclosed to Lucas's counsel, as his case was pending appeal in the California Supreme Court.  *See Broam*, 320 F.3d at 1030.

## C.    The State's Failure to Timely Disclose Impeachment Evidence Regarding John Massingale Violated Lucas's Due Process Right to Impeach the State's Witnesses and Present His Defense

11.    During Lucas's cross-examination of Massingale, Massingale admitted that he sometimes had a bad temper, but he adamantly denied that he would ever hit a woman.  (5 RT 806.)  Approximately two days after his testimony, the prosecution disclosed a police report about Massingale assaulting his wife and another woman at a party in late 1988.  (8 RT 1153-56.)  Defense counsel promptly objected to the prosecution's failure to disclose timely impeaching evidence of a key witness in a capital case in violation of discovery orders obtained by the defense (8 RT 1153-56; 56 RT 10367, 10484-86), filed a motion for mistrial, exclusion of evidence and other sanctions for violations of such discovery orders (64 CT 14101-07, 14148-51), and filed a motion for a new trial on the same grounds.  (67 CT 14872-79.)  The motions were denied.  (53 RT 10502-04; 65 RT 13640-41.)

12.    "Disclosure, to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the accused."  *United States v. Davenport*, 753 F.2d

280

1460, 1462 (9th Cir. 1985).  In this case, key impeachment evidence was not available to Lucas during counsel's cross-examination of Massingale, the only time such evidence would have had a powerful impact on attacking Massingale's truthfulness and his testimony asserting his own nonviolence towards women.  (64 CT 14106-07; 67 CT 14875-76, 14879; 51 RT 9594-99.)  This was especially important because Massingale's blanket denials of confessing to Smith or Nelson, coupled with his repeated recitations of poor memory, suggestibility, and coercion by law enforcement, insulated him from admitting any fact on which defense counsel could conduct meaningful cross-examination.[118]  The later introduction of evidence of the assault through other witnesses had minimal impact on attacking Massingale's credibility, because the jury was deprived of Massingale's reaction to being caught in a lie while on the stand and under oath.  (45 RT 8535-37.)  Thus, in addition to the *Brady* violation, the prosecution withheld information that would have put teeth in Lucas's defense to Massingale's testimony.  Depriving the defense of the opportunity to have the jury evaluate Massingale's demeanor when confronted with his lie deprived Lucas of a crucial component of his federal constitutional right to confrontation.  *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14 (2009); U.S. Const. amend., 14.

---

[118]  When counsel did attempt to aggressively cross-examine Massingale about his prior confessions and his knowledge of intimate details about the murders, the trial court, in front of the jury, told defense counsel to "lighten [his] tone." (5 RT 701-04.) The trial court also showed sympathy for Massingale by telling defense counsel, in front of the jury, to pay for the Marlboro cigarettes borrowed from Massingale to be used as an exhibit. (5 RT 733-34.)  According to the court, she was just trying to be "nice" to Massingale because defense counsel was "very hardnosed" with him. (5 RT 736-740.)

**D.     The State's Failure to Timely Disclose the Four Photos Shown to Massingale During His Interrogation and Confession Violated Lucas's Due Process Right to Impeach the State's Witnesses and Present His Defense**

13.     The detectives who interviewed Massingale in Kentucky (Pace, Ayers, and Green) testified that he was shown four photos of the Jacobs crime scene—two of the victims lying on the bedroom floor (but not showing their wounds) (42 RT 8086-87), and two photos of the front and side yards outside of the Jacobs house.  (42 RT 8086; 45 8580-83.)  The detectives refused to show Massingale any other photos prior to his first confession, and they purposefully withheld various details about the murders, including the fact that the victims had nearly been decapitated.  Massingale subsequently gave a detailed confession which included facts about the homicide and the crime scene that had not been shared with Massingale or made public.

14.     During his trial testimony, Massingale made conflicting statements about which and how many photos he saw.  For example, he claimed that he obtained inculpatory details of his confession from an unknown number of photographs of the crime scene shown to him by the detectives.  (5 RT 814-15, 818-20; 6 RT 871-73, 895-97.)  Yet Massingale later testified that he may not have been shown *any* photographs before he first confessed to Pace.  (6 RT 899-900.)  Defense counsel repeatedly tried to discover which of the many crime scene photographs actually had been shown to Massingale in Kentucky (51 RT 9604), a fact noted by the trial court.  (55 RT 10504-06.)  However, it was not until Massingale had completed his testimony and the prosecution was cross-examining Ayers that the prosecution revealed which specific photos were shown to Massingale.  (45 RT 8593-95; 55 RT 10504-07.)

15.     Defense counsel immediately objected to this failure to timely disclose favorable evidence and moved for a mistrial, exclusion of evidence, and other sactions for violations of discovery orders.  (47 RT 8606-09; 55 RT 10367-70, 10486-87; 64 CT

282

1  14101-03, 14107; 67 CT 14872-79.)  Lucas's motions were denied.  (55 RT 10504-07;

2  72 RT 13640-41.)

3      16.    Once again, the prosecution violated Lucas's rights under *Brady* by not

4  disclosing the photographs during a time when it would have had value for the

5  accused—i.e., when the jury could have evaluated Massingale's demeanor when

6  immediately confronted with his lie.  *Davenport*, 753 F.2d at 1462; *Melendez-Diaz*, 557

7  U.S. at 313-14.

8  **E.    Taken Individually or Cumulatively, the State's Violations of Its Duty**

9       **to Disclose Prejudiced Lucas and Were Not Harmless**

10     17.    The violations of the state and the federal constitutions described above

11  were prejudicial to Lucas under the applicable standards of prejudice.  *Smith v. Cain*,

12  565 U.S. 73, 75 (2012).  When the undisclosed impeachment evidence, taken

13  individually or cumulatively, is weighed against the other evidence of police

14  misconduct and the closely balanced guilt and penalty phase determinations, it is no

15  longer possible to confidently conclude that Lucas's trial was fair.  The failure to

16  disclose Sgt. Hartman's criminal activities undermines confidence in both Lucas's

17  substantive convictions and the penalty phase determinations.  Moreover, in the Jacobs

18  case, the prosecution destroyed the most significant piece of evidence (the fingerprint

19  on the Love Insurance note, which could have exculpated Lucas or inculpated

20  Massingale) and otherwise used minimal circumstantial evidence to argue that Lucas

21  had committed the Jacobs murders.  Since Lucas's convictions for the Jacobs murders

22  provided the only basis for imposing the death penalty against him, determining the

23  reliability of his convictions for those two murders requires this court's strictest

24  scrutiny.  *Kyles*, 514 U.S. at 422; *Gardner v. Florida*, 430 U.S. 349, 363 (1977).

25

26

27

28

283

**CLAIM 15:  COUNSEL WERE INEFFECTIVE AT PENALTY (SHP VI.A, VI.B, VI.C, VI.D, VI.E, VI.F, VI.G, VI.J, VI.BB, VI.CC, VI.EE, VI.FF, VI.GG, VII. A, VII.E)**

**A.    Introduction**

1.     Lucas was denied effective assistance of counsel at the penalty phase of his trial when his counsel unwittingly opened the door to damaging evidence: otherwise-inadmissible prior diagnoses, including antisocial personality disorder and other unfavorable testimony by their mental health witness.  Counsel also failed to adequately investigate and present readily available evidence of brain damage, trauma and mental illness, which would have explained and contextualized the unfavorable testimony and given the jury a vastly more sympathetic picture of the man they would sentence to death.  Because of this and other errors, Lucas's convictions, sentence, and confinement are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  But for counsel's deficient performance, there is a reasonable probability that the result of Lucas's trial would have been different.  *Strickland v. Washington*, 466 U.S. 668 (1984); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); U.S. Const. amend. V, VI, VIII, XIV.

**B.    Relevant Law**

2.     The Sixth Amendment of the Constitution guarantees the right to effective assistance of counsel.  To establish unconstitutionally inadequate representation, Lucas must show:  (1) that counsel's performance "fell below an objective standard of reasonableness," and (2) that counsel's performance was prejudicial.  *Strickland*, 466 U.S. at 687-88.

**1.    Deficient Performance**

3.     Professional standards for representation of a defendant at the penalty phase of a capital trial impose on counsel "an 'obligation to conduct a thorough investigation of the defendant's background.'"  *Porter v. McCollum*, 558 U.S. 30, 39

(2009); *see also Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) ("[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase."). Consequently, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Indeed, the Supreme Court has explained that the deference owed to counsel's strategic judgments is predicated on the adequacy of the investigation supporting those judgments. *Wiggins*, 539 U.S. at 521; *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (holding that counsel is deficient if he "neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so"). Moreover, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

### 2. Prejudice

4. To establish prejudice, a habeas petitioner does not have to show by a preponderance of the evidence that the result in his case would have been different but for counsel's error. *Wiggins*, 539 U.S. at 534. Rather, he must simply show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

5. When an ineffective assistance of counsel claim is based on trial counsel's failure to present mitigation evidence, it is "not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007). *See also Rompilla*, 545 U.S. at 393 ("[A]lthough we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test."). Rather, the court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The totality of available

285

(15cv1224)

mitigating evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams v. Taylor,* 529 U.S. 362, 397 (2000). If there is a reasonable probability that "at least one juror would have struck a different balance" after placing the totality of the available mitigating evidence on the scale, prejudice is established. *Wiggins*, 539 U.S at 537.

6.      In addition, even "overwhelming evidence of guilt does not ameliorate the failure to present mitigating evidence at the penalty phase." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999); *see also Hendricks*, 70 F.3d at 1044; *Mayfield*, 270 F.3d at 929 (finding prejudice even in light of strong aggravating evidence); *Williams*, 529 U.S. at 368-69, 399 (setting aside death sentence due to ineffective assistance at the penalty phase despite strong aggravating evidence). "Evidence of mental disabilities or a tragic childhood can affect a sentencing determination even in the most savage case." *Lambright v. Stewart*, 241 F.3d 1201, 1208 (9th Cir. 2001). There is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382(1990) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987)).

7.      Prejudice from counsel's errors must be considered collectively, not item-by-item. Even if one error viewed in isolation might not rise to the level of prejudice, multiple errors considered in the aggregate may warrant relief under *Strickland*. *Harris by and through Ramseyer v. Wood*, 64 F.3d 1432, 1436 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (cumulating *Strickland* errors with other significant errors).

8.      Moreover, the prejudice analysis must take into account the cumulative prejudice resulting from trial counsel's deficiencies in all phases trial, because counsel's ineffectiveness during the guilt phase may cause continuing prejudice at the penalty phase. Where multiple instances of ineffective assistance of counsel are alleged, a court must:

(15cv1224)

[e]xamine all aspects of the counsel's performance at different stages, from Pretrial proceedings, through trial and sentencing.  Separate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived [petitioner] of his right to effective assistance.  They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel.

*Sanders v. Ryder*, 342 F.3d 991, 1000-01 (9th Cir. 2003).

### 3. Prevailing Professional Norms for Capital Defense Counsel in 1986-89

9.    From the time of appointment until the conclusion of the proceedings, capital defense counsel in California must operate under the assumption that the case will proceed to a penalty phase, and that the penalty phase will be tried in front of jurors who have been death-qualified and who have just convicted the defendant of capital murder.  *See In re Gay*, 19 Cal. 4th 771, 814-15 (1998) (confirming that, under the standard of care in California in 1983, "all counsel representing capital defendants must prepare for all phases of the trial" and should "initiate[] the penalty phase investigation well before the return of the guilt phase verdict[]".)

10.    In 1980, the American Bar Associate promulgated its Standards for Criminal Justice ("1980 ABA Guidelines").  These standards included a duty to conduct a prompt investigation of all the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty.  1980 ABA Guidelines, Standard 4-4.1.  In 1989, the same year of Lucas's conviction, the ABA set forth Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("1989 ABA Guidelines").  The Supreme Court has looked to these guidelines in determining the reasonableness of counsel's performance. *Rompilla*, 545 U.S. at 388 n.7; *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010). Under the Guidelines, trial

287

(15cv1224)

counsel is required to conduct an independent investigation immediately upon his or her entry into the case. 1989 ABA Guidelines, 11.4.1(A).

11. Counsel has a duty to ensure that "all reasonably available mitigating and favorable information" is presented to the sentencing entity. 1989 ABA Guidelines, 11.8.2.(D); 11.8.6. Thus, by 1986-89, it was well established that the standard of care for capital defense counsel required preparation of a detailed social history of the client's life, based on information learned during counsel's investigation. *See In re Lucas* (no relation to Petitioner), 33 Cal. 4th 682, 725 (2004) (confirming that "norms prevailing in California at the time of trial [in 1987] . . . directed counsel in death penalty cases to conduct a reasonably thorough independent investigation of the defendant's social history").

12. Counsel also has a duty to become familiar with the procedures for capital sentencing and "with the case law and rules regarding what information may be presented." 1989 ABA Guidelines, 11.8.2(A). Competent capital counsel must ensure that the client is not harmed by improper, inaccurate, or misleading information being presented to the sentencing entity. 1989 ABA Guidelines, 11.8.2(C).

13. Prevailing professional norms at the time of Lucas's trial required a capital attorney to investigate each of the specific statutorily recognized mitigating factors as well as the more general factor (k). *Wiggins*, 539 U.S. at 524 (emphasizing that by 1989, "[t]he ABA Guidelines provide[d] that investigations into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (emphasis in original).

C. **Trial Counsel were Ineffective for Opening the Door to Prejudicial Evidence**

14. *Strickland* requires "thorough investigation of law and facts relevant to plausible options." *Strickland,* 466 U.S. at 690. Mistakes of law may clearly render counsel's performance deficient. *See Kimmelman v. Morrison*, 477 U.S. 365, 385

(1986) (trial counsel's mistaken belief that law required state to turn over all inculpatory evidence unreasonable and constituted deficient performance); *Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014) (trial counsel's misunderstanding of state capital funding statute was inexcusable mistake of law and constituted deficient performance).  Lucas was denied the effective assistance of counsel when his attorneys, due to their own mistake and confusion, opened the door for discovery and admission of highly prejudicial evidence and elicited expert testimony that undermined their primary defense theory of lingering doubt.

        **1.    Relevant Facts**

                **a.    Dr. Alvin Marks**

        15.    At both the guilt and penalty trials, counsel sought to present an "integrated theory of non-participation;" their consistent theory was that Lucas was not responsible for the charged crimes.  (Dkt. 36-8, 2008 State Pet., Ex. 10, A. Landon Decl. at 85 ¶ 3; Dkt. 36-8, Ex. 11, S. Feldman Decl. at 93 ¶ 2.)  This theory relied on the reasonable doubt standard at the guilt trial and lingering doubt at the penalty trial.  (*Id*.)  At guilt, the jurors convicted on only 3 of the 5 charged incidents[1] notwithstanding the prosecution's theory that the offenses were so similar that the same person must have committed them all.

        16.    At penalty, defense counsel continued to rely primarily on their theory of lingering doubt, as well as themes of positive character attributes and behavior, and Lucas's potential for a good adjustment in prison.  (Dkt. 36-8 at 85 ¶ 4; Dkt. 36-8 at 93 ¶ 2.)

        17.    Counsel had in their possession a report prepared by neuropsychologist Dr. Gale Winston Bach that showed evidence of neuropsychological impairment.  (68 RT

---

[1] The jurors acquitted on the Garcia count and deadlocked on the Strang/Fisher counts. (*See* 26 CT 5563-67.)

(15cv1224)

12791-93; 68 RT 12832; 2008 State Pet., Supplemental Ex. 16 Appx 83[119], Dr. Bach Report; Dkt. 36-10 at 1 ¶¶ 141-146; Dkt. 36-26 at 21 ¶¶ 55-67.)  Lucas's impairments affected the motor performances of his left hand and also higher mental processes such as judgment, abstraction, problem solving techniques, logic, and impulse inhibition. (2008 State Pet., Ex. 16 Appx. 83.)  Lucas's mental impairments placed him in the bottom 1-5th percentile, or worse than five percent of the population, matched for age and education.  (*Id*. at 4.)  These findings were consistent with a history of right frontal brain injury from a reported car accident.  (*Id*.)  The deficits also could have been present since birth, or have been caused by violence inflicted on Lucas throughout his life.  (*Id*.)

18.    Counsel also had a 1985 neuropsychological evaluation of Lucas by Dr. Meredith Friedman, which also showed deficits suggestive of frontal lobe impairment. (Dkt. 36-12 at 128, 2008 State Pet., Ex. 16, Appx41, M. Friedman Report pt 1; Dkt. 36-13 at 1, 2008 State Pet., Ex. 16, Appx 41, M. Friedman Report pt. 2; Dkt. 36-18 at 23, 2008 State Pet., Ex. 16, Appx 122, Raw Data from Friedman Testing.)  The frontal lobe of the brain is responsible for inhibition, planning, and volitron.  Individuals with frontal lobe deficits may suffer from difficulty modulation emotions and behavior and disinhibition regarding aggression and/or sexual behavior, outbursts of anger over trivial stimili.

19.    Counsel also had in their possession a positron emission tomography (PET scan), which revealed that Lucas had possible problems linked to his limbic system. (*Id*.)  Specifically, the PET date indicated a decreased metabolic rate in a portion of the right anterior frontal lobe and mildly abnormal decreased metabolic rate was present in both temporal-parietal regions, more marked on the rights side.  (Dkt. 26-36 at 21.) Damage to any limbic system structures may result in "marked aggression or violence,

---

[119]  As explained in Ex. 101 (R. Angulo Decl.), the version of Dr. Bach's Report previously lodged at Dkt. 36-15 at 38, is incomplete.  Petitioner has lodged a supplemental exhibit containing a complete copy of Dr. Bach's Report.

(15cv1224)

hypersexuality, or rage reactions.  (*Id*. at ¶ 68.)  The damage may have been caused by or exacerbated by the trauma Lucas experienced throughout his childhood.  (*Id*. ¶ 70.)

20.  Despite having access to this information, counsel presented only brief testimony from mental health witness, Dr. Alvin Marks.  (67 RT at 12775-94; 69 RT 13026-29.)  According to declarations submitted post-conviction, Dr. Marks played a relatively minor role in counsel's overall penalty strategy.  (Dkt. 36-8 at 88 ¶ 10.)  Counsel assumed that Dr. Marks's testimony – which was to be limited to the sympathetic aspects of Lucas's abusive and dysfunctional childhood home, his personality disorder (which he identified as "personality not otherwise specified") and his organic brain damage – would not undermine or compromise the lingering doubt theory.  (Dkt. 36-8 at 87 ¶ 8.)

21.  Counsel tried to limit the materials Dr. Marks reviewed and relied upon, including Dr. Bach's report, because it contained a diagnosis of antisocial personality disorder.  (68 RT 12837-43, 12857; 69 RT 12996.)  The prosecutor attempted to cross-examine Dr. Marks on the prior antisocial diagnosis, but the trial court denied the request, on the basis that Dr. Marks had only relied upon the portions of Dr. Bach's report relevant to brain damage.  (69 RT 12589.)

22.  Counsel also sought to prevent the jury from hearing about Lucas's Atascadero State Hospital ("ASH") records, because they contained the following diagnosis (hereinafter "ASH diagnosis") of Lucas on February 7th, 1974, by psychiatrist Dr. R.M. Schumann:

<u>Diagnosis</u>:  301.78  Antisocial personality, severe.

303.10  Alcoholism, habitual excessive drinking.

302.80  Sexual deviation, aggressive sexuality.

<u>Prognosis</u>:  Very guarded.

((Dkt.  36-8 at 122; *see also* 69 RT 13025-26.)

23.  Prior to the penalty phase, these records were sealed and unavailable to the prosecution.  (Dkt. 36-8 at 86 ¶ 5.)  Counsel mistakenly believed that as long as they

(15cv1224)

did not provide the ASH records to their expert, they would remain sealed.  (Dkt. 36-8 at 86-88 ¶ 5-6,10.)  Counsel were careful not to provide the damaging portions of the records to Dr. Marks and also Loyal Tallchief, a counselor from ASH who testified as to Lucas's good behavior there.  (*Id.* at ¶ 8.)

24.    Defense counsel understood that the ASH diagnosis was "exceptionally prejudicial" to Lucas because it portrayed him as an antisocial psychopath and as an aggressive sexual deviant, which fundamentally undermined their both their good character and their lingering doubt penalty themes.  (*Id.* at ¶ 6.)

25.    Had counsel realized that Dr. Marks's and/or Tallchief's testimony would open the door for discovery and admission of the ASH records they would not have had them testify.  In counsel's view, the prejudicial impact of the Schumann diagnosis "far outweighed" any potential benefit of Dr. Marks's and Tallchief's testimony.  (*Id.* at ¶ 10.)

26.    Due to counsel's poor preparation, Dr. Marks's testimony was extremely damaging.  Dr. Marks testified that Lucas had a personality disorder known as "personality not otherwise specified" using the DSM-IIIR that would previously have been classified as "inadequate personality" and "mixed personality disorder."  (67 RT 12779-80.)  On cross-examination, Dr. Marks testified as follows:

> "[Prosecutor] Q.  .  .  .  Let me ask you then, would he [defendant] hurt a child?
>
> [Dr. Marks] A.  I don't think he would 99 percent of the time.

 (69T 13034-35.)

27.    Dr. Marks also testified that with "medical certainty," Lucas had a "rage" against women that, at times, he could not control.  (69 RT 13035.)

28.    After Dr. Marks's direct testimony, the prosecution asked for discovery of material Dr. Marks relied upon and also asked to "unseal" Lucas's ASH records from his prior incarceration.  (67 RT 12796-12800.)  Defense objected to the discovery of the ASH records on the grounds that Dr. Marks had not relied upon them.  (67 RT 12800-

04; *see also* 12800.)  Defense counsel's objection to the ASH records revealed their mistake.  (Dkt. 36-8 at 87-88 ¶ 8-10.)  Because the defense had placed Lucas's mental state at issue by calling Dr. Marks, the trial court granted the prosecution's motion to unseal the ASH records even though Dr. Marks did not rely on them.  (67 RT 12804; 68 RT 13009.)

29.  Once it was clear that counsel could not keep the records from the jury, the parties entered into the following stipulation:

> [O]n February 7th, 1974, a licensed physician with the state of California, a doctor – medical doctor, psychiatrist, by the name of R.M. Schumann, S-C-H-U-M-A-N-N, examined in the month of February or diagnosed in the month of February 1974 Mr. David Allen Lucas, the defendant in this action, while at the Atascadero state hospital that has heretofore been referred to in these proceedings, and diagnosed him as in the DSM III or in the DSM manual as an antisocial personality, severe; alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, and the prognosis was very guarded."

(69 RT13025-26.)

30.  After the parties stipulated, the trial court admonished the jury as follows: "Again, ladies and gentlemen, that's a stipulated matter, now. It's not a matter that you have to decide. It's given to you as a fact." (69 RT 13026.)  The judge's post-stipulation admonition was reinforced by a subsequent jury instruction providing: ". . . [I]f the attorneys have stipulated or agreed to a fact, you must regard that fact as conclusively proved." (65 CT 14359.)

31.  On cross-examination, Dr. Marks testified that he was aware of the factors that support a diagnosis of antisocial personality in the DSM, but it was his opinion that those factors were not present in Lucas.  (69 RT 13031.)

### b.   The Chronology

32.   Trial counsel made another critical error in their penalty phase preparation: accidentally turning over damaging evidence to Dr. Marks in the form of a social history "chronology" of Lucas's life.  (69 RT 13001 (". . . we did not know that he even had it . . . we were not aware that he had this document.  The first time that we knew he had this document was when he testified here in court yesterday about it."); *see also* 68 RT 12993-94; Dkt. 36-8 at 89-90 ¶ 14, 16.)  This chronology also included references to the ASH records and diagnosis.  (68 RT 12993-94.)

33.   Trial counsel recognized their error and told the trial court: ". . . [W]e . . . would be very reluctant to . . . put in position for disclosure information which we thought could be devastating to our client. We would not want to do so.  We would exercise tactical judgements not to call witnesses."  (69 RT 13000.)  Counsel explained to the trial court, "We were not in a position to make a knowing judgment as to whether to call Dr. Marks because we didn't know that he had this particular document."  (69 RT 13002.)

34.   This error was so striking that the trial court held an in camera hearing in which she discussed counsel's potential ineffectiveness.  The trial court pressured Lucas to waive his right to be present (*see* Claim 18), where the judge acknowledged, "We have got a large problem here. . .". 68 RT 13002 .  (*See also* 68 RT 13007 (". . . a mistake of the attorneys . . . should not be allowed to screw up the case . . ."); 68 RT 13008 (counsel's giving Dr. Marks material by "mistake" raises "an incompetency question. . ").  The trial judge explained:

> Dr. Marks was, in essence, by mistake, given two pieces of information that the defense would not have given him on a second thought.  First was the report-- the DSM diagnosis and his report by Dr. Bach.  Second is this chronological history by the investigator. . . If that is so, what we're really looking

294

(15cv1224)

at, if this information is ordered to be turned over to the people, is an incompetency question later.

(69 RT 13006-07.)

35.    Counsel had not intended for Dr. Marks to review this chronology because, among other things, it included references to the ASH records and Dr. Schumann's diagnosis.  (Dkt. 36-8 at 89-90 ¶ 14, 16.)  In order to avoid "screw[ing] up the case," the trial judge attempted to cure counsel's ineffectiveness by blocking discovery of the chronology.  (69 RT 13007, 13012.) This purported "cure," however, did not remedy counsel's error with respect to the ASH diagnosis.  The very information their mistake had leaked, namely, an unfavorable diagnosis (*see also* 69 RT 12996, referencing counsel's "slip" in providing Dr. Gale Bach's unfavorable DSM III diagnosis) came out through the ASH records.  As the trial court explained:

> I mean, there is a limit at which you have to say no.  If you have gotten to that point where you're throwing all this stuff at your man to diagnose and consider, but then you're going to have to pull half of it back, 'but you can't look at that if you cross examine,' you can't do that.  The moment you get your expert to the point of testifying, he's open and you know that."

(69 RT 12997-98.)

**2.    Trial Counsel Mistakenly Opened the Door to Unfavorable Evidence**

### a.    Deficient Performance

36.    Diagnoses of antisocial personality disorder are aggravating, not mitigating.  *See Ponticelli v. Sec'y, Florida Dept. of Corr*, 690 F.3d 1271 (11th Cir. 2012) (finding counsel not ineffective for failing to favorable evidence because it could have been rebutted by state's evidence that client was a sociopath).

(15cv1224)

37.     Counsel was in no way required to present Dr. Marks's testimony.  *See Hardiwck v. Crosby*, 320 F.3d 1127, 1185 (11th Cir. 1995) (an attorney is not obligated to present mitigation evidence if, after reasonable investigation, he determines it may do more harm than good); *Reed v. Sec'y, Fla. De't of Corr.*, 593 F.3d 1271, 1249 (11th Cir. 2010) (it is certainly not ineffective assistance of counsel for an attorney not to call an expert when doing so causes his client to run the risk of having the state successfully make his client look like a sociopathic killer.)

38.     Further, any competent counsel would have known that Dr. Marks's testimony would open the door to testimony regarding Lucas's mental health and that any psychotherapist-patient privilege was waived by offering psychiatric evidence in mitigation.  *People v. Montiel*, 5 Cal. 4th 877, 923 (1993), disapproved on other grounds by *People v. Sanchez*, 63. Cal. 4th 665 (2016) ("By placing his mental state in issue at the penalty trial, defendant waived his psychotherapist-patient privilege.").)

39.     Counsel's presentation of Dr. Marks's testimony and the ASH diagnosis was a clear and obvious mistake.  Trial counsel knew that the prejudicial impact of allowing the prosecution to access the ASH records far outweighed any potential benefit from the testimony of either Mr. Tallchief or Dr. Marks, which is why counsel attempted to avoid introduction of the ASH by limiting the documents each expert reviewed.  In explaining their mistake of turning over a damaging chronology to Dr. Marks, trial counsel told the court, "We, cognizant of our responsibilities, would be very reluctant to offer up a document or put in position for disclosure information which we thought could be devastating to our client.  We would not do so.  We would exercise tactical judgments not to call witnesses."  (69 RT 13000.)  Yet, this is precisely what counsel did in eliciting damaging testimony.  As counsel's post-conviction declarations explain, Dr. Marks played a relatively minor role in counsel's overall penalty phase strategy.  Had they known that his testimony would open the door for the prosecution to access and offer the ASH diagnosis into evidence, they would not have called him to testify.  (Dkt. 36-8 at 88 ¶ 9-10.)

40.     By unnecessarily and unwittingly opening the door to the introduction of highly inflammatory and prejudicial aggravating evidence, defense counsel's performance was constitutionally deficient.  *See Belmontes v. Wong*, 558 U.S. 15. 25 (2009) ("A heavyhanded case to portray [the petitioner] in a positive light, with or without experts" would have opened the door to damaging rebuttal evidence.)  By failing to ascertain how Dr. Marks would respond to questioning, and also by failing to understand the evidentiary rules that would allow Lucas's medical records to be admitted, trial counsel failed to fulfill their duty not to open the door to prosecution presentation of otherwise inadmissible aggravating evidence.  The fact that counsel failed to adequately screen Dr. Marks before calling him to testify is corroborated by their confusion when they learned that Dr. Marks had reviewed both a chronology of Lucas which counsel had not intended to give Dr. Marks, and also a damaging diagnosis by Dr. Bach.

**b.     Prejudice**

41.     Dr. Marks's testimony prejudicially undermined counsel's "integrated" lingering doubt theory.  Given the nature of the charges against Lucas – a series of seemingly motiveless murders of women, accompanied on two occasions by the murder of a small child – Dr. Marks's opinions about Lucas's alleged "rage" against women and his potential to harm a child, paired with a prior diagnosis of antisocial personality disorder and sexual deviance, were devastating.

42.     The stipulated ASH diagnosis prejudiced Lucas in several ways.  First, it branded Lucas as a psychopath.  During his cross-examination of Dr. Marks, the prosecutor made it clear to the jurors that the diagnosis of antisocial personality means that Lucas was a "psychopath."  (69 RT 13032.)  Second, it concluded that Lucas was a sexual deviant.  Third, the "very guarded" prognosis allowed the jurors to infer that Lucas would never be rehabilitated and thus would continue to be a danger to others even if sentenced to life in prison without parole.

297

(15cv1224)

43.     The prosecutor relied on Dr. Marks in his final argument for death to argue that:

> ". . . [W]e know that this lust for death sits within Mr. Lucas and will continue to sit with him for the rest of his life.
>
> Dr. Marks even enlightened us on that. I asked him a question, quote, "and with medical certainty, Dr. Marks, you're telling this jury that he was incapable on certain occasions of controlling the rage he had for women?" Answer: "That's my belief, yes.
>
> . . .

(70 RT 13278.)  During deliberations the jurors asked for, *inter alia*, and were given transcripts of Dr. Marks's testimony and the ASH stipulation into the jury room.  (108 CT 24263.)  The jury returned the death verdict just hours after receiving this information, after seven days of deliberation.  (26 CT 5598-600.)  If Dr. Marks had not testified, there is a reasonable probability that Lucas would have obtained a more favorable outcome at the penalty trial.

**3.     Trial Counsel Failed to Rebut, Challenge or Contextualize the Inflammatory Diagnosis**

**a.     Deficient Performance**

44.     The ASH diagnosis was inaccurate and misleading due to a multiplicity of other explanations for Lucas's behavior, including trauma disorders and PTSD-like symptoms, organic brain damage, substance abuse and mental illness, including depression.  Yet counsel were ill-prepared to explain the diagnosis in violation of their duties under *Strickland*.  *See* 1989 ABA Guidelines, 11.8.3 (duty to rebut aggravating evidence).).  As discussed in Section D, had defense counsel prepared a comprehensive life history and consulted with experts familiar with the issues raised by that life history, including trauma and substance abuse, they would have been able to challenge the ASH diagnosis with alternative conclusions and diagnoses.  (*See* Dkt. 36-26, 2008

State Pet. Ex. 17, P. Stewart Decl. at 21-101; Dkt. 36-9 and Dkt. 36-10, 2008 State Pet. Ex. 16,  A. Tomioka Decl. at 88-101.)  Trial counsel failed to present evidence that Lucas's behavior was more likely the result of a childhood of abuse and trauma, post-traumatic stress disorder, addiction and organic brain damage.

45.    Even without offering an alternative diagnosis, counsel should have challenged the accuracy and reliability of the ASH diagnosis based on defects in Dr. Schumann's methods, including: (1) Dr. Schumann relied on an inadequate and incomplete life history; (2) Dr. Schumann did not personally participate in Lucas's therapy or treatment; (3) The Diagnostic and Statistical Manual of Mental Disorders ("DSM") relied upon by Dr. Schumann in 1974 did not recognize the alternate diagnosis of PTSD, which was added to the DSM in 1980.

### (1)    Inaccurate Social History

46.    Dr. Schumannn did not compile an adequate social history of Lucas before rendering his diagnosis.  Dr. Schumann's complete report provided as follows:

> Past history shows a record of assaultive behavior since the age of 16 years.  It also included a history of much alcohol ingestion.  The patient has not responded to past attempts at treatment and rehabilitation by the Youth Authority.   The Youth Authority psychiatrist suggests a diagnosis of passive-aggressive personality.
>
> This patient is now nearly 19 years of age.  His behavior is getting more aggressive.  He has not learned to control his behavior in the past after a combination of incarcerations and treatment by the Youth Authority.
>
> Primarily, I believe, he is an antisocial person who needs alcohol either as an excuse and/or as an aid to carrying out his aggressive activity.  At this time it seems to me that his sexual aggression is merely part of his predatory behavior.

(Dkt. 36-8 at 122 (ASH Records).)

47. Historical data is lacking elsewhere in the ASH records. The only "history" in the records as of February 7, 1974 when Dr. Schumann made his diagnosis was brief and cursory, including facts about Lucas's prior criminal history, alcoholism and employment history. (Dkt. 36-8 at 120-31.) Many of the underlying juvenile records were illegible. (Dkt. 36-9 at 7-30.) Any diagnosis made without consideration of a complete and accurate life history does not meet accepted professional standards for accuracy and reliability. *See Comprehensive Textbook of Psychiatry VI*, Kaplan and Sadock, at pp. 524-26, 601, 709. As discussed in Subclaim D, Lucas suffered from a predisposition to substance-related disorders and was raised in a brutal and intolerable home environment, which included physical abuse, psychological battering and emotional neglect. (*See generally* Dkt. 36-9 at 88-119; Dkt. 39-10 at 1-102.) Dr. Schumann's ignorance of such social and life history facts was crucial because they could have explained Lucas's behavior and substance abuse in terms of Lucas's response to genetic and environmental influences over which he had little or no control as opposed to Dr. Schumann's conclusion that Lucas deliberately used alcohol "as an excuse and/or and aid to carrying out his aggressive activity." (Dkt. 36-8 at 122; *see* Dkt. 39-9 at 96-103 ¶¶ 18-37; Dkt.36-26 at 64-66.)

48. Dr. Schumann's report also failed to discuss or otherwise reflect awareness of Lucas's significant history of closed head trauma. (*See* Dkt. 36-9 and 6-10 at 36-37, and Dkt. 36-40, 2008 State Pet. at Ex. 91 D. Lucas Decl. at 44 (recalling at least two occasions on which Lucas's father beat Lucas into unconsciousness); Dkt. 36-8 at 122.) .) This history of head trauma could have alerted Dr. Schumann to the need to conduct a neuropsychological assessment of Lucas, which likely would have revealed Lucas's organic brain damage. (*See* Dkt. 36-26 at 39-41.) ASH never conducted such an assessment, and thus Dr. Schumann had no knowledge of Lucas's organic brain damage when he diagnosed him.

(15cv1224)

**(2)     The ASH Diagnosis Was Made Using an Outdated DSM**

49.     In 1974, when Dr. Schumann made his diagnosis, the DSM II was the diagnostic standard. *See generally*, Kathleen Wayland, Ph.D., "*The DSM: Review of the History of Psychiatric Diagnosis in the U.S.*" National Legal Aid and Defender Association, *Capital Report* (November-December 1994) at 1-7.)  In 1989, at the time of Lucas's trial, DSM III-R was the standard.  (*Id*.)  DSM II did not recognize PTSD as an accepted diagnosis while DSM III-R did.  (*Id*.)  As Dr. Pablo Stewart, a psychiatrist consulted during state post-conviction proceedings found, the omission of PTSD from the DSM II fundamentally undermined Dr. Schumann's diagnosis because Lucas's history and symptoms are substantially consistent with PTSD.  (Dkt. 36-26 at 21, 2008 State Pet. Ex. 17, P. Stewart, M.D., Decl. at 42-54.)

**(3)     Biological Components of Mental Illness**

50.     Trial counsel did not object to and/or rebut the ASH diagnosis with evidence that, even assuming the diagnosis was correct, Lucas had no control over the mental disorder's onset and, therefore, the disorder should not be considered by the jurors as a factor in favor of a death verdict.

51.     While many researchers deem Antisocial Personality Disorder a developmental disorder brought on by environmental factors, there is a "biological substrate [which] must exist for the development of a psychopathic character disorder." (Meloy, J. Reid, *The Psychopathic Mind*: Origins, Dynamics, and Treatment, p. 37 (1988 J. Aronson, Inc.); *see also* DSM III-R (1987), p.343 ["Antisocial Personality Disorder is five times more common among first-degree biologic relatives of males with the disorder than among the general population"].)  Whether caused by biological or environmental forces or both, a person has no control over the mental disorder's onset and should not be deemed less deserving of mercy because of it.  It is a violation of the federal constitution to allow the jurors to find in favor of death in reliance on

(15cv1224)

1   factors which ". . . actually should militate in favor of a lesser penalty, such as perhaps

2   the defendant's mental illness [citation]." *Zant v. Stephens,* 462 U.S. 862, 885 (1983).

3       52.    To put a person to death in reliance on a mental disorder caused by

4   circumstances over which the person has no control violates the Eighth Amendment.

5   *See Kennedy v. Louisiana*, 554 U.S. 407 (2008) ("[T]he standard of extreme cruelty is

6   not merely descriptive, but necessarily embodies a moral judgment.")  Failure to object

7   on these grounds was deficient.

8               **b.   Prejudice**

9       53.    Counsel's failure to object to and/or rebut the ASH diagnosis was

10  prejudicial.  Indeed, the Supreme Court and this Court have found prejudice due to

11  counsel's deficiency where, as here, trial counsel failed to present evidence of mental

12  impairments.  *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (granting relief

13  because counsel failed to investigate and present evidence of organic brain damage);

14  *Hovey v. Ayers*, 458 F.3d 892, 924-31 (9th Cir. 2006) (granting relief where the defense

15  presented the testimony of eighteen witnesses who described the defendant as "well

16  meaning," but failed to adequately investigate and present evidence of mental illness).

17  The ASH diagnosis was highly inflammatory and damaging to the defense, the penalty

18  trial was closely balanced, and the jurors specifically asked for and received the ASH

19  diagnosis shortly before returning their death verdict.  (108 CT 24263.)

20      54.    Besides being highly inflammatory in its own right, the ASH diagnosis set

21  up the prosecutor's argument that Lucas was "evil" and that his rage against women –

22  as Dr. Marks described it – made Lucas a "mean," "wicked" person with a "depraved

23  sense of pleasure. . . ."  (70 RT 13278.)  Without an alternative explanation for Lucas's

24  behavior, the jury was left to rely upon the prosecution's argument.  There is a

25  reasonable probability that, absent counsel's omissions, the outcome of the penalty trial

26  would have been different.

27

28

(15cv1224)

**D.     Trial Counsel Were Ineffective for Failing Adequately to Investigate Lucas's Life History**

**1.     Introduction**

55.     Lucas was further deprived of the effective assistance of counsel guaranteed by the Sixth Amendment because his attorneys failed to adequately investigate, present, and contextualize Lucas's life history.  Reasonably competent counsel handling a capital case at the time of Lucas's trial knew that a thorough investigation into Lucas's background and family history, including but not limited to, his social, educational, mental health, and medical history, was essential to an adequate penalty-phase presentation.  1989 ABA Guidelines, 11.4.1 (D)(2)(C).  Because counsel failed to conduct such an investigation, they failed to discover the powerful mitigating evidence set forth below, which could have (1) explained the mitigating significance of the childhood abuse, organic brain damage and substance abuse which Dr. Marks identified but did not adequately explain; (2) humanized and contextualized Dr. Marks's damaging conclusions about Lucas's inability to control his "rage;" (3) provided the basis for presentation of a mitigating theory of institutional failure; and (4) rebutted the inflammatory ASH diagnosis.

56.     Instead, counsel decided to rely primarily on lingering doubt and brief testimony from a psychological expert, Dr. Alvin Marks.  (Dkt. 36-8, at 83, 2008 State Pet., Ex. 10, A. Landon Decl. ("Dkt. 36-8, at 83"), ¶¶ 2-17; Dkt. 36-8, at 9, 2008 State Pet., Ex. 11, S. Feldman Decl. ("Dkt. 36-8, at 91"), ¶ 2.)

57.     In Section C, above, it is alleged that the decision to call Dr. Marks violated Lucas's constitutional right to effective assistance of counsel because counsel would not have called Dr. Marks–and hence avoided the damaging consequences of his testimony–if they had anticipated, as they should have, that his testimony was going to undermine the primary defense theory of lingering doubt and open the door for the inflammatory ASH diagnosis.  In this sub-claim, Lucas alleges that, even if calling Dr. Marks was not prejudicial ineffective assistance, counsel's failure to fully investigate

303

(15cv1224)

available mitigating evidence before formulating their penalty phase strategy, including the decision to call Dr. Marks, constituted ineffective assistance of counsel.

58.     But for counsel's unprofessional errors, the results of the proceedings would have been different. *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005)  For all of these reasons, Lucas's sentence of death must be vacated.

## 2.     Duty to Investigate, Present, and Explain the Significance of Available Mitigating Evidence

59.     To be considered a constitutionally adequate strategic choice, a penalty-phase decision must have been made after counsel has conducted "reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

60.     Before deciding which psychological expert to call and what questions to ask, counsel should have a full understanding of what options they have.  Counsel should secure the assistance of experts where it is necessary or appropriate for the presentation of mitigation and/or rebuttal of aggravation.  1989 ABA Guidelines, 11.4.1 (D)(7).

61.     Additionally, even if counsel does not anticipate that the psychological expert will open up issues regarding the defendant's mental state, adequate life history investigation is still necessary given the possibility that the prosecution will be allowed to open up lines of inquiry related to mental state.  An inadequate or incomplete mitigation presentation is often worse than none at all.

62.     Counsel's duty at the penalty phase is not only to investigate and present available mitigating evidence, but also to "explain[] the significance" of that evidence. *(Terry) Williams v. Taylor*, 529 U.S. 362, 399 (2000).  This includes a duty to provide the jury with "the benefit of expert testimony to explain the ramifications." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).  Necessary experts in a capital case include witnesses to provide medical, psychological, sociological or other explanations for the offenses.  1989 ABA Guidelines 11.8.3.

### 3.      Lucas's Counsel Unreasonably Failed to Retain a Qualified Mitigation Specialist and Qualified Experts

63.      Lucas's trial counsel did not fully investigate Lucas's life history and potential mitigating themes based on that history.  (Dkt. 36-8, at 83, ¶¶ 3-17; Ex. 11, S. Dkt. 36-8, at 91, ¶ 2.)  Even though counsel did decide to call a psychological expert, Dr. Alvin Marks, this witness was called simply to provide sympathetic evidence about Lucas's childhood and background, and its effect on his development, causing a "personality disorder not otherwise specified" under the DSM-IIIR.  (*Id.*) Consequently, when counsel's strategy was torpedoed by Dr. Marks's testimony about Lucas's rage against women and ability to hurt children and by the unsealing of the ASH records, counsel were unprepared to effectively respond by presenting powerful mitigating evidence as to Lucas's family history, untreated trauma-related disorders including PTSD, brain damage and substance-related disorders including methamphetamine psychosis.

64.      In their declarations counsel state that they deliberately opted not to conduct a full penalty phase investigation under the assumption that Dr. Marks would not open the door for the prosecution to obtain and present the ASH diagnosis and would not damage their integrated non-participation defense (i.e., lingering doubt). Consequently, counsel did not adequately investigate available mitigating evidence. Counsel failed to hire a qualified mitigation specialist to fully investigate Lucas's life history and failed to have Lucas fully evaluated by qualified trauma and substance abuse experts regarding Lucas's history of trauma and substance abuse.

65.      Instead,[120] counsel hired Alex Drehsler, a former newspaper reporter who did not have the necessary education, profession training and properly supervised

---

[120]  Counsel obtained funds for Craig Haney, a mitigation specialist, but he was retained to assist with "prison issues" and he did not prepare Lucas's life history. (*See* 73 CT 16307-16308.)

experience qualifying him to prepare Lucas's life history.  (Dkt. 36-8 at 83, ¶16; Dkt. 36-8 at 91, ¶ 2.).  Drehsler prepared a penalty phase "Chronology" (Dkt. 36-26 at 113, Dkt. 36-27 at 1, 2008 State Pet. Ex. 19, Drehsler Chronology), and "Penalty Phase Compilation Memo" (Dkt. 36-27 at 24, 2008 State Pet. Ex. 20, Drehsler Penalty Phase Compilation Memo ).  Lucas's previous counsel hired investigator, Paul Newman, who compiled a "Biography" of Lucas based primarily on interviews with Lucas. (Dkt. 36-27 at 126, 2008 State Pet. Ex. 21, Newman Biography of David Lucas.)

66.     The documents prepared by Drehsler, Newman and trial counsel did not constitute a competent life history of Lucas either individually or in combination with each other.  They consisted of mere anecdotal evidence from certain periods of Lucas's childhood, but did not explain the mitigating significance of that evidence, nor the cumulative impact on Lucas's development and life.  Factually, the documents were incomplete and misleading.  Among the crucial matters that were inadequately explored were the following:

(1) Multi-generational family history

(2) Genetic disorders and vulnerabilities

(3) Multi-generational patterns of behavior

(4) Trauma history

(5) Maltreatment, emotional neglect and psychological battering during developmental years

(6) Substance abuse history

(7) Mental health history

(8) Dysfunctional social relationships

67.     None of the documents prepared by Drehsler or Newman adequately addressed significant aspects of Lucas's life history after 1978 which included heavy substance abuse and a violent, highly traumatic marital relationship.

68.     Even if counsel's decision to forego a full mitigation investigation was not based on unreasonable assumptions about Dr. Marks's testimony, counsel still had an

306

obligation to conduct an adequate penalty phase investigation before making the decision to proceed as they did at the penalty trial.

### 4. Reasonable Counsel Would Have Presented Mitigating Evidence

69. Had counsel obtained a competent life history such as the one compiled by Ariel Tomioka, they would have been alerted to powerful mitigating evidence and themes not provided or addressed by Dr. Marks. Counsel would have been able to substantiate and corroborate the themes identified in the life history through a qualified trauma and substance abuse expert such as Dr. Pablo Stewart. (Dkt. 36-26 at 21, 2008 State Pet. Ex. 17, P. Stewart, Decl. ("Dkt. 36-26 at 21").) Reasonable counsel in the same circumstances would have presented such evidence in lieu of, or in addition to, the testimony of Dr. Marks.

70. Even if Lucas's counsel's first preference would have been to not present any expert testimony at all to avoid undermining lingering doubt and opening the door for the ASH diagnosis, once the ASH diagnosis was disclosed and Dr. Marks had opined about Lucas's ability to hurt children and his at times uncontrollable rage against women, any reasonable counsel would have presented the evidence set forth in Ariel Tomioka's life history and Dr. Stewart's declaration, described below.

71. Instead, the jury only heard Dr. Marks's extremely limited, superficial, and misleading description of Lucas's childhood trauma, organic brain damage and substance abuse. They received no explanation of the mitigating significance of such evidence. Because counsel failed to explain the mitigating significance of potentially mitigating factors mentioned in Dr. Marks's testimony, the testimony did more harm than good because it appeared to corroborate the prosecution's theme that Lucas should be executed because he is "evil" and "wicked." (70 RT 13278; *see also* Claim 25.)

### 5. Mitigation Not Presented to Lucas's Jurors

72. The mitigation that was not, but could have been, presented to the jury is set forth below:

307

(15cv1224)

### a.    Physical Trauma Inflicted On Lucas By His Father[121]

73.    The evidence presented by trial counsel (*see* Section X) did not come close to accurately describing the severity of the father's attacks on Lucas.  Beginning when Lucas was no more than six years old, his father, Clarence, physically brutalized Lucas, as well as Lucas's siblings Cathy and Don and their mother Pat.  The violence that Lucas experienced during his childhood and adolescence had a profoundly damaging impact on his development.

74.    Clarence Lucas was in full control of the family.  Clarence was a physically large, intimidating and totally unapproachable person.  By his own admission Clarence was incapable of showing love or affection.

75.    Clarence ruled his family with physical abuse and intimidation.  Clarence terrorized them with unpredictable explosions of violence.  Some examples include ripping the telephone and television cords out of the walls, tearing the spark plug wires out of the car, and putting holes in the walls with his fists.  At other times, he was more deliberate and sadistic in his efforts to instill terror, as when he forced Cathy to eat her own vomit, threatened to kill his wife (Pat), and held Pat and his family hostage at gunpoint.

76.    Clarence's attacks on his children—especially on Lucas—went far beyond the bounds of reasonably necessary discipline.  It was excessive, cruel, sadistic and unjustified child abuse that would have supported criminal conviction under California's child abuse statutes if he had been prosecuted.[122] Clarence didn't merely spank Lucas, he beat him with his fists, a belt, a rubber hose and boot-clad feet.  Clarence knocked Lucas down, kicked him while he was down and then kicked him again when he tried to get up.

---

[121]    Unless otherwise specified, facts in this section are from Dkt. 36-9 at 88, ¶¶ 39-63; Dkt. 36-10 at 1, ¶¶ 64-67.

[122]    *See, e.g.*, Cal. Penal Code §§ 273(a)(2) and 273(d).

(15cv1224)

77.     Lucas lived with Clarence's brutality from age four until age sixteen, when he was old enough to defend himself.  Cathy estimates that they were beaten "several times a week."  Lucas estimated that Clarence beat him at least two to four times a week.  This meant that Clarence beat Lucas well over 1,000 times.  Also, Lucas got beaten every time Clarence found out that he had wet his bed.  And, even though Lucas tried to stop, the bed-wetting continued for many years.

78.     Lucas's mother—who worked nights—left the children alone with Clarence virtually every week-night, starting when Lucas was around six years old.  When Lucas's mother was gone Clarence's attacks were worse.  Clarence brutalized Lucas with his hands, his fists, and a thick leather belt.  He also hit Lucas with a special rubber hose he kept in the garage just for the purpose of beating the children.  Clarence forced Lucas into the garage, made him pull down his pants, and beat him with the rubber hose.  Clarence also hit Lucas so hard in the head with his bare knuckles that Lucas would "see stars" and get headaches.  Clarence's knuckles left welts or knots on Lucas's head.  Clarence deliberately directed many of his blows to Lucas's head so the welts and bruises would be obscured by Lucas's hair.  Clarence told the children that the beatings would be worse the next day if they told their mother about being hit.

79.     Moreover, even though Lucas's mother was aware of some of the abuse, she kept her schedule.  When Clarence beat Lucas in Pat's presence, Pat screamed at Clarence and he stopped temporarily, but never for good.  Nevertheless, Pat continued to leave the children alone with Clarence and allowed him to "administer the punishment" as he saw fit.

80.     The beatings were so frequent and brutal that Lucas developed a permanent exaggerated flinch or startle response.  Whenever Clarence moved, Lucas jumped.  Curt Andrewson remembers that Lucas's friends used to tease him about his startle response.  If they waived their fingers in front of Lucas's face, his eyes inevitably started to flutter and he could not control it.  He flinched when anything came too close to him or was sudden.

(15cv1224)

81.     Lucas began running away from home as soon as he was old enough. He started running away frequently around age 12 or 13.  Between the ages of 14 and 15 Lucas was apprehended five times for running away from home.  Every time, however, Lucas was returned to his violent, traumatic home.  Thus, Lucas learned that running away did not help because there was nowhere to go.

82.     Clarence's brutality is documented by Lucas's juvenile probation records which observe that "David was frequently brutalized by his natural father."  (Dkt. 36-12 at 9, 2008 State Pet., Ex. 16, Appx 25, Summary of Juvenile Court Records (" Dkt. 36-12 at 9") at p. 11.)  Other juvenile probation records corroborate the fact that Lucas's home was "extremely turbulent and that the father [was] quite violent with [Lucas] on many occasions."  (Dkt. 36-12 at 45, 2008 State Pet., Ex. 16, Appx 30, Probation Report ("Dkt. 36-12 at 45") at 51.)  These records were available to trial counsel.

83.     Even after it was known to the juvenile court that Clarence was brutalizing his son, the child protective services system did nothing to intervene on Lucas's behalf.  Lacking legal consequences or psychiatric intervention brought to bear on the family violence, Clarence felt free to physically assault Lucas through his mid-teens.

84.     It was not until Lucas could physically defend himself (around age 16) that he was finally able to stop Clarence's physical brutality.  The last attempt Clarence made to hurt Lucas occurred one day when Clarence attacked Lucas so viciously with a 2 x 4 that Cathy thought Lucas would die.  Lucas responded by fighting back for the first time.  During the attack Pat screamed and Clarence "literally picked [her] up and threw [her] in a chair."  (Dkt. 36-21 at 51¶ 5; Dkt. 36-21 at 25, 2008 State Pet., Ex. 16, Appx 169, P. Englewood Decl. ("Dkt. 36-21 at 25") at ¶ 29.)  Six months later, Pat divorced Clarence and they moved to separate locations.  (Dkt. 36-21 at 51 ¶ 5.)

(15cv1224)

### b.   Psychological Battering and Emotional Neglect[123]

85.   At the time of Lucas's trial, professional attention was being paid to the insidious and irrevocably damaging effects resulting from psychological, and not just physical, battering.[124]   As social historian Tomioka explains in his declaration (Dkt. 36-10 at 1 ¶ 95), this form of maltreatment has been conceptualized by James Garbarino, past president of the Erickson Institute for Advanced Study in Child Development, and by the International Conference on Psychological Abuse of Children and Youth, to include the following parental behaviors: terrorism, humiliation and degradation, neglect, rejection and abandonment. Lucas's history is replete with examples from all of these categories.

86.   Clarence's brutal, militaristic approach to parenting understandably terrorized his children.  This was exacerbated by the unpredictable nature of Clarence's explosions.  Lucas, Cathy, and Donald lived in constant dread as to when they would next be attacked by their father.  The children were always aware of Clarence coming home and began getting scared when it got close to the time he would arrive.  When Clarence got home, he checked everything and if anything was out of place he would go after them.

87.   Because Clarence was Lucas's father—upon whom Lucas relied for emotional support— Lucas's feelings about Clarence were ambivalent.  For example, Lucas remembered loving his father but at the same time wishing he would not come home because he was afraid of getting beaten.  Lucas lived in a constant state of fear, anxiety and hyper-arousal.

88.   Lucas lived with systematic humiliation and attacks to his sense of self-worth and self-esteem within the context of his family.  Clarence continually degraded

---

[123]   Unless specified, facts in this section are from Dkt. 36-10 at 1, ¶¶ 95-131.

[124]   Garbarino, H., Guttman, E. & Seeley, J.W. (1986), *The Psychologically Battered Child.* San Francisco: Jossey-Bass, pp. 8, 25-29.

and belittled Lucas, making him feel that he was worthless.  He would tell the children that they "weren't shit."  (Dkt. 36-10 at 1, ¶ 104.)

89.     Clarence also cruelly humiliated Lucas.  For example, every two weeks Clarence made a public spectacle of Lucas's haircuts.  He cut Lucas's hair in the garage with the door open so all of Lucas's neighborhood friends could watch and laugh.  In a similar vein, Clarence washed Lucas's mouth out with soap.

90.     As Lucas got older, Clarence started blaming Lucas for everything.  Cathy conveys that "[Clarence] will tell you to this day that the reason [Clarence and Pat] broke up is only because of David."  (Dkt. 36-21 at 51 at ¶ 4.)  Clarence also put Lucas at risk by neglecting his emotional needs.  Clarence never showed Lucas any affection or warmth.  Lucas was always starved for attention from his father but never got it.

91.     This affected Lucas in many profound ways, including his need to find another father figure in Barry Wood, a child molester whom Lucas met when he was at Atascadero State Hospital and only nineteen years old.  Barry Wood turned out to be a very bad influence on Lucas.  Wood got Lucas involved in transporting drugs, for which Lucas was eventually arrested and sentenced to prison.

92.     Lucas's mother, Pat, was neglectful in her failure to protect Lucas from Clarence's brutality.  Pat also failed to provide reasonable structure, limits and guidelines for Lucas, thus contributing her part to a dysfunctional environment in which one parent was abusively punitive and the other was passively permissive.

93.     Again, as Tomioka explains, James Garbarino and his colleagues have written about the serious consequences of child neglect.  For example, they stated that when a parent "refuse[s] to touch or show affection to the child or to acknowledge the child's accomplishments . . . [t]he parent consistently communicates a negative definition of self to the child."[125]  The negative impact of Clarence's emotional

---

[125]  *The Psychologically Battered Child*, at p. 25

(15cv1224)

rejection of Lucas and Pat's failure to protect him cannot be overstated.  Under circumstances of repeated rejection and abandonment, such as those endured by Lucas, the task of successfully developing a positive self-esteem, security, acceptance, and belonging is exceedingly difficult, if not impossible.  Clarence's constant tirades undermined Lucas's psychological wellbeing.

94.    Clarence also isolated Lucas and his other children.  As Tomioka explains, James Garbarino and his colleagues define isolation as "parental behaviors that prevent the child from taking advantage of normal opportunities for social relations . . . ."[126] Clarence isolated his children by refusing to allow the family to socialize with the neighbors.  In the name of punishment, he would restrict them to their rooms or ground them for weeks at a time.  Also contributing greatly to Lucas's isolation was the fact that Lucas's friends did not want to come to his house because they were terrified of Clarence.

95.    Another feature of Lucas's upbringing was the absence of positive, adult role modeling and the lack of adult guidance to assist him in his social and emotional development.  Instead, the modeling that Lucas received, particularly in the form of his father's actions and words, was highly damaging.  Authoritarian parents tend to be low in nurturance and model aggression in conflict resolution.  Clarence not only modeled aggression, but the most extreme forms of aggression.

### c.    Vicarious Trauma[127]

96.    That Clarence used intimidation and violence against Lucas's mother and siblings is significant because Lucas's witnessing of it further traumatized him.

97.    Clarence inflicted physical abuse on Cathy from early childhood through at least age 17.  Cathy had welts across her legs from the belt Clarence used on her. Clarence also physically assaulted Cathy with blows to her head.

---

[126] *The Psychologically Battered Child*, at pp. 27-28

[127] Unless specified, facts in this section are from Dkt. 36-10 at 1, ¶¶ 68-73.

(15cv1224)

98.   Clarence treated Pat the same way he treated the kids.  Clarence was violent so often that he constantly terrified Pat.  Clarence would also force her to have sex with him, even if she did not want to, by threatening her and holding her down.  He also raped her after they were divorced by walking into her apartment without her permission and forcing intercourse.

99.   Clarence's intimidations of Pat were particularly traumatic because they involved brandishing or shooting firearms for effect.  As noted above, when Pat was supposed to go to court for her divorce from Clarence, Clarence came home with a gun and held the family hostage.  On another occasion Clarence shot a hole in the garage door with a blast from his shotgun and said something to the effect of, "see what a shotgun can do?"  (Dkt. 36-12 at 91, 2008 State Pet., Ex. 16, P. Newman Notes on Pat E. ("Dkt. 36-12 at 91") at 94.)

100.   Even when Clarence was not raging at Pat he was still cruel and cold to her.  He never hugged or kissed her and was consistently critical.  Clarence also put soap in Pat's mouth and watched as she wretched and vomited.

101.   Lucas remembers the occasions in which Clarence forced Pat into the bedroom and raped her while Lucas was present in the house.  Clarence's treatment of Pat upset Lucas.  The trauma from witnessing this marital discord and domestic violence caused Lucas's asthma to return and increased his delinquent activity.

### d.   Disordered Attachment[128]

102.   As result of his chronic maltreatment, Lucas was never able to form close attachments to his mother and father despite his desperate need to do so.  The importance of secure attachment to a caregiver was researched and articulated first by John Bowlby.[129]  Individuals possess an inborn need for close attachments to significant

---

[128]   Unless specified, facts in this section are from Dkt. 36-10 at 1, ¶¶ 95-131

[129]   Bowlby, J. (1969). *Attachment and loss: Vol. 1 Attachment*,  New York: Basic Books; In J.E. Kesner and P.C. McKenry (1998). The role of childhood

314

others which prepares the child to give and receive in order to exist in a world of human interaction and relationships.[130]  Secure attachment is also a protective factor against later antisocial patterns of cognition, behavior, and interaction, including violence.

103.   Children with negative attachment experiences internalize the lack of adequate care, love, and protection as being their fault, and will perceive themselves as worthy of neglect or maltreatment.  Lucas's childhood, replete with emotional cruelty and physical abuse, thus reinforced two potently toxic ideas—that he was a worthless, powerless person and that the world was a bleak, dangerous place.  These beliefs created the internal conditions that made him highly vulnerable to other stressors and risk factors that he would encounter throughout his development into adulthood such as learning disabilities, genetic predisposition to mental illness, head trauma, substance addiction and dependency, juvenile delinquency, relationship instabilities and losses, and crime.

### e.   Lucas's Family History and Genetic Vulnerability[131]

104.   One of the striking features of Lucas's family system is the pervasiveness of mental illness, trauma, and/or substance abuse over at least four generations.  Lester Lucas was Lucas's paternal grandfather.  Lester's brother, Harold Lucas, committed suicide at age 34.  Later, Harold's grown son also attempted suicide.

105.   Lillian Englehart (formerly Lucas), Lucas's paternal grandmother, was an alcoholic who drank every night and had a reputation for promiscuity, ultimately leading to a divorce from Lester.  She neglected her children in favor of working at a

---

[130]  attachment factors in predicting male violence toward female intimates. *Journal of Family Violence*, 13 (4), p. 419

[130]  Bowlby, J. (1973). *Attachment and loss: Vol. 2 Separation, Anxiety and Anger*.  New York: Basic Books; In J.E. Kesner and P.C. McKenry (1998). The role of childhood attachment factors in predicting male violence toward female intimates. *Journal of Family Violence*, 13 (4), p. 419.

[131]  Unless specified, facts in this section are from Dkt. 36-9 at 88, ¶¶ 18-38.

(15cv1224)

beauty salon and chasing men.  Lillian attempted suicide after Clarence Lucas, Lucas's father, blamed her for his breakup with Patricia ("Pat") Katzenmaier (formerly Lucas).

106.   Lillian acknowledged that Clarence had a temper when he was young.  As a youth, Clarence put his brother Allen's eye out with a stick, claiming it was an accident.  Afterwards, Allen had to have a glass eye.  Clarence also was found to have committed larceny around age 12 and unlawfully discharged a firearm around age 17.

107.   As an adult, Clarence brutalized his children, although the whole family acknowledged Lucas to be his particular scapegoat.  Clarence threatened to hurt his wife Pat and even to kill her; slapped her; twisted her arms; threatened to shoot her; produced a firearm and held the family hostage; blasted a hole in the garage door with his shotgun for the purpose of intimidation; and forced her to have sex with him. Clarence also threatened or attempted suicide on more than one occasion.  Eventually, Pat obtained a restraining order against Clarence but Lucas was already 15 years old. After his divorce from Pat, Clarence became an alcoholic.  He stalked Pat and only stopped that behavior after he remarried.  Clarence raped Pat on at least one occasion after the divorce.

108.   Lucas's two siblings did not fare well, either.  Donald (Don) Lucas (Lucas's younger brother by five years) has had drug and alcohol problems his entire life.  Don's first memory is of "me and Cathy being hit with an electric cord that (our dad) ripped out of the wall."  He recalls, "He hit us with his hands, mostly.  He had big hands and we were so small.  I'm sure I was a toddler when he started hitting me.  He'd show us his two fists and ask, 'Which one do you want—6 Months in the Hospital' or 'Sudden Death?'" In addition to being beaten himself, Don observed Clarence beating Cathy and Lucas—especially Lucas.  Clarence would "beat the shit out of Lucas with two by fours and with other things when Lucas was out of it on drugs."  (Dkt. 36-21 at 17, 2008 State Pet., Ex. 16, Appx 168, Donald Lucas Decl. ("Dkt. 36-21 at 17") ¶¶ 1-2, 4.)

(15cv1224)

109.   Don began to take drugs when he was 11-12 years old.  In the 70's and early 80's he used LSD.  Then he got addicted to crystal methamphetamine.  Don has had a reputation for being violent when he was using drugs since his teenage years.  Donna Ellis, Don's first wife who got pregnant with Don's child when she was 16, said that Don treated her really harshly and that she used to be beaten up almost every day.  She always had bruises and often needed stitches.  Don and Melody, his second wife, were equally violent with each other, and both were chronic drug users.

110.   Lucas's older sister, Cathy, repeated the trauma of her childhood by marrying two abusive men each of whom she ended up divorcing.  The first, Jim Graves, was uncannily similar to her father.  Jim had a terrible temper and "went off on rages."  Tricia Ann Graves, Cathy and Jim's daughter, describes the marriage this way: "They were constantly fighting.  There were so many things being broken.  After he broke her stuff, she'd break his stuff.  He beat her.  She'd need an ambulance.  I can remember her going to the hospital in the ambulance."  (Dkt 36-25 at 38, 2008 State Pet., Ex 16, Appx 203, T. Graves Decl ("Dkt. 36-25 at 38") ¶ 2.)

111.   Cathy's second husband, Mark McEvoy, was a "peeping Tom" who secretly peeped on her daughter Tricia.  (Dkt. 36-21 at 51, 2008 State Pet., Ex. 16, Appx 170, C. McEvoy Decl.  ("Dkt. 36-21 at 51") ¶ 14.)  Just as Pat waited until Lucas was 15 to obtain a restraining order against Clarence and divorce him, Cathy waited until Tricia was 18 to divorce Mark.  In both cases, irreparable damage had already been done to the children.  Tricia dropped out of school in 9th grade and had a child when she was barely 16.  Tricia's boyfriend physically abused her.  When she was six months pregnant, he ripped off her clothes and made her walk home naked for a mile because she "didn't come fast enough when he called."  Tricia became an alcoholic and experimented with drugs.  She has anxiety, panic attacks, depression, PTSD, and insomnia.  She lives on SSI and disability benefits.

317

(15cv1224)

112.   Timmy Graves, Tricia's full biological brother, had mental disorders, was violent and had severe substance abuse problems.  Tricia recalls, "(Timmy) was sent away to a home when he was a teenager because no one could handle him."

113.   Other family relations who have mental illness or substance abuse problems are Don's children by Melody—Desiree, Alicia and Nicky, who are all "skinheads."  Pat has witnessed Desiree high on meth and alcohol.  Nicky's children were taken away by the El Cajon police at one time.  Don's daughter by Donna Ellis, Christina, may have some mental problems as well.  Lucas's sister Cathy's two children by Mark McEvoy, Patty and Crystal, also have had brushes with drugs and drinking.

114.   The Lucas family social history contains clear evidence to support a genetic predisposition to drug and alcohol abuse, as well as to mental illness, over four generations.  Child neglect permeated the Lucas family history, creating the opportunity for child abuse in all forms (physical, sexual, and emotional).  These multiple forms of child abuse resulted in severe psychological trauma, from whose symptoms the victims attempted to escape by self-medicating with drugs and alcohol.

### f.   Lack of Protective Buffers[132]

115.   Lucas lacked a single protective buffer by which he could limit or mitigate the daily trauma in his life.  Neither his mother, his extended family, his neighbors, nor the child protective services and justice systems protected him from the devastating physical brutality and emotional/psychological cruelty of his father.  Furthermore, despite evidence that Lucas had suffered serious head trauma from falls as an infant and from the blows of his father, no one explored the possibility of brain damage.  Nor did Lucas receive any counseling or psychological help in coping with his trauma.

---

[132]  Unless specified, facts in this section are from Dkt. 36-10 at 1,  ¶¶213-219

116.   Additionally, the Cowles Mountain area where Lucas lived from age 8 to 16 was a rough neighborhood.  More than half a dozen of the neighborhood kids were involved in everything from stealing to murder.  Many of the neighborhood kids grew up to be motorcycle gang members.  These were Lucas's friends.  They had a strong influence on him, especially as he became more alienated from his father.  Lucas had to defend himself against physical attacks from neighborhood kids and he ended up in many fights.  There was also a massive drug problem in the Cowles Mountain neighborhood.

117.   Nor was Lucas's church a safe and healthy refuge for him.  All of the Lucas children were baptized, went to Catechism and to confirmation at Our Lady of Grace Catholic Church and Lucas became an altar boy.  However, for a young boy like Lucas his church was a dangerous place due to the proclivity of the priests at Our Lady of Grace to molest altar boys.[133]  (Dkt. 36-23 at 118, 2008 State Pet., Ex. 16 Appx 189, Priests at Our Lady of Grace Catholic Church.)

### g.   Post-Traumatic Stress Disorder

118.   According to Dr. Pablo Stewart, Lucas meets the diagnostic criteria for Post-Traumatic Stress Disorder (PTSD) as set forth in The Diagnostic and Statistical Manual, Third Edition, Revised (DSM III-R), which was in effect at the time of Lucas's trial.  The jury never heard this.  The factors which satisfy each of the required criteria are set forth below.

**Criterion A[134]**

119.   DSM III-R Criterion A provides:

A.  The person has experienced an event that is outside the range of usual human experience and that would be markedly

---

[133]   Lucas has no accessible memory of being sexually abused but there is evidence that the priests whom he served as an altar boy were guilty of sexually molesting children.

[134]   Dkt. 36-26 at 21,. ¶¶ 73-86

319

(15cv1224)

distressing to almost anyone, e.g., serious threat to one's life or physical integrity; serious threat or harm to one's children, spouse, or other close relatives and friends; sudden destruction of one's home or community; or seeing another person who has been or is being, seriously injured or killed as the result of an accident or physical violence.

120.   Lucas's experience meets Criterion A by virtue of the brutal physical abuse, intimidation and terror Lucas personally suffered and witnessed at the hands of his father from approximately age five to age 16.  Further, what Lucas experienced as a child would have been "markedly distressing to almost anyone" and was "experienced with intense fear, terror and helplessness."  Lucas expressed these feelings verbally, by non-volitional symptoms, and by his attempts to run away and escape his father's brutality. As one example of his non-volitional symptoms, Lucas continued to wet his bed until he was 10-12 years old.  This is an objective indication that he was experiencing intense fear during this time.

**Criterion B[135]**

121.   DSM III-R Criterion A provides:

B.   The traumatic event is persistently reexperienced in at least one of the following ways:

(1) recurrent and intrusive disturbing recollections of the event (in young children, repetitive play in which themes or aspects of the trauma are expressed)

(2) recurrent distressing dreams of the event

(3) sudden acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience,

---

[135]  Dkt. 36-28 at 21, ¶¶ 87-91

320

(15cv1224)

illusions, hallucinations, and dissociative [flashback] episodes, even those that occur upon awakening or when intoxicated)

(4) intense psychological distress at exposure to events that symbolize or resemble an aspect of the traumatic event, including anniversaries of the trauma.

122.   Lucas's experience meets all four factors in Criterion B.

123.   Factor (1).  To this day Lucas has "recurrent and intrusive disturbing recollections" of his childhood trauma.

124.   Factor (2).  Lucas has had many recurrent distressing dreams [nightmares] that are likely linked to the trauma experienced.

125.   Factor (3).  Lucas has relived his traumatic childhood experiences during flashback episodes. As an adult Lucas was "afraid of" . . . "violence" because "whenever I get in a fight I kind of flash back to when my dad beat me up and I don't like that . . ."

126.   Factor (4).  Lucas has, and continues to, experience intense psychological distress when exposed to things that remind him of his childhood trauma. For example, during the clinical interview with Lucas, he exhibited anxiety and his hands were shaking when discussing his childhood experiences.

**Criterion C[136]**

127.    The diagnostic Criterion C provides as follows:

C.  Persistent avoidance of stimuli associated with the trauma or numbing of general responsiveness (not present before the trauma), as indicated by at least three of the following:

---

[136]  Dkt. 36-26 at 21, ¶¶ 92-99

(15cv1224)

(1) efforts to avoid thoughts or feelings associated with the trauma

(2) efforts to avoid activities or situations that arouse recollections of the trauma

(3) inability to recall an important aspect of the trauma (psychogenic amnesia)

(4) markedly diminished interest in significant activities (in young children loss of recently acquired developmental skills such as toilet training or language skills).

(5) feeling of detachment or estrangement from others

(6) restricted feeling of affect, e.g., unable to have loving feelings

(7) sense of a foreshortened future, e.g., does not expect to have a career, marriage, or children, or a long life.

128.    Lucas's experience meets the all seven factors in Criterion C.

129.    Factor (1).  Lucas sought to avoid thoughts and feelings associated with the trauma by dissociation.  Lucas's capacity to dissociate from the trauma continued into later life as noted by a psychologist who conducted neuropsychological testing of Lucas in 1985.  He also sought to avoid the distress of trauma by substance abuse. Lucas relied on alcohol and drugs to avoid thoughts and feelings associated with the trauma.

130.    Factor (2).  Lucas made clear efforts to avoid activities or situations that arouse[d] recollections of the trauma. For example, at an early age he left the family home and severed most ties with family members who reminded him of his traumatic childhood.

131.    Factor (3).  Lucas definitely exhibited, and continues to exhibit, psychogenic amnesia for important details of the trauma he experienced. In Dr.

(15cv1224)

Stewart's clinical interview with Lucas he exhibited an incomplete memory of important details about his traumatic childhood experiences.

132.   Factor (4).  Lucas exhibited a markedly diminished interest in significant activities. For example, at age 14-15 he stopped doing hobbies that he enjoyed such as sports and target shooting. Also, he quit school.

133.   Factor (5).  Lucas had feelings of estrangement from others.  Dr. Friedman, the neuropsychologist who tested Lucas observed that Lucas is a "withdrawn individual."  (Dkt. 36-13 at 1, 2008 State Habeas Pet., Ex. 16, Appx 41, M. Friedman Report, Pt. 2 ("Dkt. 36-12 at 1") at p. 11.)  His cousin, Linda Essik, observed Lucas to be withdrawn at times.  His best friend Kurt Andrewson reported that Lucas dealt with anger by withdrawing into himself.  A probation report written when Lucas was 17 years old concluded that he was passive and uncommunicative and he was withdrawn from everything.  As he got older Lucas continued to have problems forming healthy relationship with others, especially women.

134.   Factor(6).  Lucas had difficulty socializing with others or expressing his feelings. He did not want others to see his feelings. This is indicative of a constricted affect.

135.   Factor(7).  Although Lucas sometimes thought about the future, he felt like he was going to die early.  Even when he was engrossed in his carpet cleaning business, he was not thinking ahead.

**Criterion D[137]**

136.   The diagnostic Criterion D provides as follows:

> D.   Persistent symptoms of increased arousal (not present before the trauma), as indicated by at least two of the following:

---

[137]  Dkt. 36-26 at 21, ¶¶ 100-106.

(1) difficulty falling or staying asleep

(2) irritability or outbursts of anger

(3) difficulty concentrating

(4) hypervigilance

(5) exaggerated startle response

(6) physiologic reactivity upon exposure to events that symbolize or resemble an aspect of the traumatic event (e.g., a woman who was raped in an elevator breaks out in a sweat when entering any elevator).

137.   Lucas's experience meets all six factors in Criterion D

138.   Factor (1).  As a child Lucas had difficulty staying asleep due to his recurrent nightmares and periodic asthma attacks. When older, he needed alcohol before he could fall asleep.  A psychiatrist who examined Lucas at the county jail after his arrest concluded that Lucas was suffering from "insomnia, obsessive worrying, anxiety and difficulty with his temper."  He was given various medications for these problems including Valium.

139.   Factor (2).  Lucas has exhibited irritability and outburst of anger throughout his life.  His participation in numerous fights at school and elsewhere is indicative of irritability. He also directed outbursts of anger or rage at women with whom he was romantically involved such as his girlfriend who aborted their baby.

140.   Factor (3).  Since early childhood Lucas has found it difficult to focus and concentrate. Lucas was hyperactive in school and this "hyperactivity" was "evident" in the neuropsychological testing.

141.   Factor (4).  As a child Lucas had to develop hypervigilance because Clarence's explosions of violence were unpredictable. This unpredictability required Lucas to constantly be alert and hypervigilant whenever Clarence was present.

142.   Factor (5).  Clarence's beatings were so frequent and brutal that Lucas developed a permanent exaggerated flinch or startle response

324

(15cv1224)

143.   Factor (6).  Lucas's asthma was at least, in part, a physiologic reaction to the trauma or events—such as his parents fighting—which symbolized or resembled an aspect of the trauma.

**Criterion E:[138] Duration of the disturbance (symptoms in B, C, and D) of at least one month.**

144.   The one month duration required in Criterion E is satisfied because for Lucas the symptoms in Criteria A-D lasted for years if not decades.

### h.    Substance Abuse and Related Disorders[139]

145.   Mental illness and other psychiatric, neurological or medical impairments, including organic brain damage and PTSD, often lead to substance-related disorders. Individuals afflicted by such conditions may "self-medicate" to alleviate or control symptoms caused by an underlying mental illness such as anxiety disorders and neurological deficits.  Childhood trauma-related disorders, including PTSD, can cause excruciatingly painful feelings of rejection, abandonment, shame, humiliation, low self-esteem, depression fear, terror, anxiety and rage.  If such symptoms are left untreated, substance abuse may be the only available option for the child to seek alleviation of or escape from their intense emotional pain.

146.   Therefore, it would not be accurate to conclude that Lucas's resort to alcohol and drugs in his early teens was motivated by his free-will choice to do so. Without hearing from a qualified expert on this topic, the jury was left to conclude just that.

147.   In actuality, when Lucas began experimenting with alcohol and drugs he was experiencing severely debilitating, untreated symptoms from his neurological impairments and the trauma inflicted on him by his parents.  However, the substances

---

[138]   Dkt. 36-26 at 21, ¶ 107.

[139]   Unless specified, facts in this section are from Dkt. 36-26 at 21, ¶¶ 127-188.

(15cv1224)

to which Lucas turned further traumatized his damaged brain and exacerbated his trauma-related disorders.

148.   Lucas's substance abuse began when he was young and still experiencing trauma in his home environment which put him at greater risk for becoming substance dependent. Additionally, Lucas was at greater risk due to his genetic predisposition to substance abuse and dependence as shown by his family history of mental illness and alcoholism.

149.   Substance dependence is a disease with a known genetic predisposition. In predisposed individuals, dependence develops at a younger age and progresses more rapidly.  As use continues the user becomes trapped in a spiral of increasing use interspersed with dysphoric sobriety.  Once the dopamine regulation system becomes diseased from repetitive overstimulation, the addict loses the ability to control his or her use.

150.   Because he became psychologically and physiologically dependent on the alcohol, cocaine, and methamphetamine, Lucas experienced strong compulsions for them even though he did not like how they affected him and wanted to give them up. As soon as Lucas began using alcohol and drugs—around age 13 to escape the fear he had for his father—he was "really into it."  By age 14, Lucas was heavily abusing both alcohol and drugs including LSD, marijuana and speed. By age 15 Lucas was suffering from polysubstance abuse disorder comprising of alcohol dependence and abuse of various other substances including amphetamines, LSD and other hallucinogens, and marijuana.

151.   From age 14 to 18 Lucas engaged in "habitual excessive" consumption of alcohol.  He drank beer almost every day and by the age of 15 was consistent with alcoholism.  He also smoked marijuana almost every day and was a heavy user of speed.  Lucas was so dependent on alcohol and speed that he was never able to become alcohol and drug-free despite his best efforts to do so and despite several institutional incarcerations.  His substance abuse/dependency caused him to lose his job; crack the

(15cv1224)

windshield of his car with his head during a highspeed crash, and crash another car into a telephone pole.  Lucas's need for money to finance his drug and alcohol abuse contributed to his theft related crimes as a teenager and his drug dealing after being released from Atascadero State Hospital.  After serving his sentence for rape at Atascadero State Hospital (hereinafter, ASH) in 1975 (age 20), Lucas immediately began abusing drugs and alcohol again.  During that time he drank two six-packs of beer a day, was "stoned all the time," and became a heavy user of cocaine with a $200 a day habit. Lucas financed his substance dependence by selling drugs which led to his conviction and imprisonment on federal drug charges in 1976 (age 22).  Lucas also heavily abused methamphetamine during the period which is consistent with his federal prison dental records from 1977 and 1978.

152.   After his release from federal prison in 1979 Lucas started abusing alcohol and drugs again.  His brother, Donald, remembered that during this time he and Lucas consumed large quantities of alcohol (e.g., tequila, whiskey, beer) and various drugs including marijuana, cocaine and crystal methamphetamine.

153.   From 1979 through 1984, Lucas consistently abused alcohol, cocaine, and methamphetamine. Lucas used crystal methamphetamine to stay up for days without sleep and then used alcohol to "come down." And, as Lucas began making good money with his business he spent $200-$400 per week on cocaine.  Alcohol and drugs were a regular part of Lucas's work day.

154.   In the second half of 1983, Lucas temporarily cut back on his substance abuse, but by the spring of 1984, Lucas's drinking and drugging got completely out of control.  He would no longer buy just an eighth of an ounce, it was quarter ounces, half ounces, ounces and then quarter pounds of crystal methamphetamine at a time.  These amounts would not last long.  Lucas also drank huge quantities of alcohol.  In May 1984 Lucas estimated that his monthly expenditure for alcohol was $800.  In a recorded interview with the police Shannon, Lucas's wife, described their alcohol use as "very

(15cv1224)

heavy" and stated that they were using a "whole lot" of crystal meth. She also stated that Lucas's abuse was so bad that he was in danger of "losing everything."

155.   By mid-1984, Lucas was "definitely in 'orbit' . . . barely in touch with what was going on around him."  Lucas was so heavily into alcohol and drugs at this time that he and Shannon had to make a pact to not use alcohol and drugs on the day of their wedding so they could be "clear-headed" for it.  From around April 1984 through December 1984 Lucas used speed on a daily basis.

156.   In light of Lucas's excessive consumption of alcohol, cocaine and methamphetamine from his early teens through age 29, as described above, Lucas met the following DSM III-R criteria for alcohol, cocaine, and methamphetamine dependence:

> 1. Substance often taken in larger amounts over a longer period than the person intended to use.
>
> 2. Persistent desire or one or more unsuccessful efforts to cut down or control substance.
>
> 3. A great deal of time spent in activities necessary to get the substance, take the substance, or recover from its effects.
>
> 4. Frequent intoxication or withdrawal symptoms when expected to fulfill major obligations at work, school, or home, or when substance use is physically hazardous.
>
> 5. Important social, occupational, or recreational activities given up or reduced because of substance abuse.
>
> 6. Continued substance use despite knowledge of having a persistent or recurrent social, psychological, or physical problem that is caused or exacerbated by use of the substance.
>
> 7. Marked tolerance: need for markedly increased amounts of the substance (i.e., at least a 50% increase) in order to achieve

328

intoxication or desired effect, or markedly diminished effect with continued use of the same amount.

8. Characteristic withdrawal symptoms.

9. Substance often taken to relieve or avoid withdrawal symptoms.

157.   Lucas's dependence was "severe" under the DSM III-R criteria which requires: "Many symptoms in excess of those required to make the diagnosis, and the symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others."

158.   Physiologically, alcohol produces a general and nonselective depression of the central nervous system.  The effects of alcohol and drugs can be both acute (transient) and chronic, i.e., producing lasting effects which persist whether or not the patient continues to drink.  The behavioral effects of acute intoxication tend to be psychiatric in nature (hallucinations, paranoia, depression, or euphoria, depending on the substance), or neurocognitive (impaired attention, memory and motor coordination).

159.   Lucas's alcohol dependence, which started in his early teens and continued unabated until his arrest at age 29, impaired him in significant ways.  First, the excessive amounts of alcohol which Lucas consumed severely impaired his thought processes.  With the higher doses of alcohol—which Lucas typically used—impairment of judgment and distortion of thought increase in severity such that alcohol can cause aggression and violence.  Second, alcohol intoxication impaired Lucas's ability to weigh consequences, to use memory and logic to inhibit impulses, and to weigh the risks of his behavior.  Third, alcohol dependence exacerbated Lucas's pre-existing neurological deficits.  Even minor brain damage may be compounded and disabling when coupled with chronic alcoholism.  Fourth, Lucas's excessive and long term alcohol consumption damaged him neurologically.  Long-term, chronic alcohol abuse can lead to permanent structural damage to the brain itself, which can further compromise the person's ability to think rationally and manage violent impulses.  Fifth,

329

Lucas almost always consumed alcohol together with other substances such as cocaine or methamphetamine.  The synergistic impact of these substances heightened their adverse impact on Lucas's mental functioning and exacerbated Lucas's neuro-cognitive impairments.

160.   Methamphetamine is a powerfully addictive stimulant that affects the central nervous system.  The activation of the sympathetic nervous system produces a "fight or flight" behavior pattern in which intoxicated individuals misinterpret, overreact, and misjudge the world around them and their responses to it. Methamphetamine users experience such symptoms as repetitive activity, memory problems, paranoia, stereotypic behavior, delusions of reference, auditory hallucinations, confusion or fright, and paranoid ideation (i.e., delusions of persecution or visual hallucinations).  Methamphetamine related behavior is characteristically impulsive and more exaggerated than that which the individual would exhibit when not under the influence of methamphetamine. By virtue of methamphetamine intoxication, individuals are unable to premeditate or form specific intent; seemingly purposeful conduct must therefore be viewed as arising from a state of extreme irritability and distorted perceptions of reality.

161.   Chronic methamphetamine abuse has significant negative psychiatric consequences, particularly in users with preexisting psychiatric disorders. Methamphetamine abuse engenders neurotoxicity, damaging the dopamine and serotonin containing neurons in the brain.  Toxic psychosis resembles acute paranoid schizophrenia in many respects.  Stimulant psychosis is characterized at first by increases in suspiciousness and paranoid thinking, progressing to full-blown paranoid delusions, typically of persecution.  The person may perceive even close friends and relatives as a danger and may react with unprovoked hostility and (sometimes bizarre) violent behavior.  The potential for psychosis lasts well beyond the time that the user has methamphetamine in his system.  Once psychosis develops, further use of

(15cv1224)

methamphetamine, even in small amounts, will result in the prompt return of the psychotic symptoms.

162.   Individuals with histories of both PTSD—which can produce paranoid delusions—and methamphetamine dependence must be considered greater risks for violence because of their misinterpretation of reality.  Individuals who are impaired from the symptoms of organic brain damage and trauma-related disorders such as PTSD, are especially vulnerable to the negative psychiatric and psychological consequences of cocaine and methamphetamine.

163.   According to Dr. Stewart, Lucas was suffering from methamphetamine dependence and chronic methamphetamine induced psychosis from 1979 through 1984. This diagnosis is corroborated by the auditory and visual hallucinations Lucas experienced almost immediately after taking methamphetamine[9] and by the aggressiveness and violent out-of-control rages he exhibited in fights and arguments with his wife, Shannon, and others from 1979 through 1984.  In sum, it is likely that Lucas was in a toxic psychotic state throughout much of the period from 1979 through 1984.  During this period his cognitive functioning would have been highly impaired.

164.   Cocaine is another powerful stimulant drug that is more addictive than alcohol, heroin and marijuana.  Cocaine exacerbates existing psychological conditions and underlying mental illnesses.  Anyone using cocaine compulsively can develop toxic psychosis.  It does not require a major underlying psychopathology. Repeat tend to have more psychological toxicity.  Hallucinations, delusions, paranoia, aggression and violence are well established by-products of heavy and prolonged cocaine abuse. These by-products are exacerbated by the synergistic effect of cocaine with alcohol and methamphetamine.  Sleep deprivation further exacerbates the effects of cocaine, impairs judgement and increases impulsiveness.

165.   Lucas, who was a chronic abuser of cocaine, likely experienced heightened aggressiveness, impaired judgment and poor impulse control from cocaine especially because he used it in combination with alcohol and/or methamphetamine.

(15cv1224)

166.   Competent mental health experts familiar with the action of alcohol, cocaine and methamphetamine on the brain could have explained to the jury the scientific bases for Lucas's substance-related disorders and could have made clear that Lucas's substance abuse was not a fully "free-will" choice.  Had defense counsel and/or any mental health experts working with counsel obtained a complete, multi-sourced history of Lucas's substance abuse, such as the one compiled by Ariel Tomioka (TSH), that history would have shown that during the  period from 1979 through 1984, Lucas was cognitively impaired by substance disorders and/or stimulant induced psychosis.

### i.   Trauma in Marriage[140]

167.   During 1984 Lucas's impairments were generally exacerbated by his traumatizing wife, Shannon.  First, Shannon was a heavy polysubstance abuser who encouraged Lucas to increase his own alcohol and substance (especially methamphetamine) consumption.  Second, Shannon—who herself suffered from severe mental disorders—tormented Lucas with physical violence, psychological battering, and abandonment and neglect.  For example, she once hit Lucas in the back of the head with a rock.  (Dkt. 36-10 at 1 ¶ 139.)  This added stress from Shannon was especially harmful to Lucas because it correlated to the abuse, neglect, abandonment and betrayal which Lucas experienced as a child when his PTSD originally manifested itself.  Thus, the intense stress and torment from Shannon were especially likely to trigger rage reactions from Lucas.

### j.   Exposure to Neurotoxins[141]

168.   Lucas was likely exposed to toxic carpet cleaning solvents in the early 1980s during which time he remained "almost continuously employed as a carpet cleaner . . ." Exposure to such solvents could have caused impairment of Lucas's

---

[140]   Unless specified, facts in this section are from Dkt. 36-26 at 21, ¶ 189; *see also* Dkt. 36-10 at 1, ¶¶ 147-165.

[141]   Unless specified, facts in this section are from Dkt. 36-26 at 21, ¶ 190.

(15cv1224)

central neurological function especially in combination with his organic brain damage, trauma-related disorders including PTSD, and substance-related disorders.

### k.    Impact on Lucas's Demeanor at Trial[142]

169.    As discussed in Subclaim F, without explanation of Lucas's impairments and disorders, his appearance and demeanor in court may have appeared as if he was uncaring and without feelings of empathy or remorse.  If Lucas's demeanor was misread by a juror to represent lack of remorse or a cavalier attitude, it would be an inaccurate portrayal of Lucas because the symptoms of his untreated disorders and impairments—such as psychic numbing and dissociation—would have made him appear aloof and withdrawn.

### l.    Institutional Failure[143]

170.    An important theme in Lucas's social history, which the jury never heard, that helps to explain the downward spiral of his life is "institutional failure."  The attention he received from each public service institution failed to accomplish the tasks or responsibilities with which the institution was charged.  Also, each did not effectively address—and often did not even test for and/or diagnose correctly—his most serious mental health problems.  The institutions that failed Lucas included his schools, California Youth Authority, law enforcement, and the various institutions associated with the adult corrections (California Department of Corrections and Rehabilitation), particularly Atascadero State Hospital, the Federal Prison in Englewood, Colorado, and Salvation Army Halfway House.  Had even one of these institutions met its publicly mandated responsibilities, Lucas's life might have turned out differently.

171.    The schools that Lucas attended did not recognize and/or adequately deal with his learning disabilities, brain impairments and trauma disorders.  Despite at least

---

[142]  Unless specified, facts in this section are from Dkt. 36-26 at 21, ¶ 194.

[143]  Unless specified, facts in this section are from Dkt. 36-10 at 1,  ¶¶ 213-219.

(15cv1224)

one teacher's assessment that Lucas was "slow," the school did not provide a complete evaluation nor offer Lucas individualized remediation. When Lucas dropped out in the 11th grade, his reading was only at a 6th grade level. Lucas's school failure made it more likely that he would fall into illegal activities to provide for his needs. Had the schools that Lucas attended investigated his home life, teaching and mental health professionals would have been alerted to the pattern of serious learning disabilities in all three Lucas children and the complete lack of parental involvement. Further, careful attention to the children's learning problems would have revealed the chronic violence in the Lucas household.

172.   The California Youth Authority also failed Lucas. By 1971, Lucas committed acts of petty theft, burglary, running away, disturbing the peace, forgery, refusing to attend school, and being under the influence of drugs. In her 1971 clinical evaluation for the Community Mental Health Services Probation Division, Dr. Plotnik psychologically assessed Lucas as shy, awkward and uncomfortable, with a poor self-concept, combined with emotional insecurity and depressive trends. (Dkt. 36-11 at 162, 2008 State Pet., Ex. 16, Appx 22, Dr. Plotkin Report, pt. 1 ("Dkt.36-11 at 162") at p. 162.) Dr. Plotkin concluded that " . . . this youngster might be expected to benefit from experience with a therapeutic day center program." (Dkt. 36-12 at 1, 2008 State Pet., Ex. 16, Appx 22, Dr. Plotkin Report, pt. 2 ("Dkt. 36-12 at 1") at 1.) No therapy was forthcoming.

173.   A probation officer named Githens noted that the marital situation of Lucas's parents was unstable and that the dysfunction in the home with its evident lack of consistent discipline and supervision played a part in Lucas's maladjustment. Githens concluded that Lucas's "prognosis is bleak unless appropriate controls are instituted." (Dkt. 36-12 at 9, at p. 19.)

174.   A previous probation report, from May 24, 1971, similarly concluded that Lucas had for the past year gone downhill dramatically in his behavior at school and in the community. The report explained that much of this behavior stems from Lucas's

334

(15cv1224)

reaction to a very violent and brutal upbringing on the part of his father, and also the eventual separation and the filing of divorce on the part of the parents in recent months. The probation officer suspected that in dealing with Clarence" we are dealing with an individual who is highly disturbed and in the need of immediate help from a therapists [sic]. . . . [T]his has been a very unhappy, disturbed home for many years." This was evidenced by, among other things, Clarence's attempted suicides.  (Dkt. 36-12 at 9, at p. 18.)

175.    Despite these reports, nothing was done to protect or treat Lucas.  Lucas was subsequently committed to California Youth Authority's Rancho Del Campo, another violent environment in which Lucas was randomly attacked and beaten.  He ran away from Del Campo after getting his teeth knocked out.  After he fled, the California Youth Authority did not even bother to look for Lucas at home, to where he escaped. After finding him at home several months later, officials terminated his probation and allowed Lucas to stay in the very environment that had been previously acknowledged as a dysfunctional home that played a part in Lucas's maladjustment.

176.    Abused children tend to develop hypervigilance, misinterpret cues from their environment, and react aggressively when they perceive an ambiguous situation as a threat.  (Dodge, K. Murphy, R. & Buchsbaum, K.C. (1984).  The California Youth Authority's and related agencies failure to protect Lucas exacerbated the adverse impact of the trauma Lucas experienced.

177.    Atascadero State Hospital also failed Lucas.  Competent mental health services for Lucas should have included ongoing clinical evaluation, treatment, drug and alcohol rehabilitation, self-awareness and social education, and post-release follow-up.  Moreover, Lucas's special needs as a youth, and as a child victim of abuse and neglect, should have been taken into consideration in his program and treatment planning.

178.    However, rather than being individualized and focused, the medical records from Atascadero are full of contradictory and questionable observations and

335

conclusions.  Some reports indicate that Lucas was making good progress.  At the same time, other ASH assessments raised red flags suggesting that Lucas has serious mental health issues relating to self-esteem, insight, intimacy, sexuality, appropriate social behavior, and acknowledgment and expression of emotions, especially anger.  Further, David's denial of a drug problem, combined with his history of abuse by his father, and his inability to understand and express his emotions, should have alerted staff to the possibility, if not probability, that Lucas might fall prey to violent outbursts during substance binge-induced blackouts if released untreated.

179.   The most important reason that Lucas did not make significant progress at Atascadero was the lack of professional clinical staff to perform thorough mental health testing, evaluation, treatment, and follow-up.  There was a shortage of professional staff due to overcrowding. Most of the treatment was done by "Psych Techs" who had minimal training.  Even the professional staff who saw Lucas failed to help him because they did not have a true picture of his mental health strengths and deficits as a foundation for treatment.  Notably lacking were communication and collaboration between staff members toward deriving a holistic understanding of Lucas's psychiatric issues, agreement upon a treatment plan, the consistent application of that plan, and adjustment of that plan in response to Lucas's progress.[144]

180.   Due to these deficiencies in Atascadero's clinical services, Lucas was misdiagnosed and released without having benefitted from the institutionally promised help.  Dr. Schumann's diagnosis stated:  "Primarily I believe (Lucas) is an antisocial person who needs alcohol either as an excuse and/or as an aid to carrying out his aggressive activity.  At this time it seems to me that his sexual aggression is merely part of his predatory behavior."  "This patient is now nearly 19 years of age.  His behavior is

---

[144]   Report to the U.S. Department of Justice on Conditions at Atascadero State Hospital by Craig Haney, Ph.D., J.D., March, 1984; 67 RT 12777-70 (testimony of Loyal Tallchief).

getting more aggressive.  He has not learned to control his behavior in the past after a combination of incarcerations and treatment by the Youth Authority."  DSM diagnosis is: "Antisocial personality, severe; alcoholism, habitual excessive drinking; sexual deviation, aggressive sexuality."  (Dkt. 36-22 at 33, 2008 State Pet., Ex. 16, Appx 176, ASH Records ("Dkt. 36-22 at 33") at 59.)

181.   Perhaps the most subtly misleading of the above remarks is, "(Lucas) has not learned to control his behavior in the past after a combination of incarcerations and treatment by the Youth Authority."  Dr. Schumann refers to Lucas's incarcerations as if they were opportunities he wasted.  As previously discussed, prisons are places of intense threat, fear, and violence, not of healing or therapy.

182.   Although Dr. Schumann diagnosed Lucas with "antisocial personality disorder," reports from other ASH staff that interacted with Lucas on a more consistent basis describe a very different person: passive, shy; lacking basic social skills; lacking basic knowledge of intimate relations; nervous with people; unassertive in meeting his needs; lacking knowledge of normal sexual behavior.  Moreover, as already noted: "David scores only 23 on assertiveness scale."  (Dkt. 36-22 at 33, at 57.)

183.   Had Dr. Schumann read and considered the notes from his own staff, he would have been alerted to possible etiologies of aggression other than Antisocial Personality Disorder.  Most obvious of these possible etiologies was organic brain damage from Lucas's genetic predisposition and his life long history of closed head traumas – and trauma-related anxiety disorders[145] due to severe child abuse and neglect and organic brain damage.  Given these diagnoses, Lucas's alcohol and drug abuse would have made sense as a self-medicating response to his untreated psychiatric conditions, rather than an excuse and/or an aid to carrying out his aggressive activity.

---

[145]  Ochberg, F.M., ed., *Post-Traumatic Therapy and Victims of Violence*, Brunner/Mazel: New York, 1988, p. 48 ("Anxiety severe enough to meet DSM III criteria is a common sequelae of trauma (Katon, 1984)").

(15cv1224)

184.   Beyond failing to provide meaningful treatment, staff allowed Lucas, one of the youngest inmates at Atascadero, to fall under the influence of Barry Wood, a man 10 years older than Lucas, and an acknowledged drug addict and child molester. In turn, Lucas relied on Barry Wood for help in knowing what to say and how to conduct himself.  Barry Wood was a strong influence on Lucas during his stay at Atascadero.  Lucas and Barry planned additional [substance] consumption and other crimes.  Right after both Lucas and Barry were released from Atascadero, Barry involved Lucas in a marijuana-smuggling operation.  Lucas was caught and sent to federal prison in Englewood, Colorado.

185.   In Englewood Federal Prison in Colorado, Lucas had a counselor whom he saw very seldom.  A memo from that staff psychologist, Mary Denton, states: "David Lucas does not appear to have any deep seated emotional problems that would preclude him from any community programs.  His past behaviors apparently are related to substance abuse and previous adolescent rebelliousness.  It appears that he has matured considerably and in no way appears to be a risk to society, in my opinion."  (Dkt. 36-23 at 26, 2008 State Pet., Ex. 16, Appx 177, Colorado Prison Files ("Dkt. 36-23 at 26") at 27.)  His long-standing substance abuse problem was minimized and his crimes, including rape, were labeled as adolescent rebelliousness.  In addition, Lucas's trauma from past physical violence was restimulated by fresh violence when he was beaten by other inmates despite placement on a protective yard.

186.   After his release, one of the parole conditions was that Lucas receive therapy.  However, the parole officer wrote to the Parole Commission asking that the special condition of parole for mental health therapy be suspended, which it was.  The parole officer's case review for the period of June 29, 1981 through December 29, 1981 concluded that—despite a history of poor reporting habits—Lucas's personal life had "stabilized" and he "appears to have all areas of his life in control at this time."  (Dkt. 36-23 at 36, 2008 State Pet., Ex. 16, Appx 180, Federal Parole File ("Dkt. 36-23 at 36") at 40.)

338

(15cv1224)

187.   In reality, Lucas's life was not in control.  When released to Salvation Army Halfway house, Lucas was able to return to his substance abusing lifestyle without anyone noticing, even when he got thinner and lost a lot of weight at the same time that his income more than doubled.  It seems clear that his federal parole officer did not know or did not appreciate the severity of Lucas's untreated substance disorder, his past issues with aggression, and his history of extreme physical abuse, psychological battering and emotional neglect.  Without this understanding, his monitoring of Lucas's parole fell very short of the mark.

188.   Police officers not only failed to protect and serve Lucas, but exacerbated his trauma.  In 1962, Lucas's mother Pat observed three officers beat and kick a man.  Pat called 911 and reported the beating.  Eventually one of the officers involved was fired and two were suspended for this incident.  The victim sued and, prior to the hearing, police officers began following Pat home from work, threatening Pat with harm if she testified against them.  Nevertheless, Pat testified.  After the court case, the man who was fired sat in a car across the street from her home to intimidate Pat.  Other officers flattened her tire.  Pat gave this information to the FBI in a signed letter witnessed by Special Agent Earl M. Petersen.

189.   Officers harassed and intimidate Pat's sons, particularly Lucas.  They told Pat, "You've got two boys and we're going to get them both."  (Dkt. 36-21 at 25 at ¶ 25.)  Lucas began being personally harassed by police when he was 12 years old.  One time Lucas recalls being in the house when officers opened the door, walked in, picked up some billiard balls and threw them, threatened him and walked out.  Another time, Lucas was knocking on doors looking for new customers for his paper route when police arrived, handcuffed him, threw him in their car, and said he was "under arrest for murder" and that he was "going away to prison for life."  Eventually Lucas was released from custody.  There were at least five more similar incidents.

190.   The ongoing harassment and intimidation by the police officers simply reinforced and deepened Lucas's trauma.  It also reinforced and deepened his distrust of

339

1  authority, and pushed him further away from socially acceptable norms and toward

2  delinquent and criminal behaviors.  Lucas learned that he was not safe anywhere.

3  ### 6.   Lucas was Prejudiced Under *Strickland* Prong Two Due to

4  ### Counsel's Deficient Performance

5  191.   The evidence discussed in this sub-claim would have completely changed

6  the complexion of the penalty phase.  In failing to present any meaningful mitigating

7  evidence, Lucas's counsel blundered the opportunity to present the jury with facts that

8  would have compelled them to show mercy.

9  192.   Dr. Marks's given testimony failed to explain the mitigating significance

10  of Lucas's childhood abuse, substance abuse and organic brain damage. His testimony

11  did not present a complete picture of Lucas so as to humanize him in the eyes of those

12  who will decide his fate.  Hence, it could not effectively counter the prosecution's

13  aggravating evidence including the devastating ASH diagnosis.

14  193.   Instead, Dr. Marks presented an extremely cursory, incomplete and, as a

15  result, misleading picture of Lucas.  He briefly discussed Lucas's childhood home

16  describing it as "a typical dysfunctional family of quite great severity" (67 RT 12782),

17  but he did not come close to fully describing Lucas's childhood trauma and its

18  implications.  Dr. Marks mentioned Lucas's organic brain damage, but did not explain

19  its significance and, in fact, marginalized it in the eyes of the jurors by describing it

20  without explanation as "minimal."  (67 RT 12791-93.)  As to substance abuse Dr.

21  Marks's entire testimony was the following:

22  > Starting in about the 9th grade he began to experiment with

23  > marijuana, cocaine, speed, and there was a good deal of

24  > alcohol abuse from that period right on through to about

25  > 1984, '85.

26  > He was raised in a neighborhood, Cowles Mountain, that was,

27  > as far as I can determine, not the greatest neighborhood in the

28  > world, but there were a lot of drugs, and that kind of behavior

1      seemed to be, if not standard, at least prevalent.   (67 RT

2      12788.)

3      194.   Dr. Marks did not explain to the jurors that Lucas suffered from untreated

4   trauma-related disorders, including PTSD, and substance-related disorders including

5   methamphetamine psychosis.  Nor did Dr. Marks explain the mitigating significance,

6   either individually or in combination, of Lucas's childhood trauma and maltreatment,

7   organic brain damage and substance abuse; nor did he explain the synergistic impact of

8   these difficulties and impairments on Lucas's development and behavior.  Testimony

9   from trauma and substance abuse experts based on a full evaluation of Lucas and

10   competent life history, such as that of Dr. Stewart, would have provided the jurors with

11   crucial explanations of the mitigating evidence which they did not receive from the

12   penalty phase presentation put on by Lucas's trial counsel.

13      195.   The omitted mitigating evidence and themes would have explained the

14   mitigating significance of factors addressed in Dr. Marks's testimony, would have

15   provided additional mitigation, and would have humanized Lucas in the eyes of the

16   jurors.

17      196.   Moreover, the information and analyses provided thorough and competent

18   life history investigation by a qualified mitigation specialist (such as Ariel Tomioka)

19   and an evaluation by a trauma and substance abuse expert (such as Dr. Stewart) would

20   have countered the ASH diagnosis by explaining Lucas's condition in terms of

21   untreated organic brain damage, trauma-related disorders including PTSD and

22   substance-related disorders including methamphetamine psychosis.

23      197.   Without a case in mitigation to fight back against, the prosecution was

24   easily able to portray Lucas as an inherently evil person.  Indeed, the prosecutor did all

25   that he could to transform the defendant from a human being into a monster, and "evil"

26   "butcher."  (62 RT 11752; 70 RT 13277.)  The prosecution labeled Lucas as "a butcher,

27   a single solitary butcher.  A butcher with a lust for death and nothing short of that." (62

28   RT 11761.)  By calling him a "demon," "a butcher who revels in hearing the human

1    outcry," the prosecution portrayed Lucas as less than human in the minds of the jurors.

2    (62 RT 11762.)

3          198.   The prosecution also portrayed Lucas as a cruel, abusive husband.  On

4    rebuttal at the penalty trial the prosecution presented the testimony of Lucas's neighbor,

5    Laura Stewart, who testified as to fights and arguments between Lucas and his wife,

6    Shannon.  (69 RT 13076-82.)  As recognized by the prosecution Ms. Stewart's

7    testimony was "significant evidence in rebuttal. . . ." (69 RT 13183.)

8          199.   The prosecution relied on this evidence in closing argument:

9                 You heard evidence from Dr. Marks that he was a loving

10                husband with his wife Shannon. Well, we know more about

11                that now because Mrs. Laura Stewart talked to us about the

12                type of marriage they truly had, and the fact that it was a

13                violent marriage, a tumultuous marriage, and that there was a

14                lot of hitting going on. And one night in particular when Mr.

15                Lucas's wife Shannon was racing up and down the street

16                disturbing the neighbors, Mr. Lucas got so upset and shouted

17                out to his friend "Go get the chain. I am going to get her."

18                That's the loving husband that grieved over his wife

19                Shannon's death. "Go get the chain. I am going to get her."

20                And we know who else had a chain around her neck, . . ."

21    (70 RT 13272.)

22          200.   The evidence from a thorough and competent social history and an

23    evaluation by a trauma and substance abuse expert would have explained and mitigated

24    the prosecutor's accounts of Lucas as a generic evildoer.  As to Lucas's marriage, the

25    jury would have understood that Shannon was a violent, dysfunctional person who

26    deliberately traumatized Lucas and "pushed his buttons" to antagonize him.  (Dkt. 36-

27    10 at 1, ¶¶ 159-165.)  Moreover, the jury would have under stood that Lucas's violent

28    response to Shannon's provocations did not make him "evil" as asserted by the

342

prosecutor.  Rather they were the product of his untreated trauma-related disorders including PTSD, organic brain damage and substance-related disorders including methamphetamine psychosis.  (Dkt. 36-26 at 21.)

201.   Counsel's omissions were especially likely to be prejudicial in the present case because the penalty trial was closely balanced and the death verdict was not returned until—after two weeks of deliberation.  Further, the jurors asked for and received both the unexplained testimony of Dr. Marks and the unrebutted ASH diagnoses.  This indicates that the jurors relied on this paltry and grossly incomplete depiction of Lucas in rendering their death verdict.  It is reasonably probable that the outcome of the penalty trial would have been more favorable to Lucas if the available mitigating evidence had been fully developed and explained.

**E.**     **Counsel Were Ineffective for Failing to Clarify Dr. Marks's Misleading Testimony That Lucas's Brain Damage Was "Minimal"**

202.   Lucas's counsel failed to present evidence explaining the mitigating significance of Lucas's organic brain damage.  They also could have explained that due to the combination of brain impairments, PTSD, and substance abuse, Lucas was acting under extreme mental distress at the time of the crimes, a mitigating factor under Cal. Penal Code 190.3.  But for this error, which was not the result of an informed tactical choice, it is reasonably probable that the outcome of Lucas's penalty phase trial would have been more favorable to Lucas.

203.   Dr. Marks's testimony that Lucas's organic brain damage was "minimal" (67 RT 12792), presented without explanation, erroneously conveyed to the jury that Lucas's brain damage was not significant mitigation and not important to an understanding of his development and behavior.  In reality, Lucas's brain damage had substantial mitigating significance.

204.   Lucas's history of head trauma and brain damage is set forth in Paragraphs 197-426, above.

(15cv1224)

205.   Additionally, Dr. Gale Winston Bach, PhD, a neuropsychologist who served as a consultant to defense counsel, administered a comprehensive Halstead-Reitan neuropsychological test battery to Lucas on June 20, 1986.  (Supp. Ex. 16, Appx 83.)  Dr. Bach also relied on the 1985 neuropsychological evaluation of Lucas by Dr. Meredith Friedman to reach his conclusions.  (Dkt. 36-12 at 128, 2008 State Pet., Ex. 16, Appx41, M. Friedman Report pt 1; Dkt. 36-13 at 1, 2008 State Pet., Ex. 16, Appx 41, M. Friedman Report pt. 2; Dkt. 36-18 at 23, 2008 State Pet., Ex. 16, Appx 122, Raw Data from Friedman Testing.)

206.   The findings by Drs. Bach and Friedman were available to trial counsel and to defense expert Dr. Marks.  (Dkt. 36-10 at 1, ¶¶ 141-146; Dkt. 36-26 at 21, ¶¶ 55-67.)

207.   Although Dr. Marks relied on Dr. Bach's findings of brain damage to corroborate his own finding of Lucas's brain impairments, (67 RT 12791-92; 68 RT 12848), Dr. Marks's cursory testimony—which simply described Lucas's brain damage as "minimal"—was grossly misleading.

208.   In post-conviction proceedings, Lucas obtained declarations from Ariel Tomioka and Dr. Pablo Stewart.  Both experts explained Lucas's neurological impairment in comparison to the population as a whole in detail.  (Dkt. 36-26 at 21, ¶¶ 145-146; Dkt. 36-26 at 21, ¶¶ 56-67.)

209.   Dr. Stewart explains that the Halstead-Reitan Battery administered to Lucas by Dr. Bach is "considered to be one of the most valid and reliable measures of brain dysfunction."  (Dkt. 36-26 at 1, ¶ 55.)  Lucas's Halstead-Reitan Impairment Index was interpreted by Dr. Bach to indicate "Mild Neurological Impairment."  (*Id.*)

210.   Notably, as Dr. Stewart explains, the frontal lobe impairments described by Dr. Bach as "minor," had a significant impact on Lucas.  According to Dr. Stewart, "[f]rontal lobe disorders may have the most extreme and far-reaching implications for behavior and functioning."  (Dkt. 36-10 at 1 ¶ 59.)  Even "mild" impairments can severely impair one's ability to regulate and control impulses.  (*Id.*)  Similarly, even

minor deficits in brain functioning may be compounded and disabling when coupled with chronic alcoholism or heavy drug use.  (*Id.* at ¶ 64.)

211.   Another indicator used to diagnose Lucas was the Category Test which has found to be 90% effective in distinguishing brain-injured individuals from unimpaired individuals, particularly regarding frontal lobe damage.  (*Id.* at ¶ 56.)  Lucas scored in the lowest 1% of the population for males in his age group, reflecting "a diffuse neuropsychological impairment, particularly affecting logic, abstract thinking, problem solving and the higher cortical processes such as judgment, inhibition, and control."  (*Id.*)

212.   Dr. Bach's findings were consistent with Dr. Friedman's previous 1985 evaluation of Lucas which indicated "some deficits suggestive of frontal lobe involvement, the primary function of which is planning and executive direction of behavior. . . ."  (Dkt. 36-13 at 1, at 6.)

213.   Dr. Stewart further found that in Lucas's case, the effects of organic impairments were compounded by co-existing trauma-related disorders and chronic substance abuse and dependency.  (Dkt. 36-26 at 21, ¶ 64.)

214.   Dr. Stewart also found, based on the reports of Dr. Helen Morrison who interviewed Lucas in 1986, that Lucas may have suffered from a damaged limbic system.  (*Id.* at ¶ 69.)  Dr. Morrison recommended a positron emission tomography (PET scan), which revealed that Lucas has problems which may be linked to the limbic system.  (Id.)  Specifically, areas in the interior portion of the temporal lobes in Lucas's brain were abnormally low.  (*Id.* at ¶ 69 n.9.)  Damage to any limbic system structures may result in "marked aggression or violence, hypersexuality, or rage reactions.  (*Id.* at 1 ¶ 68.)  The damage may have been caused by or exacerbated by the trauma Lucas experienced throughout his childhood.  (*Id.* at ¶ 70.)

215.   Based on information that was available at the time of trial, Dr. Stewart concluded that at the time of the charged offenses, Lucas was suffering from an extreme mental or emotional disturbance and that his ability to conform his conduct to

(15cv1224)

the requirements of the law was impaired.  This impairment was a result of organic

neurocognitive impairments, trauma-related disorders including PTSD, substance

disorders, and stimulant induced psychosis.  (*Id.* at ¶ 202.)

216.   Counsel's failure to develop and clarify Dr. Marks's misleading testimony

regarding Lucas's brain damage left the jury with a false impression concerning the

significance of Lucas's brain damage and the impact it may have had on his

development and behavior.  It further deprived the jurors of important mitigation that

would have served to help explain and mitigate Lucas's compromised ability to control

his behavior.  Lucas was also deprived of the right to present expert testimony

regarding the defendant's mental state that may explain or lesser the client's culpability

for the underlying offense or otherwise support a sentence of less than death.  Hence,

counsel's omission violated Prong One of *Strickland.*

217.   Counsel's omission violated prong two of *Strickland* because Lucas's

brain damage—if properly presented and explained to the jurors—would have: (1) been

substantially mitigating under Factors h[146] and j (catch all)[147] of the jury instructions;

(2) provided a non-free will explanation for Lucas's substance abuse (Dkt. 36-13 at 1 at

7, M. Friedman, Ph.D. Report ); and (3) undermined the prosecution's primary penalty

phase argument based on the assertion that Lucas was an inherently evil person.

218.   There is a reasonable probability that the outcome of the penalty trial

would have been more favorable to Lucas if counsel had clarified and fully explained

---

[146]   Factor (h): "Whether at the time of the offense the capacity of the defendant
to appreciate the criminality of his conduct or to conform his conduct to the
requirement of law was impaired as a result of mental disease or defect, or the effects
of intoxication." (65 CT 14374.)

[147]   Factor (j): "Any other circumstance which extenuate the gravity of the crime
even though it is not a legal excuse for the crime, and any sympathetic or other aspect
of the defendant's character of record that the defendant offers as a basis for a sentence
less than death, whether or not related to the offense for which he was on trial."  (65 CT
14374.)

the mitigating significance of Lucas's brain damage notwithstanding Dr. Marks's characterization of it as "minimal."  (67 RT 12792.)

**F.     Counsel Were Ineffective for Failing to Rebut the Prosecution's Suggestion That Lucas Did Not Express Remorse**

219.   Lucas's sentence of death was unlawfully and unconstitutionally imposed in violation of his federal constitutional rights because of counsel's failure to present evidence of psychic numbing and disassociation resulting from childhood trauma. Such evidence would have rebutted the prosecution's suggestion that Lucas did not express remorse and prevented the jury from drawing adverse inferences from Lucas's seeming lack of emotional response.  But for this failure by counsel, which was not the result of an informed tactical choice, it is reasonably probable that the outcome of Lucas's penalty phase trial would have been more favorable.

220.   During trial Lucas's demeanor was stoic and the prosecutor argued that Lucas committed the crimes "without any express remorse."  (70 RT 13275; *see also* 70 RT 13273.)  However, a common symptom of trauma is "dissociation" and "psychic numbing."  In light of the childhood trauma experienced by Lucas it is likely that he would exhibit "dissociative conduct" and "psychic numbing."  (Dkt. 36-26 at 21, ¶¶ 116, 194.)  Counsel could have, but did not present expert testimony explaining this to the jury.  (*Id.* at ¶ 203.)

221.   This would have been an alternative and more sympathetic explanation for Petitioner's alleged failure to express remorse or show emotion than the one advanced by the prosecution (i.e., that he is an "evil monster").  (*See* 70 RT 13277-78.)  There is a reasonable probability that the outcome of the penalty trial would have been more favorable to Lucas if counsel had presented evidence explaining Lucas's alleged lack of remorse and his stoic nonexpressive demeanor in terms of trauma-induced dissociation and psychic numbing.

**G.     Miscellaneous Penalty Phase Failures**

222.   To the extent that each of the constitutional claims in this Petition was not adequately preserved, trial counsel's failure to do so violated Lucas's constitutional right to effective assistance of counsel because there was no reasonable strategic reason for not adequately preserving it.  There is a reasonable probability that, absent counsel's omission, the outcome of the trial would have been more favorable to Lucas.  These failures include the following:

**1.     Failure to Object to the Prosecutor's Closing Argument**

223.   Lucas was denied effective assistance of counsel when his trial counsel failed to object to the prosecutor's penalty phase argument informing the jurors that they must base their penalty verdict based on "what [he] did, not who he is . . . ."  During his penalty phase argument the prosecutor told the jurors:

> What is the just punishment?  What is just for Mr. Lucas?
> You must base your decision upon what Mr. Lucas did, not
> who he is or what family he comes from or any sympathy for
> his family.  The question is what did he do.  (70 RT 13273:
> 25-28.)  Defense counsel did not object to the prosecutor's
> argument.  (70 RT 13274.)

224.   The prosecutor's argument violated Lucas's constitutional rights under the Eighth and Fourteenth Amendments, which require the jurors to consider more than simply "what did he do." *See Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978) (the Eighth and Fourteenth Amendments require that capital juries be allowed to consider "any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death: as mitigating factors".)

225.   The defense presented (1) evidence of Lucas's difficult childhood in a dysfunctional family with an abusive father, and (2) considerable evidence of good and generous behavior towards a substantial number of people.  (*See* Section 11.J.)  Such

348

evidence revealed aspects of Lucas's life and character that were clearly proper factors to consider in the sentencing determination. Counsel had no reasonable tactical basis for not objecting to the prosecutor's improper argument which, if credited by the jury, could have led the jury to disregard mitigating evidence. There is a reasonable probability that, absent counsel's omission, the outcome of the penalty trial would have been more favorable to Lucas.

### 2. Failure to Seek Review of the Denial of the Disqualification Motion

226. As discussed fully in Claim 19, trial counsel moved to strike a 1973 prior conviction at the penalty phase, and moved to disqualify Judge Hamnes on the grounds that she had prejudged the issue. (61 CT 13443-49.) Trial counsel did not seek writ review based on the denial of his disqualification motion. (Claim 23.)

### 3. Failure to Preserve Trial Court Error Claims

227. Trial counsel failed to properly preserve his constitutional claim that the judge erred in excluding evidence that he passed a polygraph examination concerning his prior rape. (*See* Claim 20.)

### 4. Failure to Object to Improper Argument

228. Trial counsel failed to timely object and request admonition as to the prosecutor's improper biblical references in his closing argument. (*See* Claim 25.) Trial counsel also failed to timely object that the prosecutor's closing argument undermined the jury's sense of responsibility for a death sentence, implied a duty to return a death sentence, and urged the jurors to disregard the mitigating evidence. (*See* Claim 25.) Trial counsel failed to timely object when the prosecutor improperly encouraged the jury to disregard and/or discount the mitigating evidence by expressly misleading the jury as to the appropriate bases for judgment, and by appealing to passion in order to trivialize mitigating evidence. (*See* Claim 25.)

(15cv1224)

**H.    Lucas's Death Sentence Was Based on Incomplete, Inaccurate and Unreliable Evidence**

229.   In addition to violating Lucas's Sixth and Fourteenth Amendment rights to counsel, trial counsel's deficient investigation, development, and presentation of mitigating evidence infringed upon Lucas's Eighth and Fourteenth Amendment rights to an individualized and reliable capital-sentencing determination because the person sentenced to death bore little resemblance to Lucas.  *Jones v. United States*, 527 U.S. 373, 381 (1999); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976)

**I.    Cumulative Penalty Phase Prejudice**

230.   The penalty-phase deliberations were not open and shut.  At one point, the jury considered themselves to be hopelessly deadlocked.  (108 CT 24251-52.)  They asked for re-instruction on crucial penalty phase issues.  (*Id*.)  *See Francis v. Franklin*, 471 U.S. 307, 326 (1985) (request for re-instruction "lends further substance" to conclusion that prosecution evidence was "far from overwhelming").  They also asked to review substantial portions of the penalty phase evidence–a further indication that the deliberations were not "open and shut."  *Murtishaw v. Woodford* , 255 F.3d 926, 973 (9th Cir. 2001) (jury request for review of exhibits, readback of testimony or clarification of instructions).  Additionally, the length of the deliberations, over eight days, demonstrated the case was close.  (71 RT 13481; *see Woodford v. Visciotti*, 537 U.S. 19 (2002) (assuming that aggravating factors in death penalty trial were not overwhelming where jury deliberated for a full day and requested additional instructional guidance).)

231.   Accordingly, although Lucas is entitled to relief on the basis of any one of the individual allegations raised regarding trial counsel's failure to competently investigate, prepare, and present a defense case, to act as his advocate, or to subject the prosecution's case to adversarial testing, relief is also appropriate based on the cumulative prejudice arising from these different acts and omissions.

**CLAIM 16:  THE TRIAL COURT IMPROPERLY ADMONISHED THE JURY TO ACCEPT THE ATASCADERO DIAGNOSIS AS A PROVEN FACT (AOB 7.3.2, SHP VI.DD)**

1.     Lucas was denied his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution because the trial court instructed the jury in a misleading way that required them to accept the "proven fact" that Lucas had a diagnosis of "antisocial personality disorder, severe" and a "very guarded prognosis." Because this admonition failed to differentiate between the fact of the diagnosis and its conclusion, the jurors were left to believe that it was a proven fact that Lucas was a "psychopath" or a "sociopath."  This error violated the Eighth Amendment by discrediting the mental health mitigation offered by the defense and by unduly validating the highly prejudicial diagnosis.

> At the penalty phase, the jury heard the following stipulation:
>
> The stipulation being that on February 7th, 1974, a licensed physician with the state of California, a doctor – medical doctor, psychiatrist, by the name of R.M. Schumann, S-C-H-U-M-A-N-N, examined in the month of February or diagnosed in the month of February 1974 Mr. David Allen Lucas, the defendant in this action, while at the Atascadero state hospital that has heretofore been referred to in these proceedings, and diagnosed him as in the DSM-III or in the DSM manual as an antisocial personality, severe;  alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, and the prognosis was very guarded.

(69 RT 13025-26.)

2.     The trial court then admonished the jury as follows:  "Again, ladies and gentlemen, that's a stipulated matter, now.  It's not a matter that you have to decide. It's given to you as a fact."  (69 RT 13026.)  The trial court later instructed the jury:  ".

351

. . [I]f the attorneys have stipulated or agreed to a fact, you must regard that fact as conclusively proved."  (64 CT 14359.)

3.   Defense expert, Dr. Alvin Marks, testified on cross examination that a person with a diagnosis of antisocial personality disorder was formerly called a "psychopath" or "sociopath."  (69 RT 13032.)

4.   During deliberations the jury asked to hear the stipulation again, and both the transcript of the stipulation and the judge's admonition were sent into the jury room.  (108 CT 24263.)  The jury returned its verdict of death shortly after receiving the stipulation.  The jurors received the stipulation at 1:30 in the afternoon and returned the death verdict at 10:30 on the next morning of deliberations.  (26 CT 5598-5600.)

5.   The trial court failed to clarify the crucial distinction under state law between a stipulation of a fact as opposed to a stipulation of evidence.  The former conclusively assumes the truth of the matter asserted, while the latter leaves the factual determination to the jury.  *See e.g.*, *Ballard v. State Bar*, 35 Cal. 3d 274, 282 (1983) ("petitioner stipulated to the testimony that [the witness] would give but did not stipulate to the truth of her testimony . . ."); *People v. Adams*, 6 Cal. 4th 570, 580, fn. 7 (1993) (evidentiary stipulations are not an admission that an allegation is true).)

6.   In this case, immediately following the stipulation, the judge admonished: ". . . that's a stipulated matter . . . it's not a matter that you have to decide.  It's given to you as a fact."  (69 RT 13026.)  In this context, the trial court's comments required the jury to accept Dr. Schumann's *conclusions* as a fact.  Yet, in fact, the truthfulness and accuracy of the diagnosis was a disputed issue for the jury to resolve.  Indeed, Dr. Marks expressly disagreed with Dr. Schumann's diagnosis, testifying that the factors which would support Dr. Schumann's diagnosis were not present.  (69 RT 13031.) Despite this factual disagreement, defense counsel reinforced the admonition by failing to contest Dr. Schumann's diagnosis in penalty argument.  (70 RT 13283- 13313.)

7.   The fundamental distinction between stipulation of fact versus stipulation of evidence should be clearly explained to the jury.  *See e.g.*, *People v. Gurule*, 28 Cal.

(15cv1224)

4th 557, 622 n.18 (2002) (stipulated testimony but jury clearly informed that the facts testified to "are not contested").  Otherwise, there is a danger that the stipulation will unconstitutionally direct the jury not to consider an essential contested factual issue.

8.      The admonition violated clearly established federal law in several ways.

9.      First, the trial court's admonition violated the quintessential constitutional mandate that a jury must decide every essential factual issue.  *In re Winship*, 397 U.S. 358, 362 (1970); *Ring v. Arizona*, 536 U.S. 584, 604 (2002) (jury must determine factual issues upon which death sentence is predicated).

10.     Second, because the stipulation allowed the jury to consider evidence without confrontation of the witness in court by counsel, its admission violated Lucas's rights to due process, trial by jury, confrontation and counsel.  *See Davis v. Alaska,* 415 U.S. 308 (1974); *Francis v. Franklin*, 471 U.S. 307 (1985); *Carella v. California*, 491 U.S. 263 (1989).

11.     Third, the error resulted in a violation of the Eighth and Fourteenth Amendments, which require heightened reliability in any determination that death is the appropriate sentence.  *See Beck v. Alabama* , 447 U.S. 625, 627-46 (1980); *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

12.     Fourth, verdict reliability is also required by the due process clause of the Constitution.  *White v. Illinois*, 502 U.S. 346, 363-64 (1992); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

13.     Finally, because the error arbitrarily violated Lucas's state created rights, it violated his right to due process under the Fourteenth Amendment to the United States Constitution.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).  Dr. Schummann's diagnosis of antisocial personality disorder was extremely inflammatory evidence.  The jurors specifically asked for the stipulation regarding Dr. Schumann during their deliberations, and returned the death verdict shortly after receiving the transcript of the stipulation.  Other indicial shows that the penalty deliberations were closely balanced.

353

(15cv1224)

(*See* Claim 15(I).)  Thus, the court's error had a substantial and injurious effect on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638 (1993).

14.     To the extent that this claim was not adequately preserved, trial counsel's failure to do so violated Lucas's constitutional right to effective assistance of counsel because there was no reasonable strategic reason for not adequately preserving it.  There is a reasonable probability that, absent counsel's omission, the outcome of the trial would have been more favorable to Lucas.

## CLAIM 17:  LUCAS WAS IMPROPERLY INDUCED TO LEAVE THE IN CAMERA HEARING ON DEFENSE COUNSEL'S INEFFECTIVENESS (AOB 7.3.1)

1.     Lucas was denied his constitutional rights under the Sixth, Eighth and Fourteenth Amendments to the Constitution when the trial court improperly asked him to waive his presence at an in camera hearing where the judge and Lucas's counsel discussed counsel's incompetence.  During Lucas's absence, two matters directly concerning his trial interests were discussed:  1) the potential ineffectiveness of counsel in allowing a defense psychiatrist to review a social history that counsel did not want disclosed to the jury; and 2) a stipulation allowing the jury to hear and consider a highly prejudicial diagnosis of an Atascadero State Hospital ("ASH") doctor, which was presented to the jury immediately after the closed hearing.

## A.     Relevant Law

2.     "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (*citing Lewis v. United States*, 146 U.S. 370 (1892)).  A criminal defendant has the right "to be present from the time the jury is empaneled until its discharge after rendering the verdict."  *Shields v. United States*, 273 U.S. 583, 589 (1927).  Thus, a due process violation occurs when a defendant is excluded from any proceeding at which his presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."  *Snyder v.*

354

*Massachusetts*, 291 U.S. 97, 105-06 (1934) (overruled in part on other grounds in *Malloy v. Hogan*, 84 U.S. 1 (1964)). This clearly established federal law provides a "working constitutional standard by which to evaluate whether a defendant has a right to participate in a particular proceeding." *Fisher v. Roe*, 263 F.3d 906, 914-15 (9th Cir. 2001) (regarding a defendant's right to be present when testimony is read back to the jury), overruled in part on other grounds by *Payton v. Woodford*, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003).

**B.   Relevant Facts**

3.      During the penalty phase testimony of the defense psychologist, Dr. Alvin Marks, it was revealed that Dr. Marks received a "social history" of Lucas that trial counsel had not intended Dr. Marks to consider. (69 RT 12993-94.) During an in-court discussion regarding the prosecution's right to a copy of the social history, the trial court announced that counsel's handling of the social history created a "large problem," and then said, "I would like to talk with counsel in chambers alone on the record without Mr. Lucas's presence." (69 RT 13003.) Lucas was asked to "waive" his presence and after discussion with his counsel he left the hearing. (69 RT 13003.) The trial court also refused a request to have Lucas's second chair counsel, Jeff Steutz, present during the hearing. (69 RT 13003.)

4.      During the conference, at which counsel and the prosecutors were present, the judge explained her view that although Landon and Feldman had never before "fouled up" during this trial, as to Dr. Marks they made a "mistake" which could raise "an incompetence question later." (69 RT 13006-07.) In particular, the judge opined that:

> Dr. Marks was, in essence, by mistake, given two pieces of information that the defense would not have given him on a second thought. First was the report – the DSM diagnosis and his report by Dr. Bach. Second is this chronological history by the investigator.

355

(69 RT 13006.)

5.      In the court's view, if this "mistake" were to allow the jury to hear damaging evidence it might "screw up the case."  (69 RT 13007.)  As a result, the judge excluded the social history.  However, the prosecutor was permitted to present evidence contained in the social history through the ASH records.  (69 RT 13008-09.)  Defense counsel then agreed to a stipulation as to the negative ASH diagnosis, which was entered shortly after the secret conference.  (69 RT 13017-19, 13025-26.)[148]

6.      The jurors asked for a transcript of the stipulation during deliberations and returned its death verdict shortly after receiving that transcript.  (*See* 69 RT 13025-26; 108 CT 24263.)

## C.      Lucas's Absence at a Secret Chambers Conference Violated His Constitutional Rights

7.      Lucas had a constitutional right to be present at the chambers conference. *Shields*, 273 U.S. at 589.  He also had a statutory right to be present under state law. Cal. Penal Code § 977(b); Cal. Penal Code § 1043.

8.      The discussion at the chambers conference substantially related to Lucas's ability to defend against the charges against him because the chambers conference related directly to the ineffectiveness of Lucas's trial counsel.  The fact that counsel had given their expert damaging material by mistake raised fundamental concerns regarding

---

[148]  The stipulation provided as follows:

> Mr. Williams: The stipulation being that on February 7th, 1974, a licensed physician with the State of California, a doctor – medical doctor, psychiatrist, by the name of R.M. Schumann, S-C-H-U-M-A-N-N, examined in the month of February or diagnosed in the month of February 1974 Mr. David Allen Lucas, the defendant in this action, while at the Atascadero State Hospital that has heretofore been referred to in these proceedings, and diagnosed him as in the DSM-III or in the DSM manual as an antisocial personality, severe; alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, and the prognosis was very guarded.  (69 RT 13025-26.)

356

(15cv1224)

the thoroughness and effectiveness of both counsel's penalty phase investigation and their trial preparation.  The discussion during the chambers conference called into question counsel's decision to call Dr. Marks, because it revealed counsel's erroneous belief that they could keep the ASH records from the jury if they did not allow Dr. Marks to rely on them.  (69 RT 13009, 13011.)

9.    Neither attorney Landon nor Feldman appeared to know exactly what Dr. Marks reviewed.  And, of course, this shortcoming also suggested that defense counsel had not adequately prepared for Dr. Marks's testimony before calling him to testify.

10.    Moreover, the trial court's view that counsel had made a mistake that could "screw up the case" would have alerted Lucas and/or nonconflicted counsel of the need for further inquiry.

11.    The trial court rejected the defense's position and ruled that the ASH records were independently admissible.  (69 RT 13009.)  Hence, had Lucas been present, he could have inquired as to whether the damaging ASH diagnosis, given to the jury through stipulation, was given to the jury as a result of counsel's mistake. Even if the ASH diagnosis did not come in as a result of the result related to the chronology, it still came in as a result of counsel's mistake in opening the door by presenting mental health testimony.  Lucas was entitled to know this.

12.    The secret chambers conference was undoubtedly a proceeding at which Lucas's presence would have been necessary; Lucas should have been alerted to his counsel's apparent lack of preparation.  He then could have requested a mistrial or replacement of counsel via a *Marsden*[149] motion.

13.    Further, because the chambers conference involved counsel's ineffectiveness, the discussion created a conflict of interest between Lucas and his attorneys.  "Where a constitutional right to counsel exists, [the Supreme Court's] Sixth

---

[149] *People v. Marsden*, 2 Cal. 3d 118 (1970).

357

(15cv1224)

Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). When a trial court is made aware of an attorney's actual or potential conflict of interest, Supreme Court precedent requires that the trial court "either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978). The trial court's failure to appoint separate counsel or inquire into the attorneys' potential conflict of interest is a violation of the defendant's Sixth Amendment rights. *Id.*

14.    Hence, when a proceeding focuses upon the potential ineffectiveness of counsel, counsel's professional and financial and professional interests may conflict with the adversarial interests of the client. As recognized by the prosecutor in this case, any attorney who is accused of ineffectiveness has "an obvious motive" to try to protect their own interests. (301 Pretrial 35040-41.) In light of this conflict, exclusion of Lucas from this proceeding violated his rights to due process and effective representation of counsel. *Holloway*, 435 U.S. at 484.

15.    Here, trial counsel had "an actual conflict of interest [that] adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348. (1980). The United States Supreme Court has clearly established principles pertaining to a defendant's right to conflict-free counsel. The Sixth Amendment requires not merely a lawyer, but effective counsel for the accused's defense. *United States v. Cronic*, 466 U.S. 648, 653-54 (1984). Here, counsel's self-interest before during discussions about their incompetence prevented them from providing Lucas with effective counsel. Counsel's failure to advocate for Lucas's presence during the secret chambers conference both deprived Lucas of the assistance of counsel contemplated by *Cronic* and also constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Counsel were deficient for suggesting or agreeing to Lucas's waiver of presence and Lucas was prejudiced because he was deprived of the opportunity to challenge his counsel's ineffectiveness. Moreover, because the trial

(15cv1224)

1  court subordinated Lucas's rights to the interests of secrecy and judicial efficiency,

2  Lucas was denied his federal constitutional right to a fair and impartial judge. *Tumey v.*

3  *Ohio*, 273 U.S. 510 (1927); *Rice v. Wood*, 77 F.3d 1138, 1141 (9th Cir. 1996) (defense

4  counsel waived defendant's presence at sentencing.)

5      16.    Lucas's absence also violated the Eighth Amendment.  Modern Eighth

6  Amendment jurisprudence requires death penalty proceedings to be reliable.  *See Beck*

7  *v. Alabama*, 447 U.S. 625, 627-46 (1980); *Burger v. Kemp*, 483 U.S. 776, 795 (1987).

8  Those reliability concerns are compromised when crucial trial decisions are made

9  behind the defendant's back, by counsel who have professional and financial interests

10  which conflict with the interests of the defendant, and who collude with the trial court

11  to hide those conflicting interests from the defendant.

12      17.    Although Lucas appeared to consent to a waiver of presence, any waiver

13  based on the record in this case is invalid for several reasons.  In this case, the judge

14  expressly asked for Lucas to be excluded from the chambers conference.  This put

15  Lucas in the remarkable position of choosing his constitutional right to presence and

16  risking the trial court's displeasure.  His counsel failed to act as an advocate for him in

17  that respect.  The judge's comments show that she deliberately asked for Lucas to be

18  absent so that he would not hear discussions of his attorneys' incompetence.  A waiver

19  should never be allowed under such circumstances because the ineffectiveness of

20  defense counsel is inherently and substantially related to the opportunity to defend.  *See*

21  *Strickland v. Washington*, 466 U.S. 668 (1984).  Further, Lucas's waiver could not have

22  been intelligent because the trial court never told Lucas what he was waiving; a waiver

23  of any substantial right must be knowing and intelligent.  *See Johnson v. Zerbst*, 304

24  U.S. 458, 464 (1938).  Although counsel surely understood the nature of the "large

25  problem" the trial court referenced, Lucas likely did not understand either the

26  magnitude of his counsel's errors or their constitutional implications.  Any purported

27  waiver here is not valid because it was obtained for the purpose of discussing counsel's

28  ineffectiveness behind the defendant's back.

(15cv1224)

**D.      The Error Was Structural and, Therefore, Reversible Per Se**

18.      Reversal is automatic if the defendant's absence constitutes a structural error which permeates "the entire conduct of the trial from beginning to end" or "affect[s] the framework within which the trial proceeds. . . ." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  In this case, the secret chambers conference had a crucial bearing on the entire penalty trial, from beginning to end.  This is so because the defense strategy at trial relied heavily on the testimony of Dr. Marks, the only mental health expert called by the defense.  And, in particular, the defense penalty strategy was committed to not revealing Lucas's social history and ASH records.  (Dkt. 36-8, 2008 State Pet, Ex. 10, A. Landon Decl. ¶ 4-8.)  In sum, Lucas's exclusion from the in chambers proceeding where the consequences of counsel's errors were discussed was structural error, because those errors undermined the defense strategy, and because Lucas clearly had a right to participate, and an active role to play, in such a proceeding. Further, even under harmless error standards, for the same reasons it is clear that Lucas's absence had a "substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638 (1993); *Fisher*, 263 F.3d at 917 (*Brecht* standard applies to errors involving defendant's exclusion from proceedings.)

**CLAIM 18:  THE TRIAL COURT IMPROPERLY PRECLUDED VOIR DIRE AS TO WHETHER LUCAS'S PRIOR RAPE CONVICTION WOULD PREVENT THE JURORS FROM PERFORMING THE REQUIRED WEIGHING OF AGGRAVATION AND MITIGATION (AOB 6.3.1)**

1.      Lucas's convictions and sentence are unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because of the trial court's failure, at both death qualification and general voir dire, to allow that prospective jurors be questioned about whether they would automatically vote for death if Lucas were found to have committed a prior rape.

(15cv1224)

2.     The United States Supreme Court has repeatedly affirmed the right of a criminal defendant to voir dire examination sufficient to reasonably ensure an impartial jury. *Morgan v. Illinois*, 504 U.S. 719 (1992); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). General fairness and "follow the law" questions, without more, are constitutionally inadequate in a capital case. *Morgan*, 504 U.S. at 734-36. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Id*. at 729. Accordingly, the voir dire should serve to identify and excuse jurors who cannot fairly weigh mitigation and aggravation in making a sentencing decision. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1983) ("[the] standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'.")

3.     California law also requires that "either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence." *People v. Cash*, 28 Cal. 4th 703, 720-21 (2002) (citation omitted). In other words, it is essential that the prospective jurors be "informed of facts or circumstances likely to be present in the case being tried." *Id*. at 720.

4.     A juror who would "automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence . . ." *Morgan*, 504 U.S. at 738. The foremost concern of the Eighth Amendment is that "capital sentencing must have guarantees of reliability, and must be carried out by jurors who would view all of the relevant characteristics of the crime and the criminal, and take their task as a serious one." *Sawyer v. Smith*, 497 U.S. 227, 235 (1990).

(15cv1224)

5.     Here, early in *Hovey*[150] (death-qualification) voir dire, defense counsel asked the following question of a prospective juror who seemed uncertain whether he would favor death based solely on the conviction of the defendant at the guilt phase:

> Q:     Now we're in a penalty phase and you hear evidence from a woman who you believe; you're certain this woman is telling the truth who says, "That man, Mr. Lucas, raped me."  And you further learn that that man, Mr. Lucas, who this woman says raped her, went to prison as a result of it.

(262 Pretrial RT 27388-89.)

6.     The prosecutor objected.  (262 Pretrial 27389.)  After argument, the trial court ruled in favor of the prosecution and precluded any question as to the impact of the prior rape on the jurors' deliberations at the penalty phase.  (262 Pretrial 27394-27405; 265 Pretrial 27671-84.)  The court also ruled the prior rape could not be mentioned at the general voir dire, but that general questions about the juror's feelings about rape could be asked:

> You can certainly explore how strongly they feel about rape and whether that's ever touched their lives and whether they would be very, very, very prejudiced against somebody who did such a thing.  That will give you an indication that that's the person who will take that one aggravating factor and vote death and that's it, and I think that's a peremptory challenge.

(265 Pretrial 27684; *see also* 288 Pretrial 32841 (the 1973 prior is not "permissible either as peremptory or nonperemptory question".)

---

[150]  *People v. Hovey*, 28 Cal. 3d 1, 80 (1980),

362

7.      In *Morgan*, 504 U.S. 719, the Supreme Court overturned a death sentence on the ground that defense counsel had been impermissibly prohibited from asking the prospective jurors the following question: "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?"  504 U.S. at 723.  Here, as in *Morgan*, the defense was prohibited from asking whether a finding of guilt on the prior crime would cause a potential juror to automatically impose death.  This question was particularly necessary in light of the fact that fourteen of the potential jurors would have applied the death penalty to the crime of rape.  (262 Pretrial 27394-95; 264 Pretrial 27654-55; 80 CT 17614-107 CT 24201.)  Further, the finding of guilt on the rape prior was far from hypothetical in the sense that it was known at the time of voir dire that evidence of the prior conviction would be presented.

8.      The trial court's ruling that the defense could generally inquire as to the jurors' feelings about rape did not cure the error.  (265 Pretrial 27684; 288 Pretrial 32841.)  Such questioning would not have gotten to the heart of the matter, which was whether the jurors' views about rape would cause them to *automatically* vote for death. Moreover, by requiring the defense to reveal the prior rape to the jurors during general voir dire, the trial court unfairly forced the defense to reveal this highly prejudicial prior conviction without enabling the vindication of the right to a fair sentencing jury with appropriate questioning.

9.      In this case, the prohibition on questioning led to the impermissible risk that seated jurors would automatically vote for the death penalty based on the 1973 prior conviction.  The trial court's error violated Lucas's federal rights to due process, and also violated the Eighth Amendment by impermissibly reducing the reliability of the death sentence and failing to assure that the sentencing jurors considered the mitigating evidence in violation of the Eighth Amendment right to a reliable, fair, impartial and individualized sentencing trial.  *See Woodson v. North Carolina*, 428 U.S. 280 (1976); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

(15cv1224)

10. Furthermore, because the error violated Lucas's state-created rights to a fair and impartial jury and adequate voir dire, his right to due process under the Fourteenth Amendment to the United States Constitution was violated. *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

11. The trial court's failure to ensure that jurors were not biased in favor of death "calls into question the objectivity of those charged with bringing a defendant to judgment" and thus constitutes structural error. *See Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986). Even assuming a showing of prejudice is required, the court's error resulted in juror bias, which "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637(1993). Thus, Lucas is entitled to relief.

**CLAIM 19: THE TRIAL COURT ERRONEOUSLY DENIED LUCAS'S MOTION TO STRIKE THE ONLY AGGRAVATING EVIDENCE (AOB 6.4.1, 6.4.2, 6.4.3, 6.4.4, 6.4.5, 6.4.6, 6.4.7, 6.4.8)**

**A.    Introduction**

1. Lucas's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court refused to strike Lucas's prior 1973 rape conviction, which was obtained in violation of his constitutional rights. Lucas should not have been convicted of the prior offense. Lucas's trial counsel, Anthony Gilham, provided ineffective assistance by failing to investigate a key witness who could have bolstered Lucas's alibi and undermined the prosecution's theory. Lucas's appellate counsel in that case, Fred Arm, failed to vindicate Lucas's rights due to his own ineffectiveness as well as an impermissible conflict of interest. Because Lucas's prior conviction was obtained in violation of *Strickland v. Washington*, 466 U.S. 668, 687 (1984) and *Evitts v. Lucey*, 469 U.S. 387 (1985), the trial court in the capital case violated Lucas's constitutional rights by allowing the prosecution to use the prior conviction as a factor in aggravation at his penalty phase. *Burgett v. Texas*, 389 U.S. 109, 114 (1967); *Johnson v. Mississippi*, 486

364

U.S. 578 (1988).  Given the extremely egregious circumstances in this particular case, the end result rendered the penalty phase fundamentally unfair under the Fourteenth Amendment.

**B.    Relevant Law**

2.      The Eighth Amendment prohibits a death sentence that is based in part on an invalid prior conviction.  *Johnson*, 389 U.S. at 584-85 (noting *inter alia* the "special need for reliability in the determination that death is the appropriate punishment."); *Johnson,* 486 U.S. 578; *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985).  In *Burgett*, the Supreme Court ruled that a Texas state court had unconstitutionally relied on a defendant's prior felony conviction to invoke that state's recidivist offender law, where the defendant was unrepresented by counsel in the earlier proceeding, nor that he had waived such assistance.

3.      In addition, California law provides a legitimate expectation of the standards for attorney conflicts and for judicial protection of the defendant against such conflicts.  This goes to the heart of a defendant's right to counsel in a capital trial.  Such a legitimate state-created expectation rises to the level of Fourteenth Amendment protection.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**C.    Relevant Facts**

4.      The only aggravating evidence presented by the prosecution in its case in chief at the capital penalty trial was Lucas's 1973 conviction for rape with use of a knife.  (6 CT 1263-66; 8 CT 1697-1700; 31 CT 6842-45.)  The prosecution presented no evidence about the facts of the rape – but only the fact of Lucas's conviction.  The defense moved to strike the prior conviction on the basis that Lucas's trial and appellate counsel were ineffective in the rape case.  (36 CT 7745-81; 36 CT 7799-7906; 38 CT 8148-8250.)  The trial court refused to hear this motion on procedural grounds and noted that she did not think the motion was meritorious based on the pleadings she had seen.  (24 CT 5119; 209 RT 20280; 210 RT 20361-64.)  The defense filed a Petition For A Writ Of Mandate seeking to reverse the trial court's decision, which was granted

with instructions to entertain the motion to strike.  *Lucas v. Superior Court*, 201 Cal. App. 3d 149, 151 (1988).  On remand, the superior court held a hearing on the ineffectiveness of prior trial counsel Anthony Gilham, appellate counsel Fred Arm in the 1973 case.  (70 CT 15626; 299 Pretrial 34792-95.)

**D.  Trial Counsel in the 1973 Case was Ineffective**

**1.  Relevant Facts**

5.  The following evidence was presented in connection with the motion to strike the prior offense.

**a.  Prosecution Evidence at the 1973 Trial**

6.  In May of 1973, Teresa Briseno, a 21 year-old Mexican national, lived with the Cook family in San Diego, and worked as their housekeeper in exchange for room and board.  (34 CT 7447-48.)  When the Cooks left for the weekend, Linda Kilbourn, a 16-year old neighbor with a key, invited three boys, including Lucas, to the house to have a party.  (34 CT 7450; 35 CT 7542-43.)  Briseno did not know the boys and did not have any contact with them.  (34 CT 7452-53.)

7.  On Sunday night Briseno and her friend, later identified as Alejandrina Casas Valenzuelas ("Casas"), returned from dinner around 7:00 or 7:30 p.m., and the three boys were still there.  (34 CT 7453.)  Casas asked the boys to leave but they remained until 8:30 or 9:00, after Casas had left.  (34 CT 7453-54.)

8.  According to Briseno, one of the three boys, whom she identified as Lucas, returned to the Cook house at approximately 9:30 p.m., and said he had left his jacket.  (34 CT 7454.)  He was drunk.  (34 CT 7456.)  He forced her into the Cooks' Datsun at knifepoint, then drove up a dirt road to the top of a mountain.  (34 CT 7463-66.)  He then forced Briseno out of the car, ordered her to take off her clothes and had sexual intercourse with her.  (34 CT 7467-69.)

9.  After intercourse, she struggled for the knife and was cut on the fingers and neck.  (34 CT 7469.)  Ultimately, she obtained the knife and threw it away.  (34 CT 7471.)  The assailant asked her for forgiveness but also indicated through gestures for

366

(15cv1224)

her not to talk.  (34 CT 7471, 7482, 7505.)  He then drove her home, obtained the key to the Cooks' house from Kilbourn and let Briseno in the house.  (34 CT 7472.)  According to Briseno, that was around 11:00 p.m.  (34 CT 7499-7500.)  According to Kilbourn, when Lucas came to her house and asked for the key it was between 10:30 and 10:45 p.m.  (35 CT 7545-47.)

10.　　Approximately ten to twenty minutes after returning to the Cooks' house, Briseno called Julie Marino asking for a ride, saying something bad had happened.  (34 CT 7390; 7528-30; 35 CT 7540.)  This call, according to Marino and Briseno, was made around 11:15 p.m.  (33 CT 7386-87; 34 CT 7500-01.)  While Briseno waited for Marino to arrive, neighbor girls came to the Cooks' house to retrieve some records.  (35 CT 7544, 7547-48, 7557-58, 7563; 34 CT 7474.)  Briseno did not mention anything about being raped.  (34 CT 7474.)

11.　　Marino arrived to pick Briseno up at approximately 11:35 p.m.  (34 CT 7400.)  Marino noticed wounds on Briseno's hands and neck.  (34 CT 7390-91.)  Briseno informed Marino that she had been raped by a "hippie," but that she had waited about 20 minutes to call Marino.  (34 CT 7400-01.)  She told Marino that her assailant threatened to kill her if she told.  (34 CT 7400.)  Marino then took Briseno to her house, where she stayed the next several days.  Briseno took a bath and Marino saw scratches on her buttocks and breasts.  (34 CT 7402, 7405.)

12.　　Briseno was hesitant to contact the police because of her immigration status.  (34 CT 7401, 7482.)  However, Mrs. Cook contacted the police two days after the assault.  (34 CT 7411.)

13.　　On June 5, 1973, Briseno picked Lucas out of a photo spread that did not contain photographs of the other boys at the house.  (34 CT 7433-35.)

14.　　Several witnesses testified that Briseno was at the Cook residence between 10:30 and 11:00 p.m. during the night in question.  (35 CT 7547, 7556-57, 7569, 7577-78, 7584, 7603.)

(15cv1224)

**b.      Defense Evidence at the 1973 Trial**

15.      Four people testified that they saw Lucas between 10:15 and 10:45 on the night of the crime.  Curt Andrewson testified that on Sunday, May 27, between 10:15 and 10:30 p.m., he received a call from Lucas asking for a ride.  (33 CT 7106, 7109-11; 35 CT 7546-47, 7556, 7568-69.)

16.      Lucas testified that he was present at the Cook residence on the night in question.  (33 CT 7118.)  At 9:00 p.m. on Sunday evening Lucas left the Cooks' house with David Carroll and attempted to hitch a ride home.  (33 CT 7122-23.)  He was unable to get a ride so he started to walk back to Cline's house.  (33 CT 7124.)  On the way back, he slipped and fell while walking down a steep hill.  (33 CT 7124, 7128.) No one was at Cline's house so he walked to Kilbourn's house to try to call a friend for a ride.  (33 CT 7124.)

17.      On the way to Kilbourn's house he saw Briseno sitting on the front lawn of the Cook residence.  She said that she was locked out, so Lucas went to Kilbourn's house and asked for the keys at around 10:15 p.m.  (33 CT 7124, 7127.)  Lucas then returned to David Cline's house.  (33 CT 7125.)  Lucas then called Curt Andrewson somewhere around 10:30 p.m. and asked him to pick him up.  (33 CT 7125-27.)  He met Andrewson at the Navajo Shopping Center around 10:45 p.m.  (33 CT 7127.)

18.      Lucas denied raping Briseno.  (33 CT 7125.)  The defense theory was that Steven Hopkins, a friend at the Cook family, raped Briseno between 10:00 p.m. and 11:00 p.m.  (33 CT 7148.)

**c.      The Prosecution's Changing Timeframes**

19.      The prosecution's theory about when the assault took place was inconsistent and changed over time, although they never contended that the entire abduction took less than 45 minutes.  (*See* 33 CT 7528.)  During trial, the prosecution posited to the court that the rape occurred sometime between 10:00 p.m. and 11:00 p.m. (34 CT 7387-7388.)  Kilbourn initially testified it was "exactly" 10:30 when Lucas asked her for the key to the Cooks' house, but it may have been 10:30 to 10:45.  (35 CT

7546-47.)  Although no transcripts of attorney arguments exist, the post-verdict statements of both counsel suggest that the 9:30 to 10:30 theory was the one which was ultimately presented to the jurors.  (35 CT 7230.)  The Court of Appeal determined that the abduction began around 9:30 and ended around 11:00 p.m.  (33 CT 10396-97.)

### d.    Petition for Writ of Coram Nobis

20.    After the jury verdict in the 1973 case, trial counsel Gilham identified a witness, Casas, who could testify as to a 10:00 p.m. to 10:05 p.m. conversation with Briseno.  This conversation would have shown that Briseno was at the Cook's house when she claimed she was being assaulted on the mountain.  (34 CT 7254-61.)  And, since Lucas's alibi began at 10:30, there would not have been time for him to commit the crime between the call at 10:00 p.m. and his 10:30 p.m. call to Andrewson.  Gilham filed a petition for writ of coram nobis based, *inter alia*, on this new information.  (In Limine Ex. 761.)

21.    The day after the alleged attack, Casas received a telephone call from Briseno, who told her Lucas had raped her.  (33 CT 7262.)  Trial counsel did not to object the inadmissible hearsay testimony.

22.    In connection with the coram nobis petition, Lucas—who passed an earlier polygraph test—offered to take another polygraph to be conducted by an operator designated by the District Attorney's Office.  (33 CT 7249; 34 CT 7328.)  The court directed Lucas and Briseno to submit to the tests and asked the prosecutor to arrange for the tests.  (33 CT 7249-50; 34 CT 7327.)  However, the prosecution did not comply with the trial court's requests, and the court concluded that it did not have the power to order the tests.  (33 CT 7270-71.)  The coram nobis petition was denied.  (33 CT 7271-78; 34 CT 7328.)

### 2.    Counsel in the 1973 Case Rendered Deficient Performance

23.    Lucas's 1973 conviction should not have been used against him in his capital trial because his prior counsel was constitutionally ineffective.  To establish unconstitutionally inadequate representation, Lucas must show:  (1) that counsel's

369

performance "fell below an objective standard of reasonableness," and (2) that counsel's performance was prejudicial. *Strickland*, 466 U.S. at 687-88.

24.   The defense, trial counsel Gilham, did not interview Casas until after the jurors returned their verdict and the motion for a new trial had already been denied. (In Limine Exhibit 759B; 299 Pretrial 34865-66.) Apparently the defense first learned of Casas's testimony when the prosecutor spoke with her in the hall post-trial, during a new trial motion. (In Limine Exhibit 761 at 3.) There was no conceivable justification for failing to interview Casas prior to trial and to present her testimony to the jury.

25.   Trial attorney Anthony Gilham had handled only one serious case, and no rape cases, prior to taking the Lucas case. (299 Pretrial 34849-50.) As a result, Gilham made a number of mistakes and omissions during trial as a result of his inexperience. Most significantly, Gilham failed to investigate and present Alejandrina Casas's testimony.

26.   Casas's testimony was critical to the defense because she was talking on the telephone with Briseno from 10:00 p.m. to 10:05 p.m. During this telephone call Briseno gave no indication of having just been raped, and was clearly at the Cooks' residence. By contrast, Briseno *was* upset and reported the rape when she talked to Casas the next day, showing the rape occurred between 10:05 p.m. and the next day. Lucas's alibi began at 10:30 p.m., when he called Andrewson, and/ or retrieved a key from the Kilbourn home. Casas's testimony would have narrowed the time window for the alleged rape to a 25-minute period between 10:05 p.m. and 10:30 p.m., which would not have been enough time for a perpetrator to have driven Briseno to the top of a mountain, attacked her, and driven back to the Cooks' house. Thus, Casas's testimony would have completely undermined the prosecution's case by establishing that Lucas could not have committed the rape during the time span the prosecution claimed.

27.   Casas told Gilham's investigator and Lucas's sister that Briseno told her not to tell anyone about the 10:00 p.m. call. (33 CT 7267.) However, during her coram nobis testimony, Casas denied discussing the 10:00 p.m. call with Briseno. (33 CT

7261.)  Casas's statements to Gilham's investigator and Lucas's sister would have further undermined the prosecution's case by providing evidence that Briseno was trying to hide something.  In the totality of her testimony (including at the preliminary hearing and at trial), not once did Briseno mention the 10:00 p.m. call with Casas.

28.     Even though the police reports clearly suggested that Casas could be a material witness, and even though Casas could have been easily located (In Limine Exhibit 768 at 4), the defense did not interview her before trial.  (In Limine Exhibit 759B.)  Eventually, Gilham learned about Casas's testimony, at which point he filed a coram nobis petition.  (299 Pretrial 34864-67, 34883.)

Gilham's performance was deficient in other ways as well:

- Gilham failed to present Casas's prior inconsistent statement to his investigator and to Lucas's sister.  (33 CT 7261, 7267.)

- Gilham failed to object to Casas's inadmissible hearsay statement at the coram nobis hearing identifying Lucas as the culprit.  (33 CT 7272-73.)

- Gilham failed to object to the prosecution's last-minute change in theory as to the timing of the abduction; the preliminary hearing gave notice that the prosecution would rely on the theory that the abduction started from 10:00 to 10:30 p.m. and ended from 11:00 to 11:15 p.m.  However, the prosecutor apparently changed his theory in closing argument to the jury, and circumvented the alibi evidence by arguing that the abduction ended at 10:30.

- He may not have learned until trial that Briseno identified Lucas from a photo spread.  (300 Pretrial 34852-53.)

- Gilham did not seek to suppress the photo spread because he was unaware of the law that allows an identification to be suppressed based on suggestive identification procedures.  (300 Pretrial 34854-55.)

- Gilham did not become aware of *Ballard v. Superior Court*, 64 Cal. 2d 159 (1966) (giving defense the right to obtain psychiatric examination of

371

complaining witness in sex case) until shortly before trial.  He did not make a *Ballard* motion.  (300 Pretrial 34851-52.)

- Gilham did not learn until trial that Briseno had a boyfriend. Nor was Gilham aware before trial that Briseno had sexual intercourse with her boyfriend the night before the alleged rape and that Briseno terminated the relationship due to her anger about the intercourse.  (299 Pretrial 34885-86.)

- Gilham failed to object to testimony of Steve Hopkins and Jeff Cook that Lucas was "stoned on. . .grass, marijuana."  (33 CT 7589-90; *see also* 33 CT 7592-93, 7609-10.)

- Gilham failed to request defense-theory instructions on alibi.

- Gilham requested CALJIC 2.62 (299 Pretrial 34858-59) which the attorney expert, Katz, called "foolhardy."  (300 Pretrial 34947.)

- Gilham failed to object to "on or about" language in the jury instructions. (33 CT 7173-74.)  Such language, which also appears in CALJIC 4.71, is improper when the defense is alibi.  *See People v. Jones*, 9 Cal. 3d 546, 557 (1973) (holding that CALJIC 4.71 must not be given when the defense presents alibi evidence).)

- Gilham did not submit any points and authorities with his original motion for a new trial, which Katz said was contrary to standard practice.  (300 Pretrial 34989.)

-  At sentencing, Gilham failed to do any legal research and was unaware that the rape conviction could not be reduced to a misdemeanor after a CYA commitment.  Gilham acquiesced in the prosecution's argument that a commitment to the Youth Authority would constitute misdemeanor treatment. Gilham believed that was a correct statement of the law.  (299 Pretrial 34890, 34895.)

372

(15cv1224)

- Gilham failed to make a Penal Code § 1385 motion to dismiss the rape charge so that sentence could be imposed on the assault. (299 Pretrial 34889-90, 34895.) This would have furthered the judge's apparent lenient intent by allowing the assault to be reduced to a misdemeanor. (299 Pretrial 34895.)

- At the coram nobis hearing Gilham elicited inadmissible hearsay evidence from Casas, upon which the trial judge relied to deny a new trial. (33 CT 7262.)

29. At the hearing on the motion to strike the prior conviction in Lucas's capital case, the defense called Louis Katz as a criminal defense attorney expert. (300 Pretrial 34928.) Based on his review of the record in Lucas's 1973 trial, Katz concluded that Gilham's representation constituted deficient performance. (300 Pretrial 34964-65.)

### 3. Lucas Was Prejudiced by his Counsel's Ineffectiveness at his 1973 Trial

30. Casas' testimony would have been incredibly powerful defense evidence. If Briseno was at the Cooks' residence, calmly talking with Briseno from 10:00 to 10:05, then the prosecution's theory that the abduction happened between 9:30 and 10:30 could not have been true. Further, multiple witnesses saw Briseno and/or Lucas at the Cooks' residence between 10:30 and 10:45, including prosecution witness Laurie Kilbourn. This testimony would have made it very difficult for the jury to credit Briseno's abduction and rape story.

31. The prosecution's theory was that the entire abduction took less than 45 minutes. This is consistent with Briseno's testimony at trial. (*See e.g.*, 34 CT 7528.) This estimate was corroborated by Briseno's estimates at the preliminary hearing: they were in the house for 5 minutes (36 CT 7837); they were in the car, before starting the engine, for about 10 minutes (36 CT 7838); they drove in the car for 10 or 15 minutes (36 CT 7825) and they were stopped at the top of the mountain for 15 to 20 minutes.

(15cv1224)

(36 CT 7838-39.)  Allowing another 10 minutes to drive back to the Cook house, the total time—using Briseno's lower estimates—was 50 to 60 minutes.

32.     Further, Briseno never mentioned the 10:00 p.m. call from Casas in any of her testimony.  Nor did she mention it in her statement to the police.  (*See* In Limine Exhibit 768 at 4.)  This suggests that Briseno was trying to hide something.  (*See e.g.*, CALJIC 2.06 (suppression of evidence may indicate a consciousness of guilt.)  And, this implication was specifically bolstered by the allegation that Briseno told Casas "not to ever tell anyone of the telephone call."  (33 CT 7267.)

33.     The failure to present this evidence in the 1973 case was especially prejudicial because the evidence was closely balanced.  For example, at the close of the evidence, one juror informed the court that he had "some doubts . . . about some things" and he submitted two pages of questions about the evidence which were never answered.  (33 CT 7161-63.)  Moreover, the jurors deliberated for about 12 hours over a three day period and submitted several notes during deliberations.  (33 CT 7186-7207.)  The juror inquiries and the length of the deliberations indicate a close evidentiary balance.  Had Casas' testimony been presented, it is reasonably probable that Lucas would not have been convicted.

34.     Finally, Gilham's ineffective assistance likely resulted in the conviction of an innocent man.  Lucas took a polygraph test, and according to the examiner, Lucas's denial that he abducted and raped Briseno was truthful.  (*See* In Limine Exhibit 762.)  Further, Lucas offered to take a second test with the prosecution's polygrapher, but the prosecutor refused.  (33 CT 7249-50, 7270-71.)  While the polygraph results were not before the trial court, this Court should consider them in reviewing the denial of the motion to strike because the 1973 prior conviction was important aggravating evidence upon which the jurors likely relied in reaching its verdict of death.

374

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## E.     Appellate Counsel in the 1973 Case was Ineffective

### 1.     Relevant Facts

35.     Attorney Fred Arm represented Lucas post-trial and on appeal.  (33 CT 7284; 7328; In Limine Exhibit 769.)  Arm raised two claims on appeal:  insufficiency of the evidence to support a guilty verdict, and trial court error for denying Lucas's request for polygraph tests.  (34 CT 7351-72, 7392-94.)  The judgment was affirmed and no petition for rehearing was filed.  (48 CT 10398; 299 Pretrial 34802.)

36.     In 1973, David Lucas's mother retained Arm to work on the appeal of David's 1973 rape conviction.  (299 Pretrial 34773-74.)  She paid him $1,500.  (301 Pretrial 35030, 35053.)  Arm considered that he was retained by Mrs. Lucas.  (299 Pretrial 34786, 34802.)  She "orchestrated" what went on with the appeal, and she made the decisions.  (301 Pretrial 35051.)  David Lucas, who was only 19 years old at the time, went along with whatever his mother decided.  (301 Pretrial 35051.)

37.     Arm had far more contact with Mrs. Lucas than with David Lucas.  (301 Pretrial 34999-35000; In Limine Ex. 767.)

38.     In December 1973, Arm informed Mrs. Lucas that "[m]y investigators have informed me that something of significant importance in your son's case has been discovered, but further investigation must be done."  (In Limine Exhibit 759B.)  The letter asked Mrs. Lucas for an additional $300.00 to do the investigation.  (*Id*.)  However, Mrs. Lucas did not pay any additional funds.  (In Limine Exhibit 767.)

39.     During the course of the appeal, Arm deferred to Mrs. Lucas's decision not to challenge trial attorney Gilham's effectiveness, or to do anything that might "hurt" Gilham.  (301 Pretrial 35005.)  Arm testified that he told Lucas about his mother's decision and Lucas said that was fine with him.  (301 Pretrial 35051.)  However, Arm admitted that he did not actually discuss the matter with Lucas.  (301 Pretrial 35050-51.)  Arm believed there was a potentially meritorious ineffectiveness claim against Gilham and that it was "stupid" to not raise this claim.  (*See* 301 Pretrial 35058.)  Nevertheless, he abided by Mrs. Lucas's decision and did not raise any claims

375

(15cv1224)

1  that would have required challenging Gilham's effectiveness.  (*See* 34 CT 7351-72;

2  7392-94.)

3        40.     The Court of Appeal affirmed Lucas's conviction, also without discussing

4  the appellate claim based on Casas' testimony.  (299 Pretrial 34801-02.)  Arm did not

5  file a petition for rehearing in the Court of Appeal or hearing in the California Supreme

6  Court because he was only retained for the appeal, and Mrs. Lucas did not want to

7  expend any further funds.  (299 Pretrial 34802.)

8        **2.     Arm's Representation Created a Conflict of Interest**

9        41.     The Constitution's guarantee of assistance of counsel cannot be satisfied

10  by mere formal appointment.  *U.S.* v. *Cronic*, 466 U.S. 648, 654-55 (1984).  "[A]

11  defendant who shows that a conflict of interest actually affected the adequacy of his

12  representation need not demonstrate prejudice in order to obtain relief." *Cuyler v.*

13  *Sullivan*, 446 U.S. 335, 349-350 (1980); *see also Mickens v. Taylor*, 535 U.S. 162, 172-

14  73 (2002); *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  Arm's conflict also violated

15  standards guaranteed under California law.  *People v. Hardy*, 2 Cal. 4th 86, 135-136

16  (1992).

17        42.     Here, Arm's representation of Lucas was conflicted tin two ways.  First,

18  Arm contracted with Mrs. Lucas, not David Lucas, and Mrs. Lucas had discretion to

19  make important decisions about the appeal.  Second, Arm's representation was based

20  on an inherent financial conflict of interest.  The $1,500 retainer only covered the

21  appeal.  (301 Pretrial 34802.)  Any other services, even if necessary to perfect David

22  Lucas's legal rights, would not be provided unless Mrs. Lucas provided additional

23  funds.  (301 Pretrial 35053.)  Lucasdid not waive any conflict.

24        43.     Although no prejudice need be shown, in the present case, the adverse

25  impact of Arm's actual conflict is apparent in that Arm failed to raise potentially

26  meritorious appellate claims and failed to file a potentially meritorious petition for

27  rehearing.

28

376

### 3.      Arm's Representation Was Ineffective

44.      Arm's performance was deficient in several respects.  Most significantly, Arm was aware of potential ineffective assistance of counsel claims which could have been raised regarding Gilham's failure to present the testimony of Alejandrina Casas. (301 Pretrial 35021-25, 35048-49.)  Arm relied on Casas's testimony in the opening brief to argue that a new trial should have been ordered.  (In Limine Exhibit 757.) However, he did not raise an ineffectiveness argument based on Gilham's failure to present Casas's testimony to the jury.  (*Id.*)

45.      He failed to review the exhibit and physical evidence, including the photographic line ups, in the trial court.  (300 Pretrial 34973-76.)  He also failed to augment the record.  (300 Pretrial 34969-70, 34972.)  At the motion to suppress hearing, defense expert Katz testified concerning appellate counsel Arm's performance. Based on his experience and the standards in the defense community, Katz testified that an appellate attorney has an obligation, regardless of financial sacrifice, to make every effort to provide an adequate record and present any issue which is relevant to an adequate and vigorous representation of the client.  (300 Pretrial 34972-73.)  If the court refused to order augmentation of the record, the attorney should either pay for it himself or request funds from the appellate court to do so.  (300 Pretrial 34973.)  Based on a review of the case on appeal, it was Katz's opinion that, in terms of contemporary community standards, Arm did not comport himself as a reasonably diligent defense attorney.  (300 Pretrial 34978-79.)

46.      Arm was also ineffective for abandoning Lucas after his conviction was affirmed, and particularly for failing to file a petition for rehearing.  (299 Pretrial 34801-02.)  *Cronic*, 466 U.S. at 653-54. The Court of Appeal decision on the 1973 case misconstrued both the record and the appellate claim. (299 Pretrial 34801-02.)

47.      Lucas was prejudiced by Arm's ineffectiveness.  As a result of his failures, the reviewing court never resolved the central issue raised on appeal—whether belated discovery of a witness who would have undermined the prosecution's theory of the

377

(15cv1224)

case warrants a new trial, and whether trial counsel was ineffective for failing to investigate and present that witness.

## F.   The Trial Court Erred in Refusing to Strike the Prior

48.   Trial counsel in the 1973 case rendered prejudicially deficient performance.  He failed to investigate and present credible testimony that undermined both the prosecution's theory of the case and the credibility of the key prosecution witness.  Appellate counsel, under a conflict of interest and also providing constitutionally ineffective representation, failed to challenge Gilham's effectiveness even though he recognized the claim as a strong one.  Accordingly, the trial court in the capital trial erroneously denied the motion by ruling that both prior counsel effective assistance of counsel.  Because Lucas's death sentence was based in part on an invalid prior conviction, he is entitled to relief.  *Johnson*, 389 U.S. at 584-85.

## G.   The Error Was Not Harmless

49.   The prior rape conviction was devastating to Lucas at penalty.  By its very nature this prior conviction was highly inflammatory and prejudicial.  The trial court's assessment of the prior suggests how the jurors likely viewed the prior conviction:

> As a factor in aggravation, [Lucas's prior] conviction weighed heavily with the court, for it proved that Mr. Lucas had used force and violence with a deadly weapon on a woman in the past.  A prior conviction by jury did not change him.  It may well have taught him that rape leaves a live witness; a dead victim can't testify.
>
> (73 RT 13661-62.)

50.   The 1973 conviction for rape was the only aggravating evidence presented by the prosecution in their case in chief at the penalty trial.  Rape is an especially heinous crime in the view of most people, and fourteen potential jurors believed that

378

(15cv1224)

the death penalty "should always be imposed" for the crime of rape or rape and murder.[151]  The defense was precluded from inquiring on voir dire to determine what impact the rape conviction might have on the jurors' ability to fairly consider penalty. (288 Pretrial 32843-45, 32856-57.)

51.     The prior conviction undermined Lucas's primary defense theory of lingering doubt.  The jurors were free to rely on the prior conviction as evidence of criminal propensity.  Further, the jury could conclude that Lucas had failed to benefit from attempted rehabilitation and would be a future danger because he continued to commit violent crimes.  (*See* 282 Pretrial 31422.)

52.     The prior conviction was especially powerful aggravation because the jury could consider it under both sentencing factors Penal Code § 190.3 (b) (criminal activity involving use of force or violence) and (c) (prior felony convictions).  (65 CT 14381-83; *see also*, 66 RT 12477-78, 12491-2.)  The prosecutor relied upon this aggravating evidence both in his opening statement to the jury (67 RT 12594) and in his final argument.  (70 RT 13268-70, 13273-74.)  The prosecutor also used the prior conviction in an attempt to impeach defense mitigation witnesses.  (*See*, *e.g.*, 67 RT 12611-12, 12639, 12656, 12665, 12734-35.)

53.     The penalty deliberations were closely balanced, based on a number of indicia.  (*See* Claim 15(I).)Lucas's penalty-phase theory of lingering doubt was viable based on the fact that the jury had acquitted him of one incident and had been unable to reach a verdict on another, presumably on the strength of his uncontroverted alibi evidence.  Moreover, the evidence as to the counts for which Lucas was convicted, especially Jacobs, was not overwhelming.  (*See* Claims 1-3, 43.)

---

[151]    *See* 82 CT 18157, 18257; 83 CT 18382, 18507; 84 CT 18832; 86 CT 19282; 89 CT 20007; 91 CT 20457, 20907; 96 CT 21833; 97 CT 21933; 100 CT 22158, 22782; 103 CT 23307.

(15cv1224)

54. In sum, the 1973 prior conviction was powerful aggravating evidence which, given the close balance of the penalty deliberations, must have weighed heavily in the jurors' decision to return a death verdict. Under these circumstances, the denial of the motion to strike "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Thus, Lucas is entitled to relief.

**CLAIM 20: THE TRIAL COURT IMPROPERLY PRECLUDED MITIGATING EVIDENCE (SHP 6.5.1, 6.5.2)**

1. Lucas's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the trial court limited relevant mitigating evidence showing that Lucas was actually innocent of a 1973 prior rape conviction. The prior rape played a central role throughout the penalty phase process and was instrumental in the imposition of the death verdict upon Lucas.

2. The Eighth and Fourteenth Amendments require that a sentencer in a capital case may not be precluded from considering "as a mitigating factor, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 605 (1978). A death penalty scheme must allow particularized consideration of relevant aspects of the character and record of each convicted defendant, before the penalty of death may be imposed. *See Woodson v. North Carolina*, 428 U.S. 280, 303 (1976); *Jurek v. Texas* 428 U.S. 262, 271, 276. For purposes of Eighth Amendment analysis, "it is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense." *Roberts v. Louisiana* 431 U.S. 633, 637 (1977); *Caldwell v. Mississippi*, 472 U.S. 320, 329-330 (1985) (intangibles considered by jury in capital sentencing are rarely discernable from the appellate record).

3. The Supreme Court has found an "[e]lemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no

opportunity to deny or explain.'" "*Skipper v. South Carolina*, 476 U.S. 1, at 5, fn. 1 (1986) (citations omitted).)  Additionally, the courts have consistently ruled that traditional rules of admissibility, for purposes of guilt trials, should not be used to exclude evidence relevant to mitigation at the penalty trial.  *See Green v. Georgia*,442 U.S. 95, 97 (1979).

4.     Further, the right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  This includes the right to offer witness testimony in order to establish a defense.  *Webb v. Texas*, 409 U.S. 95, 98 (1972); *Washington v. Texas,* 388 U.S. 14, 19 (1967).

5.     The Eighth and Fourteenth Amendments require heightened reliability in any determination that death is the appropriate sentence.  *See Beck v. Alabama* , 447 U.S. 625, 627-46 (1980); *Burger v. Kemp*, 483 U.S. 776, 785 (1987); *Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988).

6.     A legitimate state-created expectation, such as the expectation that the state will enforce its own evidentiary rules and standards, rises to the level of Fourteenth Amendment protection.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980.)

**A.     Relevant Facts**

7.     In 1973, when Lucas was 18 years old, he was convicted of rape, with a finding that he was armed with a knife.  Lucas was referred to the California Youth Authority.  (Trial Exhibit 271A.)  At Lucas's capital trial, the defense sought to introduce specific evidence that Lucas did not actually commit the rape, including Lucas's alibi witnesses, his successful polygraph (66 RT 12483-84), his 1973 trial attorney Tony Gilham's belief in Lucas's innocence (66 RT 12499), Gilham's own failure to provide Lucas with effective assistance at trial (66 RT 12499-501), and the fact that exculpatory evidence was discovered by Lucas's trial attorney after the trial.

(15cv1224)

(66 RT 12499-501.)  This evidence would have included evidence that Alejandrina Casas, a friend[152] of the alleged rape victim, spoke to the victim on the phone during the alleged time-frame of the rape.  (*See* Claim 19.)  The trial court ruled that none of the proffered evidence would be admitted, except for Gilham's belief that Lucas was innocent.  (66 RT 12495; 67 CT 12705, 12710-13.)  At Lucas's capital trial, the parties stipulated to the prior conviction.  (66 RT 12495, 67 RT 12597-98.)  Notwithstanding the judge's ruling, the prosecutor agreed to allow Curt Andrewson to testify that he was with Lucas at the time the rape was committed.  (67 RT 12585-86; 12603-05.)

8.      Specifically, the capital trial court excluded evidence that Lucas had taken and passed a polygraph test regarding the 1973 rape.  (66 RT 12484; 36 CT 7710; *see also* In Limine Exhibit 762.)  Lucas took a polygraph test during deliberations in the 1973 rape trial.  (33 CT 7095, 7191-93; 34 CT 7318.)  The 1973 trial court denied Lucas's attempt to lodge the results.  (33 CT 7191-93.)  Later, after the rape conviction, the judge directed both Lucas and the victim to take polygraphs.  (33 CT 7249-50; 34 CT 7327.)  Lucas agreed, but the prosecutor refused to allow the victim to be polygraphed.  (33 CT 7270-71.)

9.      At Lucas's capital trial, the defense argued that the polygraph evidence was relevant to mitigation under two defense theories.  First, the fact that Lucas passed the polygraph test was relevant to attack the conviction itself.  (*See* 197 Pretrial 18914.)  Second, the fact that Lucas cooperated with the prosecutor's request for a polygraph was itself mitigating because it showed Lucas's willingness to cooperate.  (*See, e.g.*, 36 CT 7712-13.)  The trial court denied counsel's request based on lack of reliability and because polygraph examinations are generally not admissible.  (199 RT 19215-16.)  The court also generally precluded the defense from offering evidence to show that

---

[152]  The defense sought to prove this through the testimony of Lucas's prior counsel, Gilham.  In making the offer of proof, defense counsel suggested that the newly-discovered evidence was provided by the victim's "boyfriend," but this was obviously a reference to Briseno's "girlfriend," Alejandrina Casas.  (66 RT 12499-500.)

1   Lucas did not commit the 1973 prior on the basis that such evidence would have

2   improperly opened up the prior to "relitigation."  (66 RT 12495, 12500.)  This ruling

3   was error.

4   **B.     The Trial Court Improperly Excluded Critical Mitigation Evidence**

5          10.    Lucas had a constitutional right to present the polygraph as mitigation

6   evidence and also to explain or deny the aggravating evidence. The jury was

7   specifically permitted to consider the prior conviction was relevant to factors Penal

8   Code § 190.3(b) (criminal activity involving force or violence), and (c) (prior felony

9   conviction).  (70 RT 13269-70.)  Under state law, when the prosecution seeks to

10  establish an aggravating factor under Penal Code § 190.3(b), it must prove the elements

11  alleged violent criminal offense beyond a reasonable doubt.  *People v. Jennings*, 53

12  Cal. 3d 334, 389, n. 14 (1991).  This is because, unlike factor (c), which focuses on the

13  very existence of a conviction, factor (b) requires a finding of the "presence or absence

14  of criminal activity" involving actual or threatened force or violence.  In other words,

15  the jurors must determine whether certain events occurred, a determination which

16  requires them to consider matters of historical fact.  *Tuilaepa v. California*, 512 U.S.

17  967, 975-76 (1994).  Accordingly, because it is the conduct and not the conviction that

18  is at issue, Lucas was entitled to explain those facts.

19         11.    The trial court's refusal to allow Lucas to explain the circumstances of his

20  prior conviction resulted in a denial of due process and also denied him his Eighth

21  Amendment right to a particularized sentence.  *Lockett,* 438 U.S. at 605; *Skipper*, 476

22  U.S. at 5.  Any lingering doubt as to whether Lucas actually committed that rape could

23  have dramatically changed the underlying balance, and Lucas was entitled to the

24  benefit of that evidence.  This is all the more powerful because much of the evidence

25  (including the polygraph and the testimony of Casas), was never presented to the jury

26  in the 1973 case.

27         12.    Specifically, exclusion of Lucas's proffered polygraph evidence deprived

28  the defense of affirmative evidence that he was not, in fact, guilty of the prior rape.

383

(15cv1224)

Even if polygraph evidence may be precluded in a trial, "under controlling United States Supreme Court authority, relaxed standards govern the admission of mitigating evidence during the penalty phase of a death penalty trial. [Citations.]" *Rupe v. Wood,* 93 F.3d 1434, 1439 (9th Cir. 1996). Hence, if the state seeks to exclude relevant evidence because of doubts about reliability, such exclusion violates the principles of *Lockett* and *Eddings v. Oklahoma,* 455 U.S. 104 (1982), by interfering with the jury's ability to weigh mitigating factors. *Rupe,* 93 F.3d at 1439. "Wholly unreliable evidence" may be excluded, such as astrology or other evidence of no demonstrated scientific validity. *Id.* at 1440. However, polygraph testing is not so unreliable as to warrant exclusion. *Id.* at 1439.

13.     Further, even if the prosecutor had not been relying upon the prior conviction as evidence of factor (b) aggravation, Lucas should have been entitled to mitigate or challenge the conviction's aggravating significance under factor (c) by challenging its reliability. Indeed, persuading the jury that Lucas had been wrongfully convicted could convert the conviction from an aggravating factor into a mitigating factor. Lucas's wrongful conviction and incarceration for a crime he did not commit would clearly have provided a basis for sympathy and compassion.

## C.     The Error Was Not Harmless

14.     A new penalty phase trial is required by the above errors, including the unconstitutional limitations on jurors' consideration of mitigating evidence. The Eighth Amendment's requirement that the jury consider all mitigating evidence is so fundamental that it undermines the entire structure of the penalty trial, and should constitute structural error. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 309 (1991) (structural defects in the trial mechanism which defy analysis by "harmless-error" standards are reversible per se); *Sullivan v. Louisiana,* 508 U.S. 275 (1993).

15.     Even if the error is not structural, Lucas's sentence should be vacated under harmless-error analysis because the prior rape conviction was especially powerful and prejudicial aggravation (*see* Claim 19.) and the penalty phase in this case

384

was closely balanced.  (Claim 15(I).)  The trial court's assessment of the prior

conviction suggests how the jurors likely viewed the prior conviction:

> As a factor in aggravation, [Lucas's prior] conviction
> weighed heavily with the court, for it proved that Mr. Lucas
> had used force and violence with a deadly weapon on a
> woman in the past.  A prior conviction by jury did not change
> him.   It may well have taught him that rape leaves a live
> witness; a dead victim can't testify.

(73 RT 13661-62.)

16.   Even if prejudice need be shown, the exclusion of mitigation evidence had

a substantial and injurious effect or influence on the jury's verdict.  *Brecht*, 507 U.S. at

637.

## CLAIM 21:  LUCAS'S RIGHTS WERE VIOLATED BY THE TRIAL COURT'S DISPOSITION OF JUROR NOTES REGARDING THE DEATH OF JUROR P.W.'S FATHER, WITHOUT NOTIFYING LUCAS OR HIS COUNSEL (AOB 7.7.6; SHP VII.C)

**A.   Introduction**

1.   During the penalty deliberations Juror P.W. sent out a note informing the

court that P.W.'s father had died and that she would have to attend the funeral

sometime later that week.  Counsel were not notified about this note, apparently

because it did not involve any specific scheduling request.  (26 CT 5594.)  Due to

unrelated scheduling requests from other jurors, the court agreed that the jury did not

need to be in court on Friday, July 28, 1989.  (26 CT 5595.)  After the scheduling

change had been made, the foreperson, presumably unaware of the change, sent another

note requesting that Juror P.W. be permitted to attending her father's funeral on July

28, 1989.  (108 CT 24262).  Counsel was apparently not notified.

2.   A fair reading of the record demonstrates that: (1) counsel were not

informed of the first note concerning the death of Juror P.W.'s father, since it was not a

(15cv1224)

specific scheduling request, and (2) counsel were not informed about the second such note because the scheduling request in that note was moot at the time it was received. (See Dkt. 36-33, 2008 State Pet., Ex. 49, A. Landon Decl. ¶¶ 3-4; Dkt. 36-33, 2008 State Pet., Ex. 50 S. Feldman Decl. ¶3.)

**B.    Relevant Law**

17.    A criminal defendant's right to counsel is guaranteed by the Sixth and Fourteenth Amendments to the federal constitution.  *See Perry v. Leeke*, 488 U.S. 272, 278-79 (1989); *Penson v. Ohio*. 488 U.S. 75, 88 (1988); *United States v. Cronic*. 466 U.S. 648, 659 (1984) (the right to counsel applies to every critical stage).  A stage of the proceedings is considered a critical one if the absence may have affected the substantial rights of the defendant.  *See United States v. Wade*. 388 U.S. 218, 224-26 (1967).

**C.    Lucas's Denial Of Counsel Was Constitutional Error Because It Happened At a Crucial Stage Of The Proceedings Which May Have Affected Lucas's Substantial Rights**

18.    Not only was Lucas denied counsel, he was given no notice and denied any opportunity to be heard (via counsel or in person)—which was a basic violation of due process.  Failing to notify either counsel or Lucas on such an issue, or to afford Lucas an opportunity to be heard, also undermined Lucas's due process and Eighth Amendment right to a fair, reliable sentencing proceeding.

19.    The denial of counsel during juror deliberations violates Sixth and Fourteenth Amendments if the absence may have affected the substantial rights of the defendant.  In *Shields v. United States* 273 U.S. 583, 588-89 (1927), the Court found error in the trial court's response to a mid-deliberation jury note without notifying the defendant or his counsel; *see also Mempa v. Rhay*, 389 U.S. 128, 134 (1967) ("[A]ppointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected").

(15cv1224)

20.   The right to counsel also applies to denials of counsel for portions of a critical stage, as long as they are important to the trial.  *See Geders v. United States*, 425 U.S. 80, 88-90 (1976) (overnight recess); *Herring v. New York*, 422 U.S. 853 (1975) (closing argument); *Brooks v. Tennessee*. 406 U.S. 605, 612-13 (1972) (nullifying counsel's ability to determine point in defense case when defendant would testify).  This follows from the long established law that a defendant "requires the guiding hand of counsel at *every* step in the proceedings against him."  *Powell v. Alabama*. 287 U.S. 45, 69 (1932) (emphasis in original).  Without it, the right to counsel is denied.

21.   When Juror P.W.'s father died, the jurors were at a critical point in their penalty phase deliberations.  The jurors were obviously having difficulty reaching an agreement and, earlier had declared themselves hopelessly deadlocked.  (*See* Claim 15(I).) One juror had been discharged for misconduct and an alternate had just been sworn in.  The jury had been instructed to begin deliberations anew.  (71 RT 13627.)

22.   Under these circumstances Juror P.W.'s ability to fulfill her duties as a juror was a crucial issue which may have affected Lucas's substantial rights.  See generally *Morgan v.Illinois*, 504 U.S. 719 (1992)*; Caldwell v. Mississippi*, 472 U.S. 320 (1985).  Hence, the failure to notify counsel about the death of Juror P.W.'s father violated Lucas's Sixth and Fourteenth Amendment rights to counsel.  The Eighth and Fourteenth Amendments requirement for heightened reliability in death sentences was also violated.

**D.    Prejudice**

23.   Under the federal constitution the denial of counsel at a critical stage of the trial is reversible per se.  When a criminal defendant is denied counsel at a critical stage of the proceedings it constitutes a structural error which makes the trial presumptively unfair, and requires automatic reversal.  *United States v. Cronic*, 466 U.S. at 659.  Because counsel was denied at this critical stage of jury deliberations, habeas relief must be granted.  Alternatively, if this Court does not apply *Cronic*, habeas relief is still

387

(15cv1224)

warranted because the absence of notice to counsel regarding the death of Juror P.W.'s father had a substantial and injurious effect on the verdict. But for this error, defense counsel could have objected to the juror's continuing presence on the jury and there is a reasonably probability that at least one juror would have voted differently.

24. To the extent that Lucas is required to show prejudice to obtain relief. Lucas should be given an opportunity to make such a showing after full investigation, discovery, adequate funding and access to this Court's subpoena power and other available court processes, including an evidentiary hearing to further develop such facts. To the extent it is possible, contrary to the appellate record and the attached declarations of counsel to conclude that trial counsel were timely notified of the death of the juror's father, then counsel were ineffective under both prongs of *Strickland* in failing, prior to the return of the verdict, to request inquiry into the fitness of the juror to continue serving and/or to seek her discharge, and thereby preserve Petitioner's right to be sentenced by a fair, impartial, and competent jury. To the extent the denial was based on any flaws in appellate counsel's request for leave to settle the record on this issue, then petitioner was denied his due process rights to effective assistance of appellate counsel since appellate counsel could have had no tactical reasons for failing to properly submit or support the applications he filed on petitioner's behalf.

**CLAIM 22: FAILURE TO RE-VOIR DIRE THE JURORS PRIOR TO THE PENALTY TRIAL AND TO GIVE AN ADEQUATE CAUTIONARY INSTRUCTION WAS PREJUDICIAL ERROR (AOB 7.5.3; SHP V.D)**

**A.   Introduction and Relevant Law**

1. Because the jurors acquitted on Garcia and hung 11 to 1 in favor of guilt on Strang/Fisher, the defense asked for impanelment of a new jury or for re-voir dire of the jurors before the penalty trial. (66 RT 12381.) These requests were denied. (66 RT 12381, 12388.)

2. Due to the trial court's erroneous failure to re-voir dire the jurors prior to the penalty phase and failure to give an adequate cautionary instruction, Lucas's death

388

(15cv1224)

sentence was obtained in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  *See Kyles v. Whitley*, 514 U.S. 419 (1995) (The heightened reliability requirements for capital trials under the Eighth Amendment should require even closer scrutiny of penalty jurors.)  Indeed, a person accused of a capital crime is entitled to explore the potential bias or prejudice of his prospective penalty jury in order to protect his rights to a fair, impartial, reliable and individualized trial by jury and sentencing determination.  *See Morgan v. Illinois*, 504 U.S. 719 (1992); *Turner v. Murray*, 476 U.S. 28 (1986); *Irvin v. Dowd*, 366 U.S. 717, 72 (1961).

**B.  Re-Voir Dire Was Necessary In the Present Case**

3.  The facts here raised a concern as to the jurors' ability to fairly perform their duties at sentencing.  All five incidents and seven victims were inextricably tied together by the prosecution evidence at the guilt trial.  For this reason, the judge had no choice but to leave all the exhibits together, with the jury, during penalty phase deliberations – including exhibits concerning the excluded Garcia and Strang/Fisher incidents.  (*See* Claim II(J)(2)(b).)  Hence, it would have been especially difficult for the jurors to disregard those two incidents and three victims at sentencing.

4.  Although the jurors acquitted on the Garcia charges, they were 11 to 1 in favor of conviction on Strang/Fisher.  Thus, 11 jurors were required to totally disregard the brutal murder of a woman and young girl which they themselves had concluded were committed by Lucas beyond a reasonable doubt.  The possibility, if not probability, that one or more of these 11 jurors could not avoid considering the excluded offenses required inquiry into the issue.  *See Morgan*, 504 U.S. at 729 ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.")

5.  Because the court did not permit re-voir dire, jurors convinced that Lucas had improperly escaped punishment for the Strang/Fisher murders and who were likely deeply prejudiced against Lucas, were allowed to sentence him to death.  Their

389

presence on the jury in the penalty phase, without additional voir dire, skewed the result and denied Lucas his state and federal constitutional rights to an impartial jury and a reliable penalty determination. *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (Sixth Amendment right to a jury trial); *Irvin*, 366 U.S. 717 (due process right under Fifth and Fourteenth Amendments to trial by an impartial jury); *Gilmore v. Taylor* (1993) 508 U.S. 333, 342 ("[T]he Eighth Amendment requires a greater degree of accuracy and factfinding than would be true in a noncapital case"); *Burger v. Kemp*; 483 U.S. 776, 785 (1987) (duty to search for constitutional error with painstaking care is never more exacting than in a capital case).

6.      While the jury was admonished during the guilt trial not to form or express any opinion on the case until the matter was finally submitted (e.g., 59 RT 11290), after the guilt verdicts were returned on June 21, 1989, the jurors were not warned against forming opinions as to penalty before commencement of the penalty deliberations. Because they were warned against discussing the case in the guilt-phase, the jurors reasonably could have taken absence of an admonition as permission to do so.  Hence, the jurors had a 19 day period between the guilt and penalty trials during which to form opinions about Lucas's penalty. It was not until the commencement of the penalty trial on July 10, 1989, that the judge admonished the jurors not to form or express opinions about penalty.  (67 RT 2593-94.)

7.      And, because the error arbitrarily violated Lucas's state created rights, *see e.g.*, *People v. Davis*, 10 Cal. 4th 463, 547 (1995) (duty to inquire); *People v. Gates*, 43 Cal. 3d 1168, 1169 (1987) (new penalty jury should be empaneled if there is "good cause"), the error violated his right to due process under the Fourteenth Amendment to the United States Constitution.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**C.      The Instructions Did Not Cure the Jurors' Biases**

8.      At the penalty trial, 11 jurors already had formed the judgment that Lucas committed the Strang/Fisher murders.  Courts have recognized that jurors do not easily forget their earlier judgments of guilt.  "A juror who has made up his mind that a

390

(15cv1224)

defendant has committed an offense cannot be depended upon to be sufficiently open-minded in another case involving similar charges when the trials are held near in time." *Government of the Virgin Islands v. Parrott*, 551 F.2d 553, 554 (3rd Cir. 1977) (right to impartial jury violated where some of the jurors in murder trial also sat on a jury that convicted the same defendant of possession of an unlicenced weapon).  "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155 (1879); *see also Irvin*, 366 U.S. at 722.

9.     The trial court's did not adequately assure that the 11 jurors who voted for guilt in Strang/Fisher would set aside their conclusions that Lucas had committed the Strang/Fisher murders.[153]

10.     First, the jurors received conflicting instructions as to whether they could consider Strang/Fisher.  It is true that the court gave one instruction stating that the evidence could not be considered.  However, the instruction on factor (b) suggested that Strang/Fisher could be considered as follows:

> You shall consider, take into account, and be guided by the following factors, if applicable:
>
> (b)   The presence or absence of criminal activity by the defendant, other than the crimes for which the defendant was convicted or acquitted in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.  (65 CT 14373.)

11.     In the view of 11 jurors, Strang/Fisher was "criminal activity by the defendant, other than the crimes for which [he] was convicted or acquitted in the present proceedings . . . ."  Hence, under the express terms of this instruction,

_____

[153]   The jurors were instructed not to consider the Garcia and Strang/Fisher evidence, "instructions," "notes" and "exhibits."  (65 CT 14373, 14401, 14403.)

Strang/Fisher could be considered.  Therefore, because it cannot be determined which conflicting instruction the jury followed, *Francis v. Franklin*, 471 U.S. 307, 322 (1985), the instructions did not cure the error.

12.    Second, the jurors were only instructed to ignore evidence, instructions and exhibits.  But the jury was never admonished to disregard their impressions of Lucas's overall guilt or moral culpability – or to avoid their desire for retribution.[154] On the contrary, the trial court told the jury it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."  (65 CT 14398.)  The narrow admonition to ignore "evidence" and "instructions" was inadequate, particularly in contrast to the jurors' ability to take into account moral values and the defendant's character, background and history.  (*See* Cal. Penal Code § 190.3.)

13.    Third, it is questionable whether any admonition could overcome the bias at work here.  "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  *United States v. Bruton*, 391 U.S. 123, 135 (1968).  Some jurors may have tried intellectually to set aside their judgment, reached after serious reflection and despite extended debate, that the defendant had committed the Strang/Fisher crimes beyond a reasonable doubt and to a moral certainty.  However, when the emotional impact of that judgment and the temptation to make Lucas pay for the Strang/Fisher crimes during the penalty phase were so enormous, it is simply unrealistic to presume that jurors followed the trial court's limited instructions.

---

[154]  The term "charges" would have been preferable to "evidence."  Charges is broader and encompasses all aspects of each criminal episode in its entirety.  The instructions the court actually gave, however, were limited to "evidence."

(15cv1224)

14.     Although the trial court sensed the potential for prejudice and told the jurors not to consider evidence relating to the Strang/Fisher counts, in the end, Lucas was sentenced to death by 11 jurors who believed, beyond a reasonable doubt, that he had gone unpunished for two other capital murders.  Hence, Lucas was deprived of an impartial jury and a reliable penalty determination.

**D.     The Penalty Judgment Should Be Reversed**

15.     Imposition of a penalty by a jury that is not impartial defies harmless-error analysis.  *See Mach v. Stewart*, 137 F.3d 630, 634 (9th Cir. 1997); *see also Dyer v. Calderon*, 151 F.3d 970, 973 n. 2 (9th Cir.1998) (en banc) ("The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.").  Accordingly, structural error was committed and the judgment should be reversed without a showing of prejudice.  (*See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (structural defects in the trial mechanism, which defy analysis by "harmless-error" standards are reversible per se).

**E.     Ineffective Assistance of Counsel**

16.     To the extent that trial counsel's request was inadequate, they were constitutionally ineffective under *Strickland*.  Similarly, to the extent appellate counsel's briefing of this issue was inadequate to fully preserve it, appellate counsel was ineffective under *Strickland*.  The failure to voir dire was prejudicial because two jurors actually did prematurely form the opinion that Petitioner should be given the death penalty.  (*See* Claim 27, incorporated by reference as if fully set forth herein.) Additionally it is likely that other jurors also prematurely formed the opinion that Lucas should be executed.  Empirical studies have shown that many jurors employ a presumption that a guilty verdict justifies the death penalty.[155]  Studies also show that

---

[155]  William J. Bowers, Marla Sandys & Benjamin Steiner, Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making, 83 Cornell Law Review 1476 (1998); Theodore Eisenberg and Martin T. Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L.

(15cv1224)

almost half of the jurors who sat in capital cases believed that they knew what the punishment should be before the sentencing phase of the trial began.[156]  A juror's premature formulation of an opinion may skew the trial in favor of death over life, violating a defendant's right to trial by an impartial jury and due process.

17.    The premature determination of penalty was especially prejudicial to Lucas because the jurors did not hear the mitigating evidence until the latter portion of the penalty trial, and due to counsel's ineffectiveness, heard only a paltry version of the available evidence in mitigation.  (*See* Claim 15(D).)  The circumstances of the offenses, upon which the prosecution relied heavily in arguing for aggravation at the penalty trial, were fully known to the jurors before the penalty trial commenced.  Thus, the jurors' premature determination of penalty was extremely prejudicial to Petitioner and deprived him of impartial and open-minded jurors at his penalty trial.

## CLAIM 23:  THE TRIAL COURT WAS BIASED REGARDING THE 1973 PRIOR OFFENSE (AOB 6.4.4)

1.    The trial court's bias in ruling against the defense motion to strike the 1973 prior conviction for rape violated Lucas's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, freedom from cruel and unusual punishment, and a fair trial.  When the defense presented the motion, the trial court sua sponte ruled that it could not consider it and the judge expressed her view that the underlying claims for ineffective assistance of trial and appellate counsel were meritless.  After the California Court of Appeal ordered the trial court to consider the motion, the trial judge refused to disqualify herself.  The trial judge thus gave the appearance of bias and the bias the

---

Rev. 1 (1992); William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 American Journal of Criminal Law 1, (1989).

[156]  William S. Bowers, *The Capital Jury Project: Rationale, Design and Preview of Early Findings,* 70 Indiana Law Journal 1043, 1093 (1995); William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell Law Review 1476 (1998).

1   denial of the disqualification motion denied Lucas of his due process rights.  *Irvin v.*

2   *Dowd*, 366 U.S. 717, 722 (1961).

3   **A.      Relevant Law**

4          2.      The Sixth, Eighth, and Fourteenth Amendments to the Federal

5   Constitution require the court presiding over a criminal defendant's trial to be impartial,

6   and to refrain from actions that deprive the defendant of his right to be tried by an

7   impartial jury.  *See*, *e.g.*, *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) ("impartiality

8   of the adjudicator goes to the very integrity of the legal system").  "A fair trial in a fair

9   tribunal is a basic requirement of due process."  *In re Murchison*, 349 U.S. 133, 136

10  (1955); *see also Tumey v. Ohio*, 273 U.S. 510, 535 (1927) (regardless of the evidence

11  against a defendant, he has the right to an impartial judge); *accord Bracy v. Gramley*,

12  520 U.S. 899, 904-05 (1997) (minimum requirements of due process require a fair trial

13  before an unbiased judge).

14         3.      The probability or even appearance of bias can suffice to disqualify a

15  judge.  *Taylor v. Hayes*, 418 U.S. 488, 501 (1974).  A defendant need not prove actual

16  bias to establish a due process violation.  *Johnson v. Mississippi*, 403 U.S. 212, 215

17  (1971); *see also Murchison*, 349 U.S. at 136 (Due Process Clause may bar trial by

18  judges who have no actual bias and who would "do their very best to weigh the scales

19  of justice equally between contending parties").  The Supreme Court's admonition on

20  judicial conduct is blunt:  "'[J]ustice must satisfy the appearance of justice.'"

21  *Murchison*, 349 U.S. at 136 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954));

22  *see also* Cal. Code Civ. Proc. §170.1(a)(6)(A)(iii) (a judge shall be disqualified where

23  "[a] person aware of the facts might reasonably entertain a doubt that the judge would

24  be able to be impartial").

25         4.      The Supreme Court also has recognized "the difficulties of inquiring into

26  actual bias" on the part of a judge.  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868,

27  883 (2009); *see also Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) ("[W]hen the trial

28  judge is discovered to have had some basis for rendering a biased judgment, his actual

(15cv1224)

motivations are hidden from view, and we must presume the process was impaired.") (citing *Tumey*, 273 U.S. at 535). Thus, the Court's precedents on judicial bias focus on the appearance of and potential for bias, not actual, proven bias. Due process mandates a "stringent rule" for judicial conduct. *Murchison*, 349 U.S. at 136.

> [Trial before a] judge who [is] not impartial [is a] structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by "harmless-error" standards. The entire conduct of the trial from beginning to end is obviously affected by . . . the presence on the bench of a judge who is not impartial.

*Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (citing *Tumey*, 273 U.S. at 523). The finding of a structural defect in the trial process requires habeas relief on the conviction and the sentence. *Id.*

## B.   Relevant Facts

5.   Before the penalty phase, the defense moved to strike the prosecution's aggravating evidence–a 1973 rape conviction–based on allegations that both trial counsel and appellate counsel in the 1973 case had been ineffective. (36 CT 7745-81.) The trial court, on its own motion, questioned Lucas's right to present evidence on the motion, and questioned its jurisdiction, before ruling that it was not authorized to entertain the motion to strike. (53 CT 11589-95; 209 Pretrial 20280-93.)

6.   The trial court made comments suggesting that she had prejudged the substantive issue raised by the motion without considering additional evidence or argument that could have been presented at a hearing:

> On the habeas on the 1973 case, I am–I hope it's clear that I am very much desirous of having that taken up to the 4th District or wherever, and I don't want to entrap you into thinking that if you file it back in here, that I haven't made up my mind on those issues. I read all of the points and

1    authorities that you submitted and I spent considerable time

2    going over the transcript, and it was my opinion that none of

3    the issues raised showed incompetency either of Mr. Gilham

4    or of Mr. Arm, so I will say that right out.

5         I don't want to entrap you into thinking you come back

6    here and I may find for you.  I have already reviewed it and I

7    don't find it, at least on the paper work.

8    (210 Pretrial 20361, 20364.)

9         7.    Thereafter, Lucas filed a Petition for Writ of Mandate in the 4th District

10   Court of Appeal (D007578) challenging the court's refusal to hear the issue, which was

11   granted.  *Lucas v. Superior Court*, 201 Cal.App.3d 149 (1988).  The Court of Appeal

12   found that a challenge to a prior conviction based on the constitutional claim of

13   ineffective assistance of counsel may properly be raised by a motion to strike.  *Id*.

14        8.    Upon return to superior court, the prosecutor urged a quick resolution of

15   the motion, based on the court's earlier "ruling" that the motion was without merit:

16        Just if the court ends up allowing questions about the '73

17        rape, I think that would put a premium on litigating the

18        validity of the prior.  The remittitur has issued, and as we

19        indicated to you previously, we think you have already ruled,

20        based on [the motion] that you denied.

21   (264 Pretrial 27665.)

22        9.    The trial court set a hearing date and the defense filed a Limited Challenge

23   for Cause of Judge Hammes ("disqualification motion").  (61 CT 13443-49.)  The trial

24   court struck the disqualification motion as untimely and legally insufficient.  (61 CT

25   13476-88.)

26        10.    Ultimately, after an evidentiary hearing, the trial court refused to strike the

27   prior conviction and ruled that it could be admitted as aggravation at the penalty trial.

28   (301 Pretrial 35168-82; 70 CT 15635.)

(15cv1224)

**C.     The Trial Court had the Appearance of Bias**

11.    Here, the trial judge did not have an open mind about the 1973 prior conviction.  She candidly told defense counsel that, in effect, she had already made up her mind on the merits of the issue.  (213 Pretrial 20361.)  Because the trial judge appeared to have prejudged the issue of whether the prior conviction was admissible, her failure to recuse herself violated Lucas's constitutional rights.

12.    The trial court denied the disqualification motion even though it was legally sufficient.  As a preliminary matter, the trial court erred in finding the motion untimely.  The disqualification motion was filed thirty days after the remittitur; prior to the remittitur, it is questionable whether the trial court would have had jurisdiction to hear or rule on matters relating to the motion.  *See Auto Equity Sales Inc. v. Superior Court*, 57 Cal. 2d 450, 455 (1962) (finding that a superior court exceeded its jurisdiction by failing to follow the decisions of higher courts).

13.    Because the judge may not have been totally fair and objective, the reliability of the ruling and the death sentence to which it contributed was compromised in violation of the Eighth and Fourteenth Amendment.  *See Beck v. Alabama*, 447 U.S. 625, 643 (1980) (acknowledging a right in a capital trial, to a level of certainty and reliability).  The need for reliability is heighted here, in a capital case, particularly where the 1973 prior conviction was crucial evidence.  *Id*.

14.    Denial of a fair and impartial judge is structural error and warrants a grant of relief without a showing of prejudice.  *See Rose v. Clark*, 478 U.S. 570, 578 and n. 6 (1986).  However, the denial of the disqualification motion was prejudicial here, because it resulted in the 1973 prior conviction being erroneously admitted into evidence.  As discussed in Claim 15(I), the penalty trial was closely balanced, and the 1973 prior rape conviction was highly inflammatory evidence that had a substantial and injurious effect on the determination of the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638 (1993).

(15cv1224)

**CLAIM 24:  THE JUDGE ENGAGED IN JURY-TAMPERING BY ORDERING THE BAILIFF TO INSPECT THE DELIBERATION ROOM DURING RECESSES, AND BY GIVING A SPECIAL SUPPLEMENTAL INSTRUCTION IN LIGHT OF WHAT THE BAILIFF LEARNED (AOB 7.7.2, 7.7.3; SHP VI.JJ)**

**A.     Introduction**

1.     The privacy of jury deliberations is a hallmark of the state and federal constitutional rights to trial by jury.  Any breach of this privacy is considered a grievous violation.  In the present case, such a violation occurred when the trial judge covertly monitored the jury's deliberations and then prejudicially altered the course of the deliberations with a biased supplemental instruction.

**B.     Relevant Law**

2.     The Sixth Amendment guarantees the right to an impartial jury.  "[I]t is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Remmer v. United States*, 350 U.S. 377, 382 (1956).  "[T]he law requires that all deliberations by a jury must be conducted in the utmost privacy." *Babson v. United States*, 330 F.2d 662, 665-66 (9th Cir. 1964) (citations omitted).  Accordingly, the jurors' deliberations must be "free from outside attempts at intimidation." *Williams v. Florida*, 399 U.S. 78, 100 (1970).

3.     "As a general rule, no one–including the judge presiding at a trial–has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror.  The secrecy of deliberations is the cornerstone of the modern Anglo-American jury system." *United States v. Thomas,* 116 F.3d 606, 618 (2d Cir. 1997).  As the Ninth Circuit has recognized, achieving a perfect system for monitoring the conduct of jurors in the environment of the deliberation room "entails an unacceptable breach of the secrecy that is essential to the work of juries in the American system of justice.  To open the door to the deliberation room any more widely and provide opportunities for broad-ranging judicial inquisitions into the

1   thought processes of jurors would, in our view, destroy the jury system itself."

2   *Williams v. Cavazos*, 646 F.3d 626, 644 (9th Cir. 2011), *rev'd on other grounds by*

3   *Johnson v. Williams*, 133 S. Ct. 1088 (2013) (citing *Thomas*, 116 F.3d at 623).

4       4.      Jury tampering, including by a judge, violates a defendant's fundamental

5   right to a fair and impartial trial unfettered by outside influences.  Further, it violates

6   the Eighth and Fourteenth Amendments heightened reliability requirements in capital

7   cases.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).  It also violates to

8   confrontation, compulsory process, and representation of counsel.

9       5.      Finally, because jury tampering by the judge violates the state created right

10  to independent jury judgment, the error also violates the right to due process under the

11  Fourteenth Amendment.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

12  **C.      The Trial Court Improperly Invaded the Jurors' Privacy**

13      6.      The judge in the present case invaded the jurors' privacy by examining the

14  deliberation room during recesses to ascertain what evidence the jurors were

15  considering.  This appears to be in response to the jurors' question regarding whether

16  evidence from the whole trial was permissible to consider, or just evidence presented at

17  the guilt phase.  (108 CT 24253.)  The jury was told that it could consider guilt phase

18  evidence during its penalty deliberations.  (108 CT 24253.)

19      7.      However, after the written response was given to the jurors, the judge –

20  without notice to the parties–directed the bailiff to examine the jurors' deliberation

21  room while they were in recess to glean information about the deliberations.  (71 RT

22  13455-56.)  The bailiff informed the judge that the guilt phase exhibits were "put . . .

23  away" and that it did not appear that the jurors had looked at them.[157]  (71 RT 13456,

24  13465.)  The judge concluded from the bailiff's report, and her own observations of the

25

26

27      _____

        [157]  The bailiff did not testify.  His observations were conveyed by the judge.  (71

28  RT 13455-56.)

jury room during the guilt phase deliberations, that the jurors had not looked at the guilt exhibits during its penalty deliberations.  (71 RT 13456-57.)

8.    The judge's concern that the deliberating jurors weren't devoting time to reviewing the guilt phase exhibits was reinforced by two subsequent reports of the bailiff.  One report was made later that afternoon.  During that report the judge asked, "Was there any evidence out on the tables or anywhere?"  The bailiff responded: "Nothing similar to the guilt phase."  (71 RT 13475.)  Yet another report was made the following morning when the bailiff, who had been ordered by the judge to empty the trash and "clean up" the jury room (71 RT 13479), informed the judge that while emptying the trash cans he had noticed that one exhibit had been moved by the jurors from the anteroom to the jury room.  (71 RT 13476.)

9.    In sum, the judge and bailiff erroneously invaded the privacy and sanctity of the jurors deliberations by examining the deliberation room to ascertain what evidence the jurors were considering.[158]

**D.    The Judge Improperly Used the Knowledge Gleaned From the Jury Room Intrusion To Influence The Course Of The Deliberations**

10.    In light of the above deliberation room observations, a special supplemental instruction was given, over defense objection, (71 RT 13468-84.) which informed the jurors, inter alia, that both the penalty and guilt exhibits could be examined and considered in penalty deliberations.  (71 RT 13476-87; 65 CT 14403.)

11.    Hence, the intrusion in the present case was especially prejudicial.  It caused the trial judge to give an additional supplemental instruction which changed the course of the deliberations by again telling the jury it could consider guilt phase evidence and by emphasizing the guilt phase exhibits, many of which were highly inflammatory and prejudicial to Lucas.

---

[158]  The defense objected to the deliberation room examination and special instruction predicated on the bailiff's observations.  (71 RT 13468-84.)

12.     Prior to the intrusion, the parties had settled on a course of action–sending in the first note–which, without singling out or emphasizing the exhibits, told the jury it could consider guilt phase evidence.  However, the deliberation room inspection caused the judge to give an additional instruction which specifically referred to the exhibits.

13.     There was no legitimate need for such a supplemental instruction.  The judge had already told the jury it could consider the guilt phase evidence.  Further, given that the jury had deliberated over the guilt phase evidence for over eight days (71 RT 13481), the fact that they were not again reviewing those exhibits did not mean they were ignoring the guilt phase evidence.  Nevertheless, the trial court was apparently concerned that the jury, which was potentially deadlocked, had not spent enough time looking at the guilt phase exhibits.

14.     This additional instruction was erroneous and highly prejudicial to the defense for two reasons.

15.     First, it repeated the recently given instruction that consideration of guilt phase evidence was proper and did so in a way that emphasized the physical exhibits.

16.     An instruction that is one-sided or unbalanced violates the defendant's federal constitutional rights under the Sixth and Fourteenth Amendments to due process and a fair, impartial trial by jury.  *See Quercia v. United States*, 289 U.S. 466, 470 (1933) ("This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided. . . .'").

17.     Second, the instruction implied that the judge thought the guilt phase exhibits were important and that the deliberating jury, in attempting to determine the appropriate penalty, should spend time looking at them.

(15cv1224)

**E.**     **Assuming Arguendo that Relying on the Bailiff's and Trial Court's Observation of the Jury Room Was Not Improper, the Resultant Finding was Unfair, Unreliable, and Unconstitutional**

**1.     The Trial Court's Process Violated Fundamental Rights**

18.     The process of inspecting the jury room and giving an instruction was unconstitutional because the trial court's determination was based on the extraneous out-of-court observations of the bailiff and herself.  Furthermore, the bailiff's observations were conveyed in the form of rank hearsay by the judge.  Hence, the defense was denied any opportunity to confront or test the testimony, in violation of the Confrontation and Due Process Clauses of the Sixth and Fourteenth Amendments.  *See Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986); *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974); *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); *Turner v. Louisiana*, 379 U.S. 466 (1965).

19.     Additionally, by refusing defense counsel's request to view the jury room,[159] Lucas's rights were further violated.  The process violated the Sixth and Fourteenth Amendments to the federal constitution which guarantee the defense the rights to due process, trial by jury, confrontation, compulsory due process and to present a defense.  *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Webb v. Texas*, 409 U.S. 95 (1972) *Washington v. Texas*, 388 U.S. 14, 17-19 (1967).  Without the foregoing protections there isn't even any assurance that the bailiff's purported observations were accurate and truthful.

**2.     The Trial Court's Process was Unreliable**

20.     Moreover, the trial court's implicit finding that the jurors did not understand that they were free to consider the guilt phase exhibits was not supported by the record before the trial court, given that (1) she had just explicitly responded to a

---

[159]  The defense request to inspect the jury room was denied.  (71 RT 13473.)

403

question on this issue and told the jurors they could consider the guilt phase evidence, (2) the jurors had spent eight days in guilt phase deliberations and so the fact that they didn't pull out guilt phase exhibits did not mean they had forgotten or were not considering guilt phase evidence, and (3) the jurors had pulled at least one exhibit that may have been from the guilt phase.  (71 RT 13476.)

21.    The court's prejudicial supplemental instruction was based on an unfair and unreliable factual determination.

**F.    The Error Was Structural And Reversible Per Se**

22.    By altering the jury's subjective deliberative process based on information obtained from surreptitious monitoring of the jury room the court committed a structural error.  No matter what juror transgressions may be suspected, intrusion into the jury's privacy should not be tolerated and should never be held harmless.

**G.    If Not Reversible Per Se, the Secret Monitoring Of The Deliberations and the Unwarranted Supplemental Instruction Were Prejudicial To Lucas**

23.    However, if this Court does not find that structural error applies, the trial court's error had a substantial and injurious effect on the verdict and thus, the death sentence must be reversed.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

24.    To the extent that one can speculate about the impact of the note, the prejudice to Lucas was high.  The probable impact of the note, under the circumstances, would have been to convey to the jurors the trial court's view that, in attempting to resolve its potential deadlock as to the appropriate sentence, the jurors should consider the guilt phase exhibits.  This in turn would have caused the jurors to look at, if not focus upon, the physical exhibits thus placing undue emphasis upon some of the most inflammatory evidence in the case.  For example, the photo board (People's Trial Ex. 29), which depicted close-up views of all seven throat slashings, was an incredibly

inflammatory and emotionally evocative portrayal.[160]/[161]  Further, the trial court's message to consider such exhibits would also have prejudicially conveyed the court's own view as to the appropriate sentence.

25.   The jurors would have naturally deferred to the trial court, since "it is the court's words . . . which carry an authority bordering on the irrefutable." *United States v. Wolfson*, 573 F.2d 216, 221(5th Cir. 1978); *accord, e.g., Quercia*, 289 U.S. at 470. As the trial court observed, its words were especially influential with these particular jurors: "This jury is really tuned in and they are tuned in to me.  Whenever I look at them and say something to them, I am getting a tremendous feedback from them that they are really paying attention to what they can and cannot consider and what they are to do."  (44 RT 8401.)

26.   On the other hand, the defense theories at the penalty trial were primarily founded on the actual testimony – both guilt and penalty.  (E.g., lingering doubt, childhood abuse, good character qualities.)  The second supplemental instruction conspicuously relegated the reference to "testimony" to the end and, in contrast to how it treated the exhibits, did not specifically state that both the guilt and penalty testimony was available.  Thus, both the timing and linguistic structure of the note tended to emphasize the exhibits rather than the testimony.

27.   Further, by specifically informing the jury that it had "access to" the exhibits from *both* the guilt and penalty trials, and then informing the jury that it could ask for transcripts of testimony without mentioning that this included both guilt and penalty testimony, the note likely misled the jury into believing it could not request transcripts of guilt phase testimony.

---

[160]  Moreover, three of the pictures of this photo board, Garcia, Strang and Fisher constituted inadmissible, extrinsic evidence which the jurors were required to somehow disregard.

[161]  Additionally, by emphasizing the guilt exhibits the judge undercut the principle defense theory of lingering doubt since the jury had relied on those very exhibits to convict Lucas.

(15cv1224)

28.     Accordingly, the error had a substantial and injurious effect on the verdict.

**H.     Counsel's Failure to Object Violated Lucas's Right to Effective Assistance of Counsel**

25.     In addition to the above violations, Lucas was also deprived of the effective assistance of counsel because his trial counsel failed to object to the judge's reliance on her own observations and those of the bailiff's without allowing the defense the opportunity for cross examination. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To the extent Respondent argues that the arguments in subsections A-G were not properly preserved, trial counsel's failure to do so violated Lucas's constitutional right to effective assistance of counsel because there was no reasonable strategic reason for not adequately preserving them. There is a reasonable probability that, absent counsel's omission, the outcome of the trial and appeal would have been more favorable to Lucas.

**CLAIM 25:  THE PROSECUTOR'S CLOSING ARGUMENTS WERE IMPROPER (AOB 7.4.1, 7.4.2, 7.4.3. 7.4.4)**

1.     During penalty-phase closing arguments, the prosecution made several improper arguments, all of which were calculated to diminish the jurors' sense of responsibility and undermined the mitigation evidence. Particularly, the prosecutor framed the jury's determination as a battle between "good and evil," invoking biblical scriptures and proclaiming that "the candle of the wicked shall be put out." The prosecutor's argument was improper both because it implied that the jurors could justify their vote based on biblical law, and also because it misstated the jurors' role under the law. Other arguments suggested that the jurors were mandated to reach a particular verdict–death. Individually and cumulatively, these violated Lucas's rights under the Eighth and Fourteenth Amendments to the Constitution.

406

(15cv1224)

**A.     The Prosecution Improperly Relied on Biblical Law and a "Good v. Evil" Paradigm for the Sentencing Decision**

2.     It violates the Eighth Amendment to invoke "higher" law to support the death penalty because capital sentencing statutes must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

3.     Juror reliance on a "higher authority" such as the Bible violates the principles enunciated by *Godfrey*. *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2001) (stating that prosecutorial invocation of a 'higher law or extra-judicial authority' in argument to jury violates the Eighth Amendment); *accord*, *Chandler v. Florida*, 449 U.S. 560, 574 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law").) "The Biblical concepts of vengeance invoked by the prosecution here do not recognize such a refined approach." *Sandoval*, 241 F.3d at 776.

4.     "Argument involving religious authority . . . undercuts the jury's own sense of responsibility for imposing the death penalty." *Id*. at 777; *see Caldwell v. Mississippi*, 472 U.S. 320 (1985). "A fortiori, delegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process." *Sandoval.* 241 F.3d at 777.

5.     The trial court denied a defense request for an instruction that would have told the jury it that it must not view the penalty deliberations as "a weighing or balancing between good and bad, but between life and death." (65 CT 14463.)

6.     The prosecution's penalty argument theory was "the battle between good versus evil," and it began and ended with a biblical mandate–"the candle of the wicked shall be put out," which is a reference to a specific verse in the Bible, Proverbs 24:20." In between, the prosecutor used religious references to justify the death penalty, and to urge the jurors to side with good rather than evil by executing Lucas:

(15cv1224)

1   The candle of the wicked shall be put out. Ladies and
2   gentlemen, by your verdicts of guilty you have determined
3   that these vile, cold-blooded, savage and brutal murders
4   committed by Mr. Lucas indeed make him a wicked person.
5   Your decision now will be to decide whether or not the candle
6   of life within Mr. Lucas shall be put out.  (70 RT 13266.)

7                                     . . .

8   Mr. Lucas will ask for mercy, ladies and gentlemen.  His
9   lawyers will beg for mercy from you, but we all know that
10  mercy is not an earthly gift.  It is a divine gift, and only God
11  can grant mercy.
12  Your duty, ladies and gentlemen, is to dispense justice, and
13  after you have done so, then Mr. Lucas will seek his mercy
14  from God, and God will consider whether mercy is
15  appropriate.  (70 RT 13273.)

16                                    . . .

17  Within the story of life, ladies and gentlemen, is the battle
18  between good and evil.  There are times when we have to
19  enter into the battle of good and evil.  Sometimes it is not
20  pleasant, but sometimes we have to do that.  And as sworn
21  jurors, you have agreed to do that.  And one of those times is
22  now for you to enter into this battle between good and evil.

23      Capital punishment has been with us for thousands of
24  years, as Moses laid it down, as the punishment for
25  premeditated murder, and we have had it ever since because it
26  is a just penalty when someone commits the ultimate act of
27  evil.

28

(15cv1224)

1    We know now by your verdicts that Mr. Lucas has
2    indeed committed the ultimate act of evil in murders.

3    You are going to hear, I am sure, that the death penalty is
4    inhumane; it is immoral.  I say to you, ladies and gentlemen,
5    it is – that notion is historical and logical nonsense.  For in the
6    battle between good and evil there are times when we must,
7    when we must get into that battle and do what is right and
8    what is just and sometimes that requires that we impose the
9    death penalty, and it is proper and just in this case.

10    However, it can never be just for the purpose or the
11    reason that someone fails to get into that battle, because if you
12    fail to get into that battle and deal with it and do what is just,
13    if you fail, then justice is not done.

14    You may be told that the battle will be won by giving
15    Mr. Lucas life without possibility of parole, and I say no, no,
16    ladies and gentlemen, no.  The appropriate penalty is death,
17    because his lawyers will ask you for life."  (70 RT 13277-78.)

18                                    . . .

19    Ladies and gentlemen, justice cries for the ultimate
20    penalty; the ultimate penalty of death for Mr. Lucas.  He is a
21    person with a depraved sense of pleasure; his meanness, his
22    cold, deliberate murders of two women, an innocent child,
23    and the attempt [sic] murder of Jodie Robertson.  No one is
24    going to try to tell you that your task is a pleasant one; no
25    one.  But you must get into the battle between good and evil
26    and take care of that problem.

27    This case cries for the penalty of death, and the candle
28    of the wicked shall be put out.

(70 RT 13278.)

7.      The defense objected to this "good versus evil" argument and to the other religious references, including the argument that Moses sanctioned the death penalty, as a violation of the Eighth Amendment and an improper invocation of "religious passion." (70 RT 13279-80.) The trial court sustained the objection to the prosecutor's assertion that "only God could grant mercy" (70 RT 13273) and agreed to give a curative instruction. (70 RT 13281, 13283.) However, the rest of the prosecutor's argument did not give the trial court "concern," and she did not specifically limit the jurors' consideration of religious law or the prosecutor's "good versus evil" paradigm for the penalty deliberations. (70 RT 13281.)

8.      The religious theme that permeated the prosecution's argument was the "battle between good and evil." The prosecutor started and ended with the biblical mandate (from Proverbs 24:20) that: "The candle of the wicked shall be put out." (70 RT 13266, 13278.) Lest there were any confusion, the prosecutor explained that Lucas himself was a "wicked person" and that the "candle of life" within him should be put out. (70 RT 13266.) There was no ambiguity here; this argument implied that the Bible called for Lucas's execution. This argument was carefully calculated to lessen the jurors' sense of personal responsibility. "[T]he prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict." *Sandoval*, 241 F.3d at 776.

9.      The argument that the death penalty "as Moses laid it down," also improperly invoked "higher" law. The argument was not an explanation of the historical fact that capital punishment has been accepted by societies for generations. It was suggested as an alternate basis of legal authority. Moses "laid . . . down" the law, "and we have had it ever since," suggests that capital punishment originated from God, was promulgated by Moses and is now carried out by the people of California.

410

10.     This strategy, improperly invoking religion and biblical law to encourage and justify a death sentence, misconstrued the nature of the penalty determination.  The penalty determination under California's statutory scheme is not a simple contest between good and evil.  It is a fundamental premise of Eighth Amendment jurisprudence and of California's death penalty statute that *all* special circumstance murder is "bad" or "evil."  *See Gregg v. Georgia*, 428 U.S. 153 (1976).  Thus, the jurors do not properly exercise their discretion to decide which special circumstance murders warrant death if they impose death, in whole or part, based on the simple fact that the crime and/or the offender are "bad" or "evil."  To avoid the Eighth Amendment's proscription against cruel and unusual punishment, a death penalty law must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."  *Furman v. Georgia*, 408 U.S. 238 (1972) (White, J. concurring).

11.     It is a misstatement of the law to characterize the penalty determination in terms of good and evil.  California's death penalty statute requires punishment of life without prison at a minimum.  It allows the jury to then decide if the punishment warrants the ultimate punishment, death.  "It follows that the weighing of aggravating and mitigating circumstances must occur within the context of *those two punishments*; the balance is not between good and bad but between life and death."  (Emphasis in original.)  *People v. Brown*, 40 Cal. 3d 512, 542 n.13 (1985), reversed on other grounds by *California v. Brown*, 479 U.S. 538 (1987).  In this case, the prosecutor misconstrued the jurors' function by suggesting that Lucas could not be given a life sentence unless they found that his crimes were not evil.  Such argument was clearly improper and unconstitutional.

12.     Moreover, the court denied a defense request for a jury instruction that could have limited the prejudice by admonishing the jurors that they must not view the penalty deliberations as a balance of good versus evil.  (*See* 65 CT 14463.)  The judge's "curative" instruction simply informed the jurors that "the law does specifically provide

411

that the jury may consider mercy for the defendant in considering his sentence." (70 RT 13182.) It did not preclude the jurors from relying upon the religious law and the "good versus evil" paradigm advanced by the prosecutor. (*See* 64 CT 14275 (anything said by the attorneys concerning the law may not be followed if it "conflicts" with the court's instructions).)

13. Finally, execution of a criminal defendant based on religious law or principles violates the Establishment Clause of the First Amendment of the federal constitution. *See Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000) (citing Establishment Clause concerns in finding school prayer unconstitutional).

**B. The Prosecutor's Argument Improperly Minimized the Jurors' Role**

14. The prosecutor argued: "If Mr. Lucas does not deserve the death penalty in this case, we should abolish it as a measure of punishment in the state of California." (70 RT 13275.) Defense counsel objected at the close of the prosecution's argument in light of the trial court's policy against interrupting counsel's arguments. (70 RT 13279.) This remark violated the Eighth and Fourteenth Amendments by (1) minimizing the jurors' role in deciding the appropriate punishment; (2) implying that the jurors were duty-bound to reach a particular result; and (3) encouraging the jurors to disregard or discount the mitigating evidence.

15. Prosecutorial remarks that improperly cause the jury to feel less responsible than it should for sentencing an individual to death violate the Eighth Amendment requirement that the sentencing process facilitate and "responsible and reliable exercise of sentencing discretion." *Caldwell v. Mississippi*, 472 U.S. 320, 331 (1985). In other words, *Caldwell* prohibits comments "'that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Romano v. Oklahoma*, 512 U.S. 2004, 2010, (1994). Such remarks present an "intolerable danger of bias toward a death sentence" and call into question the reliability of the jury's determination that death is the appropriate penalty in a specific case. *Caldwell*, 472 U.S. at 331, 340.

412

16.     The prosecutor's comments also implied that the jury had a duty to reach a particular result—death.  They suggested that the authors of the California death penalty law had preordained that a case like this one should result in the death penalty.  Hence, the jurors were unconstitutionally relieved of the ultimate responsibility for imposition of the death verdict in this case.  *See Lesko v. Lehman*, 925 F.2d 1527, 1545 (3rd Cir. 1991) (prosecutor's suggestion that the jury had a duty to "even" the "score" was improper).  This Court recently granted relief in an AEDPA case in a similar situation, where a prosecutor used biblical references to persuade jurors that God mandated a death verdict.  *Roybal v. Davis*, 148 F. Supp. 3d  958, 1049 (S.D. Cal. 2016).

17.     The prosecutor's comment also encouraged jurors to disregard or discount the mitigating evidence by effectively dismissing it as irrelevant in the face of the crimes.  It compounded other prosecutorial misconduct, discussed below, which trivialized the mitigation evidence.  The result was argument that encouraged the jurors to disregard or discount the mitigating evidence, in clear violation of the Eighth Amendment.  *Lockett v. Ohio*, 438 U.S. 586 (1978).

**C.     The Prosecutor Improperly Encouraged the Jury to Disregard Mitigating Factors**

18.     The prosecutor made an inflammatory remark to arouse the passions of the jury that "His [Lucas's] friends came in and said he was a good guy. . . . Ted Bundy was a good guy when he wasn't murdering people."  (70 RT 13272.)  Defense counsel objected but the trial court found no error.  (70 RT 13279-13281.)  The prosecution also argued, "What is the just punishment?  What is just for Mr. Lucas?  You must base your decision upon what Mr. Lucas did, not who he is or what family he comes from or any sympathy for his family.  The question is what did he do."  (70 RT 13273.)

19.     In *Lockett*, the Supreme Court held that the sentencer may "not be precluded from considering, as a mitigating factor, *any aspect of a defendant's character or record* . . . ."  *Lockett v. Ohio*, 438 U.S. at 605; emphasis in original.)

413

Precluding such consideration "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."  *Id*.  Since *Lockett*, the Supreme Court has repeatedly reaffirmed that the constitutional mandate of individualized capital sentencing requires that the jury hear, listen and give full consideration to all mitigating evidence introduced during the penalty phase.  *See Sumner v. Shuman*, 483 U.S. 66, 73-74 (1987); *see also McKoy v. North Carolina*, 494 U.S. 433 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 318 (1989).  Further, it is irrelevant whether the "barrier" to consideration of all mitigation evidence is the statutory language, an evidentiary ruling, an instructional error or ambiguity, misleading prosecutorial argument, or the sentencer's misunderstanding; any such barrier is constitutionally impermissible.  *Mills v. Maryland*, 486 U.S. 367, 375 (1988).

20.    In this case, both of the above statements were improper because they unconstitutionally encouraged the jury to disregard mitigating evidence--including evidence that Lucas was a "good guy," or that he had other characteristics worthy of mercy.  At the penalty trial, the defense presented evidence of the positive aspects of Lucas's background and character.  Numerous witnesses testified regarding Lucas's acts of kindness and concern for others, especially children.  These witnesses also expressed their love for Lucas and the loss they would feel if he were executed.  However, the prosecution undermined this crucial mitigating evidence by implying that any person convicted of murder, including someone like Ted Bundy, would also have similar positive character attributes.

21.    The remark about Ted Bundy was misconduct, not only because it was calculated to prejudice the jury against Lucas and because it utilized evidence outside of the record to trivialize Lucas's mitigating evidence.  *See People v. Benson*, 52 Cal. 3d 754, 794 (1990) ("a prosecutor may not go beyond the evidence in his argument to the jury").)  This remark asked the jurors to assume that the evidence Lucas presented

414

in mitigation was not unlike that of Ted Bundy, or any other notorious criminal they may have learned about in the news media.  As counsel noted, comparing Lucas to Bundy, "who was convicted and sentenced in a different state under a different statute," was error.  (70 RT 13280.)

22.    The prosecutor's argument, suggesting that mitigation was irrelevant was clearly improper–and if credited, would have led the jury to believe it should disregard or discount the entire defense case (good character evidence, harsh and abusive upbringing, inherent human worth as reflected by the large number of people who care for him, etc.).  This is a form of *Lockett* error, which violated the Eighth Amendment.

**D.    Indiviually and Cumulatively, the Prosecution's Misconduct Prejudiced Lucas**

23.    In *Caldwell*, the death penalty was reversed because the Supreme Court could not say that the prosecutor's improper argument "had no effect on the sentencing decision." *Caldwell*, 472 U.S. at 341.  "[A] prosecutor's argument which diminishes the seriousness of the jury's penalty determination is extremely prejudicial." *Wade v. Calderon*, 29 F.3d 1312, 1324 (9th Cir. 1994), reversed on other grounds in *Pensinger v. Chappell*, 787 F.3d 1014 (9th Cir. 2015) (counsel's argument that execution would free defendant from his mental illness, like *Caldwell* error, effectively relieved the jury of any doubt about sentencing defendant to death).)

24.    In the present case the error was similarly prejudicial.  Here, the prosecutor's comments "so infected the trial with unfairness as to make the conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The prosecutorial misconduct discussed above unconstitutionally minimized the jurors' sense of responsibility, urged consideration of religious principles, improperly encouraged the jury to disregard relevant mitigating evidence, and argued inflammatory facts not in evidence to trivialize Lucas's mitigating evidence. *See Caldwell*, 472 U.S. at 331, 340; *Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988); *Lockett*, 438 U.S. at 605.

25. Because the error was substantial and the penalty deliberations were closely balanced (*see* Claim 15(I)), the error had a "substantial and injurious effect or influence" in determining Lucas's sentence. *Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638 (1993).

**CLAIM 26: THE PENALTY JURY WAS NOT IMPARTIAL BECAUSE A JUROR WAS SUBSTANTIALLY LEANING IN FAVOR OF DEATH (AOB 7.5.1)**

1. Lucas's conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because one of the jurors was predisposed to vote for death in a case where young children had been harmed.

**A.  Relevant Law**

2. The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Tinsley v. Borg*, 895 F.2d 520 523, *cert. denied*, 498 U.S. 1091 (1991); *Parker v. Gladden*, 385 U.S. 363, 364 (1966); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The United States Supreme Court has defined "an impartial trier of fact" as "a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

3. The actual or implied bias or prejudice of even a single juror violates a defendant's right to a fair trial. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). Such a juror does not have "that quality of indifference which, along with impartiality, is the hallmark of an unbiased juror." *Id*. at 982. Both juror bias and juror taint/misconduct threaten the impartiality and indifference of the jury and are constitutionally intolerable.

4. The Supreme Court has directed that a juror should be dismissed for cause if his or her views would prevent or substantially impair his or her ability to perform the duties of a juror in accordance with the instructions and under the oath. *Adams v.*

416

*Texas*, 448 U.S. 38, 45 (1980).  "[A]ctual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (internal quotation marks and citation omitted).  "Although bias can be revealed by a juror's express admission of that fact, . . . more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence." *Gonzalez*, 214 F.3d at 1111-12 (*quoting United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977)).

5.     Where actual bias is found, a new trial is required because the presence of a biased juror cannot be harmless.  *Id.*  Notably, a defendant is not required to use a peremptory challenge to strike a juror who should have been removed for cause in order to preserve the claim that the for-cause ruling impaired the defendant's right to a fair trial.  *United States v. Martinez-Salazar*, 528 U.S. 304, 314-15 (2000).

6.      "[A] juror who has formed an opinion cannot be impartial." *Irvin*, 366 U.S. at 722 (*quoting Reynolds v. United States*, 98 U.S. 145, 155 (1879).  The Sixth and Fourteenth Amendment requirements that a defendant be tried by a fair and impartial jury dictates that a capital jury be comprised of members who will not automatically vote for the death penalty, but will fairly and genuinely consider the mitigating evidence presented.  *Morgan*, 504 U.S. 719; *accord*, *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

7.     Further, a juror's premature formation of an opinion skews the burden of proof in violation of the defendant's federal constitutional rights to trial by jury and due process.  Const. amends VI, XIV; *Patton v. Yount*, 467 U.S. 1025, 1035 ("fixed opinion" prior to trial renders juror disqualified).

8.     Impanelment of jurors who are biased in favor of the death penalty violates the right to an impartial jury and to a jury aware of its undivided responsibility to determine the appropriateness of a death sentence.  *Caldwell v. Mississippi*, 472 U.S. 320, 329-33 (1985).  Jurors' strong inclinations towards handing down a death sentence

417

(15cv1224)

precludes the jury from giving a reasoned moral response to the mitigating evidence
presented at trial and creates the risk that death was imposed despite evidence which
might otherwise have been seen to call for a life sentence.  *See Penry v. Lynaugh*, 492
U.S. 302 (1989); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Witherspoon v. Illinois*, 391
U.S. 510 (1968).  Moreover, it also violates due process to give the prosecution an
unfair advantage over the defense.  *Cf. Wardius v. Oregon*, 412 U.S. 470 (1973) (due
process requires reciprocal discovery rights).

9.      In death penalty cases, the presence of biased juror also implicates the
Eighth Amendment.  The Eighth Amendment mandates that the death penalty be
imposed by a process that is reliable and free from arbitrariness.  *See Sawyer v. Smith*
497 U.S. 227, 235 (1990); *Sochor v. Florida*, 504 U.S. 527, 532-36 (1992); *Gregg v
Georgia*, 428 U.S. 153, 204 (1976).  This constitutional mandate is violated when a
penalty juror is not impartial prior to the sentencing hearing.  *Witherspoon v. Illinois*,
391 U.S. 510 (1968); *Davis v. Georgia*, 429 U.S. 122 (1976); *Wainwright v. Witt*, 469
U.S. 412 (1985); *Morgan v. Illinois*, 504 U.S. 719 (1992).

**B.      Relevant Facts**

10.      Juror S.B.[162] admitted on voir dire that she was predisposed to vote for
death where young children had been harmed.  To Juror S.B., infliction of "bodily harm
to a small child" was among the "worst" crimes imaginable.  (293 Pretrial 33735.)
Therefore, she candidly admitted that she "probably would find it hard to [deliberate]
open-mindedly, if [Lucas] had been found guilty."  (293 Pretrial 33748.)  She would
"need to be convinced in some way that he deserved a life sentence rather than death."
(293 Pretrial 33748-49.)  In other words, she would be "substantially leaning" in favor
of death.

---

[162]  To respect the jurors' privacy, only their initials will be used throughout this
brief.

418

11.     In light of her admitted bias the defense moved to dismiss Juror S.B. for cause.  (293 Pretrial 33754.)

12.     Defense counsel explained that "this juror has self-disclosed that she does not characterize herself as being open-minded," (293 Pretrial 33758), but in the final analysis, the trial court flatly rejected the defense contention that "substantial leaning in favor of death" is a basis for exclusion and denied the challenge.  (293 Pretrial 33761). Although the defense filed a motion for reconsideration of the rulings as to Juror S.B., (21 CT 4532-81, 4544-46), it was denied. (304 Pretrial 35541.)

**C.     Arbitrary Denial of a State Created Right Violates the Due Process Clause Of the Federal Constitution**

13.     In California, a capital trial is supposed to be neutral, with "no preference" for one penalty or the other.  *See, e.g., People v. Boyette*, 29 Cal. 4th 381, 417-18 (2002) (juror who would "have to be convinced" before returning a life sentence should have been excused).  Therefore, when the trial court refused to excuse a juror who was admittedly and substantially favoring death, she arbitrarily violated Lucas's state created rights in violation of the federal constitution.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**D.     The Error Was Structural and the Judgment Must Be Reversed**

14.     Structural errors are "defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards.  *Arizona v.* Fulmante, 499 U.S. 279, 309 (1991).  The presence of a biased juror is a structural error requiring reversal.  *Dyer v. Calderon*, 151 F.3d 970, 973, n.2. (9th Cir. 1998).  The death judgment should be reversed.

(15cv1224)

**CLAIM 27:  DURING VOIR DIRE, ONE JUROR MADE FALSE STATEMENTS AND TWO JURORS MISREPRESENTED THEIR ABILITY TO BE OPEN MINDED (SHP V.A., V.C.)**

**A.    Introduction**

1.    Lucas's constitutional rights were violated because during voir dire, at least one juror made false statements and concealed material information, and at least two jurors misrepresented their ability to be "open minded" and to reserve judgment as to penalty until after considering the penalty phase evidence.

**B.    Relevant Law**

2.    Under the Sixth and Fourteenth Amendments, a criminal defendant has a right to be tried by an impartial jury and to confront the witnesses who testify against him. *Irvin v. Dowd*, 366 U.S. 717 (1961); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  Jurors must maintain an open mind during the deliberation process.  In reaching their decision, jurors must be guided by the legal criteria set forth in the trial court's instruction, and may not rely upon or urge others to rely upon factors outside those criteria.

3.    Even before being sworn to sit in judgment in a particular case, potential jurors must respond honestly and openly to questions posed in jury selection voir dire and questionnaires so that disqualifying bias may be identified and the parties may intelligently exercise peremptory challenges.  It is misconduct to violate these basic rules.  *See Sparf v. United States*, 156 U.S. 51, 72 (1895) (holding that it is "the right of the court to instruct the jury on the law, and the duty of the jury to obey the instructions" (internal quotation marks omitted)); *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992) (recognizing "the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence"); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors, of course, take an oath to follow the law as charged, and they are expected to follow it.").

(15cv1224)

4.      The importance of a truthful voir dire examination in assuring a constitutionally unbiased jury is well established.  In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Court explained that voir dire examination protects the right to an impartial trier of fact by exposing possible bases of the potential jurors.  As such, "[t]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious."  *Id*. at 554.

**C.   Juror Misconduct During Voir Dire Violated Lucas's Rights**

   **1.   Lying on Voir Dire**

5.      Juror D.O. made false statements during jury selection.  In questions # 76-78 Juror D.O. stated under oath that he did "not drink" alcohol because his father was an alcoholic.  (Dkt. 36-8 at 58, 2008 State Pet., Ex. 6, Juror D.O. Questionnaire, ("Dkt. 36-8"))  Juror D.O. also stated that he had never been arrested or charged with a crime.  (*Id.* at 56.)

6.      However, the following evidence indicates that Juror D.O. was not truthful in his answers to these questions:  (a) On October 10, 1983 Juror D.O. was convicted of violating Vehicle Code § 23103 (Reckless Driving 9/1/83) and given three years probation (Dkt. 36-8 at 69, 2008 State Pet., Ex. 7, Juror D.O. 1983 Reckless Driving); (b) During Petitioner's trial Juror D.O. had alcohol on his breath (Dkt. 36-8 at 29, 2008 State Pet., Ex. 3, Juror A.R. Decl.); and (c) On December 19, 1991, approximately 17 months after Juror D.O.'s discharge from the jury, he was arrested for Driving Under the Influence of Alcohol.  (Vehicle Code § 23152(a)) (Dkt. 36-8 at 73, 2008 State Pet., Ex. 8, Juror D.O. 12/19/91 Wet Reckless), suggesting an ongoing problem with alcohol usage.  He pled guilty to a "wet reckless" per Vehicle Code § 23103/23103.5 and was given three years probation and fined $800.  (*Id*.)[4]

---

[4]  On May 28, 1992 a complaint was filed against Juror D.O. for driving with a suspended license (VC 14601.2(a)) and altering a driver's license. (VC 14610(a)(1).) On July 28, 1992 Juror D.O. failed to appear in response to this complaint and a $5,000

(15cv1224)

7.     Juror D.O. also stated on voir dire that he would conscientiously consider the evidence and "discuss it with the other jurors" before deciding. (286 Pretrial 32431-32; 32441-42.)  This statement was false as demonstrated by the declarations obtained by habeas counsel (*see below*), the foreman's statement that Juror D.O. had not "conscientiously deliberated" (71 Pretrial 13521-22), and the judge's determination–after questioning Juror D.O. in person–that he had not conscientiously deliberated. (*See* Claim 29.)

8.     On voir dire, the judge explained to Juror D.O. that the case involved multiple counts of murder including two of child victims.  (286 Pretrial 32429.)  Nevertheless, Juror D.O. indicated that he would not automatically vote for death and could consider life without parole as a sentencing option.  (286 Pretrial 32445.)  He also said that how to vote on penalty would be a "hard decision." (286 Pretrial 32448-49.)  These answers concealed the fact that Juror D.O. actually believed that the killing of a child warranted the death penalty and that he was not prepared to even consider a sentence of life without parole for Petitioner.  (Dkt. 36-30 at 231, 2008 State Pet. Ex. 21, Chris Reynolds Report.)

9.     Juror D.O. both concealed information and gave false answers during voir dire.  Concealment or false answers by a juror during voir dire, whether inadvertent or intentional, interferes with the right of a criminal defendant to conduct voir dire for the purpose of discovering bias or impartiality, and constitutes serious misconduct.  Dishonesty by a prospective juror during voir dire supports an inference of bias.  *Dyer v. Calderon*, 151 F.3d 970, 981-983 (9th Cir. 1998); *see also McDonough*, 464 U.S. at 556 (Blackmun, J. concurring) ("in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial").

---

bench warrant was issued.  (Dkt. 36-8 at 77, 2008 State Pet., Ex. 9, Juror D.O. 5/92 Suspended License and Altering License.)

(15cv1224)

10.    Lucas was prejudiced by Juror D.O.'s false statements and concealment of critical material information.  Such deliberate misleading indicates that Juror D.O. was not impartial during his participating in this case and the guilt verdict should be vacated.

### 2.    Misrepresentation of Ability to Remain Open Minded

11.    During voir dire Juror A.R.–after being informed that the allegations involved the murder of four women and two three-year-old children who "died by having their throats cut"– stated that she would be open minded at the penalty trial and would not be biased in favor of death. (286 Pretrial 32307-10.)  In particular the juror conveyed the impression that after convicting Lucas of all these offenses, she would not necessarily be of a mind that death would be automatic.  (*See* 286 Pretrial 32322-23.)

12.    However, contrary to her stated position on voir dire, Juror A.R. did, in fact, make up her mind to vote for death before the penalty phase even started: "I had made my mind up that Lucas should be executed when the jury decided to convict him of the murders.  I went into the penalty trial with this opinion already formed in my mind and nothing I heard during the evidence, argument or deliberations at the penalty trial swayed me."  (Dkt. 36-30 at 53, 2008 State Pet., Ex. 27, Juror A.R. Decl.)

13.    During voir dire of Juror S.B. the judge first explained that "the charges in this case involve throat slashings of young women and two preschool age children." (293 Pretrial 33717.)  Juror S.B., responded that she could keep an open mind at the penalty phase even if she voted to convict Lucas of such crimes. (293 Pretrial 33719.)

14.    The judge then questioned the juror regarding her views as follows:

> Judge: ". . . [I]f you were to convict someone of having committed multiple murders involving throat slashings of young women and children, you could reserve your judgement on the penalty until you had heard the additional background evidence, both the good and the bad, and then discuss all of those factors, including the circumstances of the

(15cv1224)

crimes, with the other jurors and then decide what is the appropriate penalty in the case?

A.  I could reserve judgment." (293 Pretrial 33720.)

15.    Under further questioning by defense counsel, Juror S.B. stated that she "probably would find it hard to [deliberate] open-mindedly, if [Lucas] had been found guilty." (293 Pretrial 33749.)  She would "need to be convinced in some way that he deserved a life sentence rather than death." (293 Pretrial 33736.)  However, she added: "But I would listen, I really would. That's all I can say. It's truthful." (293 Pretrial-33737.)

16.    The judge denied the defense motion to excuse Juror S.B. for cause because she effectively stated that even though she would be leaning in favor of death she had not "heard the mitigating factors yet.  So, depending on what [she] hear[d] in mitigation, [she] might change [her] mind." (293 Pretrial 33757.)

17.    Juror S.B. was seated as a juror and she voted for the guilt phase convictions and for the death verdict.  (65 RT 12304-18; 72 RT 13633.)

18.    However, contrary to her representations on voir dire, she was not just leaning in favor of death–by the end of the guilt trial she had already made a fixed, unshakable decision to vote for death and "[n]o evidence at the penalty trial could have changed [her] mind about that." (Dkt. 36-30 at 36, 2008 State Pet., Ex. 24, Juror S.B. Decl.)

19.    As demonstrated above, Jurors A.R. and S.B. failed to disclose the true extent of their views about the death penalty and their inability to keep open minds and reserve judge until the conclusion of the penalty trial.  Thus they did not have "that quality of indifference which, along with impartiality, is the hallmark of an unbiased juror." *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998).  These jurors effectively reached their sentencing determinations before the penalty trial began.  As a result, the death verdict was unfair, unreliable and in violation of the Lucas's constitutional rights.

(15cv1224)

20.     The death verdict also violated settled California law, which mandates that neither side should bear the burden of proof at the penalty phase of a capital trial, and allowing the verdict to stand would thus also violate Lucas's due process liberty interest under the Fourteenth Amendment not to be subjected to capital punishment except in accordance with the state statutory sentencing scheme. *Hicks v. Oklahoma*, 447 U.S. 343 (1980).  Under California law, "in the determination of penalty, unlike the determination of guilt, there is no burden of proof." *People v. Hayes*, 52 Cal. 3d 577, 643 (1990).

21.     Because Jurors A.R. and S.B. had already decided that Lucas should be executed before the penalty phase started, Lucas was improperly saddled with the heavy burden of changing the fixed opinion of these two jurors.  The guilt verdict and death sentence should be vacated.

**CLAIM 28:  LUCAS IS ENTITLED TO A NEW TRIAL BECAUSE THE JURORS CONSIDERED EVIDENCE NOT PRODUCED AT TRIAL (SHP V.A.)**

1.     Lucas's trial was contaminated by prejudicial juror misconduct.  Jurors considered information not presented at trial.  For example, Juror D.O. told the other jurors that he had family connections to the victim of the 1973 rape prior and provided them with information about the victim that was not introduced at trial.  The introduction of this extraneous information violated Lucas's rights to a trial by jury, to confront witnesses, to due process, and to a reliable penalty determination.  U.S. Const. V, VI, VIII, XIV Amends.

2.     Under the Sixth and Fourteenth Amendments, a criminal defendant has a right to be tried by an impartial jury and to confront the witnesses who testify against him. *Irvin v. Dowd*, 366 U.S. 717 (1961).  Moreover, under *Turner v. Louisiana*, a defendant has a right to be convicted only upon evidence produced at trial.  379 U.S. 466, 472-73 (1965).  That is, "in the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full protection

425

of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.*; *see also Parker v. Gladden*, 385 U.S. 363, (1966) (reversing conviction where jurors received extrajudicial evidence via the court's bailiff, who told jurors the defendant was a "wicked fellow" and that he was guilty); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("jurors have a duty to consider only the evidence which is presented to them in open court," citing *Turner*).

3. Extraneous influences on a jury can, under certain circumstances, require reversal. *Tong Xiong v. Felker*, 681 F.3d 1067 (9th Cir. 2012). Upon a finding that a juror has received extraneous evidence, a rebuttable presumption of prejudice attaches. *Id.* citing *Remmer v. United States*, 347 U.S. 227, 228–29 (1954). That is, the "burden rests heavily upon the Government" to establish that the extraneous influence was harmless to the defendant." *Remmer*, 347 U.S. at 229.

4. On Monday July 24, 1989, Juror C.D. sent the judge a note stating that Juror L.G. had, inter alia, "told us some information about the rape victim that I believe did not come from the trial." (108 CT 24257.)

5. The judge separately questioned the foreman about these allegations. The foreman indicated that it had been Juror D.O. who provided information about the rape victim. (71 RT 13524-26.) Juror D.O. did not on his own inform the judge that he had out-of-court information about the rape victim.

6. When questioned by the court–shortly before his discharge–Juror D.O. denied having any "particular information" outside of trial about the victim of the 1973 rape. (71 RT 13528-29.) He stated that he only knew that "she was a maid for my girlfriend's grandparents and that was it." (71 RT 13529.)

7. According to Juror L.G., Juror D.O. said that "he was absolutely sure through . . . family connections . . . that [the rape] definitely did happen. . . ." (71 RT 13567.) Also, according to Juror L.G., Juror D.O. stated that the victim had received cuts to her hand and her neck. (71 RT 13568.) After hearing from Juror L.G. the trial court stated: "I think that this definitely, without any question, shows that [Juror D.O.]

426

was not discharging his duties and was operating falsely in the jury room. . . ." (71 RT 13570.)  Most of the other jurors remembered Juror D.O. talking about his connection with the rape victim but didn't remember him saying anything else.  (71 RT 13578-13617.)  However, one juror remembered Juror D.O. stating that the victim was an illegal alien.  (71 RT 13606.)  The allegation that the victim was an illegal alien was never made during trial.  (71 RT 13562.)

8.     Juror C.D. stated that Juror L.G. mentioned the following when discussing the 1973 rape: "Well, you know, she was an illegal alien and you know how when they look at you, you guys. . . you all look alike."  Juror C.D. asked Juror L.G. "where he got that she was an illegal alien" and he said "he was given it . . . during the penalty phase."  (71 RT 13562.)  Because she did not remember evidence about the victim being an illegal alien or a maid, Juror C.D. sent a note to the judge regarding the matter.  (Dkt. 30-30 at 29, 2008 State Pet., Ex. 23 Juror C.D. Note.)  When questioned by the judge on this matter Juror L.G. said that he received the information about the rape victim from Juror D.O.

9.     The trial court should have found that the introduction of this extraneous information was misconduct that rendered Lucas's trial fundamentally unfair by improperly influencing the outcome of the jurors' decision.  The introduction of information about the prior crime violated Lucas's right under *Turner* to have the evidence used against him come from the witness stand.

10.     The extraneous information also violated *Turner*'s holding that all evidence must be produced in open court where the protections of confrontation and cross-examination apply.  Lucas had no opportunity to challenge or cross-examination the prosecution on the validity of information which may have created a sense of closeness or sympathy to the alleged victim of the rape.

11.     Lucas was prejudiced by the introduction of intimate information regarding the alleged victim of the 1973 rape.  Lucas's prior conviction for the rape was the sole piece of aggravating evidence introduced by the prosecution in its penalty-

427

(15cv1224)

phase case in chief.  The fact of the rape conviction was introduced by stipulation with no testimony given regarding the circumstances of the rape.  But for Juror D.O.'s improper statements, the jury would not have heard details about the victim's injuries or personal life.  The extraneous information provided an opportunity for the jurors to speculate as to what happened and to draw unfair influences against Lucas based on information not produced in open court.  This Court should find that Lucas was prejudiced by the jurors' misconduct and grant Lucas relief.

**CLAIM 29:  JUROR D.O., WHO VOTED FOR THE GUILT VERDICTS, DID NOT "CONSCIENTIOUSLY CONSIDER THE EVIDENCE" AND OPERATED "FALSELY IN THE JURY ROOM" AS FOUND BY THE TRIAL COURT AT PENALTY (SHP V.A., V.B.)**

**A.    Introduction**

1.      In addition to introducing extraneous information about the alleged victim of the 1973 rape prior (*see* Claim 28), and lying on voir dire (*see* Claim 27), Juror D.O. committed misconduct by refusing to deliberate.  Although the trial court dismissed Juror D.O. before the penalty-phase verdict, based on its finding that Juror D.O. did not "conscientiously consider the evidence" and operated "falsely in the jury room", Juror D.O. participated in the guilt-phase deliberations despite his similar failure to deliberate in that phase.  Juror D.O.'s participation in the guilt-phase violated Lucas's constitutional rights to due process, to a fair and impartial jury, to a fair trial, and to accurate and reliable guilt and penalty determinations were violated.  U.S. Const. V, amend. VI, VIII, XIV.

**B.    Relevant Law**

2.      Under the Sixth and Fourteenth Amendments, a criminal defendant has a right to be tried by an impartial jury and to confront the witnesses who testify against him.  *Irvin v. Dowd*, 366 U.S. 717 (1961); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  Jurors must maintain an open mind during the deliberation process and may not at any point prior to the reaching of a verdict simply refuse to participate in

deliberations.  *See Sparf v. United States*, 156 U.S. 51, 72 (1895) (holding that it is "the right of the court to instruct the jury on the law, and the duty of the jury to obey the instructions") (internal quotation marks omitted).  The fairness of the trial is compromised by a juror's premature discussion, deliberation and/or formation of opinions about the case before the jury has heard all of the evidence, arguments of counsel and jury instructions.  *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 552 (1984).

3.     The Constitution's intolerance for jury bias is absolute.  "Even if 'only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury.'"  *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (citation omitted.)

## C.     Relevant Facts

4.     On Friday, July 21, 1989, during penalty deliberations, the jury foreman sent a note explaining that Juror D.O. had threatened not to show up for at least two days and that his absence that day, therefore felt purposeful.  (Dkt. 36-8 at 21, 2008 State Pet., Ex. 1, Foreman's Notes Re Juror D.O. ("Dkt. 36-8 at 21").)  Shortly thereafter, the foreman sent out another note stating that throughout deliberations, Juror D.O. had been reading his books and not participating in deliberations.  (*Id.*; 108 CT 24256; 71 RT 13489.)

5.     The trial judge held a hearing, at which the foreman stated that Juror D.O. did not appear to be conscientiously considering the views of others and conscientiously sharing his views with others.  (71 RT 13518-24.)  Although the judge did not allow defense counsel to specifically ask about the guilt deliberations, the foreman stated that Juror D.O.'s attitude has been pretty consistent throughout the deliberations.  (*Id.*; Dkt. 36-8 at 21; 108 CT 24256) ("Juror D.O. has throughout our deliberations been reading his book.").  The foreman also stated that on both Wednesday and Thursday Juror D.O. had threatened to "not come back tomorrow" and

429

(15cv1224)

when he failed to appear on Friday the jurors got "a little emotional and angry."  (71 RT 13520.)

      6.    The judge and counsel questioned Juror D.O. who responded that he was "joking" when he threatened to boycott the deliberations and stated that on Friday when he called in sick he really did have a temperature of 103 degrees.  (71 RT 13535-36.) He admitted that during deliberations he had been reading a book, but maintained that he was still able to conscientiously consider the views of others and share his own views at all time.  (71 RT 135337.)

      7.    The judge's immediate reaction to Juror D.O.'s statements was: "I don't believe him . . . Something is just not jibing here, and if we're adding it all together, I think we have a real problem."  (71 RT 13538.)  The judge concluded that Juror D.O. was lying about being sick on Friday and about "conscientiously deliberating" with the other jurors.  (71 RT 13538.)

      8.    The prosecutor agreed with the judge's conclusion.  (71 RT 13540-41; 71 RT 13542).  The defense did not object and submitted the matter "on the court's statements."  (71 RT 13452.)  The judge ruled that other jurors need not be questioned about Juror D.O.'s participation in the deliberations because he had "perpetrated a fraud on the court" by boycotting the deliberations on Friday and lying about being sick.  (71 RT 13544.)  The judge made a formal finding that Juror D.O. was not "legitimately absent on Friday" and failed to "discharge[] his duties as required by law."  (71 RT 13553.)  When making her finding, Judge Hammes also noted "based on this record and what I have seen, that [Juror D.O.] has not properly deliberated."  (71 RT 13553.) Juror D.O. was dismissed and given a "very strong order" not to talk about the case. (71 RT 13553-55.)  He was replaced with an alternate juror.  (71 RT 13618.)

**D.    Juror D.O.'s Guilt-Phase Participation Rendered the Trial Unfair**

      9.    Although the trial court's dismissal of Juror D.O. during the penalty-phase deliberations was proper, his misconduct and failure to deliberate permeated the guilt-phase as well, rendering the verdict unfair.  The guilt verdict should be vacated.

(15cv1224)

10.     Juror D.O. not only failed to participate in deliberations but he improperly prejudged Lucas's guilt before deliberations began, compromising the fairness of the trial. *McDonough Power Equip.*, 464 U.S. at 552.

11.     Juror D.O. engaged in a pattern of willful misconduct at both the guilt and penalty phases which exhibited blatant disregard for his duty to impartially and conscientiously fulfill his duties as a juror.  Also inherent in the judge's conclusions was a further underlying finding that Juror D.O. lied to the court and counsel about these matters.

12.     Juror D.O.'s dishonesty and willful disobedience of the judge's instructions throughout the trial show that he was biased and, therefore, the guilt verdicts for which he voted should be vacated.  Any taint in the impartiality of the jury denies the defendant's constitutional right to a fair trial which introduces a structural defect not subject to harmless error analysis, and the defect can only be remedied by vacating the verdict.

13.     Juror D.O.'s dishonesty and failure to conscientiously discharge his duties as a juror undermined the reliability of the guilt verdicts in which he joined and denied Petitioner his right to due process and a fair trial.  *See Green v. White*, 232 F.3d 671, 677 (9th Cir. 2000) ("If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror–to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions–with equal scorn.").  Stated more directly, "[A] perjured juror is unfit to serve even in the absence of . . . vindictive bias." *Green v. White*, 232 F.3d 671, 677 (9th Cir. 2000).

14.     Although courts "generally presume that jurors follow their instructions" *Penry v. Johnson*, 532 U.S. 782, 800 (2001), this assumption is plainly not operative for jurors such as Juror D.O. who demonstrated a propensity to willfully disobey the court's instructions and failed to conscientiously discharge his duty as a juror.  In light

431

(15cv1224)

of the above, Juror D.O.'s participation in the trial rendered it fundamentally unreliable and in violation of the federal constitution.

15. Further, even if trial counsel was obligated to preserve a challenge to Juror D.O.'s fitness to have served at the guilt phase, any alleged waiver or forfeiture of the claim by defense counsel prejudicially violated Lucas's right to effective representation under the Sixth and Fourteenth Amendments of the constitution. To the extent that failure to raise the claim forfeited Lucas's right to relief on habeas corpus, trial counsel's omission was a prejudicial breach of their professional duty to Lucas.

**CLAIM 30: THE TRIAL COURT VIOLATED LUCAS'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY IMPROPERLY INSTRUCTING THE JURY ON THE CROSS-ADMISSIBILITY OF EVIDENCE (AOB 2.3.4.1, 2.3.4.2, 2.3.4.3, 2.3.4.4, 2.3.4.5, 2.3.4.6, 3.8.4.1, 3.8.4.2, 3.8.4.3, 3.8.4.4, 3.8.4.5, 3.8.4.6, 4.7.4.1, 4.7.4.2, 4.7.4.3, 4.7.4.4, 4.7.4.5, 4.7.4.6, 5.2.5.1, 5.2.5.2, 5.2.5.3, 5.2.5.4, 5.2.5.5, 5.2.5.6; SHP VI.M)**

1. Lucas's conviction and death sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court's instructions failed to properly address issues of cross-admissibility of evidence among the various charged crimes. The instructions placed undue emphasis on other-crimes evidence, constituted an improper judicial comment on the evidence, impaired Lucas's Constitutional right to present a defense, *Crane v. Kentucky*, 476 U.S. 683, 687 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972); present witnesses as a part of that defense, *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 294, 302 (1973), and violated Lucas's Sixth and Fourteenth Amendment rights to due process and a fair and impartial trial by jury. These instructions also unfairly favored the prosecution, in violation of the Fourteenth Amendment's guarantees of due process and equal protection. *Wardius v. Oregon*, 412 U.S. 470, 475 (1973); *Lindsay v. Normet*, 405 U.S. 56, 77 (1972); *Green v. Georgia*, 442 U.S. 95, 97 (1979); *Webb*, 409

U.S. at 97-98; *Washington v. Texas*, 388 U.S. 14, 14 (1967); *Chambers*, 410 U.S. at 284.  They also violated the Eighth and Fourteenth Amendments' requirement of reliability and heightened reliability of capital guilt and penalty verdicts.  *Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *Kyles v. Whitley*, 514 U.S. 419, 422 (1995); *Burger v. Kemp*, 483 U.S. 776, 785 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

2.     The errors and instructions that violated these various constitutional guarantees are listed below.  Lucas makes the below arguments as to the Jacobs, Santiago, Swanke, and Strang/Fisher cases.

**A.     The Other Crimes Evidence Was Emphasized To the Exclusion Of Other Evidence, In Violation of Lucas's Sixth and Fourteenth Amendment Rights**

3.     Over a defense objection (309 Pretrial 36653-704), the only discussion of specific evidence in the preliminary instructions was in an instruction concerning other crimes evidence.  (1 RT 13-14.)  This selective mention of other crimes evidence, which was already extremely prejudicial, increased the prejudice still further and unconstitutionally skewed the jury's consideration of the evidence.  And the trial court's failure to instruct on the effect of a reasonable doubt as between any of the included offenses—when it did so as between the two highest offenses, and as between the lowest offense and justifiable homicide—erroneously implied that the rule requiring a finding of guilt of the lesser offense applied only as between first and second degree murder.  Including this instruction in the preliminary instructions also constituted an improper judicial comment on the evidence.

**B.     The Other Crimes Instruction Erroneously Failed To Require the Jurors To Determine That Lucas Committed the Other Offense Before Cross-Considering It**

4.     Before trial, the prosecution successfully moved to consolidate and "cross-admit" all seven charges against Lucas, on the theory that they were so similar that

433

(15cv1224)

Lucas's commission of any charge, if proven, would be evidence that he committed the others.  (248 Pretrial 25512-13; 24 CT 5211-12.)  A major issue in Lucas's trial was therefore how the jury could utilize evidence concerning one charge to convict Lucas on another charge.  Yet, over defense objection, the trial court erroneously failed to instruct the jury that it must find that Lucas actually committed the other crime before considering such crime as identity evidence as to another charge or charges.

5.      The defense objected to the preliminary cross-consideration instruction on this basis, among others.  (309 Pretrial 36653-706.)  The trial court overruled the objection (309 Pretrial 36699) and instructed the jury that "when you consider any one murder count, the evidence on other murder counts, if believed, may not be considered by you to prove that Mr. Lucas is a person of bad character or that he has a disposition to commit crimes, but you may consider evidence on the other counts to determine whether a characteristic method exists in the commission of other offenses that is similar to the method used in the commission of the offense under consideration."  (1 RT 14.)

6.      Later, during discussion of the final instructions, the defense renewed its objection that the "other offenses" instructions should require the jury to find that Lucas committed the other charge before the charge could be considered as evidence on any other charge.  (60 RT 11490-94; 66 CT 14651.)[163]  Defense counsel argued that the prosecution "could literally convict somebody on bits and pieces of evidence from each crime."  (60 RT 11516.)  The court rejected the objection, and did not instruct the jury on a threshold finding requirement.  (60 RT 11512-18.)[164]

---

[163]   Although the defense contended that the standard should be beyond a reasonable doubt, counsel made it clear that the standard to be used was a separate issue from the fundamental question of whether the jury must make a threshold finding that the accused committed the other charge before using that charge to convict on other charges.  (60 RT 11508-11509; *see also* 60 RT 11512-13.)

[164]   The instructions given stated that the jury was permitted "if you so choose" to "use evidence from other counts, together with any count under consideration," for

434

7.     The court's refusal to instruct the jury on a threshold finding requirement in Lucas's case improperly allowed the jurors to rely on other charges to convict even if they had nothing more than a suspicion that Lucas committed those charges.  (60 RT 11516-18.)[165]  This error violated the federal constitutional principle that an accused may not be convicted of a crime based on mere suspicion.  *In re Winship*, 397 U.S. 358, 364 (1970).

8.     Moreover, the jury's improper consideration of inherently prejudicial other crimes evidence violated Lucas's federal constitutional due process rights under the Fourteenth Amendment by undermining his right to a fair and reliable adjudication of his guilt or innocence.  *Dawson v. Delaware*, 503 U.S. 159 (1992); *McKinney v. Rees*, 993 F.2d 1378, 1380-85 (9th Cir. 1993), s*uperceded by statute on other grounds as stated in Torres v. Barnes*, 2014 WL 4652400 (N.D. Cal., Sept. 18, 2014); *cf. People v. Carpenter,* 15 Cal. 4th 312, 381-82 (1997), abrogated in part on other grounds, *People v. Diaz*, 60 Cal. 4th 1176, 1189 (2015) (California law requires a threshold finding by the jury that the accused committed an alleged offense before that offense may be used as proof of the accused's guilt in another case.)

9.     The error also violated Lucas's Sixth Amendment right to trial by jury, which requires that the jury decide all relevant issues of fact and weigh the credibility of witnesses.  *United States v. Gaudin*, 515 U.S. 506, 511 (1995); *United States v. Scheffer,* 523 U.S. 303, 313 (1998); *Davis v. Alaska*, 415 U.S. 308, 318 (1974);

---

limited purposes including showing the identity of the perpetrator, a characteristic method, plan, or scheme, intent, or common motive.  (64 CT 14307-09.)

[165]  The error was not cured by the circumstantial evidence instruction which instructed the jury that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt." (64 CT 14283; CALJIC 2.01)  As the judge herself recognized (60 RT 11504-06, 60 RT 11516-18), and as the prosecutor argued (64 RT 12135), the jury would only have been required to find the other crime beyond a reasonable doubt under CALJIC 2.01 if the jury determined the other crime to be an "essential" fact or inference.  Moreover, the jury could also have reasonably concluded that no single other charge was "essential" because there were multiple other charges from which to choose.

*Bollenbach v. United States*, 326 U.S. 607, 614 (1946).  It also violated Lucas's Eighth and Fourteenth Amendment right to reliability and heightened reliability in the determination of guilt and death eligibility, *Beck*, 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *Burger*, 483 U.S. at 785; *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *Donnelly*, 416 U.S. at 646, and his due process right against arbitrary deprivation of state-created rights.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**C.**  **The Instructions Impermissibly Allowed the Jury To Cross-Consider The Charges On the Issue Of Identity Without Making the Prerequisite Finding That The Other Offenses Shared Signature-Like Similarities**

10.   The other crimes jury instructions erroneously allowed the jury to consider the other crimes evidence on the issue of identity even if the other crimes were not sufficiently distinctive to reflect the signature of a single perpetrator.  Instead, the jurors were instructed on a lesser foundational standard.

11.   In ruling that all the charged offenses were sufficiently similar to permit their cross-admissibility on the issue of identity, the trial judge purported to make the requisite foundational finding that the crimes all shared signature-like similarities. (248 Pretrial 25504-13; 24 CT 5211-12.)[166]  But the judge failed to instruct the jurors, in either the preliminary or final instructions, that they must find the offenses to share sufficiently distinct characteristics to reflect the signature of a single perpetrator as a prerequisite to cross-considering the offenses on the issue of identity.  Both sets of instructions simply defined the jurors' inquiry regarding the other crimes in terms of finding a "characteristic method, plan or scheme. . . ."  (64 CT 14307.)

---

[166]  *But see* § Claim 43, *below*, incorporated herein, wherein Lucas argues that the Santiago and Swanke crimes were not admissible to prove identity in Jacobs, and accordingly the trial court erred in (1) permitting a joint trial on these incidents and (2) authorizing the jury to consider evidence connecting Lucas to the Santiago crimes as evidence connecting him to the Jacobs incident.

436

(15cv1224)

12.   The error violated Lucas's Sixth Amendment right to trial by jury, which requires that the "jury decide all relevant issues of fact and . . . weigh the credibility of witnesses." *United States v. Hayward*, 420 F.2d 142, 144 (D.C. Cir. 1969); *see also Gaudin*, 515 U.S. at 511; *Scheffer*, 523 U.S. at 313; *Davis*, 415 U.S. at 318; *Bollenbach*, 326 U.S. at 614.  It also violated Lucas's Eighth and Fourteenth Amendment right to reliability and heightened reliability in the determination of guilt and death eligibility, *Beck*, 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *Burger*, 483 U.S. at 785; *Gilmore*, 508 U.S. at 342; *Donnelly*, 416 U.S. at 646, and his due process right against arbitrary deprivation of state-created rights.  *Hicks*, 447 U.S. at 346;[167] *cf. People v. Alvarez,* 44 Cal.App.3d 375, 383 (1975) (Other crimes evidence may only be considered if the crimes shared signature-like similarities); Cal. Evid. Code § 403(c)(1); 60 RT 11502-03; 66 CT 14657.

## D.   The Other Crimes Instruction Unconstitutionally Failed To Present the Defense Side Of the Issue

15.   The court gave the jury a special instruction that permitted the jury to consider evidence relating to other charged crimes "for certain limited purposes" in determining Lucas's guilt of the particular crime under consideration.  For instance, the instructions told the jury it could consider other crimes evidence if it found a "characteristic plan or scheme" and a "clear connection" between the two offenses, and to decide whether the requisite "intent" or a "common motive" had been shown.  (64 CT 14307-09.)  This instruction unconstitutionally presented only the prosecution's side of the issue because it failed to tell the jury that if Lucas did *not* commit one of the

---

[167]   The trial court also violated Lucas's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a due process, a fair trial, a reliable guilt and penalty phase verdict, and to present a defense by refusing to consider the testimony of Professor Steven Penrod regarding jurors' ability to heed limiting instructions restricting its consideration of evidence regarding other crimes.  (234 Pretrial 24037, 235 Pretrial 24113, 235 Pretrial 24128; 24 CT 5176-78.)

other offenses the jury could consider that fact as evidence that he did *not* commit the crime under consideration.

16. These errors violated Lucas's Sixth and Fourteenth Amendment rights to due process and fair and impartial trial by jury, *Starr v. United States*, 153 U.S. 614, 625-26 (1894); *Gray v. Mississippi*, 481 U.S. 648, 668 (1987); *Cool v. United States*, 409 U.S. 100, 104 (1972), fair instructions not slanted towards either side, *Wardius*, 412 U.S. at 475; *Green*, 442 U.S. at 97, *Webb*, 409 U.S. at 97-98; *Chambers*, 410 U.S. at 294; to have jury fully understand, and fairly apply, the law, *Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991); *Gaudin*, 515 U.S. at 514, that there be heightened reliability in capital guilt and death eligibility determinations, *Beck,* 447 U.S. at 627-46; *Kyles,* 514 U.S. at 422; *Burger*, 483 U.S. at 785; *Gilmore,* 508 U.S. at 342, *Donnelly*, 416 U.S. at 646, and against arbitrary deprivation of state-created rights under the California Constitution and statutes.  *Hicks*, 447 U.S. at 346.

17. Trial counsel was also ineffective for failing to request a modification of the modus operandi jury instruction, to include the defense's theory that a reasonable doubt as to Petitioner's guilt of one charged crime could leave the jurors with a reasonable doubt as to any other charged offenses with a similar modus operandi. There is a reasonable probability that, absent counsel's omission, the outcome of the trial would have been different.

**E.  The Other Crimes Instruction Erroneously Failed To Require Juror Unanimity As To the Existence Of the Requisite Cross-Offense Similarity Needed As A Prerequisite To Consideration Of Other Crimes Evidence**

18. The other crimes evidence instruction required the jury to find as a foundational fact, before considering other crimes evidence, that the other crimes "show a characteristic method, plan or scheme, in the commission of criminal acts similar to any method, plan or scheme used in the commission of the offense in the count then under consideration."  (64 CT 14307.)  However, this instruction violated

Lucas's Sixth and Fourteenth Amendment rights to due process and a fair trial, because it erroneously failed to inform the jury that its preliminary finding must be agreed upon unanimously by all twelve jurors before the other crimes evidence could be considered. California law required jury unanimity—a requirement that presumably extended to essential preliminary facts, such as whether one offense should be considered to prove identity as to any other offense.

19. The error violated Lucas's Sixth Amendment right to trial by jury, which requires that the jury "decide all relevant issues of fact and weigh the credibility of witnesses. *United States v. Hayward*, 420 F.2d 142, 144 (D.C. Cir. 1969); *see also Gaudin*, 515 U.S. at 511; *Scheffer*, 523 U.S. at 313; *Davis*, 415 U.S. at 318; *Bollenbach*, 326 U.S. at 614. It also violated Lucas's Eighth and Fourteenth Amendment right to reliability and heightened reliability in the determination of guilt and death eligibility, *Beck*, 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *Burger*, 483 U.S. at 785; *Gilmore*, 508 U.S. at 342; *Donnelly*, 416 U.S. at 646, and his due process right against arbitrary deprivation of state-created rights. *Hicks*, 447 U.S. at 346.

**F.    The Standard For Determining Whether the Defendant Committed the Other Offenses Should Have Been Proof Beyond a Reasonable Doubt**

20. As explained in Subsection (B), above, the trial court's instructions improperly failed to require the jury to find that Lucas committed another offense before "cross-considering" that offense as evidence of Lucas's guilt of the offense under consideration. The jury was thus not required to make that determination under any standard. To the extent the jury did make preliminary determinations that Lucas committed particular offenses, however, it should have been required to make that finding beyond a reasonable doubt. *Winship*, 397 U.S. 363-64; *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). Where the jury was incorrectly instructed on an element of the crime, the verdict should be reversed unless the record establishes guilt beyond a reasonable doubt based on facts the jury necessarily found. *Pope v. Illinois*, 481 U.S. 497, 502-03 (1987).

**G.     The Court's Errors Were Prejudicial**

21.     Lucas's guilt of the Jacobs, Santiago, and Swanke murders was far from a foregone conclusion.  Significant evidence of third-party guilt was presented as to the Jacobs crimes, and significant doubt existed as to the reliability of the state's evidence in the Santiago and Swanke cases.  Since a substantial defense existed as to each crime, the trial court's failure to properly instruct on cross-consideration of evidence had a substantial and injurious effect at the guilt phase and at the penalty phase, where the error undermined the defense's lingering doubt theory.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  At the penalty phase, the jury deliberated for six and a half days, was deadlocked until the judge refused to permit it to stop deliberating, and asked for readback on critical penalty-phase issues and substantial portions of the penalty-phase evidence.  These factors demonstrate a closely-balanced case.  *Woodford v. Visciotti*, 537 U.S. 19 (2002) (closely balanced case shown by a full day of jury deliberations, and jury request for additional instructional guidance); *Karis v. Calderon*, 283 F.3d 1117, 1140 (9th Cir. 2002) (prejudice shown where the jury deliberated for three days even with weak mitigating evidence); *Sandoval v. Calderon*, 241 F.3d 765, 770 (9th Cir. 2000) (close case shown where deliberations extended for three and a half days.)

**CLAIM 31:  JURY INSTRUCTIONS:  EVIDENTIARY AND DELIBERATION (AOB 2.9.1, 2.9.3, 2.9.4, 2.9.5, 2.9.7, 2.9.8, 2.9.9, 2.9.11, 2.9.12, 2.9.13, 3.9.1, 3.9.3, 3.9.5, 3.9.8, 3.9.9, 4.8.1, 4.8.3, 4.8.5, 4.8.7, 4.8.9, 4.8.10, 5.2.7.1, 5.2.7.3, 5.2.7.5, 5.2.7.8, 5.2.7.9)**

1.     Petitioner's conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court gave instructions that were skewed in favor of the state and unclearly phrased.  These errors unconstitutionally diluted the prosecution's burden of proof, *Sullivan v. Louisiana*, 505 U.S. 275, 277 (1993), violated Lucas's Sixth and Fourteenth Amendment rights to due process and fair trial by jury, which require fair procedures, *Gray v. Mississippi*, 481 U.S. 648, 668 (1987); *Cool v. United States*, 409

440

U.S. 100, 103 n.4 (1972), a level playing field, *Wardius v. Oregon*, 412 U.S. 470, 475 (1973); *Green v. Georgia*, 442 U.S. 95, 97 (1979), *Webb v. Texas*, 409 U.S. 95, 97-98 (1972); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); that the jury fully understand, and fairly apply, the law, *Estelle v. McGuire*, 502 U.S. 62, 70-72; *United States v. Gaudin*, 515 U.S. 506, 514 (1995), that there be heightened reliability in capital guilt and death eligibility determinations, *Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *Kyles v. Whitley,* 514 U.S. 419, 422 (1995); *Burger v. Kemp,* 483 U.S. 776, 785 (1987); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993), and against arbitrary deprivation of state-created rights under the California Constitution and statutes.  *Hicks*, 447 U.S. 343, 346 (1980).  Lucas makes each of the argument below as to the Jacobs, Santiago, Swanke, and Strang/Fisher cases.

**A.      The Preliminary Guilt Phase Instructions Tilted the Field in Favor of the Prosecution**

2.      The preliminary instructions were skewed towards the state because they set forth the prosecution's theory but not the defense theory, failed to explain the presumption of innocence or the prosecution's burden to prove guilt beyond a reasonable doubt, and erroneously told the jury they must determine the ultimate question of "the guilt or innocence of the defendant."  (1 RT 11-16.)  The preliminary and final instructions told the jurors that the "essence" of their duty was to be "judges of facts" and determine "what the facts are."  (1 RT 11; 64 CT 14276, 14348.)  That was incorrect, because jurors' duty is not to determine the "truth" but to decide whether the prosecution has proved the defendant's guilt beyond a reasonable doubt.  *Mitchell v. United States*, 526 U.S. 314, 330 (1999); *In re Winship,* 397 U.S. 358, 364 (1970).  This erroneous description of jurors' duties was reinforced by the juror pamphlet, which told jurors that their function was to "find . . . what actually happened," and by the final instruction and admonition to reach a "just verdict."  Because of the primacy effect, the pro-prosecution preliminary instructions tilted the playing field and skewed the jury's deliberations in favor of the prosecution.  *See, e.g.*, Kassin, S.M., &

Wrightsman, L.S., *On the Requirements of Proof: The Timing of Judicial Instruction and Mock Juror Verdicts*, 37 Journal of Personality and Social Psychology 1877-1887 (1979).

## B. The Trial Court Unconstitutionally Refused to Give a Cautionary Accomplice Instruction as to Third-Party Suspect Massingale

3.      The trial court should have given a cautionary accomplice instruction, CALJIC 3.18, as to Massingale, and its failure to do so deprived Lucas of his Sixth and Fourteenth Amendment right to trial by jury by impairing the jury's assessment of the evidence.  CALJIC 3.18 would have instructed the jury that "[t]he testimony of an accomplice ought to be viewed with distrust," and examined with "care and caution and in the light of all the evidence in the case."  (CALJIC 3.18 (1988).)  California law defined an "accomplice" as "one who is liable to prosecution for the identical offense charged against the defendant on trial," Cal. Penal Code § 1111; *People v. Wallin,* 32 Cal.2d 803, 806 (1948), and—at the time of Lucas's trial—its definition applied whether or not two or more persons participated in the commission of a crime.  *People v. Gordon,* 10 Cal. 3d 460, 468 (1973), subsequently disapproved in *People v. Ward*, 36 Cal. 4th 186, 212 (2005).  Because the evidence raised a reasonable suspicion that Johnny Massingale committed the Jacobs murders, the accomplice instruction should have been given.

## C. The Trial Court Improperly Denied the Defense's Request For an "Immunity Agreement" Instruction

4.      The state gave witness Frank Clark immunity from any potential drug use prosecution, in exchange for his testimony against Lucas.  (21 RT 3800, 3916-17.)  The defense therefore requested a jury instruction providing that "[i]mmunity from prosecution and other favors or assistance provided a witness by law enforcement agents, including the prosecutors, may be considered in assessing the witness' believability," and that "[a]n immunity agreement may constitute a motive for bias."

(15cv1224)

1   (65 CT 14504; 59 RT 11313.)  The judge denied the request.  (60 RT 11402; 65 CT

2   14504.)

3        5.     By impairing the jurors' ability to fairly and reliably evaluate the

4   important testimony of Frank Clark, the error violated Lucas's Sixth and Fourteenth

5   Amendment rights to due process, trial by jury, confrontation and compulsory process.

6   It also violated Lucas's right to a reliable guilt and penalty verdict, to enhanced

7   reliability in a capital case, and against arbitrary denial of state-created rights.  *Hicks*,

8   447 U.S. at 346.

9        6.     The error was prejudicial, because Clark's lay opinion testimony that

10  Lucas authored the Love Insurance note was important prosecution evidence, and the

11  jury could have rejected Clark's testimony because it was based on his memory of

12  Lucas's printing from years before and because he had never actually seen Lucas print

13  the exact three words and telephone number appearing on the note.

14  **D.    The Judge's Consistent and Arbitrary Denial Of Requested Preliminary**

15        **Finding Instructions, Which Were Mandatory Under Evidence Code §**

16        **403(c), Violated Lucas's Due Process Rights**

17       7.     The trial court further violated Lucas's due process rights by denying the

18  defense's requests for preliminary fact instructions under Evidence Code section

19  403(c).  The requested instructions would have admonished the jurors to make certain

20  preliminary findings of fact before considering various crucial items of evidence.  The

21  requested instructions included:  (1) preliminary fact instructions regarding

22  consideration of other offenses under *People v. Albertson*, 23 Cal. 2d 550, 578-80

23  (1944), *See* Claim 30(B); relevant to all charges since all claims were ruled cross-

24  admissible; (2) an instruction that before the jury could consider any opinion based on a

25  comparative identification technique, it must find as a preliminary fact that the

26  proponent of the evidence has established a foundation that proves the items are

27  reasonably comparable (66 CT 14632); (3) an instruction to disregard expert opinion

28  testimony the jury found based on speculative or conjectural data, relevant to Jacobs

(handprinting, shoeprinting, and hair comparison evidence) and Swanke (blood comparison evidence) (66 CT 14631); (4) an instruction that the identity of specimens analyzed or viewed by an expert or lay witness is a critical preliminary fact to considering any opinion regarding the evidence, relevant to Jacobs (hair evidence) and Swanke (fingernail evidence); (5) an instruction that the adequacy of the relevant photographs was critical to considering the results of electrophoretic evidence (62 CT 13837; and (6) the authenticity of the Love Insurance Note was a preliminary fact to the jury's consideration of it.  (*See* Claim 1, *above.*)

8.     The judge's refusal to give these instructions violated California Evidence Code section 403, which required the judge to instruct the jury to make the required preliminary fact findings of authenticity before considering the evidence.  *People v. Epps*, 25 Cal. 4th 19, 27 (2001) (preliminary finding of authenticity by trial judge does not preclude jury from reaching a contrary conclusion).

9.     Refusal of the preliminary fact instructions under section 403 also violated the Due Process clause of the federal Fourteenth Amendment by arbitrarily denying Lucas's state-created right under that provision.  *Hicks*, 447 U.S. at 346.  It also violated Lucas's federal Sixth Amendment right to trial by jury, *Ring v. Arizona*, 536 U.S. 584, 602 (2002); *Beck*, 447 U.S. at 633-38; his Sixth and Fourteenth Amendment right to a fair trial, *Estelle*, 502 U.S. at 70-72; *Gaudin*, 515 U.S. at 514; *Bollenbach v. United States*, 326 U.S. 607, 614 (1946); *Davis v. Alaska*, 415 U.S. 308, 317-18 (1974), and his Eighth and Fourteenth Amendment requirement of heightened reliability in capital guilt and death eligibility determinations.  *Beck*, 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *Burger*, 483 U.S. at 785; *Gilmore*, 508 U.S. at 342.

**E.     The Trial Judge Improperly Rejected the Defense's Request To Define the Term "Inference" In the Jury Instructions**

10.     The trial court further skewed the jury instructions by refusing the defense's request to define the term "inference."  The defense's requested instruction would have defined "inference" as "a deduction of fact that may logically and

444

reasonably be drawn from another fact or group of facts established by the evidence," and stated that "[a]n inference must be based on a rational connection between the fact proved and the fact to be inferred." (65 CT 14493.)  "Inference" has a technical meaning because a criminal presumption is only constitutional if "it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact upon which it is made to depend." *Leary v. United States*, 395 U.S. 6, 36 (1969); *see also Ulster County v. Allen*, 442 U.S. 140, 165-67 (1979).  This definition was critical in the Jacobs case, where almost all the evidence was circumstantial.  For example, before finding the Love Insurance note to be relevant the jury had to infer that it was actually left by the killer, and that the killer was the person who wrote it—an inference that itself required the jury to compare the writing on the note to a sample written by Lucas.

11.   The absence of an instruction defining "inference" allowed the jury to draw arbitrary inferences, thus unconstitutionally diluting the prosecution's burden of proof, *Allen*, 442 U.S. at 166-67; *Winship*, 397 U.S. at 364, and violating Lucas's Sixth and Fourteenth Amendment rights to due process and fair trial by jury, *Gray*, 481 U.S. at 668; *Cool*, 409 U.S. at 103-04 n.4, a level playing field, *Wardius*, 412 U.S. at 475; *Green*, 442 U.S. at 97; *Webb*, 409 U.S. at 97-98; *Chambers*, 410 U.S. at 294; that the jury fully understand, and fairly apply, the law, *Estelle*, 502 U.S. at 70-72; *Gaudin*, 515 U.S. at 514, that there be heightened reliability in capital guilt and death eligibility determinations, *Beck,* 447 U.S. at 627-46; *Kyles,* 514 U.S. at 422; *Burger,* 483 U.S. at 785; *Gilmore,* 508 U.S. at 342, and against arbitrary deprivation of state-created rights under the California Constitution and statutes.  *Hicks*, 447 U.S. at 346.

**F.    The Instructions Improperly Allowed the Jury Not To Consider All the Evidence**

12.   Numerous jury instructions were given which used the permissive terms "should consider" or "may consider," thus improperly suggesting that the jury was not required to consider all the evidence.  (*See,e.g.*, 64 CT 14287, 14294-95, 14298-99,

445

(15cv1224)

14303, 14305-06, 14310-11.)[168]  These terms permitted the jury to not consider crucial portions of the evidence.  (64 CT 14295 (telling jury that it "may," as opposed to "must," consider evidence of prior inconsistent statements–i.e., Massingale's confessions–which went to the heart of the defense case); and 64 CT 14310 (telling jury that in determining whether characteristic method connects the crimes the jury "may," as opposed to "must," look to the distinctiveness of marks of similarity – which undermined the legitimacy of the jury's use of other crimes evidence and precluded a fair and reliable result).)

13.     These permissive instructions violated Lucas's Sixth and Fourteenth Amendment rights which require that the jury consider exculpatory evidence upon which the defendant relies.  *See e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (state's per se rule of evidence may not be used to exclude crucial defense evidence without a specific showing that it is unreliable); *Martin v. Ohio*, 480 U.S. 228, 233 (1987) (instruction that jury could not consider self-defense evidence in determining whether there was a reasonable doubt about the State's case would violate *Winship*, 397 U.S. at 364.)

## G.     The Judge Erroneously Denied The Defense Request To Specify Which Opinion Testimony Was Circumstantial Evidence

14.     Because the critical circumstantial evidence instructions expressly did not extend to direct evidence, it was critical for the jurors to understand to which evidence they applied.  This determination was particularly difficult with regard to opinion testimony, including by experts.  Yet, the trial judge refused a defense request to

---

[168]  The defense made a specific request to change "should" to "shall" or "must" in CALJIC 2.83.  (64 CT 14305; 58 RT 11163-64.)  In light of the judge's denial of this request, making similar requests as to other instructions would have been futile.  (*See Douglas v. Alabama,* 380 U.S. 415, 422 (1965) ("No legitimate state interest would have been served by requiring repetition of a patently futile objection, . . . in a situation in which repeated objection might well affront the court or prejudice the jury beyond repair"); *see also* 9 Witkin, *Cal. Procedure* (4th ed. 1997), Appeal, § 387 at pp. 437-38.)

446

instruct the jury that "[e]xpert opinion testimony and lay opinion testimony are a type of circumstantial evidence and not direct evidence," and that "the circumstantial evidence instructions shall be applied to" lay opinion testimony, as well as "any evidence offered by a criminalist, serologist, handwriting analyst, fingerprint analyst, shoe comparison analyst, tracking analyst, hair comparison analyst, or any other analyst."  (65 CT 14523.)  Indeed, comparative opinion testimony, such as that of the handwriting experts, is circumstantial evidence because it is based on inferences drawn from the observed circumstances.  *See People v. Gentry*, 257 Cal.App.2d 607, 611 (1968); *People v. Goldstein*, 139 Cal. App. 2d 146, 153-54 (1956).

15.    The trial court instructed the jury that "[e]vidence is either direct or circumstantial," that "[d]irect evidence is evidence that directly proves a fact, without the necessity of an inference[, and,] if found to be true, establishes that fact," whereas "[c]ircumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn."  (64 CT 14282.) The trial court defined "inference" as "a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. (*Id.*)

16.    Without the defense's proposed instruction, the jurors could well have interpreted the court's explanation to mean that opinion testimony about matters such as handwriting comparison and serology analysis was direct evidence that "directly prove[d]" the fact about which the testimony was given—for example, that the handwriting expert's opinion that Lucas wrote the Love Insurance note "directly prove[d]" that fact, or that expert Brian Wraxall's opinion that the blood under Ann Swanke's fingernails was consistent with Lucas directly proved that fact.

17.    The trial court's refusal to clarify for the jury that such evidence was circumstantial unconstitutionally lessened the prosecution's burden to prove guilt beyond a reasonable doubt, and violated Lucas's Sixth and Fourteenth Amendment rights to due process and a fair trial by jury.  *Winship*, 397 U.S. at 364; *Sullivan*, 508

U.S. at 277-78. It also violated Lucas's due process right against arbitrary deprivation of state-created rights, *Hicks*, 447 U.S. at 346, and Eighth and Fourteenth Amendment right to reliability and enhanced reliability at the guilt and penalty phases of a capital case. *Beck,* 447 U.S. at 627-46; *Kyles,* 514 U.S. at 422; *Burger,* 483 U.S. at 785; *Gilmore,* 508 U.S. at 342; *White v. Illinois*, 502 U.S. 346, 356-57 (1992).

**H.      The Judge Improperly Coerced The Jurors By Admonishing Them That They Were Expected To Reach A Just Verdict**

18.      The judge compounded the unfairness of the above rulings by admonishing them that they were expected to render a "just verdict," without ever instructing them that they were not actually required to reach a verdict at all. (64 CT 14276). The absence of any specific instruction on the matter failed to assure that the verdicts were uncoerced. Unless the jurors understand that they are not required to reach a verdict there is a danger of improper juror coercion. *Jiminez v. Meyers*, 40 F.3d 980-81 (9th Cir. 1993); *United States v. Mason,* 658 F.2d 1263, 1268 (9th Cir. 1981). The error was especially significant because the jury was deadlocked at the penalty trial and the judge erroneously failed to assure that the jurors would not surrender their individual consciences to reach a verdict. (*See* Claim 38.)

19.      The lack of explanation that no verdict had to be reached violated Lucas's Sixth and Fourteenth Amendment rights to due process and fair and impartial trial by jury, *Starr v. United States*, 153 U.S. 614, 626-27 (1894); *Gray*, 481 U.S. at 668; *Cool*, 409 U.S. at 103-04 & n.4, fair and unbiased instructions, *Wardius*, 412 U.S. at 475; *Green*, 442 U.S. at 97, *Webb*, 409 U.S. at 97-98; *Chambers*, 410 U.S. at 294-95; that the jury fully understand, and fairly apply, the law, *Estelle*, 502 U.S. at 70-72; *Gaudin*, 515 U.S. at 514, to heightened reliability in capital guilt and death eligibility determinations, *Beck*, 447 U.S. at 627-46; *Kyles,* 514 U.S. at 422; *Burger,* 483 U.S. at 785; *Gilmore,* 508 U.S. at 342, and against arbitrary deprivation of state-created rights under the California Constitution and statutes. *Hicks,* 447 U.S. at 346.

**I.      The Final Instructions were Cumulatively Deficient**

**1.      The Trial Court's Instructions Improperly Framed the Issues In Terms Of Finding Guilt or Innocence**

20.      Several preliminary and final instructions improperly framed the jury's task as determining "guilt or innocence."  This language undermined the prosecution's burden to prove guilt beyond a reasonable doubt.  *See Sullivan,* 508 U.S. at 277-81; *see also Winship*, 397 U.S. at 363-64.  Indeed, the CALJIC committee recognized this problem in 1990, when they revised CALJIC 1.00 to replace the term "innocent" with "not guilty."  (*See* 1990 Revision of CALJIC 17.47, deleting "guilt or innocence," CALJIC 16.835, lines 10-11.)

**2.      The Instruction Regarding "Willfully False" Testimony Improperly Failed To Define "Material**

21.      CALJIC 2.21.2, given by the trial court, told the jury it could disbelieve the testimony of "[a] witness, who is willfully false in one material part of his or her testimony."  But it failed to define the term "material part," or inform the jury that a "material part" must relate to a fact that could be "determinative of the case."  *Cf.* Cal. Penal Code § 118; *People v. Pierce*, 66 Cal.2d 53, 61 (1967) (defining the test for materiality as "whether the statement could probably have influenced the outcome of the proceedings. . . ."); *Black's Law Dictionary* (5th Ed. 1979) at 881; definition of "material evidence.")  This omission violated Lucas's right to due process and a fair trial right to have jurors understand and fairly apply the law, *Estelle,* 502 U.S. at 70-72; *Gaudin*, 515 U.S. at 514; and right against arbitrary deprivation of state-created rights. *Hicks*, 447 U.S. at 346.

### 3. The Trial Court's Instructions Improperly Lessened the Prosecution's Burden Through CALJIC 2.21.2's "Probability Of Truth" Language and CALJIC 2.22.'s "Convincing Force" Language

22.    CALJIC 2.21.2, given by the trial court, told the jury that it "may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, *you believe the probability of truth favors his or her testimony in other particulars*.  (64 CT 14297 (emphasis added).  As applied to prosecution witnesses' testimony, the "probability of truth" language suggested a burden less than beyond a reasonable doubt.  *See People v. Rivers*, 20 Cal. App. 4th 1040, 1046 (1993) (acknowledging problems with CALJIC 2.21.2's "probability of truth" language).  This error was exacerbated by CALJIC 2.22, which told jurors that the final test of which witnesses to believe was "which appeals to your mind with more *convincing force*": language suggesting a preponderance of the evidence standard rather than proof beyond a reasonable doubt.  (64 CT 14300) (emphasis added).

### 4. The Trial Court Improperly Limited Instructions Regarding Witness Credibility to Witnesses who Testified Under Oath

23.    Important evidence at Lucas's trial came from out-of-court statements, both by witnesses who testified and by other people who did not testify.[169]  However, the  instruction on witness credibility (CALJIC 2.20) was expressly limited to "testimony" of a "witness."  The failure to include out-of-court statements in that instruction improperly allowed the jury to consider crucial portions of the evidence without first assessing "anything that has a tendency in reason to prove or disprove the

---

[169]    Among the out -of-court statements admitted into evidence were the following:  Shannon Lucas (People's Trial Exhibit 212 and  213A); Santiago (40 RT 7635-36 (identification of Lucas); 40 RT 7636 (identification of Lucas's car) 57 RT 10950-51 (identification of Lucas' house); Massingale (Def. Trial Exhibits 517A, 518 and 518A) and Jimmy Joe Nelson (Def. Trial Exhibits 659 and 659A).

(15cv1224)

truthfulness of the [statement] . . . ."  (64 CT 14292.)  It also suggested to the jury that one class of evidence should generally be treated differently than the other.  The instructions thus violated the Sixth and Fourteenth Amendments' requirements of a fair trial, due process, and unbiased jury instructions.  *Starr*, 153 U.S. at 626-28; *Wardius*, 412 U.S. at 475; *Webb,* 409 U.S. at 97-98; *Quercia v. United States*, 289 U.S. 466, 470 (1933).  It also undermined the reliability of the guilt and penalty verdicts, in violation of the Eighth and Fourteenth Amendments, *Beck*, 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *White*, 502 U.S. at 356-57, and violated Lucas's due process right against arbitrary denial of state-created rights.  *Hicks*, 447 U.S. at 346.

### 5.    Numerous Instructions Were Improperly Limited To The Testimony Of "Witnesses"

24.    Numerous instructions were improperly limited to the testimony of "witnesses."  (64 CT 14296-97, 14299-14301.)  The limitation of these instructions to "testimony" made them applicable to only some, but not all, of the evidence, and effectively told the jury that one class of evidence should be treated differently from the other.  This instruction was unbalanced and one-sided, thus violating Lucas's Sixth and Fourteenth Amendment right to due process and a fair trial.  *Cool*, 409 U.S. at 103-04 n. 4; *Starr*, 153 U.S. at 626-27; *Quercia*, 289 U.S. at 470; *Wardius*, 412 U.S. at 475.  It also undermined the reliability of the guilt and penalty verdicts, in violation of the Eighth and Fourteenth Amendments, *Beck*, 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *White*, 502 U.S. at 356-57, and violated Lucas's due process right against arbitrary denial of state-created rights.  *Hicks*, 447 U.S. at 346.

### 6.    The Instructions Improperly Failed To Instruct the Jurors How to Consider Transcripts Read Into the Record

25.    During trial, transcripts from other proceedings were read into the record.  (65 CT 14499.)  The defense made, but the trial court refused, a request to instruct the jury that those transcripts should be given the same weight as the in-court testimony of other witnesses.  (65 CT 14499.)  This omission makes it likely that the jury gave the

451

(15cv1224)

transcripts less weight, thus violating Lucas's right to have the jury fully and fairly consider the evidence. *Estelle*, 502 U.S. at 70-72; *see also Gaudin*, 515 U.S. at 514. It also violated Lucas's Eighth and Fourteenth Amendment right to reliable guilt and penalty verdicts. *Beck*, 447 U.S. at 627-46; *see also Kyles*, 514 U.S. at 422; *White*, 502 U.S. at 363-64.

**J.      The Instructions Were Not Sufficiently Understandable to Satisfy the Eighth and Fourteenth Amendment Reliability Requirements of the Federal Constitution**

26.      "[I]t is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." *Gregg v. Georgia*, 428 U.S. 153, 193 (1976) (opn. of Stewart, Powell, and Stevens, JJ.); *see also Carter v. Kentucky*, 450 U.S. 288, 302 (1981); *Bollenbach*, 326 U.S. at 612. "Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law." *Carter*, 450 U.S. at 302. "Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depend[s] on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria." *Bollenbach*, 326 U.S. at 612.

27.      Three independent, respected bodies—the United States Supreme Court, the California Judicial Council's Blue Ribbon Committee and CALJIC—have each questioned the understandability of the instructions given at Lucas's trial. In 1994, the United States Supreme Court criticized CALJIC 2.90 as "archaic" and "indefensible," though ultimately rejecting the due process challenge to CALJIC 2.90 after concluding that the instructions "taken as a whole . . . correctly conve[y] the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 22-23 (1994) (internal quotations omitted). In response to *Victor*, the California Supreme Court concluded that CALJIC 2.90 should be modified by deleting the "moral certainty" standard, leaving only the "abiding conviction" language as the measure of reasonable doubt. *People v. Freeman*, 8 Cal. 4th 450, 504 (1994). CALJIC implemented the Freeman revision of 2.90 in

452

1994, and the California legislature amended PC 1096 to comply with *Freeman* effective June 30, 1995.

28.     But even despite these changes, in 1996 California's Blue Ribbon Commission of Jury System Improvement issued a report describing California's jury instructions as "not readily understandable by the average juror," and recommending that they be "redrafted in more understandable language."  Blue Ribbon Commission on Jury System Improvement (May 6, 1996), Chapter V, at 94-95 available at http://courts.ca.gov/documents, Blue Ribbon Full Report.pdf (last visited Nov. 21, 2016).  Empirical studies confirm that conclusion.  *See, e.g.*, Haney, Santag and Costanzo, "*Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*" 50 Journal of Social Sciences No. 2 (149 Summer 1994) (showing substantial numbers of jurors misunderstood concepts of mitigation, and aggravating and mitigating evidence, and life without parole); J. Frank and B.K. Applegate, *Assessing Juror Understanding of Capital Sentencing Instructions*, 44 Crime and Delinquency No. 3 (1998) (showing limited juror understanding of sentencing instructions); Richard Weiner, *The Role of DeclarativeProcedural Knowledge in Capital Murder Sentencing*, 28 Journal of Applied Psychology, No. 2 124 (1998); Marla Sandys, *Cross-Overs–Capital Jurors Who Change Their Minds About the Punishment: A Litmus Test for Sentencing Guidelines*, 70 Indiana Law Journal 1183, 1220-1221 (1995); *see also Simmons v. South Carolina*, 512 U.S. 154, 169 (1994) (most jurors lack adequate information about the meaning of "life imprisonment" as defined by state law).

29.     The jury instructions' lack of clarity violated Lucas's Sixth and Fourteenth Amendment rights to due process and a fair trial, which require that the jury understand, and fairly apply, the law.  *Estelle*, 502 U.S. at 70-72; *Gaudin*, 515 U.S. at 506 (it is "the jury's constitutional responsibility . . . not merely to determine the facts, but to apply the law to those facts . . .").  It also violated Lucas's Eighth and Fourteenth Amendment right to reliable guilt and penalty phase verdicts.  *Woodson*, 428 U.S. 380,

453

(15cv1224)

305 (1976); *Beck,* 447 U.S. at 627-46; *Lankford v. Idaho*, 500 U.S. 110, 125-26 (1991); *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988); *Mills v. Maryland*, 486 U.S. 367, 376-77 (1988); *Caldwell v. Mississippi*, 472 U.S. 320, 329-330 (1985); *California v. Ramos*, 463 U.S. 992, 998-999 n. 9 (1983).

## K.   The Errors were Prejudicial

30.    The giving of an instruction which dilutes the standard of proof for conviction is reversible error per se, as it deprives the defendant of his or her right to be convicted only upon a jury's finding of guilt beyond a reasonable doubt as correctly defined.  *Sullivan,* 508 U.S. at 280-81.  The errors above effectively diluted the state's burden of proof, and should therefore be deemed structural.  Even assuming the errors are not reversible per se, the trial court's erroneous instructions warrant reversal because, both individually and cumulatively, they had a substantial and injurious effect on the guilt and penalty phase verdicts.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

**CLAIM 32:  THE TRIAL COURT VIOLATED LUCAS'S RIGHT TO A FAIR TRIAL BY COMMITTING NUMEROUS ERRORS IN INSTRUCTING THE JURY ON THE BURDEN OF PROOF AS TO EACH OF THE CHARGED MURDERS (AOB 2.10.1, 2.10.2, 2.10.3, 2.10.4, 2.10.5, 2.10.6, 2.10.7, 2.10.8, 2.10.9, 3.10, 4.9, 5.2.8)**

1.    Lucas's conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court's instructions misstated and diluted the applicable burden of proof, and/or improperly shifted the burden of proof to Lucas in violation of his rights to due process and fair trial by jury.  *In re Winship*, 397 U.S. 358, 364 (1970); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993); *Neder v. United States*, 527 U.S. 1, 8 (1999); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *Cage v. Louisiana*, 498 U.S. 39, 41 (1990).  These errors also violated the Eighth and Fourteenth Amendments' prohibition on cruel and unusual punishment, general requirement of verdict reliability,

*White v. Illinois*, 502 U.S. 346, 363-64 (1992); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974), and requirement of heightened reliability in the determination of guilt and death eligibility before a sentence of death may be imposed.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *Kyles v. Whitley*, 514 U.S. 419, 422 (1995); *Burger v. Kemp*, 483 U.S. 776, 785 (1987); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).  The instructions also violated Lucas's right to Due Process by depriving him of his state-created right to proper instructions on the burden of proof, under the California Constitution and Evidence Code sections 500-502.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).  Petitioner makes each of the argument below as to the Jacobs, Santiago, Swanke, and Strang/Fisher cases.

**A.     The Jury Instructions Unconstitutionally Lightened the Prosecution's Burden Of Proof and Deprived Lucas Of a Fair Trial**

2.     The trial court's unconstitutional errors regarding the burden of proof, which violated the authorities listed in the preceding two paragraphs, are listed below.

**B.     The Trial Court's Instructions Failed Adequately to Define or Explain the Burden of Proof**

3.     The trial court's instructions failed adequately to explain or define the prosecution's burden of proof, both as to the Jacobs, Santiago, and Swanke cases and the Strang/Fisher case.  The basic burden of proof instruction (64 CT 14285; 65 RT 12189), and other instructions given, used the words "burden" and "burden of proof" without defining or explaining those terms.  Absent explanation, it would not have been clear to reasonable jurors that "proof beyond a reasonable doubt" is a substantially higher standard than "clear and convincing evidence."

**C.     The Trial Court's Instructions Failed To Affirmatively Instruct That the Defense Had No Obligation To Present Or Refute**

4.     CALJIC 2.90, given at trial, omitted one of the most fundamental underpinnings of the presumption of innocence: that the accused need not present any evidence for the jury to have a reasonable doubt.  This omission, in light of all the other

455

(15cv1224)

instructions, erroneously suggested that the *defense's* evidence must raise a reasonable doubt. Though the instruction stated that a criminal defendant "is presumed to be innocent until the contrary is proved," it failed to expressly explain the "presumption of innocence." Nor did the instructions explain that Lucas's presentation of evidence did not alter the burden; that the jury could not utilize its disbelief of the defense's evidence (*i.e.* Massingale's confession) to conclude that the prosecution's burden was met; that a conflict in the evidence or lack of evidence could leave them with a reasonable doubt as to guilt; or that the presumption of innocence continues through the entire trial, including deliberations.

**D.** **The Trial Court's Instructions Improperly Described the Prosecution's Burden as Continuing "Until" the Contrary is Proved**

5. CALJIC 2.90 also improperly stated in pertinent part that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved." (64 CT 14285.) Use of the word "until" unfairly and erroneously implies that proof of guilt will be forthcoming, contrary to *Winship*'s holding that "[d]ue process commands that no man shall lose his liberty *unless* the Government has borne the burden of . . . convincing the factfinder of his guilt." *Winship*, 397 U.S. at 364 (emphasis added). *Winship* was also violated by the court's failure sua sponte to define "burden" for the jury.

**E.** **The Trial Court Failed to Instruct That the Prosecution's Burden Applies To Every Essential Element Of the Charge**

6. Neither CALJIC 2.90 nor the specific CALJIC instructions which define the elements of the charged offenses contained an "application paragraph" which expressly informed the jury exactly what must be proved before Lucas could be convicted. The absence of such an "application paragraph" was reversible error, and rendered Lucas's trial fundamentally unfair.

456

**F.     The Trial Court's Instructions Improperly Suggested that the Defendant Must Produce Evidence In Order To Raise A Reasonable Doubt**

7.     Not only did the jury instructions fail to state that the defense had no obligation to present or refute evidence, but several other instructions inappropriately suggested that the defense *did* have the burden of producing sufficient evidence to raise a reasonable doubt.

• The trial court improperly implied that the jury should weigh the evidence presented by both sides, by telling the jury its duties were "determin[ing] the facts" and "reach[ing] a just verdict. . . ."

• CALJIC 2.11, given by the trial court, implied that the defense had an obligation to present evidence by saying "[n]either side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events, or to produce all objects or documents mentioned or suggested by the evidence."  (64 CT 14281; CALJIC 2.11)(emphasis added).

• CALJIC 2.01, ¶ 2, regarding circumstantial evidence, failed to explain how the defense evidence should be considered in light of the prosecution's burden.  (64 CT 14283-85.)

• CALJIC 2.60 told the jury only that no inference of guilt could be drawn from the defendant's failure to *testify*, not the defendant's failure to present evidence.  (64 CT 14289; CALJIC 2.60.)

• CALJIC 2.61 told the jurors the defendant could "rely on the state of the evidence," in "deciding whether or not *to testify*," thus negatively implying that the instruction did not apply to the defendant's failure to present evidence.  (64 CT 14290; CALJIC 2.61(emphasis added).)

• CALJIC 2.21.2 admonished the jury to evaluate a witness's testimony in terms of whether "the probability of truth favors his or her testimony . . . "

457

(15cv1224)

1  suggesting that the defendant was obligated to produce evidence to show a reasonable

2  doubt.  (64 CT 14297.)

3       •    CALJIC 2.27 told the jury that, "before finding any fact required to

4  be established by *the prosecution* to be proved solely by the testimony of such a single

5  witness, you should carefully review all the testimony upon which the proof of such

6  fact depends."  (64 CT 14301 (emphasis added).)  The reference to "any fact required

7  to be established by the prosecution . . . " suggested by implication that some facts were

8  required to be proven by the defense.

9  **G.  The Burden of Proof Instructions Failed to Adequately Define the**

10        **Standard of Proof**

11       8.    The defense argued that the standard instruction on the presumption of

12  innocence and proof beyond a reasonable doubt (CALJIC 2.90 (5th ed. 1988)) "does

13  not focus sufficiently on the standard the prosecutor must meet, but rather focuses just

14  on the concept of reasonable doubt."  (59 RT 11343.)  Hence, the defense requested an

15  instruction defining "clear and convincing evidence" and "proof beyond a reasonable

16  doubt."  (65 CT 14568-69.)  The trial judge denied the request and gave the jury an

17  instruction that simply defined "reasonable doubt" as "not a mere possible doubt;

18  because everything relating to human affairs, and depending on moral evidence, is open

19  to some possible or imaginary doubt.  It is the state of the case which, after the entire

20  comparison and consideration of all the evidence, leaves the minds of the jurors in that

21  condition that they cannot say they feel an abiding conviction, to a moral certainty, of

22  the truth of the charge."  (64 CT 14285.)  This standard instruction did not make clear

23  to reasonable jurors[170] that proof beyond a reasonable doubt is a substantially higher

24  standard than the clear and convincing evidence standard.  *See, e.g.*, *Gaines v. Kelly*,

25

26  _____

27      [170]  Jury instructions should be reviewed in light of how they would be
understood by a reasonable juror.  *See Estelle v. McGuire*, 502 U.S. 62, 72 & n.4
28  (1991).

(15cv1224)

202 F.3d 598, 609-10 (2nd Cir. 2000) (references to "moral certainty," and other phrases, in reasonable doubt instruction, violated due process by suggesting that the decision whether to convict or acquit should be based on "abstract moral considerations" instead of the evidence alone); *Perez v. Irwin*, 963 F.2d 499, 502 (2nd Cir. 1992) (defining reasonable doubt as "doubt to a moral certainty" violated due process by diluting the government's burden of proof).

**H.     The Trial Court Improperly Refused the Defense's Request for Comparison of Proof Beyond a Reasonable Doubt with Other Burdens**

9.     As explained, it would not have been clear to reasonable jurors that proof beyond a reasonable doubt is a substantially higher standard than the clear and convincing evidence standard.  The trial court therefore acted unconstitutionally and erroneously by refusing the defense's request to provide a better explanation of the applicable standard by providing a comparison of the beyond a reasonable doubt and clear and convincing burdens.

**I.     The Trial Court's Instructions Unconstitutionally Implied That Reasonable Doubt Requires Jurors to Articulate Reason and Logic for Their Doubt**

10.     The jury was instructed with CALJIC 2.90's standard instruction on the presumption of innocence.  (64 CT 14285.)  That instruction improperly implied that jurors had to articulate logic and reasons for having a reasonable doubt of Lucas's guilt, because it told the jury that a reasonable doubt is more than "mere possible or imaginary doubt."

**J.     The Trial Court's Instructions Unconstitutionally Distinguished Possible from Reasonable Doubt**

11.     The judge gave CALJIC 2.90's standard definition of reasonable doubt, which states, *inter alia*, that "[i]t is not a mere possible doubt."  (64 CT 14285; CALJIC 2.90 (5th ed. 1988).)  This language failed to constitutionally limit the scope of possible doubt, however, because a possible doubt *is* reasonable if it is sufficient to cause a juror

459

to reasonably rely on it in making important decisions.  *See e.g., Victor v. Nebraska,* 511 U.S. 1, 20-21 (1994); *see also Wilson v. United States,* 232 U.S. 563, 570 (1914); *Holland v. United States*, 348 U.S. 121, 140 (1954).  The definition given by the trial court unconstitutionally allowed the jurors to reject a doubt as unreasonable even if they would reasonably have relied on a similar degree of doubt in their own important affairs.  It also unconstitutionally implied that Lucas bore some burden of proof to raise a probable doubt as to his guilt, *Winship*, 397 U.S. at 364, and violated the Eighth and Fourteenth Amendments' requirement of heightened reliability in the determination of guilt and death eligibility in capital cases.  *See Beck*, 447 U.S. at 627-46.

**K.     The Trial Court Improperly Instructed Jurors to Take Moral Considerations into Account in Deciding Guilt**

12.     The version of CALJIC 2.90 given by the trial court stated that "reasonable doubt" does not include "possible doubt," because "everything . . . *depending upon moral evidence* is open to some possible or imaginary doubt."  (64 CT 14285 (emphasis added).)  The instruction further stated that a "reasonable doubt" exists when jurors are convinced of the defendant's guilt, "*to a moral certainty*."  (64 CT 14285) (emphasis added).  Due Process encompasses the right to be convicted only upon proof beyond a reasonable doubt based on the evidence, rather than "moral certainty"—a phrase that unconstitutionally places the burden on the defendant and lightens the burden of the prosecution.  *See, e.g.*, *Perez*, 963 F.2d at 502.  CALJIC 2.90 also violates due process by allowing juries to inject considerations of morality into their deliberations and to find a defendant guilty based upon their moral outrage rather than a dispassionate consideration of the evidence.  *See Victor*, 511 U.S. at 21-23 (rejecting the argument that CALJIC 2.90's references to morality render it unconstitutional, but disapproving such references).

(15cv1224)

**L.     The Trial Court's Instructions Improperly Lightened the Prosecution's Burden Of Proof, and Created a Conclusive Presumption Of Guilt, Through Circumstantial Evidence Instructions (CALJIC 2.01 and 2.02)**

13.     At the end of the guilt phase, the jury was instructed with CALJIC numbers 2.01 and 2.02, which defined the sufficiency of circumstantial evidence. CALJIC 2.01 required the jury to decide between Lucas's "guilt" and "innocence" CALJIC 2.01, by saying that "if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence." CALJIC 2.02 posits a similar contradiction between the presence or absence "of the specific intent or mental state." The instructions' dichotomy between "guilt" and "innocence" shifted the burden of proof away from the prosecution, violating Lucas's Sixth, Eighth, and Fourteenth Amendment rights to due process and trial by jury. *Winship*, 397 U.S. at 358, 364. The instructions also required that the jury adopt an interpretation of the evidence that was incriminatory if it appeared "reasonable," thus unconstitutionally lowering the state's burden of proof below beyond a reasonable doubt, *Cage*, 498 U.S. at 40-41, and creating an unconstitutional conclusive presumption of guilt if the evidence merely appeared reasonable." *Carella v. California*, 491 U.S. 263, 265 (1989); *Sandstrom v. Montana*, 442 U.S. 510, 514 (1979). These principles apply particularly strongly in this case, where the prosecution's evidence of almost all the crucial elements, including identity and mental state, was largely circumstantial.

**M.     The Trial Court's Instructions Improperly Limited CALJIC 2.01's Burden of Proof Principles to Circumstantial Evidence**

14.     The trial court further undermined the presumption of innocence, and violated Lucas's Sixth and Fourteenth Amendment rights to due process and a fair trial by jury, by refusing the defense's request to substitute standard circumstantial evidence instructions (CALJIC 2.01 and 2.02), which told the jury that "if indirect evidence is

461

susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt," with an instruction applying this principle to *direct* evidence as well.  (65 CT 14496; *see also* 59 RT 11308-08; 60 RT 11398-400) (emphasis added).  Limitation of the CALJIC 2.01 principle is especially prejudicial because it implied to the jury by omission that those principles *do not* apply to direct evidence.  As much of the evidence against Lucas in this case was direct—such as Massingale's confession to the Jacobs crimes and Santiago's identification of Lucas and his residence—the trial court's refusal to extend the "two interpretations" rule to direct evidence erroneously permitted Lucas to be convicted upon direct evidence despite the existence of a reasonable interpretation of that evidence pointing to his innocence.

**N.     The Trial Court's Errors Were Structural Error**

15.     The giving of an instruction which dilutes the standard of proof for conviction is reversible error per se, as it deprives the defendant of his or her right to be convicted only upon a jury's finding of guilt beyond a reasonable doubt as correctly defined.  *Sullivan*, 508 U.S. at 280-81.  This Court should therefore grant relief.

**CLAIM 33:  THE COURT UNCONSTITUTIONALLY REFUSED TO GIVE A CALJIC 2.03 CONSCIOUSNESS OF GUILT INSTRUCTION AS TO MASSINGALE (AOB 2.8.2)**

1.     The trial court improperly refused to instruct the jury, under CALJIC 2.03, to consider Massingale's false statements as consciousness of his guilt of the Jacobs murders.  The trial court held CALJIC inapplicable to third-party suspects, (60 RT 11407), but denial of the instruction violated Lucas's due process "entitle[ment] to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988); *see also United States v. Zuniga*, 6 F.3d 569, 570-71 (9th Cir. 1993) ("A defendant is entitled to an instruction concerning his [or her] theory of the case if it is supported by

462

law and has *some foundation in the evidence*.") (internal citation omitted). It also unfairly prevented Lucas from making an argument the prosecution would almost certainly have made itself had it been prosecuting Massingale.  *See, e.g.*, *Wardius v. Oregon*, 412 U.S. 470, 474 & n.6 (1973) (criticizing "state trial rules which provide nonreciprocal benefits to the State when the lack of reciprocity interferes with the defendant's ability to secure a fair trial"); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (exclusion of testimony proffered by the defendant violated due process where, "[p]erhaps most important," the state used the evidence to prosecute another person for the same crime); *Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (judge's threatening remarks towards witness for the defense violated due process); *Washington v. Texas*, 388 U.S. 14, 23 (1967) (exclusion of accomplice's exculpatory testimony violated defendant's right to compulsory process); *Chambers*, 410 U.S. at 301-02 (due process violated by court's exclusion of critical exculpatory evidence, combined with the state's refusal to allow the defendant to cross-examine a key prosecution witness.)

**CLAIM 34:  THE TRIAL COURT'S INSTRUCTIONS IMPROPERLY SHIFTED THE BURDEN TO LUCAS ON THIRD PARTY GUILT (AOB 2.8.3, 4.8.12, AND 5.2.3.1)**

1.     The defense raised the theory of third-party guilt in the Jacobs case (based on Johnny Massingale's confession[171]) and in the Strang/Fisher case (based on the illicit activities of Strang's husband and Strang's expressed fears that she would be killed due to her husband's participation in the drug world[172]).  The defense also raised

---

[171]   *See* 41 RT 7813-37 (Testimony of John Smith); 41 RT 7850-79209, 7918-22 (Testimony of Jimmy Nelson); 42 RT 7995-8016, 8029-44, 8057-74, 8077-96, 8104-8117 (Testimony of William Green); 45 RT 8465-81, 8483-8516, 8520-23 (Testimony of Denny Pace), 45 RT 8559-67, 8576-97 (Testimony of David Ayers).

[172]   The third party suspect in the Strang case was Robert Strang, Rhonda's husband, and/or the drug dealers with whom he was involved.  (49 RT 9169-75 (John McPeek); 49 RT 9191-98 (Ronnie Christensen); 50 RT 9483-89 (Arthur Garcia); 50 RT 9506-17 (Linda Fletcher); 53 RT 10026-29; 10042-46 (Ronald Adler); 54 RT 10089-96 (Paul Fortin); 54 RT 10219-30; 10447-64 (Margaret Shelton) 56 RT 10633-44 (Richard LaFollette).)

a third-party guilt defense as to the Swanke murder, where third-party guilt was suggested by the location and collection of foreign pubic hairs that were inconsistent with the hair of Swanke, her boyfriend, and Lucas.  (28 RT 5154; 56 RT 10720-32.) Yet the trial court refused most of the defense's proffered third-party culpability instructions, and told the jury only that if defense evidence presented "for the purpose of showing" third-party guilt raised a reasonable doubt about Lucas's guilt it "must give the defendant the benefit of that doubt."  (64 CT 14313; 59 RT 11309-310; 60 RT 11407, 11416-19, 11421.)  This instruction's use of the word "show" and its requirement that Lucas "raise a reasonable doubt" improperly shifted the burden of proof to Lucas, and failed to tell the jury that it need not determine the guilt of the third party to find Lucas innocent.

2.     The failure to properly instruct on the prosecution's burden to prove every essential element of the charge beyond a reasonable doubt violated Lucas's Sixth and Fourteenth rights to due process and fair trial by jury.  *In re Winship*, 397 U.S. 358, 364 (1970); *Neder v. United States*, 527 U.S. 1, 8-9 (1999); *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979).  It also violated the Sixth and Fourteenth Amendments' guarantees of due process and a fair trial by jury, *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993), compulsory process and right to present witnesses and a defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 294, 302 (1973).

3.     The error also violated the Eighth and Fourteenth Amendments' guarantees of due process and against cruel and unusual punishment, which require heightened reliability in the determination of guilt and death eligibility in capital cases. *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995); *Burger v. Kemp,* 483 U.S. 776, 785 (1987); *Gilmore v. Taylor*, 508

U.S. 333, 342 (1993).  It also violated Petitioner's freedom against arbitrary deprivation of state-created rights.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**CLAIM 35:  LUCAS'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BY NUMEROUS INSTRUCTIONAL ERRORS (AOB 6.6.1, 6.6.2, 7.6.1, 7.6.2, 7.6.3, 7.6.4, 7.6.5, 7.6.6. 7.6.7, 7.6.8, 7.6.9, 7.7.4; SHP VI, II)**

1.      Lucas's penalty phase jury was given erroneous and improper instructions that violated his Fifth, Sixth, Eighth, and Fourteenth rights to due process, freedom from cruel and unusual punishment, and a fair trial.  The instructions permitted the jury to rely on inflammatory and prejudicial matter, in violation of *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Dawson v. Delaware*, 503 U.S. 159, 166-68 (1992); *Chambers v. Florida*, 309 U.S. 227, 236-37 (1940).  *See also Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968-69 (6th Cir. 1983).  They also violated the Fourteenth Amendment's requirement of verdict reliability, *White v. Illinois*, 502 U.S. 346, 363-64 (1992); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974), and the Eighth and Fourteenth Amendments' requirement of heightened reliability in the sentencing determination before a sentence of death may be imposed. *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995); *Burger v. Kemp*, 483 U.S. 776, 785 (1987); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).  The errors also arbitrarily denied Lucas his state created rights under the California Constitution (Art I., sections 1, 7, 15, 16 and 17) and statutory law, thus violating his Fourteenth Amendment right to due process.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**A.      The Jury Was Unconstitutionally Permitted To Rely On Lucas's Guilt Phase Conviction In Determining Whether Lucas's Guilt Of the 1973 Rape Had Been Proven Beyond a Reasonable Doubt**

2.      Lucas's jury was unconstitutionally permitted to rely on his guilt phase conviction in determining whether the state had proven Lucas's guilt of a prior 1973 rape conviction beyond a reasonable doubt, as required to satisfy factor (b) of

California's aggravating evidence statute, Penal Code § 190.3.[173]  Although Lucas stipulated to the fact of the prior conviction (26 CT 5576), the jury was still required to find beyond a reasonable doubt that Lucas actually committed the rape before it could consider it under factor (b).  *People v. Robertson*, 33 Cal. 3d 21, 53, 60 (1982); *People v. Jennings*, 53 Cal. 3d 334, 389, n.14 (1991).  Lucas disputed his guilt of the rape by presenting alibi testimony by Curt Andrewson (67 RT 12603-05), as well as testimony by Lucas's trial attorney, G. Anthony Gilham, that Gilham believed Lucas did not commit it.  (67 RT 12704-05.)

3.     Although the jurors were instructed on the elements of rape and the requirement that it be proven beyond a reasonable doubt, (65 CT 14381-85), the penalty phase instructions did not preclude consideration of the guilt phase convictions in deciding Lucas's guilt of the rape.  The guilt phase instructions, which were also applicable at the penalty-phase (64 CT 14307-10), authorized the jurors to utilize "other counts' evidence" to determine the identity of the perpetrator of the crime under consideration.[174]

4.     "A jury that already has concluded unanimously that the defendant is a first-degree murderer cannot plausibly be expected to evaluate charges of other criminal conduct without bias and prejudice."  *Williams v. Lynaugh*, 484 U.S. 935, 938 (1987) (Marshall and Brennan, JJ., dissenting from denial of certiorari).  Thus, absent some basis for cross-admissibility of the guilt and factor (b) crimes under Evidence Code Section 1101(b)—which was not presented in this case[175]—the trial court should

---

[173]   The prosecution offered the 1973 rape conviction under both factor (b) (prior violent criminal activity] and factor (c) (prior felony conviction) of Penal Code section 190.3.

[174]   Reasonable jurors would have concluded under the instructions given at the guilt phase were applicable to penalty except to the extent that they conflicted with the penalty instructions.  (71 RT 13486; 64 CT 14357, ¶ 4; 13486.)

[175]   Indeed, nothing was offered as to the prior rape except the facts of the convictions, thus there was no evidentiary basis for allowing cross-admissibility under Section 1101(b).

(15cv1224)

at least have admonished the jury not to consider the guilt convictions in making the factor (b) determination whether Lucas committed the 1973 rape.  But no such admonition was given.  Moreover, the guilt phase cross-admissibility instructions could have been reasonably interpreted to allow the guilt phase convictions to be considered to prove the prior rape.  There is no assurance that the jurors did not do this.  Indeed, the jury was expressly authorized to consider guilt phase convictions by virtue of the other offenses instruction.  (64 CT 14307-10.)  This error violated Lucas's federal constitutional rights.

**B.    The Factor (b) Instruction Failed To Require the Jurors To Find Beyond a Reasonable Doubt That Lucas Committed the 1973 Rape**

5.    The factor (b) instruction also improperly failed to require the jurors to conclude beyond a reasonable doubt that Lucas actually committed the 1973 rape, as opposed to being convicted of it.  The jury was merely instructed that it had to be "satisfied beyond a reasonable doubt that the defendant *was in fact convicted* of such prior crime" to consider it under factor (b).  (65 CT 14381.)  Although the jurors were correctly instructed in another instruction (65 CT 14385), inconsistent instructions fail to assure proper juror understanding of the law because there is no way of knowing upon which instruction the jurors relied.  *Francis v. Franklin*, 471 U.S. 307, 322 (1985).  Nor did counsel's argument cure the error.  *Kelly v. South Carolina*, 534 U.S. 246, 257 (2002) (argument of counsel was insufficient to cure ambiguity as to meaning of life imprisonment.)

**C.    The Lingering Doubt Instruction Undermined a Crucial Penalty Phase Defense Theory**

6.    A primary defense theory at the penalty trial was lingering doubt that Lucas committed the offenses for which he was convicted.  (70 RT 13283-13313.)  But the lingering doubt instruction undermined that theory by failing to: (1) require consideration of lingering doubt; (2) apply lingering doubt to each individual charge; (3) instruct that lingering doubt was a mitigating factor; and (4) define lingering doubt.

(15cv1224)

These errors arbitrarily denied Lucas's state created right to full and proper juror consideration of lingering doubt, *Hicks,* 447 U.S. at 346, and violated the Eighth and Fourteenth Amendments' bar on barriers to capital sentencers' consideration of relevant mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Mills v. Maryland*, 486 U.S. 367, 384 (1988).

7.    The instruction improperly failed to require consideration of lingering doubt, because it was drafted in permissive terms.  It merely told the jurors that they "*may* consider . . . " their lingering doubts about Lucas's guilt in deciding his penalty. (65 CT 14380 (emphasis added).)[176]  This was error under both California law and the federal constitution, which require that the relevant mitigating evidence "shall be" taken into account. *See, e.g.*, Cal. Penal Code § 190.3; *Lockett*, 438 U.S. at 604; *Mills*, 486 U.S. at 374 ("[T]he sentencer may not . . . be precluded from considering 'any relevant mitigating evidence.'")

8.    The penalty instructions also misleadingly implied that lingering doubt should be applied to the convictions as a whole, rather than to each individual conviction.  Thus, if a juror had a lingering doubt about Jacobs but not Swanke, the instructions suggested that lingering doubt was not to be considered.  Counsel's arguments failed to correct this error, because they never specifically said that lingering doubt as to one offense could be considered even absent lingering doubt as to others. (70 RT 13286, 13302-04, 13311.)

9.    The penalty instructions also improperly failed to state that lingering doubt was a mitigating factor.  California law clearly held that it was. *See, e.g.*, *People v.*

---

[176]  Even though the defense proposed instruction was also drafted as permissive (65 CT 14411), during the instruction conference the defense asked that the jury be instructed that "they must consider lingering doubt, if they have it, as a mitigating factor. . . ." (66 RT 12360.)  Neither the absence of such language in the instruction requested by the defense nor the lack of a defense objection waived the error.  To the extent, if any, that the error was waived by trial counsel's failure to object, that omission constituted ineffective assistance of counsel.

468

(15cv1224)

1  *Arias*, 13 Cal. 4th 92, 182-83 (1996); *People v. Cain,* 10 Cal. 4th 1, 67 (1995); *People*

2  *v. Kaurish*, 52 Cal. 3d 648, 705 fn. 8 (1990).

3      10.    The penalty instructions also failed to define the term "lingering doubt."

4  Absent such a definition, jurors cannot be assumed to have understood the term's

5  precise legal meaning. *See, e.g.*, *People v. Pitmon*, 170 Cal. App. 3d 38, 52 (1985)

6  (jurors cannot be expected to understand the meaning of technical legal terms).  For

7  example, the jurors could have incorrectly understood the term to mean that they

8  doubted whether the prosecution had proven Lucas guilty beyond a reasonable doubt.

9  That understanding would not have permitted proper consideration of lingering doubt,

10  which is "a state of mind between beyond a reasonable doubt and all possible doubt."

11  *People v. Snow*, 30 Cal. 4th 43, 125 (2003); *see also Arias*, 13 Cal. 4th at 182-83.[177]

12      11.    Trial counsel attempted to clarify and expand upon the lingering doubt

13  instruction during argument, (70 RT 13286, 13302-04, 13311), but this did not cure the

14  error. *See Kelly*, 534 U.S. at 257 (argument of counsel was insufficient to cure

15  ambiguity as to meaning of life imprisonment.)  Beyond being merely ambiguous, the

16  instructions failed to define fundamental matters the sentencing jury was required to

17  consider.  Indeed, the record shows the jurors still did not understand counsel's

18  lingering doubt argument to permit consideration of the guilt phase evidence, because

19  they sent out a note asking whether they could consider such evidence.

20  **D.    The Instructions Unconstitutionally Restricted Jurors' Consideration to**

21      **Mitigating Evidence Offered by the Defendant**

22      12.    The crucial "catch-all" mitigating factor was defined for the jurors as "any

23  other circumstance which extenuates the gravity of the crime even though it is not a

24  legal excuse for the crime and any sympathetic or other aspect of the defendant's

25

26      [177]  Neither the absence of such language in the instruction requested by the

27  defense nor the lack of a defense objection waived the error.  (*See* Penal Code § 1259.)
    To the extent, if any, that the error was waived by trial counsel's failure to object, that

28  omission constituted ineffective assistance of counsel.

character background or record *that the defendant offers* as a basis for a sentence less than death, whether or not related to the offense for which he is on trial . . ." (emphasis added.)  (64 CT 14267 (pre-penalty phase]; 67 RT 12591; 64 CT 14374 (final penalty phase).)[178]  The trial court later compounded this problem by giving the jury a supplemental instruction, in response to Question 3 of their third note (7/19/89)), that specifically limited the jurors to consideration of the aggravating and mitigating factors listed in the instructions.  (108 CT 24253-54.)

13.     This instruction's limitation of mitigation to evidence "that the defendant offers," violated the Eighth Amendment's requires the jury to consider any and all mitigation evidence.  *Lockett,* 438 U.S. at 604-605; *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).  It was also prejudicial, because the prosecution evidence included substantial mitigating evidence regarding Lucas's kindness to others, business successes and drug/alcohol problems. *See, e.g*., 19 RT 3423-30; 3437-42, 3454-57, 3464-70 (Lucas giving employment and/or lodging to Adler, the Johnsons, and Greg Esry); 20 RT 3731-52, 21 RT 3770-75, 23 RT 3811-15, 4236-40, 37 RT 7114-17 (Lucas's skillful management of his carpet company); 21 RT 3766-70, 3775-79, 3795-801, 23 RT 4279-93, 4319-21 (Lucas's drug and alcohol problems).

---

[178]  The current CALJIC instruction places the "that the defendant offers" language in brackets:

> . . . (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.  You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle]."  (Emphasis added.)

**E.      The Instructions Unconstitutionally Precluded the Jury From Considering Lucas' Good Behavior At Trial As Mitigation**

14.      The instructions improperly prohibited the jury from considering "[r]eactions to evidence introduced during the trial, if any, by the judge, court personnel, attorneys, defendant, or any spectator," and specifically told the jury it must "disregard" them.  (181 CT 14279.)  This instruction unconstitutionally precluded the jury from considering mitigating evidence based on Lucas's good conduct and demeanor at trial.  This error was exacerbated by the penalty instructions' improperly limitation of mitigation to evidence proffered by the defense.  The bar on jurors' consideration of mitigating evidence violated Lucas's Eighth Amendment rights. *Lockett,* 438 U.S. at 604; *McKoy v. North Carolina*, 494 U.S. 433, 443-44 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 318 (1989); *Sumner v. Shuman*, 483 U.S. 66, 76 (1987); *Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987); *Songer v. Wainwright*, 469 U.S. 1133, 1139-41 (1985); *Skipper*, 476 U.S. at 8.  This error was particularly prejudicial because Lucas's in-trial behavior was exemplary and he was never reprimanded by the court.  (*See, e.g.*, 70 RT 13298.)

**F.      Instructional Use Of the Term "Expert" To Describe Certain Penalty Phase Witnesses Was Error**

15.      By designating certain witnesses as "experts," in the guilt and penalty phase instructions, the judge gave those witnesses undue stature and emphasis in the eyes of the jury.  *See* 65 CT 14369 (penalty phase instruction defining "expert testimony").  This violated the Fourteenth Amendment's requirement of fundamental fairness, which prohibits any particular witness from being given undue emphasis or otherwise singled out for special consideration.  *See e.g., Bollenbach v. United States,* 326 U.S. 607, 612-13 (1946).  The penalty phase expert instruction was especially prejudicial to Lucas because of the damaging stipulation the defense was forced to make that Dr. Schumann had diagnosed Lucas at Atascadero state hospital as having "antisocial personality, severe;  alcoholism, habitual excessive drinking, and a sexual

deviation, aggressive sexuality, and the prognosis was very guarded." (169 RT 13025-26.)  The instruction effectively informed the jury that the judge believed Dr. Schumann was a "duly qualified expert" with "special knowledge, skill, experience, training or education. . . ." (65 CT 14369.)  This, in turn, increased the stature of Dr. Schumann's prejudicial testimony in the eyes of the jury.

16.     To the extent that this claim was not adequately preserved, trial counsel's failure to do so violated Lucas's constitutional right to effective assistance of counsel because there was no reasonable strategic reason for not adequately preserving it. There is a reasonable probability that, absent counsel's omission, the outcome of the trial would have been more favorable to Lucas.

## G.     The Jury Instructions Unconstitutionally Implied That the Penalty Decision Was a Choice Between Good And Bad

17.     At the penalty trial, the jury was instructed to reach its sentencing verdict by balancing "aggravating circumstances versus mitigating circumstances." (*See* 65 CT 14373-74; 14386; 14390; 14398-99.)  But no definition of "aggravating" or "mitigating" was provided.  Hence, reasonable jurors could have construed these terms as equivalent to morally bad and morally good, and the instruction as requiring a balancing of good versus evil.  This problem was exacerbated by the prosecutor's misleading closing argument, which expressly described the sentencing decision as a choice between good and evil and argued that Lucas's life should be extinguished because he and his acts were "wicked."  Given the instructions and this argument, it is reasonably probable that the jury adopted this unconstitutional "good" versus "bad" view of the mandated balancing test.  *See Boyde v. California,* 494 U.S. 370, 380 (1990).[179]  That approach violated the Fourteenth Amendment that juries must be

---

[179]  The trial court improperly denied a requested defense instruction that would have correctly informed the jury that it must not view the penalty deliberations as a balance of good versus bad.  (65 CT 14463.)

permitted to distinguish one capital murderer from another, rather than imposing death simply based on a conclusion that the defendant is evil or bad.  *See generally Godfrey v. Georgia*, 446 U.S. 420, 427 (1980).

## H.  By Failing To Instruct the Jury That Neither Party Had the Burden Of Proof At Penalty the Trial Court Failed To Assure Juror Impartiality

18.     Because the penalty decision of a California capital trial is inherently "moral and normative," there is no burden of proof on either party.  *People v. Hawthorne*, 4 Cal. 4th 43, 79 (1992), *overruled in part on other grounds* in *People v. McKinnon*, 52 Cal. 4th 610, 619-20 (2011); *People v. Welch*, 20 Cal. 4th 701, 767 (1999).  But the trial courts failed to so instruct the jury.  Instead, the court generally followed the CALJIC model instructions, which contained no explanation of the burden of proof as to penalty.[180]  Both the defense and prosecution requested instructions which would have informed the jury as to the neutral standard.  (65 CT 14437, 66 CT 14814.)  The trial court's failure to give such an instruction violated Lucas's Due Process right to the proper burden of proof, one of the most fundamental concepts in our legal system.  The failure to properly explain the burden of proof to the jury infects the entire proceeding to which the burden applies, and Lucas's conviction should be vacated without any further showing of prejudice.  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).  Prejudice is also particularly shown by the fact that at least one juror was predisposed towards death.  The failure to instruct that neither party had the burden allowed this juror to rely on her bias in favor of death throughout the penalty phase deliberations and, in effect, impose the burden of proof on Lucas.

---

[180]   The proof beyond a reasonable doubt burden was included in the penalty instructions but it was specifically limited to proof of uncharged violent criminal conduct under "factor (c)."  (65 CT 14385.)

**I.     The Trial Court Erroneously Refused the Defense Request For An Instruction Permitting Juror Consideration Of Sympathy For Lucas's Family**

19.     Because Lucas's trial occurred between *Booth v. Maryland*, 482 U.S. 496 (1987) and *Payne v. Tennessee*, 501 U.S. 808 (1991), the jury was not permitted to consider sympathy for the victims' families.  But the defense requested an instruction that would have permitted the jury to consider the impact Lucas's execution would have on his friends and family.  (65 CT 14415.)  Indeed, this potential impact was a major defense theory at the penalty phase, and numerous friends and family members described how Lucas's execution would adversely affect them.  The trial court denied the requested instruction.  (65 CT 14378, 14415.)

20.     The court's ruling denied Lucas's Sixth, Eighth and Fourteenth Amendment right to have the sentence "consider[] as a mitigating factor, any aspect of a defendant's character . . . that the defendant proffers as a basis for a sentence less than death."  *Skipper*, 476 U.S. at 4-5; *see also Penry*, 492 U.S. at 328 ("[I]f the jury is to give a 'reasoned *moral* response' to the defendant's background [and] character," furthermore, "full consideration of evidence that mitigates against the death penalty is essential . . . .");  *Blystone*, 494 U.S. at 307.  Sympathy for the defendant's friends and family should be a mitigating factor under the Eighth Amendment, because it is capable of giving rise to an inference that "might serve as a basis for a sentence less than death."  *Skipper*, 476 U.S. at 4-5.  And, absent a special instruction, the jury would not have understood that such could be relied upon to demonstrate mitigating qualities about Lucas's own background and character.  *See People v. Ochoa*, 19 Cal. 4th 353, 454-56 (1998) (a defendant has a right to illuminate positive aspects of his background and character by presenting evidence of how his execution would affect his friends and family).

474

(15cv1224)

**J.    The Trial Court's Supplementary Instruction Unconstitutionally Limited the Jurors' Consideration Of Mitigating Evidence To The Specific Matters Enumerated In the Instructions**

21.    In response to a juror question submitted during the penalty deliberations the trial court instructed in such a way that the jurors' consideration of mitigation was limited to the factors specified in the instructions:

> Please note that the only possible aggravating factors in this case are those that would fall within subsections (a), (b) and (c) of page 17.
>
> You may view factors, (a), (b), and (c) as aggravating and/or mitigating.  All other specifically enumerated factors listed on pages 17 and 18 must be considered as possible mitigating factors.  They cannot be considered as possible aggravating factors.   In addition, factor (j) is a "catch-all" mitigating section.
>
> In addition to the specifically enumerated mitigating factors and the catch-all mitigating section (j), you may for the defendant consider pity, sympathy and mercy and lingering doubt.  (*See* pages 21, 23 and 30 of the written instructions.)

(108 CT 24253-54).

22.    This instruction violated the Eighth Amendment's requirement that the jury be free to consider any mitigating factor, not just those listed in the instructions.  If the jurors discerned some evidence-based (or courtroom-observation-based) mitigation but could not fit it under any of the specific instructional factors, they nonetheless should have been able to rely upon it as the basis for not imposing a death sentence. The error had a substantial and injurious effect on Lucas's trial, especially given that lingering doubt was the primary defense theory at trial and a significant defense at penalty, and the jury was not adequately instructed on that defense.

475

(15cv1224)

**K.     The Trial Court Erroneously Denied the Requested Instruction Precluding Juror Consideration Of Future Dangerousness**

23.     The judge refused a proposed defense instruction that "[p]ossible belief or predictions about a defendant's future dangerousness is not a statutory listed factor in aggravation, and may not be considered by you for any purpose." (65 CT 14447.)  That ruling erroneously permitted the jury to consider evidence of future dangerousness through counsel's stipulation that Lucas had been diagnosed at Atascadero in 1974 with "*antisocial personality, severe;* alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, *and the prognosis was very guarded*." (69 RT 13025-26) (emphasis added).  Because the "very guarded" prognosis was effectively an expert prediction of future dangerousness, the jury should not have been allowed to rely on it for that purpose. *See People v. Silva*, 45 Cal. 3d 604, 639 (1988); *see also People v. Murtishaw*, 29 Cal. 3d 733, 773 (1981), superseded in part on other grounds by statute, as stated in *People v. Boyd*, 38 Cal. 3d 762 (1985) (predictions of future dangerousness are beyond the scope of the death penalty statute).

24.     By allowing the jury to consider unreliable evidence not permitted under California law, the trial court violated Lucas's Eighth and Fourteenth Amendment rights to reliability and heightened reliability in capital sentencing. *Beck,* 447 U.S. at 627-46; *Kyles*, 514 U.S. at 422; *Gilmore,* 508 U.S. at 342; *Burger*, 483 U.S. at 785; *White*, 502 U.S. at 363-64; *Donnelly*, 416 U.S. at 646-47.  The error was especially prejudicial to the defense because the jurors were likely to have relied heavily on the expert's prediction that Lucas would be dangerous in the future.  Indeed, future dangerousness is on the minds of most jurors in most cases, even when the prosecution does not explicitly argue that issue.  John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell Law Rev. 397 (2001).  Moreover, Lucas's jury expressly asked to have the prejudicial stipulation sent into the jury room during deliberations, and reached their death verdict shortly after receiving the stipulation

476

(15cv1224)

**L.**    **The Special Supplemental Penalty Instructions Improperly Limited the Jurors' Consideration Of the Guilt Phase Evidence To "Evidence Of The Circumstances Of the Crimes"**

25.    The court's supplemental instruction that jurors could consider "evidence of the circumstances of the crimes" in their penalty determination (108 CT 24253), improperly excluded other guilt-phase evidence relevant to lingering doubt, and/or mitigation.  The jury was instructed, after closing arguments, that it could consider the guilt phase evidence "as permitted, along with the penalty phase evidence," and that it was not to decide questions of fact "from any other source."  (65 CT 14360, ¶ 1.)  The jury was also given the standard CALJIC instruction to "consider all of the evidence which has been received during the guilt phase . . . insofar as such evidence is relevant to factors in aggravation or mitigation," except that it could not consider guilt phase evidence regarding victims Garcia, Strang, and Fisher.  (64 CT 14373.)  The jury was also instructed to "be guided by the applicable factors of aggravating and mitigating circumstances," and that it must not consider any statements of counsel as to the law that conflicted with the court's instructions.  (64 CT 14275.)

26.    The jurors then sent out a note, asking whether they could consider "evidence from the whole trial . . . or just evidence from [the] penalty phase."  (108 CT 24253.)  The trial court issued a responsive supplemental instruction that they could consider "[e]vidence of the circumstances of the crimes of which defendant was convicted, and the finding of the special circumstances in the guilt phase . . . insofar as such evidence is relevant to factors in aggravation or mitigation," except that evidence about Garcia, Strang, and Fisher could not be considered. (108 CT 24253.)  The trial court also instructed the jurors that they could consider the jury instructions, their notes, the exhibits, and the guilt phase jury forms.  (108 CT 24265.)

27.    By limiting the guilt phase evidence to that regarding the "circumstances of the crimes," the trial court violated Lucas's Eighth and Fourteenth Amendment right to have the jury consider all mitigating evidence that might have been presented at the

guilt phase trial, including evidence relevant to lingering doubt and/or mitigating evidence about Lucas's character and background.  *See, e.g.*, Cal. Penal Code § 190.3; *Lockett,* 438 U.S. at 604.  The instruction left out crucial defense evidence from the guilt phase, such as Johnny Massingale's confession and the suggestive identification procedures in the Santiago case because such evidence was not a "circumstance of the crimes" of which Lucas was convicted.  Counsel's penalty phase argument did nothing to cure the prejudice, because the jury expressed its confusion about the role of guilt phase evidence after the arguments had already been given.[181]

28.     The improperly limited instruction violated Lucas's Sixth, Eighth, and Fourteenth Amendment right to jury consideration of defense theories and evidence, including those relating to lingering doubt.  *Mathews v. United States*, 485 U.S. 58, 63 (1988); *Conde v. Henry*, 198 F.3d 734, 741 (9th Cir. 1999).  It also violated Lucas's Eighth and Fourteenth Amendment rights to present a defense theory and evidence. *Lockett*, 438 U.S. at 604; *Skipper*, 476 U.S. at 8.

**M.     The Trial Court Unconstitutionally Failed to Instruct on the Presumption of a Life Sentence**

29.     The trial court's failure to instruct the jury on the presumption of a life sentence violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

30.     In non-capital cases, the presumption of innocence acts as a core constitutional and adjudicative value to protect the accused, and is a basic component of a fair trial.  *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  Paradoxically, at the

---

[181]   There is a particular danger of undue emphasis with supplemental instructions.  "Supplemental instructions should be carefully framed and tendered to counsel. [Citation.] The last words a jury hears may be those which are best remembered."  (O'Malley, Grenig & Lee, *Federal Practice and Instructions* 9:03 [Communication Between Court And Jury] p. 597-98 (West, 5th ed. 2000); *see also People v. Thompkins*, 195 Cal. App. 3d 244, 255 (1987); *Powell v. United States,* 347 F.2d 156, 158, fn. 3 (9th Cir. 1965).)

penalty phase of a capital trial, where the stakes are life or death, the jury is not instructed as to the presumption of life, the penalty phase correlate of the presumption of innocence. Beth S. Brinkmann, Note, *The Presumption of Life: A Starting Point For A Due Process Analysis Of Capital Sentencing*, 94 Yale L.J. 351 (1984); *cf. Delo v. Lashley*, 507 U.S. 272 (1993).

31.    Here, the failure to instruct the jury that the law establishes a presumption of life, correlative to the presumption of innocence at the guilt phase, violated Lucas's federal constitutional rights.

**N.    The Errors Were Prejudicial**

32.    A new penalty phase trial is required by the above errors, including the unconstitutional limitations on jurors' consideration of mitigating evidence, and jurors' improper consideration of the highly inflammatory 1973 rape conviction. The Eighth Amendment's requirement that the jury consider all mitigating evidence is so fundamental that it undermines the entire structure of the penalty trial, and should constitute structural error. *See, e.g.*, *Fulminante*, 499 U.S. at 309 (structural defects in the trial mechanism which defy analysis by "harmless-error" standards are reversible per se); *Sullivan*, 508 U.S. at 281. Even if the error is not structural, Lucas's sentence should be vacated under harmless-error analysis because the penalty phase deliberations were closely balanced.

**CLAIM 36:  THE TRIAL COURT VIOLATED LUCAS'S RIGHT TO A FAIR TRIAL BY COMMITTING NUMEROUS ERRORS IN PERMITTING THE JURY TO READ PORTIONS OF THE TRIAL TESTIMONY IN THE JURY ROOM WITHOUT ANY INSTRUCTIONS (AOB 2.11.1, 2.11.2, 3.11.1, 3.11.2, 4.10.1, 4.10.2, 5.2.9.1, 5.2.9.2, 7.7.8, 7.79)**

**A.    Introduction**

1.    Petitioner's conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the court allowed the jury to read portions of the trial testimony in the jury

479

room, in violation of Lucas's rights to personal presence and to the presence of defense counsel at all critical trial stages.  *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975) (noting that The Court has recognized that an accused has a right to be present at all stages of trial where his absence might frustrated the fairness of the proceedings); *see also United States v. Gagnon*, 470 U.S. 522, 526-27 (1985) (right to presence is rooted in the Sixth Amendment Confrontation Clause and also protected by the Fifth Amendment Due Process Claus); *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (right of the accused to be present at every stage of trial is one of the most basic rights guaranteed by Confrontation Clause); *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934) (the Fourteenth Amendment reinforces the Sixth Amendment assurance of personal presence); *United States v. Cronic*, 466 U.S. 648 (1984) (a trial is unfair if the accused is denied counsel at a critical stage of his trial).  These errors also violated Lucas's right to a public trial.  *Waller v. Georgia*, 467 U.S. 39 (1984) (Sixth Amendment protects the right of the accused to a public trial); *Press-Enterprise Co. v. Superior Court* 464 U.S. 501, 508 (1984).  The errors also violated the right to a trial supervised by a judge.  *Capital Traction Co. v. Hof*, 174 U.S. 1, 13 (1899).

**B.    Relevant Facts**

2.    On June 12, 1989, shortly after the commencement of jury deliberations, the jury requested a transcript of the testimony of prosecution handwriting comparison experts David Oleksow and John Harris.  (65 RT 12232.)  In accordance with its prior ruling, the trial court ordered that the reporter prepare the entire transcript of the two witnesses, "absent the in limine discussions," "and then just hand them the transcripts." (65 RT 12233.)[182]  Thereafter, the court reaffirmed its ruling that the transcripts would be sent into the jurors rather than be read by the reporter.  (65 RT 12236.)

---

[182]  This testimony concerned the most crucial issue in the Jacobs case: the comparison of the Lucas printing with the printing on the Love Insurance note.

3.      Subsequently, between June 15, 1989 and June 20, 1989, the jury requested and presumably received[183] additional transcripts reflecting the guilt-phase testimony of:  Michelle Tortorelli, John Simms , James Bailey, Margaret Harris, Frederick Edwards, Edward Fairhurst, David Daywood, Leigh Emmerson, Pat Stewart, John Torres, Fran Van Herreweghe, Walter Hartman, Donald Lucas, Steven Katzenmaier, Pat Katzenmaier, Suzanne Herrin, Catherine McEvoy, Mark McEvoy (4/27/89); David Katsuyama, Charles Geiberger, Howard Robin, Robert Bucklin, Craig Henderson, Thomas Streed, and Cyril Wecht.  (26 CT 5559-62; Trial Court Ex. 32.)

4.      On July 31, 1989 during the penalty deliberations, the jury requested and received the following additional testimony: Dr. Marks and Pat Katzenmaier.  The jury also requested the stipulation which was read into the record on July 13, 1989 concerning Lucas's diagnoses by Dr. Schumann while at Atascadero in 1974.  (69 RT 13025-26; 26 CT 5582.)  The transcripts and stipulation were transmitted to the jury by the bailiff.

## C.      Lucas's Right to Be Personally Present Was Violated When the Jurors Were Permitted to Read Transcripts in the Jury Room

5.      The Confrontation Clause and the Due Process Clause of the Sixth and Fourteenth Amendments guarantee a criminal defendant's right to be present "at all stages of the proceedings where fundamental fairness might be thwarted by his absence." *Faretta v. California*, 422 U.S. 806, 816 (1975) (*citing Synder v. Massachusetts*, 291 U.S. 97 (1934), *overruled in part on other grounds*); *see also*

---

[183]  There is no actual record of how or when (or if) the requested transcripts were given to the jurors.  The first juror request, for Oleksow and Harris testimony, was discussed on the record with the judge ruling that they would "send the transcripts in" after they were prepared and redacted by the reporter.  (65 RT 12236.)

As to the other guilt trial jury requests for testimony, there was no on-the-record discussion.  The minute orders reflect receipt of the note and then state: "Requested transcripts are to be sent to the jury. . ." (26 CT 5559-60) or "transcripts will be sent into the jury."  (26 CT 5560.)  However, except for a corrected page (26 CT 5561) there is nothing recording or memorializing the actual transmission of the transcripts to the jury.

*United States v. Gagnon*, 470 U.S. 522, 526-27 (1985); *Illinois v. Allen*, 397 U.S. 337, 338 (1970).  Indeed, "[t]he right of a defendant charged with a felony to be personally present in the courtroom at every stage of his trial conducted there is fundamental to our system of justice."  This right has been clearly established since the 1800s:  "A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner."  *Lewis v. United States*, 146 U.S. 370, 372 (1892).  The rule includes the defendant's right to be present whenever the court communicates with the jury.  *Shields v. United States*, 273 U.S. 583 (1927).

6.     Because a readback of testimony is no less important than the original taking of the testimony, all of the salutary rights associated with the testimony (e.g., Due Process, Compulsory Process, Confrontation, Trial By Jury and Representation Of Counsel Clauses of the Sixth and Fourteenth Amendments) are implicated by readback procedures which fail to assure fair, accurate and complete recitation of the testimony. *See generally Davis v. Alaska*, 415 U.S. 308, 318 (1974); *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Turner v. Marshall*, 63 F.3d 807, 814 (9th Cir. 1995), *overruled on other grounds* (explaining that failure to allow the defendant to be present at the readback of testimony is constitutional trial error) (citing *Helger v. Borg*, 50 F.3d 1472, 1477 (9th Cir. 1995) and *United States v. Brown*, 832 F.2d 128, 130 (9th Cir. 1987)).

7.     Even when the evidence requested by the jury is a tape recording which can be mechanically replayed, the proceeding is still considered an important part of the trial "because it involves the crucial jury function of reviewing the evidence."  *United States v. Kupau*, 781 F.2d 740, 743 (9th Cir. 1986).[184]  Similarly, the absence of the defendant from the replaying of a tape of the jury instructions has been held to violate a

---

[184]  Even though *Kupau* analyzed the issue under Fed. Rule of Criminal Proc. 43, the reasoning also applies to the constitutional bases for the right to presence.

defendant's right to due process and confrontation.  *Bustamante v. Eyman*, 456 F.2d 269, 271 (9th Cir. 1972).

8.     In the absence of a waiver from Lucas, allowing the jurors to readback testimony without ensuring that Lucas was present violated his Constitutional rights. Lucas's absence at the readback should be treated as structural error because the amount of influence the readback had on the jury is impossible to determine.  Certainly, when an unsupervised readback of testimony is undertaken by the jury special standard-of-review problems are presented because how much influence the reading of the testimony may have had upon the minds of the jury is impossible to determine. *See Arizona v. Fulminante*, 499 U.S. 279, 280 (1991) (structural errors are those that defy harmless error standards).

9.     Because an unsupervised readback of testimony compromises the most fundamental elements of the entire trial process, and because the impact of the error cannot normally be evaluated on the record, the error was structural and should be reversible per se.  If this Court employs the *Brecht* standard, Lucas can still demonstrate prejudice because his absence at this critical stage had a substantial and injurious effect on the verdict.  The concomitant absence of counsel during the readback adds to the prejudice.  That the readbacks were given with no instructions, involved numerous witnesses, and concerned important phases of testimony in a capital trial also made Lucas's absence more injurious.  Because this error effected both the guilt and penalty phases of trial, Lucas is entitled to habeas relief of each of the convictions and death sentence.

10.     Neither Lucas nor his counsel waived the right to be present.  Early United States Supreme Court cases held that the right to presence in capital cases is so fundamental that such presence cannot be waived by the defendant. *See e.g.*, *Diaz v. United States*, 223 U.S. 442, 455 (1912).  More recently, commentators have interpreted dictum in *Illinois v. Allen*, 397 U.S. 337 (1970), as authorizing a limited exception to the no-waiver rule for defendants who willfully disrupt their trials.  *See*

483

(15cv1224)

*Proffitt v. Wainwright*, 685 F.2d 1227, 1257 (11th Cir. 1982).)  However, this exception is inapplicable in the present case as there is no evidence that Lucas disrupted the trial. Further, the record contains neither an express nor implied waiver by Lucas or counsel of the right to have the testimony read to the jury in the presence of the judge, counsel and the defendant.

## D.    Lucas's Right to Have Counsel Present at All Critical Stages of His Trial Was Violated When the Jurors Were Permitted to Read Transcripts in the Jury Room

11.    A criminal defendant's right to counsel is guaranteed by the Sixth and Fourteenth Amendments to the federal constitution.  *See Perry v. Leeke*, 488 U.S. 272, 278-79 (1989); *Penson v. Ohio*, 488 U.S. 75, 88 (1988); *United States v. Cronic*, 466 U.S. 648, 659 (1984) (holding that the right to counsel applies to every critical stage.) "[A]ppointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." *Mempa v. Rhay*, 389 U.S. 128, 134 (1967).  The foregoing constitutional principles are violated when defense counsel is absent from any proceeding where testimony is received by the jurors because it is a critical part of the proceedings.  Because counsel was absent during the jurors readback of testimony, Lucas's constitutional rights were violated.

12.    Under the federal constitution, the denial of counsel at a critical stage of the trial is reversible per se.  When a criminal defendant is denied counsel at a critical stage of the proceedings, it constitutes a structural error which makes the trial presumptively unfair and requires automatic reversal.  *Cronic*, 466 U.S. at 659.  This applies to denials of counsel for even portions of a critical stage, as long as they are important to the trial.  *See Geders v. United States* 425 U.S. 80, 88-90 (1976) (overnight recess); *Herring v. New York,* 422 U.S. 853 (closing argument); *Brooks v. Tennessee*, 406 U.S. 605, 612-13 (1972) (nullifying counsel's ability to determine point in defense case when a single witness (defendant) would testify).  This follows from the long-established law that a defendant "requires the guiding hand of counsel at every

484

1    step in the proceedings against him."  *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

2    Without it, the right to counsel is denied and the conviction must be reversed.  Because

3    Lucas was denied counsel at a critical stage of trial, habeas relief is warranted as to

4    each of his convictions and death sentence.

5    **E.    Lucas's Right to a Public Trial Was Violated When the Jurors Were**

6    **Permitted to Read Transcripts in the Jury Room**

7    **1.    Relevant Law**

8    13.    The right to a public trial is conferred by the Sixth Amendment to the

9    Constitution.  *Waller*, 467 U.S. 39.  This constitutional guarantee presumabley applies

10   to the entire trial.  *Id.*  (holding the right to public trial extends to suppression hearings);

11   *see also Presley v. Georgia*, 558 U.S. 209 (2010) (the right to public trial extends to

12   voir dire).  Modern courts recognize that an open trial is not "merely a safeguard

13   against unfair conviction" but acts as "'a check on judicial conduct and tends to

14   improve the performance of both parties and the judiciary.'" *Rovinsky v. McKaskle*, 722

15   F.2d 197, 201-02 (5th Cir. 1984).  It has been firmly held that a proceeding which "is

16   held as a part of the trial and after the jury has been sequestered, falls within the

17   constitutional guarantee and must be conducted as a public trial."  *U.S. Ex. Rel. Bennett*

18   *v. Rundle*, 419 F.2d 599, 606 (1969).

19   14.    "The open trial thus plays as important a role in the administration of

20   justice today as it did for centuries before our separation from England."  *Press-*

21   *Enterprise Co*, 464 U.S. at 508.  Because of this fundamental impact of public trial

22   upon "both the basic fairness of the criminal trial and the appearance of fairness so

23   essential to public confidence in the system," the closure of any criminal proceeding

24   "must be rare and only for cause shown that outweighs the value of openness.

25   [Footnote omitted.]"  *Id.* at 508-09.  Moreover, the right to a public trial "may be

26   overcome only by an overriding [state] interest" (*id*. at 521) and "no state interest,

27   however compelling, can sustain the exclusion of press and public from part of a trial,

28   absent findings of necessity articulated in the record."  *Rovinsky*, 722 F.2d at 200.

15.    The public trial guarantee is particularly applicable to the proceedings at issue here because they concerned matters advanced for consideration by the jurors and bore a relationship to "the merits of the charge [and] the outcome of the prosecution. . . ." *Rovinsky*, 722 F.2d at 201. Additionally, in the case of the readback, the concerns about the potential for undue emphasis during the reading provide a rationale for openness analogous to that which is applicable to a jury instruction proceeding.

16.    In addition to violating his rights under the Sixth Amendment, because Lucas was arbitrarily denied his state created right to a public trial under Article I, § 15 of the California Constitution, the error violated his right to due process under the Fourteenth Amendment to the United States Constitution. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**2.    There Was No Waiver Or Satisfactory Showing Of Necessity**

17.    As to all of the readback proceedings at issue here, there was neither a waiver nor an adequate showing of necessity sufficient to justify exclusion of the public from the proceedings and judicial actions. In the present case, Lucas was never informed of his right to a public readback of the testimony. To be effective, a waiver of a public trial must be "intentional and meaningful" (Annot. 61 L.Ed.2d 1018, 1030) and the waiver of such a constitutional right is "not lightly inferred." *Rovinsky*, 722 F.2d at 200. Plainly stated, one cannot knowledgeably and intentionally waive a matter about which he has no knowledge. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

18.    Moreover, the trial court emphatically stated that she would not vary from her set procedure of sending the transcripts into the jury room even though counsel had requested that the testimony be read by the reporter. (64 RT 12177-78; 65 RT 12226-27.) This ruling necessarily foreclosed reading the testimony in open court and, hence a request by defense counsel or Lucas to do so would have been futile. *See Douglas v. Alabama*, 380 U.S. 415, 422 (1965).

19.    Additionally, there was no showing of necessity to conduct the readback outside of the public sphere. There certainly was no reason why all of the

486

proceedings and judicial actions at issue here could not have been conducted in open court. Of course, while the jury could properly have been excluded from the court and counsel's discussions of the jury's notes to the court, the readback could and should have been conducted and resolved in open court rather than by private proceeding and communication to the jury.

20. In any event, even if there had been some compelling necessity for closure of the proceedings, the record fails to contain the required articulation of such necessity. *Press-Enterprise,* 464 U.S. at 510.

### 3. The Denial Of the Right To Public Trial Requires Relief

21. It is widely recognized that a violation of the right to a public trial is inherently prejudicial and requires reversal per se:

> . . . the right is both primary and instrumental: not merely a
> method to assure that nothing untoward is done clandestinely
> but a guarantee against the very conduct of private hearings ...
> Even absent a showing of prejudice, infringement of the right
> to a public trial exacts reversal as the remedy.

*Rovinsky*, 722 F.2d at 202. In other words, the error was structural and, therefore, should be reversible per se. *See generally Arizona v. Fulminante*, 499 U.S. 279 (1991). Moreover, these errors also impacted the penalty-phase deliberations.

22. Accordingly, each of Lucas's convictions and sentence of death must be set aside.

### F. Lucas's Right to a Trial By A Jury That Is Supervised and Properly Instructed Was Violated When the Jurors Were Allowed To Read the Transcripts Without Supervision or Instruction and in the Absence of a Judge

23. The procedure used in the present case violated Lucas's federal constitutional rights to the presence and supervision of critical proceedings by the trial judge. "'Trial by jury,' in the primary and usual sense of the term at the common law

487

(15cv1224)

and in the American constitutions, is not merely a trial by a jury of twelve [jurors] . . . but it is a trial by a jury of twelve [jurors], in the presence and under the superintendence of a judge . . . . This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion." *Hof*, 174 U.S. at 13.

24.    Because the Sixth Amendment right to trial by jury extends to proceedings during jury deliberation, absence of the judge during such proceedings at Lucas's trial violated the federal constitution.  A judge's absence during a criminal trial, including court proceedings after a jury begins deliberations, is error of constitutional magnitude. The presence of a judge is at the 'very core' of the constitutional guarantee of trial by an impartial jury." *Riley v. Deeds*, 56 F.3d 1117, 1119 (9th Cir. 1995) (citation omitted).

25.    Further, because Lucas was arbitrarily denied his state created rights under California Penal Code § 1138, the error violated his right to due process under the Fourteenth Amendment to the United States Constitution.  *Hicks*, 447 U.S. at 346.  Cal. Penal Code § 1138 obliges the trial court to supervise and control a readback of testimony or a re-instruction of the jury.  The statute requires that the jury be "brought into court" and that the requested information be given in court "in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."[185]  Where, as in the present case, the trial court fails to adequately supervise the reading of the trial testimony by the jury by conducting the readback in

---

[185] Cal. Penal Code § 1138 provides:
> After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called.

488

(15cv1224)

open court in the presence of, or after notice to the parties, it has not fulfilled the statutory mandate of Penal Code § 1138.

26. Lucas's rights were therefore violated because the jury was erroneously permitted to read the trial transcripts privately in the deliberation room. This error was especially prejudicial because there is no record of how the readback was conducted. It is unknown: (1) Whether the jurors read the transcripts aloud or silently to themselves or if they each complied; (2) If some jurors read the transcripts silently on an individual basis, what the other jurors did while the jurors read?; (3) If the other jurors deliberated, whether the reading juror attempt to listen to and/or participate in those deliberations? ; (4) Which of the numerous requested transcripts, if any, were read?; (5) What portions of the transcripts were read; (6) Whether the juror who read the transcripts aloud–if this was done–placed any undue emphasis on certain portions of the transcript (7) whether the juror who read the transcripts aloud do so fully and correctly.

27. Notably, that the jurors were allowed to read the testimony themselves created additional constitutional problems. When the jury is given free reign to conduct the readback proceeding in any manner it wishes, the danger of undue emphasis is inherent. *See United States v. Sacco*, 869 F.2d 499, 502 (9th Cir. 1989) ("[I]n the privacy of the jury room, a jury, unsupervised by the judge, might repeatedly replay crucial moments of testimony before reaching a guilty verdict."); *see also, United States v. Hernandez*, 27 F.3d at 1408 (advising that to avoid the possibility of undue emphasis, the preferred method of rehearing testimony is in open court, under the supervision of the court, with the defendant and attorneys present).

28. In the present case the trial court completely abdicated its duty in this regard and simply left everything up to the jury. (*See, e.g.*, 65 RT 12227 (ruling that the jury would be supplied with one copy of the transcript and "they can have one person read it, if they want, out loud to everybody.")).

29. Because the absence of the judge from the crucial readback proceedings undermined the entire structure of the trial, it should be reversible error per se as to

489

each of his convictions and sentence.  (*See* e.g., *Fulminante*, 499 U.S. at 309; *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

For the foregoing reasons, Lucas is entitled to habeas relief.

**CLAIM 37:  THE JUDGE ERRED IN ALLOWING THE JURY TO READ PORTIONS OF THE TESTIMONY DURING DELIBERATIONS WITHOUT ANY INSTRUCTIONS AS TO THE PROPER USE OF THE TRANSCRIPTS (AOB 2.11.3, 3.11.3, 4.10.3, 5.2.9.3, 7.7.10)**

**A.     Introduction**

1.     Lucas's conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the court allowed the jury to read portions of the trial testimony in the jury room, without instruction, in violation of Lucas's right to a fair trial and.  *Lisenba v. California*, 314 U.S. 219 (1941).

2.     In the preceding arguments Lucas demonstrated that trial transcripts should not have been sent into the deliberation room in response to juror requests for readback of testimony.  However, even if such a procedure were constitutionally permissible, transcripts should not have been submitted unless accompanied by a strong and complete admonition concerning the jury's use and consideration of the transcripts. In the present case, numerous transcripts of selected testimony were given to the jury during their deliberations (at both the guilt and penalty trials) without any instruction as to the use of such transcripts.

**B.     Relevant Law**

3.     The judge bears the ultimate responsibility, under California law and the federal constitution, to control and supervise any readback of testimony to the jurors during deliberations.  Cal. Penal Code § 1138; U.S. Const. amend VI, XIV.  The jurors should first be admonished regarding the mechanics of the readback before being given the transcripts.

490

4. As with individual written instructions, submitting transcripts of only a portion of the testimony is conducive to "overemphasis of isolated parts. . . ." *United States v. Schilleci*, 545 F.2d 519, 526 (5th Cir. 1977). The Ninth Circuit has expressed concern that "in the privacy of a jury room, a jury, unsupervised by the judge, might repeatedly replay crucial moments of testimony before reaching a guilty verdict." *United States v. Hernandez*, 27 F.3d 1403, 1409 (9th Cir. 1994) (citations omitted).

5. Hence, it is imperative that the jury be admonished to "weigh all the evidence and not give undue focus to any one portion of the trial." *Id.* at 1408.

6. Merely providing the jury with both the direct and cross-examination of testimony, and providing it in writing to avoid improper inflections, was not sufficient to ensure that the jury did not unduly emphasize it. *Hernandez*, 27 F.3d at 1408-09. Here, the court did even less; it provided no instruction at all.

7. Further, because Lucas was arbitrarily denied his state created rights under California law, including Penal Code § 1138, the error violated his right to due process under the Fourteenth Amendment to the United States Constitution. *Hicks v. Oklahoma* 447 U.S. 343, 346 (1980).

**C.    The Error Was Prejudicial**

8. Because the effect of the error was to undermine the fairness and reliability of the entire penalty trial, it should be reversible per se as structural error. *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

9. In the alternative, the guilt judgment should be reversed under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Given the closeness of the evidence and the significant impact of the error, there was a substantial and injurious effect upon each of the verdicts. The errors as to each case also influenced that verdict as to the other cases. Even if the error was not prejudicial as to guilt, it was prejudicial as to penalty because it undermined the mitigating theory of lingering doubt, impacting the outcome.

**CLAIM 38: THE TRIAL COURT IMPROPERLY COERCED THE JURY AFTER IT REPORTED BEING DEADLOCKED AT PENALTY (AOB 7.7.1)**

**A.    Introduction**

1.    On the second day of their penalty deliberations the jurors sent out a note stating that "a unanimous decision is not possible." (108 CT 24250.) Without conducting any inquiry, the trial court declined to accept the jurors' assessment and ordered them to continue deliberating with the assurance that she would order a mistrial if they remained deadlocked. (108 CT 24251.) The next morning the jurors sent out another note which stated that some jurors believed that "no further progress is possible" and other jurors "feel that further progress is possible with direction from the court." (108 CT 24251.) Thereafter, several notes went back and forth between the judge and jurors, one juror was replaced with an alternate, and eventually a verdict of death was returned.

2.    The trial court impermissibly coerced the jury by: (1) failing to inquire into the probability of agreement; (2) referring to the length of the trial; (3) advising the jurors that a deadlock would result in a new trial before a new jury; (4) failing to remind the jurors to follow their individual consciences; and (5) following surreptitious inspections of the deliberation room, instructing the jurors to consider the guilt phase exhibits. Therefore, the penalty judgment must be vacated.

**B.    Relevant Law**

3.    Lucas's conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because of the court's coercion.

4.    Trial courts must have paramount concern for "protecting and preserving the integrity of our jury system." *Remmer v. United States*, 350 U.S. 377, 381 (1956). "Protecting the deliberative process requires not only a vigilant watch against external threats to juror secrecy, but also strict limitations on intrusions from those who

492

participate in the trial process itself, including . . . the presiding judge." *United States v. Thomas*, 116 F.3d 606, 620 (2nd Cir. 1997).

5.      "An *Allen*[186] charge is traditionally understood as an instruction to work towards unanimity." *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999). Supplemental instructions to a divided jury must not be coercive. *See Locks v. Sumner*, 703 F.2d 403, 406 (9th Cir. 1983) (explaining that whether the state trial court infringed due process turns on whether it's inquiry would be likely to coerce jurors into relinquishing their views in favor of a unanimous decision). There is, however, nothing talismanic about any single element either making the charge valid or invalid; the fundamental question is whether the jury was improperly coerced, thus infringing the defendant's due process rights. *Weaver*, 197 F.3d at 365. Improper coercion can be explicit in the form of the jury instruction itself or implicit under the circumstances. *Id.*; *see also Jimenez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1994) (court's comments and conduct following jury deadlock amounted to "defacto" *Allen* charge.) "The general test of whether a supplemental jury instruction is in error is to consider all the circumstances to determine if the instruction was coercive." *Jiminez*, 40 F.3d at 980.

6.      In addition to violating federal due process, because the error arbitrarily violated Lucas's state created right to independent jury judgment, the error violated his right to due process under the Fourteenth Amendment to the United States Constitution. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**C.      The Trial Court's Responses and Charges to the Jurors' Announced Deadlock Was Coercive**

**1.      Instructing Jury to Continue Without Inquiry**

7.      The first note that the jury sent to the judge, dated July 18, 1989, read "Your Honor, it is the feeling of the jury that a unanimous decision is not possible. . . ."

---

[186]  *Allen v. United States*, 164 U.S. 492 (1896)

493

(108 CT 24250.)  In this note, the jurors indicated that they were hopelessly deadlocked.  In such a situation the court had a duty to determine whether there was a reasonable probability the jurors could agree on a verdict without being coerced into doing so.  *People v. Duran*, 140 Cal. App. 3d 485, 501 (1983) (trial court "may, and indeed it should, question individual jurors as to the probability of agreement").

## 2.   Improper Reference to Length of Trial

8.   In the present case, the court addressed the jury by referring to the length of the case:  "The length and complexity of this case . . . are such that I would ask you to deliberate a little further. . . ."  (70 RT 13346-47.)  *See People v. Gainer*, 19 Cal. 3d 835, 851 n.16 (1977) (reference to the expense and inconvenience of a retrial is irrelevant to the issue of defendant's guilt or innocence, and hence similarly impermissible").

## 3.   Improper Instructions That Deadlock Would Result in a New Penalty Trial

9.   In the second and third notes, the jury again indicated that some jurors felt no further progress was possible.  The jury also asked, "What happens in case of deadlock?"  (108 CT 24251.)

10.   The trial court responded by quoting from § 190.4(b) of the Penal Code:

> "If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be."

The court went on to tell the jury that what happens after a deadlock should not concern them.  (108 CT 24253.)

11.   The court's response implicates due process the Eighth Amendment's heightened reliability requirement because it is inaccurate.  Indeed, if a jury deadlocks, the prosecution retains the right to dismiss the case.

494

### 4. Failure to Instruct Each Juror Follow His or Her Own Conscience

12.   In addition to making the above *Allen* charge errors, the trial court also erred by refusing the defense request that the jurors be reminded of their duty to ultimately follow their individual consciences and to not take any cue from the court. The court instructed:

> [I] would ask that . . . each of you examine your opinions in view of the other jurors' opinions, that each of you examine the instructions in light of all of the instructions together, and attempt to make sure that you do understand each other's opinions fully and completely, and we will resume this afternoon.
>
> I will ask that you attempt once again, if it is possible, and we will certainly respect [sic] if you have another note that says you can't do it.  And if you can't do it, you can't and certainly no juror should feel pressure.  No group of jurors should feel pressure, but we do wish that you would make every attempt, if you can.

(70 RT 13346-47.)

13.   In asking jurors to re-examine their views, the trial court did not sufficiently counterbalance this charge with a word of caution that no juror should yield a conscientious conviction in order to achieve unanimity.  For example, in *Lowenfield v. Phelps,* 484 U.S. 231 (1988), the Court allowed an instruction that tempered the duty to consider other juror's views with the admonition not to surrender one's honest belief as to the weight and effect of the evidence solely because of other jurors' opinions or for the mere purpose of returning a verdict.  *Id*. at 235.

14.   A trial court's failure to give such a cautionary instruction weighs heavily in favor of the conclusion that the defendant's right to a fair trial and impartial jury has been violated." *Jiminez*, 40 F.3d at 981, fn. 5 (citation omitted).

495

(15cv1224)

15.     The timing of the instruction is also crucial.  When dealing with a deadlocked jury, the coerciveness of any instructions given will be heightened if the judge gives new and unfamiliar instructions at the time of deadlock rather than simply repeating the part of the original jury instructions dealing with the jury's duty to deliberate with an open mind.

16.     In *Weaver*, 197 F.3d 359, the Ninth Circuit Court of Appeals memorably described the effect of the improper *Allen* charge:  "It requires no imagination to comprehend that these events may have altered the minority jurors' views of the deliberations.  .  .  .  In effect, the minority jurors were told that they had two choices: give in to the majority position, or manage the same coup pulled off by Juror # 8 in Twelve Angry Men."  *Id*. at 366.

17.     In the present case the statement that "no group of jurors should feel pressure . . ." was woefully inadequate to convey the crucial requirement that no juror abandon his or her individual conscience.

**5.      Inspection of the Deliberation Room and Supplemental Instructions to Consider Guilt Evidence**

18.     The trial court also committed errors during the penalty deliberations in responding to the jurors' inquiry concerning whether the guilt phase evidence should be considered and errors calculated to encourage a death verdict.  These errors, when combined with the errors discussed in the present claim, made the process all the more coercive.

**D.      The Death Sentence Should Be Vacated**

19.     Improper coercion of the jury during a death penalty sentencing trial fundamentally undermines the fairness and reliability of the verdict and therefore, should result in reversal per se as structural error.  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (structural defects in the trial mechanism, which defy analysis by "harmless-error" standards are reversible per se).

496

(15cv1224)

20.     Alternatively, because the errors were significant and the penalty deliberations were closely balanced, the courts errors had a substantial and injurious impact on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

**CLAIM 39:  THE JUDGE IMPROPERLY FAILED TO GIVE CRUCIAL SUPPLEMENTAL INSTRUCTIONS ORALLY (AOB 7.7.11; SHP VI.LL)**

1.     The federal constitutional rights to due process and to a fair trial by jury require that the jurors fully understand the law stated in the jury instructions and that the jury fairly and accurately apply that law.  *See Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991) (due process implicated if jurors misunderstood instructions); *see also United States v. Gaudin*, 515 U.S. 506, 514 (1995) (it is "the jury's constitutional responsibility . . . not merely to determine the facts, but to apply the law to those facts . . .").  The Eighth and Fourteenth Amendments also require verdict reliability generally and heightened reliability in the determination of guilt and death eligibility before a sentence of death may be imposed.  *See White v. Illinois*, 502 U.S. 346, 363-64 (1992); *Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).  Because the jury instructions, as given, failed to ensure a full understanding, the reliability of the verdicts was undermined.

2.     During the penalty trial the jurors announced that they were deadlocked, but the trial court instructed them to keep trying.  (*See* Section II(J)(2).)  The jurors then sent out a note containing questions about what would happen in case of deadlock, whether aggravating and mitigating circumstances pertain to just the penalty trial, and whether the jurors were limited to the factors of consideration given by the court.  (108 CT 24252; 71 RT 13427.)

3.     After lengthy discussions with counsel, the trial court gave the jury written instructions addressing its questions.  (108 CT 24253-54.)  However, the court improperly failed to give these instruction to the jury orally.  Because oral instructions are necessary to assure that all jurors are fully instructed, the death judgment should be vacated.  *See People of Terr. Of Guam v. Marquez*, 963 F.2d 1311, 1315 (9th Cir. 1992) (holding that where the court gave written instructions to the jury in lieu of

497

reading in open court, structural error was committed); *see also Sullivan v. Louisiana*, 508 U.S. 275 (1993) (misinstruction on the meaning of proof beyond a reasonable doubt is a structural error requiring per se reversal); *Arizona v. Fulminante*, 499 U.S. 279 (1991).

4.    Alternatively, the failure to orally instruct the jury on a crucial instruction had a substantial and injurious effect on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  The structural integrity of the process is compromised when any important instructions are not given orally.  The supplemental instruction at issue was given to a deadlocked jury in the penalty phase of a capital case.  Clearly the instruction conveyed crucial, perhaps pivotal, information to the jury which went to the fundamental essence of the trial–the jury determination as to whether Lucas would be sentenced to die.  Under these circumstances the error was not harmless.

5.    To the extent that this claim was not adequately preserved, trial counsel's failure to do so violated Lucas's constitutional right to effective assistance of counsel because there was no reasonable strategic reason for not adequately preserving the claim.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Further, Lucas was prejudiced at the penalty phase by trial counsel's failure because, for the reasons given above, there is a reasonable probability that, absent counsel's omission, the outcome of the trial and the direct appeal would have been more favorable.

**CLAIM 40:  THE JURORS' CONSIDERATION OF THE CONSEQUENCES OF DEADLOCK WAS MISCONDUCT AND THE TRIAL COURT'S INSTRUCTIONS REGARDING THE CONSEQUENCES OF A DEADLOCK WERE ERRONEOUS (AOB 7.7.12, 7.7.13)**

1.    After several hours of deliberation at the penalty phase, the jurors sent out a note declaring that they were hopelessly deadlocked.  (70 RT 13341-42; 108 CT 24250.)  The trial court instructed the jurors that they must continue to deliberate and attempt to reach a verdict.  (70 RT 13346-47.)  Thereafter, the jurors sent the court two notes regarding this issue; the notes made it apparent that they discussed and

498

considered the consequences of not reaching a verdict.  (108 CT 24251-52.)  The defense contended that the juror discussion of the consequences of deadlock was misconduct.  (71 RT 13416; 26 CT 5589.)  However, the trial court refused to rule that juror misconduct had occurred, and failed to conduct any inquiry.  (71 RT 13419.)  Instead, the trial court erroneously sent the jurors a note explaining the statutory deadlock procedure, while admonishing them not to consider that procedure.  (*See* Section II(J)(2).)

  2. Because the consequences of deadlock are extrinsic considerations, the jurors' consideration of those consequences was misconduct violating Lucas's Sixth Amendment jury trial rights.  The Supreme Court has held that a defendant has a right to trial by an impartial jury and that, "[i]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."  *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *see also Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Marshall v. United States*, 360 U.S. 310 (1959).

  3. To safeguard a defendant's constitutional rights, the exposure of a jury to extrinsic information, such as the consequence of a deadlock, has been "deemed presumptively prejudicial."  *Remmer v. United States*, 347 U.S. 227, 229 (1954).

  4. When put on notice of potential juror misconduct the trial judge has a duty to inquire.  "Given the extremely delicate situation when a juror is suspected of prejudice or misconduct, the trial judge must assume the 'primary obligation to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial.'. . . Where juror misconduct or bias is credibly alleged, the trial judge cannot wait for defense counsel to spoon feed him every bit of information which would make out a case of juror bias; rather, the judge has an independent responsibility to satisfy himself that the allegation of bias is unfounded."  *Dyer v. Calderon*, 151 F.3d 970, 978 (9th Cir. 1998) (citation omitted).

5.      However, in the present case the trial judge refused the defense request to inquire into misconduct.  Additionally, the court should not have instructed on the statutorily mandated procedures and possibility of subsequent retrials in the event of a deadlock.  To do so is unduly confusing, and provides an irrelevant and entirely improper incentive for jurors–particularly any "holdout" jurors–to alter their votes.  Because the judge failed in her duty to inquire into the misconduct, and instead perpetuated it, the presumption of prejudice was not rebutted and the death sentence should be vacated.

6.      To the extent harmless error applies to this claim, because the penalty deliberations were closely balanced, the jury's misconduct in considering extrinsic evidence had a substantial and injurious impact on the verdict and the death judgment should be vacated on that ground.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

7.      Moreover, the error also violated the Eighth and Fourteenth Amendments by compromising the reliability of the death verdict.  In a capital case the Cruel and Unusual Punishment and Due Process Clauses of the federal constitution require heightened reliability in any determination that death is the appropriate sentence.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).  That reliability was undermined by the jury's consideration of an entirely irrelevant factor in reaching its penalty determination.

**CLAIM 41: AFTER RECEIVING NOTICE THAT A JUROR'S FATHER HAD DIED, THE JUDGE ERRONEOUSLY FAILED TO DETERMINE WHETHER THE JUROR COULD CONTINUE TO FULFILL HER DUTIES (AOB 7.7.5)**

**A.      Introduction**

1.      Lucas's constitutional rights were violated because, upon receiving a note on Monday, July 24, 1989 during penalty-phase deliberations from Juror P.W. stating that her father died of a sudden heart attack (108 CT 24259), the trial court failed to determine whether the juror could continue to fulfill her duties to deliberate.  After two other jurors sent unrelated notes asking for days off from deliberations due to

scheduling conflicts for Thursday afternoon and Friday of that week, the foreman sent another note stating that Juror P.W. would like to be excused on Friday, July 28, 1989 to attend her father's funeral.  Counsel agreed that the jury not deliberate on July 28, but the jury continued to deliberate all day Tuesday, July 25, Wednesday, July 26, and on Thursday, July 27 through the afternoon.  They were excused from Friday deliberations.  (26 CT 5595-98).

## B.    Relevant Law

2.    "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips* 455 U.S. 209, 217 (1982).  The jury "must stand impartial and indifferent;" its "verdict must be based upon the evidence developed at the trial," and may not be influenced by any other external consideration.  *Morgan v. Illinois*. 504 U.S. 719, 727 (1992).  At the penalty phase there is a "heightened 'need for reliability in the determination that death is the appropriate punishment'." (citations omitted).  *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985), and for "the responsible and reliable exercise of sentencing discretion." *Id*. at 329.

3.    "A trial court's authority to discharge a juror is granted by [California] Penal Code section 1089[.]" *People v. Williams*, 25 Cal. 4th 441, 447 (2001); *see also* Cal. Civ. Proc. Code § 233 ("If, before the jury has returned its verdict to the court, a juror becomes sick or, upon other good cause shown to the court, is found to be unable to perform his or her duty, the court may order the juror to be discharged.").  The Ninth Circuit has upheld this California statute governing the procedure for discharging and replacing jurors as facially constitutional.  *See Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir.), *amended by* 768 F.2d 1090 (9th Cir.1985), *cert. denied*, 475 U.S. 1048 (1986).

4.    This procedure preserves the "essential feature" of the jury required by the Sixth and Fourteenth Amendments.  *See id*. ("The California substitution procedure followed by the trial court preserved the 'essential feature' of the jury required by the

501

Sixth and Fourteenth Amendments." (footnote omitted).  Indeed, accused has a right to trial by an impartial jury.  *Irvin v. Dowd*, 366 U.S. 717 (1961).  Although a defendant has no right to a perfect trial, due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

5. "The death of a juror's parent constitutes good cause to discharge the juror if it affects the juror's ability to perform his or her duties."  *People v. Cunningham*, 25 Cal. 4th 926, 1029 (2001).  In *Cunningham*, "the trial court performed its duty to make reasonable inquiry, determining that by reason of her distress over, and need to visit, her dying father, [the juror] was unable to fulfill her duties."  In Lucas's case, the trial court failed to do the same.

## C. The Judge's Failure To Determine Juror P.W.'s Ability To Deliberate Violated Lucas' Federal Constitutional Rights

6. In the present case, the events surrounding the death of Juror P.W.'s father were potentially "prejudicial occurrences."  *Smith v. Phillips,* 455 U.S. at 217.  Hence, the trial court failure to determine the impact of this prejudicial occurrence violated the Eighth Amendment by failing to assure "the responsible and reliable exercise of sentencing discretion."  *Caldwell*, 472 U.S. at 329.  The trial judge's failure to exercise her discretion unacceptably increased the risk that the jury would not decide the case in a manner satisfying the heightened need for reliability required by the Eighth Amendment in capital sentencing.

7. Moreover, to the extent that Juror P.W. may have been impaired in her ability to properly perform her duties as a juror, Lucas's Sixth Amendment right to fair trial by jury was violated.  *See Morgan*, 504 U.S. 719.

## D. Prejudice

8. Because the error impacted the entire sentencing proceeding, structural error was committed, and the judgment should be reversed without a showing of

502

prejudice.  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (structural defects in the trial mechanism which defy analysis by "harmless-error" standards are reversible per se); *Dyer v. Calderon*, 151 F.3d 970, 973, n.2 (9th Cir. 1998) (presence of a biased juror is structural error, not subject to harmless error analysis).

9.     In the alternative, the presence of a juror whose emotional distress and grief rendered her potentially unable to carry out her duties, had a substantial and injurious effect on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  This is particularly so because the penalty deliberations were closely balanced.

**CLAIM 42:  INADMISSIBLE PREJUDICIAL EVIDENCE IN THE JURY ROOM THROUGHOUT THE PENALTY DELIBERATIONS CREATED A PRESUMPTION OF PREJUDICE WHICH WAS NOT REBUTTED (AOB 7.7.7)**

**A.     Introduction and Relevant Facts**

1.     Because the jury acquitted on the Garcia count, and could not reach a verdict on the Strang/Fisher charges, the judge ruled that the jurors could not consider the evidence from those charges at the penalty trial.  (71 RT 13440-41.)  However, at the outset of penalty deliberations, no effort was made to redact or remove any of the Garcia or Strang/Fisher exhibits.  Hence, all of the guilt phase exhibits which had been sent into the jury room during the guilt trial remained there throughout the penalty trial.  (71 RT 13457.)

2.     After receipt of the jurors' penalty phase note concerning whether the guilt phase evidence could be considered at penalty, the defense voiced its concern that the province of the jury not be invaded.  (71 RT 13458.)  In light of these concerns the defense opposed removing the Garcia and Strang/Fisher exhibits at that time.  (71 RT 13458-59.)

3.     However, once the judge decided to specifically instruct the jurors concerning consideration of the guilt phase exhibits, the defense voiced its concern about undue emphasis of the Garcia and Strang/Fisher evidence.  (71 RT 13483-84.)  Nonetheless, the judge foreclosed any redaction or removal of the exhibits.  (71 RT

13484-85.)  Accordingly, during the entire penalty deliberations, and at the time the jurors ultimately voted to impose a sentence of death, the jurors had in their possession inflammatory extraneous evidence.

**B.    Relevant Law**

4.    Juror consideration of extrinsic evidence violated Lucas's federal constitutional rights to due process, trial by jury, confrontation, and representation of counsel and verdict reliability as guaranteed by the Sixth, Eighth and Fourteenth Amendments.

5.    The Supreme Court has held that a defendant has a right to trial by an impartial jury and that, "[i]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*. 379 U.S. 466, 472-73 (1965); *see also Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Marshall v. United States*, 360 U.S. 310 (1959); *cf., Tanner v. United States*, 483 U.S. 107 (1987) (juror consideration of extraneous evidence may impeach the verdict).  To safeguard a defendant's constitutional rights, the exposure of a jury to extrinsic information has been "deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954).

6.    Furthermore, jurors' consideration of extrinsic evidence violates due process rights, which are guaranteed by the Fourteenth Amendment of the federal constitution.  "Due process means a jury capable and willing to decide the case *solely* on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  At the penalty phase, as well as the guilt phase of a capital trial, the jury "must stand impartial and indifferent;" its "verdict must be based upon the evidence developed at the trial," and may not be influenced by any other external consideration. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).

7.     Moreover, the error also undermined the reliability of the penalty verdict in violation of the Eighth Amendment.  At the penalty phase of a capital trial there is a "heightened need for reliability in the determination that death is the appropriate punishment" *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985)(internal citation omitted), and for "the responsible and reliable exercise of sentencing discretion."  *Id*. at 329; *Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).

8.     Finally, because the error arbitrarily denied Lucas's state created right to a fair, impartial and unfettered trial by jury, it violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Hicks v. United States*, 447 U.S. 343, 346 (1980).

## C.     Juror Exposure to Extrinsic Evidence Creates a Presumption of Prejudice

9.     Extraneous influences on a jury can, under certain circumstances, require reversal. *Tong Xiong v. Felker*, 681 F.3d 1067 (9th Cir. 2012).  Upon a finding that a juror has received extraneous evidence, a rebuttable presumption of prejudice attaches. *Id.* (citing *Remmer*, 347 U.S. at, 228-29).  That is, the "burden rests heavily upon the Government" to establish that the extraneous influence was harmless to the defendant." *Remmer*, 347 U.S. at 229.

## D.     The Presumption of Prejudice Was Not Rebutted in the Present Case

10.     The trial court assumed that an instruction to not consider the inadmissible evidence would be sufficient. However, the instruction did not rebut the presumption of prejudice for several reasons.

11.     First, it has been generally recognized that even a full and forceful admonition may, in some circumstances, be inadequate "to overcome the substantial danger of undue prejudice . . . ."  *People v. Allen*, 77 Cal. App. 3d 924, 935 (1978).  As Justice Jackson noted in his concurring opinion in *Krulewitch v. United* States, 336 U.S. 440, 453 (1949), "The naive assumption that prejudicial effects can be overcome by instructions to the jury. . . all practicing lawyers know to be unmitigated fiction."

12.     Here, the jurors were given the impossible task of reviewing and considering all the exhibits, while blocking the Garcia and Strang/Fisher exhibits from their minds.  For example, one exhibit was a chart showing close-up photos of the throat slashing suffered by each victim.  (People's Trial Ex. 29.)  Other inflammatory exhibits included an anatomical chart of the neck and throat with plastic overlays for Rhonda Strang, Amber Fisher and Gayle Garcia (People's Trial Exs. 30, 30A, 30B and 30C); Gayle Garcia's pants (People's Trial Ex. 132); color blowup photos of her pants and the wipe mark stain on them (People's Trial Exs. 669; 670A-H; 671-679); a diagram of Rhonda Strang's residence with plastic overlays depicting the bodies of Strang and Fisher (People's Trial Exs. 182 and 182A).  It was not humanly possible for the jurors to look at these exhibits and not be influenced by the pictures of the three victims, including one young child.[187]

13.     Second, the admonition referred only to the evidence in Garcia and Strang/Fisher.  (64 CT 14266; 65 CT 14373.)  This did not preclude the jurors from considering their conclusions about Lucas's guilt in Strang/Fisher.

14.     Third, in the present case, the trial court gave a special supplemental instruction calculated to encourage the jurors to examine and consider the guilt phase exhibits.  (*See* Claim II(J)(2)(b).)

15.     In sum, the presumption of prejudice has not been rebutted in the present case, and the judgment should be reversed.

**E.     Even Without the Presumption of Prejudice the Judgment Should Be Reversed**

16.     Even without considering the presumption of prejudice, the death sentence should be reversed.  Allowing grotesque exhibits from cases for which Lucas had not

---

[187]   At least one juror had verbalized the decisive impact that a child-victim would have on her sentencing verdict.  (*See* Claim 26.)

(15cv1224)

been convicted to stay with the jury during their deliberations had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

**CLAIM 43:  THE CRIMES RELATED TO EACH CASE WERE NOT ADMISSIBLE TO PROVE IDENTITY IN THE CRIMES RELATED TO ANY OTHER CASE.[188] (AOB 2.3.1, 2.3.2; 2.3.3, 3.8.1, 3.8.2, 3.8.3, 4.7.1, 4.7.2, 4.7.3, 5.2.4.1)**

**A.     Introduction**

1.     Before the consolidated trial, the court ruled that all five separate incidents were cross-admissible with each other for purposes of establishing the identity of the perpetrator.  On that basis, it permitted a joint trial on all five incidents and authorized the jury to consider evidence connecting Lucas to any of the incidents as evidence connecting him to each of the other incidents.  This ruling was erroneous because each of the incidents were not so unusual and distinctive, nor so similar, as to reflect the "signature" of a single perpetrator.  Permitting the state to join for trial the charges related to separate incidents violated Lucas's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

**B.     Relevant Procedural Background and Consolidation Facts**

**1.     The Trial Court's Ruling on Cross-Admissibility**

2.     Lucas was arraigned in Municipal Court on the offenses in CR 73093 on December 19, 1984.  (1 CT 18.)  These offenses included the Santiago, Strang/Fisher and Swanke incidents.  Lucas was arraigned in the Municipal Court on the offenses in CR 75195 on March 18, 1985.  These offenses included the Jacobs and Garcia incidents.

---

[188]  For purposes of this claim, victims killed in the same incident are considered part of the same case.

3.     The cases proceeded along separate tracks until December 1986, when the prosecution filed a motion to consolidate in order to prevent CR 75195 from going to trial before CR 73093.[189]

4.     On June 6, 1988, the trial court ruled on the cross-admissibility, consolidation and severance issues.  (248 Pretrial 25472-513; 24 CT 5211-12.)  After ruling that the motion was not untimely, it compared the offenses finding three factors to be minimally distinctive shared marks: (1) the victims were all vulnerable; (2) the women were similar in appearance; (3) the women were alone or with a small child in a secluded place at the time of the attacks.  It found two factors to be substantially distinctive: (1) the crime scenes reveal no apparent evidence of motive; and (2) each victim suffered a massive throat slashing wound.  (248 Pretrial 25504-05.)  The judge then found that the throat wounds were sufficiently distinctive to be a signature.  (248 Pretrial 25506-07.)  The trial court further found that there are independent factors about each crime which link Lucas to them and that each case adds an important element to the identification issue and that cross-admitting the claims was necessary to the prosecution's case.  (248 Pretrial 25509-10.)

5.     Finally, the trial court found that any possible prejudice to Lucas was outweighed by the probative value, and ruled that all charges be joined for trial.  (248 Pretrial 25510-13.)

**2.     Relevant Facts of Each Case**

6.     The facts of each case, including the distinctions between each case, are set forth in Sections IV-VIII, and incorporated here by reference.

---

[189]  CR 75195 was sent out to trial in response to Lucas's Penal Code § 1382(2) speedy trial request.  (*See* 40 Pretrial 7776-77, 7813.)

### 3.   Wound Comparison Testimony

#### a.   Dr. Katsuyama

7.    Dr. David Katsuyama testified for the prosecution that "based on [the] similarity of the location, the extent of injury to the victims, one has to consider the possibility that a person, a single person, may have been involved in all of the injuries in these cases."  (79 Pretrial 4203; 4260-61.)  However, Katsuyama conceded that there was no literature that would enable him to render an opinion, based on the alleged similarities of the wounds that one individual inflicted them.  (79 Pretrial 4315.)

8.    Dr. Katsuyama compared the similarities of Swanke's injuries to those of the Jacobs: the type of instrument, location of the wound high up in the neck, cutting backward into the connective tissue and to the backbone.  There was possible choking in Suzanne Jacobs.  (79 Pretrial 4201.)  The petechial hemorrhaging in Suzanne may have been caused by lack of blood and oxygen to the capillaries caused by the chest wounds.  (79 Pretrial 4202.)

9.    Dr. Katsuyama testified that the injuries to Suzanne Jacobs were in the same general area of the upper neck.  (79 Pretrial 4205.)  All of the neck wounds were in the upper portion of the larynx.  (79 Pretrial 4206.)  He saw no visible signs of trauma to Swanke's vaginal area; he did not examine the vaginal areas of other victims.  (79 Pretrial 4293-94.)

10.    Based on his examinations of the photographs in Strang and Fisher, Katsuyama could not say how many strokes were used in those cases.  The same was true of Santiago, especially in light of the fact that her wound had been sutured.  (79 Pretrial 4299.)

11.    There were three penetrating chest wounds on Suzanne Jacobs, but no such wounds in any of the other cases.  (79 Pretrial 4156.)  There were no ligature marks on Suzanne Jacobs.  That is a dissimilarity from Swanke.  (79 Pretrial 4339.)

509

(15cv1224)

1    The fact that the Jacobs incident took place in a house distinguishes it from Swanke.

2    (79 Pretrial 4337.)

3         12.    The ligature marks on Swanke were different from those on Strang and

4    were the result of different instruments being used.  (79 Pretrial 4305; 4343.)  Based

5    on his view of the photographs, Katsuyama also observed evidence of ligature in the

6    Santiago case.  (79 Pretrial 4346.)  The absence of ligature marks is a dissimilarity as

7    to Jacobs.  (79 Pretrial 4347.)

8         13.    Subsequent to his autopsies in the Lucas case, Katsuyama was no longer

9    assigned to autopsies of potential homicide victims.  (79 Pretrial 4310.)  This may

10   have been due to dissatisfaction with his work.  (79 Pretrial 4311.)  Dr. Bucklin

11   testified that Dr. Katsuyama was taken off homicide autopsies at the request of

12   Bucklin.  (87 Pretrial 5192.)  This was done for "quality control."  (87 Pretrial 5193.)

13        **b.    Dr. Robin**

14        14.    Dr. Robin testified for the prosecution that he had done some 500

15   autopsies a year and the Garcia wound was the first of this type that he had seen.  (75

16   Pretrial 3272.)  However, Dr. Robin did not believe that the similarities that he

17   described suggested that one person caused all the injuries.  (75 Pretrial 3273-74.)  Dr.

18   Robin's evaluated the seven victims as follows:

19        15.    Garcia's neck wound was between the hyoid bone and the thyroid

20   cartilage.  The muscles that attach to the trachea and thyroid were cut.  The great

21   vessels in the neck were transected.  There was a bruise on the tongue and petechial

22   hemorrhages in both eyes.  (75 Pretrial 3266-67.)

23        16.    Suzanne Jacobs, had the "same gaping wound in the neck extending from

24   the angle of the jaw on the left to the right side.  One can observe the thyroid cartilage

25   and cannot visualize the hyoid bone."  (75 Pretrial 3267.)  Suzanne Jacobs' incision

26   was in the same location as Garcia's.  It transected the great vessels of the neck and

27   extended all the way through the neck to the cervical vertebrae.  In both cases there

28

510

(15cv1224)

was a defect on the anterior surface of the second cervical vertebrae.  The defect was caused by a knife reaching to the bone.  (75 Pretrial 3267-68.)

17.    Colin Jacobs had the "same large neck wound" extending from behind the ear on the right side and across the neck to the left side.  The cut went through the thyroid cartilage and was slightly lower than in the others by half an inch.  The great vessels were severed.  (75 Pretrial 3268.)

18.    The Santiago photos revealed a neck wound in the same general area from the angle of the mandible on the left and the right.  From the photos, Dr. Robin could not determine if it was located above the thyroid and below the hyoid.  (75 Pretrial 3269.)

19.    Strang had the same large gaping incision that extends from behind the ear on both sides and transected above the trachea, and severed the great vessels.  (75 Pretrial 3269.)

20.    Fisher had the same gaping wound in the neck, through the trachea.  Dr. Robin could not discern whether it was above the thyroid cartilage as in Garcia and Jacobs and Strang.  It did cut through the strap muscles of the neck, as well as the great vessels.  (75 Pretrial 3269.)

21.    Swanke had "the same gaping wound to the neck from behind the ear on both sides . . . . We can see the top of the thyroid cartilage, indicating that the incised wound is between the hyoid bone and the top of the thyroid cartilage and it extends all the way down to the underlying cervical vertebrae.  The incised wounds were in the same level of the neck, mostly above the thyroid cartilage and below the hyoid bone.  They transected the strap muscles, the great vessels of the neck and extended down to and cut the underlying cervical vertebrae."  (75 Pretrial 3269-70.)[190]

---

[190]  Petechial hemorrhages were present in Garcia, Swanke and Strang.  (75 Pretrial 3267, 3271.)

511

(15cv1224)

22.    A firm, sharp knife blade would have caused the wounds.  (75 Pretrial 3270.)  If a razor blade did it, it would have been held in an instrument like a scalpel. (75 Pretrial 3271.)

23.    There were no stab wounds in the Garcia case or in Colin Jacobs.  In Suzanne Jacobs, there were no abrasions to the head but there were some in Garcia. (75 Pretrial 3281-82.)  There was no evidence of blunt force trauma such as a concussion to the brain in Garcia and no skull fractures.  (75 Pretrial 3283.)  In Garcia, there was some abrasion to the right wrist area.  (75 Pretrial 3285.)  Dr. Robin was unaware of any similar injury to Suzanne Jacobs, Strang and Swanke.  These wrist abrasion injuries distinguished Garcia from the others.  (75 Pretrial 3286.)

24.    The toxicology screen on Garcia was absolutely clean as opposed to the .04 blood alcohol level of Suzanne Jacobs.  (75 Pretrial 3287.)

25.    Garcia and Swanke were the only cases with nose abrasions.  (75 Pretrial 3296-97.)  He could not find any true defensive type injuries in Garcia.  (75 Pretrial 3298.)

### c.    Dr. Geiberger

26.    Dr. Geiberger testified for the prosecution that he was present at a meeting with Deputy D.A. Williams in early 1985 to discuss the similarities of Santiago's wounds with those of the other victims.  (84 Pretrial 4873.)  Dr. Geiberger concluded that the wounds in the adults were similar in several respects: the level of the wound between the thyroid cartilage and the hyoid bone, the depth of the wound in that all went back essentially to the bone although some were a millimeter or two away, all wounds were inflicted with a sharp instrument and they all had small tags along the edge of the cuts indicating multiple strokes or movement of the knife within the

(15cv1224)

wound.  (84 Pretrial 4877.)[191]  However, Dr. Geiberger agreed that there was no literature which says that it is possible to compare apparently similar injuries to enable an expert to form an opinion that the same person inflicted all of the injuries.  (84 Pretrial 4897.)

### d.   Dr. Bucklin

27.   Dr. Bucklin testified for the prosecution and concluded that Swanke, Santiago, Strang, and Fisher were not "mirror images" of each other.  The wounds were not so similar as to compel the conclusion that one person must have done them all.  Nor were there any standards among pathologists to enable one to determine whether a single person was responsible for several different throat slashings.  In fact, one could not even conclude that the same person did both Strang and Fisher much less Swanke: "I don't think anybody can say from the evidence that's here that the similarities make one assess one person as the assailant.  There is no way that you can do this and be medically responsible."  (87 Pretrial 5231-32.)  Moreover, there were both similarities and differences.  Based purely on anatomy, there was no way Dr. Bucklin could ever say that one person inflicted a series of wounds on different individuals.  (87 Pretrial 5233.)

28.   Dr. Bucklin had three or four meetings in 1985 and 1986 with the District Attorney to discuss the similarities of the wounds.  (87 Pretrial 5190.)  Bucklin was present at a meeting with the other autopsy surgeons to discuss the similarities of these wounds.  (86 Pretrial 5151.)  Bucklin saw similarities of the wounds to Swanke and Strang.  Strang's wound was as deep as the one to Swanke which involved seven cuts on the left and four on the right.  The larynx and blood vessels were severed in each.  (86 Pretrial 5153.)  Strang had five cuts and Fisher had three.  Both originated on the

---

[191]   However, on cross-examination, Geiberger testified that he regarded the Santiago wound as being caused by one stroke.  (84 Pretrial 4884.)  (*But see* 84 Pretrial 4901 (there was more than one motion).)

right side.  (86 Pretrial 5156.)  However, there was not much petechiae on Swanke as opposed to Strang.  (86 Pretrial 5157.)[192]  Bucklin also described the similarities of Suzanne Jacobs to Strang.  In Jacobs, six strokes were used and the larynx and blood vessels were transected.  (86 Pretrial 5158.)  However, only the right jugular and carotid were cut in Suzanne.  The wounds were located in the same plane.  The depth was similar and the same type of instrument was used.  Bucklin could not say if the wound penetrated to the spine in Suzanne Jacobs.  (86 Pretrial 5159.)

29.    The plane of the wound of Colin Jacobs was in same general plane of Suzanne.  There were two strokes on the left and three on the right.  The right carotid and right jugular were hit and not the left ones.  It was essentially the same plane as the Strang wound and a little lower than in Fisher.  (86 Pretrial 5161.)

30.    Dr. Bucklin also described the similarities between the Strang and Garcia wounds.  The Garcia wound was six inches long, extended from the mandibular angle across the front of the neck.  Both carotids and jugulars were cut and the cut went to the second cervical vertebrae.  It went into the membrane between the cricoid and the thyroid but a little lower than in Strang.  (86 Pretrial 5162.)

31.    The Garcia wound was in the same plane as the Fisher cut.  (86 Pretrial 5168.)

32.    In sum, all the wounds in all of the cases were similar.  (86 Pretrial 5171.) The photographs of Fisher and Swanke exaggerate the wounds.  (86 Pretrial 5201.) Bucklin's opinion of the similarities was based on the photographs.  (86 Pretrial 5202.)

33.    One difference between Strang and Fisher and Jacobs is that the Jacobs victims had only the right carotid and jugular severed, whereas both sides were severed in Strang and Fisher. (86 Pretrial 5204.)

---

[192]  The Swanke photos indicated some bruises that might have been ligatures. (86 Pretrial 5158.)

514

(15cv1224)

34.     The stab wound in Swanke's neck was unique to that case.  (86 Pretrial 5205.)

35.     If Dr. Robin said there was only one stroke in Garcia, then he was wrong. Bucklin based this on the fact that there was more than one incision line in the photographs.  (87 Pretrial 5209.)

36.     Although one cannot tell the direction of the strokes in Jacobs, one can tell it in Strang and Fisher and that is a distinguishing factor.  (87 Pretrial 5211.)

37.     With respect to the existence of tags, there has to be more than one knife movement in order to create a tag.  (87 Pretrial 5214.)

38.     The fact that Swanke was found nude from the waist down distinguished that case from all the others except Santiago.  (87 Pretrial 5217.)  The lack of pants in Swanke and Santiago may indicate some recent sexual activity.  Bucklin checked for acid phosphatase level in Strang but he found none.  (87 Pretrial 5218.)

39.     In Swanke, Bucklin saw nothing that looked like a true ligature or compression mark on the neck.  Strang had some ligature marks consistent with a necklace.  (87 Pretrial 5221.)  All he saw on Swanke were some superficial abrasions on the neck.  (87 Pretrial 5222.)

40.     Bucklin did not see any evidence of ligature marks in either of the two Jacobs cases.  That was a distinguishing feature.  There was evidence of a ligature mark in Santiago.  There was none on Garcia.  (87 Pretrial 5223.)  Bucklin could not make any statements about the direction of the wound in Swanke.  (87 Pretrial 5224.)

41.     There were no nicks to the vertebrae observed in Jacobs which set it apart from Strang, Fisher and Swanke.  (87 Pretrial 5228.)  There were no nicks to vertebrae observed in Santiago either.  (87 Pretrial 5229.)

42.     The stab wounds to Suzanne Jacobs' torso were unique to that case.  (87 Pretrial 5229.)

43.     The head wounds to Santiago were unique to her case assuming they occurred as they did not show up in the photographs. (87 Pretrial 5230.)

515

(15cv1224)

44.    On the similarity of neck wounds, Bucklin observed:  "I have seen cases where the neck organs have been incised quite similar to these.  I have seen cases, as I have noted in these other records, where they are different.  There are not a tremendous number of ways to cut a throat, and whoever cuts throats doesn't have to follow a particular pattern, but there is (sic) a limited number of ways that one can cut a throat."  (87 Pretrial 5234-35.)

45.    One case that was very similar was in Texas City where a linoleum cutter was used.  The cut was on the same plane and both carotids and jugulars were severed.  Also, they were the same depth.  (87 Pretrial 5235.)

46.    Dr. Bucklin could not say if Strang and Fisher were cut from the front or the back.  However, a right-handed person would have more difficulty in making a right to left cut from the front.  (87 Pretrial 5238.)[193]

47.    The blockage of blood in Rhonda Strang's head (suffusion) was unique to that case.  (87 Pretrial 5244.)

### e.    Other Throat Slashing Cases

48.    On April 27, 1987, Max Murphy, the supervising deputy coroner testified that he had been employed by the coroner's office since 1961.  (98 Pretrial 6472.)  In 1985, Bucklin asked Murphy to research all cases in San Diego County within a period of time in which throat slashings were a contributing cause of death.  (98 Pretrial 6480.)  Mary Ann Tamburello did the actual search and presented him with various documents.  This search went back to 1978.  (98 Pretrial 6481-82.)  The second search took place at the request of the defense and was in 1986 and went back to 1966 for throat slashings.  (98 Pretrial 6483.)  Tamburello just gave Murphy the case numbers and he pulled the actual files.  (98 Pretrial 6489.)  The defense request was broader and asked for slashings in general.  (98 Pretrial 6493.)

---

[193]  Dr. Bucklin could not make any determination whether the assailant of any of the victims was left or right handed.  (87 Pretrial 5244.)

516

(15cv1224)

49.     Tamburello and Murphy undertook the second search at the request of the defense in 1986.  (98 Pretrial 6544.)

50.     At the hearing Dr. Bucklin discussed some 20 other throat cutting cases. Many of there were clearly different from the killings charged against Lucas. However, some involved sharp cutting injuries of the larynx with extension to the cervical spine.  (98 Pretrial 6590-91, 6620-21, 6627-28, 99 Pretrial 6639, 6643-45.) The cases with such cuts were not sufficiently distinct from the homicides charged against Lucas for Dr. Bucklin to exclude the killer in the other cases as the killer in the charged cases.  (99 Pretrial 6658.)

### 4.     Testimony of Dr. Penrod

51.     Dr. Steven Penrod, an Associate Professor at the University of Wisconsin in Psychology, testified he obtained an undergraduate degree from Yale and a Ph.D. and law degree from Harvard.  (234 Pretrial 23950.)  He received various and sundry awards for his work in both law and psychology; mostly the latter.  A major focus of his research was the manner in which juries make their decisions.  One of the things that he was looking for in his joinder of offenses research was the root cause of the joinder effect and remedies therefore.  Another issue was whether or not jurors actually paid attention to limiting instructions about the use of other crimes evidence.  (234 Pretrial 23966.)

52.     Dr. Penrod found that curative instructions did not work.  (234 Pretrial 24025.)  Dr. Penrod concluded that the jury cannot effectively deal with cross-joined offenses.  First, jurors are simply unable to follow instructions which prohibit them from applying the evidence across charges.  Second, they are unable to follow instructions which require the exercise of discretion as to cross-consideration of the evidence.  Even when they were admonished to exercise discretion they "would go ahead and use the evidence . . . indiscriminately."  (235 Pretrial 24111-13.)

(15cv1224)

## C.    Relevant Law

53.    The separate trial of charges may be constitutionally required if joinder would be so prejudicial that it would deny the defendant his Fifth and Fourteenth Amendment rights to a fair trial.  *See United States v. Lane*, 474 U.S. 438, 446 n.8 (1985); *Bean v. Calderon*, 163 F.3d 1073, 1083 (9th Cir. 1998).  To assess this, the reviewing court looks at each count separately to decide if the trial of one count was rendered unfair because of the joinder of that count with one or more of the other counts.  *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991).

54.    Federal courts have recognized the high risk of prejudice that ensues when the consolidation of counts permits evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible.  *Bean*, 163 F.3d at 1084.  This risk exists because jurors at a joint trial cannot adequately compartmentalize damaging information about the defendant; thus, a trial where offenses are joined often prejudices the jurors' conception of the defendant and the strength of the evidence against the defendant on each of the counts.[194]  *See United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986).

55.    Also, jurors are prone to regard a defendant charged with multiple crimes with a more jaundiced eye and to conclude that the defendant must be bad to have been charged with so many things, and they may convict on one count based on evidence

---

[194]  *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1985) ("It is much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts, *see Ragghianti*, 527 F.2d at 587, than it is to compartmentalize evidence against separate defendants joined for trial.").  Studies have shown that joinder of counts tends to prejudice jurors' perceptions of the defendant and of the strength of the evidence on both sides of the case.  *See* Tanford, Penrod & Collins, *Decision Making in Joined Criminal Trials: The Influence of Charge Similarity, Evidence Similarity, and Limiting Instructions*, 9 Law and Human Behavior 319, 331-35 (1985); Bordens & Horowitz, *Joinder of Criminal Offenses: A Review of the Legal and Psychological Literature*, 9 Law and Human Behavior 339, 343, 347-51 1985). *Id.*

518

(15cv1224)

which only applies to another count.  *United States v. Ragghianti*, 527 F.2d 586, 587 (9th Cir. 1975) (jury might consider that defendant must be bad to have been charged with so many things).

56.    There are further due process concerns when a poorly-supported count is combined with one that is well supported.  *Bean*, 163 F.3d at 1084; *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir.1986).

57.    Additionally, California Penal Code section 954 authorizes the state to join two or more offenses of the same class of crime in one pleading, subject to a trial court's authority to order separate trials.  A trial court should exercise this authority when it is necessary to accord a criminal defendant the fundamental rights to due process and a fair trial.  *Williams v. Superior Court*, 36 Cal. 3d 441, 448 (1984); *superseded by statute on Alcala v. Superior Court*, 43 Cal. 4th 1205 (2008).  The concept that a consolidated trial may deprive a defendant of due process has been long-recognized in California.  *See In re Anthony T.*, 112 Cal. App. 3d 92, 101-02 (1980).

**D.    Joinder Violated Lucas's Right to Due Process**

58.    Although the propriety of consolidation is within the discretion of the state trial court, *Bean*, 163 F. 3d at 1084, where joinder results in a fundamentally unfair trial it becomes constitutionally problematic.  A comparison chart of the similarities and differences between the cases indicates that the differences are far more significant than the similarities such that joinder rendered Lucas's trial fundamentally unfair:

(15cv1224)

### 1. Comparison of Similarities and Differences

| | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **Victim Age** | Suzanne (S): 32<br><br>Colin (C): 3 | 29 | Rhonda Strang (RS):24<br><br>Amber Fisher (AF): 3 | 34 | 22 |
| **No. of Victims** | 2 | 1 | 2 | 1 | 1 |
| **Location and Depth of Throat Wounds** | S: One cut high above vocal cords went through upper portion of thyroid cartilage; another cut considerably lower (6 RT 952, 988; 37 RT 7058). Cut extended to front surface of backbone (6 RT 950); level of 4th vertebrae (6 RT 980-81); did not cut into vertebrae (38 RT 7193)<br><br>C: Between top of thyroid cartilage and hyoid bone (37 RT 7058).  Close to, within 1/4"; did not extend to backbone (6 RT 985, 989) | Cut went through membrane between hyoid bone and the top of the thyroid cartilage (24 RT 4493, 4499-4500; 37 RT 7058). Notch on right side of 2nd cerv. vertebrae (24 RT 4493; 4500) | RS: Cut went through upper portion of the thyroid cart., below the hyoid, through top part of body of larynx (37 RT 6988; 7058). Five cutting injuries on anterior surfaces of the 3rd & 4th vert.; most pronounced on left side (37 RT 6989, 6998); uppermost cut extended 1/4" into 3rd vertebrae (37 RT 6989)<br><br>AF: Between top of thyroid cartilage and hyoid bone (37 RT 7058).  Hit cervical vertebrae  on left side (37 RT 6995); either at C-3 or C-4 (37 RT 6999) | Wound b/t the thyroid cartilage and hyoid bone (20 RT 3687, 3690; 37 RT 7058). Within 1/16" of cervical vertebrae (20 RT 3686); would have impacted C-3 or C-4 (20 RT 3691) | Cut through upper portion of thyroid cartilage slightly above vocal cords (26 RT 4871; 37 RT 7058). Two marks; one very high up somewhere between C-2 and C-3, but see 27 RT 4974 [first near C-1 or C-2]; and one just behind the cut in the larynx between C-4 and C-5 (26 RT 4872) |

520

(15cv1224)

| | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **No. of Strokes** | S: At least 6 (6 RT 980);<br><br>C: "More than one stroke" (6 RT 988); multiple strokes on one side (6 RT 988); two definite slashes (6 RT 976) | 1 cutting stroke (24 RT 4503); possible movement of cutting instrument or victim (50 RT 9398; 9420) | RS: More than 1 stroke; 5 distinct cutting injuries to cervical vertebrae (37 RT 6993)<br><br>AF: "more than one stroke" (37 RT 6996) | 1 stroke (20 RT 3703); sawing or carving motion (20 RT 3692; 37 RT 7057; 7062) | More than 1 stroke; 7 strokes on left side and 4 on right (26 RT 4867-68) |
| **Jugular/ Carotid Severed** | S: Right carotid & right jugular vein (6 RT 945; 38 RT 7193)<br><br>C: Right carotid artery & right jugular vein (6 RT 984; 38 RT 7193) | Both jugulars & carotids on both sides (27 RT 4493) | RS: Both carotid arteries; all jugular veins (37 RT 6988)<br><br>AF: All | External jugular vein severed; internal jugulars and carotids not cut (20 RT 3686) | Both carotids arteries and both jugular veins (26 RT 4867, 4870) |
| **Direction of Throat Wound** | S: N/A<br><br>C: More on one side than the other (6 RT 988) | Left to right (27 RT 4493) | RS: Right to left (37 RT 6986-88. 7010)<br><br>AF: Originated on right side (37 RT 6995, 7010) | N/A | Blade moved across neck in both directions (38 RT 7196); likely that handle of blade was to Swanke's right (38 RT 7196) |
| **Stabs to Torso** | S: 3 severe stab wounds to torso (6 RT 952-53, 961)<br><br>C: No (6 RT 986) | None noted | RS: No (37 RT 6984-85)<br><br>AF: No (37 RT 6994) | No | No |

521

(15cv1224)

| | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **Hypoxia/ Petechiae** | S: Yes (6 RT 970-73; 38 RT 7191); <br><br> C: No (6 RT 989) | Yes (24 RT 4496) | RS: Yes; in sclera, skin of forehead, cheeks and chin (37 RT 6983-84); <br><br> ("suffusion" of the face; possibility that she had been choked (37 RT 6987) <br><br> AF: None noted | N/A | Eyes were sunken "somewhat dehydrated" (26 RT 4854, 4973); No (38 RT 7191); maybe some petechiae on inner aspect of scalp (27 RT 4910, 4974) |
| **Evidence of Ligature Marks** | S: No (7 RT 1094; 37 RT 7074) <br><br> C: No (7 RT 1094) | No (24 RT 4533-34; 37 RT 7074) | RS: Yes (37 RT 6991-92, 7059) <br><br> AF: None noted | Yes (20 RT 3694; 37 RT 7073, 7075) | Yes.  (26 RT 4854, 4863-64)  Could have been caused by choke chain found around neck (26 RT 4864; 4703; 4997) |
| **Lip/ Tongue Wounds** | S: Tongue clenched between teeth but no bleeding (6 RT 975; 38 RT 7194-95) <br><br> C: No (6 RT 986) | Yes; hemorrhagic contusion of lower lip left of midline over front left incisor (24 RT 4498-99) | RS: No (37 RT 7018); <br><br> AF: No (37 RT 7018) | N/A | Yes, hemorrhage due to tongue being clenched between teeth (27 RT 4905, 4910-11; 38 RT 7194) |

522

(15cv1224)

| | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **Other Injuries to Face/ Head** | S: No (38 RT 7198-99)<br><br>C: No (6 RT 986) | 3 linear abrasions on left side of forehead; 1 midline of forehead (24 RT 4492, 4501-03); abrasion on tip of nose (24 RT 4492); abrasions & scratches under the chin (24 RT 4493); abrasion near left ear (24 RT 4495) | RS: 1/4" superficial cut at right border of neck wound (point of origin) (37 RT 6986):<br><br>AF: Small superficial abrasions to forehead (37 RT 6997) | Severe closed head trauma; skull fractures (20 RT 3695); concussion (20 RT 3714); brain swelling (20 RT 3717); amnesia (20 RT 3711) | Minor injury 1" behind lower portion of left ear (27 RT 4976 |
| **Other Non-defensive Injuries** | S: Abrasions near collarbone (6 RT 989); bruising on back (4 RT 453); yellow discolored area high on left side of buttock area (38 RT 7199);<br><br>C: Cut to fingers; laceration in left palm (6 RT 984) | None noted | RS: Right shoulder 4" right of midline, superficial hemorrhagic area, 1/4" diam. (37 RT 6990; 7011-12);<br><br>AF: 1/4" superficial cutting-type wound on right shoulder, similar to wound on Strang (37 RT 6990-91, 6994, 7011-12) | No | Brush marks or line-like scrapes on buttocks and thighs (26 RT 4854, 4857-58; 27 RT 4888); number of scratches between buttocks & knees (26 RT 4858, 4888-89); discoloration on palmar aspects of both hands at base of the thumb (27 RT 4923); linear mark on right wrist (27 RT 4923) |

523

| | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **Defensive Wounds** | S: Broken fingernail "consistent with defense wound or struggle" (4 RT 453)<br><br>C: Maybe (See above) | No (50 RT 9395) | RS: None noted (37 RT 7009-10);<br><br>AF: None noted; but see (37 RT 6997, 7009) (cut through the tip of the finger) | Middle and ring finger of right hand cuts; cut through tendons to bone (3 RT 7054-55; 50 RT 9395-96) | Cut on ring finger of left hand (27 RT 4912-13, 4918-19) Occurred short time before death (27RT 4914, 4924-25) |
| **Sexual Overtones** | S: None noted; swabs negative for sperm (7 RT 1092-93):<br><br>C: None noted | None noted | RS: No (37 RT 6985)<br><br>AF: None noted | Yes; nude from waist down (17 RT 3048); Slides made from vaginal swabs detected sperm cells (47 RT 8766-71; 57 RT 10862-63 [Def. Trial Exs. 689, 690, 691].) | Nude from waist down except socks (25 RT 4705); 56 RT 10723, 10730 [weak indication of acid phosphatase (seminal fluid) from swab]; unidentified pubic hair found  (28 RT 5145; 5152; 56 RT 10726-27, 10730-32) |
| **Had Ad in Paper** | Yes; to sell dinette set (7 RT 116, 134) | Yes; Goff ran ad "rent to own" on house (15 RT 2611) | No | No | No |

524

(15cv1224)

|  | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **Victim Abducted** | No (See place of attack) | No (See place of attack) | No (See place of attack) | Yes; off street (38 RT 7325-34) | Yes, off street (25 RT 4722) |
| **Victim Tied Up** | No | No | No | Yes (38 RT 7340) | Possibly [linear mark on right wrist (27 RT 4923)] |
| **Attack Location** | Inside own home (1 RT 111-12; 2 RT 200) | Inside 3rd party home (15 RT 2615, 2623) | RS: Inside own home (18 RT 3201-02)<br><br>AF: Inside 3rd party home (18 RT 3201-02) | Taken to house and choked (38 RT 7338-44); found along side a public street (17 RT 2997-99, 3033-34) | Kidnapped off street; place of killing unknown– found outside in remote area (24 RT 4549-53, 4701-02; 25 RT 4722) |
| **Time of Attack** | Morning [between 6:00 a.m. and 11:30 a.m (1 RT 112-113,198; 2 RT 206-207 ) | Early evening [between 5:35 p.m. and 6:05 p.m.] (15 RT 2616-19, 2622) | Morning/Early Afternoon [between 9:00-9:30 a.m. and 1:30 p.m.] (19 RT 3395, 3402-03) | Late evening [around 10:30-11:00 p.m.] (38 RT 7324) | Early morning [between 1:15 or 1:30  a.m.] (24 RT 4549-53, 4561, 4599-600) |
| **Moved After Attack** | S: No;<br><br>C: Not Noted | Not noted | RS: Not noted;<br><br>AF: Not noted | Yes | Unknown; kidnapped off street; place of attack unknown– found outside in remote area (25 RT 4701-02) |

525

| | Jacobs | Garcia | Strang/Fisher | Santiago | Swanke |
|---|---|---|---|---|---|
| **Victim's Clothing** | S: Fully clothed (38 RT 7199); Torn or rip in back of shirt; (2 RT 324-25; bra strap broken (2 RT 325; 50 RT 9394, 9399); C: Fully clothed (2 RT 348-49; 8 RT 1312) | Fully clothed (16 RT 2941) | RS: Not indicated (but in limine testimony was fully clothed w/o shoes (79 Pretrial 4301)); AF: Not indicated (but prior testimony was fully clothed w/o shoes (79 Pretrial 4302) | No apparent cutting of clothing | Clothing was cut (25 RT 4706) |
| **Knew Lucas** | No | No | RS: Yes (19 RT 3425) AF: Through RS | No | No |

59.     As shown in the above chart, the cases varied in terms of the number of victims, the time and place of attack, the circumstances of the attack, the nature of the throat cutting and other wounds, and their relation to Lucas.

**2.     The Similarities Found by the Trial Court Were Not Substantial**

60.     As explained above, the trial court found the following similarities among all the offenses:

1.  The victims were vulnerable.

2.  All of the women were similar in appearance.

3.  At the time of the attack each woman was alone or with a small child.

4.  The crime scene suggested no motive.

5.  The victims suffered throat wounds which, in the court's view, were of "signatory significance."  (28 Pretrial 25504-07.)

61.     These factors fell far short of the unique distinctiveness and signature-like quality required for admission to show identity.

526

(15cv1224)

62.     Factors 1 and 3, vulnerability and being alone, did not make these victims unique.  It is an unfortunate fact that violent crimes are often committed against those who are alone and vulnerable.

63.     Factor 2, the appearance of the victims, is of minimal significance especially considering that Jacobs also included a 3 year-old male victim while Santiago did not.

64.     Factor 5, lack of motive, is not a point of similarity between Jacobs and Santiago.  In Jacobs there was no apparent motive, but in Santiago there was evidence of a sexual motive.  Moreover, even if there were no motive, that would not make the assaults so unique as to be "signature" crimes.

65.     Finally, the trial court's conclusion that the throat cutting was of "signatory significance" is not supported by the record.  While there were some basic similarities between the throat wounds in Jacobs and Santiago, the experts did not agree with the trial court's assessment of the distinctiveness of the throat wounds.

66.     None of the experts concluded that the wounds were of signatory significance.  For example, Dr. Bucklin testified:  "I don't think anybody can say from the evidence that's here that the similarities make one assess one person as the assailant.  There is no way that you can do this and be medically responsible."  (87 Pretrial 5232.)

**E.      Prejudice**

67.     There is "a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible."  *Bean*, 163 F.3d at 1084 (*citing Lewis*, 787 F.2d at 1322.)  To assess prejudice, the reviewing court looks at each count separately to decide if the trial of one count was rendered unfair because of the joinder of that count with one or more of the other counts.  *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000).  Taking the cases individually and together demonstrates that the joinder error had a substantial and injurious effect on the verdict.  *Brecht v.*

(15cv1224)

*Abrahamson*, 507 U.S. 619 (1993).  As indicated by Dr. Penrod's testimony and case law, this error was not cured by the court's instructions because "jurors at a joint trial cannot adequately compartmentalize damaging information about the defendant; thus, a trial where offenses are joined often prejudices the jurors' conception of the defendant and the strength of the evidence against the defendant on each of the counts.  *Lewis*, 787 F.2d at 1322 (9th Cir. 1986).  Further, rather than curing any due process violation, the prejudicial impact of joining the Jacobs and Strang/Fisher counts for trial was heightened by a series of instructional errors concerning the jury's cross-count consideration of evidence.  (*See* Claims 30.)

### 1.    Jacobs

68.    The Jacobs counts were closely balanced for several reasons.

69.    First, a third party–Johnny Massingale–confessed to committing the murders.  His confession was sufficiently detailed and credible to convince the investigators and the district attorney's office that Massingale was the perpetrator.  Charges were brought against Massingale and, after a preliminary hearing, the magistrate bound him over on the charges.  Even though Massingale recanted his confession at Lucas's trial, the veracity of his testimony was subject to dispute.  For example, he continued to deny ever carrying a knife even though numerous witnesses testified to the contrary.

70.    Second, all of the prosecution evidence offered against Lucas was ambiguous and/or subject to conflicting inferences.  The prosecution argued that the Love Insurance note was probative since Lucas purchased insurance from that company approximately three months after the Jacobs murders.  However, this evidence failed to reasonably focus guilt on Lucas since as many as ten people per day purchased insurance from Love Insurance.  (14 RT 2458-59.)

71.    Moreover, the evidence did not conclusively establish that the note was left by the killer.  Although Michael Jacobs testified that he had not seen the note before he left for work that morning (1 RT 117), the note was very small and easily

could have been overlooked by Jacobs.  Moreover, the presence of numerous unidentified fingerprints in the Jacobs house suggests that numerous other people had been in the house.  Any of these people, even if not the killer, could have left the note.

72.   Additionally, even if it is assumed that the note was left by the killer, and that Lucas had authored the note, this would not prove Massingale's innocence beyond a reasonable doubt.  By his own admission Johnny Massingale had stayed in the San Diego Salvation Army Mission where Lucas had resided as well.  (5 RT 664; 50 RT 9471-72.)  Thus, Massingale could have obtained clothing containing the Love Insurance note left by Lucas.

73.   Nor did any of the other circumstances, either individually or cumulatively, establish Lucas's guilt.  The MG evidence was inconclusive.  Margaret Harris testified that she saw an MG parked in the Jacobs' driveway, but her original description was only that it was a maroon sports car.  Even though she claimed to have known it was an MG, within two days after the murders in May 1979 she didn't tell this to the police in her discussions with them between 1979 and 1988.  It wasn't until the summer of 1988 that she informed the police about the change in her description. (42 RT 7971-72, 8103-04.)

74.   Additionally, Harris described the car she saw as maroon, but the color of Mrs. Lucas's car was bright purple.  Also, in May 1979, the car was not running.  (42 RT 7971-72, 8103-04.)

75.   Finally, Harris originally told the police that she saw the car in the Jacobs' driveway between 8:00 and 9:00 a.m.  (2 RT 234-35.)  If this was correct then it was evidence which favored the defense since Lucas was not permitted to leave his residence at the New Horizons program until 9:00 a.m.  Moreover, the inference that the Jacobs were killed before 9:00 a.m. was corroborated by another neighbor of Jacobs, Jeanette Robertson.  Robertson testified that the Jacobs were "always" out in their front yard by 9:00 a.m.  (53 RT 9906-09.)  However, on the morning of May 4,

(15cv1224)

1   1979, the Jacobs' were not out front when Robertson drove by at 9:00 a.m.  (53 RT

2   9910.)[195]

3       76.   Allowing the Santiago case to be used to prove identity in Jacobs was

4   devastating to the defense.  The cross-admissibility ruling allowed the prosecution to

5   heavily rely on the other crimes to fill in the evidentiary gaps in individual cases such

6   as Jacobs.  This exemplifies the impropriety of joining a stronger case with a weaker

7   case.  The prosecution relied on the erroneous cross-admissibility ruling extensively

8   during closing arguments.  Moreover, Santiago, in particular, involved an eyewitness

9   identification of Lucas which the jury was allowed to carry-over from Santiago to fill

10  in the evidentiary gaps in Jacobs.  In fact, the prosecution opened argument with a

11  discussion of Santiago's identification of Lucas.  (62 RT 11750.)  Allowing Santiago

12  to be cross-admitted was particularly prejudicial as to the penalty trial since the

13  Santiago count could have been used both to counter the defense theory of lingering

14  doubt and as independent aggravation under factor (a): circumstances of the crimes for

15  which Lucas was convicted in the present proceeding

16      77.   Allowing the Swanke case to be used to prove identity in Jacobs was

17  likewise devastating to the defense.  The evidence in Jacobs was far from

18  overwhelming.  Moreover, Swanke involved an eyewitness identification of Lucas's

19  vehicle and electrophoresis comparison testimony which could have been carried over

20  by the jury from Swanke to fill in the evidentiary gaps in Jacobs.

21      78.   Joining the counts for trial and allowing the jurors to use the Strang/Fisher

22  case on the issue of identity in Jacobs was particularly prejudicial because the eleven

23  jurors who voted for guilt in Strang/Fisher likely relied on the Santiago and/or Swanke

24  cases to reach that conclusion.[196]  In turn, those eleven jurors likely relied on

25  _____

26     [195]  Robertson also testified that she didn't see any cars in the driveway at that
    time.  (53 RT 9906-07.)

27     [196]  Of course the eleven jurors could also have relied on Jacobs instead of

28  Swanke and/or Santiago to vote for guilt as to Strang/Fisher.  However, Swanke and

(15cv1224)

Strang/Fisher to convict on Jacobs due to the fact that both cases involved an adult and a child victim killed in a house.

### 2. Santiago

79. The error was prejudicial because the Santiago case was closely balanced due to numerous critical factors which undermined the accuracy and reliability of Santiago's identifications.

80. Because there was no independent evidence that connected Lucas to the Strang/Fisher murders, it was error to join those counts for trial with other charges to allow the jurors to rely on Strang/Fisher to convict on the Santiago charges. This was particularly prejudicial because eleven jurors had concluded that Lucas was guilty in Strang/Fisher and likely used that conclusion to convict in Santiago.

### 3. Swanke

81. Allowing Jacobs to be used in the Swanke case was prejudicial because a key piece of forensic evidence in the Swanke case excluded Lucas as the attacker. Therefore, the error in allowing the jurors to consider the Jacobs evidence on the issue of identity in Swanke was prejudicial.

82. Allowing the Santiago case to be used in the Swanke case was particularly prejudicial because Santiago involved eyewitness identification testimony whereas Swanke did not.

83. Even though the jurors did not reach a verdict in the Strang/Fisher case, they were split 11 to 1 in favor of conviction. (65 RT 12319; 26 CT 5563.) Because

---

Santiago each involved some form of direct identification evidence and Jacobs did not. Also, in Jacobs there was a third party confession while in Swanke and Santiago there was not. Further, the Santiago, Swanke and Strang/Fisher offenses all happened in 1984 while the Jacobs murders were in 1979. Thus, it is more likely that the eleven jurors relied on Swanke and Santiago to conclude that Lucas committed the Strang/Fisher murders.

Hence, there was a factual basis for the jurors to rely on Santiago and/or Swanke to prove Strang/Fisher and then to use Strang/Fisher to convict on Jacob. The prosecution cannot demonstrate that the jurors did not rely on this improper theory and, therefore, the judgment should be vacated.

there was no independent evidence that connected Lucas to the Strang/Fisher murders, it was error to join those counts for trial with other charges to allow the jurors to rely on Strang/Fisher to convict on the Swanke charges.

**F.    Even If Guilt Is Not Vacated, the Penalty Judgment Should Be**

84.    Even if the error was not prejudicial as to the guilt judgment, it was prejudicial, individually and cumulatively, as to penalty.  The penalty trial was closely balanced and the error was substantial.  Certainly, erroneously authorizing the jury to consider the Santiago evidence in support of finding Lucas guilty of the Jacobs murders, thereby improperly undermining lingering doubt as to Lucas's guilt, had a substantial and injurious effect on the death verdict.

**CLAIM 44:  THE TRIAL COURT ERRONEOUSLY FAILED TO CONSIDER EXPERT TESTIMONY REGARDING THE INABILITY OF JURORS TO HEED LIMITING INSTRUCTIONS IN CROSS-ADMISSIBILITY CASES (AOB 2.3.5.2, 3.8.5.2, 4.7.5.2, 5.2.6.2)**

1.    Cross-admissibility and consolidation were crucial contested issues.  An important consideration in resolving these issues was whether or not the jury could properly consider the other crimes evidence.  In this regard the trial court's refusal to consider defense expert testimony on this issue violated Lucas's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

2.    The error violated Lucas's federal constitutional rights because excluding Dr. Penrod's testimony denied the defense a full and fair opportunity to litigate the cross-admissibility and consolidation issues.  The right to present evidence is a linchpin of the due process right to a fair hearing and that right was violated here.  *Crane v. Kentucky*, 476 U.S. 683 (1986); *Chambers v. Mississippi*, 410 U.S. 284 (1973).  Allowing only the prosecution to present evidence also violated due process by unjustifiably creating an imbalance between the prosecution and defense.  "[I]n the absence of a strong showing of state interests to the contrary" there "must be a two-way street" as between the prosecution and the defense. *Wardius v. Oregon*, 412 U.S. 470,

475 (1973).  Further, because the error arbitrarily denied Lucas his state created rights to a balancing of probative value against prejudice (Cal. Evid. Code § 352), a determination of admissibility under Cal. Evidence Code § 1101(b), and to present relevant and material evidence under the Cal. Evid. Code (§ 350 § 352) and the Cal. Constitution (Art. I, § 28(d)), it violated his right to due process under the Fourteenth Amendment to the United States Constitution.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

3.      In the present case, the defense sought to introduce the testimony of Professor Penrod to provide empirical insight into the issue of whether jurors are able to follow limiting instructions as to cross-admissible evidence.  Dr. Penrod testified, based on his studies, that the jurors would not be able to follow an instruction which permitted limited consideration of the other offenses.  (235 Pretrial 24113.)  The trial court's refusal to admit or consider this evidence was prejudicial error because it deprived the judge of important evidence which would have militated against granting the prosecution's consolidation motion.  Had the trial court admitted into evidence and given due weight to Dr. Penrod's testimony, the court would not have ruled the separate incidents cross-admissible or permitted a consolidated trial, in violation of due process.

4.      The error was prejudicial, warranting reversal of all convictions, because consolidating the cases and allowing the jury to cross-consider all the joined charges had a substantial and injurious effect on the verdict in a closely balanced case. [197]  Even if the error was not prejudicial as to the guilt judgment, it was prejudicial, individually and cumulatively, as to penalty.  The penalty trial was closely balanced and the error was substantial.

---

[197]  The cross-admissibility ruling allowed the prosecution to heavily rely on the other crimes to fill in the evidentiary gaps in individual cases such as Jacobs.

(15cv1224)

**CLAIM 45:  THE TRIAL COURT ERRONEOUSLY FAILED TO RULE ON THE CROSS-ADMISSIBILITY OF EACH OFFENSE INDEPENDENTLY (AOB 2.3.5.3, 3.8.5.3, 4.7.5.3, 5.2.6.3)**

1. In ruling that all the charges were cross-admissible the judge considered the offenses as a whole rather than determining cross-admissibility on a case-by-case basis, failing to determine whether each offense was linked to independent evidence. (248 Pretrial 25503.)

2. The trial court's failure to evaluate each offense independently violated Lucas's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  Under federal law, the reviewing court looks at each count separately to decide if the trial of one count was rendered unfair because of the joinder of that count with one or more of the other counts.  *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991).  Similarly, under California law, in determining whether cross-admitting evidence from other crimes is more probative than prejudicial, the trial court must evaluate whether independent evidence as to each crime points to the accused.  Without such an independent analysis of each offense the issue of cross-admissibility, and ultimately the jury's verdicts, will be based on improper "bootstrapping."  *People v. Albertson*, 23 Cal.2d 550, 580-81 (1944).  And, because the error arbitrarily violated Lucas's state created rights, the error violated his right to due process under the Fourteenth Amendment to the United States Constitution.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

3. The Due Process Clause protects a party from inflammatory and prejudicial matters that affect the fundamental fairness of the proceedings.  *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  Because admission of other crimes evidence undermines fundamental fairness it "is to be received with 'extreme caution,' and all doubts about its connection to the crime charged must be resolved in the accused's favor."  *People v. Alcala*, 36 Cal. 3d 604, 631 (1984) (citations omitted).  Hence, the jurors' improper consideration of such evidence violated Lucas's federal constitutional

534

(15cv1224)

1   due process rights under the Fourteenth Amendment.  *See McKinney v. Rees*, 993 F.2d

2   1378, 1380-85 (9th Cir. 1993).

3       4.      Moreover, the jury's erroneous consideration of the other offenses in the

4   present case undermined the reliability of both the guilt and penalty verdicts by

5   allowing the jury to rely on speculative and unreliable evidence.  An unreliable verdict

6   of conviction for any criminal offense violates the Due Process Clause of the federal

7   constitution.  *White v. Illinois*, 502 U.S. 346, 363-64 (1992).

8       5.      And, in a capital case both due process and the Cruel and Unusual

9   Punishment Clause of the federal constitution require heightened reliability in the

10   determination of guilt and death eligibility before a sentence of death may be imposed.

11   *See Beck v. Alabama*. 447 U.S. 625, 627-46 (1980).  The jury's improper consideration

12   of other crimes evidence undermined the reliability of the guilt and penalty verdicts in

13   violation of the federal constitution

14       6.      In light of the trial court's failure to consider the evidence of each offense

15   independently, the judgment should be vacated.  The prejudice resulting from

16   erroneously cross-admitting offenses is discussed thoroughly in Claim 43 and

17   incorporated herein.

18   **CLAIM 46:  THE TRIAL COURT ERRONEOUSLY DENIED AN**

19   **EVIDENTIARY HEARING ON WHETHER THE PROSECUTION'S MOTION**

20   **TO CONSOLIDATE WAS A VINDICTIVE RESPONSE TO LUCAS'S**

21   **ATTEMPT TO EXERCISE HIS RIGHT TO A SPEEDY TRIAL (AOB 2.3.5.5,**

22   **3.8.5.5, 4.7.5.5, 5.2.6.5)**

23       1.      In response to Lucas's assertion of his statutory speedy trial rights, the

24   prosecution intentionally moved to consolidate the two cases and amended its Notices

25   of Aggravation.  The defense successfully obtained an appellate order for a speedy trial

26   in case number 75195.  However, the prosecution responded by filing an eleventh hour

27   motion to consolidate the two cases, thus undermining the appellate court's order and

28   defeating Lucas's speedy trial rights.  The defense filed a supplemental motion alleging

535

prosecutorial vindictiveness as another ground for denying consolidation and as a ground for recusal of the San Diego county District Attorney's Office.  (18 CT 3702-3824; 247 Pretrial 25366; 248 Pretrial 23474-94.)  The trial court denied the defense request for an evidentiary hearing on vindictiveness and denied the defense motions without hearing any testimony.  (248 Pretrial 25460, 25465.)  The court eventually granted the prosecution's motion to consolidate and denied the defense motion to sever. (248 Pretrial 25513; 25 CT 5211-12.)  Jury selection commenced in the consolidated case almost two years after the original trial date set pursuant to the Court of Appeal's order.  (25 CT 5237-38; 70 CT 15535-36.)

2.     The federal constitutional protection against prosecutorial vindictiveness "is based on the fundamental notion that it 'would be patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.'" "*In re Bower*, 38 Cal. 3d 865, 873 (1985) (*quoting United States v. Jackson*, 390 U.S. 570, 581 (1968)).  Prosecutorial vindictiveness implicates the Due Process Clause of the federal constitution.  *Blackledge v. Perry*, 417 U.S. 21 (1974).  The same fundamental notion should also apply to the exercise of state created rights because the danger to the system is the same regardless of whether the legal right is based on the federal constitution or state law:  "[A] judicial process which permit[s] the prosecution to increase the charges against a defendant who successfully exercised a constitutional or procedural right at trial would have a chilling effect upon the assertion of those rights and could undermine the integrity of the entire proceeding."  *In re Bower*, 38 Cal. 3d at 878; *see also Hicks v. Oklahoma*, 447 U.S. 343 (1980) (arbitrary denial of state created right violates Due Process Clause of the federal constitution.)

3.     For example, "the prophylactic rule enunciated in [*Blackledge v. Perry* (1974) 417 U.S. 21] [was needed to] protect against both the possibility that defendant will be deterred from exercising a legal right, as well as the danger that the state might be retaliating against the defendant. . . ."  *Twiggs v. Superior Court*, 34 Cal. 3d 360, 369-70 (1983).  In fact, the right which was exercised in *Blackledge* was a "statutory

1    right to trial de novo." *Blackledge*, 417 U.S. at 28. *Blackledge* employed a

2    presumption of vindictiveness to find a violation of due process principles without a

3    showing of actual vindictiveness. "Thus, the court emphasized that no evidence of bad

4    faith or maliciousness on the part of the prosecutor was produced or required." *In re*

5    *Bower*, 38 Cal. 3d at 874; *see also United States v. Groves*, 571 F.2d 450, 453-54 (9th

6    Cir. 1978) (an "appearance of vindictiveness" is enough to impose a heavy burden on

7    the prosecution to prove a lack thereof). The Court exhorted that "[d]ue process of law

8    requires that such a potential for vindictiveness must not enter into North Carolina's

9    two-tiered appellate process." *Blackledge*, 417 U.S. at 28; *see also North Carolina v.*

10   *Pearce*, 395 U.S. 711 (1969).

11          4.     In later cases, the *Pearce-Perry* presumption of vindictiveness was held

12   not to arise where charges were increased prior to the attachment of jeopardy. *Borden*

13   *Kircher v. Hayes*, 434 U.S. 357 (1978); *United States v. Goodwin*, 457 U.S. 368 (1982).

14   However, the Court has noted that even where it declines to apply a presumption of

15   vindictiveness, "we of course do not foreclose the possibility that a defendant in an

16   appropriate case might prove objectively that the prosecutor's charging decision was

17   motivated by a desire to punish him for doing something that the law plainly allowed

18   him to do." *Goodwin*, 457 U.S. at 384.

19          5.     Accordingly, in situations where vindictiveness is not presumed

20   fundamental fairness requires an evidentiary hearing during which the accused is given

21   an opportunity to meet the required showing of actual vindictiveness. It is

22   fundamentally unfair to impose an evidentiary burden upon an accused without

23   allowing him or her an opportunity to satisfy that burden.

24          6.     The right to present evidence is a linchpin of the due process right to a fair

25   hearing. *See Holt v. Virginia*, 381 U.S. 131, 136 (1965) (the right to object and the

26   right to file motions would be useless if the accused is arbitrarily precluded from

27   introducing evidence in support of those motions); *Reece v. Georgia*, 350 U.S. 85, 89

28   (1955).

(15cv1224)

7.   Further, the United States Supreme Court has again and again noted the "fundamental" or "essential" character of a defendant's right both to present a defense, (*see, e.g,. Crane v. Kentucky*, 476 U.S. 683, 687 (1986), and present witnesses as a part of that defense, *see e.g. Taylor v. Illinois*, 484 U.S. 400, 408 (1988).  The Court has variously stated that an accused's right to a defense and a right to present witnesses emanates from the Sixth Amendment, *Taylor*, 484 U.S. at 409, the Due Process Clause of the Fourteenth Amendment, *Rock v. Arkansas*, 483 U.S. 44, 51 (1987), or both. *Crane*, 476 U.S. at 690.

8.   In the present case Lucas sought a hearing so that the testimony of principal witnesses (including the deputy district attorneys responsible for the decision to seek consolidation) could be heard and evaluated by the trier of fact.  Denial of that hearing violated the Due Process and Compulsory Process Clauses of the federal (Sixth and Fourteenth Amendments) constitution.  Moreover, because the error arbitrarily denied Lucas his state created rights to present evidence (California Constitution Art. I, sections 1, 7, 15, 16, 17 and 28(d); California Evidence Code § 350-§ 352) it violated his right to due process under the Fourteenth Amendment to the United States Constitution.  *Hicks*, 447 U.S. at 346.

9.   The denial of an evidentiary hearing to show prosecutorial vindictiveness had a substantial and injurious effect on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Evidence of the prosecution's vindictiveness in moving to consolidate the cases did not come in through any other means.  Had the trial court granted a hearing and allowed the defense to present evidence of prosecutorial vindictiveness, the cases would not have been consolidated and the results of the proceedings would have been different.  The prosecution relied on the consolidation of the cases to improperly cross-admit evidence from the various cases as discussed in Claim 43.  Even if the error was not prejudicial as to guilt, it was prejudicial as to penalty because it undermined the mitigating theory of lingering doubt.

(15cv1224)

**CLAIM 47:  BY BOOTSTRAPPING ITS FINDINGS, THE TRIAL COURT DENIED LUCAS A FAIR AND RELIABLE IN LIMINE DETERMINATION AS TO CROSS-ADMISSIBILITY AND OTHER CRUCIAL EVIDENTIARY ISSUES (AOB 2.3.5.4, 3.8.5.4, 4.7.5.4, 5.2.6.4)**

1.     In a number of its rulings, the trial court relied on cross-consideration of the several charges against Lucas.  This created a logical flaw in the courts's rulings.  Because the rulings were interdependent each relied on the validity of the other without that validity having been independently established.  Thus, the rulings were erroneously bootstrapped in violation of Lucas's constitutional rights under Fifth, Sixth, Eighth, and Fourteenth Amendments.

2.     For example, in finding that the offenses were cross-admissible the trial court relied on its findings that Lucas was guilty of each of the charged offenses even before trial began.  It improperly reasoned that "[i]t is the fact that Mr. Lucas is connected up through separate pieces of independent evidence to each of the crimes already linked together by signatory common marks that produces strong reliability in the identification."  (248 Pretrial 25510.)

3.     On the other hand, in making findings in each specific case as to crucial evidentiary issues bearing on whether Lucas had been proven guilty the trial court relied on the cross-admissibility of the other offenses.  The trial court's ruling excluding Lucas's eyewitness identification experts was based in part upon its conclusion that Jodie Santiago's identification was corroborated by the evidence that Lucas committed the other charged offenses.  (242 Pretrial 24900-02.)  The identification ruling was crucial because it was essential to the prosecution's case in Santiago, and in turn, could be considered as guilt in the other offenses by virtue of cross-admissibility.

4.     Similarly, in finding that the lost fingerprint from the Love Insurance note was not exculpatory, the trial court assumed the offenses were cross-admissible and

(15cv1224)

relied on "the evidence in all the Lucas cases." (247 Pretrial 25439.) This ruling was crucial because it impacted the prosecution evidence in Jacobs.

5.      Essentially, the trial court's cross-admissibility finding was predicated on Lucas's assumed guilt of the individual charges, while Lucas's assumed guilt of the individual charges was predicated upon the finding of cross-admissibility. This bootstrapping process precluded the court from making a fair and reliable independent determination as to the foundational assumptions upon which its in limine rulings depended. Hence, the in limine rulings were erroneous.

6.      The trial court's bootstrapping denied Lucas his constitutional right to a full and fair hearing of the in limine motions. The federal constitution guarantees the defendant a right to "his day in court," *In re Oliver*, 333 U.S. 257, 273 (1948), free from arbitrary adjudicative procedures. *Truax v. Corrigan*, 257 U.S. 312, 332 (1921) (due process clause requires that every man shall have the protection of "his day in court," and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously but upon inquiry). The Fourteenth Amendment requires that no one can be deprived of liberty without at least basic due process protections; at a minimum, the rights to counsel, to examine the witnesses against him, and to offer testimony. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987).

7.      In the present case, the trial court's bootstrapping deprived Lucas of "his day in court" in the crucial consolidation/cross-admissibility proceeding because the evidence was not fully considered.

8.      Additionally, the trial court's bootstrapping of the in limine rulings undermined the reliability of its rulings and, as a consequence, also undermined the reliability of the guilt and penalty verdicts. An unreliable verdict of conviction for any criminal offense violates the federal constitution. Verdict reliability is required by the Due Process Clause of the federal constitution. *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Moreover, in a capital case due process and the Cruel and Unusual Punishment Clause of the federal constitution require heightened reliability in the determination of

540

(15cv1224)

1  guilt and death eligibility before a sentence of death may be imposed.  *See Beck v.*

2  *Alabama*, 447 U.S. 625, 627-46 (1980).

3      9.    Because the bootstrapping pervaded the reliability and integrity of crucial

4  in limine rulings that impacted the entire trial, structural error was committed and the

5  judgment should be reversed without a showing of prejudice.  *See, e.g.*, *Arizona v.*

6  *Fulminante*, 499 U.S. 279, 309 (1991) (structural defects in the trial mechanism, which

7  defy analysis by "harmless-error" standards are reversible per se).  Even if this Court

8  does not find structural error, habeas relief is warranted because the improper

9  bootstrapping had a substantial and injurious effect on the verdict.  *Brecht v.*

10  *Abrahamson*, 507 U.S. 619 (1993).

11      10.    Even if the error was not prejudicial as to the guilt judgment, it was

12  prejudicial, individually and cumulatively, as to penalty.  The penalty trial was closely

13  balanced and the error was substantial.  Certainly, erroneously authorizing the jury to

14  consider the Santiago and Swanke cases to find Lucas guilty of the Jacobs murders was

15  a substantial error since it undermined the lingering doubt theory at penalty.

16  **CLAIM 48:  THE CUMULATIVE EFFECT OF THE ERRORS AND**

17  **VIOLATIONS REQUIRES THAT HABEAS CORPUS RELIEF BE GRANTED**

18  **(AOB 2.12, 3.12, 4.11, 7.9; SHP VII.K)**

19      1.    The cumulative effect of errors at Lucas's trial deprived him of his

20  constitutional rights in violation of the Fifth, Sixth, Eighth, and Fourteenth

21  Amendments to the federal Constitution.  The cumulative effect of multiple errors can

22  violate due process even where no single error rises to the level of a constitutional

23  violation or would independently warrant relief.  *Chambers v. Mississippi*, 410 U.S.

24  284, 290 n.3 (1973).  The combined effect of multiple errors justifies habeas relief "if it

25  renders a trial fundamentally unfair, even where each error considered individually

26  would not require reversal."  *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007); *see*

27  *also Fairbank v. Ayers*, 650 F.3d 1243, 1257 (9th Cir. 2011) (same); *United States v.*

28  *Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (explaining that "balkanized, issue by

issue harmless error" approach less preferable to examining overall cumulative effect of multiple errors, where no single error in isolation is sufficiently prejudicial).

2.     As discussed herein, multiple constitutional errors by state actors, the trial court, and Lucas's counsel combined and amplified each other in a way that rendered Lucas's trial fundamentally unfair and the resulting judgment and verdicts unreliable.

3.     The constitutional errors in Lucas's case began well before the trial.  After an anonymous tip, law enforcement built a case against Lucas built upon biased investigation, faulty memories and flawed forensics.  (*See* Claims 1, 2, 13, 14.)  The prosecution then charged Lucas with six homicides and an attempted murder, despite the fact that another man, Johnny Massingale, had confessed to the murder of Suzanne and Colin Jacobs.  The court erroneously consolidated these disparate cases.  (*See* Claim 43.)  The prejudicial impact of the errors related to each of the crimes (Jacobs, Santiago and Swanke, and also Strang/ Fisher and Garcia) also related to the charges in the other crimes because of the trial court's cross-admissibility ruling, which allowed the jurors to rely on each crime to convict in the others.  (*See* Claim 43.)

4.     Beyond the inappropriate and prejudicial cross-admissibility ruling, the trial court made a host of errors at the guilt phase that prevented Lucas from mounting a defense.  This included denying Lucas the opportunity to present critical evidence of third-party culpability for both the Jacobs and the Swanke crimes.  (*See* Claims 5, 9.)

5.     The case against Lucas was based largely on circumstantial evidence, and hinged primarily on the testimony of Jodie Santiago, who identified Lucas as her attacker.  However, Santiago's identification of Lucas was deeply flawed, the product of a highly suggestive investigation and photo lineup that was improperly ingrained in Santiago's damaged memory.  (*See* Claim 4.)

6.     The trial court's instructions only reinforced the unconstitutional errors from its earlier rulings.  Notably, the trial court's instructions improperly shifted the burden to Lucas on the issue of third party culpability.  (*See* Claim 30, 32, 33 and 34.)

542

7.     Even if the guilt-phase errors were not sufficiently prejudicial to require relief of the guilt judgment, they were prejudicial, individually and cumulatively, at the penalty trial.  The penalty trial was closely balanced as demonstrated by the difficulty the jury had in reaching a verdict.  Therefore, because a major defense mitigating theory at penalty was lingering doubt, any substantial error at the guilt trial should be considered prejudicial as to the penalty phase.  The guilt-phase errors were particularly prejudicial as to the penalty trial since each of the counts could have been used both to counter the defense theory of lingering doubt and as independent aggravation under factor (a) (circumstances of the crime).

8.     Counsel's critical mistake of law in opening the door to a prior diagnosis that portrayed him as an antisocial psychopath and as an aggressive sexual deviant, fundamentally undermined their both their good character and their lingering doubt penalty themes.  (*See* Claim 15.)  Counsel's lingering doubt defense was further devastated when the trial court erroneously refused to strike evidence of a 1973 prior conviction for rape, despite a showing that the prior conviction was obtained in violation of Lucas's constitutional rights to effective and conflict-free counsel.  (*See* Claim 19.)  Once counsel's lingering doubt strategy was eviscerated, they failed to present readily-available evidence of Lucas's traumatic social history, his mental impairments and organic brain damage.  (*See* Claim 15.)

9.     The prosecution's penalty-phase closing argument theme was one of "good and evil," and began and ended with improper references from the Bible, suggesting to the jury that their mandate was to put out "the candle of the wicked," by executing Lucas.  (*See* Claim 25.)

10.     Despite all these errors, failures and misconduct, Lucas's penalty-phase jury still deliberated for over eight days.  Without any one of these constitutional errors, the result would likely have been favorable to Lucas.

11.     The California Supreme Court determined that several of the trial court's rulings were indeed erroneous.  *People v. Lucas*, 60 Cal. 4th 153, 263 (2014).  This

includes the error discussed herein in Claim 1, regarding failing to give a requested instruction about the authenticity of photographs, and the error discussed in Claim 9, regarding erroneous admission of Shannon Lucas's statement.  These errors were not, as the state court found, harmless.  Individually and cumulatively they deprived Lucas of his constitutional rights.

12.     Herein, Lucas has identified numerous errors that occurred during the guilt and penalty phases of his trial.  Each of these errors individually, and all the more clearly when considered cumulatively, deprived Lucas of due process, of a fair trial, of the right to compulsory process and to confront the evidence against him, of a fair and impartial jury, of the right to present a defense, of the right to representation of counsel, and of fair and reliable guilt and penalty determinations in violation of Lucas's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  Further, each error, by itself, is sufficiently prejudicial to warrant relief from the guilt and/or death judgment. Even if that were not the case, however, relief is required because of the substantial prejudice flowing from the cumulative impact of the errors.

## CLAIM 49:  LUCAS IS INELIGIBLE FOR A DEATH SENTENCE DUE TO HIS MENTAL IMPAIRMENTS (SHP VII.H)

1.     Lucas's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because the imposition of the death penalty on an individual suffering from the mental impairments under which Lucas suffers is excessive, cruel and unusual.

## A.     Relevant Law

2.     The errors in this claim violate Lucas's rights based on the principles set forth in the following cases, *inter alia Roper* v. *Simmons*, 543 U.S. 551 (2005); *Atkins* v. *Virginia*, 536 U.S. 304 (2002); *Thompson* v. *Oklahoma*, 487 U.S. 815 (1988); *see also Eddings* v. *Oklahoma*, 455 U.S. 104 (1982) (Eighth Amendment permits only a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual); *Trop v. Dulles*, 356 U.S. 86 (1958)

(15cv1224)

(Eighth Amendment interpreted in light of the "evolving standards of decency").  In light of these standards, the Supreme Court has forbidden the execution of certain offenders whose brain development mitigates their culpability.  *See e.g.*, *Roper*, 543. U.S. 551 (prohibiting the execution of juveniles); *Atkins*, 536 U.S. 304 (prohibiting the execution of individuals with intellectual disability).  This same principle applies to those with serious mental illness.

3.     Execution of the mentally ill does not serve any purported constitutionally permitted purpose of capital punishment.  *Atkins* identified "'retribution and deterrence of capital crimes by prospective offenders'" as the social purposes served by the death penalty.  *Atkins*, 536 U.S. at 319 (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)).  Deterrence is of little value as a rationale for executing offenders with severe mental illness when they have diminished impulse control and planning abilities.  As for retribution, although capital punishment still enjoys public support among Americans, a Gallup Poll conducted in October, 2003 found that while almost two thirds of Americans surveyed support the death penalty, 75 % of those surveyed opposed executing the mentally ill.  *See* Kevin Drew, Arkansas Prepares to Execute Mentally Ill Inmate, CNN.com, Jan. 5, 2004.

4.     After forming a task force to study the issue of executing the mentally ill, the American Bar Association recently adopted a resolution opposing the execution of the mentally ill.  (See ABA Report with Recommendation No. 122A, Adopted August 2006; *see also,* Recommendations *of the American Bar Association Section of Individua1 Rights and Responsibilities Task Force on Mental Disability and the Death Penalty,* 54 Cath. U. L. Rev. 1115 (2005).)  Moreover, virtually every major mental health association in the United States has published a policy statement advocating either an outright ban on executing all mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.  The organizations that take positions against execution of mentally ill offenders include, but are not limited to: the American Psychiatric Association (*see e.g.*, *Mentally Ill Prisoners on Death Row*

(15cv1224)

(approved December 2005), *available at* http://
www.psych.org/edu/other_res/lib_archives/archives/200505.pdf.; *Moratorium on
Capital Punishment in the United States* (approved October 2000; reaffirmed 2014),
*available at* https://www.psychiatry.org/File%20Library/Learn/Archives/Position-
2014-Moratorium-Capital-Punishment.pdf); the American Psychological Association
(*see Resolution on the Death Penalty in the United States*, *available at*
http://www.apa.org/about/policy/death-penalty.aspx (last visited Nov. 21, 2016)); the
National Alliance on Mental Illness (*see Public Policy Platform of the National
Alliance on Mental Illness* § 10.9 (10th ed. Sep. 2014), *available at*
https://www.nami.org/NAMI/media/NAMI-Media/downloads/Public-Policy-
Platform_9-22-14.pdf ); and Mental Health America [198] (*see Death Penalty and People
with Mental Illness* (approved June 14, 2016), *available at*
http://www.mentalhealthamerica.net/positions/death-penalty ).  Capital prosecution of
volitionally incapacitated offenders carries heightened risks of unjustified executions.

     5.     Procedures authorizing the death penalty for volitionally incapacitated
defendants create a constitutionally unacceptable risk that the penalty will be imposed
in spite of factors which may call for a less severe punishment.  Volitionally
incapacitated defendants such as Lucas typically are poor witnesses and their demeanor
may create an unwarranted impression of lack of remorse for their crimes.

     6.     The imposition of the death penalty on offenders so mentally impaired that
they are unable to understand, modulate and/or control their behavior offends a
longstanding collective judgment of the American people regarding the nature and
limits of criminal culpability as expressed in their laws and sentencing practices, is
grossly disproportionate to such offenders' moral culpability, serves no permissible
penological goal, and carries an enhanced risk of error.  Because such an anomalous

---

[198]  Formerly known as National Mental Health Association.

1 sentence was imposed upon Lucas, the Cruel and Unusual Punishment Clause of the

2 Eighth Amendment requires vacating his sentence.

3 **B.     Relevant Facts**

4       7.     At the time of the crime, Lucas suffered from serious mental impairments,

5 the effects of which were compounded by Lucas's long-standing substance-related

6 disorders including methamphetamine psychosis, which individually and in

7 combination affected his abilities to make reasoned judgments, to rationally and

8 effectively modulate his impulses and behaviors.  Lucas's untreated organic brain

9 damage, trauma-related disorders and substance-related disorders significantly impaired

10 Lucas's mental functioning in three critical ways.  (Dkt. 36-26 at 21, 2008 State Pet.

11 Ex.17, P. Stewart, Decl. ¶¶ 26-30.)

12       8.     First, the combination of untreated PTSD and methamphetamine

13 psychosis, from which Lucas suffered, is especially powerful.  The intrusive reliving of

14 trauma associated with PTSD–combined with the powerful delusions and

15 hallucinations which can be produced by methamphetamine use–commonly activate

16 explosive emotional outbursts of anger and rage.  It is likely that Lucas experienced

17 such emotional outbursts during the period when the charged crimes were committed.

18 For someone with Lucas's traumatic history the trigger for these outbursts of rage could

19 be environmental cues or stressors which would not be expected to produce such a

20 response in a person not suffering from organic brain damage, PTSD and

21 methamphetamine induced psychosis.  (*See* Claim 15(D).)

22       9.     Second, all of Lucas's impairments and disorders, including his brain

23 damage, PTSD,and substance-related disorders, compromised his ability to control or

24 regulate his intense emotional feelings of anger or rage.  (*See* Claim 15(D).)

25       10.     Third, the combined impact of trauma-related disorders, brain damage and

26 substance-related disorders greatly impaired Lucas's executive functioning. This

27 includes higher mental processes such as judgment, abstraction, problem solving

28 techniques, logic, and inhibition which the typical adult uses to control impulse and raw

emotion.  Lucas's impairments also compromised his ability to develop and function normally.  (*See* Claim 15(D).)

11.     In sum, if Lucas did commit the charged offenses, he likely did so as a result of a dysregulated, impulse-driven emotional outburst and likely acted while under an extreme mental or emotional disturbance, while his capacity to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, and without engaging in deliberate thought processes.

12.     The effects of severe mental illness in defendants such as Lucas sharply constrict the ability to give meaningful assistance to his counsel in proceedings leading to the determination of culpability, eligibility for the death penalty, and the appropriate penalty.  Mentally ill, neurocognitively impaired defendants are significantly less able than other defendants to assist their attorneys in presenting factors which may call for a reduction in the level of legal culpability and/or a less severe penalty because they are unable to appreciate, recall, assess and meaningfully communicate information necessary to question the accuracy of aggravating details of the crime or identify the existence of mitigating circumstances.

13.     Mental illness that disables a defendant from controlling his own conduct can act as a two-edged sword in penalty phase deliberations by increasing the likelihood that the aggravating impact of apparent future dangerousness will be considered and inappropriately weighed by the jury.  A defendant's serious mental illness is that fact about a defendant which unfairly engenders the greatest fear of future violence, and yet does not reflect moral culpability on his part.  The weight of national consensus dictates that Lucas's death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment, and must be vacated.

548

(15cv1224)

**CLAIM 50:  CALIFORNIA'S DEATH PENALTY STATUTE, AS INTERPRETED BY THE CALIFORNIA SUPREME COURT AND APPLIED AT LUCAS'S TRIAL, VIOLATES THE UNITED STATES CONSTITUTION (AOB 7.8.2)**

1.     California's death penalty scheme, set forth in Penal Code sections 187-99, violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).[199]

**A.     California's Death Penalty Statute Unconstitutionally Fails to Narrow The Class of Murders Eligible for The Death Penalty**

2.     Lucas's conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution because the California death penalty scheme does not sufficiently narrow the class of persons eligible for the death penalty.  The statutory scheme is overly broad and inclusive, containing so many special circumstances that it fails to perform the constitutionally required narrowing function.  The statutory scheme therefore violates the Eighth Amendment prohibition against cruel and unusual punishment and the Fifth and Fourteenth Amendments' requirement of due process of law.

3.     Under the United States Supreme Court cases in effect at the time of Lucas's trial, a state statutory scheme had to provide rational, meaningful, and objective criteria that narrow the class of persons eligible for the death penalty from the larger group of murder defendants who would not be eligible.  *See Gregg*, 428 U.S. at 177-78, 195 n.46, 198.  "Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty."  *Zant*

---

[199] The various statutes, statistics, and practices described herein existed during the time period relevant to Lucas's case.

*v. Stephens,* 462 U.S. 862, 878 (1983).  The narrowing must occur at the definitional stage and is required to ensure that those defendants sentenced to death are the worst offenders, *i.e.*, those whose murders are "particularly serious or for which the death penalty is peculiarly appropriate . . . ."  *Gregg*, 428 U.S. at 222 (White, J., conc. op.).

4.    California's 1978 death penalty law, enacted by voter initiative, violates this narrowing principle.  Under California's broad definition of first-degree murder, nearly every murder committed is a death-eligible offense.  (*See generally* Exs. 96-106 (materials regarding studies of California's death penalty statutes).)  The law significantly expanded the number and type of special circumstances used to justify the penalty, and also broadened the definition of those circumstances, eliminating the mens rea requirement present in the 1977 law.  *See* S. Shatz & N. Rivkind, *The California Death Penalty Scheme: Requiem for Furman?*, 72 N.Y.U. Law Rev. 1283, 1310-12 (1997).  The intent of the 1978 voter initiative, as expressed in the ballot proposition arguments, was to make the death penalty applicable to *all* murders.  *Id*. at 1310.

5.    Careful statistical studies show that California's statutorily defined death-eligible class is so large that the statutory scheme performs no narrowing of the death-eligible class as mandated by *Furman*, *Gregg* and *Zant*.  In fact, it creates a *greater* risk of arbitrary death sentences than the death penalty schemes that pre-dated those cases.  *Id*. at 1317-31; *see also* Dkt. 36-30 at 119, 2008 State Pet., Ex. 31, S. Schatz Decl., ¶¶ 7-15.

6.    As applied, the death penalty statute is so broad as to sweep virtually every murderer into its grasp.  It also allows any conceivable circumstance of a crime—even circumstances squarely opposed to each other (e.g., the fact that the victim was young versus the fact that the victim was old, the fact that the victim was killed at home versus the fact that the victim was killed outside the home)—to justify the imposition of the death penalty.  Almost all felony-murders in California are now special circumstance cases, including accidental and unforeseeable deaths, acts committed in a panic or under a mental breakdown, and acts committed by others.  *See generally People v.*

*Dillon,* 34 Cal. 3d 441 (1983).  Section 190.2's reach has been extended to virtually all intentional murders by the California Supreme Court's construction of the lying-in-wait special circumstance.  *See People v. Hillhouse*, 27 Cal. 4th 469, 500-501, 512-515 (2002); *People v. Morales*, 48 Cal. 3d 527, 557-558, 575 (1989), *overruled in part on other grounds in People v. Williams*, 49 Cal. 4th 405, 459 (2010).  These broad categories are joined by so many other categories of special-circumstance murder that the statute comes very close to achieving its goal of making every murderer eligible for death.  Whereas judicial decisions have placed the entire burden of narrowing the class of first degree murderers on Cal. Penal Code § 190.2, the "special circumstances" section, that provision was specifically passed for the purpose of making every murderer eligible for the death penalty.

7.    There are no safeguards in California during the penalty phase that would enhance the reliability of the trial's outcome.  Instead, factual prerequisites to the imposition of the death penalty are found by jurors who are not instructed on any burden of proof, and who may not agree with each other at all.  Paradoxically, the fact that "death is qualitatively different" from a prison sentence, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)" has been stood on its head to mean that procedural protections taken for granted in trials for lesser criminal offenses are suspended when the question is a finding that is foundational to the imposition of death.  The result is truly a "wanton and freakish" system *Furman,* 408 U.S. at 310 (Stewart, J., concurring) that randomly chooses among the thousands of murderers in California a few victims of the ultimate sanction.  The lack of safeguards needed to ensure reliable, fair determinations by the jury and reviewing courts means that randomness in selecting who the state will kill dominates the entire process of applying the penalty of death.

551

(15cv1224)

**B.     Lucas's Death Penalty Is Invalid Because Penal Code § 190.3(a), As Applied, Allows Arbitrary and Capricious Imposition of Death In Violation Of The Fifth, Sixth, Eighth, and Fourteenth Amendments To The United States Constitution**

8.     Section 190.3(a) violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in that it has been applied in such a wanton and freakish manner that almost all features of every murder, even features squarely at odds with features deemed supportive of death sentences in other cases, have been characterized by prosecutors as "aggravating" within the statute's meaning.

9.     Factor (a), listed in § 190.3, directs the jury to consider in aggravation the "circumstances of the crime." The California Supreme Court has interpreted that phrase extremely broadly, as simply requiring some fact beyond the elements of the crime itself.[200] That Court has permitted reliance on the "circumstance of the crime" aggravating factor because three weeks after the crime defendant sought to conceal evidence,[201] or had a "hatred of religion,"[202] or threatened witnesses after his arrest,[203] or disposed of the victim's body in a manner that precluded its recovery.[204]

10.    Despite having survived a facial Eighth Amendment challenge, *Tuilaepa v. California,* 512 U.S. 967, 987-988 (1994), factor (a) has been applied in such an arbitrary and contradictory fashion as to violate due process and the Eighth Amendment. California prosecutors have used factor (a) to characterize as aggravating

---

[200] *People v. Dyer,* 45 Cal. 3d 26, 77-78 (1988); *People v. Adcox,* 47 Cal. 3d 207, 269-70 (1988); *see also,* CALJIC No. 8.88 (6th ed. 1996), par. 3.

[201] *People v. Walker,* 47 Cal. 3d 605, 639 n.10 (1988), cert. den., 494 U.S. 1038 (1990).

[202] *People v. Nicolaus,* 54 Cal. 3d 551, 581-582 (1991), cert. den., 505 U.S. 1224 (1992).

[203] *People v. Hardy,* 2 Cal. 4th 86, 204 (1992), cert. den., 506 U.S. 1056 (1993).

[204] *People v. Bittaker,* 48 Cal. 3d 1046, 1110 n.35 (1989), cert. den. 496 U.S. 1046 (1990).

(15cv1224)

almost every conceivable circumstance of the crime, even circumstances that squarely contradict each other.

11.   Prosecutors have thus misused section 190.3(a) to turn entirely opposite facts—ones present in every case—into aggravating factors that they urge support a death sentence.[205]   This approach impermissibly urges "that a particular set of facts surrounding a murder, . . . were enough in themselves, and without some narrowing principle to apply to those facts, to warrant the imposition of the death penalty." *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988).

## C.   California's Death Penalty Statute, As Interpreted By The California Supreme Court, Forbids Inter-case Proportionality Review, Thereby Guaranteeing Arbitrary, Discriminatory, or Disproportionate Impositions of the Death Penalty

12.   The Eighth Amendment requires that death judgments be proportionate and reliable.  Reliability requires "'that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case.'"  *Barclay v. Florida,* 463 U.S. 939, 954 (1983) (plurality opinion) (internal quotations omitted).

13.   One common method of ensuring reliability and proportionality in capital sentencing is comparative proportionality review—a procedural safeguard the California Supreme Court has eschewed.  In *Pulley v. Harris*, 465 U.S. 37, 51 (1984), the high court, while declining to hold that comparative proportionality review is an essential component of every constitutional capital sentencing scheme, assumed that "there could be a capital sentencing scheme so lacking in other checks on arbitrariness

---

[205]   The arbitrariness of this approach is exacerbated by the fact that California law does not require sentencing juries to unanimously agree on the existence of an aggravating factor, to find that any aggravating factor (other than prior criminality) exists beyond a reasonable doubt, or to make any record of the aggravating factors relied upon in determining that the aggravating factors outweigh the mitigating.  (*See* Claim 51.)

(15cv1224)

that it would not pass constitutional muster without comparative proportionality review." For the reasons set forth above, California's 1978 death penalty statute, as drafted and applied, has become such a scheme.

14.     As we have seen, that greatly expanded list fails to meaningfully narrow the pool of death-eligible defendants and hence permits the same sort of arbitrary sentencing as the death penalty schemes struck down in *Furman*, 408 U.S. 238. It also lacks other procedural safeguards, such as a unanimity requirement or burden of proof at the penalty phase, or a requirement of written findings. The lack of comparative proportionality review has deprived California's sentencing scheme of the only mechanism that might have enabled it to "pass constitutional muster."

15.     Whether death is an unwarranted punishment in any given case requires a comparison against the facts of other cases. The U.S. Supreme Court regularly considers other cases in resolving disproportionality claims. *See Atkins v. Virginia*, 536 U.S. 304, 314-15 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 821, 830-31 (1988); *Enmund v. Florida*, 458 U.S. 782, 796 n. 22 (1982); *Coker v. Georgia*, 433 U.S. 584, 596-97 (1977). And at least twenty-three of the thirty-four states that reinstated capital punishment after *Furman* require comparative, or "inter-case," appellate sentence review. The Supreme Court approved Georgia's proportionality scheme, holding that it guards ". . . further against a situation comparable to that presented in *Furman [v. Georgia* (1972) 408 U.S. 238]" *Gregg*, 428 U.S. at 198. By statute, Georgia requires that the Georgia Supreme Court determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ga. Code Ann. § 17-10-35(c)(3). Florida has also judicially "adopted the type of proportionality review mandated by the Georgia statute." *Profitt*

554

*v. Florida*, 428 U.S. 242, 259 (1976).  At least sixteen states have statutes similar to that of Georgia, and seven have judicially instituted similar review.[206]

16.    Section 190.3 does not provide for inter-case proportionality review.  *See People v. Fierro*, 1 Cal. 4th 173, 253 (1991), *overruled in part on other grounds*, in *People v. Thomas*, 54 Cal. 4th 908, 941 (2012).  But the prohibition on the consideration of any evidence that death sentences are not being charged or imposed on similarly situated defendants was created by the California Supreme Court.  *See, e.g.*, *People v. Marshall*, 50 Cal. 3d 907, 946-947 (1990).  Given the extraordinary breadth of the special circumstances that make one eligible for death under § 190.2, and the absence of procedural safeguards to ensure a reliable and proportionate sentence, California's lack of inter-case proportionality review now violates the Eighth Amendment.  Categories of crimes that warrant a close comparison with actual practices in other cases include the imposition of the death penalty for felony-murders or other nonintentional killings, and single-victim homicides.  *See* Article VI, § 2 of the International Covenant on Civil and Political Rights (limiting the death penalty to only "the most serious crimes.")  Categories of criminals that warrant such a comparison include persons suffering from mental illness or developmental disabilities.  *Cf. Ford v. Wainwright*, 477 U.S. 399 (1986); *Atkins*, 536 U.S. at 314-15.

---

[206]    The following list of citations is to state statutes that remain in effect as of the this petition's filing in November 2016.  *See* Ala. Code § 13A-5-53(b)(3) (1982); Del. Code Ann. tit. 11, § 4209(g)(2) (1992); Ga. Code Ann. § 17-10-35(c)(3) (Harrison 1990); Ky. Rev. Stat. Ann. § 532.075(3)(c) (Michie 1985); La. Code Crim. Proc. Ann. art. 905.9.1(1)(c) (West 1984); Miss. Code Ann. § 99-19-105(3)(c) (1993); Mont. Code Ann. § 46-18-310(1)(c) (1993); Neb. Rev. Stat. §§ 29-2521.01, 03, 29-2522(3) (1989); Nev. Rev. Stat. Ann. § 177.055(2)(e) (Michie 1992); N.H. Rev. Stat. Ann. § 630:5(XI)(c) (1992); N.C. Gen. Stat. § 15A-2000(d)(2) (1983); Ohio Rev. Code Ann. § 2929.05(A) (Baldwin 1992); S.C. Code Ann. § 16-3-25(C)(3) (Law. Co-op. 1985); S.D. Codified Laws Ann. § 23A-27A-12(3) (1988); Tenn. Code Ann. § 39-13-206(c)(1)(D) (1993); Wash. Rev. Code Ann. § 10.95.130(2)(b) (West 1990).  *See also State v. Dixon*, 283 So.2d 1, 10 (Fla. 1973); *Alford v. State*, 307 So.2d 433,444-45 (Fla. 1975); *People v. Brownell*, 404 N.E.2d 181, 197 (Ill. 1980); *Brewer v. State*, 417 N.E.2d 889, 899 (Ind. 1981); *State v. Pierre*, 572 P.2d 1338, 1345 (Utah 1977); *State v. Simants*, 250 N.W.2d 881, 890 (Neb. 1977); *State v. Richmond*, 560 P.2d 41, 51 (Ariz. 1976); *Collins v. State*, 548 S.W.2d 106, 121 (Ark. 1977).

555

(15cv1224)

17.     California's 1978 death penalty scheme and system of case review permits the same arbitrariness and discrimination condemned in *Furman* in violation of the Eighth and Fourteenth Amendments.  *Gregg*, 428 U.S. at 192.  The failure to conduct inter-case proportionality review also violates the Fifth, Sixth, Eighth, and Fourteenth Amendments' prohibitions against proceedings that are arbitrary, unreviewable, or skewed in favor of execution.

**D.      The Constitution Forbids Consideration of Unadjudicated Criminal Activity at the Penalty Phase**

18.     Any use of unadjudicated criminal activity by the jury during the sentencing phase, as outlined in § 190.3(b), violates due process and the Fifth, Sixth, Eighth, and Fourteenth Amendments, rendering a death sentence unreliable.  *See, e.g.*, *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988).  Moreover, as discussed above, the United States Supreme Court's decisions in *Hurst*, *Ring*, and *Apprendi* hold that due process and the Sixth Amendment right to a jury trial require that the jury's penalty-phase findings be made unanimously and beyond a reasonable doubt.  Thus, even if it were constitutionally permissible to rely on alleged unadjudicated criminal activity as a factor in aggravation, such alleged criminal activity would have to have been found beyond a reasonable doubt by a unanimous jury.  Lucas's jury was unconstitutionally not instructed on the need for such a unanimous finding; nor is such an instruction generally provided for under California's sentencing scheme.

**E.      The Statutory Mitigating Factors, as Written, and as Applied Through the Jury Instructions, Precluded a Fair, Reliable, and Evenhanded Administration of the Capital Sanction**

19.     The mitigating factors set forth in Penal Code section 190.3, subsections (d) through (k), were provided to the jury in the standard jury instruction, CALJIC No. 8.85.  (65 CT 14373-74.)  The statute and accompanying instructions are misleading, and unconstitutionally restricted the jury's consideration of mitigating evidence in Petitioner's case in violation of his rights under the Eighth and Fourteenth

556

Amendments.  *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

### 1. Irrelevant Factors Should Have Been Deleted

20. The trial court inappropriately instructed the jury about mitigating factors as to which the defense had presented no evidence: factors (e) and (f) of Penal Code section 190.3.  Inclusion of those factors in the instruction prejudiced the defense by suggesting that the absence of evidence to support them was aggravating.  The homicides in the instant case were not rendered more heinous than others because the victims did not consent to the killing (factor (e)), or by the fact that the killings were not "committed under circumstances which the defendant reasonably believed to be a moral justification ... for his conduct" (factor (f)).  Yet, the instruction improperly suggested otherwise.  There was therefore a real risk that the jury would aggravate Petitioner's sentence based on factors that should have played no role in its determination of penalty in this case.

### 2. Restrictive Adjectives Acted As Barriers to Consideration of Mitigation

21. Factors (d) and (g) also unconstitutionally restricted the jury's consideration of mitigation, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, through their use of the words "extreme" and "substantial."  *See Stringer v. Black*, 503 U.S. 222 (1992); *Mills v. Maryland*, 486 U.S. 367 (1988); *Lockett*, 438 U.S. 586.  The trial court should have deleted those adjectives from the instructions before submitting those factors for consideration.

22. Factor (d) requires evidence of an "extreme mental or emotional disturbance," while factor (g) requires "extreme duress" or "substantial domination."  PC § 190.3(d), (g).  There is an impermissible risk that the jury would either understand these factors, or their absence, to be aggravating, or would interpret the language to mean that mental or emotional disturbance, duress, and impaired capacity could not be given any mitigating weight unless those conditions were extreme or substantial.

Without a showing of either an "extreme" mental disturbance or "extreme" duress, the inclusion of those factors in the instruction made it unwarrantedly more difficult for the defense to convince the jury that Petitioner's life should be spared.

23.     Factors (d) and (h) also both impermissibly restrict the described conditions to the time of the offense, thus implying that unless the relevant conditions existed at that time, they could not be considered as mitigating evidence.  Limiting factors (d) and (h) to the time of the offense creates a substantial risk that the jury would believe that other mitigating evidence could not be given weight if it did not directly influence the commission of the crime.  Such an inference is impermissible because conditions and circumstances that do "not relate specifically to [the defendant's] culpability for the crime he committed" may nevertheless be mitigating under the Eighth Amendment.  *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986).

24.     The restrictive language of factors (d), (g) and (h), acted as instructional commands to the jury, rendering those factors unconstitutionally vague, overbroad, arbitrary, capricious, and incapable of principled application.  *See Maynard*, 486 U.S. at 363-64; *Godfrey v. Georgia*, 446 U.S. 420 (1980).  The jury's consideration of these factors, in turn, introduced impermissible unreliability into the sentencing process, in violation of the Eighth and Fourteenth Amendments.

### 3.    The Jury Should Have Been Instructed That Factors (d) Through (h), (j) and (k) Could Only Be Considered As Mitigation

25.     In accordance with customary state court practice, nothing in the instructions advised Lucas's jury which of the listed sentencing factors were aggravating, which were mitigating, or which could be either aggravating or mitigating depending upon the jury's appraisal of the evidence.  As a matter of state law, however, each of the factors introduced by a prefatory "whether or not"—factors (d), (e), (f), (g), (h), and (j)—were relevant solely as possible mitigators, *People v. Hamilton*, 48 Cal. 3d 1142, 1184 (1989); *People v. Edelbacher*, 47 Cal. 3d 983, 1034 (1989); *People v. Lucero*, 44 Cal. 3d 1006, 1031 n.15 (1988); *People v. Melton*, 44 Cal. 3d 713, 769-770

(1988); *People v. Davenport*, 41 Cal. 3d 247, 288-289 (1985). The jury, however, was left free to conclude that a "not" answer as to any of these "whether or not" sentencing factors could establish an aggravating circumstance and was thus invited to aggravate the sentence upon the basis of nonexistent and/or irrational aggravating factors, thereby precluding the reliable, individualized capital sentencing determination required by the Eighth and Fourteenth Amendments. *Woodson v. North Carolina,* 428 U.S. 280, 310 (1976); *Zant*, 462 U.S. at 879; *Johnson,* 486 U.S. at 584-85.

26.   It is thus likely that Lucas's jury aggravated his sentence upon the basis of what were, as a matter of state law, nonexistent factors and did so believing that the state—as represented by the trial court—had identified them as potential aggravating factors supporting a sentence of death. This violated not only state law, but the Eighth Amendment, for it made it likely that the jury treated Lucas "as more deserving of the death penalty than he might otherwise be by relying upon . . . illusory circumstance[s]." *Stringer*, 503 U.S. at 235.

27.   Even without such misleading argument, the impact on the sentencing calculus of a defendant's failure to adduce evidence sufficient to establish mitigation under factor (d), (e), (f), (g), (h), or (j) will vary from case to case depending upon how the sentencing jury interprets the "law" conveyed by the CALJIC pattern instruction. In some cases the jury may construe the pattern instruction in accordance with California law and understand that if the mitigating circumstance described under factor (d), (e), (f), (g), (h), or (j) is not proven, the factor simply drops out of the sentencing calculus. In other cases, the jury may construe the "whether or not" language of the CALJIC pattern instruction as giving aggravating relevance to a "not" answer and accordingly treat each failure to prove a listed mitigating factor as establishing an aggravating circumstance.

28.   The result is that from case to case, even with no difference in the evidence, sentencing juries will likely discern dramatically different numbers of aggravating circumstances because of differing constructions of the CALJIC pattern

559

instruction. In effect, different defendants, appearing before different juries, will be sentenced on the basis of different legal standards. This is unfair and violates the Constitution's prohibition against "'arbitrary and capricious action,'" *Tuilaepa,* 512 U.S. at 973 (quoting *Gregg*, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.)), and its requirement that the death penalty be evenhandedly applied. *Eddings,* 455 U.S. at 112.

29. In addition, the inclusion in the list of potential mitigating factors of such adjectives as "extreme" (*see* factors (d) and (g)), and "substantial" (*see* factor (g)) also acted as barriers to the consideration of mitigation in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Mills,* 486 U.S. at 375; *Lockett,* 438 U.S. at 602.

## F. The California Statute Violates The Equal Protection Clause Of The Federal Constitution By Denying Procedural Safeguards To Capital Defendants Which Are Afforded To Noncapital Defendants

30. As noted in the preceding arguments, the United States Supreme Court has repeatedly directed that a greater degree of reliability is required when death is to be imposed, and that courts must be vigilant to ensure procedural fairness and accuracy in fact-finding. *See*, *e.g.*, *Monge v. California*, 524 U.S. 721, 731-32 (1998). Despite this directive, California's death penalty scheme provides significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with non-capital crimes. For instance, when Lucas was sentenced on September 19, 1989, California required inter-case proportionality review for noncapital cases. (Former Pen. Code § 1170, subd. (f) (setting forth a procedure for the Board of Prison Terms and the courts to review the proportionality of noncapital sentences); *see People v. Martin*, 42 Cal. 3d 437, 442-444 (1986). California did not require such review for capital cases.

560

(15cv1224)

Such a distinction is irrational and violates the constitutional guarantee of equal protection of the laws.[207]

31.     Equal protection analysis begins with identifying the interest at stake. "Personal liberty is a fundamental interest, *second only to life itself*, as an interest protected under both the California and the United States Constitutions." *People v. Olivas*, 17 Cal. 3d 236, 251 (1976) (emphasis added).

32.     If the interest identified is "fundamental," then courts have "adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny." *Westbrook v. Milahy*, 2 Cal. 3d 765, 784-85 (1970).  A state may not create a classification scheme which affects a fundamental interest without showing that it has a compelling interest that justifies the classification and that the distinctions drawn are necessary to further that purpose.  *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

33.     The state cannot meet this burden.  In this case, the equal protection guarantees of the state and federal constitutions must apply with greater force, the scrutiny of the challenged classification be more strict, and any purported justification by the state of the discrepant treatment be even more compelling because the interest at stake is not simply liberty, but life itself.  To the extent that there may be differences

---

[207]   The California Supreme Court has rejected the argument that the failure to provide disparate sentence review for capital defendants violates the equal protection clause, relying heavily on the premise that the primary capital sentencing authority is the jury. *People v. Allen*, 42 Cal. 3d 1222, 1285 (1986); *People v. Rodriguez*, 42 Cal. 3d 730, 777-79 (1986).  But jurors are not the only bearers of community standards. Legislatures also reflect community norms, and a court of statewide jurisdiction is best situated to assess the objective indicia of community values which are reflected in a pattern of verdicts.  *Cf. McCleskey v. Kemp*, 481 U.S. 279, 305 (1987).  Principles of uniformity and proportionality live in the area of death sentencing by prohibiting death penalties that flout a societal consensus as to particular offenses, *Coker v. Georgia,* 433 U.S. 584, 593-95 (1977), or offenders, *Enmund v. Florida*, 458 U.S. 782, 788-801 (1982); *Ford v. Wainwright*, 477 U.S. 399 (1986); *Atkins*, 536 U.S. 304.  Juries, like trial courts and counsel, are not immune from error and can violate the larger community consensus as expressed by statewide sentencing practices.  The entire purpose of disparate sentence review is to enforce these values of uniformity and proportionality by weeding out aberrant sentencing choices, regardless of who made them.

561

(15cv1224)

between capital defendants and non-capital felony defendants, those differences justify more, not fewer, procedural protections designed to make a sentence more reliable.

34.     The Equal Protection Clause of the Fourteenth Amendment guarantees each person that they will not be denied their fundamental rights and also bans arbitrary and disparate treatment of citizens when fundamental interests are at stake. *Bush v. Gore*, 531 U.S. 98 (2000).

35.     In addition to protecting the exercise of federal constitutional rights, the Equal Protection Clause also prevents violations of rights guaranteed to the people by state governments. *Charfauros v. Board of Elections*, 249 F.3d 941, 951 (9th Cir. 2001).

36.     The California Supreme Court has cited a death sentence's reflection of community standards as justification for the arbitrary and disparate treatment of convicted felons who are facing a penalty of death.  This fact cannot justify the withholding of a disparate sentence review provided all other convicted felons, because such reviews are routinely provided in numerous states that have enacted death penalty laws as well as by the federal courts when they consider whether evolving community standards no longer permit the imposition of death in a particular case.

37.     Nor can this fact justify the refusal to require written findings by the jury, which is considered by the California Supreme Court to be the sentencer in death penalty cases, *Allen*, 42 Cal. 3d at 1286, or the acceptance of a verdict that may not be based on a unanimous agreement that particular aggravating factors that support a death sentence are true.  These procedural protections are especially important in meeting the acute need for reliability and accurate fact-finding in death sentencing proceedings. *Monge*, 524 U.S. at 732.  To withhold them on the basis that a death sentence is a reflection of community standards demeans the community as irrational and fragmented, and does not withstand the close scrutiny that should be applied when a fundamental interest is affected.

**G.     The Penalty Of Death In California Is Arbitrarily and Capriciously Imposed Depending On the County In Which The Defendant Is Charged, In Violation Of the Right To Equal Protection Of the Law**

38.     In California, the 58 counties, through the respective prosecutors' offices, make their own rules, within the broad parameters of Penal Code § 190.2, as to who is charged with capital murder and who is not.  There are no effective restraints or controls on prosecutorial discretion in California.  So long as an alleged crime falls within the statutory criteria of Penal Code § 190.2, the prosecutor is free to pick and choose which defendants will face potential death and which will face a potential lesser punishment.

39.     California does not treat capital defendants uniformly throughout the state. In some California counties a life is worth more than in others, because county prosecutors use different standards, or no standards, in choosing whether to charge a defendant with capital murder.  A 2008 study of California death sentences over the period 2000-2007 concluded that, "[w]hile the vast majority of California counties have largely abandoned execution in favor of simply sentencing people to die in prison, 10 counties continue to aggressively sentence people to execution, accounting for nearly 85 percent of death sentences since 2000."  Romy Ganschow, ACLU of N. Cal., *Death by Geography: A County By County Analysis of the Road to Execution* 1 (2008), available at http://www.aclunc.org/publications (last visited Nov. 21, 2016).

40.     If different and standardless procedures for counting votes among counties violates equal protection, as the Supreme Court held in *Bush v. Gore*, then the use of different and standardless procedures for charging and prosecuting capital murder violates the Fourteenth Amendment's equal protection clause as well.  Unequal treatment among the California counties violates the Fourteenth Amendment's Due Process and Equal Protection Clauses, *Bush v. Gore*, and article 1, section 7(b) and article IV, section 16(a) of the California Constitution.  The use of varying and standardless procedures for charging and prosecuting capital murder also violates

563

(15cv1224)

article 1, section 17 of the California constitution, and the Eighth Amendment to the United States Constitution, which requires "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings,* 455 U.S. at 112. The lack of consistency also deprives Lucas of his legitimate expectation that he will be deprived of his life or liberty only to the extent and in the manner provided for by law, in violation of due process. *See Bush*, 531 U.S. 98; *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

## H. California's Scheme Violates Due Process By Allowing the Jury to Repeatedly Consider the Same Evidence in Aggravation

41.     Petitioner's conviction, sentence, and confinement are unconstitutional because California's death penalty scheme improperly allows the jury to repeatedly consider the same facts throughout the guilt and penalty phases, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

42.     First, the scheme allows for the "triple use" of the same facts underlying the felony conduct; (1) to support the conviction of first degree murder on a felony murder theory, (2) to support the finding of the felony as a special circumstance and (3) the use of the felony as an aggravating factor which warrants the imposition of the death penalty. *See People v. Marshall*, 50 Cal. 3d 907, 945 (1990). The Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988), rejected a similar challenge to Louisiana's death penalty scheme, reasoning that the "legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Id.* at 246. However, California's scheme has a far greater number of felonies that make a defendant both eligible for first degree murder and death-eligible than did Louisiana. As such, the scheme under which Petitioner was convicted does not provide for the narrowing of death-eligible murders by the jury that the Court found in *Lowenfield* and thus violates Petitioner's rights under the Eighth and Fourteenth Amendments.

43.     Second, under section 190.3(a) of the Penal Code, the jury may consider "the circumstances of the crime of which the defendant was convicted in the present

proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." No limitations are placed on the jury's use of these "circumstances." The California Supreme Court has acknowledged the potential for double-counting the same felony conduct as both a special circumstance and an aggravating factor under 190.3(a). *Melton,* 44 Cal. 3d at 768-69. The use of felony-based special circumstances as independent factors for imposing a death sentence violated Lucas's right to a reliable determination of penalty in violation of the Eighth and Fourteenth Amendments. *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985).

44.     Third, sections 190.3(b) (presence of any criminal activity involving attempted use of force or violence) and 190.3(c) (presence of any prior felony conviction) allow the jury to double-count the same violent conduct as separate aggravating factors. Thus, double-counting of aggravating circumstances prevented the jury from a fair and proper consideration of the evidence and a reliable determination of penalty. *Caldwell*, 472 U.S. at 341.

## I.     Execution Following Lengthy Confinement Under Sentence Of Death Would Constitute Cruel and Unusual Punishment In Violation of Petitioner's State and Federal Constitutional Rights And International Law

45.     Execution of Lucas following his lengthy confinement under sentence of death (now more than twenty-seven years) would constitute cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution; article 1, sections 1, 7, 15, 16, and 17 of the California Constitution; and international law, covenants, treaties and norms.

46.     Lucas was sentenced to death on September 29, 1989, after almost five years of imprisonment in the county jail. He has now been continuously confined for thirty-two years and under sentence of death for more than twenty-seven years. This long period of delay is not Lucas's fault, but has resulted from the factors described in Claim 52. The delays have nothing to do with the exercise of any discretion on Lucas's

565

part. *Cf. McKenzie v. Day*, 57 F.3d 1461, 1466-1467 (9th Cir. 1995) (claim rejected because delay was caused by prisoner "avail[ing] himself of procedures" for post-conviction review, implying a volitional choice by the prisoner), *adopted en banc*, 57 F.3d 1493. The delays here have been caused by "negligence or deliberate action by the State." *Lackey v. Texas,* 514 U.S. 1045 (1995) (mem. of Stevens, J., respecting the denial of certiorari). Lucas was arrested on December 16, 1984. He remained continuously incarcerated until the judgment of death was imposed on September 19, 1989. Appellate counsel was appointed on July 29, 1993, almost four years later. The record on appeal was filed on April 27, 1998, but Lucas's "Motion for Orders re: Settlement, Correction and Completion of Record," filed on November 10, 1997, and "Supplemental Motion for Orders re: Settlement, Correction and Completion of Record," filed on November 25, 1997 were not ruled upon until September 19, 2001. The opening brief on appeal was filed on August 15, 2003.

47. Execution of Lucas following confinement under sentence of death for this lengthy a period of time would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Lackey,* 514 U.S. 1045; *Knight v. Florida*, 528 U.S. 990 (1999) (Breyer, J., respecting the denial of certiorari)); *Ceja v. Stewart,* 97 F.3d 1246 (9th Cir. 1996) (Fletcher, J., dissenting from order denying stay of execution).) It constitutes cruel and unusual punishment to confine an individual, such as Lucas, on death row for this extremely prolonged period of time. *See, e.g*., *McKenzie*, 57 F.3d at 1478-79; *Ceja*, 97 F.3d at 1246. Also, executing Lucas such a long time after his conviction and death sentence would violate the Eighth Amendment because the State's ability to exact retribution and to deter other murders by actually carrying out such a sentence is drastically diminished. "[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *In re Medley*, 134 U.S. 160, 172 (1890).

## J.     California's Use of the Death Penalty Violates International Law and Norms of Humanity And Decency and Violates The Fifth, Sixth, Eighth and Fourteenth Amendments

48.     Lucas's death sentence violates Article 11, section 2 and Article VI, section 2 of, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to, the United States Constitution, as well as international law, covenants, treaties and norms because it contravenes international treaties and laws to which the United States is a signatory, and which obligate the United States to comply with human rights principles.  In addition to being denied his right to the minimum international, federal and state law guarantees for a fair trial and a competent defense, Lucas has also been denied his right under customary international law to appeal and habeas corpus review by an independent, impartial tribunal.

49.     "The United States stands as one of a small number of nations that regularly uses the death penalty as a form of punishment. . . .  The United States stands with China, Iran, Nigeria, Saudi Arabia, and South Africa [the former apartheid regime] as one of the few nations which has executed a large number of persons. . . .  Of 180 nations, only ten, including the United States, account for an overwhelming percentage of state ordered executions."  *Soering v. United Kingdom: Whether the Continued Use of the Death Penalty in the United States Contradicts International Thinking,* 16 Crim. and Civ. Confinement 339, 366 (1990); *see also People v. Bull* 185 Ill.2d 179, 225 (1998) (Harrison, J., dissenting.) (South Africa abandoned the death penalty in 1995, after that article's publication.)

50.     The nonuse of the death penalty, or its limitation to "exceptional crimes such as treason"–as opposed to its use as regular punishment–is particularly uniform in the nations of Western Europe.  *See, e.g.*, *Stanford v. Kentucky,* 492 U.S. 361, 389

567

(15cv1224)

1   (1989) (Brennan, J., dissenting); *Thompson,* 487 U.S. at 830 (plur. opn. of Stevens, J.)

2   Indeed, *all* nations of Western Europe have now abolished the death penalty.[208]

3       51.     Although this country is not bound by the laws of any other sovereignty in

4   its administration of our criminal justice system, it has relied from its beginning on the

5   customs and practices of other parts of the world to inform our understanding.  "When

6   the United States became an independent nation, they became, to use the language of

7   Chancellor Kent, 'subject to that system of rules which reason, morality, and custom

8   had established among the civilized nations of Europe as their public law.'"  *Miller v.*

9   *United States*, 78 U.S. 268, 315 (1870) (Field, J., dissenting) (quoting 1 Kent's

10  Commentaries 1); *see also Hilton v. Guyot,* 159 U.S. 113, 162-68 (1895); *Sabariego v.*

11  *Maverick*, 124 U.S. 261, 291-292 (1888); *Martin v. Waddell's Lessee,* 41 U.S. 367, 409

12  (1842).  Thus, for example, Congress's power to prosecute war, as a matter of

13  constitutional law, was limited by the power recognized by the law of nations; and what

14  civilized nations of Europe forbade, such as poison weapons or the selling into slavery

15  of wartime prisoners, was constitutionally forbidden here.  *Miller*, 78 U.S. at 315-16

16  n.57 (Field, J., dissenting).

17      52.     Due process is not a static concept, and neither is the Eighth Amendment.

18  "Nor are 'cruel and unusual punishments' and 'due process of law' static concepts

19  whose meaning and scope were sealed at the time of their writing.  They were designed

20  to be dynamic and to gain meaning through application to specific circumstances, many

21  of which were not contemplated by their authors."  *Furman,* 408 U.S. at 420 (Powell,

22  J., dissenting.)  The Eighth Amendment in particular "draw[s] its meaning from the

23  evolving standards of decency that mark the progress of a maturing society."  *Trop v.*

24

25

26      [208]  Amnesty International, "The Death Penalty: List of Abolitionist and
    Retentionist Countries" (Dec. 18, 1999), *available at* Amnesty International website,
27  www.amnesty. org (last visited on November 15, 2016).  These facts remain true if one
    includes "quasi-Western European" nations such as Canada, Australia, and the Czech
28  and Slovak Republics, all of which have abolished the death penalty.  (*Id*.)

(15cv1224)

*Dulles,* 356 U.S. 86, 101 (1958); *Atkins*, 536 U.S. at 315-317.  It prohibits the use of forms of punishment not recognized by several of our states and the civilized nations of Europe, or used by only a handful of countries throughout the world, including totalitarian regimes whose own "standards of decency" are antithetical to our own.  In the course of determining that the Eighth Amendment now bans the execution of intellectually disabled persons, the Supreme Court relied in part on the fact that "within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved." *Atkins,* 536 U.S. at 316 & n.21, citing the Brief for The European Union as *Amicus Curiae in McCarver v. North Carolina*, O.T.2001, No. 00-8727 at 4.

53.     Thus, assuming arguendo that capital punishment itself is not contrary to international norms of human decency, its use as *regular punishment* for substantial numbers of crimes–as opposed to extraordinary punishment for extraordinary crimes– is.  Nations in the Western world no longer accept it.  The Eighth Amendment does not permit jurisdictions in this nation to lag so far behind.  *See Atkins,* 536 U.S. at 315.  Furthermore, inasmuch as the law of nations now recognizes the impropriety of capital punishment as regular punishment, it is unconstitutional in this country inasmuch as international law is a part of our law.  *Hilton*, 159 U.S. at 227; *see also Jecker, Torre & Co. v. Montgomery*, 59 U.S. 110, 112 (1855).  Thus, the very broad death scheme in California and the use of death as regular punishment violate both international law and the Eighth and Fourteenth Amendments.  Lucas's death sentence should be set aside.

54.     California's death penalty also violates the provisions of binding international treaties and the fundamental precepts of international human rights.  As international legal norms are incorporated into the Eighth Amendment determination of evolving standards of decency, Lucas raises this claim under the Eighth Amendment as well as binding international law.  *See Atkins*, 536 U.S. at 316 n.21; *Roper v. Simmons*, 543 U.S. 551, 560-61 (2005); *see also Stanford*, 492 U.S. at 389-90 (Brennan, J., dissenting), *abrogated by Roper*, 543 U.S. 551.

(15cv1224)

55.     Article 7 of the International Covenant of Civil and Political Rights ("ICCPR") prohibits "cruel, inhuman or degrading treatment or punishment."  Article 6, section 1 of the ICCPR, prohibits the arbitrary deprivation of life, providing that "[e]very human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of his life."[209]  The Second Operational Protocol to the ICCPR adopted by the United Nations General Assembly in 1989, provides for total abolition of the death penalty, but allows state parties to retain the death penalty only in wartime, if a reservation to that effect was made at the time of ratifying or acceding to the protocol.[210]

56.     The ICCPR was ratified by the United States in 1992 with five reservations, five understandings, and four declarations.[211]  One of the purported reservations was made to avoid the provisions of article 6 to the ICCPR, which guarantees the right to life and prohibits the execution of juveniles.  The United States ratification of the ICCPR included a declaration "that this Covenant shall be implemented by the Federal Government to the extent it exercises legislative and judicial jurisdiction over the matters contained therein," and for "state and local governments" to implement it as well.[212] *Id.*, § II(5).

57.     The United States' purported reservations are invalid.  The federal Constitution does not contain any language suggesting that the Senate can partially

---

[209]   International Covenant on Civil and Political Rights, *available at* http://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx (last visited on November 15, 2016).

[210]   Second Operational Protocol to the International Covenant on Civil and Political Rights, *available at* http://www.ohchr.org/en/professionalinterest/pages/2ndOPCCPR.aspx (last visited on November 15, 2016).

[211]   U.S. Reservations, Declarations, and Understandings, International Covenant on Civil and Political Rights, 138 Cong. record S4781-01 (daily ed. April 2, 1992), *available at* Univ. of Minnesota Human Rights Library, http://hrlibrary.umn.edu/usdocs/civilres.html (last visited on November 15, 2016).

[212]   S. Treaty Doc. No. 95-2 (Dec. 16, 1966), International Covenant on Civil and Political Rights.

570

(15cv1224)

consent to a treaty or materially alter it by placing conditions on it.[213]  Under Article VI of the United States Constitution, "all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., Art. VI.  President Clinton subsequently issued an executive order adopting a "policy and practice" of the United States government to implement international human rights treaties, and specifically referring to the ICCPR.  (Executive Order No. 13107 "Implementation of Human Rights Treaties," section 1, *available at* http://fas.org/irp/offdocs/eo13107.htm (last visited on November 15, 2016).)

58.     The purported reservation is also invalid under the Vienna Convention on the Law of Treaties, which states that a "reservation" is not valid if it "is incompatible with the object and purpose of the treaty."  Vienna Convention on the Law of Treaties, Art. 19(c), May 23, 1969, 1155 U.N.T.S. 331, 336-37 (entered into force Jan. 27, 1980); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 313(1)(c) ("A state may enter a reservation to a multilateral international agreement unless . . . the reservation is incompatible with the object and purpose of the agreement.")  The object and purpose of the ICCPR is to protect humans' inherent right to life.  (ICCPR Art. 6, para. 1, 999 U.N.T.S. 171.)  In 1995, the United Nations Human Rights Committee conclude that the United States's reservation to Article 6, paragraph 5 was incompatible with the ICCPR's object and purpose, and recommended that it be withdrawn.[214]

---

[213]  Nor does the alleged "reservation power" survive analysis under the United States Supreme Court's decisions regarding the separation of powers, culminating in *Clinton v. New York*, 524 U.S. 417, 438 (1998) (invalidating the line-item veto because the Constitution does not authorize the president "to enact, to amend or to repeal statutes."); *see also Bowsher v. Synar*, 478 U.S. 714, 732-33 (1986); *I.N.S. v. Chadha*, 462 U.S. 919 (1983).

[214]  *See* Consideration of Reports Submitted by State Parties Under Article 40 of the Covenant, U.N. Hum. Rts. Comm., 53rd Sess., 1413th meeting, at paras. 279, 292,

(15cv1224)

59.     Since the United States' purported reservation to Article 6, paragraph 5, is invalid, the United States is bound by the ICCPR and Petitioner's death sentence violates that agreement.  It also violates the Second Operational Protocol's prohibition of the death penalty except in wartime, because the United States was not at war at the time of Petitioner's offense, and Petitioner's sentence does not arise from convictions for crimes committed during a war.  Because of the improprieties of the capital sentencing process, the conditions under which the condemned are incarcerated, the excessive delays between sentencing and appointment of appellate counsel, and the excessive delays between sentencing and execution under the California death penalty system, the implementation of the death penalty in California constitutes "cruel, inhuman or degrading treatment or punishment" in violation of Article VII of the ICCPR.  For these same reasons, the death sentence imposed in this case also constitutes the arbitrary deprivation of life in violation of Article VI, section 1 of the ICCPR.

60.     Because American legal obligations under international law are one component of America's evolving standards of decency, *Roper*, 543 U.S. at 575, the fact that imposition of the death penalty violates a treaty to which the United States is a signatory militates strongly against the constitutionality of the imposition of the death penalty in the United States.

61.     Imposition of the death penalty violates the Eighth Amendment's prohibition of cruel and unusual punishment, and runs afoul of the treaty obligations of the United States.  California's very broad death penalty scheme, and death's use as regular punishment randomly imposed, violate the Eighth and Fourteenth Amendments.  Lucas's death sentence should be set aside.

---

U.N. Doc. ICCPR/C/79/Add.50 (1995), *available at* http://hrlibrary.umn.edu/usdocs/hrcuscomments.html (last visited on November 15, 2016).

572

(15cv1224)

**K.** **The State May Not Execute an Accused Whom It Has Not Afforded Fair and Reliable Procedural Protection**

62.     The Eighth Amendment requires heightened reliability in the procedures employed to determine who receives the death penalty.  *Woodson*, 428 U.S. at 305 (opinion of Stewart, Powell, and Stevens, JJ.).  This is because "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."  *Id.* (footnote omitted).

63.     The Supreme Court has adhered to *Woodson* and applied its reasoning in many later cases.  *See, e.g.*, *Lankford v. Idaho*, 500 U.S. 110, 124 (1991) (reversing a death sentence where the petitioner was not notified before his sentencing hearing that he could possibly be sentenced to death); *Craig v. North Carolina*, 484 U.S. 887 (1987); *Beck v. Alabama,* 447 U.S. 625, 638 (1980); *Maxwell v. Florida,* 479 U.S. 972 (1986) (Marshall, J., dissenting from denial of certiorari and opining that the Eighth Amendment's requirement of heightened reliability entitled the habeas petitioner to access to his case file to ensure that his claim of inadequate assistance of counsel was fully and fairly resolved); *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (death sentence vacated where the prosecutor urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the state supreme court); *Cabana v. Bullock*, 474 U.S. 376, 406-07 (1986); *Lockett*, 438 U.S. at 604 (plurality opinion) and *Gardner v. Florida*, 430 U.S. 349, 358-359 (1977) (opinion announcing judgment); *Ford,* 477 U.S. 399 (procedure for determining whether condemned was mentally incompetent to be executed criticized on Eighth Amendment grounds); *Spaziano v. Florida,* 468 U.S. 447, 456 (1984), *overruled in part on other grounds in Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616 (2016) (fact-finding procedures in capital cases must reflect a heightened standard of reliability.)

64.     The Eighth Amendment protects the capitally accused from procedures and judicial rulings that tilt the playing field against him, thereby calling into question

573

(15cv1224)

the reliability of any potential determination that death is the appropriate punishment. In the present case Lucas was not given a fair opportunity to defend, in light of the many errors throughout the trial which violated the due process and reliability requirements of the federal constitution.  (*See* Claim 31.)  These violations of Lucas's substantial rights profoundly tilted the playing field against him rendering the resultant death sentence unfair and unreliable in violation of the Eighth Amendment.

65.    Accordingly, structural error was committed and the judgment should be reversed without a showing of prejudice.  *See e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *Sullivan,* 508 U.S. at 280-81.  Alternatively, the errors had a substantial and injurious effect on the verdict, *Brecht*, 507 U.S. at 627-28, requiring reversal.[215]

## L.    The California System Of Unified Appellate And Postconviction Review Is Unconstitutional

66.    Lucas's sentences and confinement are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because California's System of Unified appellate and postconviction review is unconstitutional.

67.    Lucas has a statutory and constitutional right to appeal his convictions and death sentence.  *People v. Sheldon,* 7 Cal. 4th 1136, 1139 (1994).  In a criminal case, the defendant's right to assistance of counsel derives from the Sixth and Fourteenth Amendments to the Constitution of the United States.  Where an indigent defendant has a statutory right to appeal, he or she has a constitutional right, under the due process and equal protection of the law provisions of the Fourteenth Amendment, to court-

---

[215] *See* Claim 15(I), 26 (close balance at penalty demonstrated by near-deadlock, length of deliberations, request for readback of testimony, request for re-instruction, etc.).

574

(15cv1224)

appointed counsel. *In re Smith,* 1970 3 Cal. 3d 192 (1970); *Evitts v. Lucey*, 469 U.S. 387 (1985), *Smith v. Robbins*, 528 U.S. 259 (2000).

68.     The California Supreme Court requires that ineffective assistance of counsel claims–including claims of ineffective assistance on appeal–be filed in a habeas petition. *People v. Mendoza Tello*, 15 Cal. 4th 264, 266-267 (1997). Generally, in a capital case the habeas petition must be filed simultaneously with the appeal to be presumptively timely. The habeas petition is presumptively timely if filed within 180 days of the due date of the reply brief. The Court appears to maintain that there is no actual due date for the filing of a habeas petition. Yet, at least in practice, the petition is "due" within 180 days of the reply because a timeliness default may apply if the petition is filed after the 180 days. A petitioner who files an untimely petition risks losing his claims to relief, and his life.

69.     Ineffective assistance of appellate counsel claims, however, do not arise and are not discoverable until after the Court has decided the appeal. Thus, there is no appropriate time under the California scheme of capital case review to raise claims of ineffective assistance of appellate counsel. As a result, the California scheme of capital case review violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments (due process and the equal protection clauses) of the federal Constitution.

## M.     In Combination, the Foregoing Constitutional Deficiencies Cumulatively Result in a Denial of Lucas's Constitutional Rights

70.     The foregoing violations of Lucas's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993). Even assuming, however, the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Lucas's rights had a substantial and injurious effect or influence

575

(15cv1224)

on Lucas's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

71.     The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  Even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Lucas's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

72.     Specifically for the allegations of ineffective assistance of counsel, while each instance of trial counsel's deficient performance was individually prejudicial, the cumulative impact of trial counsel's errors at the pre-trial, guilt and penalty phase of Lucas's trial prejudiced Lucas and deprived him of a fair or reliable trial.  *See Parle v. Runnels*, 505 F.3d 922, 929-30 (9th Cir. 2007); *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995); *United States v. McLister*, 608 F.2d 785, 791 (9th Cir. 1979).  Indeed, the prejudice from trial counsel's overall failure to exhibit even a minimal showing of zealousness and competent advocacy was overwhelming.  It was because of these errors that Lucas was sentenced to death.  *See Lincoln v. Sunn*, 807 F.2d 805, 814, n.6 (9th Cir. 1987); *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992); *cf. Taylor v. Kentucky*, 436 U.S. 478 (1978) (several flaws in state court proceedings combine to create reversible federal constitutional error).

73.     In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at an earlier time.

576

(15cv1224)

**CLAIM 51:  CALIFORNIA'S DEATH PENALTY STATUTE VIOLATES DEFENDANTS' RIGHT TO A JURY TRIAL ON EACH ELEMENT OF A CAPITAL CRIME, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

1.      California's death penalty statute, Penal Code section 190.3, violates the Sixth and Fourteenth Amendments of the United States Constitution because it does not require that a jury unanimously find, or find beyond a reasonable doubt, the existence of aggravating factors, other than prior criminality, that are necessary to sentence a defendant to death.  Nor does California's death penalty statute require that a jury find beyond a reasonable doubt that the aggravating factors outweigh the existing mitigating factors, so as to warrant a death sentence.  California's scheme therefore permits a defendant to be sentenced to death even though no aggravating factor has been found unanimously or beyond a reasonable doubt, and the jury has never concluded beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors, or were so substantial as to warrant a death sentence.  In this case, there was not even a requirement that a *majority* of jurors agree on any particular aggravating factor, let alone agree that any particular combination of aggravating factors a death sentence. Because the facts found by the penalty phase jury increased Lucas's punishment beyond the life sentence that would have been possible without the penalty phase verdict, the Sixth and Fourteenth Amendments required unanimity and application of the reasonable doubt standard.  *Hurst v. Florida*, __ U.S. __, 136 U.S. 616 (2016).

**A.      The Sixth and Fourteenth Amendments Require That Any Fact Necessary to Impose the Death Penalty Be Found by a Jury Beyond a Reasonable Doubt**

2.      The Sixth Amendment's right to trial by jury requires that "any fact [other than the fact of a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see also Ring v.*

*Arizona*, 536 U.S. 584, 602 (2002).  The "statutory maximum," is the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely v. Washington*, 542 U.S. 296, 303 (2004).

3.     Encompassed within the right to a jury determination of penalty-increasing facts is the right to have those facts found beyond a reasonable doubt.  "[T]he Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated," such that "[i]t would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine . . . whether he is guilty beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993).  "In other words, the jury verdict required by the Sixth Amendment *is* a jury verdict of guilty beyond a reasonable doubt." *Id.* (emphasis added).  When a jury has rendered a decision without properly employing the reasonable doubt standard, "there has been no jury verdict within the meaning of the Sixth Amendment." *Id.* at 280.  The Constitution requires proof beyond a reasonable doubt "in order to 'provid[e] concrete substance for the presumption of innocence,' and to reduce the risk of imposing . . . deprivations [of liberty] erroneously." *Apprendi*, 530 U.S. at 484 (quoting *In re Winship*, 397 U.S. 358, 363 (1970)).  Facts that increase the punishment for a crime heighten "both the loss of liberty and the stigma attaching to the offense," and the defendant "should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached." *Id.*

4.     *Apprendi*'s rationale applies to all facts necessary to impose a death sentence, a punishment greater than any other.  "Capital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," particularly when that increased punishment is death itself. *Ring*, 536 U.S. 584, 589 (2002).  Where state law makes the finding of aggravating factors a prerequisite to imposition of a death sentence, "the required finding [of an aggravating factor] expose[s] [the petitioner] to a

greater punishment than that authorized by the jury's guilty verdict" and "operate[s] as 'the functional equivalent of an element of a greater offense." *Ring*, 536 U.S. at 604, 609 (quoting *Apprendi*, 530 U.S. at 494 n.19.)  The Sixth and Fourteenth Amendments therefore require any such aggravating factors to be found by "a unanimous jury . . . beyond a reasonable doubt." *Ring*, 536 U.S. at 589, 610 (Scalia, J., concurring).

5.      In *Hurst v. Florida*, the Supreme Court applied these principles to hold unconstitutional Florida's death penalty statute, which provided for a judge, not a jury, to determine the existence or nonexistence of aggravating factors necessary to impose a death sentence. *Hurst*, 136 S. Ct. 616.  The Florida scheme at issue in *Hurst* provided that a defendant became eligible for death upon conviction of a capital crime at the guilt phase.  (Fla. Stat. §§ 782.04(1)(a); 775.082, 921.141(1).)  After the penalty phase, the trial court was responsible for determining that "sufficient aggravating circumstances exist[ed]" and "[t]hat there are insufficient mitigating circumstances to outweigh aggravating circumstances," which are prerequisites for imposing the death penalty. *Hurst*, 136 S. Ct. at 622 (citing § 921.141(3).)  Though the scheme provided for a jury to make a recommendation to the judge as to the proper sentence, the jury's verdict was purely advisory. *Id*. at 622.  The Supreme Court held that Florida's scheme violated the Sixth Amendment because, "[a]s with *Ring*," who "would have received a life sentence" if the "judge [had] not engaged in factfinding," "a judge increased Hurst's authorized punishment based on her own factfinding." *Id.* at 621-22.

6.      *Hurst* did not hold simply that a jury must find facts necessary to impose a death sentence.  It also reiterated the rule from *Apprendi*, *Ring*, *and Blakely*, that the jury must make these findings both unanimously and beyond a reasonable doubt. *See Hurst*, 136 S. Ct. at 621 (The Sixth Amendment "in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt."); *Blakely*, 542 U.S. at 301 (English common law required that the "'truth of every accusation' . . . 'should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours.'")  Indeed, the requirement of unanimity has long

1   been held to "extend[] to all issues—character or degree of the crime, guilt and

2   punishment—which are left to the jury" in criminal trials.  *Andres v. United States*, 333

3   U.S. 740, 748 (1948).  The United States Supreme Court has held that the verdict of a

4   six-person jury must be unanimous in order to "assure . . . [its] reliability."  *Brown v.*

5   *Louisiana*, 447 U.S. 323, 334 (1980).  Unanimity is particularly critical in capital

6   sentencing proceedings, where there is an "acute need for reliability."  *Monge v.*

7   *California*, 524 U.S. 721, 732 (1998); *Johnson v. Mississippi,* 486 U.S. 578, 584

8   (1988).

9   **B.**   **California Unconstitutionally Fails to Require Unanimity, or a**

10          **Reasonable Doubt Standard, at the Penalty Phase**

11          7.     California's death penalty scheme violates the Sixth and Fourteenth

12   Amendments, as interpreted in *Apprendi*, *Ring*, *and Hurst*, because it does not impose a

13   reasonable doubt standard on the findings required to impose a death sentence:  that

14   aggravating facts exist, that they outweigh the mitigating circumstances, or that the

15   aggravating facts are so substantial as to warrant a death sentence instead of life in

16   prison without parole.  California's death penalty scheme further violates the Sixth and

17   Fourteenth Amendments because it does not require the jury to unanimously find the

18   required aggravating factors.

19          8.     In order to impose the death penalty, California law required Lucas's jury

20   to make several findings:  (1) that aggravating factors were present; (2) that the

21   aggravating factors outweighed the mitigating factors; and (3) that the aggravating

22   factors were so substantial as to make death an appropriate punishment.  (CALJIC No.

23   8.88; Cal. Penal Code § 190.3).  California law expressly recognizes those

24   determinations as "factual matters."  *People v. Sup. Ct. (Mitchell)*, 5 Cal. 4th 1229,

25   1236 (1993), which are assigned to the "trier of fact."  Cal. Penal Code § 190.3.

26   According to California's "principal sentencing instruction," *People v. Farnam*, 28 Cal.

27   4th 107, 177 (2002), "an aggravating factor is *any fact, condition or event attending the*

28   *commission of a crime which increases its guilt or enormity, or adds to its injurious*

*consequences which is above and beyond the elements of the crime itself*." (CALJIC No. 8.88; emphasis added.)  The California Supreme Court has acknowledged that fact-finding is part of a sentencing jury's responsibility; its role "is not merely to find facts, but also–and most important–to render an individualized, *normative* determination about the penalty appropriate for the particular defendant. . . ." *People v. Brown*, 46 Cal. 3d 432, 448 (1988).

9.     The three critical determinations under California's death penalty scheme—that aggravating factors exist, that they outweigh mitigating circumstances, and that they are "so substantial" as to warrant the death penalty—are subject to the *Ring/Apprendi* rule because they increase the maximum punishment that may be imposed upon the defendant.  *See Murdaugh v. Ryan*, 724 F.3d 1104 (9th Cir. 2013) ("Applying the rationale of *Apprendi* and *Ring II*, the existence or absence of a mitigating circumstance was thus a finding of fact upon which the 'increase of a defendant's authorized punishment [was] contingent.'")  Yet California law does not require (and did not require, when Petitioner was tried) that a reasonable doubt standard be used during any part of these penalty phase determinations, other than as to proof of prior criminality.  (CALJIC Nos. 8.86, 8.87); *People v. Anderson*, 25 Cal. 4th 543, 590 (2001); *People v. Fairbank*, 16 Cal. 4th 1223, 1255 (1997); *People v. Hawthorne*, 4 Cal. 4th 43, 79 (1992) (penalty phase determinations are moral and not "susceptible to a burden-of-proof quantification").  In accordance with this standard, Petitioner's jury was not instructed that it had to find beyond a reasonable doubt that aggravating factors existed under section 190.3, that any aggravating factors outweighed the mitigating circumstances, or that the aggravating factors were so substantial that they warranted a death sentence instead of life in prison without parole.

10.     Under *Apprendi*, *Ring*, and *Hurst*, these penalty-increasing findings must be made beyond a reasonable doubt.  While *Hurst* did not expressly address the standard of proof issue, the Supreme Court made clear in *Hurst* that the findings that "sufficient aggravating circumstances exist" and "that there are insufficient mitigating

(15cv1224)

circumstances to outweigh aggravating circumstances" are part of the "necessary factual finding that *Ring* requires" to be made by a jury. *Hurst*, 136 S. Ct. at 622. *Ring*, in turn, imposes a reasonable doubt standard on these findings. *Ring*, 536 U.S. at 602. By failing to require that these findings be made by a jury unanimously and beyond a reasonable doubt, California's death penalty statute fails "to give intelligible content to the right of jury trial" when the threatened penalty is at its most severe. *Blakely*, 542 U.S. at 305. California's failure to require a beyond a reasonable doubt standard at the penalty phase also violates criminal defendants' legitimate expectation of that burden of proof, provided by section 520 of the California Evidence Code. *Cf. Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (defendant constitutionally entitled to procedural protections afforded by state law). CALJIC Nos. 8.85 and 8.88 fail to provide the jury with the guidance needed for administration of the death penalty to satisfy the minimum requirements of the Sixth, Eighth, and Fourteenth Amendments.

11. California's lack of a unanimity requirement or written findings by the jury renders its death penalty scheme even less reliable. As explained above, Section 190.3 permits prosecutors to present virtually any number and range of alleged aggravating facts. California's lack of a unanimity requirement poses a grave risk (a) that the jury's ultimate verdict—that aggravating facts exist and warrant death—will cover up wide disagreement among the jurors about what specific aggravating things the defendant did and did not do; and (b) that the jurors will fail to focus upon specific factual detail and simply conclude from a wide array of proffered aggravators that where there is smoke there must be fire, and impose death on that basis. The risk of such an inherently unreliable decision-making process is unacceptable in a capital context.

12. The failure to require that capital penalty phase juries unanimously, or even by a majority, find prior criminal activity to be true, stands in stark contrast to the rules applied to non-capital cases. The failure to require such separate, unanimous findings in capital cases violates the constitutional principle that capital defendants are

582

(15cv1224)

entitled to more rigorous procedural protections than non-capital defendants. *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (conc. opn. of Burger, C.J.); *Eddings v. Oklahoma*, 455 U.S. 104, 117-118 (1982) (conc. opn. of O'Conner, J.); *Lockett v. Ohio*, 438 U.S. 586 (1978).  In fact, the current scheme adopts precisely the opposite approach: Lucas, as a capital defendant, was singled out for less procedural protection than other individuals not charged with a capital offense, in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir. 1990) (equal protection prohibits uneven application of rules ensuring jury impartiality).

13.    California's failure to require written or other specific findings by the jury regarding aggravating factors further deprives petitions such as Lucas of their federal due process and Eighth Amendment rights to meaningful appellate review. *California v. Brown,* 479 U.S. 538, 543 (1987); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976). Written findings are essential to ensure that a defendant subjected to a capital penalty trial under Penal Code § 190.3 is afforded the protections guaranteed by the Sixth Amendment right to trial by jury.  Particularly given that California juries have total discretion without any guidance on how to weigh aggravating and mitigating circumstances, *Fairbank*, 16 Cal. 4th at 1255, there can be no meaningful appellate review without at least written findings because it will otherwise be impossible to "reconstruct the findings of the state trier of fact." *See Townsend v. Sain,* 372 U.S. 293, 313-316 (1963).  Of course, without such findings it cannot be determined that the jury unanimously agreed beyond a reasonable doubt on any aggravating factors, or that such factors outweighed mitigating factors beyond a reasonable doubt.

14.    The California Supreme Court has held that capital sentencing is not susceptible to burdens of proof or persuasion because those determinations are largely moral, unlike other sentencing determinations, *People v. Lenart*, 32 Cal. 4th 1107, 1136-37 (2004).  But even faced with a normative determination, it is highly likely that one or more jurors on a given jury will find themselves torn between sparing and taking

the defendant's life, or between finding and not finding a particular aggravator. A tie-breaking rule is needed to ensure that such jurors – and the juries on which they sit – respond in the same way, so the death penalty is applied evenhandedly. "[C]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all." *Eddings,* 455 U.S. at 112. It is unacceptable—"wanton" and "freakish," *Proffitt v. Florida,* 428 U.S. 242, 260 (1976)—and the "height of arbitrariness," *Mills v. Maryland*, 486 U.S. 367, 374 (1988)—that one defendant should live and another die simply because one juror or jury can break a tie in favor of a defendant and another can do so in favor of the State on the same facts, with no uniformly applicable standards to guide either.

15.     The California Supreme Court has also held that the prosecution has no burden of proof at the penalty phase, under California's 1977 death penalty law, *People v. Williams*, 44 Cal. 3d 883, 960 (1988), and that unanimity with respect to aggravating factors is not required by statute or as a constitutional procedural safeguard. *People v. Taylor*, 52 Cal. 3d 719, 749 (1990); *accord People v. Bolin*, 18 Cal. 4th 297, 335-336 (1998).[216] The California Supreme Court has also rejected the argument that *Apperendi, Blakely, and Ring* impose a reasonable doubt standard on penalty phase proceedings in California. *People v. Prieto*, 30 Cal. 4th 226, 263 (2003). Petitioner believes the California Supreme Court should reconsider those decisions, so that its death penalty scheme will comport with the principles set forth in *Apprendi, Ring, Blakely*, and *Hurst*.[217]

---

[216]  Consistent with this construction of California's capital sentencing scheme, no instruction was given to Petitioner's jury requiring jury agreement on any particular aggravating factor.

[217]  A burden of proof of at least a preponderance is required as a matter of due process because that has been the minimum burden historically permitted in *any* sentencing proceeding. Judges have never had the power to impose sentence without the firm belief that whatever considerations underlie their sentencing decisions have been at least proved to be more likely than not. They have never had the power that a California capital sentencing jury has been accorded, which is to base "proof" of aggravating circumstances on any considerations they want, without any burden at all

584

16.     Even assuming it were permissible not to have any burden of proof at all, the trial court erred prejudicially by failing to articulate that to the jury.  The Supreme Court has recognized that the burden of proof is one of the most fundamental concepts in our system of justice, and any error in articulating it is automatically reversible error. *Sullivan,* 508 U.S. at 278.  This is because, without a proper instruction on the burden of proof, jurors may use the wrong standard.  The same is true if there is no burden of proof but the jury is not so told.  That scenario raises the constitutionally unacceptable possibility a juror would vote for the death penalty because of a misallocation of what is supposed to be a nonexistent burden of proof.  That renders the failure to give any instruction at all on the subject of a violation of the Sixth, Eighth, and Fourteenth Amendments, and reversible per se.

## C.     *Ring*/*Apprendi* Error Is Structural

17.     The denial of a unanimous jury verdict beyond a reasonable doubt, on all the factors required to impose a death sentence, should be structural and not subject to harmless error review.  The Supreme Court has characterized structural errors as ones that "affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself," and which prevent the trial from "reliably serv[ing] its function as a vehicle for determination of guilt or innocence." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  Structural errors are also ones that "infect the entire trial process," *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)), and infringe rights that exist to "protect important values that are unrelated to the truth-seeking function of the trial." *Dawson v. Delaware*, 503

---

on the prosecution, and sentence a person to die based thereon.  The absence of any historical authority for a sentencer to impose sentence based on aggravating circumstances found with proof less than 51%–even 20%, or 10%, or 1%–is itself ample evidence of the unconstitutionality of failing to assign a burden of proof.  *See, e.g.*, *Griffin v. United States*, 502 U.S. 46, 51 (1991) (historical practice given great weight in constitutionality determination); *Murray's Lessee v. Hoboken Land and Improvement Co.,* 59 U.S. 272, 276-277 (1855) (due process determination informed by historical settled usages.)

(15cv1224)

U.S. 159, 169 (1992) (quoting *Rose v. Clark*, 478 U.S. 570, 587 (1986)) (Blackmun, J., concurring in the judgment).

18.  In *Sullivan*, the Supreme Court held that an erroneous instruction on the reasonable doubt standard is a structural error, because the lack of a proper reasonable doubt instruction "vitiates *all* the jury's findings," and means that "there has been no jury verdict within the meaning of the Sixth Amendment," to which harmless error review could be applied.  *Sullivan*, 508 U.S. at 280-81.  The Supreme Court reasoned that harmless error review cannot "hypothesize a guilty verdict that was never in fact rendered," but must look "to the basis on which 'the jury actually rested its verdict.'"  *Id.* at 279 (quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991).)  The lack of a proper reasonable doubt instruction means that there has been "no jury verdict of guilty-beyond-a-reasonable doubt," and "the entire premise of *Chapman* review is simply absent" because "the question whether the same verdict of guilty-beyond-a-reasonable doubt would have been rendered absent the constitutional error is utterly meaningless."  *Id.* at 280.  The inapplicability of harmless-error analysis was also clear, the Court held, because the right to a jury verdict of guilty beyond a reasonable doubt is a "'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function."  *Id.* at 281 (quoting *Rose*, 478 U.S. at 577.

19.  Under *Sullivan*'s reasoning, California's failure to require a reasonable doubt standard at the penalty phase is a structural error.  Like the defective verdict in *Sullivan*, the absence of any reasonable doubt instruction "vitiates *all* the jury's findings" at the capital phase of a California death penalty trial.  California death judgments do not rest on any "verdict within the meaning of the Sixth Amendment" because penalty phase juries are not instructed—indeed, not even required—to make the required findings for imposition of the death penalty unanimously or beyond a reasonable doubt.  There is thus no "jury verdict within the meaning of the Sixth Amendment" to which harmless error analysis could apply.  And, to the same extent discussed in *Sullivan*, the right to a jury verdict beyond a reasonable doubt is a "basic

(15cv1224)

protectio[n]" with immeasurable effects, not amenable to harmless error review. Indeed, even in cases where there was overwhelming evidence of aggravating factors, it is impossible to know whether Lucas's jury, or any jury, would have found the required balance of aggravating and mitigating factors, or the substantiality of aggravating factors, beyond a reasonable doubt had the jury been instructed on that standard.

20.     Both the Supreme Court and the Ninth Circuit have previously determined that *Ring/Apprendi* error is not structural, but instead is subject to harmless error analysis.  *Washington v. Recuenco*, 548 U.S. 212, 220-22 (2006); *Neder*, 527 U.S. at 17-19; *Murdaugh*, 724 F.3d at 1117.  These holdings should be reconsidered and reversed, at least where—as in California cases—the error lies not in failure to have a jury make the required findings but in the failure to require that it find them beyond a reasonable doubt.  First, where the jury is not instructed on reasonable doubt, there is no rational distinction between that error and the error held structural in *Sullivan*—a flawed reasonable doubt instruction.  Second, the reasoning of *Neder* and *Recuenco* is flawed and should be reexamined.  In *Neder*, on which *Recuenco* relied, the Supreme Court held that the failure to submit an element of a crime to the jury is not structural error under *Sullivan*, because it does "not 'vitiate *all* the jury's findings,'" but only those on the element that was improperly submitted to the judge, and thus does not necessarily render the trial "an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9.  But if the absence of a proper reasonable doubt instruction means there is no proper verdict, as *Sullivan* holds, there is no logical reason why the complete absence of any reasonable doubt instruction on one element should be any different.  At the very least, cases where the jury is never instructed on reasonable doubt are distinguishable from the facts in *Neder* and *Recuenco*, where the reasonable doubt standard was employed but by the wrong factfinder (a judge instead of a jury.)

### D.     Even If Harmless Error Analysis Applies, the Error Was Not Harmless

21.     Even assuming that harmless error does apply to the *Apprendi/Ring/Hurst* error here, Lucas's conviction should be reversed because the error "had substantial and

587

injurious effect or influence in determining the jury's [punishment phase] verdict."
*Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).)  Reversal is required under this standard "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 764-65.

22.     Here, it is impossible to say that the jury would not have chosen a life sentence over a death sentence had it been instructed to make the required findings unanimously and beyond a reasonable doubt.

## CLAIM 52:  CALIFORNIA'S DEATH PENALTY SYSTEM VIOLATES THE EIGHTH AMENDMENT'S BAN ON CRUEL AND UNUSUAL PUNISHMENT

1.     California's death penalty system is plagued by delay and dysfunction, to such an extent that it is arbitrary and serves no penological purpose.  It therefore violates the Eighth and Fourteenth Amendments to the United States Constitution.

### A.     California's Death Row System is Plagued by Extreme Delay[218]

2.     The extraordinary delays in California's death penalty system have been extensively documented by courts and scholars.  In *Jones v. Chappell*, the district court discussed undisputed data chronicling the various stages of this delay and concluded, based on that data, that California's death penalty system violates the Eighth Amendment.  *Jones v. Chappell*, 31 F. Supp. 3d 1050 (C.D. Cal., July 16, 2014), *reversed on procedural grounds*, *Jones v. Davis*, 806 F.3d 538, 541 (2015).)  The *Jones* court found in 2014 that, of the more than 900 people who had been sentenced to death in California since 1978,[219] only thirteen had actually been executed, 94 had died of

---

[218]   The Ninth Circuit is currently considering this same claim, that delays in California's death penalty scheme render it arbitrary and devoid of penological purpose in violation of the Eighth and Fourteenth Amendments, in *Alfaro v. Johnson*, Ninth Cir. case no. No 15-55337.

[219]   California's current death penalty system took effect in 1978, after California voters in 1977 approved Proposition 7, known as the Briggs initiative.

(15cv1224)

other causes, 39 had been granted relief from their death sentence and not been resentenced to death, and 748 remained on death row.  *Id.* at 1053-54.  Of those 748 individuals on death row, over 40 percent had been there longer than 19 years, and nearly all were still litigating the merits of their death sentences in state or federal court. *Id.*  For those inmates who are ultimately denied relief at every level of review, the process is likely to take over twenty-five years from sentence to execution, with the majority of that time spent litigating before the California Supreme Court.  *Id.*

3.      Delay first sets in at the direct appeal stage, where, because of underfunding by the state, an average of three to five years elapses before counsel is even appointed.[220]  Once counsel is appointed, briefing typically takes fewer than four years.  *Id.* at 1057.  After briefing, however, the parties must typically wait two or three more years before argument is scheduled and the case decided.  *Id.*  Thus, between 11.7 and 13.7 years typically elapse between imposition of the death sentence and the California Supreme Court's disposition of the direct appeal.  *Id.*

4.      Further delays arise on state collateral review, where underfunding again results  in delayed appointment of counsel.[221]  As of 2014, roughly half of California's death row was still waiting for state habeas corpus counsel to be appointed, and the backlog of inmates was growing.  *Id*. at 1058.  Though the California Supreme Court has said that habeas counsel should "ideally" be appointed shortly after imposition of a death sentence, inmates typically wait for between eight to ten years after the death sentence is handed down.  *Id.*  After the filing of the habeas corpus petition, the California Supreme court takes an average of approximately 48 months (four years) to issue a decision.  *Id.* at 1059.  Thus, by the time a death row inmate's appeal and "state

---

[220]  This delay likely results from a severe shortage of attorneys qualified to accept appointment to death penalty appeals, and the state's underfunding of its death penalty system and the Office of the State Public Defender.  *Id.*

[221]  As on direct appeal, indigent Death Row inmates are entitled to state-appointed counsel to prepare their habeas corpus petitions.  Cal. Gov't Code § 68662.

(15cv1224)

habeas petition[s] [are] decided, he will likely have spent a combined 17 years or more litigating [them] before the California Supreme Court." *Id.*

5. Once capital petitioners reach federal court, an average of 10.4 years elapses from the district court review through appeal and possible petitions for en banc and Supreme Court review. *Id.* at 1059. Much of this delay "is attributable to the need to exhaust state remedies and to conduct investigations" in federal habeas, because the California Supreme Court rarely grants fact development in the state habeas process. *Id.* (quoting Arthur L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. 697, 749 (2007).) Indeed, of the 729 habeas corpus petitions the California Supreme Court has adjudicated on the merits since 1978, it has held evidentiary hearings only 45 times. *Id.* When inmates return to state court to exhaust claims discovered in federal habeas, the California Supreme Court takes an average of 3.2 years to decide their exhaustion petitions. *Id.* at 1060.

## B. The Extraordinary Delays that Permeate California's Death Penalty System Render it Unconstitutional Under the Eighth Amendment

6. The extraordinary delays in California's death penalty system render it unconstitutional under the Eighth Amendment, for two reasons. First, the delays render California's system arbitrary, by removing any rational criterion for determining which among the hundreds of Death Row inmates will actually be executed. Second, the delays sap California's death penalty of any legitimate penological purpose.

### 1. California's Death Penalty is Unconstitutionally Arbitrary

7. In *Furman v. Georgia*, 408 U.S. 238 (1972) the Supreme Court held that the Eighth Amendment "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion) (describing the holding of *Furman*). In *Furman*, the Supreme Court struck down three state death penalty schemes after concluding that they provided "no meaningful basis for distinguishing

(15cv1224)

the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313.

8.      Like the death penalty statutes struck down in *Furman*, California's system provides no meaningful basis for determining who will receive the death penalty and who will not.  The extreme delay and unpredictability in California's system mean "that the death sentence is actually carried out against only a trivial few of those sentenced to death." *Jones*, 31 F. Supp. 3d at 1062.  Only a tiny percentage of individuals sentenced to death in California since 1978 have actually been executed, no one has been executed since 2006, and even if executions resumed California would "still be unable to execute the substantial majority of Death Row inmates" due to the large population of its Death Row. *Id.*[222]  Although some of the inmates currently on Death Row may be executed at some point in the future, those inmates' selection for execution will not depend on any logical criterion, such as the nature of their crimes, the number of victims, or even "the perhaps neutral criterion of . . . the order in which they arrived on Death Row." *Id.* at 1062.  Rather, it will depend on the wholly arbitrary factor of how quickly their cases proceeded though the state courts. *Id.*

## 2.      California's Death Penalty Lacks Any Valid Penological Purpose

9.      California's death penalty system also lacks any valid penological purpose, because "the execution of a death sentence is so infrequent, and the delays preceding it so extraordinary, that the death penalty is deprived of any deterrent or retributive effect it might once have had." *Id.* at 1063.  Executions in California are "so few and far between" that "[t]he reasonable expectation of an individual contemplating a capital crime in California . . . is that if he is caught, it does not matter whether he is sentenced to death—he realistically faces only life imprisonment." *Id.* at 1064.

---

[222]  The *Jones* court noted that "just to carry out the sentences of the 748 inmates currently on Death Row, the State would have to conduct more than one execution a week for the next 14 years." *Id.* at 1062.

(15cv1224)

10.    The delays in California's death penalty system also destroy any possible retributive purpose.  *See*, *e.g.*, *Coleman v. Balkcom*, 101 S. Ct. 2994, 2996 (1981) (Rehnquist, J., dissenting from the denial of certiorari) ("There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution."); *Ceja v. Stewart*, 134 F. 3d 1368, 1374 (9th Cir. 1998) (Fletcher, J., dissenting) ("[T]he ability of an execution to provide moral and emotional closure to a shocked community diminishe[s] as the connection between crime and punishment [becomes] more attenuated and more arbitrary.")  "In California, a Death Row inmate will likely wait at least 25 years before his execution becomes even a realistic possibility"—a fact that "simply cannot be reconciled with the asserted purpose of retribution."  *Jones*, 31 F. Supp. 3d at 1065.

### 3.    Lucas's Case Exemplifies These Problems

11.    Lucas's case exemplifies the delay, arbitrariness, and absence of penological justification discussed in *Jones*.  Lucas was sentenced to death on September 19, 1989, *twenty-seven years ago*.  His direct appeal was not decided until nearly twenty-five years later, on August 21, 2014.  Thus, Lucas's case was delayed in state court for the same amount of time it generally takes California Death Row inmates, on average, to complete their *entire cycle of state and federal review*.  *See Jones*, 31 F. Supp. 3d at 1054 ("For those whose challenge to the State's death sentence is ultimately denied at each level of review, the process will likely take 25 years or more.")  Given that his federal habeas proceedings are only now beginning, Lucas will almost certainly not face any possibility of execution for at least several more years.  Executing him well beyond thirty years after he was sentenced to death can serve no discernable penological goal.

## CLAIM 53:  EXECUTION BY LETHAL INJECTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

1.    Lucas cannot be lawfully executed because the method of execution in California is forbidden by state, federal and international law.  Lucas's sentence of

death is illegal and unconstitutional under the Eighth and Fourteenth Amendments, because execution by lethal injection, the method by which the State of California plans to execute him, violates the prohibition against cruel and unusual punishment.

2.     An execution procedure that involves "the unnecessary and wanton infliction of pain" violates the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition is not static, but is responsive to "evolving standards of decency," and "contemporary values concerning the infliction of a challenged sanction." *Id.* The Fourteenth Amendment guarantees that no person may be deprived of life, liberty, or property without due process of law. A violation of procedural due process requires a showing of "(1) a constitutionally protected interest in life, liberty, or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of [the challenged] procedures effecting the deprivation." *Bank of Jackson County v. Cherry*, 980 F.2d 1362, 1366 (11th Cir. 1993). A prisoner sentenced to death has a constitutionally protected interest in life, which is not extinguished by the conviction and death sentence. *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 281 (1998).

3.     To show that a particular method of execution is constitutionally cruel and unusual, a petitioner must show "that the method presents a risk that is 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Glossip v. Gross*, __ U.S. __, 135 S. Ct. 2726 (June 29, 2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)).

4.     At the time of the offenses in this case, lethal gas was the sole means of execution provided for under California law. In 1992, California added as an alternative means of execution "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections." Cal. Penal Code § 3604. The 1992 legislation allowed the inmate to select either lethal gas or lethal injection, and provided that if the inmate made no selection, execution would be by lethal gas.

5.     On October 4, 1994, Judge Patel of the United States District Court for the Northern District of California ruled that the use of lethal gas is cruel and unusual punishment, amounting to a violation of the Eighth Amendment. *Fierro v. Gomez*, 865 F.Supp. 1387 (N.D.Cal. 1994).  This judgment was affirmed on appeal. *Fierro v. Gomez*, 77 F.3d 301 (9th Cir. 1996).  On October 15, 1996, the judgment of the Ninth Circuit was vacated and remanded for reconsideration after Penal Code section 3604 was amended to require the use of lethal injection to carry out executions unless the inmate requested otherwise. *Gomez v. Fierro*, 519 U.S. 918 (1996).

6.     In 2006, former Judge Jeremy Fogel of the Northern District of California issued an order finding that California's actions and failures to act with respect to the implementation of its lethal-injection protocol resulted in an intolerable risk of a constitutional violation. *Morales v. Tilton*, 465 F. Supp. 2d 972, 981 (N.D. Cal. 2006).  To remedy this situation, California would have to undergo a "meaningful" review of its processes, which "must be undertaken with an openness to the idea of making significant improvements in the 'infrastructure' of executions." *Id.* at 983.

7.     The Governor's Office and the California Department of Corrections and Rehabilitation ("CDCR") have unsuccessfully attempted to establish a new protocol.  On July 30, 2010, the California Office of Administrative Law ("OAL") promulgated regulations of the Lethal Injection Protocol, effective August 29, 2010.  Cal. Code Regs. tit. 15, § 3349.  On December 19, 2011, however, the Marin County Superior Court held that the revised execution protocol was improperly enacted under California's Administrative Procedures Act ("APA").  This decision was upheld by the California Court of Appeals which found that the proposed regulations failed to substantially comply with the APA, and permanently enjoined CDCR from carrying out executions until their protocol complies with the APA. *Sims v. Dept. of Corrections and Rehab.*, 216 Cal. App. 4th 1059 (2013).  On October 27, 2015, the CDCR submitted proposed lethal injection regulations to the Office of Administrative Law, and it then solicited public comments.  However, Proposition 66, which was passed on

594

(15cv1224)

November 8, 2016, exempts lethal injections from the APA.  As of this date, it is unclear whether CDCR intends to complete the APA process or whether it will assert that its previously proposed regulations are valid, even absent APA approval.  If and when California enacts a revised protocol for the administration of lethal injection, the method must adhere to "standards established under the direction of the Department of Corrections."  Cal. Gov't Code § 3604(a).  Unless and until such standards have been properly formulated and implemented, imposition of the lethal injection method would deprive Lucas of his constitutional rights.[223]

8.      If, at a later date, lethal injection in California is held to be unconstitutional, the State may attempt to execute Lucas using lethal gas.  This method, too, constitutes cruel and unusual punishment in violation of the Eighth Amendment.  The State appears to have abandoned the use of lethal gas, as it has chosen not to go forward with that method of execution in the wake of its former protocol being declared invalid.  If, in the future, the State returns to that method of execution, Lucas will seek leave of this Court to challenge that execution method further.

9.      Although this claim may be unripe, Lucas raises it here to preserve his right to review.

**CLAIM 54:  CONSTITUTIONAL FLAWS IN THE DEATH QUALIFICATION JURY SELECTION PROCESS PRODUCED BIASED JURORS WHO VOTED FOR THE DEATH VERDICT WITHOUT FAIRLY CONSIDERING THE MITIGATING EVIDENCE (SHP VII(B))**

1.      The death qualification process used to select Lucas's jury resulted in violations of his federal and state constitutional rights to an impartial jury, reliable guilt and penalty determinations, and due process. U.S. Const. amends. V, VI, VIII, XIV;

---

[223] Because there is no protocol in place, the Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35 (2008), which held that Kentucky's particular lethal injection protocol did not pose a "substantial risk of serious harm," does not foreclose this claim.

Cal. Const. art. I, §§ 7, 15, 16; *Morgan v. Illinois*, 504 U.S. 719, 726 (1992); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Under *Wainwright v. Witt*, 469 U.S. 412 (1985), courts are required in capital trials like Lucas's to determine whether each juror is death-qualified—that is, whether his or her views would "prevent or substantially impair the performance of his [or her] duties as a juror"—in deciding fairly whether to sentence a defendant to death. *Id.* at 424. Jurors who would "be unalterably in favor of, or opposed to, the death penalty in every case . . . by definition are ones who cannot perform their duties in accordance with law." *Morgan,* 504 U.S. at 735. "[J]uror[s] who will automatically vote for the death penalty in every case" must be disqualified because their service on the jury would violate "the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment." *Id.* at 729.

2. Empirical studies show that the death qualification process under *Witt,* as used at Lucas's trial, does not guarantee jurors who will consider a life sentence and who will give meaningful consideration to a defendant's mitigation evidence. Studies of actual jurors who participated in capital trials show that many jurors who had been screened under the *Witt* standard, and considered "death-qualified," and who had decided a real capital defendant's fate, approached their task believing that the death penalty is the only appropriate penalty for many of the kinds of murder commonly tried as capital offenses. W. Bowers & W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing,* 39 Crim. L.Bull. 51, 58-62 (2003). Studies of California juries show that a substantial minority, and sometimes a majority of jurors, believed that the only appropriate punishment for the defendant in their case was death without meaningful consideration of mitigation. Bowers & Foglia, at 63; J. Blume, T. Eisenberg, & S. Garvey, *Lessons from the Capital Jury Project,* in Beyond Repair?: America's Death Penalty at 150-153 (2003); R.C. Dillehay & M.R. Sandy, *Life Under Wainwright v. Witt: Juror Dispositions and Death Qualification,* 20 L. & Hum. Behav. 147, 159-160 (1996). Studies show that evidence typically considered as mitigation legally, such as abuse as a child or good behavior in jail or prison, is often

596

not considered mitigation by capital jurors.  M. Sandys & S. McClelland, *Stacking the Deck for Guilt and Death: The Failure of Death Qualification to Ensure Impartiality,* in J. Acker, R. Bohm & C. Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction at 402-406 (2nd ed. 2003).  Findings from interviews of jurors in capital cases also show that the penalty determination is distorted by a preoccupation with evidence of guilt, a perception that death is required if aggravation is presented, and a pattern of failing to discuss and consider mitigation.  U. Bentele & W. Bowers, *How Jurors Decide on Death. Guilt is Overwhelming; Aggravation Requires Death and Mitigation is No Excuse,* 66 Brooklyn L.Rev. 1011, 1019-1031 (2001).  In short, the *Witt* death qualification process fails to provide impartial jurors who are not prone to imposing the death penalty and who are instead willing to give the defendant the individualized determination that is mandated under the federal Constitution.

3.     This empirical evidence is consistent with the behavior of Lucas's jury.  At least two of Lucas's jurors reached their decision to vote for death before hearing, and without considering, the mitigating evidence presented at the penalty trial.  (*See* Claim 27.)

4.     The recent empirical studies of attitudes and behavior of capital jurors, coupled with interviews of jurors in Lucas's case, demonstrate that Lucas was sentenced to death unconstitutionally by a jury predisposed to impose the death penalty and unwilling to provide an individualized determination of the appropriateness of that penalty. This evidence undermines confidence in the penalty determination and requires vacation of his conviction and sentence of death.

5.     The death qualification process was especially unreliable in Lucas's case because the trial judge precluded Lucas's counsel from asking the jurors about the impact of Lucas's prior rape conviction on their ability to be consider voting for a life sentence.  (*See* Claim 18.)

597

(15cv1224)

6.     The failure of the death qualification process used in Lucas's case to ensure impartial jurors also undermines confidence in the reliability of the guilt determinations.  Analysis of fourteen jury studies shows that the more an individual favors the death sentence the more he or she is also likely to be biased in favor of conviction.  Allen, Mabry & McKelton, *Impact of Juror Attitudes about the Death Penalty on Juror Evaluations of Guilt and Punishment: A Meta-Analysis,* 22 L. & Hum. Behav. 715, 721 (1988).  The process of questioning jurors regarding the willingness to impose the death penalty already tends to create an improper impression that guilt is a foregone conclusion and the only real issue is punishment.  C. Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process,* 8 L. & Hum. Behav. 121 (1984).  Individuals who are death qualified are also more likely to believe that failure to testify on one's own behalf implies guilt, are more trusting of prosecutors and of prosecution witnesses, and are less likely to trust defense attorneys and witnesses, including defense expert witnesses.  *See* S. Gross, *Lost Lives: Miscarriages of Justice in Capital Cases,* 61 L. & Contemp. Probs. 125, 147 (1999); C. Cowan, W. Thompson & P. Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation,* 8 L. & Hum. Behav. 53, 79 (1984); R. Fitzgerald & P. Ellsworth, *Due Process vs. Crime Control: Death Qualification and Jury Attitudes,* 8 L. & Hum. Behav. 31, 51 (1984).  Studies show that capital jurors, as in Lucas's case, are significantly more likely to convict than the pool of jurors in a non-capital case.  *See* J. Kadane, *A Note on Taking Account of the Automatic Death Penalty Jurors,* 8 L. & Hum. Behav. 115, 119 (1984).  The death qualification process in Lucas's case is likely to have resulted in jurors biased in favor of conviction thus undermining confidence in the reliability of the guilt and special circumstances determinations.  Lucas suffered prejudice from the constitutionally flawed process of death qualifying the jurors and is entitled to vacation of his convictions, special circumstance findings and death sentence.

598

**CLAIM 55:  THE PENALTY PHASE INSTRUCTIONS ARE UNCONSTITUTIONALLY VAGUE AND INCAPABLE OF BEING UNDERSTOOD BY JURORS (SHP VII(D))**

1.     Lucas's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because Penal Code § 190.3 and the corresponding jury instructions given in this case were vague and incomprehensible, failed to guide the jury's discretion, and resulted in arbitrary, capricious, and unreliable sentencing.  To the extent that any of the errors alleged in the present claim deprived Petitioner of the benefits of state law in which he had a liberty interest, he was deprived of equal protection and due process of law under the state and federal constitutions. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

2.     Before the jury began its penalty phase deliberations, the trial court issued pattern instructions that tracked the language of Penal Code § 190.3 regarding the factors the jury was to consider in determining whether Petitioner deserved the death penalty.

3.     Even when correctly instructed according to the law, jurors can and frequently do misapprehend the rules set forth to guide their discretion in determining whether the death penalty is an appropriate sentence.  A study of actual California jurors who have served in capital cases found that many jurors interviewed "simply dismissed mitigating evidence that had been presented during the penalty phase because they did not believe it 'fit in' with the sentencing formula that they had been given by the judge."  C. Haney et al., *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 (No. 2) J. of Social Issues 149, 167-168 (1994).  Other jurors interviewed "did not understand that it was supposed to be considered mitigating," and still "[o]ther jurors recognized mitigating evidence as such but then rejected or limited its significance by imposing additional conditions on the concept that would make it difficult to ever influence a capital verdict." *Id.*  The result was that "fully 8 out of the 10 California juries included persons who dismissed

mitigating evidence because it did not directly lessen the defendant's responsibility for the crime itself. . . .  In addition, 6 of the California juries [in the] study rejected mitigating evidence because it did not *completely* account for the defendant's actions." *Id.* at 167-68; *see also McDowell v. Calderon,* 130 F.3d 833 (9th Cir. 1997) (*en banc*), *overruled in part by Weeks v. Angelone,* 528 U.S. 225 (2000)(although jurors were "properly" instructed, the plain language of the jury's request for guidance demonstrated that eleven jurors were confused about the law and erroneously believed that they could not consider eight aspects of the defendant's background as mitigating evidence); *State v. Bey*, 548 A.2d 887, 910-911 (1988) (instructions on mitigating factors that merely restate the statutory text of the mitigating factors are inadequate because they do not explain the nature of the mitigating inference sought to be drawn).

4.  Another study of actual capital-case jurors in many states by the Capital Jury Project demonstrates virtually without exception a serious lack of understanding on the part of these jurors of many of the concepts at the core of the Eighth Amendment restrictions on the death penalty.  *See generally* W. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 Ind. L.J. 1043, 1077-1102 (1995); C. Haney, *Taking Capital Jurors Seriously*, 70 Ind. L.J. 1223 (1995).  These misunderstandings virtually always skew the process in favor of death.  *See* J. Luginbuhl & J. Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?* 70 Ind. L.J. 1161, 1176-1177 (1995).  One study summed up, "if the final penalty decision is death, there is a high probability [*i.e.*, more than a "reasonable likelihood"] that this final penalty verdict is partially a product of the faulty interpretation of the law."  Luginbuhl & Howe, 70 Ind. L.J. at 1180.

5.  The empirical data demonstrates that common understanding of these principles is so likely to be wrong that Lucas's jury's understanding cannot be relied upon consistent with the Eighth Amendment's requirement of heightened reliability in capital sentencing.  *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980).  Indeed, "in both experimental and real capital jury decision-making . . . people show serious

(15cv1224)

comprehension problems."  V. Hans, *How Juries Decide Death: The Contributions of the Capital Jury Project*, 70 Ind. L.J. 1233, 1239 (1995).

6.     Allowing the decision for life or death to turn on a concept misunderstood, to the defendant's detriment, by most actual and prospective jurors, violates the Eighth Amendment's requirement of reliability in capital cases.  There is nothing in the record of Lucas's trial or sentencing proceedings to suggest that the jurors had any extraordinary ability to understand these commonly misunderstood factors.

7.     Factor (a), which directs the jury to consider the "circumstances of the crime," is unconstitutionally vague not in an abstract sense, *see Tuilaepa v. California*, 512 U.S. 967 (1994), but because it fails to identify any circumstances or types of circumstances that the jury may consider *in order to distinguish the offense from other offenses not subject to the death penalty or to make clear that there may be mitigating aspects to the circumstances of the crime*.  Furthermore, factor (a) allows the sentencer to consider the presence of *any* special circumstance findings.  The sentencer's discretion is therefore not properly channeled because all capital cases have at least one special circumstance; using factor (a), a jury cannot know how to distinguish a death-worthy case from one that is not death-worthy. For these reasons, factor (a) did not constitutionally guide Lucas's jury in determining whether death was the appropriate punishment.  *Furman*, 408 U.S. at 247.

8.     Factor (b) directs the jury to consider evidence of prior violent criminal conduct:

> The presence or absence of criminal activity by the defendant, other than the crime(s) for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

9.     Factor (b) improperly allows the jury to consider the defendant's alleged criminal conduct without requiring that the jury unanimously agree that he is guilty of

(15cv1224)

each—or any—of the alleged crimes beyond a reasonable doubt. Thus, the jurors were not required to adequately consider the evidence Lucas presented to show that he was not guilty of the prior rape for which he was convicted. (*See* Dkt. 36-30, 2008 State Pet. Ex. 42; AOB 1-21 at131, continued on Dkt. 36-31 p.1.)

10. The jury's improper consideration of factor (a) and (b) evidence violated Lucas's rights to due process under the Fourteenth Amendment to the United States Constitution, and to a fair, accurate and non-arbitrary sentencing determination under the Eighth Amendment to the United States Constitution. And the consideration of aggravating acts under factor (b) in violation of state law deprived Lucas of his state-created liberty interest in violation of due process and equal protection. *Hicks*, 447 U.S. at 346. The instructions also failed to explain, and likely misled the jury regarding, the nature and scope of mitigating and aggravating evidence.

11. Particularly in the absence of written findings, there is grave danger that Lucas's jury had the same sort of misunderstandings that most jurors have been shown to have concerning the meaning of the sentencing factors and that it sentenced Lucas to die because of those misconceptions, in violation of his right to equal protection and to his right to a fair trial and reliable, non-arbitrary and individualized penalty verdict reached through due process of law and protected by the Eighth Amendment. Because it is reasonable likely that the jury applied instructions given in an unconstitutional manner, vacation of Lucas's death sentence is mandated under the Eighth and Fourteenth Amendments.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Petitioner David Allen Lucas prays that this Court:

1. Permit Lucas, who is indigent, to proceed without prepayment of costs and fees;

2. Order Respondent to answer this Petition by specifically admitting or denying each allegation and claim herein;

602

(15cv1224)

3.      Require Respondent to bring forth the entire state court record from Lucas's state trial, appellate, and habeas actions so that this Court can review those parts of the record that are relevant to the issues and defenses raised in this proceeding;

4.      Grant Lucas the authority to obtain subpoenas in forma pauperis for witnesses and documents necessary to prove the facts alleged in this Petition;

5.      Grant Lucas and his counsel the right to conduct discovery, including the right to take depositions, request admissions, and propound interrogatories, as well as the means to preserve the testimony of witnesses;

6.      Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this Petition or any affirmative defenses presented by Respondent;

7.      Grant Lucas a stay of execution pending final disposition of this matter;

8.      Permit Lucas to amend this Petition, if necessary; to allege any other basis for his unconstitutional confinement as it is discovered or becomes ripe for federal habeas review,

9.      After full consideration of the issues raised in this Petition, issue a writ of habeas corpus to the end that Lucas might be discharged from his unconstitutional confinement and restraint and relieved of his unconstitutional convictions and sentence of death;

(15cv1224)

10.     Grant such other and further relief as may be appropriate and necessary to dispose of the matter as justice may require.

Respectfully submitted,

Hilary Potashner
Federal Public Defender

Dated:  November 22, 2016          By:  */s/ Rose D. Angulo*
_____
ROSE D. ANGULO
LAUREN COLLINS
Deputy Federal Public Defenders
CELESTE BACCHI
Legal Research and Writing Specialist

Attorneys for Petitioner
DAVID ALLEN LUCAS

(15cv1224)

**VERIFICATION**

I, Rose D. Angulo, declare as follows:

10.     I am an attorney with the Office of the Federal Public Defender for the Central District of California, and am admitted to practice in the State of California and in this Court.  I represent Petitioner David Allen Lucas in his federal habeas corpus proceeding, *Lucas v. Davis*, CV 15-01224-GPC (WVG).  I make this verification as someone acting on behalf of Mr. Lucas pursuant to 28 U.S.C. §2242.

11.     Petitioner is confined and restrained of his liberty in Marin County at San Quentin State Prison, San Quentin, California, by Ron Davis, the warden of San Quentin Prison.  I make this verification on Petitioner's behalf because the matters set forth in this petition are more within my knowledge than his, and because he is incarcerated in a county different from that in which my office is located and the county in which this petition will be filed.

12.     I have read the foregoing petition and am familiar with its contents.  Some of the information contained in the petition is information that I know to be true and correct based on my personal knowledge.  The remaining information in the petition is true and correct to the best of my knowledge, information, belief, and understanding.

I declare under penalty of perjury under the laws of the United States of America and the state of California that the foregoing is true and correct.  Executed on November 22, 2016, at Los Angeles, California.


*/s/ Rose D. Angulo*
ROSE D. ANGULO

(15cv1224)

1

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California; that my business address is the Office of the Federal Public Defender, 411 W. 4th Street, Suite 7110, Santa Ana, California 92701, Telephone No. (714) 338-4500; and at whose direction, on November 22, 2016, I electronically filed the **PETITION FOR WRIT OF HABEAS CORPUS** with the clerk of the court for the U.S. District Court, Southern District of California, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

Holly Wilkens
Office of the Attorney General
110 West A Street, Ste. 1100
San Diego, CA 92101-5266

Michael Thomas Murphy
Office of the Attorney General
110 West A Street, Ste. 1500
San Diego, CA  92101-5266


*/s/  Rose D. Angulo*
ROSE D. ANGULO